# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| CITY OF PHILADELPHIA,<br><br>    PLAINTIFF,<br><br>v.<br><br>CVS HEALTH CORPORATION; CVS PHARMACY, INC.; CAREMARK RX, LLC; CAREMARK, LLC; CAREMARKPCS HEALTH, LLC; ADVANCERX.COM, LLC (D/B/A CAREMARKPCS PENNSYLVANIA MAIL PHARMACY, LLC); EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; MEDCO HEALTH SOLUTIONS, INC.; ESI MAIL ORDER PROCESSING, INC.; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; EVERNORTH HEALTH, INC. (F/K/A EXPRESS SCRIPTS HOLDING COMPANY); EXPRESS SCRIPTS SPECIALTY DISTRIBUTION SERVICES, INC.; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMINSIGHT, INC.; OPTUMINSIGHT LIFE SCIENCES, INC.; OPTUMRX, INC.; OPTUMRX DISCOUNT CARD SERVICES, LLC; OPTUM PERKS, LLC; OPTUMHEALTH CARE SOLUTIONS, LLC; OPTUMHEALTH HOLDINGS, LLC; AND OPTUMHEALTH NETWORKS, INC.,<br><br>    DEFENDANTS. | CIV. ACTION NO. 2:25-cv-6185<br><br><br><br>**COMPLAINT**<br><br>(JURY TRIAL DEMANDED) |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................... 6

III.  PARTIES ............................................................................................. 7

    A.    Plaintiff ...................................................................................... 7

    B.    The Pharmacy Benefit Manager (PBM) Defendants ............... 8

        1.    The CVS Caremark Defendants ...................................... 8

        2.    The Express Scripts Defendants .................................... 15

        3.    The Optum Defendants .................................................. 22

IV.   THE ROLE OF PBMS IN PRESCRIPTION DRUG TRANSACTIONS ....... 33

    A.    PBMs Operate on All Sides of Prescription Drug Transactions ......... 33

    B.    PBMs Use Their Formularies as Leverage to Negotiate with Drug Manufacturers ................................................................. 36

        1.    CVS Caremark's Formularies ....................................... 41

        2.    Express Scripts' Formularies ....................................... 43

        3.    OptumRx's Formularies ................................................ 45

    C.    PBMs' Drug Utilization Management (UM) Programs ..................... 46

    D.    PBMs Contract Directly with Pharmacies ........................................ 48

V.    THE PBM DEFENDANTS' ROLE IN CAUSING THE OPIOID CRISIS .... 49

    A.    The PBM Defendants Had Access to Real-Time Data Regarding Drug Utilization Which Gave Them a Unique Vantage Point into the Opioid Epidemic ...................................................... 49

        1.    The PBM Defendants Track Every Prescription Claim They Process, Across All the Health Plans They Service, Which Provided Them with Uniquely Granular and Comprehensive Data ................................................. 50

**TABLE OF CONTENTS**

                                                                                                        Page

2.    The PBM Defendants Had Knowledge of the Opioid
      Epidemic, Abuse, and Diversion ................................................. 55

3.    The PBM Defendants Failed to Timely Undertake Actions
      to Address the Opioid Epidemic that They Helped Create ...... 66

      a.    The PBM Defendants chose not to use their claims
            data, formulary, and UM offerings to address
            overprescribing, abuse, and diversion ........................... 68

      b.    The PBM Defendants chose not to use their Drug
            Utilization Review (DUR) tools to address
            overprescribing, abuse, and diversion ........................... 80

      c.    The PBM Defendants failed to use their vast stores
            of data, formulary, UM offerings, and DURs to
            provide effective controls against diversion and/or
            to prevent the diversion and abuse of opioids .............. 84

B.    The PBM Defendants and the Opioid Manufacturers Colluded to
      Ensure Virtually Unfettered Access to Opioids ................................. 86

      1.    The PBM Defendants Granted Opioid Manufacturers
            Favorable Placement on National Formularies in
            Exchange for Rebates and Other Fees .................................... 86

      2.    The PBM Defendants and the Opioid Manufacturers
            Worked Together to Limit the Use of UM Measures for
            Opioids ................................................................................ 101

      3.    The PBM Defendants Misrepresented that They Were
            Using Their Formularies to Promote Safe Use and
            Appropriate Prescribing of Opioids ........................................ 104

C.    The PBM Defendants Conspired with the Opioid Manufacturers
      to Expand the Opioid Market and Increase Opioid Utilization ....... 108

D.    The PBM Defendants Conspired with the Opioid Manufacturers
      in the Deceptive Marketing of Opioids Throughout the Opioid
      Epidemic ........................................................................................... 109

# TABLE OF CONTENTS

Page

    1.    The PBM Defendants Disseminated the Opioid Manufacturers' Deceptive Propaganda .................................. 111

    2.    The PBM Defendants' Affiliated Entities Provided Research, Data, and Consulting to the Opioid Manufacturers to Expand the Opioid Market ....................... 122

E.    CVS Caremark, Express Scripts, and Optum Implemented Protocols to Address the Opioid Epidemic Two Decades Too Late .. 127

F.    Even After Implementing its Opioid Risk Management Program, Optum Continued Promoting Uncontrolled Opioid Sales Through Its Cash Card and Discount Card Businesses .................. 132

VI.    AS MAIL-ORDER PHARMACIES, CVS CAREMARK, EXPRESS SCRIPTS, AND OPTUMRX DISPENSED OPIOIDS IN VIOLATION OF THE CONTROLLED SUBSTANCES ACT (CSA) AND THE PENNSYLVANIA CONTROLLED SUBSTANCE, DRUG, DEVICE AND COSMETIC ACT OF 1972 (PCSA) ...................................................... 134

A.    The Applicable Statutes ................................................................ 134

    1.    The Controlled Substances Act (CSA) ................................... 134

    2.    The Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act of 1972 (PCSA) ........................................ 139

    3.    Pharmacies Are Obligated Not to Fill Prescriptions Until All Red Flags Are Resolved .................................................... 141

    4.    The CSA Applies to All Persons Who Dispense Controlled Substances ............................................................................. 144

B.    The PBM Defendants Violated the CSA and the PCSA .................. 145

VII.    THE PBM DEFENDANTS CONTRIBUTED TO THE PUBLIC HEALTH CRISIS IN PHILADELPHIA ....................................................... 151

A.    Public Health Impacts of the Opioid Epidemic in Philadelphia ...... 155

    1.    Fatal Opioid Overdoses .......................................................... 155

# TABLE OF CONTENTS

Page

2.  Opioid Use and Adverse Health Consequences in Philadelphia Repeat the National Pattern Linked to Prescription Opioids for Medical Uses ................................... 157

   a.  Opioid Addiction and Opioid Use Disorder (OUD) ...... 157

   b.  Opioid Addiction and Opioid Use Disorder (OUD) ...... 158

B.  Public Safety Impacts of the Opioid Epidemic in Philadelphia ....... 161

C.  The Opioid Epidemic Has Greatly Increased the City's Costs ......... 167

   1.  City-Funded Public Medical Costs ........................................... 167

   2.  The City's Increased Costs of Emergency Services ............... 169

   3.  The City's Increased Public Safety and Criminal Justice Costs ........................................................................ 171

   4.  The City's Increased Public Awareness Costs ....................... 173

   5.  The Opioid Epidemic Will Lead to Further Increased Costs to the City. ................................................................ 175

D.  The City's CVS Caremark Contracts .................................................. 177

VIII.  FACTS PERTAINING TO THE FORMULARY & UTILIZATION MANAGEMENT (UM) ENTERPRISE ......................................... 181

A.  Formation of the Formulary & UM Enterprise ................................ 187

B.  The Common Purpose and Fraudulent Scheme of the Formulary & UM Enterprise. .................................................................. 200

C.  Conduct and Participation of the Formulary & UM Enterprise Through a Pattern of Racketeering Activity ..................................... 215

IX.  PLAINTIFF'S CLAIMS ARE TIMELY/TOLLING STATUTES OF LIMITATION .................................................................... 222

A.  Enforcement of a Public Right ........................................................... 222

B.  Tolling Doctrines .............................................................................. 222

## TABLE OF CONTENTS

Page

    1.    Discovery Rule ............................................................ 222

    2.    Equitable Estoppel ...................................................... 224

    3.    Fraudulent Concealment............................................. 225

    4.    Continuing Violations................................................. 226

X.    SUCCESSOR LIABILITY ................................................ 227

XI.    ALTER EGO LIABILITY .................................................. 228

XII.    FACTS PERTAINING TO CIVIL PENALTIES AND PUNITIVE DAMAGES ..................................................................... 228

XIII.    CLAIMS FOR RELIEF ..................................................... 231

First Claim for Relief—Public Nuisance (Brought By Plaintiff Against All Defendants)................................................................ 231

Second Claim for Relief—Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law—73 P.S. §§ 201-1 to 201-9.3 (Brought By Plaintiff Against All Defendants)................... 239

Third Claim for Relief—Violation of PHILADELPHIA CONSUMER PROTECTION Ordinance—Phila. code § 9-6301(i)–(xxii) (Brought By Plaintiff Against All Defendants)................................ 244

Fourth Claim for Relief—Negligence and Gross Negligence (Brought By Plaintiff Against All Defendants)................................. 247

Fifth Claim for Relief—Violation of Federal Civil RICO—18 U.S.C. 1961, et seq.; 1964(c) (Brought By Plaintiff Against All Defendants) ....................................................................... 252

Sixth Claim for Relief—Civil Conspiracy (Brought By Plaintiff Against All Defendants)................................................................ 264

Seventh Claim for Relief—Concerted Action (Brought By Plaintiff Against All Defendants)..................................................... 268

Eighth Claim for Relief—Breach of Contract (Brought By Plaintiff Against CVS Caremark) ..................................................... 273

## TABLE OF CONTENTS

Page

XIV.  PRAYER FOR RELIEF ................................................................................ 275

XV.   JURY DEMAND ........................................................................................ 276

Plaintiff City of Philadelphia ("Plaintiff" or "City"), by and through the undersigned attorneys, brings this action against:

- CVS Health Corporation; CVS Pharmacy, Inc.; Caremark Rx, LLC; Caremark, LLC; CaremarkPCS Health, LLC; and AdvanceRx.com, LLC (d/b/a CaremarkPCS Pennsylvania Mail Pharmacy, LLC) (collectively, "CVS Caremark");

- Express Scripts, Inc.; Express Scripts Administrators, LLC; Medco Health Solutions, Inc.; ESI Mail Order Processing, Inc.; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Evernorth Health, Inc. (formerly Express Scripts Holding Company); and Express Scripts Specialty Distribution Services, Inc. (collectively, "Express Scripts"); and

- UnitedHealth Group, Inc.; Optum, Inc.; OptumInsight, Inc.; OptumInsight Life Sciences, Inc.; OptumRx, Inc.; OptumRx Discount Card Services, LLC; Optum Perks, LLC; OptumHealth Care Solutions, LLC; OptumHealth Holdings, LLC; and Optum Health Networks, Inc. (collectively, "Optum").

Together, CVS Caremark, Express Scripts, and Optum are referred to herein as "PBM Defendants."

Plaintiff alleges as follows:

## I.    INTRODUCTION

1.    In late 2021, the PBM Defendants began producing highly confidential documents and information in response to civil discovery requests served in *In re: National Prescription Opiate Litigation*, No. 1:17-md-2804-DAP (N.D. Ohio) and other pharmaceutical litigation.  These court-ordered disclosures would ultimately reveal to the public—for the first time—precisely how the PBM Defendants worked closely with opioid manufacturers, distributors, and pharmacies to increase the

prescribing, dispensing, and sales of prescription opioids across the nation for more than two decades.[1]

2.    Accordingly, this action targets the PBM Defendants—a group of indispensable participants in the country's prescription opioid supply and payment chain—whose critical role in stoking and extending Philadelphia's decades-long opioid epidemic had previously been fully, cleverly, and deliberately concealed.

3.    Pharmacy Benefit Managers ("PBMs"), like the PBM Defendants, provide a variety of pharmacy benefit management services (described in detail *infra*) to prescription drug benefit plans sponsored by health insurers, self-insured employers, and state and federal government agencies. PBMs sit at the center of prescription drug dispensing because they contract with the manufacturers who make the drugs, the pharmacies who dispense them, and the third-party payors who pay for them.

4.    The PBM Defendants are: (1) the three largest PBMs in the United States, collectively managing prescription drug coverage for 200+ million covered lives and processing billions of claims per year; (2) three of the top five dispensing pharmacies in the United States; (3) owned by three of the largest insurance

---

[1] Accordingly, a number of tolling doctrines apply to the City's claims against the PBM Defendants (*see, infra* ¶¶ 671-91). Moreover, claims brought pursuant to the Philadelphia Consumer Protection Ordinance (Phila. Code § 9-6301(i)–(xxii)) and Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S. §§ 201-1 *et seq.)* apply retroactively to the PBM Defendants' conduct.

companies in the world (UnitedHealth Group, Cigna, and Aetna); and (4) among the largest healthcare data, consulting, and analytics companies in the United States.[2]

5.    For as long as they have been PBMs, the PBM Defendants—CVS Caremark, Express Scripts, and OptumRx—have received, analyzed, and tracked detailed claims data for the billions of prescriptions they process each year, including opioid prescriptions.  Accordingly, the PBM Defendants quite literally tracked the opioid epidemic, pill by pill, as it unfolded over the last two decades.

6.    The PBM Defendants' wrongful conduct that drove the prescribing and dispensing increases which led to the oversupply of opioids in Philadelphia includes:

(a)    colluding with, and aiding and abetting, Purdue Pharma, L.P. ("Purdue") and other opioid manufacturers in fraudulent and deceptive marketing about, *inter alia*, the risks and benefits of prescription opioids, including OxyContin;

(b)    colluding with Purdue and other opioid manufacturers to eliminate or limit utilization management ("UM") measures on national formularies[3] —lists of drugs covered by an insurance plan's pharmacy benefit —that would have restricted opioid prescribing;

---

[2] It is estimated the PBM Defendants control nearly 80% of the market for prescription claims. *Confidential Files Detail PBMs' Backroom Negotiations—and Their Role in the Opioid Crisis*, October 11, 2024; https://www.barrons.com/articles/pbm-drug-prices-insulin-opioid-crisis-dcf9e83c (last accessed August 15, 2025).

[3] Formularies control which drugs are available to the PBM Defendants' covered lives.

(c)     colluding with Purdue and other opioid manufacturers to increase opioid sales through favorable placement on national formularies in exchange for rebates and fees[4];

(d)     deliberately failing to properly and diligently implement effective drug utilization review ("DUR") measures after representing to clients they would do so;

(e)     electing to sell—instead of act upon—the vast stores of data they had about the epidemic to limit the flood of opioids into communities across the United States, including Philadelphia; and

(f)     dispensing huge quantities of prescription opioids through their mail-order pharmacies without proper controls against diversion and/or absent valid prescriptions issued for a legitimate medical purpose, as required by the Controlled Substances Act ("CSA") and the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act of 1972 ("PCSA").

7.      As a direct result of the PBM Defendants' misconduct, individually, and in colluding with each other and with opioid manufacturers, Philadelphia remains engulfed in an opioid epidemic that has led to a public health and safety crisis of an unprecedented nature.

8.      In 2022, the Philadelphia Department of Public Health ("PDPH") reported 1,413 overdose deaths—an 11% increase from 2021.  83% of those overdose

---

[4] In fact, in just a 12-month period ending in late 2017, the PBM Defendants received approximately $400 million in rebates and fees from Purdue alone. *Confidential Files Detail PBMs' Backroom Negotiations—and Their Role in the Opioid Crisis*, October 11, 2024; https://www.barrons.com/articles/pbm-drug-prices-insulin-opioid-crisis-dcf9e83c (last accessed August 15, 2025).

deaths involved opioids.[5]  In 2023, the PDPH reported 1,315 overdose deaths, the seventh straight year it reported more than 1,100 such deaths.[6]

9.    Just last year, the newly elected Mayor of Philadelphia issued an Executive Order declaring a City-wide "public safety emergency" upon finding that "open-air drug markets continue to proliferate, scourge our communities, and inflict harm upon residents in their immediate proximity and our City as a whole[.]"[7]

10.    Philadelphia's opioid epidemic continues to otherwise interfere with public health, safety, and peace, as well as the public estate, including the enjoyment of the City's historic neighborhoods, parks, streets, and public spaces.  The epidemic has damaged the community as a whole, causing a marked decline in the City's public order, public safety, economic productivity, and quality of life.

11.    Moreover, the opioid epidemic has required the City to significantly increase its municipal services at dramatically increased cost, thereby shifting the imposition of the social costs of the opioid epidemic from those responsible—the PBM Defendants—to the City and its tax-paying residents.

12.    Justice requires that the PBM Defendants promptly and fully abate the public nuisance they have caused, exacerbated, and extended in Philadelphia.

---

[5]  https://www.phila.gov/2023-10-02-philadelphia-records-more-than-1400-overdose-deaths-in-2022-deaths-among-black-residents-rose-nearly-20/ (last accessed August 15, 2025).

[6]https://public.tableau.com/app/profile/pennsylvania.pdmp/viz/PennsylvaniaODSMP DrugOverdoseSurveillanceInteractiveDataReport/Contents (last accessed August 15, 2025).

[7] https://www.phila.gov/media/20240103134300/Executive-Order-2024-01.pdf (last accessed August 15, 2025),

Accordingly, the City brings claims against the PBM Defendants for public nuisance, violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, violation of the Philadelphia Consumer Protection Ordinance, negligence and gross negligence, violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), civil conspiracy, concerted action, and breach of contract.

13.    The claims asserted herein are brought solely by the City for communal harms and are wholly independent of any claims for injuries that individual users of opioids may have against the PBM Defendants.[8] Moreover, all of the extraordinary communal harms sustained by the City derive directly from the PBM Defendants' misconduct.

## II.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 because Plaintiff's claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*., raise a federal question. This Court has supplemental jurisdiction over the Plaintiff's state-law claims under 28 U.S.C. § 1367 because those claims are so related to the RICO claim as to form part of the same case or controversy.

15.    This Court has personal jurisdiction over the PBM Defendants because the causes of action alleged in this Complaint arise out of the PBM Defendants' transacting business in Pennsylvania, contracting to supply services or goods in this

---

[8] The City does not bring this action on behalf of a class or any group of persons that can be construed as a class.

state, causing tortious injury by an act or omission in this state, and because the PBM Defendants regularly do or solicit business or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in this state. The PBM Defendants have purposefully directed their actions towards Pennsylvania and/or have the requisite minimum contacts with Pennsylvania to satisfy any statutory or constitutional requirements for personal jurisdiction.

16. In the alternative, the Court has personal jurisdiction over the PBM Defendants under 18 U.S.C. § 1965(b) as to Plaintiff's RICO claims and pendant personal jurisdiction over the PBM Defendants as to Plaintiff's other claims, all of which arise out of a common nucleus of operative facts.

17. Venue is proper in this district pursuant to 28 U.S.C. § 1407.

## III. PARTIES

### A. Plaintiff

18. The City of Philadelphia is a municipal corporation. It is the largest city in the Commonwealth of Pennsylvania and sixth-largest city in the United States. Philadelphia is home to approximately 1.6 million residents.

19. The City of Philadelphia includes Philadelphia County, which is merged with the City. They are collectively referred to herein as the "City of Philadelphia," "City," or "Philadelphia."

20. The City provides a wide range of social services on behalf of Philadelphia residents, including health-related services. In addition, the City administers and/or provides funding for the Philadelphia Police Department, Philadelphia Fire Department, the District Attorney's Office, the Defender

Association of Philadelphia, the Philadelphia Department of Health, the Philadelphia Department of Behavioral Health and Intellectual disAbility Services, the Philadelphia Department of Human Services, and other public health and safety departments, and agencies.

21.    The City is one of the largest employers in Pennsylvania, employing thousands of individuals throughout its numerous departments and agencies.

22.    References to the City refer to the City as a municipality, including residents within its borders, the community as a whole, and the City government itself, consisting of its departments and agencies.

23.    Plaintiff has standing to bring this action to protect the public health, safety and welfare of its citizens.

**B.    The Pharmacy Benefit Manager (PBM) Defendants[9]**

**1.    The CVS Caremark Defendants**

24.    **Defendant CVS Health Corporation** ("CVS Health") is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.

25.    Until September 2014, CVS Health was known as CVS Caremark Corporation ("CVS Caremark").

---

[9] The City has made its best efforts, based on the information available, to identify all of the corporate entities with responsibilities related to the sale, distribution, and dispensing of opioids in or affecting the City. If information that becomes available to the City alters its understanding or discloses additional entities, the City reserves the right to seek to join any such entities as defendants. Furthermore, the City recognizes that corporate entities affiliated with the PBM Defendants may possess discoverable information relevant to the City claims, even though those

26.    CVS Health's connections to Pennsylvania are substantial and deep-rooted.  For example, on October 8, 2013, at an informational hearing before the Commonwealth of Pennsylvania's House of Representatives addressing proposed PBM legislation, a consultant for CVS Caremark testified that the company: (a) employed over 12,000 people in Pennsylvania; (b) owned Pennsylvania real estate; (c) paid Pennsylvania real estate taxes; (d) operated over 400 pharmacies in Pennsylvania; (e) operated a specialty pharmacy in Monroeville, Pennsylvania that dispenses specialty drugs and employed approximately 1,200 people; (f) operated a mail service pharmacy in Wilkes Barre, Pennsylvania that employed more than 600 people and dispensed approximately 500,000 prescriptions per week; (g) operated 22 Minute clinics; and (h) processed 52 million claims and dispensed over 40 million prescriptions in Pennsylvania in 2012.

27.    CVS Health transacts business and has locations throughout the United States, including Philadelphia.

28.    CVS Health—through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice Presidents, and Chief Communication Officers—creates and implements company policies that inform its PBM services and formulary construction, including prescription opioids.

---

entities have not been named as defendants. The City reserves the right to seek all information relevant to these claims.

29. On a regular basis, CVS Health executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

30. CVS Health has the largest PBM market share based on total prescription claims managed. Its pharmacy benefit management services segment provides, among other things, plan design offerings and administration, formulary management, retail pharmacy network management services, mail-order pharmacy, specialty pharmacy and infusion services, clinical services and medical spend management.

31. In each annual report for at least the last decade, CVS Health (or its predecessors) has repeatedly and explicitly stated that it:

- designs pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members;

- negotiates with pharmaceutical companies to obtain discounted acquisition costs for many of the products on CVS Health's drug lists, and these negotiated discounts enable CVS Health to offer reduced costs to clients; and

- utilizes an independent panel of doctors, pharmacists, and other medical experts, referred to as its National Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on its drug lists.[10]

32. CVS Health is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout Pennsylvania, including Philadelphia. According to CVS Health's 2022 Form 10-K filed with the

---

[10] CVS Health Annual Report (Form 10-K) (FYE Dec. 31, 2009-2022). *See also* https://www.caremark.com/portal/asset/FormDevMgmt.pdf (last accessed August 15, 2025).

U.S. Securities and Exchange Commission, the company "maintains a national network of approximately 66,000 retail pharmacies, consisting of approximately 40,000 chain pharmacies (which include CVS Pharmacy locations) and approximately 26,000 independent pharmacies, in the United States."[11]

33.    **Defendant CVS Pharmacy, Inc.** ("CVS Pharmacy") is a Rhode Island corporation whose principal place of business is at the same location as CVS Health.

34.    CVS Pharmacy, a wholly owned subsidiary of CVS Health, has been registered to do business in the Commonwealth of Pennsylvania since 1997. It may be served through its registered agent: CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101.

35.    CVS Pharmacy is the immediate parent of more than 30 entities that own and operate retail pharmacies throughout the United States, including Philadelphia, that are directly involved in and profit from CVS Health's conduct.

36.    CVS Pharmacy holds one pharmacy license (d/b/a CVS Pharmacy Central Pharmacy Services #10435) in Pennsylvania.

37.    CVS Pharmacy is also the immediate and direct parent of Defendant Caremark Rx, LLC.

38.    **Defendant Caremark Rx, LLC** ("Caremark Rx") is a Delaware limited liability company whose principal place of business is at the same location as CVS Health.

---

[11] CVS Health Annual Report (Form 10-K) (FYE Dec. 31, 2022).

39.     Caremark Rx is the immediate or indirect parent of several of CVS Health's pharmacy benefit management, specialty mail-order, and retail specialty pharmacy subsidiaries that engaged in the activities in Pennsylvania that gave rise to this Complaint.

40.     Caremark Rx, a subsidiary of both CVS Pharmacy and CVS Health, may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

41.     **Defendant Caremark, LLC** ("Caremark, LLC") is a California limited liability company whose principal place of business is at the same location as CVS Health.

42.     Caremark, LLC is a subsidiary of Caremark Rx, which is a subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of CVS Health.

43.     Caremark, LLC is and has since 2007 been registered to do business in Pennsylvania. Caremark, LLC may be served through its registered agent: CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101.

44.     Caremark, LLC (d/b/a CVS/Specialty) holds one pharmacy license in Pennsylvania.

45.     Caremark, LLC provided PBM and mail-order pharmacy services in Pennsylvania that gave rise to this Complaint.

46.    **Defendant CaremarkPCS Health, LLC** (d/b/a CVS Caremark) ("CaremarkPCS Health") is a Delaware limited liability company whose principal place of business is at the same location as CVS Health.

47.    CaremarkPCS Health is a subsidiary of CaremarkPCS, LLC, which is a subsidiary of Caremark Rx, which is a subsidiary of CVS Pharmacy, which is a wholly owned subsidiary of CVS Health.

48.    CVS Health owns all the stock of CVS Pharmacy, which owns all the stock of Caremark Rx, which owns all the stock of Caremark LLC. CVS Health directly or indirectly owns CaremarkPCS Health in its entirety.

49.    CaremarkPCS Health is and has since 2015 been registered to do business in the Commonwealth of Pennsylvania. CaremarkPCS Health may be served through its registered agent: CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101.

50.    CaremarkPCS Health provided PBM services to Plaintiff in Philadelphia that gave rise to this Complaint.

51.    **Defendant AdvanceRx.com, LLC** (d/b/a CaremarkPCS Pennsylvania Mail Pharmacy, LLC) ("AdvanceRx.com") is a Delaware limited liability company whose principal place of business is 1 Great Valley Blvd, Wilkes Barre, Pennsylvania 18706-5324.

52.    AdvanceRx.com is a subsidiary of Caremark Rx.

53.    AdvanceRx.com is registered to do business in the Commonwealth of Pennsylvania. AdvanceRx.com may be served through its registered agent: CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101.

54.    AdvanceRx.com provided PBM and mail-order pharmacy services in Pennsylvania that gave rise to this Complaint.

55.    As a result of numerous interlocking directorships and shared executives, CVS Health, CVS Pharmacy, and Caremark Rx are directly involved in the conduct of and control of CaremarkPCS Health, Caremark, LLC, and Advance Rx.com's operations, management, and business decisions related to the at-issue formulary construction, manufacturer payments, and mail-order and retail pharmacy services.

56.    CaremarkPCS Health, Caremark, LLC, and AdvanceRx.com are agents and/or alter egos of Caremark Rx, LLC, CVS Pharmacy, and CVS Health.

57.    Defendants CVS Health, CVS Pharmacy, Caremark Rx, Caremark, LLC, CaremarkPCS Health, and AdvanceRx.com, including all predecessor and successor entities, are referred to collectively as "CVS Caremark."

58.    CVS Caremark is named as a Defendant in its capacities as a PBM and as a mail-order pharmacy.

59.    From 2006 to 2019, nationally, CVS Caremark purchased over 9.8 billion morphine milligram equivalents ("MMEs") of opioids spread over 468,167,381 opioid dosage units.

60.     CVS Caremark provides pharmacy benefit services, including prescription drug fills and refills, to more than 100 million Americans every year.

61.     At all times relevant hereto, CVS Caremark offered pharmacy benefit management services nationwide and maintained standard, national formularies that were offered to and used by CVS Caremark's clients nationwide, including in Philadelphia. As detailed below, CVS Caremark's national formularies include: Standard Control, Advanced Control, and Value.

62.     These CVS Caremark formularies were utilized by prescription drug benefit plans in Pennsylvania throughout the relevant time period. At all times relevant hereto, those formularies dictated the terms of reimbursement for opioids dispensed in Pennsylvania.

63.     CVS Caremark offers pharmacy benefit services to a variety of plan sponsors with covered lives in the Philadelphia area, including both large national companies, local/regional businesses, and the City.

64.     CVS Caremark (and/or its predecessors) processed claims for opioids dispensed pursuant to CVS Caremark's national formularies and standard UM guidelines in Pennsylvania throughout the opioid epidemic.

### 2.     The Express Scripts Defendants

65.     **Evernorth Health, Inc.** (f/k/a Express Scripts Holding Company) ("Evernorth") is a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri 63121.

66.     Evernorth is the parent company to all of the Express Scripts entities named as Defendants. Evernorth, through its executives and employees, controls the

enterprise-wide policies that inform all of Express Scripts' lines of business in order to maximize profits across the corporate family.

67.     Evernorth's conduct had a direct effect in Pennsylvania, including Philadelphia.

68.     **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth. Express Scripts, Inc.'s principal place of business is at 1 Express Way, St. Louis, Missouri 63121.

69.     Express Scripts, Inc. is registered to do business in the Commonwealth of Pennsylvania and may be served through its registered agent: CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101.

70.     Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Pennsylvania engaged in the conduct which gives rise to this Complaint.

71.     During the relevant time period, Express Scripts Inc. was directly involved in the PBM and mail-order services businesses, including with respect to prescription opioids, as well as Express Scripts' data and research services.

72.     On October 8, 2013, at an informational hearing before the Commonwealth of Pennsylvania's House of Representatives addressing proposed PBM legislation, David Dederichs, Express Scripts' Senior Director of Government Affairs, testified that the company: (a) operated 16 facilities in Pennsylvania; (b) employed over 3,000 people in Pennsylvania; and (c) administered the prescription drug benefits for over 6 million Pennsylvania residents.

73.    **Defendant Express Scripts Administrators, LLC,** is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Express Scripts, Inc.

74.    Express Scripts Administrators, LLC is registered to do business in the Commonwealth of Pennsylvania and may be served through its registered agent: CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101.

75.    During the relevant time period, Express Scripts Administrators, LLC provided PBM services in Pennsylvania.

76.    **Defendant Medco Health Solutions, Inc.** (f/k/a Merck-Medco) ("Medco") is a Delaware corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey 07417.

77.    Medco is a wholly-owned subsidiary of Evernorth. Medco was previously known as Merck-Medco. Merck-Medco was acquired in the early 1990s by Merck & Co. as its pharmacy benefit manager subsidiary. In 2002, Merck & Co. spun off Merck-Medco into a publicly traded company, Medco.

78.    Medco is registered to do business in the Commonwealth of Pennsylvania and may be served through its registered agent: CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101.

79.    **Defendant ESI Mail Order Processing, Inc.** is a Delaware corporation with its principal place of business located at 600 North Hanley Road,

Suite D, St. Louis, MO 63134-2715. ESI Mail Order Processing, Inc. is a wholly owned subsidiary of Evernorth.

80.    During the relevant time period, ESI Mail Order Processing, Inc. provided mail-order pharmacy services in Pennsylvania, which gives rise to this Complaint.

81.    **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation whose principal place of business is at the same location as Express Scripts, Inc. ESI Mail Pharmacy Service, Inc. is a wholly owned subsidiary of Evernorth.

82.    ESI Mail Pharmacy Service, Inc. is registered with the U.S Drug Enforcement Agency ("DEA") to dispense controlled substances, including prescription opioids.

83.    During the relevant time period, ESI Mail Pharmacy Service, Inc. provided mail-order pharmacy services in Pennsylvania, which gives rise to this Complaint.

84.    **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation whose principal place of business is at the same location as Express Scripts, Inc. Express Scripts Pharmacy, Inc. is a wholly owned subsidiary of Evernorth.

85.    Express Scripts Pharmacy, Inc. is registered to do business in the Commonwealth of Pennsylvania and may be served through its registered agent: CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101.

86.    Express Scripts Pharmacy, Inc. is registered with the DEA to dispense controlled substances, including prescription opioids.  During the relevant time period, Express Scripts Pharmacy, Inc. provided mail-order pharmacy services in Pennsylvania, which gives rise to this Complaint.

87.    Express Scripts Pharmacy, Inc. and ESI Mail Pharmacy Service, Inc. are referred to herein collectively as "Express Scripts Mail Order Pharmacy."

88.    In 2021, Express Scripts Mail Order Pharmacy was the third largest dispensing pharmacy in the United States and reported $54.4 billion in prescription revenues.

89.    From 2006 to 2019, nationally, Express Scripts Mail Order Pharmacy purchased over 26.9 billion MMEs of opioids spread over 1.3 billion opioid dosage units.

90.    **Defendant Express Scripts Specialty Distribution Services, Inc**. is a Delaware corporation whose principal place of business is at the same location as Express Scripts, Inc.  Express Scripts Specialty Distribution Services, Inc. is a wholly owned subsidiary of Evernorth.

91.    Express Scripts Specialty Distribution Services, Inc. is registered with the DEA to dispense controlled substances, including prescription opioids.

92.    As detailed herein, Express Scripts Specialty Distribution Services, Inc. worked directly with opioid manufacturers to expand the opioid market, including with Purdue and Endo Pharmaceuticals ("Endo"), to administer and dispense opioids

through these opioid manufacturers' Patient Assistance Programs ("PAP"), including in Pennsylvania.

93.     Collectively, Evernorth, Express Scripts, Inc., Express Scripts Administrators, LLC, Medco, ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts Specialty Distribution Services, Inc., including all predecessor and successor entities, are referred to as "Express Scripts" or "ESI."

94.     Express Scripts is named as a Defendant in its capacities as a: (1) PBM; (2) data, analytics, and research provider; and (3) mail-order pharmacy.  During the relevant time period, Express Scripts contracted directly with the opioid manufacturers in each of these capacities. At all relevant times, Express Scripts performed these services in Pennsylvania.

95.     In 2012, Express Scripts acquired Medco in a $29.1 billion deal.

96.     Prior to 2012, Express Scripts and Medco were separate companies. Standing alone, these companies were two of the largest PBMs in the country and had been since at least the mid-1990s.

97.     As a result of the merger, the combined Express Scripts was formed and became the largest PBM in the nation.

98.     Following the merger, all of Medco's PBM and data and research functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's clients

becoming Express Scripts' clients and Medco's top executives becoming Express Scripts executives.

99.    In 2019, Express Scripts merged with Cigna, Inc. Prior to merging with Cigna, Express Scripts was the largest independent PBM in the United States.

100.    The following chart represents the consolidation of PBM entities that comprise Express Scripts today:



101.    Express Scripts provides pharmacy benefit service to more than 100 million Americans, filling 1.4 billion prescriptions per year.

102.    At all times relevant hereto, Express Scripts offered pharmacy benefit management services nationwide and maintained standard, national formularies that were offered to and used by Express Scripts' clients nationwide, including in Pennsylvania. Express Scripts' national formularies include its National Preferred Formulary, Basic Formulary, High Performance Formulary, and Prime Formulary. These Express Scripts formularies were utilized by prescription drug benefit plans in Pennsylvania throughout the relevant time period. At all times relevant hereto, those formularies dictated the terms of reimbursement for opioids dispensed in Pennsylvania.

103.   Express Scripts offers pharmacy benefit services to a variety of plan sponsors with covered lives in the Philadelphia area, including both large national companies and local/regional businesses.

104.   Express Scripts (and/or its predecessors) processed claims for opioids dispensed pursuant to Express Scripts' national formularies and standard UM guidelines in Pennsylvania throughout the opioid epidemic.

### 3.    The Optum Defendants

105.   **Defendant UnitedHealth Group, Inc**. ("UnitedHealth Group" or "UHG") is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.

106.   UnitedHealth Group may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

107.   UnitedHealth Group is a Fortune 5 diversified managed healthcare company. In 2022, UnitedHealth Group listed revenue in excess of $324 billion. UnitedHealth Group offers a spectrum of products and services, including health insurance plans and pharmacy benefits through its wholly-owned subsidiaries.

108.   UnitedHealth Group operates through two connected divisions—Optum and UnitedHealthcare ("UHC"). As discussed in greater detail below, Optum provides PBM services; mail-order pharmacy services; and data, analytics, consulting, and research services. UHC provides health insurance and health benefit services. In

2022, UHC insured over 46 million Americans and generated $249 billion in revenue.[12]

109.    UnitedHealth Group, through its executives and employees, controls the enterprise-wide policies that inform both UHC and Optum's lines of business in order to maximize profits across the corporate family.

110.    UnitedHealth Group's conduct had a direct effect in Pennsylvania, including Philadelphia.

111.    **Defendant Optum, Inc**. is a Delaware corporation with its principal place of business located at 11000 Optum Circle, Eden Prairie, Minnesota 55344.

112.    Optum, Inc. is a health services company managing the subsidiaries that administer UnitedHealth Group's pharmacy benefits, including OptumRx, Inc.

113.    Optum, Inc. is registered to do business in the Commonwealth of Pennsylvania and may be served through its registered agent: CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101.

114.    Since 2005, Optum, Inc. has been a part of the UnitedHealth Group.[13] As indicated, UnitedHealth Group has two major segments of its business: UHC and Optum.

---

[12]https://www.sec.gov/ix?doc=/Archives/edgar/data/731766/000073176623000008/unh-20221231.htm (last accessed August 15, 2025).

[13] UnitedHealth Group Fourth Quarter and Full Year 2005 Earnings filed with the U.S. Securities and Exchange Commission, https://www.sec.gov/Archives/edgar/data/731766/000119312506008368/dex99.htm (last accessed August 15, 2025).

115.    Optum, Inc. is engaged in five types of business activities: (1) data analytics; (2) pharmacy benefit management; (3) healthcare services; (4) mail-order pharmacy dispensing; and (5) medical discount card services.

116.    **Defendant OptumInsight, Inc. ("OptumInsight")** is a Delaware corporation with its principal place of business located at 9900 Bren Road East, Minnetonka, Minnesota 55343.

117.    OptumInsight was formerly known as Ingenix, Inc. The name change came after the State of New York investigated Ingenix, Inc. related to a scheme to defraud consumers by manipulating reimbursement rates, resulting in a $50 million settlement with the State and giving rise to U.S. Congressional hearings.

118.    OptumInsight is registered to do business in the Commonwealth of Pennsylvania and may be served through its registered agent: CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101.

119.    **Defendant OptumInsight Life Sciences, Inc.** (f/k/a QualityMetric, Inc.) is a Delaware corporation with its principal place of business located at 640 George Washington Highway, Lincoln, Rhode Island 02865.

120.    OptumInsight Life Sciences, Inc. is a wholly-owned subsidiary of UnitedHealth Group. Prior to 2011, OptumInsight Life Sciences, Inc. was known as QualityMetric.

121.    OptumInsight, Inc. and OptumInsight Life Sciences, Inc., as well as their predecessors, successors, affiliates, including but not limited to Innovus, Innovus Research, i3, QualityMetric, HTAnalytics, ChinaGate, and CanReg, are

referred to herein as "OptumInsight." OptumInsight is the Optum group that engages in data analytics.

122. OptumInsight emerged from a collection of entities acquired by the UnitedHealth Group over the years. Those legacy entities include Innovus, QualityMetric, HTAnalytics, ChinaGate, CanReg, Ingenix, and the Lewin Group.[14]



123. As discussed more fully below, OptumInsight partnered with various opioid manufacturers to create studies, marketing materials, educational programs,

---

[14] *Id.*

and even algorithms to simultaneously downplay opioids' addictive properties and expand their use and availability throughout the country, including in Pennsylvania.

124.  **Defendant OptumRx, Inc. ("OptumRx")** is a California corporation with its principal place of business at 2300 Main Street, Irvine, California 92614. OptumRx is the arm of Optum that provides PBM and pharmacy dispensing services.

125.  OptumRx, Inc. is registered to do business in the Commonwealth of Pennsylvania and may be served through its registered agent: CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101.

126.  OptumRx, Inc. is registered with the DEA to dispense controlled substances, including prescription opioids.

127.  Prior to 2011, OptumRx was known as Prescription Solutions. In addition, as depicted in the PBM Consolidation Chart below, OptumRx grew as a result of numerous mergers and acquisitions. For example, in 2012, a large PBM, SXC Health Solutions, bought one of its largest rivals, Catalyst Health Solutions Inc. in a roughly $4.14 billion deal. Shortly thereafter, SXC Health Solutions Corp. renamed the company Catamaran Corp. Following this, UHG bought Catamaran Corp. in a deal worth $12.8 billion and merged Catamaran with OptumRx.

128.  Prior to merging with OptumRx (or being renamed), Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran Corp. engaged in the at-issue PBM and mail-order activities alleged herein.

129.  OptumRx now provides both PBM and mail-order dispensing services. At all relevant times, OptumRx provided pharmacy benefit services to a variety of

plan sponsors with covered lives in the Philadelphia area, including both large national companies and local/regional businesses.

130. At all relevant times, OptumRx has sold and continues to sell prescription opioids through its mail-order pharmacies in Pennsylvania, including in Philadelphia.

131. OptumRx and all of its predecessors, including but not limited to Prescription Solutions, Catalyst Health Solutions, Inc., SXC Health Solutions Corp., and Catamaran Corp. are referred to herein as "OptumRx."

132. The consolidations that led to the emergence of OptumRx in its current form are shown on the chart below:



133. **Defendant OptumRx Discount Card Services, LLC** is a Delaware limited liability company with its principal place of business at 1423 Red Ventures Drive Building RV4, 3rd Floor, Fort Mill, South Carolina 29707.

134. OptumRx Discount Card Services, LLC (f/k/a HealthTran, Inc., Catamaran PBM of Colorado, LLC, and Catamaran Discount Card Services, LLC) contracts with third-party businesses to administer prescription discount cards on their behalf. For example, the American Association of Retired Persons ("AARP") s

prescription discount card program is "endorsed" by the AARP, but is otherwise run by Optum Discount Card Services, which pays the AARP a royalty fee to the AARP for use of its intellectual property.

135. **Defendant Optum Perks, LLC** is a Delaware limited liability company with its principal place of business in Livonia, Michigan.

136. Optum Perks, LLC (f/k/a Script Relief, LLC) is a discount card program that originally started as a joint venture between Loeb Enterprises, LLC, and Catalyst, where by 2012 Catalyst had a 47% ownership interest. Per Catamaran's 2012 10-K, "Script Relief is a variable interest entity with Catamaran being the primary beneficiary, as the Company's underlying PBM and pharmacy contracts represent Script Relief's key business operations and the Company has the power to direct these activities."

137. By 2019, OptumRx, Inc. had fully acquired Script Relief and renamed the program Optum Perks.

138. **Defendant OptumHealth Care Solutions, LLC** is a Delaware limited liability company with its principal place of business at 11000 Optum Cir., Eden Prairie, Minnesota 55344.

139. OptumHealth Care Solutions, LLC is registered to do business in Pennsylvania and may be served through its registered agent: CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101.

140. OptumHealth partnered with Purdue to educate many case managers, nurse practitioners, and medical directors throughout UnitedHealth Group's various

enterprises. These programs were specifically endorsed and coordinated through one of Optum Health's national medical directors. The content of these programs targeted pain as an undertreated disease, among other issues, and contained the similar dangerous messaging regarding the use of OxyContin that led to Purdue's guilty plea in 2007.

141.    **Defendant OptumHealth Holdings, LLC** is a Delaware limited liability company with its principal place of business at 11000 Optum Cir., Eden Prairie, Minnesota 55344.

142.    **Defendant Optum Health Networks, Inc.** is a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.

143.    Optum Health Networks, Inc. is registered to do business in the Commonwealth of Pennsylvania and may be served through its registered agent: CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101.

144.    Optum Health Networks, Inc. provides care services to enrolled members of its subsidiaries and parents that includes care management services, arranging for delivery of services, and managing client relationships and contracts for access to said services.

145.    Together, OptumHealth Care Solutions, LLC, Optum Health Holdings, LLC, and OptumHealth Networks, Inc. are referred to herein as "OptumHealth."

146.    OptumHealth is a healthcare service provider that includes specialty health services, health banking services, ancillary care networks, and health

education and information services to both individuals and health care professionals. It does this through four main lines of business: Care Solutions, Behavioral Solutions, Specialty Benefits, and Financial Services. In 2022, OptumHealth served 102 million individuals.[15]

147.    Relevant to the opioid epidemic and Plaintiff's claims—detailed *infra*—OptumHealth partnered with Purdue throughout the 2000s to provide "education" to health care providers, including medical directors, nurse practitioners, case managers, and care advisors throughout the country regarding the so-called "undertreatment" of pain and expanding the use of opioids.

148.    Collectively, OptumRx, Optum, Inc., Optum Discount Card Services, LLC, Optum Perks, LLC, OptumHealth Care Services, LLC, OptumHealth Holdings, LLC, Optum Health Networks, Inc., and OptumInsight are referred to herein as "Optum."

149.    Optum is named as a Defendant in its capacities as a: (1) PBM; (2) data, analytics, consulting, and research provider; and (3) mail-order pharmacy. During the relevant time period, Optum contracted directly with opioid manufacturers in each of these capacities. At all relevant times, Optum performed these services and derived substantial revenue in Pennsylvania, including in Philadelphia.

150.    Optum, Inc. is a health services company comprising three sectors—OptumRx, which manages pharmacy benefits for both UHC and third party clients;

---

[15] https://www.sec.gov/ix?doc=/Archives/edgar/data/731766/000073176623000008/unh-20221231.htm (last accessed August 15, 2025).

OptumHealth, which provides medical services as well as education and support for individuals throughout the country; and OptumInsight, which is the data, research, and consulting sector.[16]

151.    OptumRx is the second largest PBM in the United States. It provides PBM services to more than 65 million people.

152.    At all times relevant hereto, OptumRx offered pharmacy benefit management services nationwide and maintained standard, national formularies that were offered to and used OptumRx's clients across the country, including in Philadelphia. At all times relevant hereto, those formularies included opioids, including those at issue in this case. OptumRx national formularies include the Essential Health Benefits, Generic Centric, Core Standard, Core Choice, Select Standard, Select Choice, Premium Standard, and Premium Choice.

153.    Optum (and/or its predecessors) processed claims for opioids dispensed pursuant to Optum's standard, national formularies, and UM guidelines in Pennsylvania throughout the opioid epidemic.

154.    In addition to its pharmacy benefit services, Optum entities also provide services related to pharmaceutical reimbursement and dispensing that generate revenue and benefit from a lack of opioid controls.

155.    At all times relevant hereto, Optum offered mail-order pharmacy services and dispensed opioids in Pennsylvania, including Philadelphia.

---

[16] *Id.*

156. In 2021, Optum's mail-order pharmacy was the fourth largest dispensing pharmacy in the United States and received $34.2 billion in prescription revenues.

157. From 2006 to 2019, nationally, Optum's mail-order pharmacy purchased over 8.1 billion MMEs of opioids spread over 252 million opioid dosage units.

158. OptumInsight, Optum's data, research, and consulting arm, is one of the largest health information, technology, and consulting companies in the world. It collects, processes, sells, and profits from the vast data of all managed lives. It also provides clinical research, consulting, marketing advisory services, and analytics tools to its clients.

159. OptumInsight is an integral part of the conduct that gives rise to Plaintiff's causes of action. As alleged in detail herein, throughout the relevant time period, OptumInsight worked directly with opioid manufacturers to convince patients, prescribers, payors and the public that long term opioid use was appropriate for the treatment of chronic pain and that opioids were not addictive.

160. Each opioid manufacturer had dedicated executives assigned to work with OptumInsight. The opioid manufacturers used their relationships with OptumInsight to deepen their ties to the overall Optum corporate family.

161. OptumInsight was paid tens of millions of dollars by the opioid manufacturers during the relevant time period for its work to expand the opioid market.

## IV.    THE ROLE OF PBMs IN PRESCRIPTION DRUG TRANSACTIONS

### A.    PBMs Operate on All Sides of Prescription Drug Transactions

162.    PBMs such as CVS Caremark, Express Scripts, and OptumRx contract with insurers, self-insured employers, and state and federal government agencies (referred to by PBMs as their "clients") to provide pharmacy benefit management services. One of the services the PBMs provide is to create standard, national formularies and UM programs. PBMs offer these standard formularies and UM programs to their clients, and most clients adopt these standard offerings for their prescription drug plans without modification.

163.    In crafting these standard formularies and UM programs, PBMs review and make determinations regarding which medications are effective or appropriate. PBMs also review and pay claims for the drugs dispensed to their covered lives.  As a result, PBMs exert significant influence over prescriptions dispensed in the United States, including Philadelphia, specifically influencing the quantity, dosage strength, duration, and refill availability for each prescription.

164.    PBMs also collect and maintain all of the data associated with all of the prescriptions dispensed to their covered lives, giving them granular insight into the ongoing health and pharmaceutical patterns of these patients. This data is available to the PBMs when they craft their standard formularies and implement standard UM programs, and it also informs standard "retrospective utilization" programs that offer services to patients after a prescription has been filled.

165.    Although third-party payors contract with PBMs to provide pharmacy benefit management services, PBMs also contract with drug manufacturers and with

pharmacies. They are paid by their clients to make safe and effective drug therapies available to their covered lives. But, as described below, they are also paid by drug manufacturers to provide the greatest access to their products, so as to increase sales, with little to no regard for safety or efficacy. They are also paid by the pharmacies where the plan beneficiaries' prescriptions are filled to verify coverage, but also to assist the pharmacy in ensuring that a prescription is appropriate. Thus, in any given transaction, a PBM may be receiving money from both the payor and the pharmacy to exercise "independent" judgment about whether to authorize payment for a prescription, while also receiving money from the manufacturer to ensure that the sale is made.

166.    The business model that PBMs (including the PBM Defendants) use is thus rife with conflicts of interest and self-dealing through which they have enriched themselves at the expense of their clients and the public. Inherent in the services offered by the PBM Defendants in their agreements[17] with the opioid manufacturers (and with pharmacies) are the same services for which they are already ostensibly receiving payment from their clients, albeit with the incentives often running in the opposite direction.

---

[17] The terms of the agreements between opioid manufacturers and the PBM Defendants are considered extremely confidential by the PBM Defendants.  In fact, the PBM Defendants won't even disclose such terms to their health plan clients.

167.    This chart illustrates the central role the PBM Defendants play in the prescription drug market:[18]



168.    It is in part because of the multiple roles that PBMs play in prescription drug transactions that they have access to, and collect, the vast amounts of data they have. No other party has access to so much data because no other party is so thoroughly embedded into every aspect of prescription drug prescribing and dispensing.

---

[18] The Commonwealth Fund, *Pharmacy Benefit Managers and Their Role in Drug Spending* (Apr. 22, 2019), https://www.commonwealthfund.org/node/26411 (last accessed August 15, 2025).

**B.    PBMs Use Their Formularies as Leverage to Negotiate with Drug Manufacturers**

169.    Formularies are a central tool that PBMs (including the PBM Defendants) offer to clients for use in designing, managing and publicly identifying the extent of the coverage and benefits provided to their covered lives. In the context of prescription drugs, a formulary is simply a list of those generic and brand-name drugs that are covered by a specific health insurance plan.

170.    Because formulary listing affects how much a patient pays for a drug, formulary placement makes a prescriber more likely to prescribe, and a patient more likely to pay for, certain drugs over others. Indeed, driving drug utilization is one of the key purposes and functions of formulary design, implementation, and management.

171.    Moreover, the PBMs' clients rely upon the PBMs' formularies. The Pharmaceutical Care Management Association ("PCMA"), a powerful PBM trade association, testified to the Pennsylvania House of Representatives that even sophisticated clients rely almost entirely on PBMs to manage their drug benefit.[19] Indeed, it is their expertise that the PBMs are marketing to their clients, so it makes sense that most clients rely on that expertise and, lacking their own expertise, have little choice but to do so. Many PBM clients utilize the PBMs' standard national formularies. Even though there may be a few large, sophisticated clients that

---

[19] Letter from Barbara Levy, Vice President of PCMA to Matthew E. Baker, Pennsylvania House of Representatives, Comm. on Health, (last accessed August 15, 2025).

ostensibly use "custom" formularies, in reality, these formularies often either mirror the PBMs' standard formularies or were constructed in large part by the PBMs.

172.    Since the PBM Defendants' standard formulary offerings heavily influence drug reimbursement terms for 200+ million covered lives, the PBMs have significant leverage when negotiating with brand drug manufacturers. The PBM Defendants use this leverage to maximize the amount of rebates paid to them by brand drug manufacturers, including opioid manufacturers. These rebates are paid to the PBMs on every eligible drug dispensed; thus, the more the PBMs drive utilization, the more rebates are paid by opioid manufacturers to the PBMs.

173.    Rebate eligibility is a critical factor. In a typical PBM rebate contract with an opioid manufacturer, eligibility for rebate payments is tied to the way a particular drug is treated on the formulary and whether the drug is or is not "restricted" by UM. Put differently, if a drug is placed on a non-preferred tier, or if the drug is restricted by UM programs, rebates will either be adversely impacted or not paid at all. Thus, the PBM Defendants are incentivized to structure their standard formulary and UM offerings in ways that enhance and do not restrict opioid utilization so that they can maximize the rebate payments for which they will be eligible.

174.    At times, PBMs do share manufacturer rebates with their clients. But the PBM Defendants generally pass through only a portion of these rebates to their

clients and retain the rest as profit.[20] As a result, the PBM Defendants have profited handsomely from rebates received from drug makers, including opioid manufacturers, for each brand drug sold.[21]

175.    Ultimately, PBMs are very much incentivized to keep sales volumes high for both generic and brand opioids.[22]  As a result, the PBM Defendants have a monetary interest in ensuring that favored drugs are covered, prescribed, and dispensed.

176.    Because of market consolidation, the PBM Defendants control a significant portion of the pharmacy benefit market. The PBM market is thus highly concentrated, both within Pennsylvania and throughout the United States.

177.    In contrast, the market for PBM clients is much less concentrated, with the largest companies accounting for less than two-thirds of the business in 2014.[23]

---

[20] Nat'l Prescription Coverage Coalition, "It's Time To Determine How Much Your PBM Is Depriving Your Plan of Rebates: File An 'Accounting' Procedure."

[21] N. Adam Brown, "It's Time to Reform the Mysterious PBM System – Vertical integration and a lack of transparency are at the heart of the problem," *MedpageToday* (Aug. 25, 2023), https://www.medpagetoday.com/opinion/prescriptionsforabrokensystem/106054 (last accessed August 15, 2025).

[22] *See* "Health Policy Brief: Pharmacy Benefit Managers," *Health Affairs,* (Sep. 14, 2017), https://www.healthaffairs.org/do/10.1377/hpb20171409.000178/full/ (describing how PBMs negotiate and their incentives) (last accessed August 15, 2025).

[23] Evi Heilbrunn, "Top Health Insurance Companies," *U.S. NEWS & WORLD REPORT* (Nov. 5, 2014), https://health.usnews.com/health-news/health insurance/articles/2013/12/16/top-health-insurance-companies (last accessed August 15, 2025).

For brand-name drug manufacturers, thirteen companies account for 90% of the U.S. pharmaceutical market.[24]

178.    Thus, it is typical to have one of the (large) PBMs negotiating with the (large) opioid manufacturers on behalf of a number of relatively small clients. The small world consisting of the PBM Defendants and approximately ten opioid manufacturers facilitated collusive negotiations that benefited the manufacturers and the PBM Defendants at the expense of patient health and safety.

179.    Rebate payments are only part of the payments the PBM Defendants receive from opioid manufacturers. In addition to rebates, drug manufacturers, including opioid manufacturers, have paid the PBM Defendants substantial amounts of various "administrative fees" and "service fees" in exchange for, among other things, ensuring a given drug's formulary placement and providing various services to the drug makers—the same services they are already being paid to provide to their clients.[25]

180.    For example, Express Scripts' standard form of contract discloses that it receives "administrative fees" for, among other things, providing opioid manufacturers access to "drug utilization data, and receives "service fees" (which are

---

[24] Charles Roehrig, "The Impact of Prescription Drug Rebates on Health Plans and Consumers", *Altarum* (Apr. 2018) at 8, https://f.hubspotusercontent00.net/hubfs/8011857/Admere_August2020/Pdf/Altarum -Prescription-Drug-Rebate-Report_April-2018.pdf (last accessed August 15, 2025).

[25] Henry C. Eickelberg, "The Prescription Drug Supply Chain "Black Box" — How it Works and Why You Should Care," *Am. Health Pol'y Inst.* (2015) https://terrygroup.com/app/uploads/2015/12/December-2015_AHPI- Study_Understanding_the_Pharma_Black_Box.pdf (last accessed August 15, 2025).

explicitly described as separate from both rebates and administrative fees) for "formulary compliance initiatives, clinical services, therapy managements services, education services, medical benefit management services, including, for example, formulary compliance initiatives, clinical services, therapy management services, education services, medical benefit management services, and the sale of non-patient identifiable claim information."

181.  The PBM Defendants are able to minimize the portion of monies from drug manufacturers that they pass along to their clients, in part, through misleading labeling of the various payments.  This lack of transparency, and the PBM Defendants' central role in ensuring it, has allowed the PBM Defendants to conceal their collusion with the opioid manufacturers from their own clients and from the public.

182.  As industry expert Linda Cahn observed, "[i]f a PBM enters into contracts with drug manufacturers and chooses to give rebates another name—like administrative fees or health management fees or grants—the PBM will arguably eliminate its obligation to pass through the financial benefits to its clients."[26]

183.  Administrative fees can make up a substantial portion of the total dollar amount of drug company payments to a PBM. According to pharmacy-benefits

---

[26] Jeanne Pinder, "Don't Get Trapped By PBM's Rebate Labeling Games: Managed Care magazine by Linda Cahn" *Clear Health Costs* (Feb. 26, 2018), https://clearhealthcosts.com/blog/2018/02/dont-get-trapped-pbms-rebate-labeling-games-managed-care-magazine/ (last accessed August 15, 2025).

consultant David Dross, administrative fees can amount to 25-30% of total payments from drug companies like Purdue.[27]

184.    Consequently, the PBM Defendants actively courted administrative fees.  For example, a September 2009 "Purdue business plan" notes CVS Caremark's increasing demands for administrative fees relating to both new and existing health plan contracts.

### 1.    CVS Caremark's Formularies

185.    CVS Caremark's formulary development process is managed throughout by the activities of the CVS Caremark National Pharmacy and Therapeutics Committee ("P&T Committee") and Formulary Review Committee ("FRC").[28]

186.    The P&T Committee is an external advisory body of experts comprised of 23 health care professionals (20 physicians and three pharmacists).  The regular voting members of the P&T Committee are not employed by CVS Caremark.  The P&T Committee is charged with reviewing all drugs, including generics, that are represented on the CVS Caremark approved drug lists.[29]

187.    According to CVS Caremark, the decisions of its P&T Committee are "based on scientific evidence, standards of practice, peer-reviewed medical literature,

---

[27] David Dross, *Will Point-of-Sale Rebates Disrupt the PBM Business?*, Mercer (July 31, 2017), https://www.mercer.com/en-us/insights/us-health-news/will-point-of-sale-rebates-disrupt-the-pbm-business/ (last accessed August 15, 2025).

[28] https://www.caremark.com/portal/asset/FormDevMgmt.pdf (last accessed August 15, 2025).

[29] *Id.*

accepted clinical practice guidelines, and other appropriate information."  Moreover, CVS Caremark suggests that it "takes all measures to ensure the P&T Committee review medications from a purely clinical perspective without consideration of information on rebates, negotiated discounts, or net costs."[30]

188.   CVS Caremark further suggests its P&T Committee "reviews and approves all utilization management (UM) criteria (*i.e.*, prior authorization, step therapy, and quantity limits outside of FDA-approved labeling)."  Standard formularies and UM criteria are reviewed annually and reviews are "conducted by drug class to ensure that the formulary recommendations previously established are maintained and to recommend additional changes for clinical appropriateness if advisable based on newly available pharmaceutical information."[31]

189.   Conversely, the FRC is an internal CVS Caremark committee that evaluates "additional aspects" that affect the company's national formularies.  For example, the FRC evaluates utilization trends, impact of generic drugs/drugs designated to become available over the counter, brand and generic pipeline, line of business, plan sponsor cost, applicable manufacturer agreements, and potential impact on members.[32]  The FRC makes business recommendations to the P&T Committee based on the foregoing considerations.

---

[30] *Id.*

[31]  https://www.caremark.com/portal/asset/FormDevMgmt.pdf (last accessed August 15, 2025).

[32] *Id.*

190.    Consequently, as indicated, the FRC—whose members are all employed by CVS Caremark—considers financial factors in making its recommendations, including applicable manufacturer agreements (rebates, administrative fees, etc.). Moreover, the P&T Committee inherently considers the FRC's financial evaluations when constructing CVS Caremark's national formularies, drug tiers, and other lists affecting prescription drug access and utilization. Rebates paid by Purdue and other manufacturers to CVS Caremark ensured that UMs were not placed on preferred opioid prescriptions.

191.    During a substantial portion of the relevant time period, CVS Caremark had three basic formularies: Standard Control, Advanced Control, and Value. The basic Standard Control and Advanced Control formularies did not contain step therapies, prior authorization requirements, or quantity limits for opioids. Similarly, the basic Value formulary lacked step therapies and prior authorization for immediate release opioids and did not require prior authorization when opioids were prescribed for chronic pain.

## 2.    Express Scripts' Formularies

192.    Express Scripts develops its operative national formularies utilizing three committees—Therapeutic Assessment Committee ("TAC"), Pharmacy & Therapeutics Committee ("P&T"), and the Value Assessment Committee ("VAC"). The TAC reviews the clinical properties of new drugs and pre-existing drugs (to the extent new or developing clinical information warranted such review) and prepares research memoranda discussing the benefits and drawbacks for each drug. The TAC also makes recommendations regarding whether any particular drug under review

should be included on Express Scripts' national formularies. The TAC's research memoranda and recommendations are then provided to the Express Scripts' P&T Committee.

193.    The P&T Committee consists of outside, third-party medical providers who were/are not employees of Express Scripts. Express Scripts claims that the P&T is fully independent and exercises its own clinical judgment. Express Scripts further claims that "the P&T Committee considers the drug's *safety and efficacy*," and the company "fully compl[ies] with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of *safety and efficacy*."

194.    The P&T reviews the research memoranda provided by TAC. The P&T then places each drug it reviewed into one of three categories: "must include," which meant that the drug must be included on Express Scripts' national formularies; "must exclude," which meant the drug could not be included on Express Scripts' national formularies; and "optional," which meant that the drug could or could not be included on national formularies, at the discretion of a third committee.

195.    This third committee is known as the VAC. Like the TAC, the VAC also consists of Express Scripts employees. But while Express Scripts represents that neither the TAC nor the P&T is supposed to consider any financial or economic factors, the VAC expressly considers financial factors. The financial factors considered by the VAC include rebates and administrative fees paid by manufacturers, including the opioid manufacturers.

196.   At all times, Express Scripts has benefited from these rebates and administrative fees, because Express Scripts retains some portion of them. After considering these financial factors, the VAC constructs the Express Scripts' national formularies and determines on which tier a drug is placed. The lower the tier, the greater the access/utilization.

### 3.   OptumRx's Formularies

197.   OptumRx develops its formularies through a process primarily involving the following committees: the Clinical Programs Subcommittee ("CPS"); Drug Intelligence; the National Pharmacy and Therapeutics Committee ("P&T"); and the Business Implementation Committee ("BIC").

198.   The CPS is an advisory subcommittee of the P&T. CPS's role is to: (1) review and approve treatment guidelines for patients with specific conditions; (2) review and approve clinical algorithms for disease state management and other clinical activities; (3) review and approve prior authorization algorithms and decision support tools; (4) provide expert guidance to the P&T regarding national and local guidelines for medical care; and (5) review certain UM for medications and make recommendations to the BIC committee based on those reviews.

199.   OptumRx's P&T committee's role is to: (1) review PBM formularies and preferred drug lists at least annually for drug inclusions/exclusions; (2) review and approve clinical guidelines and/or criteria and procedures related to the timely use of and access to medications annually; (3) create procedures that guide UM tools and formulary management activities; and (4) advise on clinical education programs for

plan sponsors' members, health care provider networks, plan participants, and pharmacy providers.

200.    OptumRx's P&T committee creates recommendations on formulary inclusion, UM, and clinical programs that are then provided to the BIC. The BIC determines the tiering and UM for the OptumRx national formularies. The BIC's recommendations are informed by "financial analysis." When determining clinical program, or UM strategies, the BIC also considers economic and pharmacoeconomic evidence.

201.    Once the BIC has made its final recommendations regarding formulary placement and UM for medications, it communicates those to OptumRx. The final formularies are then provided to the client.

**C.    PBMs' Drug Utilization Management (UM) Programs**

202.    In connection with their formulary development, PBMs (including the PBM Defendants) also create standard drug UM programs and rules, which they offer to their clients and which most clients adopt.

203.    One example of UM offered by the PBM Defendants, since at least the late 1990s, is a "quantity limit," which is a utilization management tool that limits the total dosage of a particular drug that a beneficiary may receive. Another example is a "step edit" or "step therapy," which requires a patient to try a different drug (designated by the PBM) before the patient can receive the drug they were prescribed. Another is a "prior authorization," or PA, which is a tool that requires a clinical follow-up with the prescribing physician prior to the drug being dispensed to double-check and make sure the prescription is appropriate for the patient beneficiary.

204.    Studies, including those conducted by the PBM Defendants, have shown that implementing PAs can reduce the utilization of dangerous and addictive drugs like OxyContin. Thus, like their standard formulary offerings, standard UM offerings are another tool the PBM Defendants use to steer patients. UM tools, if used as intended, should act as an impediment to patients gaining access to drugs that are susceptible to oversupply and abuse, or that are more costly than others.

205.    CVS Caremark, Express Scripts, and OptumRx's businesses are set up on a model of standardization. While clients have the option to design their own programs, most clients accept the PBM Defendants' standard formularies and UM programs, like step therapy, prior authorizations and DUR edits. Thus, it is the manner in which CVS Caremark, Express Scripts, and OptumRx construct their standard formularies and programs (outside of any client interaction) that has an enormous influence on drug utilization.

206.    The amount of influence that each PBM Defendant had over drug utilization was central to the parties' discussions about rebates and administrative fees.  The more a PBM Defendant could drive market share to or away from a drug by controlling formulary and UM decisions, the more an opioid manufacturer was willing to pay.

207.    CVS Caremark, Express Scripts, and OptumRx have always had the ability to provide baseline opioid UM controls for its clients, which they did on July 1, 2017 (when OptumRx launched its Opioid Risk Management Program), September 1, 2017 (when Express Scripts offered its Advanced Opioid Management Program),

and January 1, 2018 (when CVS Caremark rolled out its "enhanced opioid utilization management approach").

### D.    PBMs Contract Directly with Pharmacies

208.    As noted above, PBMs (including the PBM Defendants) also contract directly with retail pharmacies to dispense drugs to a patient.

209.    Express Scripts contracts with approximately 65,000 retail pharmacies, representing over 98% of all retail pharmacies in the United States. These pharmacies become part of Express Scripts' network for coverage purposes.

210.    OptumRx contracts with a network of more than 70,000 retail pharmacies and multiple delivery facilities.

211.    As indicated above, CVS Health maintains a national network of approximately 66,000 retail pharmacies, consisting of approximately 40,000 chain pharmacies (which include CVS Pharmacy locations) and approximately 26,000 independent pharmacies.

212.    When a pharmacy is in the network with CVS Caremark, Express Scripts, and/or OptumRx, a covered life pays out-of-pocket for a small portion of the prescription and the PBM arranges for direct payment to the pharmacy of the remainder of the cost of the prescription. In this way, covered lives need not advance the cost of their prescriptions and seek reimbursement afterwards.

213.    In connection with contractual arrangements with their network pharmacies, the PBM determines the patient's copay and how much it will reimburse pharmacies for each medication covered under the drug plan. PBMs generally pre-determine how much each drug covered under their standard formularies should cost,

and this determination affects the amount they reimburse to the pharmacies. Critically, the PBM Defendants also receive real-time claims data from pharmacies at the point of sale, as part of their electronic adjudication of claims, which includes determining eligibility for reimbursement and conducting concurrent drug utilization review ("cDUR"), discussed in detail below.

214.    Pursuant to contracts with their networks of pharmacies, CVS Caremark, OptumRx, and Express Scripts undertake to perform "drug utilization review" and to provide mechanisms to ensure safe dispensing. Express Scripts claims that it uses DUR to "review prescriptions for safety and effectiveness, in real-time, electronically and systematically, when presented to our pharmacies or submitted for coverage by network pharmacies, and alert the dispensing pharmacy to detected issues. Issues not adequately addressed at the time of dispensing may also be communicated to the prescriber retrospectively."

## V.    THE PBM DEFENDANTS' ROLE IN CAUSING THE OPIOID CRISIS

### A.    The PBM Defendants Had Access to Real-Time Data Regarding Drug Utilization Which Gave Them a Unique Vantage Point into the Opioid Epidemic

215.    CVS Caremark, Express Scripts, and OptumRx aided and abetted the spread of the opioid epidemic. The PBM Defendants watched as the number of opioids prescribed and dispensed exploded. They were made fully aware of the opioid epidemic by way of the vast amount of data they possessed, the knowledge they gained from their clients, manufacturers, and other entities in the health care arena, and through clinical evaluations for matters such as formulary placement.

1.    **The PBM Defendants Track Every Prescription Claim They Process, Across All the Health Plans They Service, Which Provided Them with Uniquely Granular and Comprehensive Data**

216.    Due to their business model, CVS Caremark, Express Scripts, and Optum have access to an extraordinary amount of data. CVS Caremark, Express Scripts, and Optum can see detailed information on individual prescribers and pharmacies, but can also aggregate that data across manufacturers, patients, pharmacies, and payors. Their visibility into this data is thus both uniquely granular and comprehensive.

217.    This data includes information such as: the volume, nature, dosage, and conditions for which health care providers are prescribing opioids to individual patients and on an aggregate basis; the volume of opioids obtained by individual patients and by geography; the pharmacies at which opioids were dispensed; and the volume of opioids dispensed by geographic area. CVS Caremark, Express Scripts and Optum also collected data via their own mail-order pharmacies.

218.    CVS Caremark's Senior VP and Chief Analytics Officer has stated, "[A]s a pharmacy benefit manager (PBM), CVS Caremark has access to millions of pharmacy claims, which allow a real-time look at the pharmaceutical market, enabling us to identify trends and patterns that can affect payors' benefit spend. Analysts can also identify which plans could be most impacted by these trends."

219.    CVS Caremark further acknowledges that its data-gathering technology can provide a "single view of the member" and can "translate critical data into solutions that help to deliver unparalleled care."    Relatedly, CVS Caremark

specifically noted in 2013 that "[c]hain pharmacies [like CVS] … have the advantage of aggregated information on all prescriptions filled at the chain."[33]

220.    For the past two decades, Express Scripts has processed 8 to 10 million prescription claims per day—1.4 billion claims per year—for its members with hundreds of data points for each transaction. At all times since the 1990s, Express Scripts has possessed as much—if not more—detailed claims data on opioid utilization and prescribing than any other entity in the pharmaceutical industry.

221.    Express Scripts not only collected prescription data, but also analyzed it to track utilization patterns. Since 1997, Express Scripts has compiled in-depth drug utilization analyses of its own claims data from millions of Express Scripts' members across the country in its Drug Trend Reports. Since at least 1999, Express Scripts' Drug Trend reports reflected both Express Scripts' knowledge of increasing OxyContin and opioid utilization, as well as its understanding of the dangers of these drugs.

222.    Express Scripts' ability to monitor and analyze opioid prescription data is exemplified by its 2014 "A Nation in Pain" report, which focused on the opioid epidemic. The report reviewed 36 million pharmacy claims from 2009 to 2013, which illustrated the widespread opioid epidemic. In the report, Express Scripts demonstrated its ability to identify opioid use trends by geography, age, and gender, as well as by the prevalence of doctor and pharmacy shopping and drug cocktail use.

---

[33] Abusive Prescribing of Controlled Substances—A Pharmacy View, *New England Journal of Medicine*, Vol. 369, No. 11, September 12, 2013.

223.   Optum (and/or its predecessors) has possessed data for its 66 million UHC and OptumRx covered lives for the duration of the relevant time period, processing 3.8 million prescription claims per day, or 1.4 billion a year. Before 2011, Optum had access to claims for over 75 million individuals nationwide. Since its inception, Optum has been able to track how many opioids its millions of members were receiving, including the quantity of pills, the dosing strengths, the combination of drugs being dispensed, and the distance that members traveled to acquire prescription opioids. Additionally, Optum has access to clinical information for millions of patients, which includes clinical files and over 4.5 billion text notes from members' clinical records.[34]

224.   In a presentation touting the effectiveness of the company's opioid management program, Optum's Senior Vice President of Clinical Engagement described the power that Optum has to track data and use it to stop inappropriate opioid utilization at the pharmacy counter:

> I have billions of claims, literally billions of claims. Every claim that we go through goes through an algorithm. This is all happening in realtime at the pharmacy. When you go to the pharmacy, in microseconds, I know if my patients are on a concurrent benzo. I know what the dose is. I know what the day's supply is. I know what other drugs they're taking, and I can have realtime [point of sale] edits going through making sure everything is happening appropriately.

225.   Similarly, Optum has touted its ability to use "near-real-time data feeds to integrate medical claims data into our intelligent claims engine," and boasts that

---

[34] Optum, *Optum EHR Data: Gain Visibility Across Therapeutic Areas and the Continuum of Care*, https://business.optum.com/en/data-analytics/life-sciences/real-world-data/ehr-data.html (last accessed August 15, 2025).

"[o]ur data capabilities are structured in order to flag these individuals using both our own pharmacy claims data plus medical claims data." Furthermore, OptumRx claims "[w]hen it comes to identifying at-risk patients, we get maximum leverage out of our claims-paying role as a PBM. In this capacity, we have direct insight into which patients are getting which drugs."

226.    Before 2007, Prescription Solutions (OptumRx's predecessor) had the ability to review every claim submitted by its members and "look for problem patterns and intervene with prescribers closer to the point of a member's care," including being able to identify both doctor shopping and pharmacy shopping by patients, as well as other red flags, such as early refills or suspicious drug combinations.

227.    OptumRx has described its "comprehensive retrospective drug utilization review" ("RDUR") as "specifically designed to look for problem patterns and intervene with prescribers closer to the point of a member's care," including being able to identify both doctor shopping and pharmacy shopping by patients, as well as other red flags, such as early refills or suspicious drug combinations. Furthermore, OptumRx claims:

> When it comes to identifying at-risk patients, we get maximum leverage out of our claims-paying role as a PBM. In this capacity, we have direct insight into which patients are getting which drugs. This insight feeds our RDUR capability.
>
> The RDUR clinical opportunities directly contribute preventing progression to chronic use. For example, retrospective data helps identify "shoppers," those that are using multiple physicians, pharmacies, and/or multiple prescriptions. This is key, because when patients are using multiple prescriptions it is not uncommon to see dose escalation over time, putting them at higher risk for overdose.

The system is also looking for other patterns of high risk behavior, such as early refills, or those who are using dangerous combinations of products.

228.    Optum's ability to control drug utilization was best stated by Dr. David Calabrese, Optum's Chief Clinical Officer: "We drive the ship in terms of how their drugs get used, not [the opioid manufacturers]."

229.    Because of all of data they possessed, the PBM Defendants were well aware that the volume of opioids being prescribed in the United States, including in Philadelphia, far exceeded an amount that could possibly be justified as medically necessary or appropriate.  They knew that opioids were being overprescribed and used inappropriately, and that Philadelphia was being flooded with an oversupply of these dangerous drugs.

230.    To make matters worse, rather than use their data to stop the public health crisis they helped create, since at least 1997, the PBM Defendants sold their detailed claims data, as well as their clients' formulary and health plan information, to Purdue and other opioid manufacturers. The opioid manufacturers then used this data to gain insight into the pharmacies and health care providers who were dispensing and prescribing their opioids (as well as their competitor's products) *and, more importantly,* those pharmacies and prescribers who were *not* prescribing and dispensing their products. This allowed sales representatives of Purdue and the other opioid manufacturers to be laser precise when targeting high prescribers and pharmacies in order to aggressively push opioids into the market.

231.    For as long as they have been PBMs, CVS Caremark, Express Scripts, and OptumRx have received, compiled, and analyzed massive amounts of prescription claims data demonstrating that opioids were being over-utilized, abused, and diverted. Indeed, the PBM Defendants had more data on, and awareness of, the opioid epidemic unfolding than any other entities in the pharmaceutical industry. They knew or certainly should have known for decades that opioids were causing a public health crisis.

### 2.    The PBM Defendants Had Knowledge of the Opioid Epidemic, Abuse, and Diversion

232.    According to the Centers for Disease Control and Prevention ("CDC"), the rise in opioid overdose deaths can be defined in three distinct waves.[35] As the CDC explains: "The first wave began with increased prescribing of opioids in the 1990s, with overdose deaths involving prescription opioids (natural and semi-synthetic opioids and methadone) increasing since at least 1993. The second wave began in 2010, with rapid increases in overdose deaths involving heroin. The third wave began in 2013, with significant increases in overdose deaths involving synthetic opioids, particularly those involving illicitly manufactured fentanyl."[36]

---

[35] Centers for Disease Control and Prevention, *Understanding the Opioid Overdose Epidemic* (Nov. 1, 2024), https://www.cdc.gov/overdose-prevention/about/understanding-the-opioid-overdose-epidemic.html#cdc_generic_section_3-three-waves-of-opioid-overdose-deaths (last accessed August 15, 2025).

[36] *Id.*

233.    Most recently, as of September 2023, the United States has entered the Fourth Wave of the Opioid Epidemic. A study[37] released by the Center for Social Medicine and Humanities, University of California, Los Angeles, found that "recently, scholars have argued that the 'fourth wave' of the US overdose crisis has begun, in recognition of rapidly rising polysubstance overdose deaths involving illicitly manufactured fentanyl, with stimulants playing a key role. By 2021, methamphetamine and cocaine were the only leading co-involved substances as depicted below. This represents current 2021 trends, a culmination of a long road of crisis level addiction beginning with *prescription opioid abuse.*"



---

[37] Friedman, J, Shover, CL, Charting the fourth wave: Geographic, temporal, race/ethnicity and demographic trends in polysubstance fentanyl overdose deaths in the United States, 2010–2021, 118 ADDICTION 12 (Dec. 2023), https://doi.org/10.1111/add.16318 (last accessed August 15, 2025).

234.    The following chart, depicting "Geographic, temporal, race/ethnicity and demographic trends in polysubstance fentanyl overdose deaths in the United States, 2010–2021" shows the four waves of the epidemic:



235.    Due in large part to their complicity in its creation and expansion, the PBM Defendants fully understood when and why the nation's opioid epidemic began and escalated.

236.    Notably, in 2013, CVS Caremark asserted that "[t]he causes of increases in prescriptions and the prevalence of abuse are manifold."[38] CVS Caremark attributed the increase in illness and death caused by "inappropriate use" of prescription opioids to:

---

[38] Abusive Prescribing of Controlled Substances—A Pharmacy View, *New England Journal of Medicine*, Vol. 369, No. 11, September 12, 2013.

- Chronic pain advocates in the mid-1990s arguing that pain was largely untreated and exhorting clinicians to be more liberal in their treatment;

- The availability of new formulations of opioid analgesics; and

- Inappropriate prescribing.[39]

237. In 2016, CVS Health convened a meeting of its Board of Directors to discuss "Our Approach Towards the Opioid Abuse Epidemic." At that time, CVS Health's Board recognized "[t]he epidemic opioid abuse is a significant medical and societal issue in the United States" and that "more than 165,000 people died from overdose related to prescription opioids" between 1999 and 2014.



---

238. Similarly, Express Scripts' marketing material explicitly recognized this evolution in the national opioid crisis:



239. Likewise, Optum's promotional material acknowledged these progressive stages of the opioid epidemic:



240.    In short, well before the latter waves of the crisis started, CVS Caremark, Express Scripts and Optum knew that opioid abuse and misuse posed serious problems.

241.    The PBM Defendants knew that opioids were addictive and carried a significant risk of serious injury or death, and they have known this for at least the past 20 years.

242.    For example, both Medco and Prescription Solutions informed Purdue that they had concerns about the potential for abuse of OxyContin shortly after its 1996 launch. A few years later, in early 2001, an executive of Optum's parent company, UHG, wrote to Purdue to discuss the "whole OxyContin overuse issue . . . which has been brought about by the 'heightened marketing skills of Purdue." The email continued, "I believe Purdue has acted irresponsibly in over-promoting the use of oxycodone . . . the activity has resulted in the overuse of morphine, an increase in the abuse of this narcotic, unnecessary and significant increases in pharmacy trend, and most importantly, an increase in patient morbidity and mortality." In other words, Optum/UHG recognized that OxyContin was being overused and killing people in increasing numbers over two decades ago.

243.    Similarly, starting in at least the early 2000s, certain Express Scripts and Medco clients also began to express concern about abuse and diversion issues related to OxyContin. Upon hearing from their clients, Express Scripts and Medco would often reach out to Purdue directly seeking help to quash these concerns.

Purdue often worked with the PBM Defendants by providing research and "educational" materials downplaying the risks associated with opioid use.

244.     For example, in 2002, internal Purdue emails describe a call with Medco regarding clients who "had concerns about tablet restrictions and proper utilization of OxyContin." Medco informed Purdue that "an overview of the abuse and diversion issue surrounding OxyContin would be helpful for [Medco] to respond to their customers questions/concerns."

245.     The PBM Defendants also knew or had reason to know that opioids were being improperly marketed. They were aware, for example, that the price of at least some opioids (including OxyContin) increased as dosage increased. When describing this dose-creeping phenomenon during a 2003 conference, an Express Scripts employee suggested it is not merely attributable to tolerance from chronic use. Rather, the employee suggested dose-creeping "may be reflective of detailing for this drug." Indeed, a Purdue employee who attended the same conference informed his colleagues that "[Express Scripts] is looking at the detailing of the drug. [Express Scripts] implied that there may be improper detailing by the manufacturer."

246.     In 2006, Express Scripts executives again recognized the abuse risk that opiates posed. But Express Scripts was reluctant to implement more robust monitoring for fear of customer blowback and loss of prescription volume:

| | |
|---|---|
| **From:** | Behm, Andrew (BLM) |
| **Sent:** | Monday, August 14, 2006 2:08 PM |
| **To:** | Gross, Amy (BLM); Colby, Andrew J. (STL) |
| **Subject:** | RE: Retro DUR Addictive Substances question |

No Stadol. We previously targeted all controlled substances plus Tramadol, Soma, and combos of those products.

When we enhanced the targeting, CPMs were only really interested in the opiates from an abuse perspective. I suppose we could revisit the targeting --- especially if you're aware of any new feedback --- but that will definitely impact the number of letters and volume.

247.    The PBM Defendants also knew that opioids were being improperly marketed because Purdue pled guilty to criminal misbranding of OxyContin in 2007. The plea agreement[40] identified specific representations that Purdue acknowledged were false. Although the PBM Defendants knew these misrepresentations were still being used by Purdue and others in the marketing of prescription opioids, they failed to use their standard formulary and UM offerings to counteract the effects of this fraudulent marketing.

248.    In 2008, five years after the U.S. Food and Drug Administration ("FDA") issued a Warning Letter to Purdue for misleading advertisements, CVS Caremark continued to work with Purdue on "educational" programs, such as a pain management program for pharmacists. A participant in Purdue's speaker program even gave a speech at CVS Caremark's 2008 regional operations meeting in Florida.

249.    As early as 2008, Express Scripts acknowledged the acute diversion risk with opioids. For example, Express Scripts employee Adam Kautzner (now its President) noted the "improved street value" of brand name narcotics:

**From:** Kautzner, Adam W. (EHQ)
**Sent:** Tuesday, November 04, 2008 11:32 AM
**To:** Gross, Amy (BLM); Martin, Jason (STL)
**Cc:** Boike, Jackie L. (BLM)
**Subject:** RE: file on temp transfer drive

I was afraid this was going to be your response!
Brand name narcotics may especially be interesting with their improved street value.
I will dig in my email archives for requests but haven't had many lately. Especially for QLLs.

---

[40] https://www.documentcloud.org/documents/5744917-Purdue-2007-Agreed-Statement-of-Facts/ (last accessed August 15, 2025).

250.    Moreover, the following slide was included in a client-facing presentation discussing the 2008 Express Scripts Drug Trend Report. The slide included speaker notes acknowledging Express Scripts' awareness that it needed to do something about OxyContin abuse: "We all know the abuse potential for [Oxycontin] and we knew that a solution needed to be offered to all of you here if you wanted to address it:"



251.    In 2009, Express Scripts received an email from a client stating, "Houston, we have a problem, and its name is Oxycontin." That same year, another large client reached out to Express Scripts regarding its desire to put into place an "aggressive PA policy" on opioids to combat "rampant abuse and inappropriate" opioid use.

252.    The PBM Defendants also knew for years that as many as 80% of users of illicit opioids started out using a prescription opioid. Below is a slide from a

presentation by OptumRx Chief Pharmacy Officer Calabrese, quoting a 2014 CDC study in this regard:



253.    In 2013, Express Scripts put together the following client-facing marketing poster utilizing its own data and outside sources.  The poster recognized that opioid abuse was "deadlier than cocaine and heroin combined" and the pivotal role that Express Scripts plays in "collaborating to end the epidemic":



254.    Express Scripts' 2014 report, "A Nation in Pain," similarly concluded, among other things, that "[p]rescription rates for opioids increased dramatically in the past two decades . . ." and that "[o]pioid abuse is an epidemic in the U.S."[41] "A Nation in Pain" also referenced a separate Express Scripts study which found that 40% of opioid prescriptions filled by members with employer-sponsored drug coverage between 2011 and 2012 were written by only 5% of prescribers.

---

[41] "A Nation in Pain: Focusing on U.S. Opioid Trends for Treatment of Short-Term and Longer-Term Pain, An Express Scripts Report," (Dec. 2014).

255.    The PBM Defendants also knew of the opioid epidemic through the work of their P&T Committees. As discussed, these P&T Committees have historically been concerned with "the documented safety and efficacy of new drug formulations."[42]

### 3.    The PBM Defendants Failed to Timely Undertake Actions to Address the Opioid Epidemic that They Helped Create

256.    The PBM Defendants had the ability and every opportunity to rein in opioid access. As early as 2007, Prescription Solutions, OptumRx's predecessor, identified patients engaging in doctor and pharmacy shopping for opioid analgesics as part of its Narcotic DUR program.

257.    However, the scope of the Narcotic DUR was extremely narrow: to be identified as "shopping" by the program, a patient had to see four or more prescribers for the exact same opioid analgesic, or fill prescriptions for the exact same opioid analgesic at three or more pharmacies, within a three-month period. And even when patients were identified under these limited criteria, the action by Prescription Solutions was minimal. The prescribers involved merely received a fax or mailing with patient drug utilization information and materials on "appropriate opioid use"—based on guidelines established by the American Pain Society and the Federation of State Medical Boards, pro-opioid front groups working closely with the opioid manufacturers.

---

[42] Zhixiao Wang et al., "Cost-Effectiveness Analysis and the Formulary Decision-Making Process," *Journal of Managed Care Pharmacy,* Vol. 10, no. 1, pp 48–59 at p. 48 (Jan./Feb. 2004).

258.  These mailings, unsurprisingly, did little to change prescribing patterns.  If a prescriber chose to respond, he or she could simply state that the medication use was appropriate. And if the prescriber responded that further monitoring for that patient was unnecessary, Prescription Solutions would exclude that patient from any subsequent reports. The Narcotic DUR program did nothing to limit the quantity of opioids the prescribers could provide, nor did it identify prescriber-level red flags, such as writing the same controlled substance prescription repeatedly or a high ratio of controlled substance prescriptions compared to other drugs.

259.  In a 2013 email, an OptumInsight Life Sciences consultant forwarded an article to Endo, an opioid manufacturer, which reported that CVS Caremark was cutting opioid access for a limited number of "risky" prescribers.  OptumInsight acknowledged it could do the same: "Within our data, we can track the physicians, their # of prescriptions within the Optum database, their patients comorbidities and conditions (e.g. do their patients have pain issues?). . . .  We can also track the pharmacies as well."

260.  Catamaran, a PBM that subsequently became part of Optum, also promoted its ability in 2013 to identify "current as well as future at-risk patients and drive interventions in our clinical programming" based on a "dynamic rules engine that continuously scans patient data." Moreover, Catamaran claimed it could identify these risks "in real time" based on just 30 days of prescription data.

a.   **The PBM Defendants chose not to use their claims data, formulary, and UM offerings to address overprescribing, abuse, and diversion**

261.   Claims data available to the PBM Defendants gave them the ability to identify opioid abuse and fraud. Having individually identifiable information for patients, physicians, and retail pharmacies allowed the PBM Defendants to analyze opioid utilization, patterns, and abuse.

262.   Yet despite having an array of available, commonly used tools to detect physician overprescribing and manage patient drug utilization, the PBM Defendants failed to: i) timely implement opioid limits that would have drastically reduced the inappropriate prescribing and dispensing of opioids; and ii) reveal what they knew from the data they collected and analyzed so informed decisions could be made about ongoing dispensing practices and system-wide abuses. Moreover, at the same time, the PBM Defendants were contracting with opioid manufacturers for payments of rebates and fees based on unrestricted opioid utilization.

263.   The PBM Defendants knew for decades that they possessed the ability to address the overutilization of prescription opioids.  For instance, Express Scripts' own studies dating back to at least 2002 demonstrated the effectiveness that UM tools, such as prior authorizations, had at decreasing opioid overutilization.  In fact, Express Scripts specifically confirmed that PAs significantly decreased inappropriate OxyContin utilization.

264.   In response to this study, Purdue executives expressed concern in 2003 that the study may decrease OxyContin use: "The emphasis [that the study] placed

on statements about areas of tolerance, safety, abuse and detailing of the product may have left the impression that other ESI Medicaid and commercial clients should consider implementation of a similar restriction on OxyContin."

265. Notably, Express Scripts had considered implementing a PA on opioids in 2007. Internal Express Scripts documents reveal the company had received "requests in 2007 for [point of sale] programs for inappropriate narcotic utilization ... [because] a more robust standard program covering all narcotics was desired." Express Scripts elected not to pursue this program.

266. Had Express Scripts created and offered a robust PA program on opioids in 2007, it likely would have resulted in tens (if not hundreds) of millions of fewer opioids being dispensed throughout the country, including in Philadelphia.

267. Prior to 2017, whenever Express Scripts was questioned by federal or state governments (or its own clients) on what it was doing to combat prescription opioid abuse, it pointed to its step therapy policy on long-acting opioids ("LAO"). This policy required a patient to try a generic opioid before the patient could be dispensed a brand opioid.

268. However, Express Scripts knew its LAO step policy was not created to address opioid overutilization or abuse. Rather, it was merely a cost containment and stockpiling/waste measure. In fact, in 2011, Andrew Behm (Express Scripts Vice President of Clinical Evaluation & Policy) wrote to Amy Gross (Express Scripts Clinical Director) asking whether the following statement in the draft Drug Trend Report was true: "Possible abuse continues to concern plan sponsors. In 2010, Express

Scripts initiated a long-acting opioid strategy designed to ensure that published pain-treatment guidelines are followed." Gross responded:

> What??? The [long acting opioid step therapy policy] has nothing to do with pain treatment guidelines. It is just generic before brand. Then we updated the OxyContin [Drug Quantity Management] to include the other long-acting meds. But again not to ensure published treatment guidelines were followed. I HATE this sentence . . .The [Step Therapy] and [Drug Quantity Management] are in place for cost-containment (generic before brand) and stockpiling/waste.

269.    By the time that Express Scripts enacted its LAO step policy, its financial incentives with respect to opioids had shifted.  Specifically, Express Scripts began to make more money on generic opioids. Therefore, while Express Scripts' LAO policy did nothing to address the opioid epidemic, it did shift utilization from addictive brand opioids to equally addictive generic opioids that were more profitable for Express Scripts.

270.    For years, OptumRx also expressed concerns regarding implementing PAs and offering other UM protocols because of lost profits.  For example, OptumRx would frequently put PAs on opioid products that did not offer high enough rebates. In doing so, OptumRx steered patients to "preferred" opioids—typically OxyContin products.

271.    The best example of this occurred in 2013, when OptumRx created a "pay to avoid PA" program on long-acting opioids. This was not a clinical PA; instead, it was a threat to extract higher rebates from opioid manufacturers. The strategy was simple: make opioid manufacturers "pay to avoid a PA."

272.    Clinically appropriate PAs were not placed on Optum's highest selling LAOs for OptumRx until January 1, 2018, because the profitability of LAOs would necessitate that *any* such change would need to be "thoroughly reviewed." New PAs would have required OptumRx to renegotiate all of its current rebate agreements with opioid manufacturers.

273.    OptumRx did not offer a standard PA program targeting short-acting opioids until the launch of its Opioid Risk Management Program in late 2017, despite the company being aware that opioid abuse was driven primarily by short acting generic opioids.

274.    Similarly, although also recognizing years earlier that prescription opioid abuse derived mainly from short-acting opioids, CVS Caremark did not impose a standard PA for those drugs until 2018.  At that time, CVS also imposed other requirements for opioid prescriptions, including a 7-day supply limit for acute conditions, use of an immediate release opioid prior to an extended release version (step therapy), and maximum quantity limits.[43]

275.    By no later than 2011, the PBM Defendants had been put on notice by the Centers for Medicare and Medicaid Services ("CMS") that all actors involved in delivery of healthcare in the United States needed to take steps to address the overutilization of prescription opioids, which was contributing significantly to the growing opioid crisis.

---

[43] https://www.caremark.com/portal/asset/Opioid_Reference_Guide.pdf (last accessed August 15, 2025).

276.    In September 2011, CMS sent a memorandum to "All Part D Sponsors" (which included the PBM Defendants and/or their predecessors-in-interest) describing the agency's desire to work with them to develop policies and procedures to significantly reduce opioid abuse. This notice advised all recipients that Medicare data show overutilization of prescription opioids that is "highly indicative of drug seeking behavior due to drug abuse or diversion."

277.    The PBM Defendants received the notice and understood their need to take action to address the opioid crisis through the use of UM tools. Although acknowledging that some Part D sponsors were employing "claim-level" controls to try to prevent opioid misuse, CMS had determined these measures did not adequately address the opioid overutilization.  CMS suggested that "beneficiary-level controls" were needed, including clinical upper thresholds for appropriate dosing, beneficiary-level utilization reports that identify unusual patterns of opioid use, and denial of payment for any claims that reflect amounts in excess of appropriate clinical thresholds that cannot be justified after review.

278.    Likewise, in June 2012, CMS issued a draft guidance on improving DUR controls. In this guidance, CMS explained that due to sponsor comments seeking clarification of what is expected, CMS was providing a "sample program" and "additional detail" on "how such a program could be implemented."  This sample program called for, among other things:

- Written policies and procedures that are updated and reviewed by a plan's P&T committee;

- Establishment of "methodology to identify potential opioid overutilizers based on drug claims data through clinical thresholds and prescription patterns set by the P&T committee that would trigger case management";

- A protocol to exclude from retrospective review persons who truly need significant amounts of opioids (cancer patients, palliative care);

- Regular communication with prescribers and beneficiaries about case management actions;

- A process for data sharing among sponsors when beneficiary/patient disenrolls voluntarily from a plan; and

- Policies and procedures for reporting to appropriate agencies when overutilization occurs.

279.  However, even with CMS calling attention to their responsibility to prevent opioid misuse in 2011 and 2012, the PBM Defendants' internal resistance to implementing policies and procedures to significantly reduce abuse continued. For instance, in a February 6, 2017 email, Nathan Merrill (OptumRx Manager of Clinical UM Operations) stated his concerns to David Calabrese (OptumRx Chief Pharmacy Officer), regarding the placement of PA limits on the opioids Embeda (Pfizer), OxyContin (Purdue), and Opana ER (Endo) because "these are preferred products that are tied to 'significant' rebates," and that "[b]y adding a [prior authorization] to these products we jeopardize any rebates we have contracted with the manufacturer."

**From:** Merrill, Nathan <Nathan.Merrill@optum.com>
**Date:** Monday, Feb 06, 2017, 4:09 PM
**To:** Calabrese, David <David.Calabrese@optum.com>
**Subject:** RE: BIC

David,

Venkat had concerns about adding a PA to Embeda, Oxycontin, and Opana ER since these are preferred products that are tied to "significant" rebates. By adding a PA to these products we jeopardize any rebates we have contracted with the manufacturer. I wasn't in a position to argue so I just explained that we anticipated there would likely be concerns within this class that we would address later. With BIC scheduled for this Wednesday do you think you would be able to attend to go to battle for us on this one? I know Venkat is going to say we cannot put a PA on those 3 products and I'm not sure there is anything more I can say or do to get around this. I appreciate any feedback you might have.

Thank you,

280.   As late as 2019, Optum was still profiting from keeping OxyContin on its standard formularies. In a March 2019 email exchange, Brian Sabin asked Venkat Vadlamudi (Optum's Senior Director of Industry Relations) whether the company should remove OxyContin from its formularies altogether, "rebate losses be damned," upon noting that Purdue "basically caused the Opioid epidemic" and Optum's continued inclusion of OxyContin on its formularies was "essentially rewarding their bad behavior." Sabin added, "From a purely PR perspective, I think it would look good on us."



> **From:** Sabin, Brian
> **Sent:** Friday, March 01, 2019 8:32 AM
> **To:** Vadlamudi,Venkat
> **Subject:** Purdue
>
> I wanted to run a possible scenario past you....
>
> What do you think, rebate losses be damned, about removing Oxycontin from OptumRx PDLs?  We have a branded long-acting oxycodone available on the market.  Purdue has looked awful in the news since basically 2008, they basically caused the Opioid epidemic, and we're essentially rewarding their bad behavior.
>
> From a purely PR perspective, I think it would look good on us.  But I also know we don't like to announce these types of decisions.
>
> **Regards,**
> **Brian Sabin**
> Director, Industry Relations | OptumRx
> 17900 Von Karman,  Irvine, CA 92614
> Office  949/988-6314
> M/S#CA016-0202
> Brian.Sabin@Optum.com
> www.optumrx.com
>
> *Our* United Culture. The way forward.
> ▪ Integrity▪ Compassion ▪ Relationships ▪ Innovation ▪ Performance

281.   Vadlamudi candidly replied, "We as a company looked into this, but the amount of utilization on Oxycontin and the rebates we collect prevented us from doing it."  Vadlamudi also suggested that "maybe we can change" if Sabin "can look into it and model the scenarios":

**From:** Vadlamudi,Venkat
**Sent:** Friday, March 01, 2019 9:44 AM
**To:** Sabin, Brian
**Subject:** RE: Purdue

Brian,
Valid point. We as a company looked into this, but the amount of utilization on Oxycontin and the rebates we collect prevented us from doing it.

But times are different now, if you can look into it and model the scenarios, <u>maybe</u> we can change..

Thank You,

Venkat Vadlamudi

282.    Likewise, Express Scripts resisted limits that threatened rebates and other fees. For example, in a 2017 email chain, several Express Scripts employees derided the fact that the effort to put a PA limit on OxyContin had been overruled by the ESI Value Assessment Committee. Janelle Kuntz (Express Scripts Clinical Director for the Office of Clinical Evaluation & Policy) stated that the decision "[w]as not sitting well with me at all," and wanted it escalated "to ensure that the rebate gain outweighs the likely erosion of our reputation." Nancy Pehl (Senior Director, Drug Evaluation Unit Office of Clinical Evaluation & Policy) responded that the decision "is really sad, really disheartening" and made "[n]o clinical sense to say the least." Express Scripts did not share these discussions with its clients or the public.

283.    Similarly, rather than remove OxyContin or its generic equivalents from its health plans or impose stringent daily pill limits, CVS Caremark also chose—in the midst of the opioid epidemic— to promote and implement health plans that

authorized four or more pills a day per plan beneficiary in order earn maximum rebates from Purdue.[44]

284.    In sum, in exchange for lucrative financial benefits from opioid manufacturers, CVS Caremark, Express Scripts, and Optum have stoked the fires of the opioid epidemic by allowing unfettered access on their standard formularies to dangerous, highly addictive opioids. That reality, however, has not deterred the PBM Defendants from continuing to publicly tout their unique ability to alter the course of the opioid epidemic.

285.    For example, on September 12, 2013, CVS Caremark's Chief Medical Offer and Executive Vice President (Dr. Troyen Brennan) stated, "Prescription drug abuse in this country is an epidemic, but it doesn't have to be."[45] Dr. Brennan continued: "CVS is committed to mitigating drug abuse by advancing legislation, promoting technology, and creating safer communities."[46]

286.    Four years later, on September 21, 2017, the President and CEO of CVS Health (Larry J. Merlo) asserted that "[a]s America's front door to health care with a presence in nearly 10,000 communities across the country," the company "see[s] firsthand the impact of the alarming and rapidly growing epidemic of opioid addiction

---

[44] *Confidential Files Detail PBMs' Backroom Negotiations—and Their Role in the Opioid Crisis*, October 11, 2024; https://www.barrons.com/articles/pbm-drug-prices-insulin-opioid-crisis-dcf9e83c (last accessed August 15, 2025).

[45] Abusive Prescribing of Controlled Substances—A Pharmacy View, *New England Journal of Medicine*, Vol. 369, No. 11, September 12, 2013.

[46] *Id*.

and misuse."[47]  Merlo further announced "an expansion of our enterprise initiatives to fight the opioid abuse epidemic that leverages CVS Pharmacy's national presence with the capabilities of CVS Caremark, which manages medications for nearly 90 million plan members."[48]

287.    On February 18, 2018, Express Scripts' Snezana Mahon testified before the United States Senate Committee on Health, Education, Labor and Pensions in a hearing titled, "The Opioid Crisis: The Role of Technology and Data in Preventing and Treating Addiction." During the hearing, Mahon discussed how Express Scripts had the ability to "minimize early opioid exposure and prevent progression to overuse and abuse."  Mahon further testified to Congress:

> Because Express Scripts interacts with patients, pharmacies, prescribers, and payers, our company is uniquely situated to collect data when patients receive and fill a prescription for an opioid under their pharmacy benefit. *We can leverage that data across the care continuum in order to design interventions aimed at preventing opioid addiction from beginning in the first place.* With 2 million Americans addicted to prescription narcotics, and more than 1,000 people treated daily in emergency departments for misusing prescription opioids, this is a $53 billion public health crisis.[49]

---

[47] *CVS Health Fighting National Opioid Abuse Epidemic With Enterprise Initiatives*, September 21, 2017, https://www.cvshealth.com/news/pharmacy/cvs-health-fighting-national-opioid-abuse-epidemic-with-enterpri.html (last accessed August 15, 2025).

[48] *Id*.

[49] Snezana Mahon, PharmD, *The Opioid Crisis: The Role of Technology and Data in Preventing and Treating* Addiction (February 27, 2018), https://www.help.senate.gov/imo/media/doc/Mahon.pdf (emphasis added) (last accessed August 15, 2025).

288.    Likewise, in 2017, OptumRx announced that "[b]y leveraging OptumRx's clinical, analytics and administrative services and its deep connections to those who can effect change—patients, providers and pharmacists—the company is uniquely positioned to help address the opioid epidemic."[50]

289.    Optum's Chief Pharmacy Officer, David Calabrese, has made similar statements: "PBMs are uniquely positioned to connect and partner with physicians, pharmacists, patients, pharmaceutical manufacturers, health systems and other components of the industry and therefore are better able to drive improvements in education surrounding the dangers of opioid therapy, as well as the various tools available for constituents to positively change the course of this epidemic." Calabrese added: "Our nation's indiscriminate prescribing, dispensing, demand for, and consumption of prescription opioid drugs has led to a scenario in which we now consume more than 80% of the world's supply of prescription opioids and a corresponding death toll due to opioid overdose which is one of the highest in the world."[51]

290.    In March 2017, Calabrese gave a talk at a PBM trade association conference titled, "Confronting the Crisis We Brought Upon Ourselves: America's Opioid Abuse Epidemic," admitting that "[w]e are all accountable . . . and all part of the solution . . .":

---

[50] Optum, *OptumRx Opioid Risk Management Program Leads to Better Outcomes for Patients and Clients,* (Aug. 22, 2017).

[51] Managed Healthcare, *Four PBM programs poised to rein in the opioid epidemic*, (Jan. 1, 2018), https://www.managedhealthcareexecutive.com/view/four-pbm-programs-poised-rein-opioid-epidemic (last accessed August 15, 2025).



291.    Notably, Calabrese's presentation specifically discusses that the "most effective" way to "[c]lose the [f]loodgates" on opioid abuse would be to "capitalize on the enormous powers we have as a PBM in benefit management . . . to deploy much more aggressive interventions that limit exposure to these drugs . . . right out of the gate":

> So now the HOW...
>
> From my own chair, the most effective way that I believe we can make the most immediate and most substantial impact on the rising prevalence of dependence and addiction is by capitalizing on the enormous powers we have as a PBM in benefit management, UM and POS claims adjudication edits to deploy much more aggressive interventions that limit exposure to these drugs, particularly in the opioid naïve patient, right out of the gate.
>
> To often we see patients going home from the doctor's office after minor acute injuries, outpt procedures, and even dental visits with excessive supplies of opioid meds.
>
> This entails...
>
> NOT days supply limits...why?...because a 7-day supply of a drug like Percocet or Vicodin (dosed 1-2 tabs Q 3-4 hrs) still can put >100 tabs/caps into the hands of pts at max dosage
> PA:
> requiring PA on all opiate-naïve pts who receive a long-acting agent regardless of qty
> PA on any opiate for a pt who is pregnant (concomitant prenatal vitamins)
> Limiting access to long-acting opioid drugs for only select med conditions where benefits may outweigh risks

292.    Among the tools Calabrese suggests could be utilized is OptumRx's "predictive modeling capabilities [which identify at-risk patients and monitor

physician prescribing patterns] that will allow us much greater leverage in getting ahead of the problems for our members, before it is too late."

293.    Finally, speaker notes from an OptumRx sales presentation held in 2016 accurately characterize the PBM Defendants' response to the opioid crisis as a "delayed reaction," as well as acknowledge that they sat "idly by."

> **b.    The PBM Defendants chose not to use their Drug Utilization Review (DUR) tools to address overprescribing, abuse, and diversion**

294.    The PBM Defendants also chose not to use their DUR programs to control the flow of opioids.  Internal documents from the PBM Defendants show that rebate monies had a direct impact on how the PBM Defendants managed access to opioids, including their obligations to monitor on a real-time basis, through concurrent DUR, that only safe and appropriate opioid prescriptions would be filled.

295.    Concurrent DUR or "cDUR" involves the real-time evaluation of drug therapy and intervention, if necessary, while the patient is undergoing therapy, including screening at the point of sale for potential drug therapy problems due to therapeutic duplication, age/gender-related contraindications, over-utilization and under-utilization, drug-drug interactions, incorrect drug dosage or duration of drug therapy, drug-allergy contraindications, and clinical abuse/misuse. But the PBM Defendants refused to use cDUR to control opioid misuse because doing so would have impacted their revenue, including receipt of rebates, income generated from opioid dispensing, and other fees.  For years, the PBM Defendants have failed to deploy cDUR initiatives to ensure that only appropriate opioid prescriptions were being

dispensed in pharmacies across the country (including in their own mail-order pharmacies). This intentional refusal by the PBM Defendants permitted the dramatic increase in medically inappropriate prescribing and dispensing of prescription opioids that contributed to the fueling of the opioid epidemic.

296.    CVS Caremark finally deployed legitimate cDUR initiatives in 2024.  In a CVS Health publication entitled, *The Rx Report*, the company revealed that CVS Pharmacy had introduced "… a first-of-its-kind approach to drug utilization reviews, helping provide pharmacists with actionable alerts alongside clinical information, talking points and recommendations. This reimagined drug utilization review (DUR) system, called SmartDUR™, better supports and empowers pharmacy colleagues … to prioritize personalized, high-quality care."[52]

297.    Several months later, in a January 2025 update addressing the role of its Board of Directors in the company's "opioid action plan," CVS Health implied that cDUR would indeed be utilized by CVS Caremark.[53]   Specifically, the update indicated that "CVS Caremark, our PBM business, has implemented utilization criteria to help members manage prescription opioid use. Complementing utilization management, our efforts to help prevent prescription opioid abuse and misuse extend to the pharmacy counter. Our pharmacists evaluate opioid prescriptions before they

---

[52] https://www.cvshealth.com/content/dam/enterprise/cvs-enterprise/pdfs/2024/CVS-Health-Rx-Report-2024.pdf (last accessed August 15, 2025).

[53] https://www.cvshealth.com/impact/healthy-community/our-opioid-response/the-boards-role.html (last accessed August 15, 2025).

are dispensed, and we retrospectively monitor for outlier prescribing or dispensing patterns, including those potentially indicative of forgery or abuse."[54]

298. However, when some clients had previously attempted to place cDUR dosage limits on the excessive use of opioids, the PBM Defendants often colluded with opioid manufacturers to push back. For example, when the FDA removed the indication for use of long-acting narcotics to treat moderate pain in 2013, Express Scripts saw no reason to change its cDUR program, acknowledging that its strategy was "more focused on driving preferred products and managing quantities." One Express Scripts employee described the FDA change as "kind of a non-event."

299. Moreover, when Express Scripts tried to implement cDUR limits on Purdue's drugs in 2016, the manufacturer pushed back, reminding Express Scripts that the cDUR limits (which would have restricted opioid use to acute pain, blocked opioids unless the use was for cancer or other approved uses, or required PAs for all opioids) would be in violation of its rebate agreement.

300. Optum, too, was unwilling to implement robust cDUR restrictions because doing so would impact its receipt of rebates. In 2017, when OptumRx tried to implement changes which would have used cDUR to control inappropriate opioid usage, there was pushback because it would mean the loss of rebates. In response to these concerns, on March 24, 2017, David Calabrese raised the question whether, "[i]f our opioid mfg industry partners can't appreciate the magnitude of the problem we

---

[54] *Id.*

are facing [and] the immediacy of the need for intervention[,] . . . I would question whether they are the right partner for us longer term":

> **From:** Calabrese, David [mailto:David.Calabrese@optum.com]
> **Sent:** Friday, March 24, 2017 7:19 AM
> **To:** Rogers, Kent D
> **Cc:** Gilbertson, Jenna M [From Catamaran]; Lahman, Robert C
> **Subject:** RE: Morphine Equivalent Dosing (MED) Edits & Trade Implications
>
> OK. Thanks.
>
> If our opioid mfg industry partners can't appreciate the magnitude of the problem we are facing; the immediacy of the need for intervention; and the clinical value of our efforts here, I would question whether they are the right partner for us longer term.

301.    Later that same day, Robert Lahman (OptumRx's SVP Industry Relations) responded, "I agree with you but you also have to be mindful of our [rebate] contracts." Lahman also warned Calabrese to "[s]top with the attitude and help us make sure we are compliant with our contracts."

302.    Frustrated that OptumRx would delay changes to its use of cDUR limits resulting from what he saw as "gross overprescribing and overpromotion of these medications . . . , and the countless deaths," an irate Calabrese later responded to Lahman: "Maybe you should be the one to take a step back and look at the bigger picture here. I need <u>you on board with doing your job</u> and convincing the [manufacturers] that we drive the ship here in terms of how their drugs get used, not them!"

303.    Even when opioid products like Opana ER were being withdrawn from the market, Optum refused to put a PA in place that would have prevented new patients from starting on the drug because it would "put [Optum's] rebates at risk."

**From:** Calabrese, David [mailto:David.Calabrese@optum.com]
**Sent:** Thursday, July 13, 2017 10:38 AM
**To:** Lahman, Robert C; Dutta, Sumit [From Catamaran]; Rogers, Kent D
**Subject:** RE: Clinical News Summary - Opana ER market withdrawal, NovoPen Echo recall, DepoCyt discontinuation, Alkeran first-time generic

The drug is being removed from the market for clinical safety reasons.

Why, in the best interest of the patients we serve, would we allow any new patient start on this drug between now and then??

**From:** Lahman, Robert C
**Sent:** Thursday, July 13, 2017 1:24 PM
**To:** Calabrese, David <David.Calabrese@optum.com>; Dutta, Sumit <Sumit.Dutta@optum.com>; Rogers, Kent D <kent.rogers@optum.com>

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    OPTUMRX_JEFFCO_0000430032

**Subject:** RE: Clinical News Summary - Opana ER market withdrawal, NovoPen Echo recall, DepoCyt discontinuation, Alkeran first-time generic

We currently get rebates and that would put our rebates at risk.  Why would we do this before 1/1?

Bob

**From:** Calabrese, David [mailto:David.Calabrese@optum.com]
**Sent:** Thursday, July 13, 2017 5:38 AM
**To:** Dutta, Sumit [From Catamaran]; Lahman, Robert C; Rogers, Kent D
**Subject:** FW: Clinical News Summary - Opana ER market withdrawal, NovoPen Echo recall, DepoCyt discontinuation, Alkeran first-time generic
**Importance:** High

Want to deploy an off-cycle PA ASAP to prevent any new starts from going on this product?  All good with that?

> **c.    The PBM Defendants failed to use their vast stores of data, formulary, UM offerings, and DURs to provide effective controls against diversion and/or to prevent the diversion and abuse of opioids**

304.    As described more fully below, CVS Caremark, Express Scripts, and Optum provide both PBM and mail-order dispensing services. In their capacities as mail-order dispensers, CVS Caremark, Express Scripts, and Optum are (as required) registered with the DEA. The CSA and PCSA and their implementing regulations require all registrants to provide "effective controls" against the diversion of

controlled substances. 21 C.F.R. § 1301.71(a); 28 Pa. Code § 25.61. Nothing in the CSA or PCSA suggests that this obligation is limited to only certain aspects of a registrant's business. A retail pharmacy, for example, cannot satisfy its obligations by exercising controls at its dispensing counter if it is maintaining an open-air illegal drug market in its parking lot. The obligation to maintain effective controls against diversion applies to all of a registrant's activities.

305.    CVS Caremark and OptumRx failed to maintain effective controls against diversion in the operation of their PBM services. On the contrary, as detailed above, at every turn CVS Caremark and OptumRx used their standard formularies, UM tools, and DUR programs to increase the supply of opioids, without regard to abuse or diversion of these drugs. CVS Caremark's and OptumRx's operation of their standard formularies, UM tools, and DUR programs was thus in violation of their obligations as a CSA registrant to provide "effective controls" against diversion. This is especially true because, as detailed above, CVS Caremark and OptumRx *knew* that their policies resulted in diversion and that the changes they declined to make would have reduced oversupply and diversion.

306.    Express Scripts used unique corporate entities to operate its PBM and mail-order dispensing businesses. But Express Scripts knew that prescription opioids presented serious risks of abuse and diversion, as well as understood its mail-order pharmacy was required by the CSA to provide effective controls against diversion. Express Scripts also knew that it possessed massive amounts of data that could be used to provide such effective controls.  The company also had a panoply of tools at

its disposal – standard formularies, UM tools, and DUR programs – all of which could be used to reduce diversion.

307.    Even if the Express Scripts entities that provide PBM services were not directly subject to DEA oversight, those entities had parallel responsibilities to operate their PBM services with appropriate care in light of the dangers of diversion that the CSA is designed to guard against. Any controls that Express Scripts Pharmacy, Inc., ESI Mail Pharmacy, Inc., and Express Scripts Specialty Distribution Services, Inc. (all DEA registrants) provided (assuming there were any) could not be effective while their sister companies conducted their PBM activities so as to maximize the volume of opioid sales. Either way, Express Scripts had a duty to operate its PBM business in such a way as to minimize or reduce the risks that these dangerous drugs would be diverted. All of the data available to Express Scripts was also available to its mail-order dispensing affiliates, and those entities had a duty to use that data in maintaining effective controls against diversion.

**B.    The PBM Defendants and the Opioid Manufacturers Colluded to Ensure Virtually Unfettered Access to Opioids**

**1.    The PBM Defendants Granted Opioid Manufacturers Favorable Placement on National Formularies in Exchange for Rebates and Other Fees**

308.    In 1996, Purdue began aggressively promoting the use of its powerful brand-name prescription opioid, OxyContin, for the treatment of back, neck, and joint pain. Purdue's marketing strategy, which was effectively executed by a small army of bonus-driven sales representatives, utilized: (1) a disinformation campaign designed to, *inter alia*, downplay the serious risk of prescription opioid addiction; and

(2) drug dispensing data that allowed the company to efficiently identify and call upon the nation's most prolific prescription opioid prescribers. OxyContin sales skyrocketed from $44 million (316,000+ prescriptions dispensed) in 1996 to nearly $3 billion (14+ million prescriptions dispensed) in 2001-02.[55]

309.    Recognizing the unique role that the PBM Defendants play as the gatekeepers of the pharmaceutical market, Purdue set out to change the PBM Defendants' policies about OxyContin and regarding opioids generally. Purdue did not do so by convincing the PBM Defendants that OxyContin was safe and effective for the treatment of chronic non-cancer pain (which it is not). Rather, Purdue convinced the PBM Defendants that they could make vast amounts of money by allowing unrestricted access to opioids.

310.    During the rapid expansion of OxyContin sales in the 1990s, Medco— later acquired by Express Scripts—was the largest customer of Purdue products. When OxyContin was first released, Medco made several attempts to restrict its utilization. For example, in early 1996, Medco established a "ceiling dose" quantity limit for OxyContin because of the potential for abuse for that drug.

311.    In January 1997, Purdue received notice from "pain clinic doctors" that Medco was sending letters to prescribers because of a "concern[] about abuse

---

[55] *The Promotion and Marketing of OxyContin; Commercial Triumph, Public Health Tragedy*, American Journal of Public Health, February 2009; https://pmc.ncbi.nlm.nih.gov/articles/PMC2622774/ (last accessed August 15, 2025). In an effort to capture a share of the expanding prescription opioid market, Purdue's competitors—including Allergan, Johnson & Johnson/Janssen, Endo, Insys, Mallinckrodt, Purdue, and Teva/Cephalon—soon began promoting their own brand-name and/or generic opioids for the treatment of acute and chronic pain.

potential" in patients taking OxyContin for chronic non-malignant pain. Specifically, Medco's letters informed prescribers that it would not pay for OxyContin prescriptions for non-cancer pain treatment ("Medco prescriber letters").

312. Medco's concerns were forwarded up to several high-ranking Purdue executives, including the president of the company, Richard Sackler. James Lang, head of marketing and sales at Purdue, explained, "Our success with OxyContin is starting to create concerns amongst the large PBMs as you already know because they recognize we are targeting non cancer pain. This goes beyond their initial perception that [OxyContin] was primarily a cancer pain medication."

313. The Medco prescriber letters were a serious threat to Purdue and to other opioid manufacturers. The opioid manufacturers knew that they could not expand the opioid market and flood communities with their products without preferred, unrestricted access to their opioids on the PBM Defendants' formularies.

314. A number of Purdue executives saw Medco's addiction concerns as pretextual and thought that Medco's true intentions were focused on cost and extracting larger rebates.

315. For example, when Purdue's medical director Paul Goldenheim suggested, "[w]e need to talk to Medco and others about addiction," Purdue's president Richard Sackler responded, "we should consider that 'addiction' may be a convenient way to 'just say 'NO' and when this objection is obliterated, [Medco] will fall back on the question of cost."

316.    Mark Alfonso, Purdue's vice-president of marketing, also weighed in: "My impression of this issues is that there are several major products . . . that are growing at a great rate and [managed health care[56]] organizations are not slowing them. . . I also believe that a lot of what [Purdue's Managed Care Account Executives] hear from their accounts is with the intention of softening them up before the [managed health care] asks for more aggressive rebates. They are told 'I am going to drop you from the formulary' for several months and then one day they are told if you give me higher rebate you can keep OxyContin in the formulary."

317.    Purdue executives did, however, recognize the substantial threat this posed to OxyContin's success—if Purdue did not take immediate action to address Medco's economic concerns, it could be an existential threat to Purdue's business. Sales and marketing executive Michael Friedman (who would later become Purdue's CEO) stated, "If we do not do [demonstrate the economic value of OxyContin], I can promise you that we will eventually be shut out. . . This is a serious matter that we cannot ignore and that we must discuss . . . We cannot go on ignoring the reality of [the PBMs'] economic proof requirements . . . If we are to stay in business we need this proof of economic performance."

318.    Indeed, Purdue's own data shows the impact that a major payor (such as Medco) moving OxyContin from a preferred formulary tier to an excluded product has on utilization:

---

[56] Purdue refers to payors' agents, such as the PBM Defendants, as "managed care."



319. Ultimately, in response to Medco's actions in 1996, Purdue determined that it needed to expand the OxyContin market by demonstrating the economic value of OxyContin in chronic non-cancer pain use to Medco and other PBMs. As Paul Goldenheim, Purdue's medical director, explained to Richard Sackler: "We have the tiger by the tail, and I wonder if we should add more muscle. Let's discuss over live sushi!"

320. This was a critical moment in the spread of the epidemic. If Medco— Purdue's largest customer in 1997—had excluded OxyContin from its formularies or put in place restrictions on the opioid's use in non-cancer pain treatment, it would have had a substantial impact on the success of OxyContin and would possibly have

driven the drug off the market. OxyContin may never have become widely available, other branded opioids and generics never would have followed the OxyContin wave, and the epidemic likely never would have happened.[57]

321.    Medco, however, did not take action to exclude or restrict the sales of OxyContin. To the contrary, by May 1997, Medco had completely reversed course and "become very interested in 'partnering with Purdue'" on numerous projects to expand opioid use into the chronic pain market:

---

[57] Other major payors at that time, such as Cigna, had also excluded OxyContin from their formularies. OptumRx (then known as Prescription Solutions) also refused to put OxyContin on its commercial formularies in 1997, due to concerns regarding the abuse potential of oxycodone (the active ingredient in OxyContin), especially considering its limited comparative effectiveness to morphine sulphate. Similar to Medco, Prescription Solutions' resistance to OxyContin was short lived. By 2007, it was receiving over $70 million in rebates relating to OxyContin alone.

## Managed Care

To:     Jim Lang                          From:   Tim Richards
        Ernie Merlino

Subject:  Medco                          Date:   May 4, 1997

Per our discussion on Medco on Friday, May 2, 1997 the following is a summary of information that has surfaced since the meeting with Medco in August, 1996.

*       Along with Isaac Schulman, Mel Grayson has been calling on Joe DaBronzo, Pharm.D., who was promoted to Director of Utilization Management at Medco.  Mr. DaBronzo feels that Medco's physician      network is not properly trained on the basics of assessment and management of pain.  It was Mr. Dabronzo's and Mr. Schulman's opinion that internally, Medco health care professionals needed education on pain assessment and management.  Mel has set up a speaker program with Dr. Elizabeth Narcessian at Medco for May 13, 1997.

*       Pertaining to discussions at the August, 1996 meeting at Medco and accentuated by Mr. DaBronzo's recent promotion, decision makers at Medco have become very interested in "partnering with Purdue" on pain assessment and management.  Mr. DaBronzo is interested in developing the following materials with the help of Purdue:

        *       Medco specific pain protocols for not only cancer pain, but for chronic non-malignant pain.

        *       Purdue to initiate retrospective outcome pharmacoeconomic studies using and partnering with Medco data.

        *       Purdue's consideration of Medco intervention for Purdue products and a negotiation of    market share/performance-based contracts from this intervention.

        *       Education materials (CME disease state related) for physicians, case workers, nurses and pharmacists in the Medco system.

        *       Disease related patient education on pain assessment and chronic pain patient care.

With the above list, and the scheduled speaker program, Medco would like to move forward with Purdue in partnering for pain management into the future.  Medco has requested of Mel Grayson for Purdue to move forward quickly in deciding whether Medco's partnering ideas are of any interest.

322.    Within three years of this May 4, 1997 memo, Joe DaBronzo, Medco's Director of Utilization Management, took a position as an executive director at Purdue.

323.    As a first step reflecting its new "partnership" with Purdue, Medco significantly raised its quantity limits on OxyContin. Within five months of

OxyContin's release and following further discussions with Purdue, Medco doubled its quantity limit to 160 mg/day by May 1996. And no later than 2001, Medco again doubled this quantity limit and the "most restrictive [quantity limit] that Medco would recommend is for 320mg/day as per [Purdue's] platform."

324. In fact, to make its formulary changes even more effective, Medco worked "behind the scenes" with Purdue to persuade several of Medco's largest clients (including Optum's affiliate insurer, UHC) to lift any restrictions they had (such as prior authorizations and quantity limits) on OxyContin prescriptions. This covert collusion between the PBM Defendants and the opioid manufacturers opened the flood gates to the unfettered formulary access for their opioids in exchange for rebates and other fees.

325. The opioid manufacturers early on recognized that CVS Caremark, Express Scripts, and OptumRx would provide unrestricted formulary status on their standard formularies in exchange for rebates and other fees. For example, in a candid February 15, 2000 email exchange, Purdue Managed Care Account Executive David Wallen explained that he could get Express Scripts "to steer [OxyContin] prescriptions" to retail pharmacies because of the rebates it received. According to Wallen, "Express Scripts makes their money from the rebate, so they cannot make any money on this account if they do not get rebates." In a February 25, 2000 email, Wallen later explained that Express Scripts pressured its clients to put OxyContin on its formularies without restrictions: "[Express Scripts puts] pressure on [their client] to put OxyContin on formulary . . . because they make their money from

rebates, and they do not get rebates if OxyContin is [subject to UM restrictions that reduce prescriptions]."

326.    Notably, the PBM Defendants were not just pressuring their clients in an effort to increase rebate-related profits.  In a February 2005 document setting forth his goals and objectives, a Purdue national accounts executive complained that his CVS Caremark contracting partner had tried to "bully" him in an effort to "get more rebates" because he was "unhappy about [Purdue's] reduction in OxyContin rebates, particularly in the open benefit design."

327.    Internal Express Scripts documents show that by 2013, some within Express Scripts believed that, with respect to OxyContin, Express Scripts was "out of alignment with the rest of the PBM/Health Plans in . . . putting this drug on a preferred tier (and) that other organizations have leaned more towards taking a harder stance on this highly abused medication."

328.    By the time of the Express Scripts-Medco merger, internal Purdue meeting notes reflect that in a meeting between Express Scripts/Medco and Purdue, Express Scripts/Medco representatives stated that "when Medco reviewed the drug spend for 2013, OxyContin was at the top of the list . . . *OxyContin use at Medco is out of control compared with [the other large PBMs] . . . Patients are selecting Medco because Medco [has] OxyContin in a preferred position*."

329.    After the merger (and years after it knew OxyContin was a heavily abused drug), Express Scripts was still pushing Purdue for more rebate dollars in exchange for granting OxyContin preferred positions on its standard formularies. In

2014, Express Scripts reached out to Purdue requesting a higher rebate rate for OxyContin to maintain its preferred position. Purdue executives agreed, given the importance of the Express Scripts relationship to OxyContin sales, stating: "[Express Scripts/Medco commercial is 20-25% of our total OxyContin gross business, and the spillover effect of a negative move by [Express Scripts] on OxyContin in 2015 cannot be underestimated . . . Given the importance and impact of this customer on OxyContin sales . . . I approve [the decision to increase OxyContin rebate rates]." Express Scripts celebrated this rebate increase as a win: "we got $20M in incremental from Purdue on OxyContin . . . Not too bad considering likely not doing anything."

330.    Notably, at the same time (2014) that Express Scripts was pushing Purdue for more rebates to continue preferring OxyContin on its formularies, Express Scripts was also preparing the press releases and sales communications for its "Nation in Pain" report (discussed below). Thus, on one hand, Express Scripts was releasing a report for marketing purposes on the opioid epidemic to "highlight the power of Express Scripts data and clinical expertise, and our commitment to identifying ways to make the use of prescription opiates safer and more effective," while on the other hand, Express Scripts was receiving millions of dollars in extra rebates in order to continue preferring the drug that started the opioid epidemic (OxyContin) on its standard formularies.

331.    Despite its knowledge of the nationwide opioid health crisis, and despite its knowledge of the impact that preferred formulary placement and the lack of UM restrictions had on increasing opioid sales, through at least 2017, Express Scripts

continued granting OxyContin on the most preferred brand formulary tier, with no UM restrictions, on nearly all Express Scripts' standard formulary offerings.

332.    Likewise, for most of the relevant time period, OptumRx also granted OxyContin unrestricted, preferred formulary status for most of its standard formularies. Along with the aforementioned lack of prior authorization, OptumRx refused to put effective quantity limits on opioids. For example, up until 2017, OptumRx allowed OxyContin to have a quantity limit of four tablets a day of any strength, including 80mg strengths.

333.    Further, OptumRx's 320mg limit did not apply to short-acting opioids, which provide relatively quick pain relief but for a shorter duration as compared to long-acting opioids. In fact, OptumRx increased its quantity limits for short-acting opioids between 2007 and 2012. For example, the quantity limit for Opana was 12 tablets a day, or 1080 tabs for a 90-day supply.

334.    In mid-2014, OptumRx had the following quantity limits for opioids: MS Contin at 120 tablets a month, with the 200mg strength at 90 tablets a month; Nucynta 100mg at 210 tablets per month, with lesser strengths at 180 tablets per month; Opana was 180 tablets per month; OxyContin was at 270 tablets per month. OptumRx did not require a prior authorization for any of these opioids.

335.    Similarly, for most of the relevant time period, CVS Caremark also granted OxyContin unrestricted, preferred formulary status for most of its standard formularies. Moreover, like Express Scripts and OptumRx, CVS Caremark's rebate agreements with Purdue placed OxyContin on CVS Caremark's formularies soon

after its 1996 launch.  In 2000 and beyond, the agreements made clear that the payment of rebates was contingent on CVS Caremark's placement of OxyContin and other Purdue products on its national formularies largely "without restriction."  As depicted in the chart below, by the first quarter of 2004, CVS Caremark controlled 33% of Purdue's PBM-related gross sales of OxyContin.



336.    Although CVS Caremark recognized that one of the purposes of formularies is to "help the PBM provide pharmacy care that is clinically sound," the company received rebate payments from Purdue and other manufacturers for preferred placement of opioids on its formularies and encouraged the use of preferred drugs over non-preferred drugs. CVS Caremark continued to provide preferred placement of OxyContin on its formularies through at least 2017.

337.    Moreover, the more its health plans utilized OxyContin, the larger the rebate CVS Caremark would earn.  In contracts executed between CVS Caremark and Purdue, rebates were defined as a percentage of OxyContin's list price.  Between 2014 and 2019, CVS Caremark was to receive the maximum rebate range of 10% to 19.75% for OxyContin if a health plan authorized four or more pills a day per plan beneficiary.[58]

Table 1:

**BASE REBATES FOR OXYCONTIN®**
**(INCLUDES ALL NDCs, STRENGTHS & PACKAGE SIZES)**

| Plan Type | 1 of 1 Manufacturer Status | 1 of 2 Manufacturer Status | 1 of 3 Manufacturer Status | Listed Formulary Status | Third Tier Status |
|---|---|---|---|---|---|
| Managed Plans - 2T (Please see below Option A) | 10.00% | 10.00% | 10.00% | 10.00% | N/A |
| Managed Plans - 3T (Please see below Option A) | 10.00% | 10.00% | 10.00% | 10.00% | No Rebates |
| Highly Managed Plans (Please see below Option A & B) | 19.75% | 19.75% | 19.75% | 19.75% | No Rebates |
| Closed Plans* (Please see below Option B) | 19.75% | 19.75% | 19.75% | 19.75% | No Rebates |
| **Incremental Base Rebate For Additional Controls:** **(Payable on all Plan types)** | | | | | |

3) Except for quantity-limit-related prior authorizations or edits beginning above usage levels of four (4) tablets per day of OxyContin®, the Product is not subject to Disadvantaging.

4) Neither PBM nor Plan has mandated a maximum allowable cost, mandatory generic substitution, step therapy or prior authorization for the Product.

5) In the event that a Product is listed by strength on the applicable Formulary then all strengths of that Product shall be covered at the same applicable Status and meet the requirements and conditions herein for any of the strengths to receive a Rebate.  If Product's name is the sole reference to Product being listed than such Product name shall indicate that all strengths of Product are adjudicating at the same tier without restrictions.

---

[58] *Confidential Files Detail PBMs' Backroom Negotiations—and Their Role in the Opioid Crisis*, October 11, 2024; https://www.barrons.com/articles/pbm-drug-prices-insulin-opioid-crisis-dcf9e83c (last accessed August 15, 2025).

Conversely, the rebate range would be reduced to 5% to 8.25% if a health plan's authorization was limited to two pills.  In 2017, CVS Caremark restructured its agreement with Purdue in order to allow two pills a day to achieve the higher rebate range.[59]

338.    Another set of post-2013 agreements between CVS Caremark and Purdue afforded special treatment to 80-milligram OxyContin tablets, the highest dose available to Medicare Part D prescription plan beneficiaries. The terms stated that Purdue would only pay rebates on the opioid if the plans permitted prescription of at least four pills a day.  In 2017, the terms of these agreements were also modified to allow CVS Caremark to earn the rebates absent the four-pill requirement.[60]

339.    During a January 2017 discussion between Purdue and CVS Caremark, a CVS Caremark executive noted he had received "lots of pressure" from the company's clinical team "given the current landscape pressures and the opioid epidemic."[61]  The CVS Caremark executive informed Purdue that "considerable rebate enhancements" would be necessary for the company to maintain Oxycontin in its prescription plans.

340.    The following year, Purdue increased its rebates. As late as 2017, the use of rebates was recognized by Purdue account executives to be the most effective tool in persuading the PBM Defendants to keep Oxycontin on their formularies.

---

[59] *Id.*

[60] *Id.*

[61] *Id.*

341.   CVS Caremark's rebate-for-preferred-placement agreements with Purdue were not limited to OxyContin. A 2014 Purdue email notes that CVS Caremark was "demanding a Preferred 2T rebate rate of 25% . . . + admin fee, in order to move Butrans to Preferred status. . . . If Purdue is unwilling to meet this rebate level, Caremark has determined it will move Butrans to 'Exclusion list.'" The email further explains that if Butrans (another opioid) was on the exclusion list, the drug would not be on formulary and the member would have to pay 100% of the cost of the prescription.

342.   CVS Caremark, Express Scripts, and OptumRx have been so successful in working with the opioid manufacturers to optimize their common purpose between formulary placement/UM and rebates and other fees that payments have reached as high as 70% to 80% of wholesale acquisition cost for some opioid drugs.

343.   To make matters worse, as the market shifted from branded opioids to generics in the mid-2000s, CVS Caremark, Express Scripts and OptumRx continued to grant generic opioids unrestricted and preferred placement on their standard formularies because of the profits these drugs generated for the PBM Defendants through spread pricing[62] and in other ways. Indeed, OptumRx's own internal presentation from 2013 touts generic utilization as a "high driver of revenue and profit," even more so than brand rebates.

---

[62] PBMs also earn money through "spread pricing," whereby a PBM will charge its client a higher price for a generic prescription than what the PBM pays the pharmacy for the same drug. The PBM will then pocket the difference in this price spread as profit.

344. Thus, from the late 1990s through 2018, CVS Caremark, Express Scripts, Medco, and OptumRx granted both brand and generic opioids, including OxyContin, preferred positions on their standard formulary offerings, which was critical to the success of the opioid manufacturers increasing utilization and expanding the opioid market both nationally and in Philadelphia.[63]

2. **The PBM Defendants and the Opioid Manufacturers Worked Together to Limit the Use of UM Measures for Opioids**

345. While the PBM Defendants have represented that they use UM measures such as quantity limits and prior authorization requirements to ensure only the safe and effective use of pharmaceuticals, behind closed doors they had entered into confidential agreements with the opioid manufacturers to bargain away the use of these measures which would have limited dispensing to only medically appropriate uses.

346. Throughout their confidential negotiations with the opioid manufacturers, in exchange for rebates and other fees, the PBM Defendants agreed that they would not "disadvantage" opioid drugs on their formularies, nor would they place UM restrictions on their use within their standard offerings. Effectively, this has meant that the PBM Defendants have bartered away application of UM measures, which opened the floodgates to these dangerous drugs. These parity and "no disadvantage" contract terms had the effect of the PBM Defendants and the opioid

---

[63] Since 2014, Purdue had a distribution and supply agreement with Teva Pharmaceuticals USA, Inc. pursuant to which Purdue supplied oxycodone to Teva and Teva subsequently labeled and sold it as a generic Teva product.

manufacturers sharing a common purpose of ensuring the unfettered access to opioids across the entire class of opioid drugs.

347.    Express Scripts' standard rebate agreements defined the term "disadvantage" as any time when the opioid manufacturer's product is "subject to prior authorization, NDC blocks, counter-detailing, co-pay differentials, or a step edit that negatively had to have affects the reimbursement and/or Formulary status of the Product as compared to other products in its designated [competitive product category] . . . ."

348.    Such rebate-tied language appears in Express Scripts' contracts with Purdue in 2002 (no restrictions on opioids), 2009 (opioids to remain "unrestricted on the preferred brand tier"), 2014 (OxyContin to remain on "lowest preferred brand tier, without restrictions, including no prior authorization or step therapy"), and 2016 (OxyContin not limited to non-acute pain).    Express Script negotiated similar arrangements with Janssen Pharmaceuticals ("Janssen") (no step edit restrictions regarding Nucynta, a fentanyl-based opioid) and Endo (UM restrictions must apply to all products in the competitive class) during the same period.

349.    OptumRx's template rebate agreements had similar language tying payment of rebates to common treatment of all other opioids in the formulary's therapeutic category. The language stated that rebates would only be payable if the opioid manufacturer's product is not "subject to Disadvantaging including, but not limited to: prior authorization, NDC blocks, counter-detailing, co-pay differentials, dispensing restrictions, or endorsed targeted messages (electronic edits)."

350.    For example, Optum Rx's rebate-restricting language appears in a 2011 agreement with Janssen (Nucynta and other drugs not to be "disadvantaged as compared to other Branded or specialty Drugs"), a 2012 contract with Reckitt Benckiser (Suboxone Film to "not be subject to …prior authorization, NDC blocks, counter-detailing, etc.)," 2012 negotiations with Mallinckrodt Pharmaceuticals (agreement to use the "boilerplate disadvantaging language" with regard to tiering of its opioid drug), a 2015 agreement with Teva (requiring unrestricted access and "parity" between its fentanyl-based opioid, Fentora, and other drugs in its "Defined Drug Market"), and a 2016 agreement with Depomed (stating that "[p]rior authorization shall not be allowed unless applied to all other single source branded Drugs in the Defined Drug Market that are on Formulary . . . .").

351.    Similarly, contracts between CVS Caremark and manufacturers tied the earning of rebates to prescription drugs not being "disadvantaged."  As indicated, CVS Caremark's agreements with Purdue state that "[t]he payment of Rebates for Products dispensed to Members of Commercial Plans is subject to the following conditions … Except for quantity-limit-related prior authorization or edits beginning at or below the usage levels of four (4) tablets per day of OxyContin®, *the Product is not subject to Disadvantaging*."

352.    The lockstep parity terms that each PBM Defendant and opioid manufacturer negotiated served and furthered the common purpose of the Formulary & UM Enterprise (described in greater detail below) because it normalized the use of UM measures across the entire class of opioids and guaranteed that the overall

market for prescription opioids would not diminish because of UM. The rebate agreements conditioned payment on each opioid manufacturer not being disadvantaged with regard to applying UM measures unless the entire market basket of all competing drugs was treated the same.

353. The parity terms, therefore, ensured that no single opioid manufacturer would be disadvantaged against the other and each could be free to compete outside of the Formulary & UM Enterprise for market share of their drug within the fraudulently increased system. The opioid manufacturers knew that UM presented a slippery slope: if more UM were employed, such would ultimately lead to the adoption of restrictions across the entire class of drugs.

354. As alleged more fully below, each member of the Formulary & UM Enterprise thus conducted and participated in the conduct of their enterprise through a pattern of racketeering activity—including mail and wire fraud—in which they formed a common purpose of growing the unfettered use of opioid drugs.

### 3. The PBM Defendants Misrepresented that They Were Using Their Formularies to Promote Safe Use and Appropriate Prescribing of Opioids

355. Rather than provide transparency into their dealings with the opioid manufacturers, CVS Caremark, Express Scripts, and Optum falsely represented to their clients, patients, and the public that they used their market power to design formulary offerings to promote the safe use and appropriate prescribing of opioids. In truth, CVS Caremark, Express Scripts, and Optum constructed standard formularies

that garnered significant rebates and other fees in exchange for often unfettered access for "preferred" opioids.

356.  For years, the PBM Defendants have represented that they promote better health and are dedicated to making the use of prescription drugs safer.  For example:

- In its 2007 annual report, the company's first post-merger annual report, CVS Caremark represented that "[i]n CVS Caremark, you get a company with the potential to have a major impact on the way pharmacy and health care services in the United States are delivered. We plan to leverage our unique combination to help payors control costs more effectively, improve patient access, and promote better health outcomes in a way that no other company can."

- In its 2008 annual report, CVS Caremark noted that it had introduced Proactive Pharmacy Care™, an "earlier, easier, more effective approach to engaging plan participants in behaviors that can help lower costs, improve health, and save lives."

- In its 2012 Annual Report on Form 10-K, CVS Caremark represented that it was "uniquely positioned to deliver significant benefits to plan sponsors through effective cost management solutions and innovative programs that engage plan members and promote healthier and more cost-effective behaviors."

- Between 2000 and 2010, Express Scripts represented in its SEC filings that it "works with clients, manufacturers, pharmacists and physicians to . . . improve members' health outcomes and satisfaction."

  o During these years, Express Scripts also represented in its SEC filings that it "is a company dedicated to making the use of prescription drugs safer and more affordable for plan sponsors and over 50 million members and their families."

- During the same time period, Medco represented in its SEC filings that "[Medco] capitalize[s] on our clinical expertise and advanced information technology infrastructure . . . to improve safety and the quality of care for patients. We do this by developing action-oriented clinical programs and services based on clinical rationale. . ."

- In its 2008 annual report, Medco represented that "[a]t Medco innovation, precision, and advocacy are in our DNA. We strive to make all of medicine smarter and as a result make healthcare better."

- In a 2013 interview, Express Scripts CIO Gary Wimberly represented that "by filling 1.4 billion prescriptions per year, we have over 10 petabytes of useful data from which we can gain insights and for which we can develop solutions . . . [to] improve the health of patients." In addition, Mr. Wimberly stated, "[Express Scripts] has researchers and scientists whose sole job is to interpret and analyze the data to identify opportunities to improve health outcomes."

- In 2002, Prescription Solutions represented in public filings: "We recognize the treatment value of prescription medications. Our goal is . . . to increase the appropriate use of prescription medications. Getting the right medication to the right person at the right time is the best approach for everyone concerned."

- In 2007, Prescription Solutions represented: "Our goal is to promote the appropriate use of prescription medications. By focusing on clinical quality and total patient care, we help our clients and members improve outcomes."

- In its 2008 Annual Report, Optum represented: "Beyond the data and technology, and beyond the numbers and networks, our businesses are made up of people who strive, every day, to fulfill our mission by helping people live healthier lives."

- UnitedHealth Group's 2009 Annual Report states, "Information technology has the power to transform health care. UnitedHealth Group built a $2 billion business, Ingenix [OptumInsight predecessor], around that idea. Ingenix is committed to using the power of health information and analytics to help save lives, improve care and modernize the health care system."

- UnitedHealth Group's 2011 Annual Report states, "OptumRx is dedicated to helping people achieve optimal health . . . improving quality and safety, increasing compliance and adherence, and reducing fraud and waste."

357. Similarly, in a September 2013 letter to the Pennsylvania House of Representatives Committee on Health, Express Scripts stated that "[o]ur company's mission is to make prescription drugs safer . . ."[64]

358. Likewise, OptumRx's parent company, UnitedHealth Group, represented in its 2013 Annual Report that "UnitedHealth is advancing strategies to improve the way health care is delivered and financed . . .."[65]

359. In a 2013 interview, Express Scripts CIO Gary Wimberly summed it up as follows: "Everything we do every day focuses on health outcomes."

360. As alleged more fully herein, despite the PBM Defendants' acknowledgement that they are supposed to construct formulary and UM offerings that promote safe and affordable drugs for their members, the PBM Defendants have not actually done so. To the contrary, the PBM Defendants have used their power to negotiate rebates and other fees, control the offered formulary structures, and to refrain from implementing or offering UM measures, all in an effort to promote unfettered access to prescription opioids on their formularies so that the number of opioids prescribed and sold could continue to grow and generate more profits for the

---

[64] Letter from David Dederichs, Sr. Dir. Express Scripts to Matthew Baker, Pennsylvania House of Representatives, Comm. on Health, *Re Opposition to HB 746*, at 1 (Sep. 4, 2013) https://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2013_0159_0011_TSTMNY.pdf (last accessed August 15, 2025). Mr. Dederichs again suggested Express Scripts' mission "is simply to make prescription drugs safer and more affordable" when testifying at an informational hearing before the Commonwealth of Pennsylvania's House of Representatives on October 8, 2013.

[65] UnitedHealth Group 2013 SEC Form 10-K, at p. 2 (Dec. 31, 2013) https://www.sec.gov/Archives/edgar/data/731766/000073176614000008/unh2013123110-k.htm (last accessed August 15, 2025).

PBM Defendants and the opioid manufacturers, thereby bringing the opioid epidemic to Philadelphia.

### C.  The PBM Defendants Conspired with the Opioid Manufacturers to Expand the Opioid Market and Increase Opioid Utilization

361.  Not content merely to *permit* access to opioids, the PBM Defendants colluded with opioid manufacturers to *increase* opioid prescribing. Since the release of OxyContin, the PBM Defendants have conspired with Purdue in several crucial ways to expand the opioid market and increase the sales and prescribing of OxyContin.

362.  For example, following the 2003 merger between Caremark Rx and AdvancePCS, CVS Caremark began utilizing its newly acquired RxReview, a program in which letters were sent to "high-prescribing" physicians alerting them to purportedly "clinically and economically appropriate therapies for their patients."[66] In truth, as detailed below, CVS Caremark used its RxReview program to influence prescribers to switch their patients to prescription drugs, including opioids, that provided a greater financial benefit to CVS Caremark.

363.  Medco also partnered with Purdue on therapeutic exchange programs to increase OxyContin utilization during the years immediately following the drug's release. For example, in 1997-1998, Medco worked with Purdue to develop a "switch program" where pharmacies would switch out a competing product for OxyContin at the pharmacy counter. Purdue executive Michael Friedman explained the value of

---

[66]https://www.sec.gov/Archives/edgar/data/1012956/000095013402009682/d99118ex v99w2.htm (last accessed August 15, 2025).

this program: "Medco is a huge customer and the potential gain from this effort could dwarf that of many other opportunities."

364.   In addition, during key years in the growth of OxyContin utilization, Medco also worked with Purdue "behind the scenes" to get large health plans to lift restrictions—such as prior authorizations and quantity limits—on OxyContin utilization. For example, a 2002 email reveals Medco and Purdue working together to prevent the implementation of a PA that would have reduced the supply of opioids:

---

**To:**      Radlund, Julia[/O=PURDUE/OU=PURDUE US/CN=Sales and Marketing -
Field/cn=DCB07D6C]
**Cc:**      Nagorski, Lynn[/O=PURDUE/OU=PURDUE US/CN=Sales and Marketing -
Field/cn=9F4581F2]; Richards, Tim[/O=PURDUE/OU=PURDUE US/CN=RECIPIENTS/CN=CBCEAB1F]
**From:**    Grayson, Mel
**Sent:**    Wed 3/13/2002 9:31:10 PM
**Subject:** Concerns at MMMC

To All;

I met today with Ed Adamcik of MMMC.   His major concern is to negotiate a new rebate contract.  Ed says that the reason they have been able to keep various clients from placing a PA on Oxy has been the value of the rebates to them.    If this is suddenly reduced, there may be more clients who might want to place a PA, or some other type of restriction on OxyContin.

---

## D.   The PBM Defendants Conspired with the Opioid Manufacturers in the Deceptive Marketing of Opioids Throughout the Opioid Epidemic

365.   The PBM Defendants knew that there has never been reliable evidence demonstrating opioids were safe or effective at treating chronic pain long term. The PBM Defendants further knew that opioids, particularly when used long term to treat chronic pain, carry serious risks of addiction. And yet, starting shortly after the release of OxyContin and continuing for years after the opioid epidemic was spreading throughout the country, the PBM Defendants worked with the opioid manufacturers in numerous capacities in furtherance of these efforts. In particular: the PBM Defendants (1) disseminated the opioid manufacturers' false messages

about chronic pain and addiction to high prescribers and patients, and (2) provided research, data, and consulting services to the opioid manufacturers to assist in expanding the opioid market.[67]

366.    For example, Express Scripts (along with its subsidiaries—*e.g.*, Express Scripts Specialty Distribution Service; Express Scripts SDS; HealthBridge, United BioSource LLC; Curascript, Inc.) partnered and/or collaborated with opioid manufacturers (*e.g.*, Purdue, Endo) on Patient Assistance Programs ("PAP"), which provide free or low-cost medications to eligible individuals based on factors such as low-income and/or lack of health insurance. PAPs were viewed as "a triple boon for manufacturers" as they "increase demand, allow companies to charge higher prices, and provide public-relations benefits.[68]

367.    Express Scripts and/or its subsidiaries would play multiple roles (*e.g.*, partner mail-order pharmacy, program administrator, etc.) in Purdue's and Endo's respective PAP marketing schemes for more than two decades. As a result of Express Scripts' integral involvement with Purdue's PAP, it was well aware of the addiction, abuse and diversion issues surrounding OxyContin and other opioids since the mid-1990s.

---

[67] The PBMs Defendants made more money by increasing the volume of prescriptions sold to their covered lives. If the PBM Defendants generated higher volume (more sales) for manufacturers, they could expect higher manufacturer rebates.

[68] Howard, David H., *Drug Companies' Patient-Assistance Programs – Helping Patients or Profits?* New England J. Med, 97, 97-99 (2014), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJMp1401658 (last accessed August 15, 2025).

368.    The PBM Defendants' participation in the increasing opioid utilization and the fraudulent marketing of opioids continued even after Purdue pled guilty to criminal misbranding of OxyContin in 2007, as described below. In other words, even after Purdue acknowledged the falsity of its claims, the PBM Defendants, in collaboration with opioid manufacturers (including Purdue), continued to spread the same misrepresentations about the safety and efficacy of opioids.

**1.    The PBM Defendants Disseminated the Opioid Manufacturers' Deceptive Propaganda**

369.    Starting in the late 1990s, the PBM Defendants partnered with Purdue and other opioid manufacturers to spread false information about opioids in order to increase opioid sales and expand the market. For example, in 1999, Medco arranged for its pharmacists to be trained by Purdue's speaker consultants regarding chronic pain management and the use of OxyContin.

370.    In 2003, internal Purdue documents show "[o]pportunities have been presented by Medco to work more closely with targeted clients within the marketplace on a client-by-client basis." These "opportunities" included developing educational programs to "stave off any formulary restrictions," disseminating Purdue created "educational" materials—including "New Perspectives on the Pharmacology of Opioids and Their Use in Chronic Pain" and "Drug Diversion and Abuse: The Facts, Legal and Ethical Issues Affecting Pain Management: Fact or Fiction." Purdue provided this information to Medco to "be used with employers and managed care plans on the appropriate utilization of [Purdue's] products."

371.    Express Scripts also worked directly with Purdue in the critical years of OxyContin growth to expand the pain treatment market through the dissemination of misinformation about the use of opioids to treat chronic non-cancer pain.

372.    For example, in 2000 and 2001, Purdue and Express Scripts worked together on numerous programs to disseminate "educational" materials to tens of thousands of patients and high prescribers of OxyContin, advocating for opioids in chronic pain treatment and downplaying the risks of addiction. These programs included Express Scripts' mass mailings of Purdue-created propaganda, such as "Dispelling the Myths about Opioids," "The Impact of Chronic Pain: An Interdisciplinary Perspective CME booklet," "Overcoming Barriers to Effective Pain Management," and "Use of Opioids in Chronic Noncancer Pain CME booklet." These documents contained false information downplaying the risk of addiction and promoting the use of opioids in long term chronic pain treatment.

373.    In one particularly telling internal Purdue "call note," a Purdue executive discussed "developing a piece on Opioid guidelines, [New England Journal of Medicine (NEJM)] quotes, and addiction terms."  Notably, the "NEJM quotes" likely refer to a one-paragraph letter that was subsequently published in the *New England Journal of Medicine* reporting an observed low rate of addiction in patients prescribed opioids for short periods in an in-patient hospital setting.[69] The Purdue executive continued: "[l]egal has stated that [Purdue] representatives cannot utilize

---

[69] Purdue and other opioid manufacturers later misrepresented this letter as a "study" and claimed that it demonstrated that the risk of addiction to opioids was low when the drugs were prescribed for long-term, outpatient use.

this [NEJM] piece. My thoughts are that this piece may be sent out by Express Scripts. Express Scripts and Purdue could target [family practitioner physicians and internal medicine physicians] who are the high writers of [DEA Schedule II and III drugs]. The mailer was intended to "educate" the physician on the beneficial uses of OxyContin and the preferred formulary status."

374.    A number of these joint programs between Express Scripts and Purdue were prompted by Express Scripts' desire to work with Purdue to address the negative attention that OxyContin was receiving related to abuse and diversion in the early 2000s. For example, a March 14, 2001 letter from Express Scripts to Purdue explained "[c]learly with the market turbulence surrounding OxyContin you and your organization have significant demands on your time . . . there are several strategic initiatives where Express Scripts can support Purdue Pharma in your efforts to educate the market on the prescribing, administration and consumption of OxyContin."

375.  These "strategic initiatives" proposed by Express Scripts included sending 15,000 "targeted" mailings to physicians which included a letter written by Express Scripts' Medical director summarizing key principles of the Purdue front group, American Pain Society ("APS"), and included the Purdue-created brochures "The Patient Bill of Rights for Pain Management" and "Dispelling the Myths about Opioids," both which contained misinformation about OxyContin risks, such as "addiction risk also appears to be low when opioids are dosed properly for chronic noncancer pain."

113

376.    An April 2001 Purdue memo further described the reasons behind Express Scripts and Purdue's collaborations at that time: "[Express Scripts] has told us that this mailing is necessary so that [Express Scripts] may squelch the anti-OxyContin pushback from their clients (Managed Care Organizations and Employer Groups) due in large part to the national media attention OxyContin is receiving."

377.    Purdue's and Express Scripts' joint efforts to expand the opioid market continued in the summer of 2001, when they used an Express Scripts "proprietary database" to identify the top 1,900 physicians with high prescribing rates for Schedule 2 narcotics and then mailed these 1,900 physicians materials created by APS. The mailed APS material promoted use of pain scales and the debunked, industry-advocated concept of pseudo-addiction.

378.    Express Scripts and Purdue's collaboration continued through 2004, when Express Scripts and Purdue developed a series of pain management presentations for Express Scripts' clients, to be conducted by Purdue's Medical Liaisons, who were doctors and medical professionals employed by Purdue to promote opioid therapy.

379.    During these same years, Purdue also conspired with Optum to spread misinformation about the use of opioids to treat chronic pain and the risks of opioid addiction. One example occurred in February 2003, when UHC and OptumInsight met with Purdue to give a presentation on "Managing Chronic Pain Associated with Lower Back Pain." The goal of this presentation was to develop a comprehensive plan between Purdue, UHC, and OptumInsight to re-educate physicians on opioid use for

the treatment of chronic pain and low back pain. The program included "[t]argeting physicians not aligning with UHG clinical objectives [for treating chronic pain] to modify behavior."

380.    As a result of this meeting, OptumInsight and Purdue executed a Master Services Agreement to roll out this program in 2004-05. The program would include Purdue, UHC, and OptumInsight working together to identify physicians from UHC and OptumInsight's database and then developing comprehensive education materials on the effectiveness of opioids in chronic pain treatment to send to these physicians.

381.    OptumInsight and Purdue delivered this information through a series of teleconferences, newsletters, faxes, live meetings, case study monographs, letters, and website and web-based programming directly to physicians.

382.    The project, referred to as the United Healthcare Physician Education program, included the following false and misleading messages targeted at UHC prescribing physicians:

- Opioid use is associated with some moderate side effects, but the risk of drug dependence is low;

- Concerns about abuse, addiction, and diversion should not prevent the proper management of chronic and low back pain;

- Opioids are the most effective way to treat pain;

- Opioid addiction does not occur in the chronic pain patient; and

- Certain signs of dependence that sometimes can be confused with addiction are actually "pseudoaddiction."

383.   CVS Caremark also partnered with Purdue to spread similar misinformation.  In 2001, Purdue Executive Steve Seid met with "three of the key pharmacy people at CVS" to discuss "mutually beneficial initiatives with CVS to improve education with their pharmacists."   Mr. Seid reported that the CVS representatives "felt that Purdue was . . . being victimized," that Oxycontin was "not the issue, but …the abuser [was] the issue," and that Purdue should be "pointing out the benefits" of its brand. He also noted that CVS: (a) was going to send out a Purdue brochure directed towards CVS pharmacists; and (b) wanted to use Purdue's Continuing Education programs. Additional joint "educational" efforts were also discussed.

384.   To assist in the marketing efforts of opioid manufacturers, CVS Caremark, Express Scripts, and Optum have routinely provided multiple opioid manufacturers with lists of all their plan clients, as well as the names of physicians who were participating in the plan's provider networks. The manufacturers used this information to target the highest opioid prescribers with pull-through marketing.[70]

385.   For example, in 2004, CVS Caremark and Purdue used RxReview's patient-specific information to "influence key prescribers" to prescribe even more Oxycontin.  As reflected in the PowerPoint slide below, utilizing three Purdue-

---

[70] Pull-through marketing is a strategy that involves attracting or drawing customers towards a product, service, or brand by creating interest and demand. It relies on enticing or "pulling" consumers in, rather than actively pushing products or services onto them.

sponsored letter campaigns, CVS Caremark targeted 60,000 "high prescribing" medical providers in its database.



386. As noted in the following draft, each letter included an issue of RxReview, a "medical abstract" authored by CVS Caremark which provided the prescriber with information "on the appropriate use of long-acting opioids in the treatment of moderate to severe chronic noncancer pain[.]"

FOR BACKGROUND PURPOSES ONLY, NOT FOR DUPLICATION, OR USE IN DETAILING

June 2004

John Q. Sample
Suite ABC
123 Any Street
Anytown, US  12345-6789

Dear Dr. Sample:

This issue of RxReview® focuses on the appropriate use of long-acting opioids in the treatment of moderate to severe chronic noncancer pain and includes information about:

- The importance of proper pain assessment and patient evaluation when using opioids for the treatment of chronic noncancer pain
- Medical treatment options and national guidelines for osteoarthritis
- Clinical trial information on the use of opioids for treatment of moderate to severe chronic pain

Purdue Pharma is committed to the advancement of proper pain management and has sponsored this issue of RxReview to provide education information regarding the appropriate use of long-acting opioids.

**Recommendation:**
AdvancePCS supports national guidelines regarding the proper management of chronic pain, including the appropriate use of long-acting opioids in the treatment of moderate to severe chronic pain.

The AdvancePCS-preferred long-acting opioid analgesics are:

**generic morphine extended release**
**OxyContin®** (oxycodone controlled release)

Generic oxycodone extended release 80 mg is now available. Generics may have a lower copayment for your patients than brand-name drugs. AdvancePCS-preferred drugs are products that help optimize clinical results and economic value for patients and/or health plans.

387.    Like the letter itself, each issue of RxReview recommends that the prescriber utilize Purdue's OxyContin because "clinical experience" and "clinical trials" purportedly support the use of opioids for persistent moderate to severe chronic non-cancer pain, including the management of moderate to severe osteoarthritis-related pain.

Opioids may be appropriate in the treatment of moderate to severe chronic pain whether due to cancer or noncancer origins. Evidence and extensive clinical experience among pain specialists support the use of opioid analgesia in patients with persistent moderate to severe chronic noncancer pain who have not responded to other therapies. Clinical trials have demonstrated the usefulness of long-acting opioids in the management of moderate to severe osteoarthritis-related pain when used appropriately.

**Recommendation**

AdvancePCS supports national guidelines regarding the proper management of chronic pain, including the appropriate use of long-acting opioids in the treatment of moderate to severe chronic pain.

The AdvancePCS-preferred long-acting opioid analgesics are:

**generic morphine extended release**
**OxyContin®** (oxycodone controlled release)

Generic oxycodone extended release 80 mg is now available.
Generics may have a lower copayment for your patients than brand-name drugs.

AdvancePCS-preferred drugs are products that may help optimize clinical results and economic value for patients and/or health plans.

388.    Purdue budgeted $2.1 million for CVS Caremark's RxReview program in 2004.    In 2009, Caremark CVS approached Purdue about participating in RxReview again.

389.    CVS Caremark's RxReview program is not an isolated instance of the pull-through marketing tactics used by both the opioid manufacturers and the PBM Defendants to maximize profitable opioid prescribing.    According to one 2011 email,

Endo sales representatives were instructed to "[m]aximize pull-through with key managed care plans," "[d]rive brand awareness across top [Opana ER] prescribers," and promote favorable Opana ER formulary positioning. Sales representatives were also told to focus on providers "that have the most potential" and not "waste time" on other physicians. Sales representatives also were dispatched to (and did) promote Opana ER formulary status to prescribers.

390.    In another example, after Endo had negotiated a favorable Tier 2 formulary deal with OptumRx in 2010, sales representatives were told to "present the great information" to prescribers and take advantage of the Opana ER "opportunity" for "pull through" sales.

> **4. Only when all this is done should you present the great information that now,** OPANA ER is 2T, Lowest Branded Co-Pay for UHC Commercial (and Part D) patients! **Get commitment first that OPANA ER is the right choice...then show how easy it is to provide OPANA ER for these patients!**

391.    In addition, beginning in 2006, Express Scripts and Purdue entered into an ongoing "Participating Manufacturer Agreement" under which, in return for "administrative fees," Express Scripts would make "routine communications to physicians" and patients about the availability of Purdue's opioids on Express Scripts' standard formularies and "encourage use of" these drugs by patients. Express Scripts would also conduct "physician education with respect to Formulary products." Express Scripts also agreed it would provide numerous deliverables to Purdue, including "detailed information regarding each Express Scripts Client," which enabled Purdue to more effectively pull through its drugs' formulary status to

physicians. The "administrative fees" Express Scripts received were tied to the number of opioids it sold—*i.e.*, the more opioids it sold, the more it made. This agreement, in place at least through the end of 2010, was strictly confidential and renewed on no less than three occasions.

392.    In fact, as late as 2017, Express Scripts gave educational presentations on pain management that treated the risk of addiction to opioids as minimal. In a presentation regarding "The Management of Persistent Pain in Older Persons," Express Scripts Vice President Andrew Behm asserted that psychological dependence to narcotic analgesics was "rare" and that "[a]ddiction associated with the appropriate use of opioid analgesics is uncommon." The presentation also described "physical dependence" as "common" and a "state of adaptation to chronic opioid therapy," as well as recommended fentanyl for chronic pain in older adults.

393.    OptumRx also participated in a Purdue advisory board in 2013 for the "abuse deterrent" version of OxyContin, which was focused on payers in managed care. In 2016, OptumRx conducted studies for Purdue to assess the economic impact of reformulated OxyContin.

394.    OptumRx affiliates also marketed their data analytics capabilities to Purdue for research projects related to opioids, proposing, for example, to sell medical and pharmacy claims data from its "Cliniformatics DataMart" to Purdue, as to study patient disenrollment in Medicare Advantage plans that discontinued coverage of OxyContin ER, and to research overdoses associated with OxyContin.

2.    **The PBM Defendants' Affiliated Entities Provided Research, Data, and Consulting to the Opioid Manufacturers to Expand the Opioid Market**

395.    In addition to assisting the opioid manufacturers in spreading false information about opioids, for years, the PBM Defendants and their affiliated companies provided the manufacturers with data, research, and consulting services needed to expand the opioid market.

396.    For example, in the late 1990s and early 2000s, Express Scripts' affiliate research entity, Practice Patterns Sciences, Inc. ("PPS"), and Medco's Institute for Effectiveness Research provided research and studies for Purdue to aid its efforts to expand the opioid market. One example occurred in 2001, when Express Scripts/PPS developed a study for Purdue on "The Value of OxyContin Therapy in Patients with Moderate to Severe Pain due to Osteoarthritis."

397.    In addition, from the early 2000s until 2015, OptumInsight, a sister company of OptumRx, also helped Purdue generate clinical studies, educational materials, and marketing programs to downplay the addictive properties of OxyContin and expand its use throughout the country.

398.    In order to do so, OptumInsight was paid by Purdue to reverse engineer studies to achieve desired outcomes; create algorithms to identify potential pain patients to suggest OxyContin prescriptions; and create large-scale marketing plans to convince payors that long-term opioid usage was not only useful for many types of pain but did not lead to serious addiction for long-term opioid users.

399.    For example, in 2000 and 2001, OptumInsight (then known as Ingenix) worked with Purdue to develop algorithms and studies to identify chronic pain patients. One was an algorithm that would mine UHC's claims data, "the chronic pain patient identification algorithm." The other was called "Profiling the OxyContin Patient." Purdue paid for these studies, in part, to counter the recent focus in the market on "cases of diversion" and "premium pricing" of OxyContin. Purdue's goal of these studies was to use OptumInsight's "data/evidence" to demonstrate the clinical/financial benefit of OxyContin given the overall costs associated with the undermanagement of pain.

400.    In October of 2002, OptumInsight proposed a "Chronic Pain Management" study and education initiative to present in a series of teleconferences to providers in the UHG/UHC network. The purpose of this educational initiative was to "optimize patient care in the treatment of chronic pain," based on the unfounded notions that "[m]ost specialists in pain medicine and addiction agree that patients with prolong opioid therapy . . . do not usually develop addictive behavior" and "[o]pioids are effective, have a low addiction potential, and may have fewer long-term side effects than other pain treatments."

401.    This clinical initiative was launched by UHG that same year. UHG requested $200,000 to implement the initiative and begin targeting plans for the program. Purdue indicated that while that was a big investment, it also recognized that the return would be high. The study with UHG proved overall to "significantly improve the relationship with this client" and would "provide outcomes data that can

prove valuable in the future with regard to placement and pull-through for United and other major HMOs."

402.    In February 2003, UHC threatened to implement a stricter quantity limit on OxyContin and other Purdue products. Purdue worked with OptumInsight to provide "new data" for June 2003. Based on the joint efforts of Purdue and OptumInsight, UHC subsequently doubled its quantity limit (to a level that Purdue believed was high enough as to not affect OxyContin sales).

403.    In March of 2005, OptumInsight prepared an Executive Summary for Purdue for "A Usual Care, Multicenter, Open-label, Randomized, 4-month Parallel Group Trial to Compare the Impact of Therapy with OxyContin on Health Outcomes and Research Utilization in Subjects with Moderate to Severe Osteoarthritis Pain of the Hip or Knee." The purpose of the study was to present evidence to "health-system decision-makers" of the cost effectiveness of treating osteoarthritis with OxyContin.[71] OptumInsight went on to present this study on behalf of Purdue at the International Society for Pharmacoeconomics and Outcomes Research annual meeting in 2005, where it won an award.

404.    Because these studies were reverse engineered and constructed in order to advance Purdue's market share of OxyContin, in certain instances, members of the medical/health care community pushed back on Purdue's and OptumInsight's joint

---

[71] This study was performed by Innovus Research Inc.  As noted above, Innovus subsequently merged with Ingenix and was renamed "OptumInsight."

medical journal publications. When that occurred, the two companies worked together to respond.

405.    From 2011 through at least 2015, Purdue and OptumInsight worked together to build a comprehensive, multi-step "aspirational statement" and "evidence-generated" strategies for Butrans, OxyContin, Intermezzo, Targin, and hydromorphone.[72] The goal of this coordinated effort was to identify the best way to position these drugs with the public, patients, providers, and payors to increase utilization and maximize sales.

406.    From 2003 to at least 2012, OptumInsight conducted similar studies for other opioid manufacturers. For example, in 2012, OptumInsight's analysis attempted to show that Suboxone film vs. a tablet formulation was superior to prevent diversion/abuse/misuse.[73]

407.    Along with the studies OptumInsight was producing for Purdue to further legitimize the proliferation of opioids without adequate controls throughout the United States, OptumHealth, a subsidiary of UHC, began an "educational partnership" campaign in the early 2000s to educate nurses and case managers throughout the country on the alleged undertreatment of pain.

---

[72] These examples represent OptumInsight's effort with respect to OxyContin. OptumInsight produced similar documents for Purdue relating to Butrans, OxyContin, Intermezzo, Targin, and Hydromorphone.

[73] In 2019, Reckitt Benckiser/Indivior was fined $1.4 billion for the marketing of Suboxone as less-divertible and less-abusable and safer around children, families, and communities than other buprenorphine drugs, even though such claims were never validated. Indivior made these claims publicly, including to the Massachusetts Medicaid program. OptumInsight provided Reckitt Benckiser/Indivior "data/evidence" related to these marketing efforts and otherwise.

408.    In 2004, David Rosen, an employee at Purdue, connected his father, Dr. Michael Rosen, a National Medical Director at OptumHealth from 1996-2021, with account executives at Purdue to begin educating UHC and client clinical staff on how to effectively manage pain. Importantly, UHC's P&T Committee directly reported to Dr. Rosen. Moreover, his son was on the marketing team at Purdue and utilized his relationship with his father to connect Purdue with OptumHealth and UHC.

409.    In January 2005, Dr. Rosen coordinated with Purdue to present two major Continuing Education Programs to be given to case managers at UHC. The next month, the educational initiatives were implemented.  Part of the program targeted nurse practitioners, and included a presentation called "Communication to Enhance Collaboration and Outcomes." The PowerPoint presentation emphasized the "Possible Adverse Effects of Undertreated Pain" and had speaker notes that advocated for increased opioid use: "If we continue to provide pain care as it has always been provided, patients will continue to suffer needlessly." The same presentation was given to case managers, then expanded to UHC-affiliated groups throughout the country, including to risk managers and telephone triage nurses.

410.    In 2006 and 2007, Dr. Rosen and Purdue worked together on multiple programs, including a program called "UHC Educate the Educator."

411.    In 2009, Dr. Rosen worked with Purdue to roll out a six month "chronic pain mgmt. program" that would directly link to Purdue's "Partners Against Pain" website. Intended for Optum case managers throughout the country, the program

was to focus on Purdue's FACETS modules. The series was to be presented by Optum Medical Directors and some Purdue employees.

412.    In March 2009, Optum employees reached out to Purdue to facilitate Medical Director Faculty Forum presentations regarding pain. One of the faculty presentations addressed how to treat lower back pain with opioids using one of the FACETS topics. Optum distributed the literature for the topic to medical directors. Thereafter, Purdue held multiple educational seminars with the Medical Directors at Optum and disseminated the same information to hundreds of case managers throughout the country via seminars and literature.

413.    In sum, the opioid manufacturers' efforts to disseminate misinformation about opioid addiction, opioid use for chronic pain, and opioids as a first-line therapy inappropriately expanded the opioid market. Beginning in the 1990s, the PBM Defendants collaborated with Purdue to spread this misinformation in an effort to increase opioid utilization and sales. The result of these joint efforts (in Express Scripts' own words) was the "opiate explosion: vast increase in prescribing [and] more potent formulations [of opioids]."

### E.    CVS Caremark, Express Scripts, and Optum Implemented Protocols to Address the Opioid Epidemic Two Decades Too Late

414.    After decades of working to increase opioid utilization, in 2017, due to mounting pressure from their clients and the federal government, CVS Caremark, Express Scripts, and Optum finally implemented programs aimed at addressing opioid overutilization and abuse. CVS Caremark's "enterprise initiatives" and

"enhanced opioid utilization management approach" were publicly announced on September 21, 2017.[74]    Express Scripts' Advanced Opioid Management ("AOM") program commenced on September 1, 2017. Optum's Opioid Risk Management ("ORM") program commenced in January 2018.

415.    As debuted on September 1, 2017, Express Scripts' AOM 1.0 program finally provided tools (such as prior authorizations) at the pharmacy level (referred to as "point of sale" or "POS") that Express Scripts should have been providing for decades.[75] In 2019, Express Scripts reported that 17.4 million covered lives were enrolled in the AOM program.[76]

416.    Optum began rolling out its own program in mid-2017, although key features did not launch until January 2018, due to concerns about OxyContin rebate impact.  Optum's ORM program offered a "Base Offering," which was the standard program that applied to all PBM clients at no additional fee. No opt-in was required. *Id.*

---

[74] *CVS Health Fighting National Opioid Abuse Epidemic With Enterprise Initiatives*, September 21, 2017, https://www.cvshealth.com/news/pharmacy/cvs-health-fighting-national-opioid-abuse-epidemic-with-enterpri.html (last accessed August 15, 2025).

[75] Notably, the AOM program was the first time Express Scripts had taken any direct steps to limit the quantity or flow of short acting opioids.

[76] Express Scripts, *Two Years Later: Still Leading the Industry in Protecting Patients,* https://www.express-scripts.com/corporate/articles/measuring-impact-opioid-crisis-management (last accessed Nov. 14, 2023).

417.    The ORM program had a significant impact on opioid utilization across OptumRx's book of business. Five months after the soft launch of the ORM program, the company reported it had achieved:

- 21% reduction in first-fill prescriptions exceeding the CDC dosing guidelines of <50 MED per day. This translated to a 93% compliance rate with CDC safe dosing recommendations;

- 11% reduction in first-fill acute opioid prescriptions written for durations in excess of CDC-recommended 7-day supply maximum, translating to a 92 percent compliance to safe duration;

- 5% decrease in opioid prescriptions for current chronic opioid utilizers issued for >90mg MED resulting in 97 percent compliance to safe dosing;

- 14% reduction in average dose across all SAO prescriptions; and

- 12% reduction in overall volume of SAO prescriptions.

418.    On September 21, 2017, CVS Health announced a series of "enterprise initiatives" as part of the company's alleged "broad commitment to fighting the "national opioid abuse epidemic." According to CVS Health, the expanded initiatives would "leverage[] CVS Pharmacy's national presence with the capabilities of CVS Caremark, which manages medications for nearly 90 million plan members."[77]

419.    In conjunction with announcing the remedial measures, CVS Health acknowledged that "opioid prescribing rates have increased nearly three-fold" between 1991 and 2013.[78]  CVS Health, however, made no mention of the fact that

---

[77] *CVS Health Fighting National Opioid Abuse Epidemic With Enterprise Initiatives*, September 21, 2017, https://www.cvshealth.com/news/pharmacy/cvs-health-fighting-national-opioid-abuse-epidemic-with-enterpri.html (last accessed August 15, 2025).

[78] *Id.*

opioid dispensing rates—including those of CVS Caremark—had followed the same disturbing trend during and beyond that same period.

420.   Most notably, as part of the company's overall plan to "roll out an enhanced opioid utilization management approach for all commercial, health plan, employer, and Medicaid clients," CVS Health indicated, *inter alia*, that it would: (1) limit to seven days the supply of opioids dispensed for certain acute prescriptions for patients who are new to therapy: (2) limit the daily dosage of opioids dispensed based on the strength of the opioid; and (3) require the use of immediate-release formulations of opioids before extended-release opioids are dispensed.[79]

421.   Like Express Scripts and Optum, CVS Caremark could have implemented such pill limitations and/or formulation requirements years earlier. Instead, as indicated, CVS Caremark spent those same years solidifying the opioid epidemic's grip on the nation by acquiescing to manufacturers' daily pill count demands and providing preferred formulary placements in exchange for larger manufacturer rebates.

422.   For example, in 2018, Purdue would acquiesce to CVS Caremark's demand that "considerable rebate enhancements" be made to account for the company's ultimate decision to maintain Oxycontin in prescription health plans in the face of the nation's ongoing opioid epidemic.[80]  Yet that same year, while reaping

---

[79] *Id.*; https://www.caremark.com/portal/asset/Opioid_Reference_Guide.pdf (last accessed August 15, 2025).

[80] *Confidential Files Detail PBMs' Backroom Negotiations—and Their Role in the Opioid Crisis*, https://www.barrons.com/articles/pbm-drug-prices-insulin-opioid-crisis-dcf9e83c, October 11, 2024 (last accessed August 15, 2025).

the financial rewards of restructured rebate agreements, CVS Caremark informed the public of its intent to expand two of its "signature" opioid abuse prevention programs—the safe medication disposal program, which provides medication disposal units in CVS pharmacy locations, and the "Pharmacists Teach" program, where pharmacists visit schools and talk to students and parents about the dangers of opioid abuse.   In doing so, CVS Caremark also represented that it "has implemented criteria to help adopting clients manage opioid utilization in a manner consistent with the Guideline for Prescribing Opioids for Chronic Pain issued by the Centers for Disease Control and Prevention (CDC)."[81]

423.   Notably, CVS Caremark, Express Scripts, and Optum could have implemented these opioid reducing measures at any point over the past two decades. In fact, quantity limits and PAs have been used to control drug utilization since before CVS Caremark, Express Scripts, and Optum operated as PBMs.  Moreover, the PBM Defendants have utilized step therapy in conjunction with other prescription drugs since the late 1990s.[82]

424.   Had the PBM Defendants created effective protocols to address opioid overutilization—such as the programs they ultimately implemented in 2017—when they first knew these drugs were causing a public health crisis, the PBM Defendants

---

[81] *CVS Health Announces Expanded Opioid Abuse Prevention Efforts*, November 7, 2018; https://www.cvshealth.com/news/community/cvs-health-announces-expanded-opioid-abuse-prevention-efforts (last accessed August 15, 2025).

[82] Express Scripts, *Innovating for Better: 30+ Years and Counting*, https://www.express-scripts.com/corporate/about/timeline (last accessed Nov. 14, 2023).

could have significantly reduced the excessive amounts of opioids dispensed in Philadelphia.

**F.    Even After Implementing its Opioid Risk Management Program, Optum Continued Promoting Uncontrolled Opioid Sales Through Its Cash Card and Discount Card Businesses**

425.    Optum also collects set administrative fees for every opioid paid for with either its own discount card or one of its administered cash cards—which are governed by either Optum Perks, LLC or Optum Discount Card Services, LLC. Cash cards neither adhere to formularies, nor do they have traditional UM controls. Cash cards played a significant role in the opioid epidemic, as they allowed patients that submitted prescriptions which exceeded their insurance plan limits a cheaper way to access opioids.[83] Cash cards could be used by anyone to purchase opioids—including individuals who do not receive benefits from Optum or UnitedHealth Group.

426.    Optum counts individuals who utilize its administered cash card—but who do not receive benefits from Optum or UnitedHealth Group—as "members" of Optum.  Optum receives administrative fees and other revenue from each opioid prescription paid for with an Optum-administered cash card. Optum issues cash cards for opioids despite knowing that this allows individuals an "end run around" dispensing controls built into Optum and other payors' formularies. Further, and most importantly, cash cards are not subject to any limits, exclusions or PA controls since members pay the entire amount of the discounted claim.

---

[83] Kelly Ayotte, THE HILL, *Shut the Back Door to America's Opioid Epidemic* (July 3, 2018), https://thehill.com/opinion/healthcare/395401-shut-the-back-door-to-americas-opioid-epidemic/ (last accessed August 15, 2025).

427.    Optum's cash card business focus took root in approximately 2015, when it realized that an expanded Cash Card/Pharmacy Discount service was an opportunity for revenue growth (a realization coinciding with its acquisition of Catamaran, which had a significant cash card business). This included partnering with drug manufacturers, including opioid manufacturers, to further empower its cash card business.

428.    Optum explicitly communicated that their cash card business included a lack of opioid controls. In fact, one opioid manufacturer (Collegium) declined to participate in Optum's cash card program due to the lack of opioid utilization controls.

429.    At the same time, Optum was advertising and encouraging individuals—whether they were Optum or UnitedHealth Group members or not—to use its various administered cash card and discount programs to purchase opioids.

430.    In 2017, while OptumRx was publicly touting its new ORM program, internal documents reveal that Optum was also unwilling to control any prescriptions administered by Optum Perks or Optum Discount Card Services, and wanted it known that there were "no restrictions on cash cards, ever." When presented with the opportunity to block opioids on its cash cards in 2017, Optum calculated that it would cost the business $26 million per year.  As a result, Optum decided not to block the use of cash cards for opioid claims. By 2018, Optum served over 3.6 million cash card "members."

431.    Despite Optum's public-facing commitment to fighting the opioid epidemic, in June 2018, Optum also refused to block opioid adjudication on its suite

of cash cards. This included a refusal by Optum, its affiliates, and its marketing partners to cease advertising the use of Optum's suite of discount card pricing tools to pay for opioid prescriptions. Optum's stated reason for this refusal was that such would "cut into it [sic] revenue/the admin fees Optum collects regarding opioids."

432.    Optum was fully aware its cash cards were being used to abuse, divert, and misuse opioids. For example, in 2019, Calabrese wanted to know Optum's exposure when the FBI charged dozens of medical practitioners and pharmacies throughout the country for the illegal prescribing of opioids. An analysis of those "exposure" claims showed a large number of them related to cash card claims administered by OptumRx.

## VI.    AS MAIL-ORDER PHARMACIES, CVS CAREMARK, EXPRESS SCRIPTS, AND OPTUMRX DISPENSED OPIOIDS IN VIOLATION OF THE CONTROLLED SUBSTANCES ACT (CSA) AND THE PENNSYLVANIA CONTROLLED SUBSTANCE, DRUG, DEVICE AND COSMETIC ACT OF 1972 (PCSA)

### A.    The Applicable Statutes

433.    The PBM Defendants knowingly violated their duties under the CSA and PCSA and their implementing regulations, including, but not limited to, 21 U.S.C.A. §§ 829, 841, 842; 21 C.F.R. §§ 1301.71, 1306.04, 1306.06; 35 P. S. §§ 780-1 *et seq.*; 69 P.S. § 390-2; 28 Pa. Code §§ 25.1-131; and 49 Pa. Code § 27.18, by ignoring their obligation to provide effective controls against diversion.

#### 1.    The Controlled Substances Act (CSA)

434.    The CSA and its implementing regulations govern the manufacture, distribution, and dispensing of controlled substances in the United States. From the outset, Congress recognized the importance of preventing the diversion of drugs from

legitimate to illegitimate uses. Accordingly, the CSA establishes a closed regulatory system under which it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA. *See* 21 U.S.C. § 841(a).

435.    The CSA categorizes controlled substances in five "Schedules."

436.    Schedule II (also called herein CII) contains drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence," but nonetheless have "a currently accepted medical use in treatment." 21 U.S.C. § 812(b)(2).

437.    Schedule III contains drugs in which, although the abuse potential is less than a Schedule II drug, such abuse may lead to moderate "physical dependence or high psychological dependence." Schedule III drugs also have "a currently accepted medical use." 21 U.S.C. § 812(b)(3).

438.    The CSA makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" except as specifically authorized. 21 U.S.C. § 841(a)(1).

439.    Accordingly, the CSA requires those who manufacture, distribute, or dispense controlled substances to obtain a registration from the DEA. 21 U.S.C. § 822(a). A registrant is only permitted to dispense or distribute controlled substances "to the extent authorized by their registration and in conformity with the [CSA]." 21 U.S.C. § 822(b).

440.    An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription within the meaning and intent of the CSA. 21 U.S.C. § 829.

441.    At all times relevant to this Complaint, the PBM Defendants have registered their mail-order pharmacies with the DEA in Schedule II–V controlled substances. Those DEA registrations authorize the PBM Defendants'-owned pharmacies to "dispense" controlled substances, which "means to deliver a controlled substance to an ultimate user … by, or pursuant to the lawful order of, a practitioner." 21 U.S.C. § 802(10), *accord* 21 U.S.C. § 823(f).

442.    In the case of CVS Caremark, the entities that are registered with the DEA are CVS Pharmacy, Inc., CaremarkPCS Health, LLC, and AdvanceRx.com, LLC (d/b/a CaremarkPCS Pennsylvania Mail Pharmacy, LLC).   In the case of Express Scripts, the entities that are registered with the DEA are Express Scripts Pharmacy, Inc., ESI Mail Pharmacy, Inc. and Express Scripts Specialty Distribution Services, Inc. In the case of Optum, the registered entity is OptumRx, the same entity that performs PBM services.

443.    Agents and employees of a registered manufacturer, distributor, or dispenser of controlled substances, such as a pharmacist employed by a registered mail-order pharmacy like those owned by the PBM Defendants, are not  required to register with the DEA "if such agent or employee is acting in the usual course of his business or employment." 21 U.S.C. § 822(c)(1).

444.   Under the CSA, the lawful dispensing of controlled substances is governed by 28 U.S.C. § 829, and more specifically in Part 1306 of the CSA's implementing regulations. *See generally* 21 C.F.R. § 1306.

445.   Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency. 21 U.S.C. § 829(a).

446.   A prescription, whether written or oral, is legally valid under the CSA *only* if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment … is not a prescription within the meaning and intent of [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." 21 C.F.R. § 1306.04(a).

447.   As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." 21 C.F.R. § 1306.04(a). Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

448.   Moreover, "[a] prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either

registered individually, or employed in a registered pharmacy...." 21 C.F.R. § 1306.06.

449.    Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, *but only if*, such dispensing would be in accordance with a generally accepted, objective standard of practice—*i.e.,* "the usual course of his [or her] professional practice" of pharmacy. 21 C.F.R. § 1306.06.

450.    Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose. *See* 21 C.F.R. §§ 1306.04, 1306.06.

451.    Unlawful dispensing of controlled substances by a pharmacist may subject the pharmacy or pharmacist to criminal actions and to civil enforcement actions for money penalties or injunctions. 21 U.S.C. §§ 842, 843.

452.    A pharmacy also needs to know there is a corresponding responsibility for the pharmacist who fills the prescription.[84] The pharmacist has a legal duty to recognize "red flags" or warning signs, such as early refills or suspicious drug combinations, that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.  A pharmacist's corresponding responsibility extends to the pharmacy itself.

---

[84] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act* (Rev. 2020).

453.    A pharmacy's registration can be revoked because its pharmacists have violated the corresponding responsibility rule and both the pharmacy and pharmacists may be the subject of further discipline.[85]

### 2.    The Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act of 1972 (PCSA)

454.    CVS Caremark, Express Scripts, and Optum, as dispensers of controlled substances, are also required to comply with the PCSA and its implementing regulations, including, but not limited to, 35 P. S. §§ 780-1 *et seq.*; 69 P.S. § 390-2; 28 PA. CODE §§ 25.1-131; and 49 PA. CODE § 27.18.

455.    Pennsylvania law requires every person who manufactures, distributes, or dispenses controlled substances to be registered with the Commonwealth.  35 P.S. § 780-106; 28 Pa. Code § 25.113.

456.    Similar to the CSA, Pennsylvania law, 35 P.S. § 780-104, categorizes controlled substances in five "Schedules."

457.    Opioids are categorized as Schedule II controlled substances under Pennsylvania law.  35 P.S. § 780-104(2).  Schedule II drugs have a "high potential for abuse" and "may lead to severe psychic or physical dependence."  35 P.S. § 780-104; 28 Pa. Code § 25.72(c).

458.    Pennsylvania law generally requires an electronic prescription in order to dispense Schedule II controlled substances.  35 P.S. § 780-111(a).  No prescription for a Schedule II controlled substance may be refilled.  *Id.*

---

[85] *Id.*

459.   As with the CSA, Pennsylvania laws impose a "corresponding responsibility" on pharmacists dispensing controlled substances to ensure that the prescription is "issued for a legitimate medical purpose by a licensed practitioner in the usual course of professional practice."  28 Pa. Code § 25.52(a).  A prescription may not be issued for any controlled substance to someone who is "drug dependent" "for the purpose of continuing his dependence upon such drugs."  28 Pa. Code § 25.52(b).

460.   Pennsylvania law explicitly provides that pharmacists in the Commonwealth "shall have the responsibility described in 21 C.F.R. § 1306.04."  *See* 35 P.S. § 780-111(b.3)(2).   Thus, Pennsylvania law incorporates pharmacists' "corresponding responsibility" under federal law, which requires pharmacists to ensure, prior to dispensing, that a prescription is issued for a legitimate medical purpose by a practitioner in the usual course of professional practice.  *See* 21 C.F.R. § 1306.04; 28 Pa. Code § 25.52(a).

461.   CVS Caremark, Express Scripts, and Optum have an affirmative duty under Pennsylvania law to act as gatekeepers to guard against the diversion of highly addictive, dangerous opioid drugs.

462.   Pennsylvania law also requires that distributors and others "maintaining stocks or having controlled substances in production areas or on hand for distribution shall provide effective controls and procedures to guard against theft and diversion of the substances."  28 Pa. Code § 25.61.

### 3. Pharmacies Are Obligated Not to Fill Prescriptions Until All Red Flags Are Resolved

463. A pharmacy cannot ignore red flags indicative of abuse and diversion. On the contrary, "a pharmacist is obligated to refuse to fill a prescription if he knows or has reason to know that the prescription was not written for a legitimate medical purpose."[86] "[W]hen prescriptions are clearly not issued for legitimate medical purposes, a pharmacist may not intentionally close his eyes and thereby avoid actual knowledge of the real purpose of the prescriptions."[87] Thus, 21 C.F.R. § 1306.064 requires "pharmacists [to] use common sense and professional judgment," which includes paying attention to the "number of prescriptions issued, the number of dosage units prescribed, the duration and pattern of the alleged treatment," the number of doctors writing prescriptions, and whether the drugs prescribed have a high rate of abuse or diversion.[88] "When [pharmacists'] suspicions are aroused as reasonable professionals," they must at least verify the prescription's propriety, and if not satisfied by the answer they must "refuse to dispense."[89]

---

[86] *Medic-Aid Pharmacy*, Revocation of Registration, 55 Fed. Reg. 30,043-01, 30,044, 1990 WL 328750 (Dep't of Just. July 24, 1990).

[87] *East Main Street Pharmacy*, Affirmance of Suspension Order, 75 Fed. Reg. 66,149-01, 66,150, 2010 WL 4218766 (Dep't of Just. Oct. 27, 2010).

[88] *Ralph J. Bertolino, d/b/a Ralph J. Bertolino Pharmacy, Inc.*, Revocation of Registration, 55 Fed. Reg. 4,729-01, 4,730, 1990 WL 352775 (Dep't of Just. Feb. 9, 1990).

[89] *Id.*; *see also Townwood Pharmacy*, Revocation of Registration, 63 Fed. Reg. 8,477-04, 1998 WL 64863 (Dep't of Justice Feb. 19, 1998); *Grider Drug No. 1 & Grider Drug No. 2*, Decision & Order, 77 Fed. Reg. 44,070-01, 2012 WL 3027634 (Dep't of Justice July 26, 2012); *The Medicine Dropper*, Revocation of Registration 76 Fed. Reg. 20,039-01, 2011 WL 1343276 (Dep't of Justice Apr. 11, 2011); *Medicine Shoppe-*

464.    Courts, too, have recognized the obligation of pharmacies not to dispense until red flags are resolved.[90] In *Medicine Shoppe-Jonesborough*, the Sixth Circuit affirmed a pharmacy's liability for filling false or fraudulent prescriptions for controlled substances, concluding that the pharmacy violated § 829 of the CSA and 21 C.F.R. § 1306.04. The Sixth Circuit held "[t]he CSA forbids a pharmacy to dispense a Schedule II, III, or IV controlled substance without a prescription, 21 U.S.C. § 829(a)-(b), which 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,' 21 C.F.R. § 1306.04(a)."[91] Prescriptions that "involved excessive" quantities of drugs and "remedies outside the prescriber's ordinary area of practice" "should have raised red flags at Medicine Shoppe."[92] "By filling these prescriptions anyway. . . the pharmacy not only violated its duties under federal (and state) law to ensure that only proper prescriptions were filled but also put public health and safety at risk."[93]

465.    The trial court in *In re: National Prescription Opiate Litigation*, MDL No. 2804 ("MDL Court") has addressed this very issue. The MDL Court unequivocally

---

*Jonesborough*, Revocation of Registration, 73 Fed. Reg. 364-01, 2008 WL 34619 (Dep't of Justice Jan. 2, 2008); *United Prescriptions Services, Inc.*, Revocation of Registration, 72 Fed. Reg. 50,397- 01, 50,407-8, 2007 WL 2455578 (Dep't of Just. Aug. 31, 2007).

[90] *See Med. Shoppe-Jonesborough v. Drug Enf't Admin.*, 300 F. App'x 409, 413-14 (6th Cir. 2008); *United States v. Henry*, 727 F.2d 1373, 1378-79 (5th Cir. 1984); *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp.2d 145, 160 (D.D.C. 2012).

[91] *Med. Shoppe-Jonesborough*, 300 F. App'x at 412.

[92] *Id*. at 413.

[93] *Id*.

stated that "[t]here is no question that dispensers of controlled substances are obligated to check for and conclusively resolve red flags of possible diversion prior to dispensing those substances."[94]

466.    In fact, the MDL Court found that the corporate parents of chain pharmacies have an affirmative obligation under the CSA to "design and implement systems, policies, or procedures to identify red flag prescriptions."[95] The MDL Court reasoned that pharmacies "cannot collect data as required by the statute, employ a licensed pharmacist as required by the statute, identify red flags as required by Agency decisions, but then do nothing with their collected data and leave their pharmacist-employees with the sole responsibility to ensure only proper prescriptions are filled. Possessing, yet doing nothing with, information about possible diversion would actually facilitate diversion, and thus violate the CSA's fundamental mandate that '[a]ll applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances.'" 21 C.F.R. § 1301.71(a) (emphasis added).[96]

---

[94] *In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. 3d 613, 629 (N.D. Ohio 2020), clarified on denial of reconsideration, No. 1:17-MD-2804, 2020 WL 5642173 (N.D. Ohio Sept. 22, 2020). *See also City and Cnty. Of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936, 960 (N.D. Cal. 2022).

[95] *In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. at 630.

[96] *Id.*

### 4.    The CSA Applies to All Persons Who Dispense Controlled Substances

467.    Courts have found that because the plain language of § 842 of the CSA extends its requirements to "all persons," registrants and non-registrants alike are responsible for complying with the law.[97] Importantly, in those cases, the courts found that because the pharmacy owners, who were not registrants, essentially operated the facilities on a day-to-day basis, they were not exempted from the requirements of Section 842.[98]

468.    At least one court has explicitly held that a non-registrant pharmacy owner can be held liable for dispensing controlled substances without valid prescriptions. In *United States v. City Pharmacy*, the court found that the owner of the pharmacy could be held liable in his personal capacity for violations of Section 842(a)(1), even though he was not a registrant and the pharmacies he owned were

---

[97] *See United States v. Blanton*, 730 F.2d 1425, 1434 (11th Cir. 1984) (Section 842(a)(5) applied to a physician who was not properly registered with the DEA); *United States v. Clinical Leasing Serv., Inc.*, 759 F. Supp. 310, 313-14 (E.D. La. 1990), *aff'd*, 925 F.2d 120 (5th Cir. 1991) ("Had Congress intended to limit the applicability of § 842(a)(5) to registrants only, it would have done so"); *United States v. Stidham*, 938 F. Supp. 808, 814 (S.D. Ala. 1996); *United States v. Poulin*, 926 F. Supp. 246, 250, 253 (D. Mass. 1996).

[98] *Stidman*, 938 F. Supp. at 809, 814 (the owner of a clinic, who was not a registrant, could be liable because he "shouldered [the] responsibility [to provide a system for the control of drug traffic and to prevent the abuse of drugs] and derived the benefits and profits from operating a methadone clinic."); *Poulin*, 926 F. Supp. at 249, 253 ("Although Mattapoisett Pharmacy, Inc. was listed as the registrant, the statute specifically makes the stated obligations to produce required records applicable to all persons, not simply to registrants.").

separately incorporated.[99] The *City Pharmacy* court also found that the individual defendant could not use the pharmacies' separate incorporation to shield himself from CSA liability.[100]

469.    Just like the defendant in *City Pharmacy*, as alleged more fully herein, the PBM Defendants have invested the funds to organize and open their mail-order pharmacies and play a very active role in the management of those pharmacies, including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

## B.    The PBM Defendants Violated the CSA and the PCSA

470.    At all times material hereto, DEA registrants like the PBM Defendants had the duty to "provide effective controls and procedures to guard against theft and diversion of controlled substances."[101] Diversion includes the use of medication outside the usual course of professional practice.

471.    The DEA has repeatedly emphasized that pharmacies like those owned by the PBM Defendants, as DEA registrants, are required to implement systems that will detect and prevent abuse and diversion and must monitor for red flags of abuse and diversion. In regulatory actions, the DEA has also repeatedly affirmed the

---

[99] *United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2016 WL 9045859, at *4 (N.D. W.Va. Dec. 19, 2016); *see also United States v. Moore*, 423 U.S. 122, 134 n.11 (1975); *United States v. Stidham*, 938 F. Supp. 808, 813-814 (S.D. Ala. 1996).

[100] *City Pharmacy,* 2016 WL 9045859, at *4.

[101] 21 C.F.R. § 1301.71(a).

obligations of pharmacies to maintain effective controls against abuse and diversion.[102] According to the DEA, pharmacists are the "[l]ast line of defense."[103]

472.    The framework of state and federal statutes and regulations, along with industry guidelines, make clear that pharmacies—like those owned by the PBM Defendants—are expected to use their specialized and sophisticated knowledge, skill, information, and understanding of the risks and dangers of the abuse and diversion of prescription narcotics, when dispensing medications.

473.    The PBM Defendants were on notice that case law and administrative proceedings interpreting the CSA required their pharmacies to recognize and resolve all "red flags" indicating addiction, abuse and diversion, such as criminal, civil, or

---

[102] *See, e.g.*, *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, Decision & Order, 77 Fed. Reg. 62,316-01, 2012 WL 4832770 (Dep't of Justice Oct. 12, 2012); *East Main Street Pharmacy,* Affirmance of Suspension Order, 75 Fed. Reg. 66,149-01, 2010 WL 4218766 (Dep't of Justice Oct. 27, 2010); *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp. 2d 145 (D.D.C. 2012); *Townwood Pharmacy*, Revocation of Registration, 63 Fed. Reg. 8,477-04, 1998 WL 64863 (Dep't of Justice Feb. 19, 1998); *Grider Drug No. 1 & Grider Drug No. 2*, Decision & Order 77 Fed. Reg. 44,070-01 (Dep't of Justice July 26, 2012); *The Medicine Dropper*, Revocation of Registration, 76 Fed. Reg. 20,039-01 (Dep't of Justice Apr. 11, 2011); *Medicine Shoppe-Jonesborough*, Revocation of Registration 73 Fed. Reg. 363-01 (Dep't of Justice Jan. 2, 2008).

[103] *See* Thomas W. Prevoznik, *Birmingham Pharmacy Diversion Awareness Conference, DEA Perspective: Pharmaceutical Use & Abuse,* at 139-40 (Mar. 28-29, 2015), https://web.archive.org/web/20160418074249/https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2015/march_2015/prevoznik.pdf (last accessed August 15, 2025).

administrative actions pending against the prescriber, pattern prescribing, pharmacy shopping, doctor shopping, high abuse potential prescriptions, drug cocktails, etc. [104]

474.   In particular, the PBM Defendants should have been looking for instances when there were multiple red flags in combination, which would make them truly unresolvable. According to *Holiday CVS*:

> Professor Doering specifically identified such red flags as. . . ; the respective locations of the patient and the prescriber . . . ; that a prescriber writes for certain combinations or patterns of drugs. . . .; and multiple patients presenting "prescriptions for the same drugs, the same quantities . . . from the same doctor without any kind of variability or change considering the different patients that come into the pharmacy," thus suggesting that the physician prescribes in a "factory like manner." *Id.* Professor Doering reviewed the various spreadsheets of the prescriptions dispensed by Respondents and testified regarding whether Respondents could have lawfully dispensed various prescriptions given the red flags they presented.[105]

475.   At all times material hereto, the PBM Defendants were in a position to recognize the red flags identified above. All or some of these red flags were frequently present in hundreds of thousands of prescriptions their pharmacies received during

---

[104] *Holiday v. Holder*, 839 F. Supp. 2d 145; *Pharmacy Drs. Enterprises, Inc. v. Drug Enf't Admin.*, 789 Fed. App'x 724, 730 (11th Cir. 2019); *Holiday CVS*, 77 Fed. Reg. at 62,318, 62,326, 62,331, 62,344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66,159; *Oak Hill Hometown Pharmacy v. Dhillon*, 418 F. Supp. 3d. 124, 131 (S.D.W.Va., 2019); *Jones Total Health Care Pharmacy, LLC v. DEA*, 881 F.3d 823, 828 (11th Cir. 2018); "Centers for Disease Control, CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016," 65 Morb. And Mort. Wkly Rep. (Mar. 18, 2016) https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf; *See supra,* Prevoznik, *Birmingham Pharmacy Diversion Awareness Conference,* at 139-140, https://web.archive.org/web/20160418074249/https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2015/march_2015/prevoznik.pdf (last accessed August 15, 2025).

[105] *Holiday CVS*, 77 Fed. Reg. at 62,318.

the relevant time period—prescriptions which the PBM Defendants' mail-order pharmacies should have reported and refused to fill.

476.    The PBM Defendants, as sophisticated owners of multiple mail-order pharmacies, had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations. The PBM Defendants track every prescription claim they process across all the health plans they service. Furthermore, the PBM Defendants could aggregate this data across various entities in the pharmaceutical supply chain, including drug manufacturers, pharmacies, insurers, and patients. Their own data would have allowed the PBM Defendants to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, and of prescribers or facilities that seem to engage in improper prescribing.[106]

477.    Rather than use their data to limit problematic opioid utilization or investigate outlier prescribers, the PBM Defendants sold the data to third-party vendors who, in turn, resold the data to drug makers like Purdue. Drug makers used this data to stoke sales of opioid drugs to physicians across the United States.

478.    The PBM Defendants did little to fulfill their duties as the last line of defense during the relevant time period.  Specifically, the PBM Defendants failed to ensure that the prescriptions they were filling were issued to legitimate patients for legitimate medical purposes by practitioners acting in the usual course of professional

---

[106] *See, e.g.*, *id.*, at 62,326-28 (DEA expert witness examined dispensing records alone to identify inappropriately dispensed medications).

practice, as is evidenced by the copious amounts of opioids that were dispensed by their mail-order pharmacies throughout the United States, including Philadelphia.

479.    The lack of diversion controls is not surprising, given the frenetic pace at which the PBM Defendants' mail-order pharmacies operated. The pressure on their pharmacists to fill large volumes of prescriptions made the performance of appropriate due diligence, including the required resolution of red flags, nearly impossible.

480.    For instance, employees at Express Scripts and Optum mail-order pharmacies routinely complained of being under significant pressure to fill as many prescriptions as possible, as quickly as possible. In this vein, Express Scripts instituted a "point system" that governed the prescription-filling process, while the activities of Optum's mail-order pharmacists were audited weekly to ensure they met company metrics. CVS Health's performance-based metric system has also been criticized for creating employee burnout, unfairly eliminating older employees, and causing dispensing errors.[107]

481.    Based on recent disciplinary action taken by the State of California's Board of Pharmacy ("CBOP"), CVS Caremark's performance-based metric system is likely a substantial cause of its illegal and improper mail-order dispensing practices.

---

[107] *See, e.g.,* How Chaos at Chain Pharmacies is Putting Patients at Risk, *The New York Times*, February 1, 2020; CVS Fined for Prescription Errors and Poor Staffing at Pharmacies, *The New York Times*, July 16, 2020; What's Gone Wrong at Pharmacies? A CVS Store in Virginia Beach Holds the Answer, Feb. 9. 2024; https://www.barrons.com/articles/pharmacies-medication-mistakes-cvs-e405367a (last accessed August 15, 2025).

Specifically, on June 7, 2023, CVS-PCS Pennsylvania Mail Pharmacy LLC d/b/a CVS Caremark executed a Stipulated Settlement and Disciplinary Order in relation to allegations that the Wilkes Barre, Pennsylvania-based mail-order pharmacy ignored red flags and allowed hundreds of thousands of pills—including prescription opioids—to be improperly dispensed between July 6, 2018 and July 6, 2021.[108]

482.    Given that CVS Caremark, Optum, and Express Scripts' mail-order dispensing policies prioritized speed and efficiency above all else, some employees reported complete mental and physical exhaustion, continuous fear of disciplinary action, and an unrelenting pressure to fill higher volumes of prescriptions in even shorter amounts of time.

483.    CVS Caremark is certainly not the only PBM Defendant which has been subject to DEA regulatory action for failures to implement appropriate controls on mail-order dispensing. For instance, on May 15, 2012, Express Scripts Pharmacy Services, Inc. agreed to pay the United States $2.75 million to resolve allegations under the CSA that drug diversion occurred at several Express Scripts mail-order facilities, including facilities in Bensalem, Pennsylvania and Harrisburg, Pennsylvania, between 2002 and 2006.[109]

---

[108] https://www.pharmacy.ca.gov/enforcement/fy2122/ac217258 (last accessed August 15, 2025).

[109] Press Release, *United States Settles With Express Scripts Over Diversion Of Controlled Substances And Use Of Improper DEA Numbers*, U.S. Attorney's Office, E.D. PA. (May 15, 2012), https://www.justice.gov/archive/usao/pae/News/2012/May/esi_release.htm (last accessed August 15, 2025).

484. At all times material hereto, the PBM Defendants' mail-order pharmacies dispensed huge quantities of opioids. For example, according to the DEA Automated Reports and Consolidated Ordering System ("ARCOS") database, during the 2006 to 2019 time period, Express Scripts and Optum pharmacies purchased 45 billion MMEs nationally, spread over more than 2 billion dosage units.

485. From at least 2006 to the present, the PBM Defendants violated the CSA, the PCSA, and their implementing regulations by dispensing controlled substances in violation of their corresponding responsibility under 21 C.F.R. § 1306.04(a) and outside the usual course of pharmacy practice under 21 C.F.R. § 1306.06.

486. The PBM Defendants also violated the CSA and the PCSA, and their implementing regulations, each time their mail-order pharmacies filled a controlled substance prescription without identifying and resolving red flags because, *inter alia*:

- They were knowingly filled outside the usual course of professional practice and not for a legitimate medical purpose; therefore, they were not dispensed pursuant to a valid prescription under 21 U.S.C. § 829 and 28 Pa. Code § 25.52(a), and thereby violated 21 U.S.C. § 842(a)(1) and 35 P.S. § 780-111(b.3)(2); and

- They were knowingly and intentionally dispensed outside the usual course of professional pharmacy practice in violation of 21 C.F.R. 1306.06 and 28 Pa. Code § 25.52(a), and therefore such dispensing and delivering of controlled substances was not authorized by the CSA and PCSA, and thereby violated 21 U.S.C. § 841(a) and 35 P.S. § 780-111(b.3)(2).

## VII. THE PBM DEFENDANTS CONTRIBUTED TO THE PUBLIC HEALTH CRISIS IN PHILADELPHIA.

487. On January 10, 2018, the Governor of Pennsylvania issued a "Proclamation of Disaster Emergency," upon finding the opioid crisis "is of such

magnitude or severity that emergency action is necessary to protect the health, safety, and welfare of affected citizens in Pennsylvania[.]"[110] Today, more than seven years later, the Pennsylvania Attorney General has recognized that "[t]he heroin and opioid epidemic" remains "the number one public health and public safety challenge facing Pennsylvania."[111] Although the entire Commonwealth continues to grapple with the adverse effects of the ongoing opioid crisis, no Pennsylvania city or county has suffered more than Philadelphia.

488.    In 2016, the City established a task force of stakeholders working in public health ("Mayor's Task Force") to investigate the opioid epidemic in Philadelphia and make recommendations to address the ongoing public health and safety crisis. On May 19, 2017, the Mayor's Task Force issued its final report and recommendations ("Mayor's Task Force Report").[112] The conclusions of the Mayor's Task Force Report were sobering, disturbing, and alarming:

---

[110] https://www.pa.gov/content/dam/copapwp-pagov/en/pema/documents/governor-proclamations/documents/opioid-disaster-emergency-extension-092418.pdf (last accessed August 15, 2025).

[111] https://www.attorneygeneral.gov/protect-yourself/opioid-battle/ (last accessed August 15, 2025).

[112] *The Mayor's Task Force to Combat the Opioid Epidemic in Philadelphia: Final Report and Recommendations*, City of Philadelphia (May 19, 2017) ("Mayor's Task Force Report"), available at https://www.phila.gov/documents/opioid-task-force-report/ (last accessed August 15, 2025). The Mayor's Task Force subsequently issued several Opioid Misuse and Overdose Reports:

(i) *Opioid Misuse and Overdose Report*, Phila. Dept. of Public Health (Sept. 13, 2017) (hereinafter "*Opioids Misuse Report*, Sept. 13, 2017"), available at https://www.phila.gov/media/20180606132329/OTF_StatusReport-1.pdf (last accessed August 15, 2025);

> The crisis caused by opioids encompasses opioid use, opioid use disorder, and related morbidity and mortality. Each of these is a problem of its own and each leads to many other individual and social problems. Opioid use and addiction are not new issues, but they have reached epidemic proportions in the city and demand a new and coordinated response.[113]

489.    Importantly, the Mayor's Task Force Report specifically recognized that Philadelphia was facing an "opioid epidemic" and "public health crisis" caused by the enormous rise in the use of prescription opioids for medical purposes.[114]

490.    Approximately one year later, on October 3, 2018, the Mayor of Philadelphia issued an "Opioid Emergency Response Executive Order."[115]    The Executive Order identified, *inter alia*, the catastrophic effect of the opioid epidemic on public rights, including the right to public health, safety, peace, and comfort:

- "Kensington and the surrounding neighborhoods are facing extreme challenges related to the opioid crisis[.]"

- "[D]rug overdoses in Philadelphia claimed more than 1200 lives in 2017 and more than 500 lives so far in 2018.  The crisis is killing more Philadelphians

---

(ii) *Opioid Misuse and Overdose Report*, Phila. Dept. of Public Health (Dec. 13, 2017), available at https://www.phila.gov/media/20180606132334/OTF_StatusReport_December2017.pdf (last accessed August 15, 2025);

(iii) *Opioid Misuse and Overdose Report*, Phila. Dept. of Public Health (Nov. 29, 2018), available at https://www.phila.gov/media/20181129123743/Substance-Abuse-Data-Report-11.29.18.pdf (last accessed August 15, 2025); and

(iv) *Opioid Misuse and Overdose Report*, Phila. Dept. of Public Health (Aug. 6, 2020) available at https://www.phila.gov/media/20200806162023/Substance-Abuse-Data-Report-08.06.20.pdf (last accessed August 15, 2025).

[113] *Id*. at 6.

[114] *Id*. at 2 and introductory page titled, "Message from Mayor Kenney."

[115] https://www.phila.gov/media/20210602145015/executive-order-2018-03.pdf (last accessed August 15, 2025).

than AIDS at the peak of that epidemic, and nearly four times as many as killed by homicide[.]"

- "[T]he crisis has driven up the number of individuals suffering street homelessness."

- "46 injection drug users were diagnosed with HIV infection (non-AIDS) during the 12 months ending August 31, 2018, an increase of 15 (48%) compared to the previous 12 months[.]"

- "[T]he crisis has created unacceptable conditions for Kensington and the surrounding neighborhood … Drugs are bought, sold, and injected openly. Addiction has increased the number of people participating in the sex trade. Streets, school yards and public parks are littered with trash, human waste and used syringes.  Children and commuters dodge illegal activity on their way to school and work[.]"

- "It is apparent that the City's resources alone cannot resolve the challenges facing Kensington and the surrounding neighborhoods."

- "Kensington and its surrounding neighborhoods are in the midst of a disaster."[116]

491.    During the last several years, the City—working within the confines of a limited budget—has implemented many of the recommendations of the Mayor's Task Force and followed the directives of the 2018 Opioid Emergency Response Executive Order.[117]  Despite the City's commendable and costly efforts, Philadelphia's opioid crisis has no end in sight.

---

[116] *Id*.  The images from Philadelphia's Kensington neighborhood continue to shock the conscience.  *See, e.g.*, Philadelphia deploys teams to help people struggling with opioid and 'tranq' addictions, NBC News, March 14, 2023, https://www.youtube.com/watch?v=cNJn2_3GY2E (last accessed August 15, 2025); Streets of Philadelphia, Kensington Ave Documentary, July 17-18, 2023, SBC News, https://www.youtube.com/watch?v=EULgmc9MqFs (last accessed August 15, 2025).

[117] https://www.phila.gov/programs/overdose-response-unit/the-citys-response/. Such efforts include expanding access to treatment, preventing overdoses, and strengthening prevention and education.

A.    **Public Health Impacts of the Opioid Epidemic in Philadelphia**

1.    **Fatal Opioid Overdoses**

492.    As reflected in the data table below, fatal drug overdoses remain at crisis levels in Philadelphia, having increased dramatically between 2010 and 2021.  The City's opioid-related overdoses comprise more than 80% of all such deaths.[118]



493.    In fact, the CDC reports that Philadelphia mortality rates doubled in the 15-year period between 2006 and 2021. These drug-related death rates (per 1000

_____

[118] https://www.substanceusephilly.com/fatal-overdoses (last accessed August 15, 2025).

people) grew steadily from 26.84-28.03 in 2006 to 75.74-78.80 in 2021, an increase of nearly 200%. During the same period, Philadelphia's population grew from 1,488,710 to 1,576,251, a mere six percent (6%) increase.[119]

494.    More recent data further confirms the deadly trend. The PDPH reported 1,413 overdose deaths in 2022—an 11% increase from the prior year.  83% of those overdose deaths involved opioids.[120]

495.    Importantly, ARCOS data confirms that Philadelphia's marked increase in opioid-related deaths directly coincides with a substantial increase in the distribution of prescription opioids within the City.

496.    Specifically, the ARCOS table below reflects transactional data for opioid drugs submitted by the drug manufacturers and distributors doing business in Philadelphia. The volume of opioid drugs distributed in Philadelphia: (1) nearly doubled between 2006 and 2019; (2) dramatically outpaced the City's 7% population growth during the same period; and (3) did not return to pre-2006 levels until 2019.[121]

---

[119] CDC, County-level Drug Overdose Mortality in the United States, 2003-2021 https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality/ (last accessed August 15, 2025).

[120] https://www.phila.gov/media/20231002090544/CHARTv8e3.pdf (last accessed August 15, 2025).

[121] ARCOS Data, 2006-2019.



**2.** **Opioid Use and Adverse Health Consequences in Philadelphia Repeat the National Pattern Linked to Prescription Opioids for Medical Uses**

**a.** **Opioid Addiction and Opioid Use Disorder (OUD)**

497. The PDPH tracks the prevalence and incidence of opioid addiction and opioid use disorder ("OUD") in a number of ways, including referring to data collected from state authorities and data the PDPH collects regarding hospitalization for OUD.

498. Philadelphia data on opioid-related hospitalizations for the period 2002-2018 is as follows:[122]

---

[122] *Opioids Misuse and Overdose Report*, Aug 6, 2020, *supra,* at 28.



499.    Moreover, in 2018, approximately 84% of individuals with hospital stays in Philadelphia attributable to opioids received some form of public insurance paid by the City.[123]  The number of hospitalizations also increased in both 2019 and 2020. In 2021, 581 people were hospitalized for opioid-related reasons.[124]

### b.    Opioid Addiction and Opioid Use Disorder (OUD)

500.    Opioid use during pregnancy can lead to neonatal abstinence syndrome (NAS) and may interfere with a child's brain development, mental functioning, and behavior. In Philadelphia, the rate of NAS increased more than four-fold, from 3 per

---

[123] *Opioids Misuse and Overdose Report*, Aug. 6, 2020, *supra,* at 30.

[124] https://www.substanceusephilly.com/hospitalizations (last accessed August 15, 2025).

1,000 live births in 2002, to 13.75 per 1,000 live births in 2018.[125] The following graph

illustrates the drastic increase in NAS in Philadelphia:[126]



501.    Although the NAS diagnosis rate in the City has slowly declined since

2018, it still stood at 10.7 cases per 1,000 live births in 2021—three times higher than

the 2002 rate.  Costs for treating NAS can exceed $60-70,000 per infant for hospital

care, as compared to less than $8,000 for a healthy birth.[127]

---

[125] *Mayor's Task Force Report*, *supra,* at 10.

[126] *Opioids Misuse and Overdose Report*, Aug. 6, 2020, *supra,* at 53.

[127] *What's Best for Babies Born to Drug-Addicted Mothers?*, USA TODAY (April 26, 2014), *available at* https://www.usatoday.com/story/news/health/2014/04/25/best-babies-born-drugaddicted-mothers/8170555/ (last accessed August 15, 2025); *Neonatal Abstinence Syndrome: An Update on the Cost and Length of Stay Associated with Treatment during the Hospital Stay*, Marshall Digital Scholar (March 24, 2023), *available at*

502.    Opioid use can also lead to infectious diseases as a result of using contaminated needles. The PDPH found that "concurrent with the increases in opioid overdose has been other adverse outcomes including increasing rates of ... hepatitis C virus (HCV) transmission."[128]  Specifically, it determined that the "number of newly-identified cases of HepC infection among 18-35 year olds nearly . . . doubled from 660 in 2010 to 1161 in 2016."[129] PDPH estimates that more than 51,000 people have been diagnosed with hepatitis C in Philadelphia since 2013.[130]

503.    Hepatitis C infections continue to plague Philadelphia. There were 144 reports of new acute hepatitis C infections in 2023, a number "increasing back to pre-COVID-19 pandemic incidence."[131]  An additional 1,089 new chronic hepatitis C infections were reported, maintaining a persistent three-year rate.    If left untreated, HCV can result in liver cirrhosis, cancer, and end-stage liver disease. 12-week treatments for HCV can cost approximately $84,000 per patient.[132]

---

https://mds.marshall.edu/cgi/viewcontent.cgi?article=1249&context=mgmt_faculty (last accessed August 15, 2025).

[128]https://www.phila.gov/programs/combating-the-opioid-epidemic/reports-and-data/ (last accessed August 15, 2025).

[129] *Hepatitis C Virus Infection in Philadelphia*, Phila. Dept. of Public Health (Nov. 2017), *available at* https://www.phila.gov/media/20181106124822/chart-v2e11.pdf (last accessed August 15, 2025).

[130] https://www.phila.gov/media/20250103100039/Hepatitis2023-Annual-Report.pdf (last accessed August 15, 2025).

[131] *Id.*

[132] *Jack Hoadley et al.*, *The Cost of a Cure: Revisiting Medicare Part D and Hepatitis C Drugs* (Nov. 3, 2016), *available at* https://www.kff.org/medicare/perspective/health-affairs-blog-the-cost-of-a-cure-revisiting-medicare-part-d-and-hepatitis-c-drugs/ (last accessed August 15, 2025);

504.    Similarly, injecting opioids can lead to right-sided heart valve infections. The incidence of right-sided heart valve infections has increased rapidly over the past decade as a consequence of the opioid epidemic.[133]

## B.    Public Safety Impacts of the Opioid Epidemic in Philadelphia

505.    As the Mayor's Task Force and others have recognized, the opioid crisis also imperils, and adversely affects, public safety in the City.  According to the Mayor's Task Force Report, the disease of opioid addiction has prompted criminal acts by addicted individuals seeking to obtain opioids through illegal—and sometimes violent—means. This type of public safety issue strains City resources and places all residents at an increased risk of harm.  Opioid-related crimes include, among other things, theft of money or property to finance opioid addiction; theft of prescription opioids from friends, relatives or others; and crimes committed while under the influence of opioids.

506.    Nationally, a majority of individuals who are incarcerated are in jail for a crime committed while under the influence of alcohol or drugs, in order to obtain

_Drug Pricing & Challenges to Hepatitis C Treatment Access_, Journal Health Biomedical Law (Sept. 2018), _available at_ https://pmc.ncbi.nlm.nih.gov/articles/PMC6152913/ (last accessed August 15, 2025).

[133] Hospitalizations for Heart Infection Related to Drug Injection Rising Across the US, Science Daily (Sept. 1, 2016), available at https://www.sciencedaily.com/releases/2016/09/160901092818.htm (last accessed August 15, 2025).

drugs (including opioids), or for a crime associated with the trade in illegal or diverted drugs.[134] Philadelphia's criminal justice system profile is no different.

507.    As discussed above, four out of five individuals who begin using heroin start the transition to heroin from prescription opioid pain medications.[135] In both 2016 and 2017, there were approximately 4,000 arrests in Philadelphia related to heroin.[136] Heroin-related arrests spiked in 2019, followed by a significant decrease in 2020, due to the COVID-19 quarantine.[137]

508.    Opioid abuse has also adversely impacted neighborhood public safety and well-being throughout the City, including its streets, parks, municipal buildings, and other public spaces. The notorious railroad encampment of drug users in North Philadelphia, known as "El Campamento," is a striking example of how the opioid crisis harmed public safety in the City.

509.    Until it was shut down (yet again) in the summer of 2017, in no small part due to the efforts of City law enforcement, a sprawling encampment of drug users had sprung up on the railroad tracks running under Gurney Street in the Kensington area of Philadelphia. Hundreds of drug users—who regularly injected themselves with heroin and other opioids in broad daylight—came from around the United States

---

[134] *Alcohol, Drugs and Crime*, https://recovered.org/addiction/alcohol-drugs-and-crime (last accessed on August 15, 2025).

[135] According to the American Society of Addiction Medicine, 80% of the people who initiated heroin use in the past decade started with prescription painkillers which, at the molecular level and in their effect, closely resemble heroin.

[136] *Opioids Misuse Report*, Sept. 13, 2017, *supra,* at 22; *Opioids Misuse and Overdose Report*, Nov. 29, 2018, *supra,* at 39.

[137] *Opioids Misuse Report*, Aug. 6, 2020, *supra,* at 33.

to live in what eventually became the largest open-air drug market on the East Coast. Piles of trash, human waste, and hundreds of thousands of used needles littered the encampment.[138]

510.    In response to this enormous public health and safety crisis, the City worked to clean up the area.[139] The effort, which included tearing down makeshift shacks and disposing of toxic waste, began in July 2017. Ultimately, the City paid tens of thousands of dollars for, *inter alia*, security, waste removal, and fencing at the Kensington encampment, plus substantial additional costs to police the area.

511.    The City continues to spend millions of dollars as part of its ongoing effort to dismantle drug markets in Kensington and other Philadelphia neighborhoods, as well as to reclaim streets, parks, municipal buildings, and other public spaces on behalf of its residents. For example, on May 8, 2024, the Philadelphia Police Department (PPD) and other City agencies orchestrated a two-block sweep of Kensington Avenue.  As part of that coordinated effort, the City cleaned streets, provided wound treatment, and offered both drug treatment and temporary shelter to the unhoused.[140]

512.    Opioid use also remains a significant cause of homelessness in Philadelphia. A large number of unhoused individuals afflicted with OUD have

---

[138] https://www.nytimes.com/2018/10/10/magazine/kensington-heroin-opioid-philadelphia.html (last accessed August 15, 2025).

[139] https://www.phila.gov/press-releases/kenney/city-conrail-reach-deal-to-clean-up-fairhill-kensington-tracks/ (last accessed August 15, 2025).

[140]  https://www.phila.gov/2024-05-09-city-completes-encampment-closure-in-kensington-area (last accessed August 15, 2025)/.

crowded into encampments on City property, including neighborhoods, parks, municipal buildings and other parts of the public estate, with the byproducts of their abuse—piles of trash, needles, and human waste—adversely affecting the public's right to public health, safety, peace, and comfort.

513.  The City's Office of Homeless Services operated with a $45 million budget in 2016,[141] some of which was used to serve the opioid-addicted unhoused.  A year later, the City incurred costs of $28,500 for each participant in a housing, treatment and social services program for individuals with OUD, [142] at a total annual cost of approximately $1.7 million.

514.  In June 2024, the City approved plans to develop a $100 million drug treatment center in Northeast Philadelphia that will house and treat more than 600 people at a time.[143]  The project, which will utilize City-owned land and buildings, is intended to support the City's ongoing efforts to eliminate the open-air drug market that persists in the Kensington area and provide care for the hundreds of individuals currently living on the neighborhood's streets.[144]

---

[141] *The Mayor's Operating Budget in Brief for Fiscal Year 2018*, at 71 (March 2017), (last accessed August 15, 2025).

[142] Don Sapatkin, *In Philly, Finding a Place for the Homeless on Opioids*, Philadelphia Inquirer (Sept. 29, 2017), https://www.inquirer.com/philly/health/addiction/housing-first-treatment-second-philadelphia-pathways-for-homeless-opioid-users-20170929.html (last accessed August 15, 2025).

[143] https://dbhids.org/news/city-council-oks-100-million-drug-treatment-center-in-northeast-philly/ (last accessed August 15, 2025).

[144] *Id.*

515.   As noted by the Mayor's Task Force, "improper disposal of drug use equipment," such as used needles, pose a threat to neighborhood safety.[145]  Accidental needle sticks remain a safety hazard to Philadelphia's residents. Relatedly, the City's environmental services programs continue to clear thousands of bags of trash in affected neighborhoods.[146]

516.   According to the Mayor's Task Force Report and commentators, automobile accidents caused by impaired opioid users also pose a public safety risk. "[R]esearchers report a sevenfold increase in the number of drivers killed in car crashes while under the influence of prescription [opioid] painkillers. . . . Prescription [opioid] drugs can cause drowsiness, impaired thinking and slowed reaction times, which can interfere with driving skills."[147]

517.   Philadelphia's children also face safety risks when opioid-addicted parents are unable to properly care for them.  A recent study, "Characteristics of Children with Opioid Poisoning Consulted by a Child Protection Service," examined the demographic and medical records of 69 Philadelphia-area children who were assessed by a child protection team.[148]  The study found that over a 10-year period

---

[145] *Mayor's Task Force Report*, *supra,* at 23.

[146] https://www.phila.gov/2025-04-29-health-department-releases-reports-on-overdose-crisis/ (last accessed August 15, 2025).

[147] Steven Reinberg, *Significant Spike in Opioid-Related Car Crash Deaths*, CBS News (July 31, 2017), https://www.cbsnews.com/news/opioid-drugs-car-crash-fatalities-deaths/ (last accessed on August 15, 2025).

[148] *Opioid Poisoning in Children Increasing Alongside Adult Misuse*, American Academy of Pediatrics, Sept. 27, 2024; https://www.aap.org/en/news-room/news-releases-from-aap-conferences/opioid-poisoning-in-children-increasing-alongside-

(June 2012 to December 2023), there was an increase in cases of children ingesting opioids, with a four-fold increase occurring between 2019 and 2023. Most of the affected children were under the age of 2 years, with the youngest being only 19 days old.[149]

518.    Opioid abuse has also led to an increase in foster care services and attendant costs due to the prevalence of parents struggling with opioid addiction. According to Pennsylvania's Department of Human Services, more than half of the 16,000 children in the state's foster care system in 2015 were removed from their homes due to parental drug use.[150]

519.    Philadelphia's foster care system, in particular, has been overwhelmed by the opioid crisis. Between 2014 and 2016, capacity waivers—which allow foster families to care for more than six children in a single home—went up nearly 50%.[151] In March 2018, more than 6,000 children in Philadelphia resided in foster care, group homes, or with relatives or close friends.

520.    Opioid-related disturbances occur regularly on public property in the City and detract from their intended uses and value. Much opioid-related criminal activity—including prostitution and theft committed to support opioid addiction— takes place in City streets, parks, buildings, and other public areas. Such are just a

---

adult-misuse/?srsltid=AfmBOopDYHs61usnhV-25jxdOHp66ecwhyTne4yy-8HVq835iJ79K1_M (last accessed on August 15, 2025).

[149] *Id.*

[150] *Id.*

[151] Foster care system overwhelmed by opioid crisis, https://6abc.com/philadelphia-opioids-opioid-crisis-drugs/3149661/ (last accessed on August 15, 2025).

few examples of how Philadelphia's real property interests—and the public's right to safely enjoy all public spaces—have been adversely affected by the opioid epidemic.

521.    As indicated, the result of the PBM Defendants' conduct has created an epidemic of opioid addiction, overdoses, and deaths that have significantly interfered with public health, safety, peace, and rights, as well as the public estate, including the enjoyment of the City's historic neighborhoods, parks, streets, and public spaces.

## C.    The Opioid Epidemic Has Greatly Increased the City's Costs

### 1.    City-Funded Public Medical Costs

522.    Over 17,500 people were treated for OUD in the City's publicly funded health system in 2019, up from 16,844 in 2018, and 15,561 in 2017.[152]  Notably, the number of persons treated understates the actual need for treatment because those participating in addiction treatment represent only a fraction of those with OUD. National data establishes that roughly one out of every ten people with a substance use disorder actually obtain treatment for the specific disorder.[153]  Extrapolating on those findings, if there were 17,500 Philadelphia residents who received treatment for OUD in 2019, there were roughly 175,000 residents who needed it.

523.    In Philadelphia, Community Behavioral Health ("CBH"), a division of the City's Department of Behavioral Health and Intellectual disability Services ("DBHIDS"), is contracted and funded by the City to manage behavioral health

---

[152] *Opioids Misuse and Overdose Report*, Aug. 6, 2020, *supra,* at 59.

[153] Rachel Lipari *et al.*, *America's Need for and Receipt of Substance Use Treatment in 2015*, Substance Abuse and Mental Health Services Administration (Sept. 29, 2016), https://www.samhsa.gov/data/sites/default/files/report_2716/ShortReport-2716.html (last accessed on August 15, 2025).

services for Philadelphia's Medicaid beneficiaries. CBH maintains a network of treatment providers for various behavioral and medical needs, including opioid abuse.

524.   In 2017, there were 13 opioid treatment providers within the CBH network, as well as residential treatment facilities, halfway houses, and hospitals.[154] Scores of CBH-approved providers continue to offer a host of OUD treatment services for Philadelphia residents.[155]   Notably, in 2024, the City confirmed it would further expand treatment access with the aid of a specially equipped van that will offer mobile services throughout Philadelphia.[156]

525.   Medication-assisted treatment remains an important component of treatment for OUD in Philadelphia. In 2016, 13 City-funded methadone clinics served nearly 6,000 Philadelphia residents.[157] Other forms of medication-assisted opioid treatment, including Suboxone (buprenorphine plus naloxone) and Vivitrol (injectable extended release naltrexone), are included in City-funded programs, along

---

[154] *Mayor's Task Force Report*, *supra,* at 13.

[155] https://dbhids.org/wp-content/uploads/2022/07/How-to-Access-Treatment-and-MAT-List_Summer-2022.pdf (last accessed on August 15, 2025).

[156] Philly's first mobile methadone van is on track with $1.2 million spending plan, city says, https://www.inquirer.com/health/opioid-addiction/mobile-methadone-program-opioid-settlement-funding-20241107.html (last accessed August 15, 2025).

[157] *Mayor's Task Force Report*, *supra,* at 14.

with psychosocial services.[158] In 2021, 17,496 individuals received some form of medication for OUD, a 4% increase from the prior year.[159]

526.    Moreover, the number of death investigations performed by the Philadelphia Medical Examiner's Office rose about 20 percent between 2013 and 2016 (from 2,489 to 3,018).  The increase, largely due to opioid deaths, required a doubling in the City's budget for supplies and materials (body bags, safety equipment, gowns, etc.) and the hiring of a new assistant medical examiner.[160] Opioid-related deaths typically require a costly autopsy and toxicology screen.

### 2.    The City's Increased Costs of Emergency Services

527.    City police, fire, and other Emergency Medical Services (EMS) have been severely burdened by the opioid epidemic, which has directly led to increased costs related to naloxone,[161] 911 emergency calls, and the hiring and retention of first responders.  Notably, 80 to 90 percent of persons receiving naloxone are transported to hospitals.[162]

---

[158] *Id.* at 14, 27.

[159] https://www.substanceusephilly.com/substance-use-treatment (last accessed August 15, 2025).

[160] Sam Wood, *Victims of Opioid Overdoses Stack Up for Coroners, Costing Taxpayers Dearly*, PHILADELPHIA INQUIRER (Oct. 19, 2017), https://www.inquirer.com/philly/health/addiction/bodies-opioid-ods-coroners-oxycontin-marino-trump-cdc-cadavers-philadelphia-pathologists-autopsies-norristown-toxicology-20171018.html (last accessed August 15, 2025).

[161] The drug naloxone (usually sold under the brand name Narcan) is a potentially life-saving medication that reverses the effect of opioids and is used to treat opioid overdoses that would otherwise be fatal.

[162] *Opioid Misuse and Overdose Report*, Aug. 6, 2020, *supra*, at 2.

528.    In 2017, Philadelphia's EMS administered naloxone to more than 5,000 individuals.   In both 2018 and 2019, EMS treated more than 3,000 people with naloxone. Approximately 5,500 doses of naloxone were also distributed from a needle exchange program to individuals who use drugs and are at risk of a fatal overdose. [163]

529.    More recently, in 2020, the City distributed roughly 65,000 doses of Narcan (naloxone) to medical providers, community organizations, first responders, law enforcement agencies, and criminal justice organizations.[164]   In 2023, the City distributed over 100,000 doses, along with 180,000 fentanyl test strips and nearly 50,000 xylazine test strips.[165] In conjunction with said distributions, the City conducted more than 230 training sessions. Moreover, vending machines containing free Narcan have been available in the City since February 2022.[166]

530.    Opioid overdoses and life-saving naloxone administration continue to regularly occur throughout the City's streets, parks, and other public places.  In fact, since 2015, 54 overdose incidents have occurred at City libraries.  In more than 40% of those incidents, library employees were forced to administer naloxone.[167]

---

[163] *Opioid Misuse and Overdose Report*, Aug. 6, 2020, *supra*, at 2.

[164] *Mayor's Task Force Report*, *supra,* at 9.

[165] https://www.phila.gov/2025-04-29-health-department-releases-reports-on-overdose-crisis / (last accessed August 15, 2025). Xylazine, a veterinary sedative associated with severe wounds, was involved in 38 percent of the City's overdose deaths in 2023.  *Id*.

[166] https://whyy.org/articles/philly-unveils-first-of-its-kind-narcan-vending-machine-at-west-philly-free-library/ (last accessed August 15, 2025).

[167] *Id*.

### 3.    The City's Increased Public Safety and Criminal Justice Costs

531.    Opioid addiction continues to adversely and substantially impact the City's public safety and criminal justice system at significant cost.[168] The opioid epidemic has caused an increase in crime, arrests, and incarceration for opioid-related offenses.

532.    In 1997, the City established a "Drug Treatment Court," which was designed to steer criminal defendants to substance abuse disorder treatment (in lieu of incarceration).[169] In 2017, approximately 37% of the individuals who participated in Drug Treatment Court reported that they were opioid users. 3,203 participants successfully completed the Drug Court Treatment program between 1997 and 2017.[170] Of that number, 84% remained arrest-free within one year of graduation.[171]

533.    In January 2025, via Executive Order, the City also established a "Wellness Court" to address ongoing issues of opioid abuse in the Kensington area of Philadelphia.  A pilot program, the City's Wellness Court is intended to "allow a person who has been arrested the opportunity for same-day physical and behavioral

---

[168] *Mayor's Task Force Report*, *supra,* at 11.

[169] *Mayor's Task Force Report*, *supra,* at 11-12. Drug Treatment Court proceedings frequently result in individuals being enrolled in treatment services, such as recovery housing, vocational training, employment placement programs, medication-assisted treatment, and trauma counseling.

[170] https://phlcouncil.com/wp-content/uploads/2018/04/FY19-Budget-Hearing-Testimony-FJD.pdf (last accessed on August 15, 2025).

[171] *Id.*

health assessment, basic medical care and withdrawal management, diversion, and intake for treatment." [172]

534.    The Philadelphia Department of Prisons ("PDP") has directly incurred increased costs for inmates incarcerated for opioid-related crimes. For example, many such inmates require additional hospitalization and medical care directly relating to their OUD.  Notably, every incarcerated person who suffers from substance abuse disorder is offered treatment by the PDP.  Nationally, only 11% of incarcerated individuals receive such treatment.[173]

535.    In 2017, the PDP provided withdrawal management services to about 8,000 inmates, approximately three-quarters of whom suffered from OUD.[174]  The PDP continues to provide methadone, Suboxone, and/or Vivitrol to thousands of inmates at considerable cost.

536.    Because inmates are at greater risk of opioid overdose upon release, the PDP also provides newly released inmates with five days of Suboxone as to guard against cravings and allow them adequate time to secure treatment in the

---

[172] https://www.phila.gov/media/20250121135610/Executive-Order.pdf (last accessed on August 15, 2025).

[173] https://www.phila.gov/2024-08-19-the-complexity-and-strengths-of-the-department-of-prisons-program-to-prevent-overdoses/ (last accessed on August 15, 2025); https://www.phila.gov/media/20190110101212/The-Opioid-Epidemic-in-Philadelphia-.pdf at 4 (last accessed on August 15, 2025).

[174] *Mayor's Task Force Report*, *supra,* at 11.

community.  Prior to release, all inmates receive training regarding the risk of opioid overdose, how to recognize overdose, and the administration of naloxone.[175]

537.    Public safety and criminal justice costs directly attributable to the opioid epidemic also include increased costs for police resources, district attorney resources, public defender resources, judicial system resources, prison resources, as well as increased costs in the form of property losses. Nationally, these costs have been calculated to exceed $7.6 billion per year.[176] Based on the disproportionate severity with which the opioid epidemic has impacted Philadelphia relative to the rest of the country, the City has suffered a disproportionate share of these financial burdens.

### 4.    The City's Increased Public Awareness Costs

538.    The City has spent considerable time and money to increase public awareness of the opioid crisis. Specifically, the City launched several effective campaigns between 2017 and 2020.

539.    First, the City (via the PDPH) launched the "Don't Take the Risk" campaign. The 2017 campaign, which featured Philadelphians who have personally experienced addiction to prescription painkillers or lost loved ones to opioid overdose,

---

[175] https://www.phila.gov/2024-08-19-the-complexity-and-strengths-of-the-department-of-prisons-program-to-prevent-overdoses/ (last accessed on August 15, 2025).

[176] Florence, et al., *The Economic Burden of Opioid Overdose, Abuse, and Dependence in the United States, 2013*, Medical Care, Vol. 54, No. 10, at 904 (October 2016).

appeared on cable and broadcast television, as well as in print and social media. The campaign also included a website (donttaketherisk.org).[177]

540.    Second, the City (via PDPH) launched "Think NSAIDS," a campaign designed to encourage healthcare providers to prescribe opioids and benzodiazepines to fewer patients, in smaller amounts, and for shorter periods of time. The PDPH provided more than 16,000 Philadelphia-area healthcare providers with prescribing recommendations via mail. Moreover, between November 2017 and February 2018, PDPH representatives made over 2,000 in-person visits, including more than 900 follow-up visits, to opioid prescribers to reinforce the prescribing recommendations and address any related questions and concerns.[178]

541.    Third, in 2017, PDPH, the Philadelphia Department of Human Services ("DHS"), CBH, and four Medicaid physical health plans collaborated to provide Pennsylvania Medicaid providers with bi-annual personalized "dashboard" reports to help healthcare providers review their opioid and benzodiazepine prescribing over time and relative to their peers.[179]

542.    Fourth, launched in 2019, the City's Knock and Talk Initiative was a collaborative effort between PDPH and the Philadelphia Police Department ("PPD")

---

[177] https://www.phila.gov/press-releases/kenney/official-launch-of-dont-take-the-risk-campaign/ (last accessed on August 15, 2025); https://www.phila.gov/2018-10-18-city-launches-dont-take-the-risk-campaign-to-prevent-opioid-deaths-2/ (last accessed August 15, 2025).

[178] https://www.phila.gov/documents/think-nsaids-action-kit/ (last accessed August 15, 2025).

[179] https://phlcouncil.com/wp-content/uploads/2018/05/DBHIDS-Response_submitted-to-Council-5.4.pdf (last accessed August 15, 2025).

in which the PPD visited the offices of more than two dozen Philadelphia healthcare providers identified as: (1) being among the highest prescribers of opioids; and/or (2) having treated patients who had recently died from an opioid overdose.

543.    Fifth, as part of the Think NSAIDS campaign, PDPH partnered with Pennsylvania's Prescription Drug Monitoring Program in 2020-21 to conduct an opioid detailing campaign that addressed the prescribing practices of high-volume opioid prescribers.[180]

544.    Finally, in 2020, via a partnership involving DHS, PDPH, and DBHIDS, the City launched a "Safe Medicine Storage" public health campaign to educate the community and encourage adults to follow safety precautions when using medications that could be harmful to children.[181]  DHS launched a similar campaign on behalf of the City in 2024.[182]

     **5.    The Opioid Epidemic Will Lead to Further Increased Costs to the City.**

545.    The Mayor's Task Force made various recommendations to address Philadelphia's opioid epidemic and to change the behaviors of doctors and patients regarding opioid prescribing and use, including the following:

---

[180] https://www.phila.gov/documents/think-nsaids-action-kit/ (last accessed on August 15, 2025).

[181] https://www.phila.gov/2020-11-12-city-of-philadelphia-launches-safe-medicine-storage-campaign-in-an-effort-to-end-accidental-child-drug-ingestion/ (last accessed on August 15, 2025).

[182] https://www.phila.gov/2024-03-15-safe-storage-is-critical-keeping-medicines-and-drugs-out-of-childrens-reach/ (last accessed on August 15, 2025).

(a)    Conducting a consumer-directed media campaign about opioid risks;

(b)    Conducting a public education campaign about naloxone, including the availability of naloxone through various avenues;

(c)    Destigmatizing OUD and its treatment via public education programs;

(d)    Improving health care professional education about the dangers and abuse of opioids;

(e)    Establishing insurance practices that support safer opioid prescribing and related treatment;

(f)    Increasing the provision of medication-assisted opioid abuse treatment;

(g)    Expanding addiction treatment access and capacity at City-funded sites;

(h)    Embedding withdrawal management into all levels of patient care;

(i)    Implementing "warm handoffs" to treatment centers after overdose;

(j)    Providing safe housing, recovery, and vocational support systems;

(k)    Incentivizing medical providers to enhance the quality of substance-use disorder screening and treatment;

(l)    Expanding naloxone availability;

(m)    Further exploring comprehensive user engagement sites;

(n)    Establishing a coordinated rapid response to periodic surges in the number of overdoses;

(o)    Addressing homelessness among opioid users;

(p)    Expanding the Philadelphia court system's capacity for diversion of opioid abusers to treatment programs;

(q)    Expanding law enforcement's capacity in key areas relevant to opioid abuse; and

(r)    Providing substance use disorder assessment and treatment in the PDP.[183]

546.    The Mayor Task Force's recommendations represent a substantial effort to address the impact of the opioid epidemic in Philadelphia. To date, the City has implemented many of those recommendations. Certain additional necessary measures are set forth in the injunctive relief requested herein, which can and must supplement the City's efforts, both existing and planned, to abate the many harms involved.

547.    Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of prescription opioids, the PBM Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon the City.

## D.    The City's CVS Caremark Contracts

548.    Since at least 2006, CVS Caremark has provided pharmacy benefit management services for the City's group health plans. These plans cover the lives of thousands of the City's current and former employees.

549.    Pursuant to a series of contracts and addendums ("CVS Caremark Contracts"), the City has paid CVS Caremark tens of millions of dollars for its services since 2006.

---

[183] *Mayor's Task Force Report, supra,* at 15-25.

550. Although each CVS Caremark Contract is unique in terms of duration, cost, and scope of services, all of the CVS Caremark Contracts require CVS Caremark to provide the City with, *inter alia*, formulary management, DUR, and mail service pharmacy services.

551. In terms of formulary management, the CVS Caremark Contracts require CVS Caremark to make changes to its formulary, including its Performance Drug List, Prescribing Guide, and Covered Drugs on no less than a quarterly basis "based upon, among other things, the introduction of new products, customer safety, clinical appropriateness, efficacy, cost effectiveness, changes in availability of products, new clinical information and other considerations, changes in the pharmaceutical industry or its practices, introduction of new Generic Drugs, new legislation and regulations."

552. As detailed herein, CVS Caremark breached its obligations under the CVS Caremark Contracts because it chose to pursue profits in lieu of making formulary management decisions based on the safety and efficacy of drugs and/or which otherwise reflected changes in the pharmaceutical industry or its practices relating to the dispensing of prescription opioids.

553. In terms of providing DUR services, the CVS Caremark Contracts require CVS Caremark to provide "its automated concurrent DUR Services including but not limited to: (i) drug to drug interactions; (ii) therapeutic duplications; (iii) known drug sensitivity; (iv) over-utilization; (v) insufficient or excessive drug usage; and (vi) early or late refills."

554. As detailed herein, CVS Caremark breached its obligations under the CVS Caremark Contracts because it chose to pursue profits in lieu of properly using DUR to ensure safe dispensing, including the prevention of over-utilization and excessive drug usage, on behalf of the City.

555. In terms of providing mail service pharmacy services, the CVS Caremark Contracts require CVS Caremark to "[f]ill prescriptions subject to the professional judgment of the dispensing pharmacist, good pharmacy practices in accordance with the standards where a pharmacy is located, Applicable Law, and product labeling guidelines[.]"

556. As detailed herein, CVS Caremark breached its obligations under the CVS Caremark Contracts because it failed to comply with the CSA and the PCSA in dispensing through their mail-order pharmacies.

557. The CVS Caremark Contracts also vaguely reference certain payments that CVS Caremark would contemporaneously receive from pharmaceutical manufacturers relating to prescription drugs, including opioids, that are covered by the CVS Caremark Contracts. Specifically, the CVS Caremark Contracts typically include terms indicating:

> **City's Authorization**. City authorizes Provider to contract with pharmaceutical companies for Rebates as a group purchasing organization for the Plan.
>
> **Remittance of Rebates**. Provider will remit to City the Rebates received by Provider with respect to City's Claims during the prior calendar quarter pursuant to Exhibit PA-B. City acknowledges and agrees that it shall not have a right to interest on, or the time value of, any Rebate payments received by Provider or monies payable under this Agreement. Upon termination of this Agreement or upon City's breach

of this Agreement, Provider shall credit the City for any Rebate payable but not paid to the City at the time for such termination or breach; Provider may apply such Rebates to set off amounts due from City or may reasonably delay remittance of Rebates to allow for final adjustments. Such right of set off or delay shall be in addition to Provider's other rights set forth in this Agreement.

**Disclosure of Manufacturer Fees**. In accordance with Section 6.1 of this Agreement, Provider or its affiliates may hold contracts with pharmaceutical companies relating to products covered under this Agreement. In connection with such contracts, Provider or its affiliates may have a financial relationship with such pharmaceutical companies and may receive and retain fees or other compensation from pharmaceutical companies for services rendered and property provided to pharmaceutical companies, including, without limitation, administrative fees that range between one percent (1%) and four percent (4%) of the Wholesale Acquisition Cost ("WAC") of the products dispensed across Provider's book of business. In addition, Provider or its affiliates may receive concurrent or retrospective discounts from pharmaceutical companies which are attributable to or based on products purchased by Provider affiliated dispensing pharmacies. The term "Rebates" as used in this Agreement does not include the fees, compensation, and concurrent or retrospective discounts associated with the purchase price of products described in this Section 6.4, which belong exclusively to Provider or its affiliates.

558. As detailed herein, CVS Caremark breached its obligations under the CVS Caremark Contracts because, *inter alia*, it: (1) failed to disclose to the City that its formulary, UM, and DUR decisions relating to prescription opioids directly increased the fees the company received from opioid manufacturers; and (2) mislabeled rebate payments received from opioid manufacturers as to avoid passing along them along to the City.

## VIII. FACTS PERTAINING TO THE FORMULARY & UTILIZATION MANAGEMENT (UM) ENTERPRISE

559.    CVS Caremark, Express Scripts, Optum, all of their mail-order pharmacies and each of the opioid manufacturers (including Allergan, Johnson & Johnson/Janssen, Endo, Insys, Mallinckrodt, Purdue, and Teva/Cephalon, referred to collectively as the "Opioid Enterprise Manufacturers" for the purposes of this Section) formed an association in fact enterprise, the "Formulary & UM Enterprise."

560.    The common purpose of the Formulary & UM Enterprise was to profit from the increased and unrestricted prescribing, dispensing, and sale of prescription opioids without regard for public safety. The PBM Defendants conducted, and participated in the conduct of, the Formulary & UM Enterprise by agreeing to not take action that would undercut each other's business; agreeing to work together with the opioid manufacturers; agreeing to take and taking formulary action that would motivate and facilitate increased opioid prescribing; agreeing to take and taking UM actions that would facilitate easier and increased opioid dispensing and sales; working together with opioid manufacturers to disseminate the false marketing and to support their detailing of prescription opioids to prescribers; and failing to uphold their distribution and dispensing obligations under the CSA and its implementing regulations.

561.    All of this conduct furthered the underlying fraudulent scheme of the Formulary & UM Enterprise because it served to deprive people of money and property by means of an underlying fraudulent scheme, including taking actions that directly contradicted the public representations they made about their conduct as

well as the promises they made to their clients. Furthermore, CVS Caremark, Express Scripts and Optum have engaged in additional illegal conduct, including filing false statements about their revenue with the SEC.

562.    The Formulary & UM Enterprise was characterized by a common purpose, relationships among members of the Formulary & UM Enterprise, and sufficient longevity to accomplish the common purpose thereof. The PBM Defendants each conducted and participated in the conduct of the Formulary & UM Enterprise through a pattern of racketeering activity.

563.    Each member of the Formulary & UM Enterprise knew that prescription opioids were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain. Each member of the Formulary & UM Enterprise was also aware that use of prescription opioids carried risks such as addiction, OUD, overdose, and death. Nevertheless, each member of the Formulary & UM Enterprise joined together into an association-in-fact enterprise for the common purpose of profiting from an expansion of the market for prescription opioids, and increased prescribing, dispensing, and sales of those drugs.

564.    That each member of the Formulary & UM Enterprise is a for-profit company and may legally pursue profits is not in dispute. However, each member of the Formulary & UM Enterprise sought to fulfill common purpose through a pattern of mail and wire fraud, and felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in controlled substances. Specifically, each member of the Formulary & UM Enterprise supported each other

member in perpetrating a fraudulent scheme on the consumers who received prescriptions for prescription opioids, on the American public, and on the PBM Defendants' clients. Each member of the Formulary & UM Enterprise also supported each other member in feloniously possessing and dispensing controlled substances in Schedules II through IV in manners that were not authorized by the CSA.

565. Each member of the Formulary & UM Enterprise knew that prescription opioids were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain. Each member of the Formulary & UM Enterprise was also aware that use of prescription opioids carried risks such as addiction, OUD, overdose, and death. Therefore, each member of the Formulary & UM Enterprise knew that they needed to engage in a fraudulent scheme if they were going to increase the market for prescription opioids and increase their profits from prescribing, dispensing, and sales of prescription opioids.

566. For their part, the Opioid Enterprise Manufacturers' illegal marketing and false statements regarding prescription opioids have been well documented. They knew that prescriptions were dangerous and addictive and, nevertheless, marketed them as safe and non-addictive. These representations furthered the common purpose of the Formulary & UM Enterprise.

567. The PBM Defendants, for their part, made representations alleged, *supra*, that their businesses were committed to making decisions about their formulary and UM offerings that were driven by a commitment to the health and safety of their covered lives and were focused on delivering safe healthcare.

568. PBM Defendants and opioid manufacturers also knew that the PBM Defendants' mail-order pharmacies were receiving prescriptions that were not for lawful orders of a practitioner. PBM Defendants and opioid manufacturers knew that the PBM Defendants' mail-order pharmacies were filling illegitimate prescriptions.

569. By these strategies, and the activities alleged *supra* and *infra*, both the PBM Defendants and the Opioid Enterprise Manufacturers agreed to further the common purpose of the Formulary & UM Enterprise through a fraudulent scheme and felonious possession and dispensing of controlled substances, and to grow the market for prescription opioids by increasing prescribing, dispensing, and sales of prescription opioids.

570. As an example, the Opioid Enterprise Manufacturers contracted and agreed with each PBM Defendant to coordinate unfettered formulary placement (with no or limited) UM measures regarding each opioid drug on the PBM Defendant's standard offerings, such that there would be as little impediment as possible to opioid prescribing and dispensing. From their agreements, each member of the Formulary & UM Enterprise stood to reap significant profits from ever-increasing prescribing, dispensing, and sale of prescription opioids: the Opioid Enterprise Manufacturers from sales of their drugs and the PBM Defendants from rebates and other fees.

571. As part of these agreements, the PBM Defendants gave each of the Opioid Enterprise Manufacturers parity terms, ensuring that no Opioid Enterprise Manufacturer's opioid was disadvantaged within each class of opioid analgesics, and provided the Opioid Enterprise Manufacturers with data about the lives that they

managed, the prescriptions written by doctors on their plans, and assistance with pull through contracts to assist them in pulling through the formulary decisions which would continue to increase prescribing and sales.

572.    These contracts, and further information described below, evidence an agreement between the PBM Defendants, their mail-order pharmacies, and the Opioid Enterprise Manufacturers. Each PBM Defendant and each Opioid Enterprise Manufacturer understood that the PBM Defendants were going to operate on a fundamentally fraudulent basis. As alleged more fully *supra*, the PBM Defendants promised their clients they would take actions that would ensure that opioid prescribing and dispensing were safe and cost effective.

573.    The PBM Defendants also represented to legislative bodies and the public that their conduct was intended to maximize health, safety, and cost-effective healthcare for their covered lives. However, the PBM Defendants had agreed with each other and the Opioid Enterprise Manufacturers that their conduct would have the opposite effect. Instead of prioritizing health, safety, and cost-effectiveness, the Formulary & UM Enterprise and its members intended to obtain money and property from the prescribing, dispensing, and sale of prescription opioids that they would not otherwise have received had they been honest and conducted their businesses along the lines of their public representations.

574.    Importantly, some of the conduct alleged, above and below, may appear to be the behavior of competitors working against each other, or of opposing parties working to secure advantage at the expense of ether other. However, each PBM

Defendant worked with each Opioid Enterprise Manufacturer in negotiations that were intended to maximize the amount of profit for the PBM Defendants and the Opioid Enterprise Manufacturers. As an example described earlier, discussion of formulary status and prior authorization were always a vehicle for discussion about the amount of rebates and administrative fees. As the Opioid Enterprise Manufacturers and PBM Defendants knew and intended, the end result was always the same—agreements for favorable formulary status without UM so that prescribing, dispensing, and sales could continue to increase.

575.    The similarity of conduct by each PBM Defendant, including similar contract terms, pull-through marketing, facilitating dissemination of the Opioid Enterprise Manufacturers' marketing messages, favorable formulary status, as little UM as possible, research on behalf of the Opioid Enterprise Manufacturers, and free-flowing dispensing of prescription opioids, further evidences the existence of the Formulary & UM Enterprise. Each PBM Defendant knew of the other's conduct and refrained from commenting on or revealing the behavior, and continued to engage in the same conduct so that all members of the Formulary & UM Enterprise could continue to profit from ever-increasing prescribing, dispensing, and sales.

576.    That the PBM Defendants may have competed with each other for clients, or negotiated sharply with the Opioid Enterprise Manufacturers for increasing rebates and administrative fees did not undercut the common purpose of the Formulary & UM Enterprise because it did not slow or decrease the overall prescribing, dispensing, and sale of prescription opioids in the market as a whole.

Similarly, competition among the Opioid Enterprise Manufacturers for increasing market share of their drug against a competitor's drug did not undercut the common purpose of the Formulary & UM Enterprise.

577.    For example, Purdue's competition with Endo for market share of OxyContin over Opana did not slow or decrease the prescribing, dispensing, or sale of prescription opioids as a class of drugs. Furthermore, each member of the Formulary & UM Enterprise knew that there would be competition in the market, but each member also knew that their participation in the Formulary & UM Enterprise was necessary to continue growing the market and agreed to work together towards that goal.

578.    As alleged more fully herein, the Formulary & UM Enterprise caused direct injury to Plaintiff's money and property.

### A.    Formation of the Formulary & UM Enterprise

579.    The Formulary & UM Enterprise was formed primarily in two ways, including: the forced dealing of the members with each other in the closed system of controlled substance manufacture, distribution, and dispensing, as well as the members work together in trade associations and industry working groups like the Pharmaceutical Care Management Association ("PCMA") and other informal groups described below.

580.    First, the formation of the Formulary & UM Enterprise occurred, in part, through the parties' dealings with each other required by the closed system imposed by the CSA. The pharmaceutical industry is extremely insular and part of a "closed system" open only to those who register to do so. Other than their CSA

obligations as mail-order pharmacies, the PBM Defendants are some of the very few participants in controlled substance manufacturing, distribution and dispensing that are not required to register with the DEA. However, in their efforts to secure cost-effective access to controlled substances on behalf of their clients, the PBM Defendants were forced to work closely with the Opioid Enterprise Manufacturers.

581.    Over at least the last two decades, the consolidation and acquisition of pharmacy benefit management companies into ever-larger entities has led to the formation of close personal business relationships between the few remaining PBMs and the Opioid Enterprise Manufacturers that were based on a shared interest in and the common purpose of ensuring the widespread dispensing of opioids.

582.    There can be no doubt that the PBM Defendants and the Opioid Enterprise Manufacturers maintain interpersonal relationships with each other. As business entities, they have been negotiating with each other since the mid-1990s. And, as alleged above, the negotiations between the Opioid Enterprise Manufacturers and PBM Defendants often took place at, and/or involved, high level executives at both companies, a multitude of emails and phone calls, including personal calls between executives to iron out details. The contractual dealings between the Opioid Enterprise Manufacturers and the PBM Defendants created relationships and provided context in which the common purpose of the Formulary & UM Enterprise could develop.

583.    Documents produced by the Opioid Enterprise Manufacturers and the PBM Defendants reveal that there have been decades of contract negotiations over

rebate agreements, amendments, re-negotiations, payment discussions, and rebate invoicing. These contract negotiations were always geared towards maximizing the number of prescriptions written for the PBM Defendants' clients and ensure the most optimal formulary placement and least amount of UM under the PBM Defendants' standard offerings so that the prescribing, dispensing and sales could continue to grow.

584.    The earliest indications of the existence of the Formulary & UM Enterprise can be found in the PBM Defendants' negotiations with Purdue, their work together on disseminating the Opioid Enterprise Manufacturers' marketing messages about prescription opioids, the presence of Purdue-paid speakers at the PBM Defendants' offices, and the PBM Defendants' research work supporting the Opioid Enterprise Manufacturers. Although the earliest indications of the Formulary & UM Enterprise's existence begin with Purdue and the predecessors of the PBM Defendants, the allegations above indicate that the Formulary & UM Enterprise grew to include all of the Opioid Enterprise Manufacturers and the consolidated PBMs now named as PBM Defendants.

585.    As alleged more fully herein, various documents indicate that the Formulary & UM Enterprise found its beginnings with Purdue-sponsored doctors speaking at PBM offices, in the late 1990s, all across the country, and rebate contract negotiations between the Opioid Enterprise Manufacturers and the PBM Defendants that began around the same time and have continued through the present.

586.    The formation of the Formulary & UM Enterprise did not happen solely within the formation of the rebate contracts between the Opioid Enterprise Manufacturers and the PBM Defendants. The Formulary & UM Enterprise also continued to develop through regular non-contractual interactions, including through the use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme in: (1) interactions about the administration of the rebate contracts; (2) pull-through marketing and assistance therewith; and (3) joint participation in trade associations and informal coalitions.

587.    Trade associations and informal coalitions and forums not only provide a basis for the formation of the Formulary & UM Enterprise, but also serve as central conduits for the conduct of and participation in the Formulary & UM Enterprise.[184] The prime example of a trade association through which the Formulary & UM Enterprise developed and operated is the PCMA, the PBMs' trade association.

---

[184] *Pain Care Forum became 'echo chamber' for opiate distribution, epidemic in United States* (Sep. 19, 2016), https://www.oxfordeagle.com/2016/09/19/pain-care-forum-became-echo-chamber-for-opiate-distribution-in-united-states/ (last accessed on August 15, 2025); *see also* Geoff Mulvihill, Liz Essley Whyte *et al.*, "Purdue Pharma, Pain Care Forum fought opioid limit 'domino effect' Groups wage battle against Washington state's efforts to curb opioid overuse," *Times Union* (Sep. 18, 2016), https://www.timesunion.com/news/article/Purdue-Pharma-Pain-Care-Forum-fought-opioid-9229680.php (last accessed on August 15, 2025); Matthew Perrone, "Painkiller politics: Effort to curb prescribing under fire," (Dec. 18, 2015), https://apnews.com/article/765439c771b649a7b6940fda87595735 (last accessed on August 15, 2025); Scott Higham, Sari Horwitz, Steven Rich and Meryl Kornfield, "Inside the Drive Industry's Plan to Defeat the DEA," *The Washington Post* (Sep. 13, 2019), https://www.washingtonpost.com/graphics/2019/investigations/drug-industry-plan-to-defeat-dea/ (last accessed on August 15, 2025).

588.    PCMA describes itself as "lead[ing] the effort in promoting PBMs and the proven tools they utilize, which are recognized by consumers, employers, policymakers, and others as key drivers in lowering prescription drug costs and increasing access."[185]

589.    While PCMA boasts of being the national association representing America's pharmacy benefit managers, it actually has a much broader membership base and focus. As evident from the PCMA website, PCMA membership includes member PBMs[186] and so-called "Affiliate" drug manufacturers and other entities, including numerous of the Opioid Enterprise Manufacturers as current or former members.[187]

590.    As repeatedly mentioned in the PCMA's annual conference materials, the drug manufacturers are the PBMs' most notable business partners.[188]

> The PCMA Annual Meeting is the industry's premier executive conference. The event is tailored specifically for senior executives from PBMs and their affiliated business partners — most notably drug manufacturers. We've designed the Annual Meeting to be an important part of your business strategy and one proud of the unique value

---

[185] About PCMA, https://www.pcmanet.org/about/ (last accessed August 15, 2025).

[186] PCMA Members, https://www.pcmanet.org/members/ (last accessed August 15, 2025).

[187] PCMA Affiliates, https://www.pcmanet.org/affiliates/ (last accessed August 15, 2025).

[188] PCMA Annual Meeting 2016 Conference Program Book, https://www.pcmanet.org/events/past-events/2016-annual-meeting/ (last accessed August 15, 2025).

591.    The PBM Defendants are members of PCMA, and due to their leadership positions, have substantial control over PCMA.[189] Indeed, PCMA is governed by PBM executives—including the PBM Defendants' top executives.

592.    Adam Kautzner, President of Express Scripts, was appointed Chair of the PCMA's Board of Directors on February 3, 2023.[190] David Joyner, Executive Vice President of CVS Health and President, CVS Caremark, replaced Mr. Kautzner and served as PCMA's Chair through October 2024.[191]

593.    Current or past PCMA Board Members include: Dr. Patrick Conway, CEO of OptumRx; Heather Cianfrocco, former CEO of OptumRx; John Prince, President and COO of Optum, Inc. and former CEO of OptumRx; Jon Roberts, Executive Vice President and COO of CVS Health Corp.; Amy Bricker, Chief Product Officer of CVS Health (and former President of Express Scripts); Alan Lotvin, former Executive Vice President of CVS Health and President of CVS Caremark; and Tim Wentworth, former CEO of Evernorth and Express Scripts.

594.    An image illustrating the membership in the PCMA is as follows:[192]

---

[189] PCMA Board of Directors, https://www.pcmanet.org/board-of-directors/ (last accessed on Oct. 11, 2023).  PCMA no longer identifies members of its Board of Directors on its website.

[190] https://www.pcmanet.org/press-releases/express-scripts-president-adam-kautzner-appointed-chair-of-pcma-board-of-directors/02/03/2023/ (last accessed August 15, 2025).

[191] https://chaindrugreview.com/prime-therapeutics-mostafa-kamal-becomes-pcma-board-chair/ (last accessed June 20, 2025).

[192] PCMA Annual Meeting 2016 Conference Program Book, https://www.pcmanet.org/events/past-events/2016-annual-meeting/ (last accessed August 15, 2025).



595.   Active control over the PCMA Board of Directors is important to the PBM Defendants and clearly conditioned on current employment by the PBM. As an example, in 2022, former Express Scripts President Amy Bricker was the former Chair of the PCMA Board of Directors and the only Express Scripts employee on the Board. But when Ms. Bricker left Express Scripts in late 2022/early 2023, she was removed from the PCMA Board. On February 3, 2023, PCMA issued a press release, naming Mr. Kautzner the Chair of the Board.

596.   Each year during the relevant period, PCMA has regularly held industry conferences, including its Annual Meeting and Business Forum conferences.

597.   Every year, high-level representatives and corporate officers from both the PBM Defendants and the Opioid Enterprise Manufacturers have attended these

conferences to meet in person and engage in discussions, including those in furtherance of the Formulary & UM Enterprise.

598.    In fact, many of the Opioid Enterprise Manufacturers have been "Partners," "Platinum Sponsors," or "Presidential Sponsors" of these PCMA conferences.

599.    Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, as Presidential Sponsors of these conferences, the Opioid Enterprise Manufacturers were permitted to host "private meeting rooms" that offer "excellent opportunities for interactions between PBM members, drug manufacturers, and other industry partners."[193]

600.    Representatives from each PBM Defendant and the Opioid Enterprise Manufacturers have routinely met during the Annual Meetings and Business Forum conferences that PCMA holds (and the manufacturers sponsor) each year.

601.    In addition, all PCMA members, including Affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community."[194]

---

[193] PCMA, *The PCMA Annual Meeting 2021 Will Take Place at the Broadmoor in Colorado Springs, CO September 20 and 21,* https://www.pcmanet.org/pcma-event/annual-meeting-2021/ (an event "tailored specifically for senior executives from PBMs and their affiliated business partners" with "private reception rooms" and "interactions between PBM members, drug manufacturers, and other industry partners") (last accessed on Oct. 11, 2023).

[194] PCMA, *PCMA-Connect,* https://www.pcmanet.org/contact/pcma-connect/ (last accessed on August 15, 2025).

602.    As PCMA members and Affiliates, the PBM Defendants and the Opioid Enterprise Manufacturers utilized both PCMA-Connect, as well as the meetings facilitated by PCMA (including at conferences), to exchange information and to reach agreements in furtherance of the Formulary & UM Enterprise.

603.    Thus, PCMA served as a conduit of information between the Opioid Enterprise Manufacturers and the PBM Defendants on subjects like access to prescription opioids.

604.    That the PCMA served as a conduit for the sharing of information, and the formation of collaborative partnerships is not reasonably disputable. PCMA hosts regular meetings during which PBMs and Opioid Enterprise Manufacturers, or "Pharma" as they are called by the PBMs, can discuss their coordinated and shared objectives/strategies. PCMA's website posts programs for its regular meetings that highlight the close and "[i]mperative" collaboration and partnership between the PBMs and the Opioid Enterprise Manufacturers. Some examples from the program agendas and/or booklets currently available on PCMA's website include:

- Hot Topics and Trends Impacting Today's PBM and Pharma Strategies;[195]

- Meeting Patients Where They Are: Pharma and PBMs working to close gaps in care in the post pandemic era;[196]

---

[195] PCMA Business Forum 2023, Conference Program Agenda for Monday, February 27, available at https://www.pcmanet.org/events/past-events/pcma-business-forum-2023/ (last accessed December 1, 2023).

[196] PCMA Annual Meeting 2022, Conference Program Book at p. 4, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2022/ (last accessed December 1, 2023).

- Unlocking the Value of PBM and Small Manufacturer Relationships;[197]

- Manufacturers and PBMs Working Together to Reward Innovation;[198]

- PBM & Pharma Priorities, Opportunities and Challenges in 2022 and Beyond;[199]

- PBM and Pharma Collaboration: Focusing on Patients and Value;[200]

- Collaboration Imperative—Identifying the Shared Interests of PBMs and Pharma;[201]

- Market Dynamics Driving the PBM and Pharma Relationship;[202]

- The Future of PBM-Pharma Relations and Negotiations;[203]

---

[197] PCMA Business Forum 2022, Conference Program Book at p. 6, available at https://www.pcmanet.org/events/past-events/pcma-business-forum-2022/ (last accessed December 1, 2023).

[198] PCMA Annual Meeting 2022, Conference Program Book at p. 6, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2022/ (last accessed December 1, 2023).

[199] PCMA Annual Meeting 2021, Conference Program Agenda for Tuesday, September 21, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2021/ (last accessed December 1, 2023).

[200] PCMA Business Forum 2020, Conference Program Book at p. 3, available at https://www.pcmanet.org/events/past-events/spcma-business-forum-2020/ (last accessed December 1, 2023). Although this event was cancelled due to the pandemic, it still corroborates the view shared by PBMs and Opioid Manufacturers that they are collaborating.

[201] PCMA Annual Meeting 2019, Conference Program Book at p. 4, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2019/ (last accessed December 1, 2023).

[202] PCMA Annual Meeting 2019, Conference Program Book at p. 6, available at https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2019/ (last accessed December 1, 2023).

[203] PCMA Business Forum 2019, Conference Program Book at p. 4, available at https://www.pcmanet.org/events/past-events/business-forum-2019/ (last accessed December 1, 2023).

- How Health Care Companies are Using Data and Predictive Algorithms to Identify and Address the Opioid Crisis;[204]

- State of the PBM-Manufacturer Partnership;[205]

- Confronting the Crisis We Brought Upon Ourselves: America's Opioid Abuse Epidemic;[206]

- The PBM/Pharma Relationship in the Era of High Price Drugs;[207] and

- PBMs, Specialty Pharmacies and Pharma Program Alignment—Affordability, Adherence and Outcomes.[208]

605.    Notably, PCMA only publishes the agendas and booklets from its regular meetings going back to 2014.  Plaintiff is informed and believes that similar meetings would have been held, and topics discussed throughout the entirety of the relevant discovery period.

606.    Given the foregoing, it is not surprising that Purdue viewed PCMA as a valuable source of information and coordination on subjects regarding prescription

---

[204] PCMA Business Forum 2018, Conference Program Book at p. 2, available at https://www.pcmanet.org/events/past-events/business-forum-2018/ (last accessed December 1, 2023).

[205] PCMA Annual Meeting 2017, Conference Program Book at p. 3, available at https://www.pcmanet.org/events/past-events/annual-meeting-2017/ (last accessed December 1, 2023).

[206] PCMA Business Forum 2017, Conference Program Book at p. 3, available at https://www.pcmanet.org/events/past-events/business-forum-2017/ (last accessed December 1, 2023).

[207] PCMA Annual Meeting 2016, Conference Program Book at p. 3, available at https://www.pcmanet.org/events/past-events/2016-annual-meeting/ (last accessed December 1, 2023).

[208] PCMA Annual Meeting 2014, Conference Program Book at p. 10, available at https://www.pcmanet.org/events/past-events/2014-annual-meeting/ (last accessed December 1, 2023).

opioids and OxyContin. As examples, Purdue employees were notified about meetings at the PCMA conference in 2001 that discussed "oxy attacks as a predatory action on the part of the media or one of your competitors," and Burt Rosen (another Purdue employee) reached out to PCMA in 2014 to find the right person to connect with "on opioids."

607.    More broadly, produced documents show that PCMA (including through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme) served as a clearinghouse for communication, discussion, consensus building and speaking on behalf of the PBM Defendants and the Opioid Enterprise Manufacturers who were Affiliate members. Documents confirm that PCMA was a conduit through which discussions occurred and consensus could be reached (including discussion between the PBM Defendants outside of official PCMA correspondence) and that specific discussions and work took place around efforts to curb opioid abuse (which would have worked against the common purpose of the Formulary & UM Enterprise).

608.    PCMA was not the only way in which the PBM Defendants and the Opioid Enterprise Manufacturers collaborated. Additional documents show that the members of the Formulary & UM Enterprise knew how to, and did form, ongoing informal coalitions that for years met regularly to work on issues of common concern and advance their common interests. These documents show that a Controlled Substances Stakeholder's Coalition was formed in October 2013 in order to "further collaborate on interprofessional efforts to combat the United States opioid epidemic."

At the time of the Coalition meeting in December 2016, these meetings had been ongoing for at least three years with each organization providing "updates for increasing awareness and decreasing misuse and diversion."

609.    Express Scripts claimed that it was making recommendations to physicians that had substantially decreased opioid prescriptions and taking actions to increase depository sites for drug disposal. As alleged more fully herein, however, documents confirm that CVS Caremark, Express Scripts, and OptumRx were at the same time, in order to protect their shares of rebates and other fees, actively working with the Opioid Enterprise Manufacturers in the Formulary & UM Enterprise to avoid taking actions that would have reduced prescribing, thus ignoring their obligations to reduce unsafe and inappropriate prescribing.

610.    Finally, documents will show that groups like PCMA supported the formation of the Formulary & UM Enterprise and agreements within it:

- "The Coalition discusses the terms 'drug abuse' and 'addiction' versus 'substance use disorder,' . . . and agreed";

- "Members then discussed the purpose of the slide deck . . . and agreed";

- "Additionally, the Coalition discussed various communication strategies . . . . Members agreed"; and

- "Members unanimously agreed that further meetings were necessary to ensure that continued progress would be made."

611.    Members of the Formulary & UM Enterprise also participated in similar stakeholder meetings directly and/or through PCMA regarding topics like red flags and warning signs related to prescribing and dispensing controlled substances. The express purpose of these stakeholder meetings was to foster open channels of

communication, foster understandings, and to discuss collaborative actions. Notably, membership in some stakeholders meetings and working groups included some of the Opioid Enterprise Manufacturers' front groups and trade association (PhRMA), opioid distributors, the National Association of Chain Drug Stores, and other PBMs and pharmacies.

612. The foregoing facts, and as alleged in more detail herein, demonstrate that the Formulary & UM Enterprise arose from personal business relationships developed between the enterprise members in various ways over the course of at least the last two decades.

**B.    The Common Purpose and Fraudulent Scheme of the Formulary & UM Enterprise.**

613. The personal business relationships that formed the Formulary & UM Enterprise also allowed for the formation of a common purpose between the Opioid Enterprise Manufacturers and PBM Defendants in the Formulary & UM Enterprise. Specifically, the Formulary & UM Enterprise was formed for the common purpose of illegally and fraudulently profiting from an expansion of the market for prescription opioids, and increased prescribing, dispensing, and sales of those drugs. As alleged more fully herein, the fraudulent scheme that furthered the common purpose of the Formulary & UM Enterprise relied on fraudulent representations from each PBM Defendant to each one of its clients and to the public that it would structure formulary offerings and perform cDUR benefit services in the interests of its clients and patients to ensure that opioids were prescribed and dispensed only for safe and legitimate reasons. Instead of providing standard formulary and UM offerings that were in their

clients' best interests or for safe and legitimate reasons, the PBM Defendants made decisions that gave the Opioid Enterprise Manufacturers and their prescription opioids unfettered and preferred formulary access, without utilization management, and did not disadvantage any opioid compared with another in the same class or formulary tier, agreed to parity treatment for opioids within the same class and/or formulary, supported the Opioid Enterprise Manufacturers' pull-though marketing, pocketed enormous rebates and other fees, and (through its mail-order pharmacies) dispensed prescription opioids without conducting the necessary due diligence.

614.    Each member of the Formulary & UM Enterprise played a part and furthered the common purpose of the Formulary & UM Enterprise.

615.    For their part, the Opioid Enterprise Manufacturers have been engaged in fraudulent conduct related to the marketing of prescription opioids beginning in the mid-1990s. As alleged by multiple entities and proven through extensive briefing, the Opioid Enterprise Manufacturers engaged in a fraudulent scheme, including through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme, to grow the market for prescription opioids through the use of branded and unbranded marketing materials, key opinion leaders ("KOLs") to give speaker presentations and publish about prescription opioids, and front groups which would contribute to and publish books, articles, documents, etc., all of which misrepresented the benefits and risks of prescription opioid use.

616.    The Opioid Enterprise Manufacturers commonly made the same misrepresentations through common KOLs and Front Groups. For example, each of

the Opioid Enterprise Manufacturers made repeated misrepresentations about the risks and benefits of prescription opioids, including:

(a)    The risk of addiction from chronic opioid therapy is low;

(b)    To the extent there is a risk of addiction, it can be easily identified and managed;

(c)    Signs of addictive behavior are "pseudoaddiction," requiring more opioids;

(d)    Opioid withdrawal can be avoided by tapering;

(e)    Opioid doses can be increased without limit;

(f)    Long-term opioid use improves functioning;

(g)    Alternative forms of pain relief pose greater risks than opioids;

(h)    OxyContin provides twelve hours of pain relief; and

(i)    New formulations of certain opioids, labeled abuse deterrent, successfully deter abuse.

617.    Each of the Opioid Enterprise Manufacturers made nearly identical representations about their branded drugs and/or unbranded prescription opioids as a class of drugs during the relevant time period.

618.    Each of the Opioid Enterprise Manufacturers used similar Front Groups to promote prescription opioid use. As examples, multiple of the Opioid Enterprise Manufacturers used Front Groups including, as examples, the following: the American Pain Foundation, the American Academy of Pain Medicine, the American Pain Society, Federation of State Medical Boards, the Alliance for Patient Access, the United States Pain Foundation, the American Geriatric Society, and the National Initiative on Pain Control.

619.    The Opioid Enterprise Manufacturers took an active role in guiding, reviewing, and approving many of the false and misleading statements issued by the Front Groups, ensuring that the Opioid Enterprise Manufacturers were consistently in control of their content and that it stayed on message in favor of more opioid prescribing. The Opioid Enterprise Manufacturers exercised control over and adopted their false and deceptive messages and acted in concert with the Front Groups and, through the Front Groups, with each other to deceptively promote the use of prescription opioids.

620.    Each of the Opioid Enterprise Manufacturers used similar KOLs and the strategy of paying opinion leaders and speakers who favored aggressive treatment of pain with prescription opioids. Pro-opioid doctors have been at the hub of the Opioid Enterprise Manufacturers' well-funded, pervasive marketing scheme since its inception and were used to create the grave misperception that opioids were safe and efficacious. As examples, multiple Opioid Enterprise Manufacturers used similar Key Opinion Leaders including, but not limited to: Dr. Russell Portenoy, Dr. Lynn Webster, Dr. Perry Fine, and Dr. Scott Fishman.

621.    Each of these KOLs and numerous other, lower profile doctors, were paid to speak on behalf of prescription opioids as an unbranded class of drugs. They were used extensively to present the appearance that unbiased and reliable medical research supported the broad use of prescription opioids. These pro-opioid doctors also began to write, consult on, edit, and lend their names to books and articles, they

gave speeches, they served on committees, etc., all the while encouraging the use of prescription opioids.

622.   The Opioid Enterprise Manufacturers' marketing conduct did not end with the KOLs and Front Groups—they were merely one of the vehicles for the dissemination of the misrepresentations. The Opioid Enterprise Manufacturers also used branded and unbranded advertising and marketing; funded, edited and distributed pro-opioid publications; speakers bureaus and continuing education programs. Examples of speakers bureaus and continuing medical education events occurring at the PBM Defendants' facilities are found throughout document productions from the Opioid Enterprise Manufacturers.  Furthermore, as alleged above, the PBM Defendants often facilitated and/or disseminated the Opioid Enterprise Manufacturers' marketing messages directly to doctors who prescribed for patients covered by the PBM Defendants' clients.

623.   One of the primary means by which the Opioid Enterprise Manufacturers disseminated their messaging about prescription opioids was through drug detailing: the practice of sending out pharmaceutical company representatives to provide details about specific branded products in order to persuade prescribers to begin writing (or write more) prescriptions for a specific product.

624.   The Opioid Enterprise Manufacturers adopted detailing as a key component of their prescription opioids strategy early on to capitalize on the fraudulent unbranded marketing—developing carefully crafted marketing messages

and tactics to deliver messages to prescribers through close relationships with sales representatives.

625.    Drug detailing is data driven, requiring identification of the prescribers who are writing high or low volumes of prescriptions, targeting places where additional messaging might be affecting and to test the effectiveness of messaging. In accordance with common industry practice, the Opioid Enterprise Manufacturers purchased and closely analyzed prescription sales data from companies like IMS Health (now IQVIA) and the PBM Defendants which allowed them to track—precisely—the rates of initial and renewal prescribing by individual prescribers.

626.    The nexus between data and detailing helped drive the formation of the common purpose of the Formulary & UM Enterprise. In return for data and unfettered formulary placement from the PBM Defendants, the Opioid Enterprise Manufacturers were willing to pay higher rebates and other fees to each PBM Defendant.

627.    Once that occurred, the PBM Defendants once again supported the Opioid Enterprise Manufacturers' fraudulent marketing regarding prescription opioids. After the Opioid Enterprise Manufacturers obtained the PBM Defendants' data and favorable formulary placement, the Opioid Enterprise Manufacturers' sales personnel immediately began to analyze their managed care or PBM data in order to "pull through" the formulary placement in order to drive increased sales. Documents produced from the Opioid Enterprise Manufacturers and PBM Defendants are replete with examples of pull-through initiatives touting the beneficial formulary

placement of Opioid Enterprise Manufacturers' drugs to drive increased sales and use of the PBM Defendants' data to maximize the pull through effort.

628.    These documents make clear that the formulary placement was viewed as a "win" and an opportunity to make the rebate agreements profitable by pulling through sales. Sophisticated presentations outlining the exact steps a sales representative should take were often included in the sales training materials. The impact of these agreements and the ability to pull-through increased sales using the PBM data was dramatic:



629.    Using the "Best Practices Identified" of: 1. Identifying the local UHC MC Opportunity; 2. Targeting the Right UHC Customer; 3. Hyper Targeting; 4. Delivering the Right Message; and 5. Consistent Cross-Functional Communication— the Pittsburgh District experienced dramatic growth in sales, as described by Endo:



630.    Formulary wins were a boon for each member of the Formulary & UM Enterprise. Each prescription opioid that enjoyed a favorable formulary placement, or continued to enjoy prescribing and dispensing without UM, ensured that all prescription opioids would continue to enjoy unrestricted sales due to the privity clauses that the PBM Defendants agreed to with each Opioid Enterprise Manufacturers. And, as indicated by the graph cited above, these wins increased sales. And, by increasing sales, the wins increased profits for the Opioid Enterprise Manufacturers whose drugs were sold and for the PBM who received rebates and administrative fees tied to sales. From that perspective, the graph above is literally evidence of the Formulary & UM Enterprise and its common purpose.

631.    As alleged in more detail herein, the PBM Defendants took on obligations to perform and made representations that they would conduct point-of-sale review, and take actions to ensure that only safe and legitimate prescriptions were being filled when they had no intention of doing so. Had the PBM Defendants taken the actions they had promised their clients, it would have dramatically reduced

medically inappropriate prescribing, sales and dispensing of prescription opioids. As alleged more fully herein, the PBM Defendants' failure to do so had a significant role in allowing opioids to flood into communities across America, including into Philadelphia.

632. The PBM Defendants also paid lip service to their commitment to taking action about prescription opioids. In September 2013, CVS Caremark reported that it had "recently instituted a program of analysis and actions to limit inappropriate prescribing."[209]  According to CVS Caremark, the "program was intended to identify and take action against physicians and other prescribers who exhibited extreme patterns of use of 'high-risk drugs' relative to other prescribers."[210]  Yet after reviewing data from prescriptions submitted between March 2010 through January 2012, CVS Caremark identified just 42 "high-risk" prescribers from a group of nearly 1 million.[211]  Internal documents reveal that CVS Caremark ultimately chose to "suspend" 36 of the 42 prescribers based on their prescribing behavior—a number recognized to be "an exceptionally small group."

633. Although well aware of problematic opioid prescribing and abuse long before 2013, CVS Caremark would not release its "Opioid Prescriber Toolkit"—a educational resource purportedly designed to assist prescribers "in providing appropriate therapy to patients with chronic noncancer pain" until 2017.

---

[209] Abusive Prescribing of Controlled Substances—A Pharmacy View, *New England Journal of Medicine*, Vol. 369, No. 11, September 12, 2013.

[210] *Id.*

[211] *Id.*

634.    Optum submitted its opioid use/risk management plan for consideration by the National Alliance of Healthcare Purchaser Coalitions, claiming that its program focuses on preventing misuse by educating care providers and consumers, minimizing early exposure and promoting alternative treatments for pain while advancing best practices and made multiple representations about itself and its programs during the presentation.[212] Similar representations were made on OptumRx's website, touting its expertise and commitment to fight the opioid epidemic and demonstrating expertise in opioid management: "Optum Rx® implements a multi-dimensional Opioid Risk Management solution to help curb the rising tide of opioid abuse across the United States . . . as part of its commitment to drive opioid safety and prevention."[213]

635.    Express Scripts also represented in 2013 that it was leading the fight against prescription drug fraud, waste and abuse.  But Express Scripts' promise that it was addressing fraud, waste, and abuse was no less empty than those made by CVS Caremark and Optum.

636.    For example, one former Fraud, Waste and Abuse investigator for Express Scripts from 2013 to 2019, Confidential Informant No. 1 (CI-1), explained that even when they identified blatant instances of pill seekers and pill mill doctors,

---

[212] "UnitedHealth Group Recognized by National Alliance of Healthcare Purchaser Coalitions with 2018 eValue8™ Innovation Award," (Dec. 15, 2018) https://www.nationalalliancehealth.org/news/news-press-releases/evalue8-awards (last accessed August 15, 2025).

[213] Optum, "White Paper: Working to end the opioid epidemic" at 7 (2018) https://www.optum.com/content/dam/optum3/optum/en/resources/white-papers/opioid-whitepaper-wf914999.pdf (last accessed August 15, 2025).

nothing happened. "No one really cared," he said. "No one really followed up on anything. The members were just like a number. We'd totally forget this was a human being because it was just a case number. We'd just look at it, type it up and it was gone. They never got the help they needed. I never heard this person is in rehab."

637.    Moreover, as far as CI-1 knew, none of his findings were ever shared with law enforcement, even if it involved well documented pill mill doctors or pill seekers.

638.    CI-1 explained that when he was hired, he thought he would be investigating "serious major fraud, all of these people writing all of these false prescriptions," he said. "I just thought it was more investigation stuff." They would re-run patients and doctors' names every five months, he said. "We'd see the same people over and over," he said. "Just because we identified the behavior didn't mean it stopped. We'd just call the doctors and they didn't even care. They just felt this patient was in pain, but we're not going to do anything about it. It wouldn't be rare to have [the bad doctors] written up twice in a year. . . . I'd say 90 percent of the reports never got read in my opinion. . . . Let's say I spent months, sometimes weeks on a report—it's being written for the manager. It really doesn't go anywhere else."

639.    Similarly, the PCMA and some of its PBM members participated in coalitions or external activities indicating that they were "increasing awareness and decreasing misuse." However, the internal documents produced by the PBM Defendants show a different story and uncover the fraudulent nature of the PBM Enterprises. The PBM Defendants did not make decisions based on the terms of the

contracts with their clients or in order to fight drug abuse and/or diversion. Rather, the PBM Defendants made decisions in order to protect their rebates and generate profit, despite concerns about prescription opioids and the companies that sold them.

640.    The PBM Defendants hid these facts from their clients. In a telling exchange in 2002, when Highmark Blue Cross Blue Shield decided it would put a 300mg daily limit on a drug, Medco pushed back because this meant that Medco would lose Purdue rebates if there was a limit below 320mg per day. This is evidence that an action could have been taken to limit inappropriate prescribing, sales and dispensing, but it was ignored in favor of the action that advanced the common purpose of the Formulary & UM Enterprise. Instead of taking action to limit medically unnecessary and inappropriate prescribing, sales and dispensing, an August 18, 2002, email from Bernadette Katsur (Purdue National Account Director) reveals that a Medco Vice President convinced its client—Highmark—to drop its daily dosage limit.

641.    Documents created in the mid-2010s confirm that the PBM Defendants regularly delayed taking actions that could have dramatically reduced medically inappropriate prescribing, sales and dispensing despite promises from the PBM Defendants to do the same.

642.    As an example, a November 3, 2016, email from Bob Lahman, Trade Relations VP at OptumRx explained that OptumRx had agreed to forego measures that would have used prior authorization ("PA") as a tool to control the prescription of opioids. The explanation reveals how closely each Opioid Enterprise Manufacturer

worked with each PBM Defendant: "It was not unusual for any manufacturer to not want a PA on their product, especially if it was a small molecule product, and very few would have agreed to a rebate where they did not have unrestricted access (no PAs or steps (sic) edits)." Emails like this, and others cited throughout this Complaint, demonstrate that the PBM Defendants and the Opioid Enterprise Manufacturers all had an understanding of the game—the end goal was increasing prescribing, dispensing, and sales through favorable formulary access without UM, and the means to that end goal was pay rebates and administrative fees.

643. When the pressure began mounting in 2017 to limit access to prescription opioids by use of UM measures like PA, step edit, or days' supply limits, there were serious concerns expressed within OptumRx about the impact on the "significant" rebates being received from the drug makers:

---

**From:** Merrill, Nathan <Nathan.Merrill@optum.com>
**Date:** Monday, Feb 06, 2017, 4:09 PM
**To:** Calabrese, David <David.Calabrese@optum.com>
**Subject:** RE: BIC

David,

Venkat had concerns about adding a PA to Embeda, Oxycontin, and Opana ER since these are preferred products that are tied to "significant" rebates. By adding a PA to these products we jeopardize any rebates we have contracted with the manufacturer. I wasn't in a position to argue so I just explained that we anticipated there would likely be concerns within this class that we would address later. With BIC scheduled for this Wednesday do you think you would be able to attend to go to battle for us on this one? I know Venkat is going to say we cannot put a PA on those 3 products and I'm not sure there is anything more I can say or do to get around this. I appreciate any feedback you might have.

Thank you,

_____

Nathan Merrill, PharmD, CGP | OptumRx
Manager, Clinical UM Operations

---

644. Later, OptumRx employees discussed whether they would be willing to put a hard limit on morphine equivalent dosing (MED) on OxyContin 80mg to align with the 2016 CDC Prescribing Guidelines. The discussion was immediately

interrupted by Brian Sabin, Manager of Industry Relations, who explained that they needed to delay implementation to "ensure we protect rebates" because "we cannot sacrifice rebates on only the 80mg strength here" as that would mean OptumRx would "sacrifice rebates on *all* OxyContin scripts."

> Based solely on the Purdue contract, **I would highly suggest delaying the MED implementation on all clients until 1/1/2018** – as we are doing with the new criteria – so we have time to ensure we can protect rebates.  Purude has a clause built into their agreement that mandates that ALL strengths be unrestricted.  So we cannot sacrifice rebates on only the 80mg strength here.  We would sacrifice rebates on *all* Oxycontin scripts.

645.    Here, again, a PBM Defendant did not take an action that it could have taken to block inappropriate prescription opioid dispensing.

646.    As another example, despite their contractual obligations and their public representations, it was not until 2019 that OptumRx even began to consider exclusion of OxyContin from its formularies.

647.    An email exchange in March 2019 between Optum's Brian Sabin (Optum Director of Industry Relations) and Venkat Vadlamudi raises the question whether they should remove OxyContin from its formularies altogether, "rebate losses be damned," arguing that Purdue caused the opioid epidemic and Optum's continued inclusion of OxyContin on its formularies was "rewarding their bad behavior." Sabin argues that, "[f]rom a purely PR perspective, I think it would look good on us." In response, Vadlamudi states that "[w]e as a company looked into this," but the amount of OxyContin rebates Optum collected "prevented us from doing it." But even Vadlamudi goes on to admit that "times are different now. [I]f you can look into it and model the scenarios maybe we can change."

648.    Even as Purdue explored bankruptcy and OptumRx became aware of the potential for lost rebates, the answer was not to discontinue OxyContin's preferred formulary position, but instead to move other drugs into preferred positions in order to ensure the free flow of prescription opioids from another Opioid Enterprise Manufacturer in the Formulary & UM Enterprise.

649.    Express Scripts went through similar issues with OxyContin prescribing. In a March 2017 email, there were several employees from Express Scripts who derided the decision by the Express Scripts Value Added Committee to overrule the prior authorization limit on OxyContin, stating that the decision did not sit well with them at all. As Express Scripts employees noted, this decision made no clinical sense. Without question, the PA limit would have dramatically reduced medically inappropriate prescribing, sales, and dispensing which would have impacted "rebate gain."

650.    But the PBM Defendants' involvement did not end there. As alleged more fully herein, CVS, Caremark, Express Scripts and Optum each own and operate a mail-order pharmacy. As alleged above, each of the PBM Defendants' mail-order pharmacies dispensed massive amounts of branded and generic opioids without performing the requisite due diligence on prescriptions or refusing to fill prescriptions that could not be resolved through due diligence. As such, the mail-order pharmacies provided another mechanism for the goal of the Formulary & UM Enterprise—*i.e.*, the unrestricted increase in prescribing and dispensing of prescription opioids for the profit of the Opioid Enterprise Manufacturers and the PBM Defendants.

651.   As alleged more fully herein, the Formulary & UM Enterprise maintained a common purpose from the late 1990s through to the present day, creating sufficient longevity in their personal business relationships for them to pursue the common purpose of the Formulary & UM Enterprise.

652.   By dispensing branded and generic prescription opioids without performing the requisite due diligence on prescriptions or refusing to fill prescriptions that could not be resolved through due diligence, the PBM Defendants' mail-order pharmacies furthered the common purpose of the Formulary & UM Enterprise. They continued to facilitate the increased dispensing and sale of prescriptions opioids. However, this also violated the law governing dispensing controlled substances in Schedules II through IV in ways that are punishable as felonies.

## C.   Conduct and Participation of the Formulary & UM Enterprise Through a Pattern of Racketeering Activity

653.   The common purpose of the Formulary & UM Enterprise alleged more fully herein was perpetrated through a fraudulent scheme fulfilled by multiple acts of mail fraud and wire fraud, and by felonious possession and dispensing of controlled substances. PBM Defendants predicate acts of racketeering, constituting a pattern of racketing activity.

654.   The pattern of racketeering activity used by the PBM Defendants and their mail-order pharmacies likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme through which the common purpose was achieved.

655.   Use of the mail and wire facilities began with the formation of the Formulary & UM Enterprise. Negotiations and communications about the contracts between the PBM Defendants and the Opioid Enterprise Manufacturers occurred through interstate mail and wire facilities and involved meetings, communications, and negotiations about contracts between the PBM Defendants and the Opioid Enterprise Manufacturers, the Opioid Enterprise Manufacturers' marketing and the PBM Defendants assistance therewith, and pull-through marketing which required the transmission of large volumes of data.

656.   As alleged more fully herein, the Opioid Enterprise Manufacturers and the PBM Defendants regularly and continuously communicated through the use of the U.S. Mail and interstate wire facilities in furtherance of the common purpose of the Formulary & UM Enterprise and their fraudulent scheme, including discussions of formulary placement, prior authorization limits, step edits, preferred formulary status and their impact on opioid prescribing and dispensing and, relatedly, rebates and other fees. Importantly, rarely mentioned during these discussions was the impact of the burgeoning opioid epidemic. These discussions were clearly intended to further the common purpose of the Formulary & UM Enterprise, happened over at least the last two decades (beginning with Purdue's work with predecessors of CVS Caremark, Optum, and Express Scripts and continuing to involve more Opioid Enterprise Manufacturers over time), and reveal the ongoing personal business relationships that developed between the members of the Formulary & UM Enterprise.

657.    Similarly, each PBM Defendant engaged in significant pull-through marketing assistance with each Opioid Enterprise Manufacturer. As revealed by documents cited herein, each of the PBM Defendants, through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme, agreed to provide the Opioid Enterprise Manufacturers with preferred formulary placement and prescribing data. This ensured that the unfettered formulary access (granted despite the PBM Defendants' contrary representations to the public and their clients), would facilitate unrestricted opioid prescribing and dispensing. Documents confirm these facts and evidence that unrestricted formulary access was a boon for each Opioid Enterprise Manufacturers marketing efforts and that "pull through" efforts were undertaken after each formulary announcement "win" in order to drive the Opioid Enterprise Manufacturers' profitability. The PBM Defendants were not only aware of this pull through marketing, they actively joined in efforts with the Opioid Enterprise Manufacturers by creating reports about the "value proposition" of unrestricted use of prescription opioids as alleged more fully herein.

658.    Finally, each PBM Defendant and the Opioid Enterprise Manufacturers regularly (and through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme) participated in trade industry associations and informal coalitions that provided recurring non-contractual opportunities and forums in which to continue developing personal business relations and in which they form a common purpose of growing the unfettered use of opioid drugs.

659.   The PBM Defendants each engaged in essentially uniform conduct with the Opioid Enterprise Manufacturers whereby the PBM Defendants granted the Opioid Enterprise Manufacturers' drugs unfettered formulary access (including preferred formulary placement coupled with refraining from UM) despite their public promises and contractual obligations to make formulary and UM decisions in their clients' best interests, and facilitated their pull through marketing and/or directly facilitated the dissemination of their marketing messages. The PBM Defendants also provided the Opioid Enterprise Manufacturers with PBM data so that they could pull through the formulary "wins" and drive increased prescribing. At the back end of the fraudulent scheme, the PBM Defendants profited from their fraud by receiving rebates and other fees while the Opioid Enterprise Manufacturers enjoyed increased sales through pull through marketing and unfettered formulary access.

660.   The fraudulent scheme was advanced through mailings and interstate wire transmissions that constitute racketeering activity. Collectively, these violations constitute a pattern of racketeering activity, through which the PBM Defendants and their mail-order pharmacies and the Opioid Enterprise Manufacturers defrauded and intended to defraud Pennsylvania consumers, including Philadelphia consumers, and other intended victims.

661.   The PBM Defendants and their mail-order pharmacies devised and knowingly carried out an illegal and fraudulent scheme using materially false or fraudulent pretenses, representations, promises, or omissions regarding their conduct. Specifically, as alleged more fully herein, the PBM Defendants promised to

perform pharmacy benefit management services, including cDURs, formulary decisions, and UM decisions in their clients' best interests and in ways that would ensure safe and effective prescribing. As alleged herein, the PBM Defendants further represented to their clients and the public that they were committed to preventing and addressing misuse, abuse, and diversion of prescription opioids. These promises were made in person, in publications, and through the mail and the wires.

662.    The PBM Defendants and their mail-order pharmacies did not intend to comply with their contractual obligations, the promises to their clients, or their public representations. The PBM Defendants and their mail-order pharmacies intended to continue to make decisions and take actions that benefitted the members of the Formulary & UM Enterprise and its common purpose by: failing to perform cDURs, granting unfettered formulary access, and blocking implementation of any UM measures. All told, the PBM Defendants and their mail-order pharmacies intended to take actions that directly contradicted their promises, contractual obligations and public promises because they supported increased prescribing, sale, and dispensing of prescription opioids with as little inhibition or impediments as possible.

663.    The PBM Defendants and their mail-order pharmacies intended that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities intentionally and knowingly with the specific intent to advance and for the purpose of executing the illegal and fraudulent scheme.

664. By engaging in their intended conduct, as alleged more fully herein, the PBM Defendants and their mail-order pharmacies engaged in fraudulent and unlawful conduct constituting a pattern of racketeering activity.

665. The PBM Defendants and their mail-order pharmacies used the U.S. Mail and interstate wire facilities to perpetrate the fraudulent scheme of the Formulary & UM Enterprise with thousands of communications, publications, representations, statements, electronic transmissions, and payments including, but not limited to:

(a)    Contracts negotiated and circulated between members of the Formulary & UM Enterprise;

(b)    Contracts negotiated and circulated between PBM Defendants and their clients;

(c)    Public representations by the Opioid Enterprise Manufacturers and the PBM Defendants about their commitment to addressing misuse, abuse, and diversion of prescription opioids;

(d)    Marketing materials about prescription opioids transmitted between the Opioid Enterprise Manufacturers and the PBM Defendants that were later disseminated by the PBM Defendants;

(e)    Communications between the PBM Defendants and their clients about their commitment to following the terms of their respective contracts;

(f)    Communications between the Opioid Enterprise Manufacturers and the PBM Defendants regarding formulary changes;

(g)    Communications between the Opioid Enterprise Manufacturers and the PBM Defendants regarding and including PBM prescribing data;

(h)    Transmission of rebate payments; and

(i) Transmission of payments from the clients of the PBM Defendants.

666. To achieve the common purpose of the Formulary & UM Enterprise, the PBM Defendants and their mail-order pharmacies and the Opioid Enterprise Manufacturers hid from their clients, patients, regulators and Plaintiff: (a) the fraudulent nature of the scheme; (b) the fraudulent nature of their representations; (c) their intention to ignore their contractual cDUR obligations; (d) intent to make formulary and UM decisions that failed to limit the medically unnecessary and inappropriate prescribing, sales, or dispensing of prescription opioids or address misuse, abuse, and diversion; and (e) the true nature of the association between each member of the Formulary & UM Enterprise.

667. Each member of the Formulary & UM Enterprise, including the PBM Defendants and their mail-order pharmacies, agreed with the overall objective of the Formulary & UM Enterprise's fraudulent schemes and participated by taking action that furthered the common purpose of the Formulary & UM Enterprise, including in the common course of conduct to commit acts of fraud and indecency.

668. The pattern of racketeering activity involving the felonious possession and dispensing of controlled substances in Schedules II through IV likely involved thousands, if not millions, if improperly dispensed prescriptions for branded and generic prescription opioids in violation of the CSA and the PBM Defendants' registrations as mail-order pharmacies. The PBM Defendants knowingly and intentional possessed and dispensed branded and generic prescription opioids for reasons that were not authorized by the CSA.

669.   The predicate acts of the Formulary & UM Enterprise all had the purpose of furthering the opioid epidemic that substantially injured Plaintiff's business and property, while simultaneously generating billion-dollar revenue for the PBM Defendants and their mail-order pharmacies. The predicate acts were committed, and/or caused to be committed, by the PBM Defendants and their mail-order pharmacies through their participation in the Formulary & UM Enterprise and in furtherance of the fraudulent schemes, felonious possession and dispensing of controlled substances, and common purpose thereof.

## IX. PLAINTIFF'S CLAIMS ARE TIMELY/TOLLING STATUTES OF LIMITATION

### A.   Enforcement of a Public Right

670.   No statute of limitation can be pleaded against the Plaintiff, which seeks to enforce strictly public rights.

### B.   Tolling Doctrines

671.   Plaintiff has diligently pursued and investigated the claims asserted herein.  Through no fault of its own, the City did not learn, and could not have learned, the factual bases for its claims or the source of the injuries suffered therefrom until recently.  Consequently, the following tolling doctrines apply.

#### 1.   Discovery Rule

672.   In any event, no statute of limitations has run because Plaintiff did not know about the PBM Defendants' conduct until shortly before filing this Complaint. Nor did Plaintiff possess sufficient information concerning the PBM Defendants'

conduct complained of here, or its cause, to put it or any reasonable person on inquiry notice to determine whether actionable conduct was involved.

673.    Plaintiff did not learn that it had been injured by the PBM Defendants' actions, the source of those injuries, or that those injuries were part of a pattern of conduct until only recently, when documents revealing those facts were produced in discovery by various entities in *In re: National Prescription Opiate Litigation*, No. 1:17-md-2804-DAP (N.D. Ohio), and other opioid litigations, including the documents cited, quoted, and relied on herein. These documents—and the facts they contain— had never before been made public, nor have they ever before been in Plaintiff's possession.  Thus, any applicable limitations period did not begin to run when the PBM Defendants committed their wrongful acts or the damage resulting from the PBM Defendants' wrongful acts was sustained, but instead, when they were capable of ascertainment by Plaintiff, which, at the earliest, occurred when the documents revealing those facts were produced in discovery in late 2021 and thereafter.

674.    A reasonably prudent person in Plaintiff's position would not have known, or been placed on inquiry notice, of the PBM Defendants' wrongful conduct or that substantial damage had resulted therefrom.  Nor would diligent inquiry have disclosed the true facts had Plaintiff been aware of any cause to undertake such an inquiry.

675.    Even today, there is lack of transparency regarding the arrangements, relationships, and agreements between and among prescription opioid

manufacturers and the PBM Defendants that continues to obscure the PBM Defendants' unlawful conduct from payors, patients and the general public.

676.    For these reasons, the applicable statutes of limitations, if they were to apply, did not begin to run until 2022, at the earliest.

### 2.    Equitable Estoppel

677.    To the extent any statute of limitations defense would apply, the PBM Defendants are equitably estopped from relying upon such a defense because, as described above, they undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the public, including Plaintiff that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting and generating profits. Notwithstanding the allegations set forth above, the PBM Defendants affirmatively assured the public, including Plaintiff, that they were working to curb the opioid epidemic.

678.    The PBM Defendants intended that their actions and omissions would be relied upon, including by Plaintiff, the public and persons living in Philadelphia. Plaintiff did not know, and did not have the means to know, the truth due to the PBM Defendants' actions and omissions.

679.    Plaintiff reasonably relied on the PBM Defendants' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

### 3.     Fraudulent Concealment

680.    The PBM Defendants concealed their: fraudulent and deceptive marketing and oversupply of opioids; favorable placement of prescription opioids on national formularies in exchange for rebates and fees; elimination or limitation of UM measures on national formularies that would have restricted opioid prescribing; failure to properly and diligently implement effective DUR measures after undertaking to do so; refusal to act on the vast stores of information they had about the epidemic to limit the flood of opioids into Philadelphia; and their dispensing of huge quantities of prescription opioids through their mail-order pharmacies without proper controls against diversion.

681.    The PBM Defendants undertook efforts, including through the use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme, to purposefully conceal their wrongful conduct by: (1) manipulating and distorting public information, knowledge, and facts; (2) misrepresenting their role in the pharmaceutical market as promoting safe use and appropriate opioid dispensing; (3) assuring the public and governmental authorities that they were complying with their obligations and were acting to prevent diversion and drug abuse; (4) hiding the true nature of their relationships with the Opioid Enterprise Manufacturers; (5) failing to make public or otherwise produce nonpublic information, over which the PBM Defendants had exclusive possession, dominion, and control, that would have revealed the truth; (6) entering into overly broad confidentiality agreements with any entity in the supply chain with whom they contracted; (7) suing governmental and other entities to block the release of details in their agreements with the Opioid

Enterprise Manufacturers and pharmacies; and (8) by deliberately and fraudulently concealing the truth.

682.    The PBM Defendants intended that their false statements and omissions be relied upon.

683.    The PBM Defendants knew of their wrongful acts and had material information pertinent to their discovery, but concealed that information from the public, including from Plaintiff.

684.    Only the PBM Defendants knew of their widespread misinformation campaign and of their repeated, intentional failures to prevent opioid overutilization and diversion.

685.    Due in large part to their deceptive, intentional, and fraudulent conduct, the full scope of the PBM Defendants' wrongful conduct and their central role in the opioid epidemic has not yet come to light.

### 4.    Continuing Violations

686.    The PBM Defendants' wrongful conduct alleged herein is of a persistent and continuing nature.

687.    The opioid epidemic continues today in Philadelphia and the City continues to suffer harm and damages from the wrongful conduct of the PBM Defendants.

688.    The PBM Defendants' tortious conduct has not ceased, and its consequences are not completed, nor have all Plaintiff's damages yet been incurred from the PBM Defendants' wrongful conduct.

689.   The public nuisance caused by the PBM Defendants wrongful conduct remains unabated.

690.   The PBM Defendants' wrongful conduct which caused the opioid epidemic and continues to cause Plaintiff's damages remains unabated.

691.   Accordingly, all applicable statutes of limitations are tolled.

## X.    SUCCESSOR LIABILITY

692.   To the extent that the wrongful acts or omissions alleged herein were committed or omitted by predecessor entities, their respective successor entities are liable for those acts or omissions because (1) they expressly or impliedly assumed the predecessor's liability, (2) there was a consolidation or merger of predecessor and successor, or (3) the surviving entity was a mere continuation of the predecessor. To the extent there was no formal merger of predecessor and successor, the respective successor entities are also liable for the wrongful acts or omissions of their respective predecessors based on the doctrine of de facto merger based on the factors of (a) continuity of ownership; (b) cessation of ordinary business and dissolution of the predecessor; (c) assumption by the successor of liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; (d) continuity of management, personnel, physical location, assets and general business operation of the predecessor, and (e) assumption of an identical or nearly identical name. The details regarding the foregoing facts are particularly within the knowledge and control of the respective PBM Defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## XI.    ALTER EGO LIABILITY

693.    To the extent that the wrongful acts or omissions alleged herein were committed or omitted by wholly-owned or majority-owned entities, the parent entities are liable for those acts or omissions as alter egos because (1) they dominated and controlled the wholly-owned or majority-owned entity and (2) exercised that domination and control to perpetrate a wrong or injustice. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## XII.    FACTS PERTAINING TO CIVIL PENALTIES AND PUNITIVE DAMAGES

694.    As detailed herein, the PBM Defendants:

(a)    Knowingly and intentionally colluded with the opioid manufacturers in deceptive marketing schemes that were designed to, and successfully did, change the perception of opioids and cause opioid prescribing and sales to skyrocket;

(b)    Knowingly and intentionally facilitated the increased use of opioids by giving opioids unwarranted preferred formulary status in standard offerings in exchange for profiting from payments from the opioid manufacturers;

(c)    Intentionally maintained preferred formulary status for OxyContin and other highly abused opioids in standard offerings, despite knowing, or being substantially certain, from their own extensive data, that addiction, abuse, and illegitimate prescribing of such drugs were rampant;

(d)    As to increase the amount of manufacturer rebates and/or the dispensing of prescription opioids, deliberately elected not to undertake timely actions utilizing their real-time data that would have drastically reduced the inappropriate prescribing and dispensing of opioids, such as requiring prior authorization, step

therapy, limiting days of supply, or excluding OxyContin from its standard formulary offerings;

(e)     As to increase the amount of manufacturer rebates and/or the dispensing of prescription opioids, dissuaded payor clients from requesting or using and deliberately elected not to impose prior authorization requirements or limits on the availability of opioids in its standard formulary offering;

(f)     As to increase the amount of manufacturer rebates and/or the dispensing of prescription opioids, deliberately elected not to implement adequate safeguards to dispense opioids in a safe and effective manner and to maintain effective controls against diversion of opioids through their mail- order pharmacies; and

(g)     As to increase the amount of manufacturer rebates and/or the dispensing of prescription opioids, deliberately elected not to report suspicious prescribers and pharmacies.

695.    When the PBM Defendants engaged in this conduct, they knew, or were substantially certain, that, *inter alia*: (i) increasing the availability of opioids would increase the number of opioids that would be abused, misused, and diverted into the illegal, secondary market and would be obtained by persons with criminal purposes; (ii) the marketing by manufacturers with which they colluded was deceptive and that the PBM Defendants' conduct served to increase opioid sales; (iii) many of the opioid prescriptions they dispensed, or facilitated the dispensing of, were not issued for a legitimate medical purpose and were likely to be diverted; and (iv) by failing to act reasonably and lawfully with respect to the sale and dispensing of opioids, and "cocktails" of opioids and other drugs, and by participating in the false marketing of opioids, in Philadelphia, diversion and the associated harms and resulting interference with public health, safety, and welfare would occur.

696.    The PBM Defendants also created the false and misleading impression to regulators, prescribers, their clients, and the public, that they voluntarily and rigorously carried out their legal duties, including their duty to implement effective controls against diversion and to exercise due diligence to prevent the dispensing of opioid prescriptions that are illegitimate and/or likely to be diverted.

697.    In truth, the PBM Defendants knowingly abandoned their duties to implement effective controls against diversion and to exercise due diligence to prevent the dispensing of opioid prescriptions that are illegitimate and/or likely to be diverted.

698.    The PBM Defendants' conduct was so willful and deliberate that it continued in the face of enforcement actions, fines, and other warnings from federal, state, and local governments and regulatory agencies. As detailed herein, the PBM Defendants paid fines, made promises to do better, and yet continued on with their marketing, supply, and dispensing schemes.   Through their ongoing course of conduct, the PBM Defendants knowingly, deliberately and repeatedly threatened, harmed, and created a risk of harm to public health and safety, and caused large-scale economic loss to communities and governments across the country, including Philadelphia.

699.    As all of the governmental actions against the PBM Defendants show, the PBM Defendants knew that their actions were unlawful, and yet they deliberately refused to change their practices because compliance with their legal obligations

would have decreased their opioid-related profits.  Meanwhile, the opioid epidemic rages unabated in the City.

700.    By engaging in the above-described intentional and/or unlawful acts or practices, the PBM Defendants acted with actual malice, wantonly, and oppressively. The PBM Defendants engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm.

## XIII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF—PUBLIC NUISANCE
### (Brought By Plaintiff Against All Defendants)

701.    The City re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

702.    The PBM Defendants have contributed to and/or assisted in creating and maintaining a condition that is harmful to the health of thousands of Philadelphia residents and which has interfered with public health, safety, and peace, as well as the public estate, including the enjoyment of the City's historic neighborhoods, parks, streets, and public spaces.

703.    The increased incidence and prevalence of this condition has damaged the City and its community as a whole, and caused a serious deterioration in public order, public safety, economic productivity, and quality of life.  The opioid epidemic has also required City government to increase significantly the provision of services at dramatically increased costs, thereby shifting the imposition of the social costs of

the opioid epidemic from those responsible to the City, its residents and the community as a whole.

704.   Each PBM Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable interference with a right common to the general public, which is the proximate cause of Plaintiff's injury. *See* Restatement Second, Torts § 821B. *See Machipongo Land & Coal Co. v. Com.*, 799 A.2d 751, 773 (Pa. 2002); *Muehlieb v. City of Philadelphia*, 574 A.2d 1208 (Pa. Commw. 1990).

705.   The health and safety of the citizens of the City, including those who use, have used or will use opioids, as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern to the City's citizens and residents. The PBM Defendants' misconduct as set forth above has created or contributed to an unreasonable interference with rights common to the general public, including the right to be free of an unreasonable interference with public health, safety and peace, as well as the public estate.

706.   The public nuisance created by the PBM Defendants' actions is unreasonable—it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit.

707.   The PBM Defendants knew, or should have known, that their promotion and irresponsible marketing and dispensing of opioids (in violation of their monitoring and reporting obligations) would create a public nuisance.

708.   The PBM Defendants are liable for a public nuisance because they acted without lawful authority in knowingly creating and maintaining opioid use at such

volumes and degree as to create an epidemic, which clearly affects a number of citizens, is injurious to public health, safety, morals and welfare, and interferes with the exercise and enjoyment of public rights.

709.    Each PBM Defendant is liable for public nuisance because each PBM Defendant's conduct at issue has caused or contributed to an unreasonable interference with a right common to the general public. The PBM Defendants' conduct described herein interferes with public health, safety, peace, comfort, and convenience, as well as the public estate. The PBM Defendants' actions contributed to opioids becoming widely available and widely used for non-medical purposes. Without the PBM Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid, heroin, and fentanyl[214] overuse, abuse, and addiction that now exists in the City would have been averted.

710.    In addition and independently, the PBM Defendants' conduct invades a legally protected interest. The PBM Defendants' conduct constitutes an unreasonable interference because, *inter alia*, each PBM Defendant has violated federal and Pennsylvania law. The PBM Defendants have permitted dangerous drugs under their control to be diverted for illicit purposes such as to injure the City and its residents.

711.    The PBM Defendants have unlawfully and/or intentionally caused opioids to be dispensed without maintaining effective controls against diversion. Such conduct was illegal.

---

[214] In 2023, 80% of the City's overdose deaths involved fentanyl, https://www.phila.gov/2025-04-29-health-department-releases-reports-on-overdose-crisis/ (last accessed August 15, 2025).

712.    A violation of any rule or law controlling the dispensing of a drug of abuse in the City and the Commonwealth is a public nuisance.  The PBM Defendants' promotion, marketing, and dispensing of opioids while failing to maintain effective controls against diversion was proscribed by Pennsylvania and federal statutes and regulations.

713.    The PBM Defendants' unreasonable interference with a right common to the public is of a persistent and continuing nature.

714.    The PBM Defendants have intentionally and/or unlawfully created an absolute nuisance.

715.    The PBM Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference with public rights that their conduct has caused in the City.

716.    The PBM Defendants intentionally inserted themselves into the chain of distribution and dispensing of prescription opioids, thereby assuming duties to act reasonably while comporting with the CSA and the PCSA.

717.    The PBM Defendants are in the business of prescription drugs, including opioids, which are specifically known to the PBM Defendants to be dangerous because, *inter alia,* these drugs are defined under Pennsylvania and federal law as substances posing a high potential for abuse and severe addiction. 35 P.S. § 780-104; 21 U.S.C. § 812(b)(2).  The PBM Defendants' actions created and expanded the abuse of opioids, drugs specifically codified as constituting severely harmful substances.

718.    The PBM Defendants' conduct in marketing, distributing, and/or dispensing prescription opioids which the PBM Defendants know, or reasonably should know, will likely be diverted for nonlegitimate, non-medical use, creates a strong likelihood that these opioids will cause death and injuries to Philadelphia residents and otherwise unreasonably interfere with public health, safety, welfare, peace, spaces, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

719.    The injury, damage and costs to the City from the PBM Defendants' misconduct were both significant and either known or wholly foreseeable to the PBM Defendants. While reaping billions of dollars in revenues and profits through their misconduct, the PBM Defendants improperly shifted the burden, harm and costs of their public nuisance to the City and the community as a whole, and its residents, which the City has had to address to its detriment, as alleged herein. It is, or should be, reasonably foreseeable to the PBM Defendants that their conduct will cause deaths and injuries to residents in Philadelphia, and will otherwise unreasonably interfere with public health, safety, welfare, peace, and spaces, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

720.    The following circumstances provide further support for the City's public nuisance claim:

(a)    The PBM Defendants had sufficient control over, and responsibility for, the public nuisance they created, as alleged more fully herein. The PBM Defendants were in control of the "instrumentality" of the nuisance, namely the dissemination of

prescription opioids, their collusion with manufacturers in promoting opioids, and standard formulary and drug UM offerings that increased utilization of opioids as described herein.

(b)     The PBM Defendants are not immune from public nuisance claims because they promoted and marketed otherwise and/or allegedly legal products. Lawful conduct of businesses, like lawful conduct of individuals, has long been held to constitute a public nuisance if it unreasonably interferes with public health, safety, or peace. In any event, the PBM Defendants' conduct was unlawful.

(c)     The PBM Defendants have interfered with common public rights, which were understood for centuries to be and have become common rights to public health, safety, order, peace, comfort, or convenience, as well as the public estate, rather than specific, individual rights.

721.    The PBM Defendants' misconduct has not been insubstantial or fleeting as it has involved sophisticated and highly deceptive conduct. The misconduct is ongoing and has produced permanent or long-lasting harm including the worst drug epidemic in the history of the country and in the City, along with all of the deleterious consequences thereof as more fully alleged herein. The PBM Defendants' misconduct has caused deaths, serious injuries, and a significant disruption of public health, safety and peace in the City.

722.    The staggering rates of opioid, heroin, and fentanyl use resulting from the PBM Defendants' abdication of their gate-keeping duties have caused harm to the entire community, including:

(a)     Unnecessary opioid abuse, addiction, overdoses, injuries, and deaths.

(b)     Infants being born addicted to opioids due to prenatal exposure who will suffer severe withdrawal symptoms and lasting developmental impacts.

(c)    Residents enduring both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

(d)    Increased health care costs.

(e)    The loss of productive and healthy employees.

(f)    Increased criminal behavior.

(g)    Addicted persons turning from prescription pills to heroin and fentanyl.  People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin and fentanyl as a foreseeable result.

(h)    Increased demands on human, medical, public health, law enforcement, and financial resources of the City due to, *inter alia*, degradation of the City's historic neighborhoods, parks, streets, and public spaces.

723.    The opioid epidemic and resulting public health and safety crisis touch and harm many neighborhoods, workplaces, and communities in the City.  The harm is not confined to any City zip code or census tract, or to people of any race, ethnicity, religion, gender, sexual preference, or other demographic, but affects the public health, safety, order, public estate, and well-being of the City as a whole.

724.    The deterioration of public health, safety, and spaces caused by the opioid epidemic tears at the social and economic fabric of the City; its impact is not limited to opioid users adversely affected by the side-effects of prescription opioids, but have been socialized and ultimately borne by the community and the City as a whole—true communal harms.

725.    The public nuisance for which the PBM Defendants are responsible has caused, and continues to cause, substantial, extraordinary and repeated injury to the City and its residents that will continue unless enjoined and remedied by the Court.

726.    The City sues in its public capacity for all appropriate injunctive and mandatory relief to abate the ongoing public nuisance, restore the City's public health, safety and peace, and recover all appropriate costs to abate the nuisance.

727.    The City has suffered and continues to suffer special harm that is different in kind and degree from that suffered by individual residents of the City. The harm to City residents includes opioid addiction, overdoses, and death, as well as interference with the right to public health, safety, and peace, as well as the public estate, while the harm to the City itself, upon which this action is based, includes social services costs, treatment costs, emergency costs, equipment costs, costs to clean up neighborhoods, streets, and City properties, and medical and prescription costs, among other things.

728.    The PBM Defendants also are liable for punitive damages to reflect the aggravating circumstances of their intentional, willful, wanton, malicious and oppressive conduct as set forth herein.  The PBM Defendants acted or failed to act knowingly, willfully and deceptively, with gross negligence, maliciously, and/or wantonly with conscious disregard of the public's health, safety, and welfare.

WHEREFORE, Plaintiff demands judgment against the PBM Defendants, jointly and severally, for the following:

    (a)    injunctive relief as noted above;

(b)     abatement of the public nuisance, to the fullest extent allowed by law, including an abatement fund;

(c)     expenses, costs and fees to the fullest extent allowed by law, exclusive of interest;

(d)     punitive damages;

(e)     litigation costs (including expert fees) and attorneys' fees;

(f)     pre- and post-judgment interest; and

(g)     such other and further relief as the Court deems just and proper.

## SECOND CLAIM FOR RELIEF—VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### 73 P.S. §§ 201-1 TO 201-9.3
### (Brought By Plaintiff Against All Defendants)

729.    The City re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

730.    This Claim does not sound in fraud.

731.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits companies from employing "[u]nfair methods of competition" and "unfair or deceptive acts or practices," which are defined to include, *inter alia*, the following conduct:

(a)     "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." 73 P.S. § 201-2(4)(ii);

(b)     "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . . ." 73 P.S. § 201-2(4)(v); or

(c)     "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).

239

732. The PBM Defendants are "persons" under the UTPCPL. 73 P.S. § 201-2(2).

733. The PBM Defendants violated the UTPCPL in that their conduct as alleged herein caused a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of the drugs at issue.

734. The PBM Defendants violated the UTPCPL in that by their conduct, as alleged herein, they represented that the drugs at issue had sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have.

735. The PBM Defendants also violated the UTPCPL in that by their conduct, as alleged herein, the PBM Defendants engaged in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

736. Under Pennsylvania law, an act or practice is unfair or deceptive if it had the capacity to deceive, or was likely to deceive, a substantial portion of the public, and was likely to make a difference in the purchasing decision.

737. The PBM Defendants' conduct as alleged herein constitutes unfair or deceptive acts or practices in violation of the above provisions of the UTPCPL in that they:

> (a)    Promoted the use of opioids for conditions and in circumstances where they are neither safe nor effective; misrepresenting to the public and the medical community that opioids could be taken at high doses and for long durations with minimal risk of addiction;
>
> (b)    Facilitated and encouraged the use of dangerously addictive opioids by colluding with manufacturers to place opioid drugs on standard formulary offerings with preferred status;

(c)    Failed to disclose the material facts that *inter alia* they were not in compliance with laws and regulations requiring that they protect against addiction and severe harm;

(d)    Misrepresented to regulators and the public that their distribution services and methods for preventing diversion were safe and effective when they were not; and

(e)    Misrepresented their compliance with their affirmative legal obligations to provide effective controls to guard against diversion.

738.   The PBM Defendants' conduct, including their deceptive representations and concealments of material fact, created a significant likelihood of confusion and/or misunderstanding as to the safety, efficacy, and risks of opioids, including the risks associated with the use of opioids for chronic pain.

739.   The PBM Defendants' conduct had a tendency to deceive a substantial segment of the target audiences in the Philadelphia area, and their misrepresentations and concealments of material facts were likely to be misinterpreted in a misleading way.

740.   The PBM Defendants' acts and practices—taken individually and collectively—were likely to make a difference in the prescribing decisions of doctors; usage and purchasing decisions of patients; and the payment decisions of end-payors like the City, because their misrepresentations and other wrongful acts were specifically designed to mislead and convince these individuals and groups that the PBM Defendants were complying with their legal duties to prevent diversion and working with law enforcement to prevent diversion.

741. As a direct result of the foregoing acts and practices, the PBM Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in violations of the UTPCPL as alleged herein.

742. As direct result of their foregoing acts and practices in violation of the UTPCPL, the PBM Defendants have caused the City and its affected residents and other persons in interest to incur and continue to incur enormous costs and expenses related to the purchase of opioids and the consequences of dealing with the opioid epidemic.

743. The City operates as a consumer when it purchases goods or services, which it does when it pays for the procurement of and/or reimbursement for prescription opioids.

744. The City was injured in that the PBM Defendants' deceptive and misleading statements regarding their efforts to prevent the diversion of prescription opioids led the City to believe the PBM Defendants' methods for preventing diversion were safe and effective when they were not.

745. But for the PBM Defendants' deceptive conduct in violation of the UTPCPL, the City would not have expended millions of dollars in connection with the purchase or reimbursement of prescription opioids or the treatment for opioid addiction, OUD, or any other opioid-related adverse health effect involving the opioid epidemic. As a direct and proximate result of the PBM Defendants' deceptive conduct, the City has been injured.

746.    Plaintiff has suffered economic injuries that are direct, ascertainable, and quantifiable. The City's damages constitute both an "ascertainable loss of money or property" and "actual damages" for purposes of 73 P.S. § 201-9.2(a).

747.    The Court "may, in its discretion, award up to three times the actual damages sustained." 73 P.S. § 201-9.2(a).

748.    The City is entitled to treble damages in light of the severe, willful, and long-running nature of the PBM Defendants' conduct, the opioid epidemic it caused, and the resulting harm to public health and safety.

749.    The City is also entitled to an award of its litigation costs and attorneys' fees pursuant to 73 P.S. § 201-9.2(a).

WHEREFORE, Plaintiff demands judgment against the PBM Defendants, jointly and severally, for the following:

(a)    injunctive relief to enjoin the PBM Defendants' continued violations of the UTPCPL as requested in detail above;

(b)    damages to the fullest extent allowed by law, exclusive of interest and costs;

(c)    treble damages;

(d)    litigation costs (including expert fees) and attorneys' fees;

(e)    pre- and post-judgment interest; and

(f)    such other and further relief as the Court deems just and proper.

### THIRD CLAIM FOR RELIEF—VIOLATION OF PHILADELPHIA CONSUMER PROTECTION ORDINANCE
### PHILA. CODE § 9-6301(I)–(XXII)
### (Brought By Plaintiff Against All Defendants)

750.   The City re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

751.   This Claim does not sound in fraud.

752.   The Philadelphia Consumer Protection Ordinance ("PCPO") prohibits companies from employing "[u]nfair methods of competition" and "unfair or deceptive acts or practices," which are defined to include, *inter alia*, the following conduct:

(a)   "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." Phila. Code § 9-6301(1)(d)(.2);

(b)   "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . . ."; Phila. Code § 9-6301(1)(d)(.5); or

(c)   "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." Phila. Code § 9-6301(1)(d)(.22).

753.   The City may file an action in the name of the City in any court of competent jurisdiction against any persons alleged to have violated the PCPO. Phila. Code § 9-6303(2).

754.   The PBM Defendants are persons under the PCPO. Phila. Code § 9-6301(1)(a).

755.   The PBM Defendants violated the PCPO in that their conduct as alleged herein caused a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of the drugs at issue.

756. The PBM Defendants violated the PCPO in that by their conduct, as alleged herein, they represented that the drugs at issue had sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have.

757. The PBM Defendants also violated the PCPO in that by their conduct, as alleged herein, the PBM Defendants engaged in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

758. Under Pennsylvania law, an act or practice is unfair or deceptive if it had the capacity to deceive, or was likely to deceive, a substantial portion of the public, and was likely to make a difference in the purchasing decision.

759. The PBM Defendants' conduct as alleged herein constitutes unfair or deceptive acts or practices in violation of the above provisions of the PCPO in that they:

(a) Promoted the use of opioids for conditions and in circumstances where they are neither safe nor effective; misrepresenting to the public and the medical community that opioids could be taken at high doses and for long durations with minimal risk of addiction;

(b) Facilitated and encouraged the use of dangerously addictive opioids by colluding with manufacturers to place opioid drugs on standard formulary offerings with preferred status;

(c) Failed to disclose the material facts that *inter alia* they were not in compliance with laws and regulations requiring that they protect against addiction and severe harm;

(d) Misrepresented to regulators and the public that their distribution services and methods for preventing diversion were safe and effective when they were not; and

(e) Misrepresented their compliance with their affirmative legal obligations to provide effective controls to guard against diversion.

760. The PBM Defendants' conduct, including their deceptive representations and concealments of material fact, created a significant likelihood of confusion and/or misunderstanding as to the safety, efficacy, and risks of opioids, including the risks associated with the use of opioids for chronic pain.

761. The PBM Defendants' conduct had a tendency to deceive a substantial segment of the target audiences in Philadelphia, and their misrepresentations and concealments of material facts were likely to be misinterpreted in a misleading way.

762. The PBM Defendants' acts and practices—taken individually and collectively—were likely to make a difference in the prescribing decisions of doctors; usage and purchasing decisions of patients; and the payment decisions of end-payors like the City, because their misrepresentations and other wrongful acts were specifically designed to mislead and convince these individuals and groups that the PBM Defendants were complying with their legal duties to prevent diversion and working with law enforcement to prevent diversion.

763. As a direct result of the foregoing acts and practices, the PBM Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in violations of the PCPO as alleged herein.

764. As direct result of their foregoing acts and practices in violation of the PCPO, the PBM Defendants have caused the City and its affected residents and other persons in interest to incur, and continue to incur, enormous costs and expenses related to the  consequences of dealing with the opioid epidemic.

765.    The City seeks a civil penalty of two thousand dollars ($2,000) for each violation of the PCPO by the PBM Defendants. Phila. Code § 9-6304(2).

766.    The City is also entitled to an award of its litigation costs and attorneys' fees pursuant to Phila. Code § 9-6304(4).

WHEREFORE, Plaintiff demands judgment against the PBM Defendants, jointly and severally, for the following:

> (a)    injunctive relief to enjoin the PBM Defendants' continued violations of the PCPO as requested in detail above;
>
> (b)    civil penalties of $2,000 per violation;
>
> (c)    litigation costs (including expert fees) and attorneys' fees;
>
> (d)    pre- and post-judgment interest; and
>
> (e)    such other and further relief as the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF—NEGLIGENCE AND GROSS NEGLIGENCE
### (Brought By Plaintiff Against All Defendants)

767.    The City re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

768.    The PBM Defendants owe Plaintiff a duty to employ reasonable standards of care in the sale, delivery, dispensing, promotion, and gatekeeping control of the supply of highly addictive, dangerous opioids. This includes a duty to not create a foreseeable risk of harm or injury.

769.    The degree of care the law requires is commensurate with the risk of harm the conduct creates. The PBM Defendants' conduct in selling, delivering, dispensing, promoting, and gatekeeping control of the supply of highly addictive and

dangerous opioids requires a high degree of care and places them in a position of great trust and responsibility. Their duty cannot be delegated.

770.    The PBM Defendants, by promoting opioid over-use and by facilitating access to opioids through their standard formulary and UM offerings and their mail-order pharmacies, set in motion a force that created an unreasonable and foreseeable risk of harm for Plaintiff and its community.

771.    The PBM Defendants also undertook and assumed a duty to create formulary and UM offerings based on the health and safety of the public and of the lives covered by the benefit plans that were their clients. The PBM Defendants represented to the public, as well as to their clients, that they were structuring formulary and UM offerings based on the health and safety of the public and the lives their clients insured, when in fact they were doing the exact opposite and doing it to maximize their own revenue in concert with the opioid manufacturers. The PBM Defendants knew, at the time that they made these representations to the public and to their clients, that they would not base their formulary and their UM offerings on the health and safety of the covered lives involved, nor of the public, but rather that they would structure, and were already structuring, formulary and UM offerings solely (or at least primarily) to increase profits to the PBM Defendants.

772.    The PBM Defendants had actual or, at the very least, constructive knowledge of the over-use and over-supply of opioids because of their access to claims and other data which they developed and maintained. The PBM Defendants also had the ability to curtail the over-use and over-supply of prescription opioids because of

their unique gatekeeping function in the pharmaceutical supply chain. Yet, despite this knowledge and ability, the PBM Defendants refused and failed to take necessary and appropriate actions to prevent the harms which were the foreseeable consequence of their failures, actions, and inactions.

773. The PBM Defendants, having facilitated and set in motion the over-use and over-supply of opioids, had a duty to use reasonable care to prevent and curtail the spreading opioid crisis.

774. The PBM Defendants breached this duty by failing to exercise reasonable care or skill with respect to their opioid-related conduct. Collectively, and individually, the PBM Defendants made highly addictive prescription opioids available to the marketplace with the knowledge that they were likely being used for non-medical purposes and/or posed an inherent danger especially to patients who were using opioids for chronic pain not associated with active cancer, end-of-life or palliative care. The PBM Defendants knew or reasonably should have known that their breach would foreseeably cause harm to Philadelphia.

775. The PBM Defendants were negligent in failing to abide their duties to conduct themselves with the requisite care and skill and faithfulness.

776. The PBM Defendants placed their profit motives above their legal duties and enabled, encouraged, and caused the over-supply and over-use of opioids.

777. The PBM Defendants are highly sophisticated and knowledgeable actors in the health care marketplace, well informed of the highly addictive nature of prescription opioids and likelihood of foreseeable harm to communities from

prescription opioid addiction and diversion. The PBM Defendants breached their duties when they failed to act with reasonable care in their respective roles, roles which positioned each of them to help minimize the opioid epidemic if they elected to use their power for good, instead of profit.

778.    Violating these duties poses distinctive and significant dangers to Philadelphia.

779.    At all times, the PBM Defendants each had the ability and obligation to control the opioid access and utilization that led to this human-made epidemic. The PBM Defendants controlled and were responsible for the operation of the instrumentality of the harm in this case—their promotion of opioid over-use and facilitation of access to opioids through their formularies and UM offerings and their mail order pharmacies. The PBM Defendants failed to take appropriate precautions to avoid injuries to Plaintiff caused by the PBM Defendants' failures, actions and inactions.

780.    The PBM Defendants knew or in the exercise of reasonable diligence should have known under the circumstances of this case that the harms suffered by the City were the reasonably foreseeable consequences of Defendants' failures, actions, and inactions.

781.    The PBM Defendants' conduct also foreseeably created a new secondary market for opioids—providing both the supply of narcotics to sell and the demand of people addicted to opioids to buy them. The result of the PBM Defendants' deceptive and improper conduct is not only an explosion of prescription opioids on the black

market, but also—predictably—a marked increase in the availability of heroin and synthetic opioids.

782.    The health, safety, and welfare of the citizens of Philadelphia, including those who use, have used, or will use opioids, as well as those affected by opioid users, is a matter of great public interest and legitimate concern to Philadelphia's citizens and residents. It was reasonably foreseeable to the PBM Defendants that the burden of the opioid crisis would fall to communities like Philadelphia in the form of social and economic costs. The PBM Defendants' negligence was a substantial factor in producing harm to the City.

783.    As a direct and proximate result of PBM Defendants' negligent conduct, the City has incurred, and will continue to incur, excessive costs to treat the opioid epidemic in Philadelphia including, but not limited to, increased costs of police, emergency, health, prosecution, corrections, rehabilitation, and other services. These costs are over and above Plaintiff's ordinary public services.

784.    The PBM Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

785.    Plaintiff is asserting its own rights and interests and its claims are not based upon or derivative of the rights of others.

786.    The PBM Defendants' conduct was also grossly negligent. They had actual, subjective awareness that, viewed objectively from their viewpoint at the time, their conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. The PBM Defendants knew of the dangerous and addictive nature of prescription opioids and also knew the risks associated with the oversupply and diversion of such drugs. Yet they nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Philadelphia by and through their conduct described herein.

WHEREFORE, Plaintiff demands judgment against the PBM Defendants, jointly and severally, for the following:

(a)    damages to the fullest extent allowed by law, exclusive of interest and costs;

(b)    litigation costs (including expert fees) and attorneys' fees;

(c)    pre- and post-judgment interest;

(d)    punitive damages; and

(e)    such other and further relief as the Court deems just and proper.

**FIFTH CLAIM FOR RELIEF—VIOLATION OF FEDERAL CIVIL RICO**
**18 U.S.C. 1961, *ET SEQ.;* 1964(C)**
**(Brought By Plaintiff Against All Defendants)**

787.    The City re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

788.    At all relevant times, CVS Caremark, Express Scripts, and Optum were each a "person" under 18 U.S.C. § 1961(3) because they were all capable of holding, and do hold, legal or beneficial interests in property.

789. As alleged more fully herein, the PBM Defendants formed an association-in-fact enterprise with each of the Opioid Enterprise Manufacturers, described above as the Formulary & UM Enterprise, for the purpose of carrying out a fraudulent scheme and felonious possession and dispensing of controlled substances to maximize profits for themselves and the Opioid Enterprise Manufacturers from increasing sales of prescription opioids through unfettered and preferential formulary access without UM in the PBM Defendants' standard offerings, despite the PBM Defendants' promises, representations and contractual obligations to take actions, including through cDUR, formulary decisions and UM decisions that were in their clients' best interests, to ensure safe and medically appropriate opioids were being dispensed, and to address opioid abuse, misuse and diversion.

790. As alleged more fully herein, the Formulary & UM Enterprise consisted of personal business relationships formed through contractual negotiations over decades and participation in and through the PCMA and other informal coalitions and working groups. Evidence of the existence of the Formulary & UM Enterprise can be found in:  the way in which each PBM Defendant took nearly identical action towards formulary and UM offerings; in the research they performed for the Opioid Enterprise Manufacturers; the contracts they negotiated with the Opioid Enterprise Manufacturers that gave them preferential formulary positions and prohibited the implementation of UM; the research that each PBM Defendant performed for Opioid Enterprise Manufacturers; the pull-through marketing; their failure to comply with

the dispensing requirements of the CSA and Pennsylvania law; and their interactions through PCMA and other informal coalitions.

791.    At all relevant times, the Formulary & UM Enterprise (a) had an existence separate and distinct from each of the members; (b) was separate and distinct from the pattern of racketeering in which the members engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the members; (d) was characterized by interpersonal business relationships among the members; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as continuing units.

792.    Each member of the Formulary & UM Enterprise conducted, and participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding profits.

793.    The PBM Defendants carried out, or attempted to carry out, a scheme to defraud by knowingly conducting and participating in the conduct of the Formulary & UM Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) that made use of the mail and wire facilities in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

794.    The PBM Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Formulary & UM Enterprise members committed, or aided and abetted in the commission of, were related to each other, posed a threat

of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Formulary & UM Enterprise members' regular use of the facilities, services, distribution channels, and employees of the Formulary & UM Enterprise. The PBM Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

795.   PBM Defendants also conducted and participated in the conduct of the affairs of the Formulary & UM Enterprise through a pattern of racketeering activity by the felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in controlled, punishable under any law of the United States.

796.   PBM Defendants committed crimes that are punishable as felonies under the laws of the United States. Specifically, 21 U.S.C. § 841 makes it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance except as authorized by Subchapter I of the CSA. A violation of § 841 in the case of controlled substances on Schedule II is punishable by not more than 20 years of imprisonment, or not less than 20 years imprisonment if death or seriously bodily injury results from the use of such substance.  21 U.S.C. § 841(b)(1)(C). Similarly, a violation of § 841 in the case of controlled substances on Schedule III is punishable by not more than 10 years imprisonment, or not less than 15-year imprisonment if death or seriously bodily injury results from the use of such substance. 21 U.S.C. § 841(b)(1)(E). Similarly, a violation of § 841 in the case of controlled substances in

Schedule IV is punishable by not more than 5 years imprisonment. 21 U.S.C. § 851(b)(2). All three violations of § 841 are felonies.

797.    Each of PBM Defendants' mail-order pharmacies is a registrant as defined in the CSA. Their status as registrants imposes obligations on them to ensure that they only dispense "to the extent authorized by their registration and in conformity with the [CSA]. 21 U.S.C. § 822(b).

798.    The PBM Defendants registered their mail-order pharmacies with the DEA to dispense Schedule II-V controlled substances. Their DEA registrations only authorized the PBM Defendants' owned pharmacies to "dispense" controlled substances, which "means to deliver a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner."[215]

799.    As alleged above, the PBM Defendants knowingly and intentionally dispensed opioids outside the usual course of professional pharmacy practice in violation of 21 C.F.R. § 1306.06 and thereby violated 21 U.S.C. § 841 by knowingly or intentionally possessing, selling, delivering and dispensing controlled substances for reasons and purposes not authorized by the CSA.

800.    The Formulary & UM Enterprise's predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

(a)    Mail Fraud: The Formulary & UM Enterprise violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate

---

[215] 21 U.S.C. § 802(10); 21 U.S.C. § 829(a)-(b) (stating no Schedule II, III or IV drug may be dispensed without the written prescription of a practitioner, and that no Schedule V drug may be dispensed other than for a medical purpose); *accord* 21 U.S.C. § 823(f).

carriers for the purpose of executing the unlawful scheme of the Formulary & UM Enterprise.

(b) Wire Fraud: The Formulary & UM Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme of the Formulary & UM Enterprise.

(c) Felony Controlled Substance Violations: The PBM Defendants violated 21 U.S.C. § 841 by knowingly or intentionally possessing and dispensing controlled substances for reasons and purposes not authorized by the Controlled Substance Act.

801. The Formulary & UM Enterprise conducted their pattern of racketeering activity in this jurisdiction and throughout the United States.

802. The Formulary & UM Enterprise aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses, and the 21 U.S.C. § 841 offense.

803. The members of the Formulary & UM Enterprise, with knowledge and intent, agreed to the overall objective of the Formulary & UM Enterprise, including the fraudulent scheme and felonious possession and dispensing of controlled substances, and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing, distributing, and dispensing prescription opioids.

804. Indeed, for the Formulary & UM Enterprise's fraudulent scheme to work, each member of the Formulary & UM Enterprise had to agree to implement their necessary portion of the Formulary & UM Enterprise's activities in the manner alleged above.

805.    As alleged more fully herein, the Formulary & UM Enterprise engaged in a pattern of related and continuous predicate acts for years. The predicate acts were each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

806.    The predicate acts all led to the creation of the opioid epidemic that substantially injured Plaintiff's business and property, while simultaneously generating billion-dollar revenue and profits for the Formulary & UM Enterprise. The predicate acts were conducted by members of the Formulary & UM Enterprise and in furtherance of its fraudulent scheme.

807.    The pattern of racketeering activity alleged more fully herein, and the Formulary & UM Enterprise are separate and distinct from each other. Likewise, the PBM Defendants are distinct from the Formulary & UM Enterprise.

808.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

809.    Many of the precise dates of the Formulary & UM Enterprise's actions at issue here have been hidden by the PBM Defendants and the members of the Formulary & UM Enterprise and cannot be alleged without complete access to the PBM Defendants' books, records, and dispensing data. Indeed, an essential part of

the successful operation of the Formulary & UM Enterprise alleged herein depended upon secrecy.

810.    It was foreseeable to the PBM Defendants and members of the Formulary & UM Enterprise that Plaintiff would be harmed when they engaged in the fraudulent scheme that forms the common purpose of the Formulary & UM Enterprise and the pattern of racketeering activities alleged herein.

811.    The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

812.    The Formulary & UM Enterprise members' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property.

813.    The Formulary & UM Enterprise members' pattern of racketeering activity logically, substantially and foreseeably has caused an opioid epidemic. Plaintiff was injured by the Formulary & UM Enterprise's pattern of racketeering activity and the opioid epidemic that its members created through their actions.

814.    Members of the Formulary & UM Enterprise knew that the prescription opioids at the center of their pattern of racketeering activity were extremely dangerous, highly addictive, prone to diversion, abuse and misuse, and often caused overdose and death. They were also aware that placing those drugs in favorable formulary positions without UM controls in place would grow the market for prescription opioids through increased prescribing, dispensing and sales. They were also aware that the growth in prescribing, dispensing and sales would be driven, in

large part, by oversupply, addiction, and misuse and abuse. Members of the Formulary & UM Enterprise also knew that the oversupply, addiction, misuse and abuse would result in the writing of illegitimate prescriptions about which the PBM Defendants' mail-order pharmacies would need to conduct due diligence or refuse to fill.

815. Nevertheless, members of the Formulary & UM Enterprise engaged in a scheme of deception, which utilized the mail and wires as part of their fraud, in order to increase prescribing of prescription opioids, and providing the Opioid Enterprise Manufacturers' drugs unfettered formulary access without limits from UM. Members of the Formulary & UM Enterprise also engaged in felonious possession and dispensing of controlled substances by filling prescriptions without performing due diligence and failing to refuse to fill prescriptions, thereby providing the Formulary & UM Enterprise with unfettered and illegal possession and dispensing by PBM Defendants' mail-order pharmacies.

816. Plaintiff was and continues to be damaged in its business and property by reason and as a result of the PBM Defendants' conduct of the Enterprise through the pattern and practice of racketeering activity described herein, which was a logical, direct, foreseeable and substantial cause of the opioid epidemic.

817. Specifically, Plaintiff's injuries, as alleged throughout this Complaint, and expressly incorporated herein by reference, include:

> (a)    Losses caused by purchasing and/or paying reimbursements for the Formulary & UM Enterprise PBM Defendants' prescription opioids, that Plaintiff would not have paid for or purchased but for the Formulary & UM Enterprise Defendants' conduct;

(b)     Losses caused by the decrease in funding available for Plaintiff's public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

(c)     Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

(d)     Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

(e)     Costs associated with providing police officers, firefighters, and emergency and/or first responders with naloxone, an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

(f)     Costs associated with emergency responses by police officers, firefighters, and emergency and/or first responders to opioid overdoses;

(g)     Costs for providing treatment of infants born with opioid-related medical conditions, or born addicted to opioids due to drug use by a mother during pregnancy;

(h)     Costs for providing mental health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

(i)     Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into local communities, to arrest and prosecute street-level dealers, to prevent the opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

(j)     Costs associated with increased burden on Plaintiff's judicial system, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction;

(k)    Costs associated with providing care for children whose parents are suffering from opioid-related disability or incapacitation.

(l)    Loss of tax revenue due to the decreased efficiency and size of the working population in Plaintiff's community;

(m)    Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root;

(n)    Damage to City properties and public spaces related to opioid abuse and overdoses; and

(o)    Losses caused by diminished property values in the form of decreased business investment and tax revenue.

818.    Plaintiff's injuries were proximately caused by the PBM Defendants' racketeering activities because they were a logical, substantial, and foreseeable cause of Plaintiff's injuries. But for the opioid-addiction epidemic created by the PBM Defendants' conduct, Plaintiff would not have lost money or property.

819.    Plaintiff's injuries were directly caused by the pattern of racketeering activities by the members of the Formulary & UM Enterprise.

820.    Plaintiff is most directly harmed and there are no other plaintiffs better suited to seek a remedy for the economic harms at issue here.

821.    Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*, actual damages; treble damages; equitable and/or injunctive relief in the form of court supervised corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest, including, *inter alia*:

(a)    Actual damages and treble damages, including pre-suit and post-judgment interest;

(b)     An order enjoining any further violations of RICO;

(c)     An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

(d)     An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

(e)     An order enjoining any future marketing efforts or misrepresentations;

(f)     An order enjoining future decisions by the PBM Defendants to prioritize rebates and profits over patient safety and proper, clinically based, decision making regarding the formulary status, prior authorization, step therapy or utilization management measures related to prescription opioids;

(g)     An order enjoining the PBM Defendants' mail-order pharmacy from dispensing prescriptions without conducting proper due diligence and documenting that due diligence before dispensing prescriptions;

(h)     An order compelling the PBM Defendants to make corrective advertising statements that shall be made in the form, manner and duration as determined by the Court;

(i)     An order enjoining any future lobbying or legislative efforts regarding the manufacture, marketing, distribution, prescription, or use of opioids;

(j)     An order requiring the PBM Defendants to disclose publicly all documents, communications, records, data, information, research or studies concerning the health risks or benefits of opioid use;

(k)     An order establishing a national foundation for education, research, publication, scholarship, and dissemination of information regarding the health risks of opioid use and abuse to be financed by the PBM Defendants in an amount to be determined by the Court;

(l)     An order enjoining any diversion of opioids or any failure to monitor, identify, investigate, report and halt suspicious prescribing, dispensing, abuse, or diversion of opioids;

(m)    An order requiring all PBM Defendants to publicly disclose to federal and state law enforcement all documents, communications, records, information, or data, regarding any prescriber, facility, pharmacy, clinic, hospital, manufacturer, distributor, person, entity or association regarding prescribing, dispensing, abuse, or diversion of opioids;

(n)    An order divesting each PBM Defendant of any interest in, and the proceeds of any interest in, the Formulary & UM Enterprise, including any interest in property associated therewith;

(o)    Dissolution and/or reorganization of any trade industry organization, or any other entity or association associated with the Formulary & UM Enterprise identified in this Complaint, as the Court sees fit;

(p)    Dissolution and/or reorganization of any PBM Defendant named in this Complaint as the Court sees fit;

(q)    Suspension and/or revocation of the license, registration, permit, or prior approval granted to the PBM Defendants, entities, associations or enterprises named in the Complaint regarding the prescribing of opioids;

(r)    Forfeiture as deemed appropriate by the Court; and

(s)    Attorney's fees and all costs and expenses of suit.

## SIXTH CLAIM FOR RELIEF—CIVIL CONSPIRACY
### (Brought By Plaintiff Against All Defendants)

822.    The City re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

823.    As alleged in these paragraphs, the PBM Defendants and the opioid manufacturers engaged in concerted action to accomplish an unlawful objective, or to accomplish a lawful objective by unlawful means: the unfettered sale and dispensing of vast quantities of opioids in Philadelphia without regard to patient safety, the impact on the community, or their obligations and duties under federal and state law.

Each of the PBM Defendants either actively participated and/or aided and abetted in the pursuance of this common purpose.

824.    Specifically, opioid manufacturers contracted and agreed with the PBM Defendants to coordinate unfettered formulary placement with no or limited UM measures regarding each opioid drug in the PBM Defendants' standard offerings, such that there would be as little an impediment as possible to opioid prescribing and dispensing. These contracts relied on an underlying fraudulent scheme designed to ensure unfettered access to PBM formulary offerings. The opioid manufacturers understood that the PBM Defendants were going to operate on a fundamentally fraudulent basis.

825.    As alleged more fully herein, even though the PBM Defendants promised their clients they would take actions that would ensure the safety of opioid prescribing and dispensing, the PBM Defendants had no intention of taking actions regarding the opioid manufacturers' branded and generic drugs that would have ensured safety, because those actions would have dramatically reduced their receipt of rebates, revenue from opioid dispensing, and other fees.

826.    The PBM Defendants also conspired with opioid manufacturers to increase prescription opioid utilization by providing them with data, research, and consulting services.    For example, the PBM Defendants provided opioid manufacturers with lists of all their plan clients, as well as the names of physicians, who were participating in the plan's provider networks—allowing the opioid manufacturers to target the highest opioid prescribers with pull-through marketing.

827.    The PBM Defendants further conspired with opioid manufacturers, and Purdue in particular, by generating clinical studies, educational materials, and marketing programs to downplay the addictive properties of opioids, including OxyContin. For instance, OptumInsight encouraged and substantially assisted Purdue by reverse engineering studies to achieve desired outcomes; create algorithms to identify potential pain patients to suggest OxyContin prescriptions; and create large-scale marketing plans to convince payors that long-term opioid usage was not only useful for many types of pain and did not lead to serious addiction for long-term opioid users.

828.    At the same time, the PBM Defendants operated their mail-order pharmacies in such a way that they did not stop obviously illegitimate prescriptions from being dispensed.   For example, the PBM Defendants deliberately failed to employ concurrent drug utilization (cDUR) initiatives, including real-time screening at the point of sale, as to identify:  potential drug therapy problems due to therapeutic duplication, age/gender-related contraindications, over-utilization and under-utilization, drug-drug interactions, incorrect drug dosage or duration of drug therapy, drug-allergy contraindications, and clinical abuse/misuse.

829.    As detailed herein, the PBM Defendants and the opioid manufacturers committed numerous overt acts to further the conspiracy's objectives that were unlawful under federal and/or Pennsylvania law.

830.    At all relevant times, each of the PBM Defendants was aware of the enterprise's conduct, was a knowing and willing participant in that conduct, and

reaped profits from that conduct in the form of increased sales, distributions, and prescriptions of opioids.

831.    By knowingly misrepresenting the appropriate uses, risks, and safety of opioids, the PBM Defendants committed overt acts in furtherance of their conspiracy.

832.    As an intended result of the intentional wrongful conduct as set forth herein, the PBM Defendants have profited and benefitted from the opioid epidemic they caused, thus harming Philadelphia.

833.    As a proximate result of the intentional wrongful conduct by the PBM Defendants and their co-conspirators (the opioid manufacturers), the City has incurred substantial costs including, but not limited to, law enforcement action for opioid-related to drug crimes, for addiction treatment, and other services necessary for the treatment of people addicted to prescription opioids, and the other harms alleged herein. Similarly, abating the vast societal harms the PBM Defendants and their co-conspirators caused will require extensive efforts and substantial resources. These costs and harms are addressed in more detail in the paragraphs addressing the City's racketeering and public nuisance counts. These allegations are specifically incorporated herein.

834.    Plaintiff seeks to impute liability for its other claims on the PBM Defendants for the wrongful conduct of their co-conspirators, the opioid manufacturers, and to hold the PBM Defendants jointly and severally liable for that conduct.

835.    Additionally, as discussed above, the conduct of the PBM Defendants and their co-conspirators, the opioid manufacturers, was fraudulent, malicious, and/or grossly negligent. For this reason, Plaintiff seeks to recover punitive damages.

WHEREFORE, Plaintiff demands judgment against the PBM Defendants, jointly and severally, for the following:

(a)    damages to the fullest extent allowed by law, in excess of $75,000, exclusive of interest and costs;

(b)    punitive damages;

(c)    litigation costs (including expert fees) and attorneys' fees;

(d)    pre- and post-judgment interest; and

(e)    such other and further relief as the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF—CONCERTED ACTION
### (Brought By Plaintiff Against All Defendants)

836.    The City re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

837.    Pennsylvania follows the Restatement (Second) of Torts § 876 (1979) in holding that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself[.]"  *Kline v. Ball*, 452 A.2d 727, 728 (Pa. Super. 1982); *Marion v. Bryn Mawr Tr. Co.*, 288 A.3d 76, 85 (Pa. 2023).

838.    The opioid manufacturers had a duty under federal law and the laws of Pennsylvania not to promote or sell controlled substances, including opioids, for non-medical purposes, including abuse and diversion. Each participant in the supply

chain of controlled substance distribution including, but not limited to, opioids and opioid cocktail drug distribution, including the PBM Defendants, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring and reporting suspicious activity.

839.   The PBM Defendants encouraged and substantially assisted the opioid manufacturers in the violation of the PBM Defendants' duties, knowing that the conduct they were encouraging and assisting constituted a violation of these duties.

840.   The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes. The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity, and mortality in Philadelphia and the harm caused thereby.

841.   The PBM Defendants knew that there has never been reliable evidence demonstrating opioids were safe or effective at treating chronic pain long term. The PBM Defendants further knew that opioids, particularly when used long term to treat chronic pain, carry the risks of addiction. The PBM Defendants knew that opioids were addictive and carried a significant risk of serious injury or death for at least the past 20 years.

842.   And yet, starting shortly after the release of OxyContin and continuing for years after the opioid epidemic was spreading throughout the country, the PBM Defendants worked with the opioid manufacturers in numerous capacities encouraging and substantially assisting the opioid manufacturers in expanding the opioid market by creating and disseminating misinformation about the safety and

efficacy of opioids used in chronic pain treatment and the risks of opioid addiction. For instance: (1) the PBM Defendants disseminated the opioid manufacturers' false messages about chronic pain and addiction to high prescribers and patients, and (2) the PBM Defendants provided research, data, and consulting services to the opioid manufacturers to assist in expanding the opioid market.

843. The PBM Defendants' encouragement and substantial assistance in increasing opioid utilization and the fraudulent marketing of opioids continued even after Purdue pleaded guilty to criminal misbranding of OxyContin in 2007, as described above. Thus, even after Purdue acknowledged the falsity of its claims, the PBM Defendants continued to encourage and substantially assist the opioid manufacturers in spreading the same misrepresentations about the safety and efficacy of opioids.

844. The PBM Defendants' encouragement and substantial assistance in assisting the opioid manufacturers in the fraudulent marketing of opioids continued long after their own data told them that the huge increases in opioid prescribing were creating a crisis of addiction, overdose, and death across the United States.

845. The PBM Defendants' encouragement and substantial assistance in the opioid manufacturers' fraudulent marketing efforts included providing the opioid manufacturers with data, research, and consulting services needed to expand the opioid market. For example, the PBM Defendants provided opioid manufacturers with lists of all their plan clients as well as the names of physicians who were

participating in the plan's provider networks—allowing the opioid manufacturers to target the highest opioid prescribers with pull-through marketing.

846.    The PBM Defendants' encouragement and substantial assistance of the opioid manufacturers included assisting Purdue in generating clinical studies, educational materials, and marketing programs to downplay the addictive properties of OxyContin and expand its use throughout the country. For instance, OptumInsight encouraged and substantially assisted Purdue by reverse engineering studies to achieve desired outcomes; created algorithms to identify potential pain patients to suggest OxyContin prescriptions; and created large-scale marketing plans to convince payors that long-term opioid usage was not only useful for many types of pain and did not lead to serious addiction for long-term opioid users.

847.    The goal of the PBM Defendants' encouragement and substantial assistance of the opioid manufacturers was to identify the best way to position these drugs with the public, patients, providers, and payors to increase utilization and maximize sales.

848.    The PBM Defendants encouraged and provided substantial assistance to the opioid manufacturers to disseminate misinformation about opioid addiction, opioid use for chronic pain, and opioids as a first-line therapy which inappropriately expanded the opioid market in breach of the opioid manufacturers' duties under Pennsylvania and federal law.

849.    By encouraging and providing substantial assistance to the opioid manufacturers in facilitating the overprescribing and overuse of opioids, as described

above, the PBM Defendants contributed to the oversupply of opioids in Philadelphia, and the resulting damages and public nuisance.

850.    The PBM Defendants knew at all times that the encouragement and substantial assistance they were providing to the opioid manufacturers required the opioid manufacturers to breach their duties, and that this breach of the opioid manufacturers' duties was creating, fostering, growing and sustaining an illegal secondary market for opioids, which significantly interfered with the rights of the public.

851.    As a direct and proximate result of the wrongful conduct of the opioid manufacturers—which the PBM Defendants encouraged and substantially assisted—a public nuisance resulted in the form of a robust illegal secondary market for opioid abuse and diversion. This public nuisance significantly interfered and continues to interfere with the rights of the public, as described above.

852.    Philadelphia's injuries as set forth herein were the foreseeable result of the PBM Defendants' conduct of encouraging and providing substantial assistance to the opioid manufacturers in breaching their legal duties under Pennsylvania and federal law to not promote or sell controlled substances, including opioids, for non-medical purposes, including abuse and diversion.  The City's injuries as set forth herein were the foreseeable result of the PBM Defendants and the opioid manufacturers' concerted conduct.

853.    The City seeks to impute liability for the City's other claims on the PBM Defendants for the wrongful conduct of the opioid manufacturers for which the PBM

Defendants encouraged and provided substantial assistance while knowing that such wrongful conduct constituted a breach of duty.

WHEREFORE, Plaintiff demands judgment against the PBM Defendants, jointly and severally, for the following:

> (a) damages to the fullest extent allowed by law, in excess of $75,000, exclusive of interest and costs;
>
> (b) punitive damages;
>
> (c) litigation costs (including expert fees) and attorneys' fees;
>
> (d) pre- and post-judgment interest; and
>
> (e) such other and further relief as the Court deems just and proper.

## EIGHTH CLAIM FOR RELIEF—BREACH OF CONTRACT
### (Brought By Plaintiff Against CVS Caremark)

854. The City re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

855. The CVS Caremark Contracts are valid and enforceable written contracts which covered the period 2006 to the present.

856. Under the CVS Caremark Contracts, Plaintiff and CVS Caremark agreed to provide one another with valuable consideration. Specifically, in exchange for payment of tens of millions of dollars, CVS Caremark agreed to provide pharmacy benefit management services to the City.

857. Plaintiff has fully performed or tendered all performance required under the CVS Caremark Contracts.

858. As detailed above, the CVS Caremark Contracts required CVS Caremark, *inter alia*, to:

(a)    make changes to its formulary, including its Performance Drug List, Prescribing Guide, and Covered Drugs on no less than a quarterly basis "based upon, among other things, the introduction of new products, *customer safety*, clinical appropriateness, efficacy, cost effectiveness, changes in availability of products, new clinical information and other considerations, *changes in the pharmaceutical industry or its practices*, introduction of new Generic Drugs, *new legislation and regulations*."

(b)    provide "its automated concurrent DUR Services including but not limited to: (i) drug to drug interactions; (ii) therapeutic duplications; (iii) known drug sensitivity; (iv) *over-utilization*; (v) *insufficient or excessive drug usage*; and (vi) *early or late refills*."

(c)    "*Fill prescriptions subject to the professional judgment of the dispensing pharmacist, good pharmacy practices in accordance with the standards where a pharmacy is located, Applicable Law, and product labeling guidelines*[.]"

(d)    "remit to City the Rebates received by Provider with respect to City's Claims during the prior calendar quarter pursuant to Exhibit PA-B."

859.    As detailed herein, CVS Caremark breached its obligations under the CVS Caremark Contracts because it:

(a)    pursued profits in lieu of making formulary management decisions (including structuring formulary and UM offerings) that considered the City's safety and/or otherwise reflected changes in the pharmaceutical industry or its practices relating to the dispensing of prescription opioids;

(b)    pursued profits in lieu of properly using DUR to ensure safe dispensing on behalf of the City;

(c)    dispensed opioids through their mail-order pharmacies in violation of the CSA and PCSA (as detailed above); and

(d)    concealed and misappropriated rebate funds to which the City was otherwise entitled based on the City's Claims.

860.   As a result of CVS Caremark's breaches of contract, Plaintiff has been damaged in that the City: (1) paid millions of dollars for PBM services that were not legitimately provided; (2) did not receive the amount of rebates to which it was entitled; and (3) continues to fight an opioid epidemic created, in part, by CVS Caremark's oversupply of opioids and lack of dispensing controls.

861.   As a direct and proximate result of CVS Caremark's breaches of contract, the City has incurred, and will continue to incur, excessive costs to treat the opioid epidemic in Philadelphia including, but not limited to, increased costs of police, emergency, health, prosecution, corrections, rehabilitation, and other services. These costs are over and above Plaintiff's ordinary public services.

WHEREFORE, Plaintiff demands judgment against CVS Caremark for the following:

(a)    damages to the fullest extent allowed by law, exclusive of interest and costs;

(b)    litigation costs (including expert fees) and attorneys' fees;

(c)    pre- and post-judgment interest; and

(d)    such other and further relief as the Court deems just and proper.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff City of Philadelphia respectfully requests the Court order the following relief, including:

(a)    abatement of nuisance;

(b)    actual damages, exclusive of interest and costs;

(c)    treble damages and/or civil penalties as allowed by statute;

(d)  punitive damages;

(e)  equitable and injunctive relief in the form of Court-enforced corrective action, programs, and communications;

(f)  forfeiture disgorgement, restitution and/or divestiture of proceeds and assets;

(g)  attorneys' fees;

(h)  costs and expenses of suit;

(i)  pre- and post-judgment interest; and

(j)  such other and further relief as this Court deems appropriate.

## XV.  JURY DEMAND

The City of Philadelphia demands a jury trial on all issues so triable.

Dated: October 30, 2025                    BY: _____

Renee Garcia, City Solicitor
(PA Bar No. 315622)
Anne Taylor, Litigation Chair
(PA Bar No. 206057)
Lydia Furst, Chief Deputy City Solicitor
(PA Bar No. 307450)
Michael Pfautz, Deputy City Solicitor
(PA Bar No. 325323)
**CITY OF PHILADELPHIA LAW DEPT.**
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
Tel: (215) 683-5000
renee.garcia@phila.gov
anne.taylor@phila.gov
lydia.furst@phila.gov
michael.pfautz@phila.gov

Jerry R. DeSiderato (PA Bar No. 201097)
Timothy J. Ford (PA Bar No. 325290)
Silvio Trentalange (PA Bar No. 320606)
Stanford B. Ponson (PA Bar No. 322548)
**DILWORTH PAXSON LLP**
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Tel: (215) 575-7000
jdesiderato@dilworthlaw.com
tford@dilworthlaw.com
strentalange@dilworthlaw.com
sponson@dilworthlaw.com

David Kairys (PA Bar No. 14535)
P.O. Box 4073
8225 Germantown Avenue
Philadelphia, PA 19118

Russell W. Budd
Chris Mansour
Catherine Hancock Dorsey
**BARON & BUDD, P.C.**
3102 Oak Lawn Ave, Suite 1100
Dallas, TX 75219
Tel.: (214) 521-3605
rbudd@baronbudd.com
cmansour@baronbudd.com
cdorsey@baronbudd.com

Burton LeBlanc
**BARON & BUDD, P.C.**
2600 Citiplace Drive, Suite 400
Baton Rouge, LA 70808
Tel.: (225) 927-5441
bleblanc@baronbudd.com

Daniel Alberstone
Mark P. Pifko
**BARON & BUDD, P.C.**
15910 Ventura Blvd #1600
Encino, CA 91436
Tel: (818) 839-2333
dalberstone@baronbudd.com
mpifko@baronbudd.com

dkairys@verizon.net

Stephen A. Sheller (PA Bar No. 3270)
**SHELLER, P.C.**
1528 Walnut Street, 4th Floor
Philadelphia, PA 19102
Tel: (215) 790-7300
sasheller@sheller.com

Andrew B. Sacks (PA Bar No. 41390)
John Weston (PA Bar No. 26314)
**SACKS LAW, LLC**
55th Floor
1 Liberty Place
1650 Market Street
Philadelphia, PA 19103
Tel: (215) 925-8200
asacks@sackslaw.com
jweston@sackslaw.com

Gregory B. Heller (PA Bar No. 61130)
**FELDMAN SHEPHERD,
WOHLGELERNTER TANNER
WEINSTOCK DODIG LLP**
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
Tel.: (215) 567-8300
gheller@feldmanshepherd.com

*Counsel for Plaintiff City of Philadelphia*