# EXHIBIT 1

CaremarkPCS Health, L.L.C.
T.Shields (vw)
City of Philadelphia
Office of Human Resources

Contract Number 2220350

# **PROVIDER AGREEMENT**

## **(General Consultant Services)**

**CONFORMED**

**THIS PROVIDER AGREEMENT** is made as of March 29, 2022, by and between THE CITY OF PHILADELPHIA (the "City"), by and through the Office of Human Resources, Employee Benefit Unit (the "Department"), and CAREMARKPCS HEALTH, L.L.C. ("Provider"), a for profit limited liability company, with its principal place of business at 2100 Lake Cook Road, Buffalo Grove, IL Floor 60089.

### **BACKGROUND**

The City and Provider desire that Provider render general consultant services to the City in accordance with the provisions of this Provider Agreement, the City of Philadelphia Professional Services Contract General Consultant Services General Provisions, as revised July 2020 (the "General Provisions") and all of the other documents and exhibits which together constitute the Contract Documents as defined in the General Provisions. A copy of the General Provisions is attached hereto and incorporated herein by reference.

In consideration of the mutual obligations set forth herein, and intending to be legally bound, the City and Provider covenant and agree as follows:

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound by all of the Contract Documents, have caused the Contract to be executed by their respective duly authorized officers as of the date in the heading of this Provider Agreement.

| APPROVED AS TO FORM | THE CITY OF PHILADELPHIA |
|---|---|
| DIANA P. CORTES, CITY SOLICITOR | Through: Office of Human Resources |
| Per: *Peter Kim* (DocuSigned) | By: *Marsha Greene-Jones* (DocuSigned) |
| Name: Peter Kim | Name: Marsha Greene-Jones |
| Title: Divisional Deputy City Solicitor | Title: Deputy Human Resources Director |

**CAREMARKPCS HEALTH, L.L.C.**

By: *Diane Galo* (DocuSigned)

Name: Diane Galo

Title: Vice President, Government Business Unit

WITNESS

By: *Benno Weisberg* (DocuSigned)

Name: Benno Weisberg

a Mail Order Pharmacy solely with respect to the dispensing of non-Specialty Drugs and shall constitute a Specialty Pharmacy with respect to the dispensing of Specialty Drugs. Non-Specialty drugs dispensed shall be included in the Retail pricing guarantees.

1.38 **"Manufacturer Administrative Fees"** means the administrative fees received by Provider or its affiliate from pharmaceutical companies for administrative services rendered in its capacity as a group purchasing organization for the Plan in contracting for Rebates and administering Rebate contracts.

1.39 **"Manufacturer Payments"** includes Rebates and Inflation Protection Payments, but excludes Other Pharma Revenue.

1.40 **"Market Share Rebate(s)"** or **"Performance Rebate(s)"** means a rebate collected by Provider or PBM Affiliates from pharmaceutical companies that is based on the utilization of a rebated product compared to the utilization of competitor products and is attributable to City's specific utilization.

1.41 **"Maximum Allowable Cost"** or **"MAC"** means the unit price that has been established by Provider for a drug with more than two sources included on the MAC drug list applicable to City, which list may be amended periodically in response to changes in the marketplace by Provider in maintaining its generic pricing program. City acknowledges that the MAC list applicable to City is not the same as the MAC list published by the Centers for Medicare and Medicaid Services (formerly known as the Health Care Financing Administration, or "HCFA MAC"). A copy of such MAC drug list shall be provided to City prior to execution of this Agreement and upon execution of each amendment for an Additional Term if such Additional Term is granted by City. The same MAC list will be used for both retail and mail Claims (i.e. same number of drugs, same drugs, same NDC).

1.42 **"Member-Submitted Claim(s)"** or **"Paper Claim(s)"** means a Claim for which the Member paid the full amount of the Claim and was then submitted to Provider by a Member for reimbursement.

1.43 **"Military Pharmacy"** means a Retail Pharmacy whose primary function is to store, prepare and dispense pharmaceuticals and other associated items to uniformed services beneficiaries. These pharmacies may be associated with Department of Defense or U.S. Coast Guard clinic, Department of Defense hospital or freestanding. Usually associated with outpatient services. Associated with taxonomy code "332000000X". These Pharmacies are identified by a National Council for Prescription Drug Program's (NCPDP's) dispenser type code of 17.

1.44 **"Non-Preferred Rebates"** mean payments collected by Pharmacy or PBM Affiliates from Manufacturers for Claims that may be designated as non-preferred or non-covered via Formulary or utilization management criteria and are directly or indirectly attributable to City's specific utilization.

1.45 **"Over-the-Counter"** or **"OTC"** Claim(s) means a Claim for items that do not require a prescription for a Member to purchase that City has chosen to or has been required to include as covered products under the prescription drug benefit. OTC Claims are defined as having an 'O' or 'P" indication in Medi-Span's Rx-OTC Indicator Code.

1.46 **"Participating Pharmacy"** means a retail pharmacy that participates in a retail network established by Provider.

1.47 **"PBM Affiliates"** of a party shall mean an entity:
    (i) which is directly or indirectly controlling such party;
    (ii) which is under the same direct or indirect ownership or control as such party; or
    (iii) which is directly or indirectly owned or controlled by such party.

For these purposes, an entity shall be treated as being controlled by another if that other entity has fifty percent (50%) or more of the votes in such entity or is able to direct its affairs and/or to control the composition of its board of directors or equivalent body.

1.48 **"PDL" or "Formulary"**, means Provider's formulary, adopted by City pursuant to Section 2.6 of this Exhibit PA-A, as created, maintained and amended by Provider from time to time. The Formulary consists of (a) a ranking of Covered Products into preferred and non-preferred tiers, (b) a listing of Non-Covered Products, and (c) associated utilization review programs pursuant to Provider's standard clinical criteria, which may include, but not limited to, prior authorizations, step therapy and/or quantity limits for one or more Covered Products. These programs may be conducted prospectively or retrospectively. The

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARKPCS HEALTH, L.L.C.**

Formulary has been approved by Provider's P&T Committee. The pricing set forth in Exhibit PA-B is conditioned upon City adoption of the Formulary identified in Exhibit PA-B as its Plan formulary.

1.49 **"Pharmacy and Therapeutics Committee"** means Provider's independent committee of health care professionals that reviews and approves prescription drugs for inclusion in Provider's PDL based on safety and efficacy

1.50 **"Pharmacy Purchase Discount(s)"** or **"Mail Order Volume Discount(s)"** means discounts, paid at time of purchase, or retrospectively, received by Provider or its affiliates from pharmaceutical manufacturers, which are attributable to or based on products purchased by PBM affiliated dispensing pharmacies.

1.51 **"Plan"** means the health benefit plan(s) sponsored by City that includes the prescription drug benefit.

1.52 **"Plan Design Document"** or **"PDD"** means various documents or forms, including implementation forms, clinical management forms, clinical utilization or other documents, prepared by Provider and approved by City, as may be modified by City from time to time in accordance with Section 5.3 of this Exhibit PA-A, which documents detail the relevant parts of City's Plan for prescription drug benefits and clinical programs adopted by City and which are used by Provider to provide Services under this Agreement.

1.53 **"Plan Participant"** or **"Member"** means each individual identified by City to be eligible for prescription drug benefits under the Plan, as set forth in City's eligibility file or otherwise communicated by City in a format acceptable to Provider.

1.54 **"PPACA"** means the Patient Protection and Affordable Care Act, as amended and the regulations promulgated thereunder.

1.55 **"Prescriber"** means a health care practitioner licensed or authorized by law to issue an order for a prescription drug.

1.56 **"Pricing Source"** means Medi-Span Prescription Guide including supplements.

1.57 **"Protected Health Information"** or **"PHI"** shall have the meaning given such term by HIPAA, but limited to that information created or received by Provider in its capacity as a business associate to the Plan.

1.58 **"Rebates"** means the return of partial payments from a pharmaceutical manufacturer, pursuant to the terms of a rebate contract, negotiated directly or indirectly with a pharmaceutical company by Provider or PBM Affiliates, on behalf of all plan sponsors, and directly or indirectly attributable to the utilization of certain prescriptions by Members. Rebates shall include Formulary Rebates (i.e. Access Rebates), Market Share Rebates (i.e. Performance Rebates), Incentive Rebates, Value-Based Rebates, Medical Drug Rebates (if carve-in with a Health Plan), and Non-Preferred Rebates. Rebates do not include the value of manufacturer coupons applied at the pharmacy or other patient assistance programs.

1.59 **"Retail Pharmacy"** or **"Retail"** means any type of Pharmacy other than a Mail Order Pharmacy or Specialty Pharmacy, and includes any independent pharmacies, supermarket pharmacies, chain pharmacies or mass merchandiser pharmacies having a state license to dispense medications to the general public

1.60 **"Sales Tax"** means a tax imposed by local, state, or federal government at the point of sale on a Claim that is collected by the dispensing Pharmacy

1.61 "**Single Source Generic(s) or SSG(s)**" are Generic Drugs that are manufactured by one generic drug manufacturing company.

1.62 **"Specialty Drugs"** means certain pharmaceuticals, biotech or biological drugs, that are Covered Drugs and that are used by Provider, that are used in the management of chronic, complex or genetic disease, including but not limited to, injectible, infused, or oral medications, or products that otherwise require special handling and/or close supervision or clinical management, including without limitation those listed in Attachment 1 of Exhibit PA-B (which Provider amends periodically in response to changes in the marketplace) upon written notice to the City. Specialty Drugs require a customized medication management program that includes medication use review, patient training, coordination of care and adherence management for successful use such that more frequent monitoring and training is required. In addition, Covered Drugs must meet at least two of the following criteria to be classified as Specialty

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARKPCS HEALTH, L.L.C.**

1.73 **"Veteran Affairs Pharmacy or VA"** means a Retail Pharmacy under veteran affairs jurisdiction where drugs are dispensed and pharmaceutical care is provided to enrolled veterans, by licensed pharmacists. These Pharmacies are identified by a National Council for Prescription Drug Program's (NCPDP's) dispenser type code of 9.

1.74 **"Value-based Rebates"** mean payments collected by Provider or PBM Affiliates from pharmaceutical companies when pharmaceutical companies' drug therapies underperform by not meeting certain effectiveness criteria.

1.75 **"Zero Balance Due"** or **"ZBD"** claim means any Claim where the Member pays the total amount of the Claim, including any applicable sales tax, and the Plan pays zero.

2. **Provider Services.** Provider shall provide the Services in a manner consistent with the PDD, and the terms of this Agreement, and City hereby authorizes Provider to provide the Services in such manner.

2.1 **Claims Processing.**

(a) <u>On-Line Claims Processing</u>. Provider will perform Claims processing services for products dispensed by Participating Pharmacies and Provider's mail and specialty pharmacies. Provider will perform standard drug utilization services, as described in Section 2.8 of this Exhibit PA-A, for each Claim submitted by Participating Pharmacies, and Provider's mail and specialty pharmacies.

(b) <u>Submitted Paper Claims</u>. To the extent authorized by the PDD, Provider will process Claims submitted by Plan Participants directly to Provider consistent with Provider's standard procedures and for the fees set forth in Exhibit PA-B.

2.2 **Mail Service Pharmacy**. Provider's mail service pharmacies shall provide the following products and services:

(a) Dispense new or refill prescriptions following receipt from a Plan Participant and/or Prescriber of (i) a prescription and a completed order or refill order, and (ii) any applicable Cost Share;
(b) Fill prescriptions subject to the professional judgment of the dispensing pharmacist, good pharmacy practices in accordance with the standards where a pharmacy is located, Applicable Law, and product labeling guidelines;
(c) Ship all drugs to Plan Participants via First Class United States postal service or other appropriate carriers consistent with Provider's standard policies to the address provided by City and/or the Plan Participant. In the event non-standard shipping is requested by City and/or Plan Participant, additional charges may apply;
(d) Comply with Provider's terms and conditions applicable to mail pharmacy services as may be modified by Provider periodically as deemed appropriate by Provider; and
(e) In the event of a delayed or incorrectly processed mail order prescription caused by Provider, Provider shall arrange and pay any differential in cost for a short-term retail supply (bridge supply) of a delayed order. Provider shall not charge Members for expedited delivery of the mail order prescription if the prescription delay is caused by Provider. For clarification, if Provider mails a prescription to an incorrect address supplied to it by a Plan Participant or in Eligibility Information supplied by the City, such mail service pharmacy order shall not be considered incorrectly processed or delayed by Provider.

2.3 **Retail Pharmacy Network**. Provider contracts with Participating Pharmacies, which are independent businesses and not subcontractors of Provider, to provide prescription drugs and related products and services with respect to the Plan. Provider shall in accordance with the retail network agreement between Provider and Participating Pharmacies:

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARKPCS HEALTH, L.L.C.**

2.4 **Implementation.**

  (a) In consultation with City, Provider shall develop a mutually agreeable implementation project plan prior to the Effective Date, or prior to the implementation of any new group or Plan during the Term.
  (b) City or City's designee shall provide to Provider prior to the Effective Date, or prior to the implementation of any new group or Plan during the Term: (i) the initial eligibility test data and the initial full eligibility data; (ii) the governing Plan documents, a summary plan description, and an executed PDD; and (iii) a refill file (if available) in a format acceptable to Provider. Any delays by City or its designee in providing this information may delay the implementation of Services by Provider.
  (c) Subject to timely receipt of a refill file or prescription, Provider will begin filling prescriptions through its mail service pharmacies as of the Effective Date.
  (d) Provider will electronically provide implementation information to new Plan Participants which may include the following materials: (i) introductory cover letter; (ii) standard identification cards for use within the retail network which shall include Provider's name and toll free number; (iii) a standard client benefit brochure; (iv) mail service order form; (v) paper Claim reimbursement form, if applicable; and (vi) PDL brochure, if applicable. At City's expense and election, Provider may prepare printed information, materials or envelopes for mailing such information to Plan Participants. Provider will use Plan Participant address information provided as part of the Eligibility Information submitted in accordance with Section 2.5.
  (e) Any reprints or customization of any communication materials requested by City shall be at City's expense.
  (f) Provider will be responsible for the cost to reproduce ID cards (including priority shipping) if the reproduction is due to Provider's error or Provider initiated changes.

2.5 **Eligibility Data**.

  (a) City, or City's designee, at City's sole expense, will provide Provider the minimum necessary information concerning its Plan and Plan Participants needed to perform the Services, including any updates thereto ("Eligibility Information"). This Eligibility Information must be complete and accurate, provided timely, and in a mutually agreeable format and media.
  (b) City acknowledges and agrees that Provider will not use Social Security Numbers on Plan Participants' identification cards and will instead use alternate identification numbers assigned and provided by City.
  (c) City acknowledges that Provider, Plan Participant's Prescriber or Participating Pharmacy shall be able to rely on the accuracy of the Eligibility Information provided by City and Provider shall not be liable for any Claims processed for terminated Plan Participants any time before Eligibility Information is provided by City and loaded.
  (d) Provider shall reasonably coordinate with the City to receive and process manual updates and off-cycle files, which may arise from new acquisitions or strike situations.
  (e) Provider shall provide the City with a web-based tool for making immediate, on-line, real-time manual Eligibility Information updates for urgent requests from the City.
  (f) Provider shall capture the nine digit Social Security Number and the six digit numeric City ID in its eligibility system.

2.6 **Formulary Management.**

  (a) <u>Formulary Election</u>. City hereby adopts, as part of the Plan design and as City's formulary, the Provider Formulary, as in effect from time to time. The specific formulary election made by City is identified in <u>Exhibit PA-B</u> to this Agreement.

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARKPCS HEALTH, L.L.C.**

(b) <u>Formulary Changes</u>. Changes made by Provider to the Formulary may be based upon, among other things, the introduction of new products, customer safety, clinical appropriateness, efficacy, cost effectiveness, changes in availability of products, new clinical information and other considerations, changes in the pharmaceutical industry or its practices, introduction of new Generic Drugs, and/or new legislation and regulations. Provider shall provide quarterly notices to City regarding any negative changes to the Formulary which may include, but are not limited to, movement of a drug from a preferred to a non-preferred tier or the addition of or removal of utilization management edits. Provider shall use reasonable efforts to provide such notice at least sixty (60) days prior to such change. The parties acknowledge that Provider may elect to add to the Formulary new drugs introduced to the market, or line-extensions of certain currently available drugs, only after Provider's P&T Committee has evaluated such drug and recommends such drug be added to the Formulary.

(c) <u>Non-Covered Products</u>. With regards to any drug(s) Provider may identify as a Non-Covered Product and/or remove from the Formulary, Provider may make such decisions based upon, among other things, new products, customer safety, clinical appropriateness, efficacy, cost effectiveness, changes in availability of products, new clinical information and other considerations, changes in the pharmaceutical industry, introduction of new Generic Drugs, excessive inflation in the cost of the product (i.e., hyperinflation), and/or new legislation and regulations. City acknowledges and agrees that Provider (i) may remove drugs from the Formulary and/or identify drugs as Non-Covered Products from time to time on a quarterly basis; and (ii) will provide City at least sixty (60) days' prior notification of any such removals from the Formulary. In the event of a removal of a drug from the Formulary Provider shall provide targeted communications to Plan Participants prior to the date of removal. In the event safety concerns or regulatory action require Provider to remove a Covered Product from the Formulary without prior notice, Provider shall notify City of the removal within five (5) business days.

(d) <u>Prescriber Authority</u>. City acknowledges the Prescriber shall have final authority over the drug prescribed to a Plan Participant, regardless of benefit coverage.

.

2.7 **Generic Substitution Program.**

(a) Generic substitution may be conducted through Provider's mail service pharmacies and Participating Pharmacies under a program which substitutes Brand Drugs with Generic Drugs, where available and clinically appropriate, unless (i) the Prescriber requires the prescription to be dispensed as written and does not authorize generic substitution, or (ii) the Plan Participant has notified the dispensing pharmacy to dispense the Brand Drug only.

(b) Provider will provide generic messaging to Participating Pharmacies, which is intended to promote point-of-sale generic substitution of multi-source Brand Drugs. City acknowledges that a pharmacist may override such messaging if the Prescriber or the Plan Participant has notified the dispensing Participating Pharmacy to dispense the brand name drug only.

2.8 **Drug Utilization Review ("DUR") Services.**

(a) Provider will provide its automated concurrent DUR Services including but not limited to: (i) drug to drug interactions; (ii) therapeutic duplications; (iii) over-utilization; (iv) insufficient or excessive drug usage; and (v) early or late refills.

(b) Participating Pharmacies and Prescribers are individually responsible for acting or not acting upon information generated and transmitted through the DUR Services, and for performing services in each jurisdiction consistent with the scope of their licenses. The DUR Services are necessarily limited by the amount, type and accuracy of Plan Participant information made available to Provider.

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARKPCS HEALTH, L.L.C.**

        provision of such Additional Health-Related Services. City may discontinue one (1) or more Additional Health-Related Services upon sixty (60) days prior written notice to Provider and upon an amendment to the PDD.

2.17    **City Information.** City acknowledges that Provider shall not be held responsible for an obligation if City fails to provide Provider with information which is materially accurate, timely and complete as reasonably needed to meet such obligation.

2.18    **City Debit Card Program.** City hereby authorizes and directs Provider to disclose data, upon the request of City, to a third party vendor for the purposes of administering debit card program payments under a flexible spending account or other consumer directed health plan subject to such third party's execution of Provider's form confidentiality agreement. Provider may provide such data, as requested by the third party for this purpose, until such time as City provides otherwise in writing.

2.19    **Performance Guarantees.** Provider agrees to perform in accordance with the performance standards described in Exhibit PA-D. Unless otherwise stated, all performance standards shall be measured across Provider's book of business based on Provider's standard calculation methodology and shall exclude Specialty Drugs and related specialty services.

2.21    **Maintenance Choice.** Provider shall provide the City with Provider's Voluntary Maintenance Choice Program (hereinafter defined) in accordance with the terms and conditions described in Exhibit PA-E.

2.22    **Appeals.** Provider shall conduct appeals for the fees set forth in Exhibit PA-A in accordance with the terms and conditions described in Exhibit PA-F.

2.23    **HealthTag Service.** Provider shall provide the HealthTag service in accordance with the terms and conditions described in Exhibit PA-H.

2.24    **Point Solutions Management Service.** Provider shall provide point solutions management service in accordance with the terms and conditions described in Exhibit PA-I

3.    **Maintenance of Records.** Provider shall maintain records with respect to the processing, payment, and denial of Claims by Provider and shall retain such records for a period of up to ten (10) years after the transaction occurred and as otherwise required by Applicable Law.

4.    **Audit Rights.**

4.1    **Claims Audits.** City, or a mutually acceptable independent third party retained by City, may conduct an annual Claims audit and such audit shall be limited to the prior Contract Year of Provider data that directly relates to Claims billings. Any mutually agreed upon third party auditor engaged by City shall execute Provider's form confidentiality agreement prior to conducting a Claims audit ensuring that all information reviewed during such audit and all details will be treated as confidential and will not be revealed in any manner or form by or to any third party. The scope and procedures of the Claims audit shall be in accordance with the procedures set forth in Exhibit PA-C. City acknowledges that it shall not be entitled to audit agreements with vendors, pharmaceutical companies, Participating Pharmacies or other providers of products or services to Provider as part of any Claims audit.

4.2    **Rebate Audits.**

    (a) City, through a mutually agreeable independent third party retained by City, may conduct an annual Rebate audit for the prior Contract Year. Such audit shall be limited to a review of up to ten (10) pharmaceutical company contracts directly related to City's Rebates as selected by City. Such review

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARKPCS HEALTH, L.L.C.**

      of pharmaceutical company contracts may include formulary and Rebate provisions to the extent permitted by such contracts and shall be limited to information necessary for validating the accuracy of the Rebate amounts remitted to City by Provider. The scope and procedures of the Rebate audit shall be in accordance with the procedures set forth in <u>Exhibit PA-C</u>.

    (b) Any mutually agreed upon third party auditor engaged by Provider shall execute Provider's form confidentiality agreement prior to conducting a Rebate audit ensuring that all information reviewed during such audit and all details and terms of any pharmaceutical company contract reviewed will be treated as confidential and will not be revealed in any manner or form by or to any third party, including City.

**5.**      <u>**Obligations of City**</u>.

5.1     **Implementation.**

    (a) The parties acknowledge that City has been a client of Provider and Provider has provided Services to City prior to and through the Effective Date. Accordingly, City or its designee has previously supplied and Provider has previously received: (i) the initial eligibility test data and the initial full eligibility data, and (ii) the Plan documents, a refill file in a format acceptable to Provider and summary plan descriptions.

    (b) City will advise Plan Participants that any consents and/or authorizations required for Provider to perform the Services and for the use and disclosure of information including PHI, as permitted under this Agreement, should be sent to Provider at: CVS Caremark, Compliance and Integrity, P.O. Box 52072, Phoenix, AZ 85072-2072.

    (c) City has and will disclose to Plan Participants any and all matters relating to the Plan and Services as required by Applicable Law to be disclosed.

5.2     **Control of Plan**. City represents that the Plan is not governed by ERISA. Unless otherwise stated in this Agreement, City and/or plan administrator retain the sole and absolute authority to design, amend, terminate or modify, in whole or in part, all or any portion of the Plan, including the sole authority to control and administer the Plan and any assets of the Plan. City and/or Plan administrator shall also have complete discretionary, binding and final authority to construe the terms of the Plan, to interpret ambiguous Plan language, to make factual determinations regarding the payment of Claims or provision of benefits, to review denied Claims and to resolve complaints by Plan Participants. Provider agrees to be a fiduciary solely for the purpose of initial Claim adjudication and appeals relating to the coverage of prescription drug benefits, as further described in Exhibit PA-F. Provider and City acknowledge and agree that, except with respect to its fiduciary obligations as specifically delegated and accepted by Provider pursuant to this Agreement, Provider shall not be (i) the administrator of the Plan for any purpose; (ii) a named fiduciary with respect to the Plan for purposes of ERISA or any applicable state law; (iii) delegated discretionary authority or responsibility, or exercise discretionary authority or control, with respect to the Plan or its administration; or (iv) deemed a fiduciary with respect to the Plan for purposes of ERISA or any applicable state law**.**

5.3     **PDD**.

    (a) City represents and warrants that the PDD, as approved by City in writing, accurately reflects the terms of the Plan.

    (b) City shall provide Provider with sixty (60) days prior written notice of any proposed changes to the PDD, or other material Plan amendments that may impact prescription drug coverage under the Plan, which changes shall be consistent with the scope and nature of the Services to be performed by

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARKPCS HEALTH, L.L.C.**

6.3 **Collection Efforts; Non-Compliance**. Provider will use commercially reasonable efforts to collect Rebates. Provider may, but shall not be required to, initiate formal action to collect Rebates, in which event Provider may offset collection costs, including reasonable attorneys' fees and expenses, against the Rebates actually collected. Provider does not guarantee pharmaceutical company performance. In no event shall Provider be liable to City for any Losses arising from a pharmaceutical company's failure to pay Rebates. City shall not be entitled to interest on any Rebates. In the event of City's breach of this Agreement, Provider may, in addition to Provider's other rights set forth in this Agreement, apply Rebates to offset amounts due from City.

6.4 **Manufacturer Relationships.** Provider-affiliated pharmacies may contract with pharmaceutical companies for the purchase of products and these contracts may provide for prompt pay discounts and other concurrent or retrospective purchase discounts on products purchased for pharmacy dispensing inventories. Provider and its affiliates may also contract with pharmaceutical companies for the provision of services, such as care management, program administration, adverse event and other data reporting, and fulfillment services. Provider may receive and retain compensation for such services. For clarity, the discounts, fees and other compensation described in this paragraph and the Manufacturer Administrative Fees are independent of the Rebates.

**7.** **Pennsylvania Right to Know Law.**

Provider acknowledges and agrees that the City, as a municipal corporation, is subject to the Pennsylvania Right to Know Law (65 P.S. Section 67.101 et seq.) (the "Right to Know Law") and local disclosure laws and, as such, is legally obligated to disclose to the public documents to the extent required thereunder; the City, to the extent permitted or required by the Right to Know Law, agrees to protect such documents from public disclosure. Without limiting the foregoing sentence, the City's legal obligations shall not be limited or expanded in any way under the Right to Know Law by Provider's assertion of confidentiality, proprietary and/or trade secret rights to such documents.

In accordance with the Right to Know Law, the City shall notify Provider of a request for a record if Provider provided the record and included a written statement signed by a representative of Provider that the record contains a trade secret or confidential proprietary information. The City shall notify Provider of a request for a record within five (5) business days of receipt of request from a third party for the record. Provider shall have five (5) business days from receipt of notification from the City to provide input on the release of the record. The City shall deny the request for the record or release the record within ten (10) business days of the provision of notice to Provider and shall notify Provider of the decision.

**8**. *Intentionally omitted.*

**9.** **Miscellaneous Provisions.**

9.1 **Exclusivity**. Pricing contained in this Agreement is conditioned upon Provider being the exclusive provider of each of the Services described in this Agreement. City acknowledges and agrees that in the event it provides, directly or indirectly, or engages any prescription benefit manager or other third party, to provide to the Plan any service that is similar to one of the Services provided by Provider, including without limitation, retail pharmacy network contracting, pharmacy claims processing, mail and specialty pharmacy services, and formulary and rebate administration services, Provider shall be entitled to modify or amend the pricing terms hereof in accordance with the terms of Section 9.2(a) of this Exhibit PA-A.

9.2 **Pricing Assumptions.** In addition to any pricing assumptions set forth in any pricing implementation or similar document that is executed by City:

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARKPCS HEALTH, L.L.C.**



# THE CITY OF PHILADELPHIA

# PROFESSIONAL SERVICES CONTRACT

# GENERAL PROVISIONS

# FOR

# GENERAL CONSULTANT SERVICES

PSC GP (GCS)
Rev. Date: July 2020

Materials satisfactorily performed and delivered prior to such termination or modification of this Contract under this Section 5.2.

5.3. **Crossing Fiscal Years.** If any portion of the compensation set forth in this Contract is to be paid in any City fiscal year following the fiscal year in which the Initial Term or any Additional Term of this Contract commences (in either case, "Appropriated Fiscal Year"), Provider understands and agrees that the portion of the compensation under this Contract payable with City funds for any period following the Appropriated Fiscal Year is subject to the discretion of City Council as to future appropriations. If, for any reason, funds for any such portion of the compensation are not appropriated by City Council in any Fiscal Year following the Appropriated Fiscal Year, this Contract and the City's liability under this Contract shall automatically terminate at the end of the then current Appropriated Fiscal Year; provided, however, that Provider shall be compensated in accordance with the terms of this Contract for Services and Materials satisfactorily performed and delivered prior to the end of the then current Appropriated Fiscal Year, subject to the other provisions of this Article V.

5.4. **Allowability of Cost Items.** All payments by the City under this Contract are subject to the limitations on the allowability of cost items imposed by the Contract Cost Principles.

### ARTICLE VI: AUDITS; INSPECTION RIGHTS; RECORDS

6.1. **City Audit.** From time to time during the Term, and for a period of five (5) years after the expiration or termination of this Contract, the City may audit any and all aspects of Provider's performance under this Contract, including, but not limited to, its billings and invoices. Audits may be conducted by representatives, agents or contractors of the City, including the Department, or other authorized City representatives, including, without limitation, the City Controller. If requested by the City, Provider shall submit to the City all vouchers or invoices presented for payment pursuant to this Contract, all cancelled checks, work papers, books, records and accounts upon which the vouchers or invoices are based, and any and all documentation and justification in support of expenditures or fees incurred pursuant to this Contract. All books, invoices, vouchers, records, reports, cancelled checks and other materials shall be subject to periodic review or audit by the City.

6.2. **Inspection.** All Services and Materials shall be subject to inspection and review by City, state and federal representatives, as may be applicable, or their designees, at the offices of Provider in the City, or in another location with the City's consent. Provider shall cooperate with all City, state and federal inspections and reviews conducted in accordance with the provisions of this Contract. Such inspection and review of Provider's Services and Materials, including, without limitation, programs and facilities, shall be in the sole discretion of the inspecting or reviewing entity. Such inspection or review may include, without limitation, meetings with consumers, review of staffing ratios and job descriptions, and meetings with any of Provider's staff members who are either directly or indirectly involved in providing Services or Materials.

6.3. **Availability of Records.** Provider shall make available, in the City at reasonable times during the Term of this Contract and for the period set forth in Section 6.4 (Retention of Records) below, all records pertaining to this Contract for the purpose of inspection, audit or reproduction by any authorized representative (including any agent or contractor and the City Controller) of the City, the Commonwealth of Pennsylvania Auditor General, and any other federal and state auditors, as may be applicable.

6.4. **Retention of Records.** Provider shall retain all records, books of account and documentation pertaining to this Contract for the period set forth in Section 6.1 (City Audit) above. If any litigation, claim or audit is commenced prior to expiration of said five (5) year period, then the records shall be retained until all litigation, claims or audit findings have been completely terminated or resolved, without right of further appeal, or if Applicable Law requires a longer period, then the records shall be retained for such longer period.

6.5. **Audits Pursuant to Section 6-400 of the Home Rule Charter.** Any Provider that is an Agency, as defined in Section 6-400 (Auditing Department) of the Charter, shall permit the City Controller to audit its affairs as authorized in Section 6-400 during the Initial Term or any Additional Term. Under Section 6-400, an Agency is any entity that a) receives funds from the City; and either b) is created by, or whose board of directors is in whole or part appointed by, one or more City officials or bodies, or c) is organized pursuant to legal authority granted to it by City ordinance.

### ARTICLE VII:  ASSIGNMENT

7.1. **Assignment By Provider.** Provider shall not assign this Contract, or any part of this Contract, or delegate performance of this Contract (other than to its own work forces), without obtaining the prior written consent of the Responsible Official. The decision whether to consent to an assignment, the timing of consent, if any, and conditions to such consent, if any, shall each be in the City's sole discretion. Any consent to the assignment of any monies to be paid under this Contract shall not relieve Provider from the faithful performance of any of its obligations under this Contract or change any of the terms and conditions of this Contract. Any purported assignment in violation of this provision shall be void and of no effect. The City's consent to an assignment shall not release the assignor from any liability accrued or thereafter accruing under this Contract. Any assignment or purported assignment shall be in writing and shall contain an express assumption by the assignee of all liability accrued or thereafter accruing under this Contract. Consent by the City to any assignment shall not be deemed a course of conduct, dealing or performance with respect to any other assignment or proposed assignment. For purposes of this Section 7.1, an assignment includes the acquisition of Provider, or a controlling interest therein, through a corporate or other merger, and the appointment of a receiver or bankruptcy trustee, and the transfer of this Contract or Provider in any bankruptcy or other insolvency proceeding.

7.2. **Applicability in Case of Bankruptcy or Insolvency.** A receiver or trustee of or for Provider in any federal or state bankruptcy, insolvency or other proceedings concerning Provider shall comply with the requirements set forth in Section 7.1 (Assignment By Provider) above.

7.3. **Personal Services.** Provider acknowledges that the Services and Materials are the personal services of Provider and the City shall have no obligation to accept performance by a third party without the Responsible Official's prior and express written consent.

### ARTICLE VIII:  INDEPENDENT CONTRACTOR; INDEMNIFICATION; LITIGATION COOPERATION

8.1. **Independent Contractor.** Provider is an independent contractor and shall not in any way or for any purpose be deemed or intended to be an employee or agent of the City. Neither Provider nor its agents, employees or Subcontractors shall in any way represent that they are acting as employees, officials or agents of the City.