# EXHIBIT 2

Caremark 12/10 (crg) CK

Contract Number 1020407

City of Philadelphia
Human Resources

# PROVIDER AGREEMENT

### (General Consultant Services)

**THIS PROVIDER AGREEMENT** is made as of the 2nd day of March, 20 11, by and between THE CITY OF PHILADELPHIA (the "City"), by and through the Office of Human Resources (the "Department"), and CAREMARKPCS HEALTH, LLC ("Provider"), a corporation, with its principal place of business at 2211 Sanders Road, Northbrook, Illinois 60062.

### BACKGROUND

The City and Provider desire that Provider render general consultant services to the City in accordance with the provisions of this Provider Agreement, the City of Philadelphia Professional Services Contract General Consultant Services General Provisions, as revised February, 2006 (the "General Provisions") and all of the other documents and exhibits which together constitute the Contract Documents as defined in the General Provisions. A copy of the General Provisions is attached hereto and incorporated herein by reference.

In consideration of the mutual obligations set forth herein, and intending to be legally bound, the City and Provider covenant and agree as follows:

**CONFORMED**

### ARTICLE I: GENERAL TERMS

MAR 0 2 2011

1.1   **Incorporation of Background.**

The Background is incorporated by reference herein.

1.2   **Definitions.**

Capitalized terms shall have the meanings set forth in the General Provisions.

### ARTICLE II: TERM

2.1.   **Initial Term.**

The term of this Contract shall commence on January 1, 2010 and

MAC"). A copy of such MAC drug list shall be provided to City prior to execution of this Agreement and upon execution of each amendment for an Additional Term if such Additional Term is granted by City.

1.11 **"Participating Pharmacy"** means a retail pharmacy that participates in a retail network established by Provider.

1.12 **"PDL"** means one or more list(s) of preferred pharmaceutical products, created and maintained by Provider, as amended from time to time, which: (a) has been approved by Provider's Pharmacy and Therapeutics Committee; and (b) reflects Provider's recommendations as to which pharmaceutical products should be given favorable consideration by plans and their participants. Provider typically updates the PDL on a quarterly basis, but may remove drugs more frequently when a drug is removed for safety or regulatory reasons.

1.13 **"Pharmacy and Therapeutics Committee"** means Provider's independent committee of health care professionals that reviews and approves prescription drugs for inclusion in Provider's PDL based on safety and efficacy.

1.14 **"Plan"** means the health benefit plan(s) sponsored by City that includes the prescription drug benefit.

1.15 **"Plan Design Document"** or **"PDD"** means the document prepared by Provider and approved by City, as may be modified by City in accordance with this Agreement, which documents detail the relevant parts of City's Plan for prescription drug benefits and which are used by Provider to provide Services under this Agreement. The PDD as of the effective date of this Agreement is attached as Exhibit G.

1.16 **"Plan Participant"** means each individual identified by City to be eligible for prescription drug benefits under the Plan, as set forth in City's eligibility file or otherwise communicated by City in a format acceptable to Provider.

1.17 **"Prescriber"** means a health care practitioner licensed or authorized by law to issue an order for a prescription drug.

1.18 **"Prescribing Guide"** means the Provider Prescribing Guide, as modified and published from time to time, which has been approved by Provider's Pharmacy and Therapeutics Committee. Provider may typically update the Prescribing Guide on a quarterly basis, but may remove drugs more frequently when a drug is removed for safety or regulatory reasons.

1.19 **"Protected Health Information"** or **"PHI"** shall have the meaning given such term by HIPAA, but limited to that information created or received by Provider in its capacity as a business associate to the Plan.

1.20 **"Rebates"** means the formulary rebates, including base and market share rebates, collected by Provider in its capacity as a group purchasing organization for the Plan from various pharmaceutical companies that are attributable to the utilization of single source brand, prescription drugs by Plan Participants.

1.21 **"Specialty Drugs"** means certain pharmaceuticals, biotech or biological drugs, as offered by Provider, that are used in the management of chronic or genetic disease, including but not limited to, injectible, infused, or oral medications, or products that otherwise require special handling, including without limitation those listed in Attachment 1 of Exhibit B (which Provider amends periodically in response to changes in the marketplace) upon written notice to the City.

1.22 **"Usual and Customary"** or **"U&C"** means a Participating Pharmacy's average charge for the identical prescription drug purchased by a customer without a pharmacy benefit management program.

THIS DOCUMENT CONTAINS INFORMATION THAT IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.
SUCH INFORMATION MAY ONLY BE DISCLOSED IN ACCORDANCE WITH PARAGRAPH 7 OF THE SCOPE OF SERVICES (EXHIBIT A) OF THE AGREEMENT.

2.  **Provider Services.** Provider shall provide the Services in a manner consistent with the PDD, and the terms of this Agreement, and City hereby authorizes Provider to provide the Services in such manner.

2.1 **Claims Processing.**

   (a) <u>On-Line Claims Processing</u>. Provider will perform Claims processing services for products dispensed by Participating Pharmacies and Provider's mail and specialty pharmacies. Provider will perform standard drug utilization services, as described in Section 2.8 of this Agreement, for each Claim submitted by Participating Pharmacies, and Provider's mail and specialty pharmacies.

   (b) <u>Submitted Paper Claims</u>. To the extent authorized by the PDD, Provider will process Claims submitted by Plan Participants directly to Provider consistent with Provider's standard procedures and for the fees set forth in <u>Exhibit B</u>.

2.2 **Mail Service Pharmacy.** Provider's mail service pharmacies shall provide the following products and services:

   (a) Dispense new or refill prescriptions following receipt from a Plan Participant of (i) a prescription and a completed order or refill order form, and (ii) any applicable Cost Share;
   (b) Fill prescriptions subject to the professional judgment of the dispensing pharmacist, good pharmacy practices in accordance with the standards where the pharmacy is located, applicable law, and product labeling guidelines;
   (c) Ship all drugs to Plan Participants via First Class United States postal service or other appropriate carriers to the address provided by City and/or the Plan Participant; and
   (d) Comply with Provider's terms and conditions applicable to mail pharmacy services as may be modified by Provider periodically as deemed appropriate by Provider.

2.3 **Retail Pharmacy Network.** Provider contracts with Participating Pharmacies, which are independent businesses and not subcontractors of Provider, to provide prescription drugs and related products and services with respect to the Plan. Provider shall:

   (a) Require Participating Pharmacies to service Plan Participants during their normal business hours, in all applicable geographic areas;
   (b) Include in its standard retail network agreements that Participating Pharmacies must comply with Provider's terms and conditions applicable to participation in the retail pharmacy network as may be modified by Provider periodically as deemed appropriate by Provider;
   (c) Provide information to Participating Pharmacies concerning drug interaction, safety edits, and generic substitution and therapeutic intervention programs;
   (d) Direct Participating Pharmacies to collect all applicable Cost Shares or the lesser of Cost Share or U&C from Plan Participants;
   (e) Provide and maintain toll free telephone access for Participating Pharmacies to address Claim submission and clinical drug utilization review issues;
   (f) Maintain a database of Participating Pharmacies so that Plan Participants and City may locate a Participating Pharmacy using Provider's Web site;

THIS DOCUMENT CONTAINS INFORMATION THAT IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.
SUCH INFORMATION MAY ONLY BE DISCLOSED IN ACCORDANCE WITH PARAGRAPH 7 OF THE SCOPE OF SERVICES (EXHIBIT A) OF THE AGREEMENT.

not be liable for any Claims processed for terminated Plan Participants any time before Eligibility Information is provided by City and loaded.

2.6    **Formulary Management.**

(a) City hereby adopts, as part of the Plan design and as City's formulary, the PDL and the Prescribing Guide.

(b) Changes made by Provider to the PDL or the Prescribing Guide may be based upon, among other things, new products, customer safety, clinical appropriateness, efficacy, cost effectiveness, changes in availability of products, new clinical information and other considerations, changes in the pharmaceutical industry, introduction of generics, new legislation and regulations. Provider shall use reasonable efforts to provide City with thirty (30) days notice prior to the addition or removal of a drug from the PDL or the Prescribing Guide. In the event safety concerns or regulatory action require Provider to remove a drug sooner, Provider shall notify City of the removal of a drug from the PDL or the Prescribing Guide within five (5) business days.

(c) Provider may implement Drug Interchange program(s), which has been approved by Provider's Pharmacy and Therapeutics Committee for selected prescriptions, under which Provider's mail service pharmacy shall contact Prescribers, as appropriate, to obtain approval for the Drug Interchange. In accordance with its standard policies, Provider shall credit City or Plan Participant, as appropriate, for any mail prescription returned to Provider upon rejection by the Plan Participant of the Drug Interchange. City acknowledges that the adoption of therapeutic interventions may result in an increase of Rebates payable by pharmaceutical manufacturers pursuant to their agreements with Provider.

(d) City acknowledges the Prescriber shall have final authority over the drug prescribed to a Plan Participant, regardless of benefit coverage.

(e) Provider may implement Drug Interchange programs, as approved by its Pharmacy and Therapeutics Committee, for Participating Pharmacies to promote the use of the PDL or Prescribing Guide by encouraging Participating Pharmacies to: (i) identify appropriate opportunities for converting a prescription from a non-PDL or Prescribing Guide drug to a clinically comparable drug on the PDL or Prescribing Guide, and (ii) contact the Plan Participant and the Prescriber to request that the prescription be changed to a clinically comparable drug on the PDL or Prescribing Guide. Participating Pharmacies may be compensated by Provider for the services they provide in connection with Drug Interchange programs.

2.7    **Generic Substitution Program.**

(a) Generic substitution may be conducted through Provider's mail service pharmacies and Participating Pharmacies under a program which substitutes brand name drugs with generic equivalents, where available and clinically appropriate, unless (i) the Prescriber requires the prescription to be dispensed as written and does not authorize generic substitution, or (ii) the Plan Participant has notified the dispensing pharmacy to dispense the brand name drug only.

2.8    **Drug Utilization Review ("DUR") Services/Clinical Programs.**

THIS DOCUMENT CONTAINS INFORMATION THAT IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.
SUCH INFORMATION MAY ONLY BE DISCLOSED IN ACCORDANCE WITH PARAGRAPH 7 OF THE SCOPE OF SERVICES (EXHIBIT A) OF THE AGREEMENT.

(a) Provider will provide its automated concurrent DUR Services including but not limited to: (i) drug to drug interactions; (ii) therapeutic duplications; (iii) known drug sensitivity; (iv) over-utilization; (v) insufficient or excessive drug usage; and (vi) early or late refills.

(b) Participating Pharmacies and Prescribers are individually responsible for acting or not acting upon information generated and transmitted through the DUR Services, and for performing services in each jurisdiction consistent with the scope of their licenses. The DUR Services are necessarily limited by the amount, type and accuracy of Plan Participant information made available to Provider.

(c) Provider shall provide clinical services as described in Exhibit F.

(d) In accordance with Applicable Law, Provider may, subject to City consent, perform the following services or programs (collectively referred to herein as "Additional Health-Related Services"): (i) Prescriber education programs; (ii) health research; (iii) compliance and persistency; (iv) health education or management programs for Plan Participants, including, but not limited to, informing Plan Participants about preventive care programs, health assessments, and other treatment options; (v) communications about health-related products or services that would be offered on behalf of City through Provider as a value-added item or service that is not part of the Plan benefit; and (vi) share Plan Participant information as necessary for the treatment, payment and health care operations of other health care providers (which may or may not be affiliated with Provider) or plans. City and Provider acknowledge and agree that: (A) although the Additional Health-Related Services may be of benefit to City and its Plan Participants, Provider will not charge City for the performance of such Additional Health-Related Services; (B) the performance of such Additional Health-Related Services may utilize PHI; (C) the performance and scope of such Additional Health-Related Services shall be determined by Provider, and Provider shall have no obligation to perform Additional Health-Related Services; and (D) Provider may contract with, and pursue and retain for its own account compensation or fees received from, pharmaceutical companies for the funding and provision of such Additional Health-Related Services.

2.9 **Plan Participant Services**. Provider shall operate toll-free customer service lines twenty-four (24) hours a day, seven (7) days a week for the purpose of responding to inquiries from Plan Participants. Provider shall also provide telephonic emergency pharmacist services twenty-four (24) hours a day, seven (7) days a week.

2.10 **Communication Materials**. In addition to materials provided under Section 2.4(d), Provider shall produce and provide the following communication materials:

(a) Provider will provide an Internet Web site where Plan Participants can access information with respect to Plan specific drug information, the PDL, Cost Shares, Participating Pharmacy listings and prescriptions.

(b) Provider may provide communications to Plan Participants and/or City regarding drug recalls or withdrawals, provided however, that such communication shall in no event obligate Provider in regard to any refunds or reimbursements associated with such drug recalls or withdrawals.

2.11 **Reports, Claims Data and SAS 70**. Provider shall provide reports and detailed Claims data to City as follows:

THIS DOCUMENT CONTAINS INFORMATION THAT IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.
SUCH INFORMATION MAY ONLY BE DISCLOSED IN ACCORDANCE WITH PARAGRAPH 7 OF THE SCOPE OF SERVICES (EXHIBIT A) OF THE AGREEMENT.

      (a) City represents and warrants that the PDD accurately highlights main components/features of the Plan for purposes of this Agreement.

      (b) City shall provide Provider with ninety (90) days prior written notice of any proposed changes to the PDD, which changes shall be consistent with the scope and nature of the Services to be performed by Provider under this Agreement. City agrees that it is responsible for Losses resulting from (i) any failure to implement Plan design changes which are not communicated in a written format acceptable to Provider, or (ii) Provider's implementation of City's verbal or written direction regarding exception or overrides to the PDD. City shall notify Plan Participants of any Plan design changes prior to the effective date of any such changes.

5.4 **Government Programs.** It is the intention of the parties, that for purposes of the Federal Anti-kickback Statute, any discount, rebate or other City credit, shall constitute and be treated as discount against the price of drugs within the meaning of 42 U.S.C. §1320a 7b(b)(3)(A). To the extent reporting and disclosure may be required by Applicable Law or contractual commitment, City agrees to fully and accurately disclose and report to Medicare, Medicaid or other government health care programs any discount or rebate or other credit received by City under this Agreement, whether reflected in the fees for the products and services or otherwise provided hereunder, as discounts against the price of the drugs under all applicable state or federal programs that provide reimbursement to City for products or services provided by Provider (i.e., City will report the net amount paid for drugs).

5.5 **Plan Participant Cost Share.** Provider may, but shall not be obligated to, dispense a prescription even if the prescription is not accompanied by the Cost Share. Provider will credit any amount submitted by Plan Participant in excess of the Plan Participant's Cost Share. In the event a Plan Participant submits to Provider an insufficient Cost Share and the Plan Participant fails to remit the balance of the Cost Share amount to Provider within thirty (30) days of Provider's request, then Provider shall have the right to invoice City for, and City shall have an obligation to pay Provider, the amount of the uncollected Cost Share(s). If the Plan Participant subsequently pays the Provider, Provider shall credit the amount in full to the city. The parties have agreed to a maximum dollar amount of Plan Participant credit of Two Hundred Fifty Dollars ($250), which dollar level may be changed by mutual agreement of the parties, above which Provider will not dispense a prescription without the accompanied Cost Share. Shipping of prescriptions submitted without the appropriate Cost Share may be delayed and these delayed shipments shall not be included in the measurement of any applicable performance guarantees.

## 6. Pharmaceutical Contracts and Rebates.

6.1 **City's Authorization.** City authorizes Provider to contract with pharmaceutical companies for Rebates as a group purchasing organization for the Plan.

6.2 **Remittance of Rebates.** Provider will remit to City the Rebates received by Provider with respect to City's Claims during the prior calendar quarter, if any, net of that portion of the Rebates authorized by City to be retained by Provider pursuant to Exhibit B. City acknowledges and agrees that it shall not have a right to interest on, or the time value of, any Rebate payments received by Provider or monies payable under this Agreement. Upon termination of this Agreement or upon City's breach of this Agreement, Provider shall credit the City for any Rebate

Page 10

THIS DOCUMENT CONTAINS INFORMATION THAT IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.
SUCH INFORMATION MAY ONLY BE DISCLOSED IN ACCORDANCE WITH PARAGRAPH 7 OF THE SCOPE OF SERVICES (EXHIBIT A) OF THE AGREEMENT.

payable but not paid to the City at the time for such termination or breach; Provider may apply such Rebates to set off amounts due from City or may reasonably delay remittance of Rebates to allow for final adjustments. Such right of set off or delay shall be in addition to Provider's other rights set forth in this Agreement.

6.3 **Rebate Limitations**. City acknowledges that whether and to what extent pharmaceutical companies are willing to provide Rebates to City may depend upon a variety of factors, including the content of the PDL adopted by City, the Plan's design features, City meeting criteria for Rebates, and the extent of participation in Provider's formulary management programs, as well as Provider receiving sufficient information regarding each Claim for submission to pharmaceutical companies for Rebates. City acknowledges and agrees that Provider may, but shall not be required to, initiate any collection action to collect any Rebates from a pharmaceutical company.

6.4 **Disclosure of Manufacturer Fees**. In accordance with Section 6.1 of this Agreement, Provider or its affiliates may hold contracts with pharmaceutical companies relating to products covered under this Agreement. In connection with such contracts, Provider or its affiliates may have a financial relationship with such pharmaceutical companies and may receive and retain fees or other compensation from pharmaceutical companies for services rendered and property provided to pharmaceutical companies, including, without limitation, administrative fees not exceeding ▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ of the products dispensed across Provider's book of business. In addition, Provider or its affiliates may receive discounts or rebates from pharmaceutical companies which are attributable to or based on products purchased by Provider affiliated dispensing pharmacies. The term "Rebates" as used in this Agreement does not include the fees, compensation, discounts and rebates described in this Section 6.4, which belong exclusively to Provider or its affiliates.

6.5 **Non-Interference.** City agrees that during the Term of this Agreement, City will not directly or indirectly negotiate, contract, or agree with any pharmaceutical company, or any other third party, for the purpose of obtaining rebates or other discounts related to the drug utilization of Plan Participants, including, but not limited to the use of over the counter products. City represents and warrants that, as of the Effective Date, it does not have any direct or indirect agreements, arrangements and/or contracts with any pharmaceutical company or other third party related to any rebates or discounts. City acknowledges and agrees that a breach of this Section 6.5 shall be deemed a material breach of this Agreement.

7. **Pennsylvania Right to Know Law**

   Provider acknowledges and agrees that the City, as a municipal corporation, is subject to the Pennsylvania Right to Know Law (65 P.S. Section 67.101 et seq.) (the "Right to Know Law") and local disclosure laws and, as such, is legally obligated to disclose to the public documents to the extent required thereunder; the City, to the extent permitted or required by the Right to Know Law, agrees to protect such documents from public disclosure. Without limiting the foregoing sentence, the City's legal obligations shall not be limited or expanded in any way under the Right to Know Law by Provider's assertion of confidentiality, proprietary and/or trade secret rights to such documents.
   In accordance with the Right to Know Law, the City shall notify Provider of a request for a record if Provider provided the record and included a written statement signed by a representative of

Page 11

THIS DOCUMENT CONTAINS INFORMATION THAT IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.
SUCH INFORMATION MAY ONLY BE DISCLOSED IN ACCORDANCE WITH PARAGRAPH 7 OF THE SCOPE OF SERVICES (EXHIBIT A) OF THE AGREEMENT.



# THE CITY OF PHILADELPHIA

## PROFESSIONAL SERVICES CONTRACT

## GENERAL PROVISIONS

satisfactorily performed and delivered prior to the end of the then current Appropriated Fiscal Year.

    5.4    **Allowability of Cost Items.** All payments by the City to Provider under this Contract shall be subject to the limitations on the allowability of cost items imposed by the Contract Cost Principles.

### ARTICLE VI: AUDITS; INSPECTION RIGHTS; RECORDS

    6.1    **City Audit.** From time to time during the Initial Term and any Additional Term(s) of this Contract, and for a period of five (5) years after the expiration or termination of this Contract, the City may audit any and all aspects of Provider's performance under this Contract, including but not limited to its billings and invoices. Audits may be conducted by representatives, agents or contractors of the City, including the Department, or other authorized City representatives including, without limitation, the City Controller. If requested by the City, Provider shall submit to the City all vouchers or invoices presented for payment pursuant to this Contract, all cancelled checks, work papers, books, records and accounts upon which the vouchers or invoices are based, and any and all documentation and justification in support of expenditures or fees incurred pursuant to this Contract. All books, invoices, vouchers, records, reports, cancelled checks and other materials shall be subject to periodic review or audit by the City.

    6.2    **Inspection.** All Services and Materials shall be subject to inspection and review by City, federal and state representatives, as may be applicable, or their designees, at the offices of Provider in the City, or in another location with the City's consent. Provider shall cooperate with all City, state and federal inspections and reviews conducted in accordance with the provisions of this Contract. Such inspection and review of Provider's Services and Materials, including, without limitation, programs and facilities, shall be in the sole discretion of the inspecting or reviewing entity. Such inspection or review may include, without limitation, meetings with consumers, review of staffing ratios and job descriptions, and meetings with any of Provider's staff members who are either directly or indirectly involved in providing Services or Materials.

    6.3    **Availability of Records.** Provider shall make available, in the City at reasonable times during the Term of this Contract and for the period set forth in Section 6.4 (Retention of Records) below, all records pertaining to this Contract for the purpose of inspection, audit or reproduction by any authorized representative (including any agent or contractor and the City Controller) of the City, the Commonwealth of Pennsylvania Auditor General, and any other federal and state auditors, as may be applicable.

    6.4    **Retention of Records.** Provider shall retain all records, books of account and documentation pertaining to this Contract for a period of five (5) years following expiration or termination of this Contract; however, if any litigation, claim or audit is commenced prior to expiration of said five (5) year period, then the records shall be retained until all litigation, claims or audit findings have been completely terminated or resolved, without right of further appeal, or

if Applicable Law requires a longer period, then the records shall be retained for such longer period.

    6.5    **Audits Pursuant to Section 6-400 of the Home Rule Charter.** Any Provider that is an Agency, as defined in Section 6-400 of the Philadelphia Home Rule Charter, shall permit the City Controller to audit its affairs as authorized in Section 6-400 during the Initial Term or any Additional Term. Under Section 6-400, an Agency is any entity that a) receives funds from the City, and either b) is created by, or whose board of directors is in whole or part appointed by, one or more City officials or bodies; or c) is organized pursuant to legal authority granted to it by City ordinance.

## ARTICLE VII: ASSIGNMENT

    7.1    **Assignment By Provider.** Provider shall not assign this Contract, or any part of this Contract, or delegate performance of this Contract (other than to its own work forces, any of its subsidiaries or affiliates or as part of a sale of all, or substantially all, of its assets), without obtaining the prior written consent of the Responsible Official. The decision whether to consent to an assignment, the timing of consent (if any), and conditions to such consent, if any, shall each be at the City's sole discretion. Any consent to the assignment of any monies to be paid under this Contract shall not relieve Provider from the faithful performance of any of its obligations under this Contract or change any of the terms and conditions of this Contract. Any purported assignment in violation of this provision shall be void and of no effect. The City's consent to an assignment shall not release the assignor from any liability accrued or thereafter accruing under this Contract. Any assignment or purported assignment shall be in writing and shall contain an express assumption by the assignee of all liability accrued or thereafter accruing under this Contract. Consent by the City to any assignment shall not be deemed a course of conduct, dealing or performance with respect to any other assignment or proposed assignment. For purposes of this Section 7.1 (Assignment by Provider), an assignment includes the acquisition of Provider, or a controlling interest therein, through a corporate or other merger, and the appointment of a receiver or bankruptcy trustee, and the transfer of this Contract or Provider in any bankruptcy or other insolvency proceeding.

    7.2    **Applicability in Case of Bankruptcy or Insolvency.** A receiver or trustee of or for Provider in any federal or state bankruptcy, insolvency or other proceedings concerning Provider shall comply with the requirements set forth in Section 7.1 (Assignment by Provider) above.

    7.3    **Personal Services.** Provider acknowledges that the Services and Materials are the personal services of Provider and the City shall have no obligation to accept performance by a third party without the Responsible Official's prior and express written consent.

## ARTICLE VIII: INDEPENDENT