# EXHIBIT 3

Received 2/21/2024 3:00:45 PM Commonwealth Court of Pennsylvania

Filed 2/21/2024 3:00:00 PM Commonwealth Court of Pennsylvania
58 MD 2024

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

COMMONWEALTH OF
PENNSYLVANIA,
Acting by Attorney General
Michelle Henry,

                    Petitioner,

v.

CVS PHARMACY, INC.;
WALGREEN CO.; and
WALMART, INC.,
                    Respondents,

C.A. NO.:  58 MD 2024

CIVIL ACTION

## <u>MOTION TO APPROVE CONSENT DECREE</u>

1.    The Commonwealth of Pennsylvania acting through its Attorney General, Michelle Henry ("Commonwealth") initiated this action by filing a Petition for Review in the Nature of a Complaint against CVS Pharmacy, Inc. ("CVS" or "Respondent") the allegations of which are incorporated herein by reference.

2.    The Commonwealth and the Respondent have resolved the allegations in the Petition for Review in the Nature of a Complaint subject to this Court's approval of the terms and conditions contained in the proposed Consent Decree with CVS.

3.      The Commonwealth believes the terms of the proposed Consent Decree promote the best interests of the public and offers the most expeditious conclusion of this case.

**WHEREFORE,** the Commonwealth respectfully requests that this Honorable Court approve the proposed Consent Decree.

Respectfully Submitted,

COMMONWEALTH OF PENNSYLVANIA
Michelle Henry
Attorney General

Date: 2/21/2024          By: */s/ Tyler Ritchie*
                         Tyler W. Ritchie
                         Deputy Attorney General
                         PA Attorney I.D. No. 329895

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, Acting by Attorney General Michelle Henry, | |
| Petitioner, | C.A. NO.:  58 MD 2024 |
| v. | CIVIL ACTION |
| CVS PHARMACY, INC.; WALGREEN CO.; and WALMART, INC., | |
| Respondents, | |

## **ORDER**

AND NOW, on this _____ day of _____ 2024, upon consideration of the Motion to Approve Consent Decree, the motion is hereby granted.

The Consent Decree shall be entered as an order of this Court.

_____
Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

COMMONWEALTH OF
PENNSYLVANIA,
Acting by Attorney General
Michelle Henry,

                              Petitioner,

v.

CVS PHARMACY, INC.;
WALGREEN CO.; and
WALMART, INC.,
                              Respondents,

C.A. NO.:  58 MD 2024

CIVIL ACTION

### FINAL CONSENT JUDGMENT AND DISMISSAL WITH PREJUDICE

The Commonwealth of Pennsylvania ("*Commonwealth*") and CVS Pharmacy, Inc., together with and all of their past and present direct and indirect parents and subsidiaries (collectively, "*CVS*") (together with the Commonwealth, the "*Parties*," and each a "*Party*") have entered into a consensual resolution of the above-captioned litigation (the "*Action*") pursuant to a settlement agreement dated as of December 9, 2022 (as subsequently updated) (the "*Agreement*"), a copy of which is attached hereto as Exhibit A.  The Agreement shall become effective by its terms upon the entry of this Final Consent Judgment (the "*Consent Judgment*") by

the Court without trial or adjudication of any contested issue of fact or law, and without finding or admission of wrongdoing or liability of any kind.

**RECITALS:**

1.    Each Party warrants and represents that it engaged in arm's-length negotiations in good faith.  In hereby executing the Agreement, the Parties intend to effect a good-faith settlement.

2.    The Commonwealth, acting through its Attorney General, has determined that the Agreement and entry of this Consent Judgment is in the public interest.

3.    CVS denies the allegations against it and denies that it has any liability whatsoever to the Commonwealth, its Subdivisions, and/or (a) any of the Commonwealth's or its Subdivisions' departments, agencies, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts and other Special Districts in the Commonwealth, and (c) any person or entity acting in a *parens patriae*, sovereign,

quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public. CVS is entering into this Consent Judgment solely for the purpose of settlement, and nothing contained herein may be taken as or construed to be an admission or concession of any violation of law, rule, regulation, or ordinance, or of any other matter of fact or law, or of any fault, liability, or wrongdoing, all of which CVS denies.

4.      The Parties recognize that the outcome of the Action is uncertain and a final resolution through the adversarial process likely will require protracted litigation.

5.      The Parties agree to the entry of the injunctive relief terms attached as Exhibit P to the Agreement.

6.      Therefore, without any admission of liability or wrongdoing by CVS or any other Released Entities (as defined in the Agreement), and without this Consent Judgment constituting evidence against or admission by anyone with respect to any issue of fact or law, the Parties now mutually consent to the entry of this Consent Judgment and agree to dismissal of the claims with prejudice pursuant to the terms of the Agreement to avoid the delay, expense, inconvenience, and uncertainty of protracted litigation.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

In consideration of the mutual promises, terms, and conditions set forth in the Agreement, the adequacy of which is hereby acknowledged by all Parties, it is agreed by and between CVS and the Commonwealth, and adjudicated by the Court, as follows:

1.      The foregoing Recitals are incorporated herein and constitute an express term of this Consent Judgment.

2.      The Parties have entered into a full and final settlement of all Released Claims of Releasors (including but not limited to the Commonwealth) against CVS and the Released Entities pursuant to the terms and conditions set forth in the Agreement.  This Consent Judgment summarizes and gives effect to those terms.  In the event of a conflict between the terms of the Agreement (including its exhibits) and language in this Consent Judgment, the terms of the Agreement shall govern.  Nothing in this summary document shall have the effect of expanding, diminishing, explaining, or otherwise modifying any term of the Agreement.

3.      The "Definitions" set forth in Section I of the Agreement are incorporated by reference into this Consent Judgment.  The Commonwealth is a "Settling State" within the meaning of the Agreement.  Unless otherwise defined herein, capitalized terms in this Consent Judgment shall have the same meaning given to them in the Agreement.

4.      The Parties agree that the Court has jurisdiction over the subject matter of the Action and over the Parties with respect to the Action and this Consent Judgment.  This Consent Judgment shall not constitute and shall not be construed or used as a waiver of any jurisdictional defense CVS or any other Released Entity may raise in any other proceeding.

5.      The Court finds that the Agreement was entered into in good faith and is in the public interest, and that entry of this Consent Judgment is in the public interest.  By this Consent Judgment, the Agreement is hereby approved by the Court.

6.      The Commonwealth's Claims against CVS are hereby DISMISSED WITH PREJUDICE, subject to a retention of jurisdiction by the Court as provided herein and in the Agreement.

7.      The Court shall have authority to resolve disputes identified in Section VI.F.2 of the Agreement, governed by the rules and procedures of the Court.

8.      By this Judgment, the relevant funds paid pursuant to this Agreement will be allocated according to the Pennsylvania Opioid Misuse and Addiction Abatement Trust Order, a copy of which is attached hereto as Exhibit B and as incorporated into the Agreement pursuant to Exhibit O of the Agreement.  The Pennsylvania Opioid Misuse and Addiction Abatement Trust Order may be subject to further modification as approved by this Court.

9.      The Parties have satisfied the Condition to Effectiveness of

Agreement set forth in Section VIII of the Agreement and the Release set forth in

Sections XI.A and G of the Agreement, as follows:

a.      The Attorney General of the State exercised the fullest extent of his or her powers to release CVS and all other Released Entities from all Released Claims pursuant to the release attached hereto as Exhibit C (the "*AG Release*").

b.      CVS has determined to proceed with the Agreement.

c.      The Subdivision Participation Agreement for each Participating Subdivision in the State that has joined to date has been made available to CVS. As stated in the Subdivision Participation Agreement, and for the avoidance of doubt, nothing in the Subdivision Participation Agreement executed by the Participating Subdivisions is intended to modify in any way the terms of the Agreement to which the Participating Subdivisions agree. As stated in the Subdivision Participation Agreement, to the extent the terms of the executed version of the Subdivision Participation Agreement differ from the terms of the Agreement in any respect, the terms of the Agreement control.

d.      Pursuant to Section VIII.C of the Agreement and Paragraph 2 of the Subdivision Participation Agreement, each Litigating Subdivision in the State that has become a Participating Subdivision is dismissing with prejudice any Released Claims that it has filed against CVS or any of the Released Entities.

10.     <u>Release</u>.  The Parties acknowledge that the release provisions in Section

XI of the Agreement and the AG Release, which are incorporated by reference

herein, are an integral part of this Consent Judgment. Pursuant to the Agreement

and the AG Release and without limitation and to the maximum extent of the power

of the Commonwealth's Attorney General, CVS and the other Released Entities are,

as of the Effective Date, hereby released from any and all Released Claims of (a) the Commonwealth and its Participating Subdivisions and any of their departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including the Commonwealth's Attorney General, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing, and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts, and other Special Districts in the Commonwealth, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the Commonwealth or any Subdivision in the Commonwealth, whether or not any of them participate in the Agreement.    Pursuant to the Agreement and the AG Release and to the maximum extent of the Commonwealth's power, CVS and the other Released Entities are, as of the Effective Date, hereby released from any and all Released Claims of (1) the Commonwealth, (2) all past and present executive departments, State agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, and (3) any of the

Commonwealth's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Alleged Harms and/or Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution or dispensing license. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the Commonwealth's Governor. Further, the provisions set forth in Section XI of the Agreement are incorporated by reference into this Consent Judgment as if fully set forth herein. The Parties acknowledge, and the Court finds, that those provisions are an integral part of the Agreement and this Consent Judgment, and shall govern the rights and obligations of all participants in the settlement, including without limitation the Commonwealth, CVS and the Released Entities.

11.    <u>Release of Unknown Claims.</u>  The Commonwealth (for itself and its Releasors) expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her,

        would have materially affected his or her settlement with
        the debtor or released party.

The Commonwealth may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the Commonwealth (for itself and its Releasors) expressly waived and fully, finally, and forever settled, released and discharged, through the Agreement and AG Release, any and all Released Claims that may exist as of the Effective Date but which the Commonwealth does not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would have materially affected the Commonwealth's decision to enter into the Agreement.

      12.    The Court finds that the releases are given in good faith and are effective as to all Releasors and Released Entities.

      13.    <u>Costs and Fees.</u>  The Parties will bear their own costs and attorneys' fees except as otherwise provided in the Agreement.

      14.    <u>No Admission of Liability</u>.  CVS is consenting to this Consent Judgment solely for the purpose of effectuating the Agreement, and nothing contained herein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which CVS expressly denies.  Neither CVS nor any other Released Entity admits that it caused or contributed to any public nuisance,

and neither CVS nor any other Released Entity admits any wrongdoing that was or could have been alleged by the Commonwealth, its Participating Subdivisions, or any other person or entity. No part of this Consent Judgment shall constitute evidence of any liability, fault, or wrongdoing by CVS or any other Released Entity. The Parties acknowledge that payments made under the Agreement are not a fine, penalty, or payment in lieu thereof and are properly characterized as described in Section V.F of the Agreement.

15.    No Waiver. This Consent Judgment is entered based on the Agreement without trial or adjudication of any contested issue of fact or law or finding of liability of any kind. This Consent Judgment shall not be construed or used as a waiver of CVS's right, or any other Released Entity's right, to defend itself from, or make any arguments in, any other regulatory, governmental, private individual, or class claims or suits relating to the subject matter or terms of this Consent Judgment. Notwithstanding the foregoing, the Commonwealth may enforce the terms of this Consent Judgment as expressly provided in the Agreement.

16.    No Private Right of Action. This Consent Judgment is not for use by any third party for any purpose, including submission to any court for any purpose, except Participating Subdivisions for the limited purposes set forth in Section VI.A of the Agreement. Except as expressly provided in the Agreement, no portion of the Agreement or this Consent Judgment shall provide any rights to, or be enforceable

by, any person or entity that is not a Settling State or Released Entity. The Commonwealth shall allow Participating Subdivisions in the Commonwealth to notify it of any perceived violations of the Agreement or this Consent Judgment. No Settling State, including the Commonwealth, may assign or otherwise convey any right to enforce any provision of the Agreement.

17.    Admissibility.  This Consent Judgment shall not be admissible in any other case against CVS or any other Released Entity. This Consent Judgment shall not be binding on CVS or any other Released Entity in any respect other than in connection with the enforcement of this Consent Judgment or the Agreement in the Commonwealth. For the avoidance of doubt, nothing herein shall prohibit CVS or any other Released Entity from entering this Consent Judgment or the Agreement into evidence in any litigation or arbitration concerning (1) CVS's right to coverage under an insurance contract or (2) the enforcement of the releases provided for by the Agreement and this Consent Judgment.

18.    Preservation of Privilege.  Nothing contained in the Agreement or this Consent Judgment, and no act required to be performed pursuant to the Agreement or this Consent Judgment, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, patient-safety work product protection, or common interest/joint defense privilege, and each

Party agrees that it shall not make or cause to be made in any forum any assertion to the contrary.

19. <u>Mutual Interpretation</u>. The Parties agree and stipulate that the Agreement was negotiated on an arm's-length basis between parties of equal bargaining power and was drafted jointly by counsel for each Party. Accordingly, the Agreement is incorporated herein by reference and shall be mutually interpreted and not construed in favor of or against any Party.

20. <u>Retention of Jurisdiction</u>. The Court shall retain jurisdiction over the Parties for the limited purpose of the resolution of disputes identified in Section VI.F.2 of the Agreement. The Court shall have jurisdiction over Participating Subdivisions in the Commonwealth for the limited purposes identified in the Agreement.

21. <u>Successors and Assigns</u>. This Consent Judgment is binding on CVS's successors and assigns.

22. <u>Modification</u>. This Consent Judgment shall not be modified (by the Court, by any other court, or by any other means) without the consent of the Commonwealth and CVS. Modification of the Agreement shall be governed by Section XIII.W of the Agreement.

So ORDERED this _____ day of _____, 2024.

BY THE COURT:

_____
                                            J.

**APPROVED, AGREED TO AND PRESENTED BY:**

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL


Date: 2/20/2024          By:    */s/ Neil F. Mara*
                                Neil F. Mara
                                Chief Deputy Attorney General
                                Office of Attorney General
                                1000 Madison Avenue #310
                                Norristown, PA 19403

CVS PHARMACY, INC.

Date: February 8, 2024        By:    */s/ Mark D. Villanueva*_____
                                     Mark D. Villanueva
                                     (Atty I.D. No. 89892)
                                     STRADLEY RONON STEVENS & YOUNG, LLP
                                     2005 Market Street, Suite 2600
                                     Philadelphia, PA  19103
                                     (215) 564-8000
                                     mvillanueva@stradley.com

Date: February 8, 2024        By:    */s/ Steven N. Herman*_____
                                     Steven N. Herman
                                     (Atty I.D. No. 205832)
                                     ZUCKERMAN SPAEDER LLP
                                     1800 M Street, NW, Suite 1000
                                     Washington, DC 22153
                                     (202) 778-1800
                                     sherman@zuckerman.com

Received 2/21/2024 3:00:43 PM Commonwealth Court of Pennsylvania

Filed 2/21/2024 3:00:43 PM Commonwealth Court of Pennsylvania
58 MD 2024

# EXHIBIT A

WITH TECHNICAL CORRECTIONS 02.03.2023

# CVS SETTLEMENT AGREEMENT

## TABLE OF CONTENTS

**Page**

I.    Definitions......................................................................................................2

II.    Participation by States and Condition to Preliminary Agreement .....................14

III.    Injunctive Relief............................................................................................15

IV.    Settlement Payments .....................................................................................16

V.    Allocation and Use of Settlement Payments.....................................................31

VI.    Enforcement..................................................................................................38

VII.    Participation by Subdivisions .........................................................................43

VIII.    Condition to Effectiveness of Agreement and Filing of Consent Judgment ...................46

IX.    Additional Remediation ................................................................................46

X.    Plaintiffs' Attorneys' Fees and Costs .............................................................47

XI.    Release .........................................................................................................47

XII.    Later Litigating Subdivisions; Non-Settling States ..........................................52

XIII.    Miscellaneous ...............................................................................................53

EXHIBIT A – Alleged Harms ............................................................................... A-1

EXHIBIT B – Enforcement Committee Organization Bylaws ..................................B-1

EXHIBIT C – Litigating Subdivision List...............................................................C-1

EXHIBIT D – [Intentionally Omitted] ................................................................... D-1

EXHIBIT E – List of Opioid Remediation Uses ......................................................E-1

EXHIBIT F – List of States and Allocation Percentages ...........................................F-1

EXHIBIT G – Subdivisions Eligible to Receive Direct Allocations from the Subdivision
Fund and Subdivision Fund Allocation Percentages ....................................... G-1

EXHIBIT H – [Intentionally Omitted] ................................................................... H-1

EXHIBIT I – Primary Subdivisions.........................................................................I-1

EXHIBIT J – Illustrative List of Released Entities ...................................................J-1

i

EXHIBIT K – Subdivision Participation Form and Release ...................................................... K-1

EXHIBIT L – Settlement Fund Administrator ........................................................................... L-1

EXHIBIT M – Maximum Payment Amounts................................................................................M-1

EXHIBIT N – Additional Remediation Amount Allocation Percentages ................................. N-1

EXHIBIT O – Adoption of a State-Subdivision Agreement ..................................................... O-1

EXHIBIT P – Injunctive Relief .................................................................................................P-1

EXHIBIT Q – [Intentionally Omitted] ..................................................................................... Q-1

EXHIBIT R – Agreement on Attorneys' Fees, Costs, and Expenses ........................................R-1

EXHIBIT S – Agreement on the State Outside Counsel Fee Fund ........................................... S-1

EXHIBIT T – Agreement on the Joint State Cost Fund ........................................................... T-1

EXHIBIT U – IRS Form 1098-F .............................................................................................. U-1

EXHIBIT V – CVS Settlement Agreement Sign-on Form........................................................ V-1

EXHIBIT W – Non-Litigating Threshold Subdivisions List.................................................... W-1

EXHIBIT X – Governor's Release of Opioid-Related Claims.................................................. X-1

# CVS SETTLEMENT AGREEMENT

This Settlement Agreement, dated as of December 9, 2022 (the "*Agreement*"), sets forth the terms of settlement between and among the Settling States, CVS, and the Participating Subdivisions (as those terms are defined below). Upon satisfaction of the conditions set forth in <u>Section II</u> and <u>Section VIII</u>, this Agreement will be binding on all Settling States, Participating Subdivisions, and CVS. This Agreement will then be submitted for entry as part of Consent Judgments in the respective courts of each of the Settling States, pursuant to the terms set forth in <u>Section VIII</u>.

WHEREAS, certain States and Subdivisions have filed or could file Actions in various forums against CVS raising Claims or allegations concerning, related to, based upon, or in connection with the Alleged Harms and/or the Covered Conduct;

WHEREAS, CVS (i) denies each and all of the Claims and allegations of wrongdoing made by the States and Litigating Subdivisions in each of the Actions and maintains that it has meritorious defenses; (ii) denies all assertions of wrongdoing or liability against CVS arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Actions already brought or that could be brought by any State or Subdivision related to the Covered Conduct and/or Alleged Harms and contends that the factual allegations made in the current Actions relating to CVS are false and materially inaccurate; (iii) denies that any State, Subdivision, or resident thereof was harmed by any conduct of CVS; (iv) denies liability, denies any wrongdoing, and denies it violated any federal or state statute, regulation, or common law; and (v) maintains that CVS would be able to successfully defend against the Claims and allegations at trial, that the facts do not support the allegations, that CVS engaged in no misconduct or unlawful activity, and that CVS caused no harm to any State, Subdivision, or resident thereof;

WHEREAS, the Parties have investigated the facts and analyzed the relevant legal issues regarding the Claims and defenses that have been or could have been asserted in the Actions;

WHEREAS, the Parties have determined that it is preferable to resolve any Claims the States and Subdivisions may have through a cooperative and mutually beneficial settlement that provides funding to remediate Alleged Harms;

WHEREAS, the Parties have each considered the costs, delays and uncertainty associated with the continued prosecution and defense of the Actions;

WHEREAS, the Parties believe the settlement set forth herein avoids the uncertainties of litigation and assures that the benefits reflected herein are obtained;

WHEREAS, the States have concluded that the terms of the settlement are fair, reasonable and adequate and in the best interests of the States and all Subdivisions and citizens and residents of the States;

WHEREAS, the Parties have agreed to the terms herein for the sole purpose of settlement, and nothing herein may be taken as or construed to be an admission or concession of any violation

1

of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing or lack thereof;

WHEREAS, no part of this Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing, or of any lack thereof; and

WHEREAS, unless the contrary is expressly stated, this Agreement is not intended for use by any Party or any third party for any purpose not expressly stated herein, including submission to any court for any purpose other than Court approvals associated with this Agreement.

NOW, THEREFORE, IT IS HEREBY AGREED by and between the Settling States, Participating Subdivisions, and CVS, by and through their respective counsel, as follows:

## I.    Definitions

For all sections of this Agreement except Exhibit E and Exhibit P, the following definitions apply:

A.    "*Actions*" means any lawsuit by a Settling State or Participating Subdivision asserting any Released Claim against one or more Released Entities.

B.    "*Additional Remediation Amount*" means the amount available to the Settling States totaling up to $28,527,739.

C.    "*Advisory Committee*" has the meaning set forth in Section V.E.2.d.

D.    "*Agreement*" has the definition set forth in the preamble, including all exhibits.

E.    "*Alleged Harms*" means the alleged past, present, and future financial and societal harms and related expenditures arising out of the alleged misuse and abuse of Products, non-exclusive examples of which are described in the documents listed on Exhibit A, including those expenditures that have allegedly arisen as a result of the physical and bodily injuries sustained by individuals suffering from opioid-related addiction, abuse, death, and other related diseases and disorders, and that have allegedly been caused by CVS.

F.    "*Allocation Statute*" means a state law that governs allocation, distribution, and/or use of some or all of the Settlement Fund amounts allocated to that State and/or its Subdivisions. In addition to modifying the allocation as set forth in Section V.D.2, an Allocation Statute may, without limitation, contain a Statutory Trust, further restrict expenditures of funds, form an advisory committee, establish oversight and reporting requirements, or address other default provisions and other matters related to the funds. An Allocation Statute is not required to address all three (3) types of funds comprising the Settlement Fund or all default provisions.

G.    "*Annual Payment*" means the total amount payable to the Settlement Fund Administrator by CVS on the Payment Date each year, as calculated by the Settlement Fund Administrator pursuant to Section IV.C.3. For the avoidance of doubt, this term does not include the Additional Remediation Amount, amounts paid pursuant to Section X, amounts paid for the

cost of the Settlement Fund Administrator pursuant to <u>Section V.C.4</u>, or amounts paid for the cost of the Implementation Administrator pursuant to <u>Section VIII.A</u>.

H.    "*Appropriate Official*" has the meaning set forth in <u>Section XIII.F.3</u>.

I.    "*Base Payment*" has the meaning set forth in <u>Section IV.G</u>.

J.    "*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

K.    "*Bar*" means either:  (1) a law barring Subdivisions in a State from maintaining Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and the exercise of such authority in full); or (2) a ruling by the highest court of the State (or, in a State with a single intermediate court of appeals, the intermediate court of appeals when not subject to further review by the highest court of the State) setting forth the general principle that Subdivisions in the State may not maintain any Released Claims against Released Entities, whether on the ground of this Agreement (or the release in it) or otherwise.  For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from payments made by CVS under this Agreement) shall not constitute a Bar.

L.    "*Case-Specific Resolution*" means either:  (1) a law barring the Subdivision at issue from maintaining any Released Claims against any Released Entities (either through a direct bar or through a grant of authority to release claims and the exercise of such authority in full); or (2) a ruling by a court of competent jurisdiction over the Subdivision at issue that the Subdivision may not maintain any Released Claims at issue against any Released Entities, whether on the ground of this Agreement (or the release in it) or otherwise.  For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from payments made by CVS under this Agreement) shall not constitute a Case-Specific Resolution.

M.    "*Claim*" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, *parens patriae* claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, abatement, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

N.    "*Claim-Over*" means a Claim asserted by a Non-Released Entity against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory relating to a Non-Party Covered Conduct Claim asserted by a Releasor.

O.    "*Consent Judgment*" means a state-specific consent judgment in a form to be agreed by the Settling States and CVS prior to the Initial Subdivision Participation Date that, among other things, (1) approves this Agreement and (2) provides for the release set forth in Section XI.A, including the dismissal with prejudice of any Released Claims that the Settling State has brought against Released Entities.

P.    "*Covered Conduct*" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) in any line of business arising from or relating in any way to: (1) the distribution, dispensing, delivery, monitoring, reporting, supply, sale, prescribing, physical security, warehousing, coverage, purchases, reimbursement, discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, and/or any similar act or failure to act related to any Product; the use and/or abuse of any Product; orders, prescriptions, formularies, guidelines, payments and/or rebates for any Product; policies, practices and/or operating procedures, statements, contracts, commercial arrangements, insurance, claim and/or benefit administration, claim adjudication, plan design, data and/or sales thereof, and/or any similar act or failure to act relating to any Product; and/or any system, plan, policy and/or advocacy relating to any Product, including but not limited to unbranded promotion, marketing, programs, and/or campaigns related to any Product and/or class of Products; (2) the characteristics, properties, risks and/or benefits of any Product; (3) the reporting, disclosure, non-reporting and/or non-disclosure to federal, state and/or other regulators of orders and/or prescriptions, theft, diversion and/or any similar conduct related to any Product; (4) the purchasing, selling, acquiring, disposing of, importing, exporting, handling, processing, packaging, supplying, distributing, and/or converting any Product; and (5) controls against diversion, corresponding responsibility, and/or suspicious order monitoring related to any Product.

Q.    "*CVS*" means CVS Health Corporation and CVS Pharmacy, Inc. and all of their past and present direct and indirect parents and subsidiaries.  For the avoidance of doubt, this definition shall not in any way limit the definition of Released Entities.

R.    "*Designated State*" means New York.

S.    "*Effective Date*" means fifteen (15) calendar days after the Reference Date.

T.    "*Eligible State*" means the states, commonwealths, and territories of the United States of America, but excluding Florida, New Mexico, and West Virginia.  Eligible States are listed in Exhibit F-2.  The use of non-capitalized "state" to describe something (*e.g.*, "state court") shall also be read to include parallel entities in commonwealths, territories, and the District of Columbia (*e.g.*, "territorial court").

4

U.      "*Enforcement Committee*" means a committee consisting of certain representatives of the Settling States and of the Participating Subdivisions selected and operating pursuant to the organizational bylaws set forth at Exhibit B.  Notice pursuant to Section XIII.Q shall be provided when there are changes in membership or contact information.

V.      "*Final Order*" means an order or judgment of a court of competent jurisdiction with respect to the applicable subject matter (1) which has not been reversed or superseded by a modified or amended order, is not currently stayed, and as to which any right to appeal or seek *certiorari*, review, reargument, stay, or rehearing has expired, and as to which no appeal or petition for *certiorari*, review, reargument, stay, or rehearing is pending, or (2) as to which an appeal has been taken or petition for *certiorari*, review, reargument, stay, or rehearing has been filed and (a) such appeal or petition for *certiorari*, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which *certiorari*, review, reargument, stay, or rehearing was sought, or (b) the time to appeal further or seek *certiorari*, review, reargument, stay, or rehearing has expired and no such further appeal or petition for *certiorari*, review, reargument, stay, or rehearing is pending.

W.      "*Global Settlement Amount*" means the sum of (a) the Maximum Remediation Payment, (b) the Additional Remediation Amount, and (c) any attorneys' fees and costs set forth in Exhibit R, Exhibit S and Exhibit T.

X.      "*Implementation Administrator*" means the vendor agreed to by CVS and the Enforcement Committee and retained by CVS to provide notice pursuant to Section VII.A and to manage the initial joinder period for Subdivisions, including the issuance and receipt of Subdivision Participation Agreements.

Y.      "*Incentive C Eligible Subdivisions*" has the meaning set forth in Section IV.H.8.e.

Z.      "*Incentive A*" and "*Incentive Payment A*" mean the incentive payment described in Section IV.H.6.

AA.     "*Incentive B*" and "*Incentive Payment B*" mean the incentive payment described in Section IV.H.7.

BB.     "*Incentive C*" and "*Incentive Payment C*" mean the incentive payment described in Section IV.H.8.

CC.     "*Incentive Payment D*" means the incentive payment described in Section IV.H.9.

DD.     "*Incentive Payment D Look-Back Dates*" has the meaning set forth in Section IV.H.9.d.

EE.     "*Initial Participating Subdivision*" means a Subdivision that meets the requirements set forth in Section VII.D.

FF.    "*Initial Subdivision Participation Date*" means ninety (90) calendar days after the Preliminary Agreement Date, unless it is extended by written agreement of CVS and the Enforcement Committee.

GG.    "*Injunctive Relief Terms*" means the terms described in <u>Section III</u> and set forth in <u>Exhibit P</u>.

HH.    "*Later Litigating Subdivision*" means a Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for Alleged Harms to the Subdivision and/or the people thereof) that:  (1) first files a lawsuit bringing a Released Claim against a Released Entity after the Initial Subdivision Participation Date; or (2) adds a Released Claim against a Released Entity after the Initial Subdivision Participation Date to a lawsuit brought before the Initial Subdivision Participation Date that, prior to the Initial Subdivision Participation Date, did not include any Released Claims against a Released Entity; or (3) (a) was a Litigating Subdivision whose Released Claims against Released Entities were resolved by a legislative Bar or legislative Case-Specific Resolution as of the Initial Subdivision Participation Date, (b) such legislative Bar or legislative Case-Specific Resolution is subject to a Revocation Event after the Initial Subdivision Participation Date, and (c) the earlier of the date of completion of opening statements in a trial in an action brought by a Subdivision in that Settling State that includes a Released Claim against a Released Entity or one hundred eighty (180) days from the Revocation Event passes without a Bar or Case-Specific Resolution being implemented as to that Litigating Subdivision or the Litigating Subdivision's Released Claims being dismissed; or (4) (a) was a Litigating Subdivision whose Released Claims against Released Entities were resolved by a judicial Bar or judicial Case-Specific Resolution as of the Initial Subdivision Participation Date, (b) such judicial Bar or judicial Case-Specific Resolution is subject to a Revocation Event after the Initial Subdivision Participation Date, and (c) such Litigating Subdivision takes any action in its lawsuit asserting a Released Claim against a Released Entity other than seeking a stay or dismissal.

II.    "*Later Participating Subdivision*" means a Participating Subdivision that is not an Initial Participating Subdivision, but meets the requirements set forth in <u>Section VII.E</u>.

JJ.    "*Litigating Subdivisions*" means all Subdivisions that have brought any Released Claim against any Released Entities as of the Initial Subdivision Participation Date. Attached as <u>Exhibit C</u> is a list of the Litigating Subdivisions in each Eligible State.  <u>Exhibit C</u> will be updated (including with any corrections) periodically, and a final version of <u>Exhibit C</u> will be attached hereto as of the Initial Subdivision Participation Date.

KK.    "*Maximum Remediation Payment*" means $4,279,160,837, the total amount available to Eligible States for Annual Payments as set forth in <u>Exhibit M-1</u>.[1]  The actual amount paid for Annual Payments is subject to reduction from the Maximum Remediation Payment for

[1]  The total maximum amount of this settlement is up to $5,022,083,578, which includes (i) up to $4,279,160,837 in the Maximum Remediation Payment; (ii) up to $539,457,124 in Common Benefit and Subdivision Attorneys' Fees, Expenses and Costs; (iii) up to $85,583,217 in the State Outside Counsel Fee Fund, State Cost Fund and Additional Remediation Amount; (iv) a credit of $117,882,400 for CVS's settlements with the state of New Mexico, state of West Virginia, and Nassau County and Suffolk County of New York.  In no event shall CVS's payment obligation under this Agreement exceed the sum of (i)-(iii) above ($4,904,201,178).

6

Non-Settling States, unachieved incentive payments, and as otherwise set forth in this Agreement. In no event shall CVS's total Annual Payments under this Agreement ever exceed the Maximum Remediation Payment.

LL.    "*Maximum Annual Remediation Payments*" means the total amount available to Eligible States for Annual Payments in each Payment Year as set forth in the "Total Remediation" column of Exhibit M-1.  In no event shall an Annual Payment in Payment Years 1-5 exceed the Maximum Annual Remediation Payment for that Payment Year set forth in Exhibit M-1.  For Payment Years 6-10, the Annual Payment may exceed the Maximum Annual Remediation Payment for that Payment Year only to the extent needed for Incentive Payment D for a Settling State that has not earned some or all Incentive Payment C in prior Payment Years, having resulted in correspondingly lower Annual Payments in those prior Payment Years.  In no event shall an Annual Payment in Payment Years 6-10 exceed the range set forth in Exhibit M-2 for that Payment Year.  For the avoidance of doubt, in no event shall the Annual Payments in Payment Years 6-10 cause CVS's total Annual Payments to exceed the Maximum Remediation Payment.

MM.    "*National Arbitration Panel*" means the panel comprised as described in Section VI.F.3.b.

NN.    "*National Disputes*" has the meaning set forth in Section VI.F.3.a.

OO.    "*Non-Litigating Subdivision*" means any Subdivision that is neither a Litigating Subdivision nor a Later Litigating Subdivision.

PP.    "*Non-Litigating Threshold Subdivision*" means (a) all Primary Subdivisions with populations equal to or greater than 30,000 that have not brought a Released Claim against any Released Entity as of the Initial Subdivision Participation Date and (b) any other Primary Subdivisions with populations between 10,000 and 30,000 that have not brought a Released Claim against any Released Entity but have brought a claim related to Products, including any Claims related to the Covered Conduct and/or Alleged Harms, against McKesson, AmerisourceBergen, Cardinal Health, Janssen Pharmaceuticals, or any parents, subsidiaries, divisions, predecessors, successors, and assigns of McKesson, AmerisourceBergen, Cardinal Health, or Janssen Pharmaceuticals.  Attached as Exhibit W is a list of the Non-Litigating Threshold Subdivisions in each Eligible State.  Exhibit W will be updated (including with any corrections) periodically, and a final version of Exhibit W will be attached hereto as of the Initial Subdivision Participation Date.

QQ.    "*Non-Participating Subdivision*" means any Subdivision that is not a Participating Subdivision.

RR.    "*Non-Party Covered Conduct Claim*" means a Claim against any Non-Released Entity involving, arising out of, or related to Alleged Harms and/or Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity).

SS.    "*Non-Party Settlement*" means a settlement by any Releasor that settles any Non-Party Covered Conduct Claim and includes a release of any Non-Released Entity.

TT.    "*Non-Released Entity*" means an entity that is not a Released Entity.

7

UU.    "*Non-Settling State*" means any Eligible State that is not a Settling State.

VV.    "*Opioid Remediation*" means care, treatment, and other programs and expenditures (including reimbursement for past such programs or expenditures[2] except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to remediate Alleged Harms, including to (1) address the misuse and abuse of opioid products, (2) treat or mitigate opioid use or related disorders, or (3) mitigate other alleged effects of, including on those injured as a result of, the opioid epidemic.  Exhibit E provides a non-exhaustive list of expenditures that qualify as being paid for Opioid Remediation.  Qualifying expenditures may include reasonable related administrative expenses.

WW.    "*Opioid Tax*" means any tax, assessment, surcharge or any other fee (other than a fixed prospective excise tax or similar tax or fee that has no restriction on pass-through) imposed by a Settling State on a pharmacy's ordering or dispensing of opioid products.  For the avoidance of doubt, an Opioid Tax shall not include a fee that a retail pharmacy pays to become registered or licensed to operate as a retail pharmacy or to dispense controlled substances in a Settling State, or to renew such a registration or license in a Settling State.

XX.    "*Overall Allocation Percentage*" means a Settling State's percentage as set forth in Exhibit F-2.  For the avoidance of doubt, the aggregate Overall Allocation Percentage of all Eligible States (including Settling States and Non-Settling States) shall equal one hundred percent (100%).

YY.    "*Participating Subdivision*" means any Subdivision in a Settling State that joins the Agreement and meets the requirements for becoming a Participating Subdivision under Section VII.B or Section VII.C, as applicable.

ZZ.    "*Participation Percentage of Incentive C Eligible Subdivision Population*" has the meaning set forth in Section IV.H.8.d.

AAA.    "*Participation Percentage of Litigating Subdivision Population*" has the meaning set forth in Section IV.H.7.d.

BBB.    "*Parties*" means CVS and the Settling States (each, a "*Party*").

CCC.    "*Payment Year*" means the calendar year during which the applicable Annual Payment is due pursuant to Section IV.B.  Payment Year 1 is 2023, Payment Year 2 is 2024 and so forth.  References to payment "*for a Payment Year*" mean the Annual Payment due during that year.  References to eligibility "*for a Payment Year*" mean eligibility for Annual Payment during that year.

DDD.    "*Preliminary Agreement Date*" has the meaning set forth in Section II.C.

EEE.    "*Primary Fire District*" means a fire district that covers a population of 25,000, or 0.20% of an Eligible State's population if an Eligible State's population is greater than 18 million.

---

[2] Reimbursement includes amounts paid to any governmental entities for past expenditures or programs.

If not easily calculable from state data sources and agreed to between the Eligible State and CVS, a fire district's population is calculated by dividing the population of the county or counties a fire district serves by the number of fire districts in the county or counties. "Primary Fire Districts" shall mean fire districts as identified in connection with the implementation of the July 21, 2021 Janssen Settlement Agreement.

FFF.    "*Primary Subdivision*" means any General-Purpose Government (including, but not limited to, a municipality, county, county subdivision, city, town, township, parish, village, borough, gore, or any other entities that provide municipal-type government) with a population over 10,000.  Attached as Exhibit I is an agreed list of the Primary Subdivisions in each Eligible State.

GGG.    "*Prior Litigating Subdivision*" means a Subdivision (or Subdivision official) that brought any Released Claim against any Released Entity prior to the Initial Subdivision Participation Date and all such Released Claims were separately settled or finally adjudicated prior to the Initial Subdivision Participation Date; *provided*, *however*, that if the final adjudication was pursuant to a Bar, such Subdivision shall not be considered a Prior Litigating Subdivision. Notwithstanding the prior sentence, CVS and the Settling State of the relevant Subdivision may agree in writing that the Subdivision shall not be considered a Prior Litigating Subdivision.

HHH.    "*Product*" means any chemical substance, whether licit or illicit, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is (1) an opioid or opiate, as well as any product containing any such substance; (2) a benzodiazepine, a muscle relaxer, carisoprodol, zolpidem, or gabapentin; or (3) a combination or "cocktail" of any stimulant or other chemical substance prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates.  "Product" shall include, but is not limited to, any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam, carisoprodol, gabapentin, or any variant of these substances or any similar substance. Notwithstanding the foregoing, nothing in this section prohibits a Settling State from taking administrative or regulatory action related to a benzodiazepine (including, but not limited to, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, and midazolam), a muscle relaxer, carisoprodol, zolpidem, or gabapentin that is wholly independent from the use of such drugs in combination with opioids, provided such action does not seek money (including abatement and/or remediation) for conduct prior to the Effective Date.

III.    "*Reference Date*" means the date on which CVS is to provide notice to the Settling States and the Enforcement Committee of its determination whether to proceed with this Agreement as required by Section VIII.B.  The Reference Date shall be no later than thirty (30) days after the Initial Subdivision Participation Date, unless it is extended by the written agreement of CVS and the Enforcement Committee.

JJJ.   "*Released Claims*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern Covered Conduct and/or Alleged Harms occurring prior to the Initial Subdivision Participation Date.  Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against the Released Entities by any Settling State or any of its Litigating Subdivisions or Litigating Special Districts in any federal, state or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct and/or Alleged Harms, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by a State, any of its Subdivisions or Special Districts, or any Releasors (whether or not such State, Subdivision, Special District, or Releasor has brought such action or proceeding).  Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct and/or Alleged Harms.  The Parties intend that "Released Claims" be interpreted broadly.  This Agreement does not release Claims by private individuals.  It is the intent of the Parties that the use and/or effect of this Agreement in connection with Claims by private individuals be treated in accordance with applicable law.  Released Claims is also used herein to describe Claims brought by a Later Litigating Subdivision or other non-party Subdivision that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

KKK.   "*Released Entities*" means CVS and (1) all of CVS's past and present direct or indirect parents, subsidiaries, divisions, predecessors, successors, and assigns; (2) the past and present direct or indirect parents, subsidiaries, divisions, predecessors, successors, assigns, and joint ventures of any of the foregoing; (3) all of CVS's insurers (solely in their role as insurers with respect to the Released Claims); (4) all of CVS's, or of any entity described in subsection (1), past and present joint ventures; and (5) the respective past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, and employees of any of the foregoing (for actions that occurred during and related to their work for, or employment with, CVS).  Any person or entity described in subsections (3)-(5) shall be a Released Entity solely in the capacity described in such clause and shall not be a Released Entity with respect to its conduct in any other capacity.  For the avoidance of doubt, any joint venture partner of a joint venture in subsection (2) or (4) is not a Released Entity unless such entity independently falls within subsections (1)-(5) above.  An illustrative list of CVS's present joint ventures, subsidiaries, affiliates and predecessor entities is set forth in Exhibit J.  With respect to joint ventures (including predecessor entities), only entities listed on Exhibit J are Released Entities.  Current or former defendants in *In re: National Prescription Opiate Litigation*, No. 1:17-md-2804 (N.D. Ohio) ("*MDL*") (or in other pending litigation asserting a Claim for Covered Conduct, as identified in the *"National Opiate Litigation – Case and Defendant Extract"* provided to CVS by the Plaintiffs' Executive Committee on November 22, 2022) not identified in Exhibit J are not considered Released Entities, *provided, however*, that any CVS entities that fall within clauses (1)-(5) above against whom Released Claims are brought in the MDL on or after December 9, 2022 shall be considered Released Entities even if not listed on Exhibit J.  For the avoidance of doubt, any entity acquired, or joint venture entered into, by CVS before the Initial Subdivision Participation Date is a Released Entity, but any entity acquired, or joint venture entered into, by CVS after the Initial Subdivision Participation Date is not a Released Entity.

10

LLL.    "*Releasors*" means (1) each Settling State; (2) each Participating Subdivision; and (3) without limitation and to the maximum extent of the power of each Settling State's Attorney General and/or Participating Subdivision to release Claims, (a) the Settling State's and Participating Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in their official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts and other Special Districts in a Settling State, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to a Settling State or Subdivision in a Settling State, whether or not any of them participate in the Agreement.  The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision.  Each Settling State's Attorney General represents that he or she has or has obtained (or will obtain no later than the Initial Subdivision Participation Date) the authority set forth in <u>Section XI.G</u>.  In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide the Subdivision Participation Agreement referenced in <u>Section VII</u> providing for a release to the fullest extent of the Participating Subdivision's authority.

MMM.    "*Remediation Accounts Fund*" means the component of the Settlement Fund described in <u>Section V.E</u>.

NNN.    "*Revocation Event*" means, with respect to a Bar, Settlement Class Resolution, or Case-Specific Resolution, a revocation, rescission, reversal, overruling, or interpretation that in any way limits the effect of such Bar, Settlement Class Resolution, or Case-Specific Resolution on Released Claims, or any other action or event that otherwise deprives the Bar, Settlement Class Resolution, or Case-Specific Resolution of force or effect in any material respect.

OOO.    "*Settlement Class Resolution*" means a class action resolution in a court of competent jurisdiction in a Settling State (that is not successfully removed to federal court) with respect to a class of Subdivisions in that Settling State that (1) conforms with that Settling State's statutes, case law, and rules of procedure regarding class actions; (2) is approved and entered as an order of a court of competent jurisdiction in that Settling State and such order has become a Final Order; (3) is binding on all Non-Participating Subdivisions in that Settling State (other than opt outs as permitted under the next sentence); (4) provides that all such Non-Participating Subdivisions may not bring any Released Claims against any Released Entities, whether on the ground of this Agreement (or the releases herein) or otherwise; and (5) does not impose any costs or obligations on CVS other than those provided for in this Agreement, or contain any provision inconsistent with any provision of this Agreement.  If applicable state law requires that opt-out rights be afforded to members of the class, a class action resolution otherwise meeting the foregoing requirements shall qualify as a Settlement Class Resolution unless Subdivisions collectively representing more than one percent (1%) of the total population of that Settling State opt out.  In seeking certification of any Settlement Class, the applicable Settling State and Participating Subdivisions shall make clear that certification is sought solely for settlement

purposes and shall have no applicability beyond approval of the settlement for which certification is sought.  Nothing in this Agreement constitutes an admission by any Party that class certification would be appropriate for litigation purposes in any case or for purposes unrelated to this Agreement.

PPP.  "*Settlement Fund*" means the interest-bearing fund established pursuant to this Agreement into which the payment under Section IV is made.  The Settlement Fund is comprised of the Remediation Accounts Fund, State Fund, and Subdivision Fund.

QQQ.  "*Settlement Fund Administrator*" means the entity that determines the payments and reversions due under Section IV and Section IX, including annually determining the Payout Amount and calculating incentive payments, administers the Settlement Fund, and distributes amounts into three sub-funds (the Remediation Accounts Fund, State Fund, and Subdivision Fund) pursuant to this Agreement.  The duties of the Settlement Fund Administrator shall be governed by this Agreement.  Prior to the Initial Subdivision Participation Date, CVS and the Enforcement Committee shall agree to selection and removal processes for and the identity of the Settlement Fund Administrator, and a detailed description of the Settlement Fund Administrator's duties and responsibilities, including a detailed mechanism for paying the Settlement Fund Administrator's fees and costs, all of which shall be appended to the Agreement as Exhibit L.

RRR.  "*Settling State*" means an Eligible State that has entered into this Agreement with CVS and delivers an executed State Participation Form and executed releases in accordance with Section II.A.

SSS.  "*State Global Allocation Percentage*" means the allocation percentages for all States as set forth in Exhibit F-1, which represents allocations before adjusting for States that are not Eligible States due to prior settlements with CVS (Florida, New Mexico, and West Virginia).

TTT.  "*State Fund*" means the component of the Settlement Fund described in Section V.C.

UUU.  "*State Participation Form*" means the form attached as Exhibit V.

VVV.  "*State Participation Date*" has the meaning set forth in Section II.A.

WWW.  "*State-Subdivision Agreement*" means an agreement that a Settling State reaches with the Subdivisions in that Settling State regarding the allocation, distribution, and/or use of funds allocated to that Settling State and to its Subdivisions.  A State-Subdivision Agreement shall be effective if approved pursuant to the provisions of Exhibit O or if adopted by statute.  Preexisting agreements addressing funds other than those allocated pursuant to this Agreement shall qualify if the approval requirements of Exhibit O are met.  A Settling State and its Subdivisions may revise a State-Subdivision Agreement if approved pursuant to the provisions of Exhibit O, or if such revision is adopted by statute.

XXX.  "*Statewide Payment Amount*" means the amount from an Annual Payment to be paid to a Settling State, its separate types of funds (if applicable), and its Participating Subdivision listed on Exhibit G.

YYY.  "*Statutory Trust*" means a trust fund established by state law to receive funds allocated to a Settling State's Remediation Accounts Fund and restrict any expenditures made using funds from such Settling State's Remediation Accounts Fund to Opioid Remediation, subject to reasonable administrative expenses.  A Settling State may give a Statutory Trust authority to allocate one (1) or more of the three (3) types of funds comprising such State's Settlement Fund, but this is not required.

ZZZ.  "*Subdivision*" means any (1) General-Purpose Government (including, but not limited to, a municipality, county, county subdivision, city, town, township, parish, village, borough, gore, or any other entities that provide municipal-type government), School District, or Special District within a Settling State, and (2) any other subdivision, subdivision official (acting in an official capacity on behalf of the subdivision) or sub-entity of or located within a Settling State (whether political, geographical or otherwise, whether functioning or non-functioning, regardless of population overlap, and including, but not limited to, nonfunctioning governmental units and public institutions) that has filed a lawsuit that includes a Released Claim against a Released Entity in a direct, *parens patriae*, or any other capacity.  "General-Purpose Government," "School District," and "Special District" shall correspond to the "five basic types of local governments" recognized by the U.S. Census Bureau and match the 2017 list of Governmental Units.[3]   The three (3) General-Purpose Governments are county, municipal, and township governments; the two (2) special purpose governments are School Districts and Special Districts.[4]  The terms "Fire District," "Health District," "Hospital District," and "Library District" shall correspond to categories of Special Districts recognized by the U.S. Census Bureau.[5]  References to a Settling State's Subdivisions or to a Subdivision "in," "of," or "within" such Settling State include Subdivisions located within the Settling State even if they are not formally or legally a sub-entity of such Settling State; *provided*, *however*, that a "health district" that includes any of the following words or phrases in its name shall not be considered a Subdivision:  mosquito, pest, insect, spray, vector, animal, air quality, air pollution, clean air, coastal water, tuberculosis, and sanitary.

AAAA.        "*Subdivision Allocation Percentage*" means the portion of a Settling State's Subdivision Fund set forth in Exhibit G that a Subdivision will receive pursuant to Section V.C or Section V.D if it becomes a Participating Subdivision.  The aggregate Subdivision Allocation Percentage of all Subdivisions receiving a Subdivision Allocation Percentage in each State shall equal one hundred percent (100%).  Immediately upon the effectiveness of any State-Subdivision

---

[3] https://www.census.gov/data/datasets/2017/econ/gus/public-use-files.html.

[4] *E.g.*, U.S. Census Bureau, "Technical Documentation:  2017 Public Use Files for State and Local Government Organization" at 7 (noting that "the Census Bureau recognizes five basic types of local governments," that three of those are "general purpose governments" (county governments, municipal governments, and township governments), and that the other two are "school district and special district governments"), https://www2.census.gov/programs-surveys/gus/datasets/2017/2017_gov_org_meth_tech_doc.pdf.

[5] A list of 2017 Government Units provided by the Census Bureau identifies 38,542 Special Districts and categorizes them by "FUNCTION_NAME."  "Govt_Units_2017_Final" spreadsheet, "Special District" sheet, included in "Independent      Governments      -      list      of      governments      with      reference      information," https://www.census.gov/data/datasets/2017/econ/gus/public-use-files.html. As used herein, "fire district" corresponds to Special District function name "24 – Local Fire Protection," "Health District" corresponds to Special District function name "32 – Health," "Hospital District" corresponds to Special District function name "40 – Hospitals," and "Library District" corresponds to Special District function name "52 – Libraries."  *See id.*

13

Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by Section V.D.3 (or upon the effectiveness of an amendment to any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by Section V.D.3) that addresses allocation from the Subdivision Fund, whether before or after the Initial Subdivision Participation Date, Exhibit G will automatically be amended to reflect the allocation from the Subdivision Fund pursuant to the State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by Section V.D.3. The Subdivision Allocation Percentages contained in Exhibit G may not change once notice is distributed pursuant to Section VII.A, except upon the effectiveness of any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by Section V.D.3 (or upon the effectiveness of an amendment to any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by Section V.D.3) that addresses allocation from the Subdivision Fund. For the avoidance of doubt, no Subdivision not listed on Exhibit G shall receive an allocation from the Subdivision Fund and no provision of this Agreement shall be interpreted to create such an entitlement.

BBBB. "*Subdivision Fund*" means the component of the Settlement Fund described in Section V.C.

CCCC. "*Subdivision Participation Agreement*" means the form of agreement attached as Exhibit K that Participating Subdivisions must execute and return to the Implementation Administrator or Settlement Fund Administrator.

DDDD.    "*Threshold Motion*" means a motion to dismiss or equivalent dispositive motion made at the outset of litigation under applicable procedure. A Threshold Motion must include as potential grounds for dismissal any applicable Bar or the relevant release by a Settling State or Participating Subdivision provided under this Agreement and, where appropriate under applicable law, any applicable limitations defense.

EEEE. "*Total Remediation Amount*" means the aggregate amount paid or incurred by CVS hereunder other than amounts paid as attorneys' fees and costs or identified pursuant to Section V.B.2 as being used to pay attorneys' fees, investigation costs or litigation costs.

## II.    Participation by States and Condition to Preliminary Agreement

A.    *Notice to States*. On December 9, 2022, this Agreement shall be distributed to all Eligible States by the Enforcement Committee. The Eligible States' Attorneys General shall then have until December 31, 2022 (the "*State Participation Date*"), to decide whether to become Settling States. Eligible States that determine to become Settling States shall sign a State Participation Form, in the form attached as Exhibit Y, and provide it to CVS and the Enforcement Committee on or before the State Participation Date. The State Participation Date may be extended by the written agreement of CVS and the Enforcement Committee.

B.    *Condition to Preliminary Agreement—Settling States' Determination to Proceed*. Following the State Participation Date, the Settling States on the Enforcement Committee shall determine whether enough Eligible States have agreed to become Settling States to proceed with notice to Subdivisions as set forth in Section VII below. The Settling States shall have full, unfettered, and unilateral discretion to abandon the Agreement, without prejudice, should they

14

determine, based on any criteria or factors they deem relevant, that the Eligible State participation level is insufficient. Within seven (7) calendar days after the State Participation Date, the Settling States shall provide notice to CVS and the Enforcement Committee whether they intend to proceed with the Agreement. Should the Settling States give notice of insufficient Eligible State participation and elect not to proceed, then this Agreement shall have no further effect and all releases, payment obligations, and other commitments or obligations contained herein shall be void.

C. *Condition to Preliminary Agreement—CVS's Determination to Proceed.* If the Settling States elect to proceed, then CVS shall determine whether enough Eligible States have agreed to become Settling States to proceed with notice to Subdivisions as set forth in <u>Section</u> VII below. CVS shall have full, unfettered, and unilateral discretion to abandon the Agreement, without prejudice, should it determine, based on any criteria or factors it deems relevant, that the Eligible State participation level is insufficient. Within seven (7) calendar days after receiving notice of the Settling States' election to proceed pursuant to <u>Section II.B</u>, CVS shall provide notice to the Settling States and the Enforcement Committee whether it intends to proceed with the Agreement. Should CVS give notice of sufficient Eligible State participation and elect to proceed, the date of the notice shall be the Preliminary Agreement Date. Should CVS give notice of insufficient Eligible State participation and elect not to proceed, then this Agreement shall have no further effect and all releases, payment obligations, and other commitments or obligations contained herein shall be void.

D. *Later Joinder by States.* Should the Settling States and CVS elect to proceed with the Agreement, then an Eligible State may become a Settling State after the Preliminary Agreement Date only with the consent of CVS, in its sole discretion. If an Eligible State becomes a Settling State more than sixty (60) calendar days after the Preliminary Agreement Date, but on or before May 31, 2023, then the Subdivisions in that Eligible State that become Participating Subdivisions within ninety (90) calendar days of that Eligible State becoming a Settling State shall be considered Initial Participating Subdivisions. An Eligible State may not become a Settling State after May 31, 2023.

E. *Litigation Activity.* Following the State Participation Date, Eligible States that determine to become Settling States shall make reasonable efforts to cease all litigation activity against the Released Entities, including by jointly seeking stays or severance of Claims against Released Entities, where feasible, and otherwise to minimize such activity by means of agreed deadline extensions and agreed postponement of depositions, document productions, and motion practice if a motion to stay or sever is not feasible or is denied.

## III. Injunctive Relief

A. *Injunctive Relief.* As part of the Consent Judgments, the Parties agree to the entry of the injunctive relief terms as set forth in <u>Exhibit P</u>.

IV.    **Settlement Payments**

A.    *Settlement Fund.*   All payments under this <u>Section IV</u> shall be made into the Settlement Fund, except that, where specified, they shall be made into the Settlement Fund Escrow. The Settlement Fund shall be allocated and used only as specified in <u>Section V</u>.

B.    *Annual Payments by CVS*.

1.    CVS shall make ten (10) Annual Payments, each comprised of base payments and incentive payments as provided in this <u>Section IV</u> and <u>Exhibit M-1</u>; *provided that* the Annual Payment in Payment Year 1 shall consist solely of base payments.  As a result, and as set forth in <u>Exhibit M-1</u>, base payments in Payment Years 2 through 10 are less than base payments in Payment Year 1 to ensure they do not exceed thirty-eight percent (38%) of each Settling State's allocable share of the Maximum Remediation Amount.

2.    In no instance shall CVS's Annual Payment obligation exceed the Maximum Annual Remediation Payments, reduced for Non-Settling States, except as specified in the definition of "Maximum Annual Remediation Payments" for Payment Years 6-10.  In no instance shall the sum of CVS's Annual Payment obligations exceed the Maximum Remediation Payment, reduced for Non-Settling States.

C.    *Settlement Fund Payment Process*

1.    To determine each Annual Payment for Payment Year 2 forward, the Settlement Fund Administrator shall use the data as of April 30 of the Payment Year for each Annual Payment, unless another provision of the Agreement specifies a different date. Prior to the Effective Date, the Parties will include an exhibit to the Agreement setting forth in detail the process for the Settlement Fund Administrator obtaining relevant data and for distributing funds to Settling States and Participating Subdivisions listed on <u>Exhibit G</u> consistent with the terms of this Agreement as quickly as practical.

2.    The Settlement Fund Administrator shall determine the Annual Payment and the Statewide Payment Amount for each Settling State, consistent with the provisions in <u>Exhibit L</u>, by:

a.    determining, for each Settling State, the amount of base payments and incentive payments to which the State is entitled by applying the criteria in this Section;

b.    applying any reductions or offsets required by <u>Section IV</u> and <u>Section XII</u>; and

c.    determining the total amount owed by CVS to all Settling States and Participating Subdivisions listed on <u>Exhibit G</u>.

3.    As soon as possible, but no later than forty-five (45) days prior to the Payment Date, the Settlement Fund Administrator shall give notice to CVS, the Settling

States, and the Enforcement Committee of the amount of the Annual Payment, and the Statewide Payment Amount for each Settling State, following the determination described in Section IV.C.2, and the following timeline shall apply:

a.    Within twenty-one (21) days of the notice provided by the Settlement Fund Administrator, CVS, any Settling State or the Enforcement Committee may dispute, in writing, the calculation of the Annual Payment, or the Statewide Payment Amount for a Settling State.  Such disputing party must provide a written notice of dispute to the Settlement Fund Administrator, the Enforcement Committee, any affected Settling State, and CVS identifying the nature of the dispute, the amount of money that is disputed, and the Settling State(s) affected.

b.    Within twenty-one (21) days of the sending of a written notice of dispute, any affected party may submit a response, in writing, to the Settlement Fund Administrator, the Enforcement Committee, any affected Settling State, and CVS identifying the basis for disagreement with the notice of dispute.

c.    If no response is filed, the Settlement Fund Administrator shall adjust the amount calculated consistent with the written notice of dispute, and CVS shall pay the adjusted amount as the Annual Payment on the Payment Date. If a written response to the written notice of dispute is timely sent to the Settlement Fund Administrator, the Settlement Fund Administrator shall notify CVS of the preliminary amount to be paid, which shall be the greater of the amount originally calculated by the Settlement Fund Administrator or the amount that would be consistent with the notice of dispute, *provided, however,* that in no circumstances shall the preliminary amount to be paid be higher than the Maximum Annual Payment.  For the avoidance of doubt, a transfer of payments from the Settlement Fund Escrow for other Payment Years does not count toward determining whether the amount to be paid is higher than the Maximum Annual Remediation Payments.

d.    The Settlement Fund Administrator shall place any disputed amount of the preliminary amount paid by CVS into the Settlement Fund Escrow and shall disburse any undisputed amount to each Settling State and its Participating Subdivisions listed on Exhibit G.

e.    At any time before the Payment Date for an Annual Payment, CVS and the Enforcement Committee may agree on the amount of the Annual Payment and the Statewide Payment Amount for each Settling State.  If such agreement is reached, CVS and the Enforcement Committee shall inform the Settlement Fund Administrator, and the Settlement Fund Administrator shall treat those amounts as the determination described in Section IV.C.2.

4.    If a Settling State informs the Settlement Fund Administrator that it and its Participating Subdivisions listed on Exhibit G have reached consensus on the amount of its Statewide Payment Amount, determined pursuant to Section IV.C.2 or Section IV.C.3, to be distributed to the Settling State, among its separate types of funds (if applicable), and among its Participating Subdivisions listed on Exhibit G, the Settlement Fund

17

Administrator shall disburse the Statewide Payment Amount pursuant to the consensus distribution amounts provided by the Settling State.  For a Settling State that does not so notify the Settlement Fund Administrator, the Settlement Fund Administrator shall allocate the Settling State's Statewide Payment Amount, pursuant to <u>Section V</u>, among the separate types of funds for the Settling State (if applicable), and among its Participating Subdivisions listed on <u>Exhibit G</u> using the following procedures:

        a.      As soon as possible for each payment and following the determination described in <u>Section IV.C.2</u> or <u>Section IV.C.3</u>, the Settlement Fund Administrator shall give notice to the relevant Settling States and their Participating Subdivisions listed on <u>Exhibit G</u> of the amount to be received by each Settling State, the amount to be received by the separate types of funds for each Settling State (if applicable), and the amount to be received by each Participating Subdivision listed on <u>Exhibit G</u> for each Settling State.

        b.      Within twenty-one (21) days of the notice provided by the Settlement Fund Administrator, any Settling State or Participating Subdivision listed on <u>Exhibit G</u> may dispute, in writing, the calculation of the amount to be received by the relevant Settling State and/or its Participating Subdivision listed on <u>Exhibit G</u>.  A dispute will be deemed invalid and disregarded if it challenges the allocations adopted by a State-Subdivision Agreement approved pursuant to the provisions of <u>Exhibit O</u> or by statute.  Such disputing party must provide a written notice of dispute to the Settlement Fund Administrator, any affected Settling State, and any affected Participating Subdivision identifying the nature of the dispute, the amount of money that is disputed, and the Settling State(s) affected.

        c.      Within twenty-one (21) days of the sending of a written notice of dispute, any affected Settling State or any affected Participating Subdivision may submit a response, in writing, to the Settlement Fund Administrator, any affected Settling State and any affected Participating Subdivision identifying the basis for disagreement with the notice of dispute.

        d.      If no response is filed, the Settlement Fund Administrator shall adjust the amount calculated consistent with the written notice of dispute.

        e.      The Settlement Fund Administrator shall place any disputed amount into the Settlement Fund Escrow and shall disburse any undisputed amount to the Settling State and its Participating Subdivisions eligible for payment.

    5.      Disputes described in this subsection (other than those for which no response is filed under <u>Section IV.C.3.c</u> or <u>Section IV.C.4.d)</u> shall be resolved in accordance with the terms of <u>Section VI</u>.

    6.      The Settlement Fund Administrator may combine the disbursements of Annual Payments with disbursement of funds under other comparable opioid settlements. In determining when disbursements for each Annual Payment will be made, the Settlement Fund Administrator may take into account the timeline for the availability of disbursements

under other comparable opioid settlements.  No such disbursement determinations by the Settlement Fund Administrator shall impact in any respect the amount, composition, or determination of an Annual Payment under this Agreement or CVS's obligations under this Agreement.

7.     For the avoidance of doubt, Subdivisions not listed on Exhibit G shall not receive and are not eligible to receive an allocation from the Subdivision Fund and no provision of this Agreement shall be interpreted to create such an entitlement.

D.     *Payment Date and Procedure for Annual Payment in Payment Year 1.*  The procedure described in Section IV.C.2 and Section IV.C.3 for determining the amount of the Annual Payment shall not apply to Payment Year 1.  The procedure in lieu of Section IV.C.2 and Section IV.C.3 for determining the amount of the Annual Payment for Payment Year 1 is as set forth here.  The Payment Date for Payment Year 1 is June 30, 2023 or the Effective Date, whichever is later.  On or before such date, and *provided that* the conditions set forth in Section II.B, Section II.C, Section VIII.B, and Section VIII.C have been satisfied, CVS shall deposit into the Settlement Fund the Maximum Annual Remediation Payment for Payment Year 1 as specified in Exhibit M-1 (which, again, shall consist only of base payments).  The excess amount paid in Payment Year 1—including without limitation any amounts allocable to Non-Settling States— shall be deducted from the Annual Payment for Payment Year 2, along with any other deductions or reductions to the Annual Payment for Payment Year 2.

E.     *Payment Date for Payment Years 2 through 10.*  The Payment Date for Payment Years 2 through 10 is June 30 of each Payment Year or thirty (30) calendar days from when the Settlement Fund Administrator gives notice to CVS of the amount of the Annual Payment for a Payment Year, whichever is later.  The Annual Payments for those Payment Years shall be made pursuant to the process set forth in Section IV.C.

F.     *Offsets to Annual Payments to the Settlement Fund for Non-Settling States.*  An offset equal to the Maximum Remediation Payment of $4,279,160,837 times the Overall Allocation Percentage assigned to each Non-Settling State in Exhibit F-2 shall be deducted from the total amount to be paid by CVS to the Settlement Fund.  Non-Settling States shall not be eligible for any payments or have any rights in connection with this Agreement.  Accordingly, the Maximum Annual Remediation Payments specified in Exhibit M-1 are reduced by the aggregate Overall Allocation Percentage of Non-Settling States as set forth in Exhibit F-2.

G.     *Base Payments.*

1.     CVS shall make base payments into the Settlement Fund in an amount equal to thirty-eight percent (38%) of the Maximum Remediation Payment of $4,279,160,837 minus any offsets for Non-Settling States specified in Section IV.F. The maximum total for base payments is $1,626,081,118.  The base payments shall be due in annual installments consistent with Exhibit M-1 over the ten (10) Payment Years, subject to potential offsets for Non-Settling States as provided in Section IV.F.

19

2.    Each Settling State's total base payments for all Payment Years shall not exceed thirty-eight percent (38%) of each Settling State's Overall Allocation Percentage times the Maximum Remediation Payment.

3.    The base payment for any Settling State in each Payment Year shall be the base payment for that Payment Year specified in Exhibit M-1 times the Settling State's Overall Allocation Percentage specified in Exhibit F-2.

H.    *Incentive Payments.*

1.    CVS shall make potential incentive payments into the Settlement Fund, totaling up to a maximum of sixty-two percent (62%) of the Maximum Remediation Payment of $4,279,160,837, minus any offsets for Non-Settling States specified in Section IV.F, with the actual incentive payment amount depending on whether and the extent to which the criteria set forth below are met in each Settling State.  The potential maximum total for incentive payments is and cannot exceed $2,653,079,719.

2.    A Settling State qualifies to receive incentive payments in addition to base payments if it meets the incentive eligibility requirements specified below.  The maximum total Incentive Payment for any Settling State shall be no more than the maximum total for incentive payments listed in Section IV.H.1 times the Settling State's Overall Allocation Percentage specified in Exhibit F-2.  Incentive payments are state-specific, with the actual amount depending on whether and the extent to which the criteria set forth below are met in such Settling State.

3.    The incentive payments shall be available from four (4) categories, referred to as Incentive Payments A, B, C, and D.  Incentive Payments A, B, and C will be due in annual installments over the nine (9) Payment Years beginning with Payment Year 2, and Incentive Payment D will be due in installments over five (5) years beginning with Payment Year 6, as shown on Exhibit M-1.  The total amount of incentive payments in an Annual Payment shall be the sum of the incentive payments for which individual Settling States are eligible for that Payment Year under the criteria set forth below.  The incentive payments shall be determined with respect to a specific Settling State based on its eligibility for that Payment Year under the criteria set forth below.  For the avoidance of doubt, eligibility for Incentive Payments A, B, C, and D shall be determined on a Settling State-by-Settling State basis and for each Payment Year as set forth below.  Except to the limited extent provided below for Incentives A (see Section IV.H.6.c) and D (see Section IV.H.9.j), a Settling State may not earn and shall not be paid in any later Payment Year an annual incentive payment for a prior Payment Year, or any portion thereof, that it failed to qualify for in that prior Payment Year.

4.    A Settling State may either qualify for Incentive Payment A, or it can alternatively qualify for Incentive Payments B, C, and/or D.  A Settling State will be eligible for its full allocable share of the maximum amount available for incentive payments by either (a) achieving Incentive Payment A within two (2) years of the Effective Date or (b) by fully earning Incentive Payment B in each Payment Year it is available and

earning Incentive Payments C and D in a manner that produces that maximum possible combined amount from those two incentives.

5.      The following time periods apply to Incentive Payments B and C:

a.      Period 1: Zero to two hundred ten (210) days after the Effective Date.

b.      Period 2: Two hundred eleven (211) days to one year after the Effective Date.

c.      Period 3: One year and one day after the Effective Date to April 30, 2027.

6.      Incentive Payment A.

a.      Incentive Payment A is mutually exclusive with Incentive Payments B, C, and D; if a Settling State receives Incentive Payment A in an Annual Payment, such Settling State is not eligible for Incentive Payments B, C, or D in that Annual Payment.

b.      Incentive Payment A shall be up to a maximum of sixty-two percent (62%) of the Maximum Remediation Payment of $4,279,160,837, minus any offsets for Non-Settling States specified in Section IV.F, with the actual amount depending on whether and the extent to which the criteria set forth below are met in each Settling State.  The potential maximum total for Incentive Payment A is $2,653,079,719.

c.      The Incentive Payment A for any Settling State in each Payment Year shall be the Incentive Payment A for that Payment Year specified in Exhibit M-1 times the Settling State's Overall Allocation Percentage specified in Exhibit F-2, provided such Settling State achieves Incentive Payment A by two (2) years after the Effective Date.  If a Settling State achieves Incentive Payment A after April 30, 2024 but before two (2) years after the Effective Date, it shall receive a catch-up payment as part of the next Annual Payment for the difference between what it would have earned had it qualified for Incentive Payment A for Payment Year 2 and what it was actually paid for Payment Year 2.  The Settlement Fund Administrator shall decrease the catch-up payments payable pursuant to this Section IV.H.6.c to the extent they cannot be paid without exceeding an applicable payment limit shown in Exhibit M-1 for the next Payment Year.

d.      A Settling State is eligible for Incentive Payment A if: (i) there is a Bar in that State in full force and effect; (ii) there is a Settlement Class Resolution in that State in full force and effect; (iii) there is a ruling from the State's highest court barring all Subdivisions from bringing or maintaining Released Claims; (iv) the Released Claims of all of the following entities are released through the execution of Subdivision Participation Agreements:  (1) all Litigating Subdivisions,

21

(2) all Non-Litigating Primary Subdivisions, (3) all non-litigating School Districts with a K-12 student enrollment of at least 25,000 or 0.10% of a State's population, whichever is greater, (4) all non-litigating health districts and hospital districts that have at least one hundred twenty-five (125) hospital beds in one or more hospitals rendering services in that district, and (5) all Primary Fire Districts; or (v) a combination of the actions in clauses (i)-(iv) has achieved the same level of resolution of Claims by Subdivisions (*e.g.*, a Bar against future litigation combined with full joinder by Litigating Subdivisions). For the avoidance of doubt, subsection (iv) cannot be satisfied unless all Litigating Subdivisions are Participating Subdivisions or there is a Case-Specific Resolution against any such Subdivisions that are not Participating Subdivisions.

e.      A Settling State that does not achieve Incentive Payment A as of two (2) years after the Effective Date shall not be eligible for, and shall not receive, Incentive Payment A for any Payment Year.

f.      CVS shall acknowledge on or before the Initial Subdivision Participation Date the sufficiency of any existing Bars in Settling States, provided that such States shall have provided no less than 30 days' notice to CVS of such Bars. Any other Settling State that believes it qualifies for Incentive Payment A by two (2) years after the Effective Date shall provide prompt notice to CVS, the Enforcement Committee, and the Settlement Fund Administrator, including data sources or other information establishing such Settling State's entitlement to Incentive Payment A. CVS and the Enforcement Committee shall meet and confer in order to agree on data sources for purposes of this Section prior to the Preliminary Agreement Date.

g.      If CVS made a payment under Incentive Payment A solely on the basis of a Bar or Settlement Class Resolution in a Settling State and that Bar or Settlement Class Resolution is subsequently subject to a Revocation Event, that Settling State shall not be eligible for Incentive Payment A thereafter, unless the State requalifies for Incentive Payment A through any method pursuant to <u>Section IV.H.6.d</u>, in which case the Settling State shall be eligible for Incentive Payment A less any litigation fees and costs incurred by CVS in the interim, except that, if the re-imposition occurs after the completion of opening statements in a trial involving a Released Claim, the Settling State shall not be eligible for Incentive Payment A (unless this exception is waived by CVS).

7.      <u>Incentive Payment B</u>.

a.      Incentive Payment B shall be available to Settling States that do not qualify for Incentive Payment A.

b.      Incentive Payment B shall be up to a potential maximum of twenty-eight percent (28%) of the Maximum Remediation Payment of $4,279,160,837 minus any offsets for Non-Settling States specified in <u>Section IV.F</u>, with the actual amount depending on whether and the extent to which the criteria set forth below

are met in each Settling State. The potential maximum total for Incentive Payment B is $1,198,165,035.

c.  The potential maximum Incentive Payment B for any Settling State in each Payment Year shall be the Incentive Payment B for that Payment Year specified in <u>Exhibit M-1</u> times the Settling State's Overall Allocation Percentage specified in <u>Exhibit F-2</u>, provided such Settling State becomes eligible for Incentive Payment B by April 30 of the Payment Year or April 30, 2027, whichever is earlier. The Incentive Payment B for any Settling State that qualifies for Incentive Payment B is subject to reduction in accordance with <u>Section IV.H.7.f</u>, <u>Section IV.H.7.g</u>, and <u>Section IV.H.7.h</u>.

d.  For Payment Years 2 through 5, the calculations specified by this <u>Section IV.H.7</u> shall be based on a Settling State's Participation Percentage of Litigating Subdivision Population[6] as of April 30 of that Payment Year. For Payment Years 6 through 10, the calculations specified by this <u>Section IV.H.7</u> shall be based on a Settling State's Participation Percentage of Litigating Subdivision Population as of April 30, 2027.

e.  A Settling State qualifies for an Incentive Payment B if Litigating Subdivisions collectively representing at least eighty-five percent (85%) of the Settling State's Litigating Subdivision population are either Participating Subdivisions or have their Claims resolved through Case-Specific Resolutions.

f.  <u>Within Period 1</u>: If Litigating Subdivisions collectively representing at least eighty-five percent (85%) of a Settling State's Litigating Subdivision population are Participating Subdivisions, or have their Claims resolved through Case-Specific Resolutions, during Period 1, then a sliding scale will determine the share of the Settling State's maximum Incentive Payment B for a Payment Year that it has earned. Under that sliding scale, if Litigating Subdivisions collectively representing eighty-five percent (85%) of a Settling State's Litigating Subdivision population become Participating Subdivisions, or achieve Case-Specific Resolution status, by the end of Period 1, a Settling State will receive twenty percent (20%) of its maximum Incentive Payment B for each Payment Year. If more Litigating

---

[6] The "Participation Percentage of Litigating Subdivision Population" shall be determined by the aggregate population of a Settling State's Litigating Subdivisions (including without limitation School Districts and Special Districts) that are Participating Subdivisions, or have their Claims resolved through Case-Specific Resolutions, divided by the aggregate population of that Settling State's Litigating Subdivisions (including without limitation School Districts and Special Districts). In calculating the Settling State's population that resides in Litigating Subdivisions, the population of the Settling State's Litigating Subdivisions shall be the sum of the population of all Litigating Subdivisions in the Settling State, notwithstanding that persons may be included within the population of more than one Litigating Subdivision. An individual Litigating Subdivision shall not be included more than once in the numerator, and shall not be included more than once in the denominator, of the calculation regardless if it (or any of its officials) is named as multiple plaintiffs in the same lawsuit; *provided*, *however*, that for the avoidance of doubt, no Litigating Subdivision will be excluded from the numerator or denominator under this sentence unless a Litigating Subdivision otherwise counted in the denominator has the authority to release the Claims (consistent with <u>Section XI</u>) of the Litigating Subdivision to be excluded.

WITH TECHNICAL CORRECTIONS 02.03.2023

Subdivisions become Participating Subdivisions, or achieve Case-Specific Resolution status, the Settling State shall receive an increased percentage of the maximum Incentive Payment B for each Payment Year as shown in the table below.

| Participation Percentage of Litigating Subdivision Population | Incentive Payment B Percentage |
|---|---|
| Participation of less than 85% | Payment of 0% of Incentive B |
| Participation of 85% but less than 86% | Payment of 20% of Incentive B |
| Participation of 86% but less than 87% | Payment of 30% of Incentive B |
| Participation of 87% but less than 88% | Payment of 33% of Incentive B |
| Participation of 88% but less than 89% | Payment of 36% of Incentive B |
| Participation of 89% but less than 90% | Payment of 40% of Incentive B |
| Participation of 90% but less than 91% | Payment of 43% of Incentive B |
| Participation of 91% but less than 92% | Payment of 46% of Incentive B |
| Participation of 92% but less than 93% | Payment of 50% of Incentive B |
| Participation of 93% but less than 94% | Payment of 55% of Incentive B |
| Participation of 94% but less than 95% | Payment of 58% of Incentive B |
| Participation of 95% but less than 96% | Payment of 60% of Incentive B |
| Participation of 96% but less than 97% | Payment of 70% of Incentive B |
| Participation of 97% but less than 98% | Payment of 75% of Incentive B |
| Participation of 98% but less than 99% | Payment of 85% of Incentive B |
| Participation of 99% but less than 100% | Payment of 95% of Incentive B |
| Participation of 100% | Payment of 100% of Incentive B |

g.      Within Period 2: If a Settling State did not qualify for Incentive Payment B in Period 1, but Litigating Subdivisions collectively representing at least eighty-five percent (85%) of the Settling State's Litigating Subdivision population become Participating Subdivisions, or achieve Case-Specific Resolution status, by the end of Period 2, then the Settling State qualifies in each Payment Year for seventy-five percent (75%) of the Incentive Payment B it would have qualified for in Period 1.  If a Settling State qualifies for Incentive Payment B in Period 1 and increases its Participation Percentage of Litigating Subdivision Population in Period 2, the additional Incentive Payment B for each Payment Year shall be eighty-seven and one-half percent (87.5%) of the difference between (i) the Incentive Payment B calculated pursuant to Section IV.H.7.f in Period 2 and (ii) the Incentive Payment B calculated pursuant to Section IV.H.7.f at the end of Period 1.

h.      Within Period 3: If a Settling State did not qualify for an Incentive Payment B in Periods 1 or 2, but Litigating Subdivisions collectively representing at least eighty-five percent (85%) of the Settling State's Litigating Subdivision population become Participating Subdivisions, or achieve Case-Specific Resolution status, by the end of Period 3, then the Settling State qualifies for fifty percent (50%) of the Incentive Payment B it would have qualified for in Period 1.  If a

24

Settling State qualifies for Incentive Payment B in Period 2 and increases its Participation Percentage of Litigating Subdivision Population in Period 3, the additional Incentive Payment B in each Payment Year shall be seventy-five percent (75%) of the difference between (i) the Incentive Payment B calculated pursuant to Section IV.H.7.f in Period 3 and (ii) the Incentive Payment B calculated pursuant to Section IV.H.7.f at the end of Period 2.

i.    For the avoidance of doubt, an increase in a Settling State's Participation Percentage of Litigating Subdivision Population in Periods 2 and/or 3 from an earlier Period entitles the Settling State to receive the Incentive Payment B Percentage it had earned as of the end of the earlier Period plus the additional Incentive Payment B Percentage specified by the calculations in Section IV.H.7.g and Section IV.H.7.h.

j.    If a Settling State has not qualified for Incentive Payment B by April 30, 2027, it shall no longer be eligible to qualify for and shall not receive any Incentive Payment B for any Payment Year.

k.    If there are no Litigating Subdivisions in a Settling State, and that Settling State is otherwise eligible for Incentive Payment B, that Settling State will receive its maximum Incentive Payment B for that Annual Payment provided by Section IV.H.7.c.

8.    Incentive Payment C.

a.    Incentive Payment C shall be available to Settling States that do not qualify for Incentive Payment A.

b.    Incentive Payment C shall be equal to up to a potential maximum of twenty-eight percent (28%) of the Maximum Remediation Payment of $4,279,160,837 minus any offsets for Non-Settling States specified in Section IV.F, with the actual amount depending on whether and the extent to which the criteria set forth below are met in each Settling State. The potential maximum total for Incentive Payment C is $1,198,165,035.

c.    The potential maximum Incentive Payment C for any Settling State in each Payment Year shall be the Incentive Payment C for that Payment Year specified in Exhibit M-1 times the Settling State's Overall Allocation Percentage specified in Exhibit F-2, provided such Settling State becomes eligible for Incentive Payment B by April 30 of the Payment Year or April 30, 2027, whichever is earlier. The maximum Incentive Payment C for any Settling State that qualifies for Incentive Payment C is subject to reduction in accordance with Section IV.H.8.f, Section IV.H.8.g, and Section IV.H.8.h.

d.    For Payment Years 2 through 5, the calculations specified by this Section IV.H.8 shall be based on the participation percentage of a Settling State's Non-Litigating Threshold population and its Litigating Subdivision population

25

("*Participation Percentage of Incentive C Eligible Subdivision Population*")[7] as of April 30 of that Payment Year. For Payment Years 6 through 10, the calculations specified by this <u>Section IV.H.8</u> shall be based on a Settling State's Participation Percentage of Incentive C Eligible Subdivision Population as of April 30, 2027.

      e.      Incentive Payment C shall be available depending on the percentage of the aggregate population of a Settling State's Non-Litigating Threshold Subdivisions and Litigating Subdivisions (including without limitation School Districts and Special Districts) that are Participating Subdivisions or have their Claims resolved through Case-Specific Resolutions (the "*Incentive C Eligible Subdivisions*"). A Settling State qualifies for an Incentive Payment C if Incentive C Eligible Subdivisions collectively representing at least eighty-five percent (85%) of the Settling State's Incentive C Eligible Subdivision population are either Participating Subdivisions or have their Claims resolved through Case-Specific Resolutions.

      f.      <u>Within Period 1</u>: If Incentive C Eligible Subdivisions collectively representing at least eighty-five percent (85%) of a Settling State's Incentive C Eligible Subdivision population are Participating Subdivisions, or have their Claims resolved through Case-Specific Resolutions, during Period 1, then a sliding scale will determine the share of the Settling State's maximum Incentive Payment C for a Payment Year that it has earned. Under that sliding scale, if Incentive C Eligible Subdivisions collectively representing eighty-five percent (85%) of a Settling State's Incentive C Eligible population become Participating Subdivisions or achieve Case-Specific Resolution status by the end of Period 1, a Settling State will receive twenty percent (20%) of its maximum Incentive Payment C for each Payment Year. If more Incentive C Eligible Subdivisions become Participating Subdivisions, or achieve Case-Specific Resolution status, the Settling State shall receive an increased percentage of the maximum Incentive Payment C for each Payment Year as shown in the table below.

---

[7] The "Participation Percentage of Incentive C Eligible Subdivision Population" shall be determined by the aggregate population of a Settling State's Non-Litigating Threshold Subdivisions and Litigating Subdivisions (including without limitation School Districts and Special Districts) that are Participating Subdivisions, or have their Claims resolved through Case-Specific Resolutions, divided by the aggregate population of that Settling State's Non-Litigating Threshold Subdivisions and Litigating Subdivisions (including without limitation School Districts and Special Districts). In calculating the Settling State's population that resides in Non-Litigating Threshold Subdivisions and Litigating Subdivisions, the population of the Settling State's Non-Litigating Threshold Subdivisions and Litigating Subdivisions shall be the sum of the population of all Non-Litigating Threshold Subdivisions and Litigating Subdivisions in the Settling State, notwithstanding that persons may be included within the population of more than one Non-Litigating Threshold Subdivisions and Litigating Subdivision. An individual Non-Litigating Threshold Subdivisions or Litigating Subdivision shall not be included more than once in the numerator, and shall not be included more than once in the denominator, of the calculation regardless if it (or any of its officials) is named as multiple plaintiffs in the same lawsuit; *provided*, *however*, that for the avoidance of doubt, no Non-Litigating Threshold Subdivision or Litigating Subdivision will be excluded from the numerator or denominator under this sentence unless a Non-Litigating Threshold Subdivision or Litigating Subdivision otherwise counted in the denominator has the authority to release the Claims (consistent with <u>Section XI</u>) of the Non-Litigating Threshold Subdivision or Litigating Subdivision to be excluded.

| Participation Percentage of Incentive C Eligible Subdivision Population | Incentive Payment C Percentage |
|---|---|
| Participation of less than 85% | Payment of 0% of Incentive C |
| Participation of 85% but less than 86% | Payment of 20% of Incentive C |
| Participation of 86% but less than 87% | Payment of 30% of Incentive C |
| Participation of 87% but less than 88% | Payment of 33% of Incentive C |
| Participation of 88% but less than 89% | Payment of 36% of Incentive C |
| Participation of 89% but less than 90% | Payment of 40% of Incentive C |
| Participation of 90% but less than 91% | Payment of 43% of Incentive C |
| Participation of 91% but less than 92% | Payment of 46% of Incentive C |
| Participation of 92% but less than 93% | Payment of 50% of Incentive C |
| Participation of 93% but less than 94% | Payment of 55% of Incentive C |
| Participation of 94% but less than 95% | Payment of 58% of Incentive C |
| Participation of 95% but less than 96% | Payment of 60% of Incentive C |
| Participation of 96% but less than 97% | Payment of 70% of Incentive C |
| Participation of 97% but less than 98% | Payment of 75% of Incentive C |
| Participation of 98% but less than 99% | Payment of 85% of Incentive C |
| Participation of 99% but less than 100% | Payment of 95% of Incentive C |
| Participation of 100% | Payment of 100% of Incentive C |

g.    Within Period 2: If a Settling State did not qualify for Incentive Payment C in Period 1, but Incentive C Eligible Subdivisions collectively representing at least eighty-five percent (85%) of the Settling State's Incentive C Eligible Subdivision population become Participating Subdivisions, or achieve Case-Specific Resolution status, by the end of Period 2, then the Settling State qualifies in each Payment Year for seventy-five percent (75%) of the Incentive Payment C it would have qualified for in Period 1.  If a Settling State qualifies for Incentive Payment C in Period 1 and increases its Participation Percentage of Incentive C Eligible Subdivision Population in Period 2, the additional Incentive Payment C for each Payment Year shall be eighty-seven and one-half percent (87.5%) of the difference between (i) the Incentive Payment C calculated pursuant to Section IV.H.8.f in Period 2 and (ii) the Incentive Payment C calculated pursuant to Section IV.H.8.f at the end of Period 1.

h.    Within Period 3: If a Settling State did not qualify for an Incentive Payment C in Periods 1 or 2, but Incentive C Eligible Subdivisions collectively representing at least eighty-five percent (85%) of the Settling State's Incentive C Eligible Subdivision population become Participating Subdivisions, or achieve Case-Specific Resolution status, by the end of Period 3, then the Settling State qualifies for fifty percent (50%) of the Incentive Payment C it would have qualified for in Period 1.  If a Settling State qualifies for Incentive Payment C in Period 2 and increases its Participation Percentage of Incentive C Eligible Subdivision Population in Period 3, the additional Incentive Payment B in each Payment Year shall be seventy-five percent (75%) of the difference between (i) the Incentive

27

Payment B calculated pursuant to <u>Section IV.H.8.f</u> in Period 3 and (ii) the Incentive Payment B calculated pursuant to <u>Section IV.H.8.f</u> at the end of Period 2.

i.      For the avoidance of doubt, an increase in a Settling State's Participation Percentage of Incentive C Eligible Subdivision Population in Periods 2 and/or 3 from an earlier Period entitles the Settling State to receive the Incentive Payment C Percentage it had earned as of the end of the earlier Period plus the additional Incentive Payment C Percentage specified by the calculations in <u>Section IV.H.8.g</u> and <u>Section IV.H.8.h</u>.

j.      If a Settling State has not qualified for Incentive Payment C by April 30, 2027, it shall no longer be eligible to qualify for and shall not receive any Incentive Payment C for any Payment Year.

k.      If there are no Incentive C Eligible Subdivisions in a Settling State, and that Settling State is otherwise eligible for Incentive Payment C, that Settling State will receive its maximum Incentive Payment C for that Annual Payment provided by <u>Section IV.H.8.c</u>.

9.      <u>Incentive Payment D</u>.

a.      Incentive Payment D shall be available to Settling States that do not qualify for Incentive Payment A.

b.      Incentive Payment D shall be equal to up to a potential maximum of fifteen percent (15%) of the Maximum Remediation Payment of $4,279,160,837 minus any offsets for Non-Settling States specified in <u>Section IV.F</u>, with the actual amount depending on whether and the extent to which the criteria set forth below are met in each Settling State.  The potential maximum total for Incentive Payment D is $641,874,126.[8]

c.      Incentive Payment D shall be available to be earned starting at Payment Year 6 and the amount of Incentive Payment D in Payment Years 6-10 will depend on (i) the Settling State's eligibility as set out in <u>Section IV.H.9.d</u> and (ii) the Participation Percentage of the Incentive C Eligible Subdivision Population achieved by the Settling State as of April 30, 2027.

d.      A Settling State is eligible for Incentive Payment D if no Later Litigating Subdivision (for purposes of Incentive Payment D, Later Litigating Subdivisions are limited to (i) a Primary Subdivision; (ii) a school district with a K-12 student enrollment of at least 25,000 or 0.10% of the State's population, whichever is greater; (iii) a health district or hospital district that has at least one

[8] The Incentive Payment C table specified in <u>Section IV.H.8.f</u> and Incentive Payment D table specified in <u>Section IV.H.9.e</u> operate so that the combined amount of Incentive Payment C and Incentive Payment D cannot exceed thirty-four percent (34%) of the Maximum Remediation Payment over the term of the Agreement.  CVS will have no obligation to pay more than $1,454,914,684 for the combined amounts of Incentive Payment C and Incentive Payment D minus any offsets for Non-Settling States specified in <u>Section IV.F</u> and reductions for unachieved incentives.

hundred twenty-five (125) hospital beds in one or more hospitals rendering services in that district; and (iv) Primary Fire Districts) in that State has a lawsuit against a Released Entity that survived in whole or in part a Threshold Motion and is pending as of April 30 in Payment Years 6 to 10 ("*Incentive Payment D Look-Back Dates*").

e.    The Incentive Payment D for any Settling State in Payment Years 6-10 shall be between six percent (6%) and fifteen percent (15%) of the Maximum Remediation Payment times the Settling State's Overall Allocation Percentage specified in Exhibit F-2.  The applicable percentage shall be determined based on the Participation Percentage of the Incentive C Eligible Subdivision Population achieved by the Settling State as of April 30, 2027 as shown in the table below:

| Participation Percentage of Incentive C Eligible Subdivision Population as of April 30, 2027 | Settling State's Applicable Incentive Payment D Percentage |
|---|---|
| Participation of less than 96% | 15% of Maximum Remediation Payment |
| Participation of 96% but less than 97% | 14.4% of Maximum Remediation Payment |
| Participation of 97% but less than 98% | 13% of Maximum Remediation Payment |
| Participation of 98% but less than 99% | 10.2% of Maximum Remediation Payment |
| Participation of 99% but less than 100% | 7.4% of Maximum Remediation Payment |
| Participation of 100% | 6% of Maximum Remediation Payment |

f.    Incentive Payment D shall be available in equal installments in Payment Years 6-10, unless an adjustment to payment is required by Section IV.H.9.i or Section IV.H.9.j after the Annual Payment is made for Payment Year 6, in which case the adjustment shall be made in a way that equalizes, to the extent possible, its effect over the remaining Payment Years.[9]

g.    Prior to determining the Annual Payment for each of Payment Years 6 through 10, the Settlement Fund Administrator shall determine a Settling State's eligibility for Incentive Payment D as of the Incentive Payment D Look-Back Date

[9] The top of the range for Incentive Payment D specified in Exhibit M-2 for Payment Years 6-10 represents five years of equal payments of Incentive Payment D at fifteen percent (15%) of the Maximum Remediation Payment for all Eligible States.  The bottom of the range for Incentive Payment D specified in Exhibit M-2 for Payment Years 6-10 represents five years of equal payments of Incentive Payment D at six percent (6%) of the Maximum Remediation Payment for all Eligible States.  Incentive Payment D cannot exceed the top of the range for Incentive Payment D specified in Exhibit M-2 for each of Payment Years 6-10.  Any Incentive Payment D in excess of the bottom of the range for Incentive Payment D must correspond to reductions to Incentive Payment C in a prior or the same Payment Year, as provided by the Incentive Payment C table specified in Section IV.H.8.f.

29

in each such Payment Year. Prior to each Incentive Payment D Look-Back Date, CVS may provide the Settlement Fund Administrator and the Enforcement Committee with notice identifying any Settling State(s) it believes do not qualify for Incentive Payment D and information supporting its belief.

h.    If, at any time during the term of this Agreement any Subdivision becomes a Later Litigating Subdivision (as that term is limited by Section IV.H.9.c), then CVS shall, within thirty (30) calendar days of CVS or any Released Entity being served, provide notice to the Settling State in which such Released Claims are being pursued and shall give the relevant Settling State a reasonable opportunity to extinguish the Released Claims without any payment or any other obligations being imposed upon any Released Entities (apart from the Global Settlement Amount payable by CVS under the Agreement or the Injunctive Relief Terms incurred by it). The relevant Settling State and CVS shall confer and use reasonable efforts to promptly resolve the lawsuit so that it is dismissed with prejudice. Nothing in this subsection creates an obligation for a Settling State to make a monetary payment or incur any other obligation to an entity filing a lawsuit.

i.    If a Later Litigation Subdivision's lawsuit results in a money judgment being entered against a Released Entity or reasonable settlement being reached with a Released Entity, the amount is to be set off from the total Incentive Payment D for which the Settling State may become eligible. The total Incentive Payment D for which the Settling State may become eligible shall be reduced by the amount of the judgment or settlement.

j.    Notwithstanding Section IV.H.9.d, a Settling State can become re-eligible for Incentive Payment D if the lawsuit that survived a Threshold Motion is dismissed pursuant to a later motion on grounds included in the Threshold Motion, in which case the Settling State shall be eligible for any missed payments of Incentive Payment D in the following Payment Year, less any litigation fees and costs incurred by CVS in the interim, except that if the dismissal motion occurs after the completion of opening statements in such action, the Settling State shall not be eligible for Incentive Payment D. The Settlement Fund Administrator shall decrease the missed payments payable pursuant to this Section IV.H.9.j to the extent it cannot be paid without exceeding the top end of an applicable payment range shown in Exhibit M-2 for the remaining Payment Years.

I.    In no event shall any Settling State receive base payments and incentive payments totaling more than one hundred percent (100%) of its respective Overall Allocation Percentage specified in Exhibit F-2 times the Maximum Remediation Payment.

J.    *Credit for Dispensing Services.* CVS and a Settling State may enter into an agreement for CVS to earn credits against Annual Payments for dispensing free-of-charge opioid alternatives, for free-of-charge product provided in connection with other opioid-related resolutions, and/or for other initiatives and services.

**V.    Allocation and Use of Settlement Payments**

A.    *Components of Settlement Fund*.  The Settlement Fund shall be comprised of a Remediation Accounts Fund, a State Fund, and a Subdivision Fund for each Settling State.  The payment made under <u>Section IV</u> into the Settlement Fund shall be initially allocated among those three (3) sub-funds and distributed and used as provided below or as provided for by a State-Subdivision Agreement (or other State-specific allocation of funds).

B.    *Use of Settlement Payments*.

1.    It is the intent of the Parties that the payments disbursed from the Settlement Fund to Settling States and Participating Subdivisions be for Opioid Remediation to address Alleged Harms, subject to exceptions that must be documented in accordance with <u>Section V.B.2</u>.  In no event may less than 95.5% of CVS's maximum payment amounts pursuant to <u>Section IV</u> as set forth on <u>Exhibit M-1</u> over the entirety of all Payment Years (but not in any single Payment Year) be spent on Opioid Remediation; *provided, however*, that the remaining 4.5% only may be spent outside of Opioid Remediation to the extent necessary to satisfy: (a) back-stop attorney fee agreements entered into by Settling States with respect to at least one opioid settlement on or before November 30, 2022, even if such an agreement did not as of that date apply to CVS's Annual Payments; or (b) contingency fee agreements entered into by Settling States covering CVS's Annual Payments.  Any amounts not spent to satisfy such agreements must be spent on Opioid Remediation.

2.    While disfavored by the Parties, a Settling State or a Participating Subdivision may, subject to the limitation in the second sentence of <u>Section V.B.1</u>, use monies from the Settlement Fund (that have not been restricted by this Agreement solely to future Opioid Remediation) for purposes that do not qualify as Opioid Remediation, provided that if, at any time, a Settling State or a Participating Subdivision listed on <u>Exhibit G</u> uses any monies from the Settlement Fund for a purpose that does not qualify as Opioid Remediation, such Settling State or Participating Subdivision listed on <u>Exhibit G</u> shall identify such amounts and report to the Settlement Fund Administrator and CVS how such funds were used, including if used to pay attorneys' fees, investigation costs, litigation costs, or costs related to the operation and enforcement of this Agreement, respectively.  Such expenditures shall be reported to the Settlement Fund Administrator and CVS by January 31 of the year following the calendar year in which they are made.  It is the intent of the Parties that the reporting under this <u>Section V.B.2</u> shall be available to the public.  For the avoidance of doubt, (a) any amounts not identified under this <u>Section V.B.2</u> as used to pay attorneys' fees, investigation costs, or litigation costs shall be included in the Total Remediation Amount for purposes of <u>Section V.F</u> and (b) Participating Subdivisions not listed on <u>Exhibit G</u> may only use monies from the Settlement Fund for purposes that qualify as Opioid Remediation.

C.    *Allocation of Settlement Fund*.  The allocation of the Settlement Fund allows for different approaches to be taken in different Settling States, such as through a State-Subdivision Agreement.  Given the uniqueness of Settling States and their Participating Subdivisions, Settling States and their Participating Subdivisions are encouraged to enter into State-Subdivision

Agreements in order to direct the allocation of their portion of the Settlement Fund. This Agreement has no effect on the ability of Settling States and their Participating Subdivisions to internally agree on the allocation of their portion of the Settlement Fund. As set out below, the Settlement Fund Administrator will make an initial allocation to three (3) state-level sub-funds. The Settlement Fund Administrator will then, for each Settling State and its Participating Subdivisions, apply the terms of this Agreement and any relevant State-Subdivision Agreement, Statutory Trust, Allocation Statute, or voluntary redistribution of funds as set out below before disbursing the funds.

      1.    <u>Base Payments</u>. The Settlement Fund Administrator will allocate base payments under <u>Section IV.G</u> among the Settling States pursuant to Section VI.G. Base payments for each Settling State will then be allocated fifteen percent (15%) to its State Fund, seventy percent (70%) to its Remediation Accounts Fund, and fifteen percent (15%) to its Subdivision Fund. Amounts may be reallocated and will be distributed as provided in <u>Section V.D</u>.

      2.    <u>Incentive Payments</u>. The Settlement Fund Administrator will treat incentive payments under <u>Section IV.H</u> on a Settling State-specific basis in proportion to each Settling State's respective Overall Allocation Percentage. Incentive payments for which a Settling State is eligible under <u>Section IV.H</u> will be allocated fifteen percent (15%) to its State Fund, seventy percent (70%) to its Remediation Accounts Fund, and fifteen percent (15%) to its Subdivision Fund. Amounts may be reallocated and will be distributed as provided in <u>Section V.D</u>.

      3.    <u>Settlement Fund Administrator</u>. Prior to the Initial Subdivision Participation Date, CVS and the Enforcement Committee will agree to a detailed mechanism consistent with the foregoing for the Settlement Fund Administrator to follow in allocating, apportioning, and distributing payments, which shall then be appended hereto as <u>Exhibit L</u>.

      4.    <u>Settlement Fund Administrator Costs</u>. Any reasonable costs and fees of the Settlement Fund Administrator accruing under this Agreement as described in <u>Exhibit L</u> shall be paid from the interest accrued in the Settlement Fund; *provided*, *however*, that if such accrued interest is insufficient to pay the entirety of any such costs and fees, CVS shall pay fifty percent (50%) of the additional amount directly to the Settlement Fund Administrator and fifty percent (50%) shall be paid out of the Settlement Fund.

D.    *Settlement Fund Reallocation and Distribution*.

As set forth below, within a particular Settling State's account, amounts contained in the Settlement Fund sub-funds may be reallocated and distributed per a State-Subdivision Agreement or other means. If the apportionment of amounts is not addressed and controlled under <u>Section V.D.1</u> and <u>Section V.D.2</u>, then the default provisions of <u>Section V.D.4</u> apply. It is not necessary that a State-Subdivision Agreement or other means of allocating funds pursuant to <u>Section V.D.1</u> and <u>Section V.D.2</u> address all of the Settlement Fund sub-funds. For example, a Statutory Trust might only address disbursements from a Settling State's Remediation Accounts Fund.

1.    <u>Distribution by State-Subdivision Agreement</u>.  If a Settling State has a State-Subdivision Agreement, amounts apportioned to that Settling State's State Fund, Remediation Accounts Fund, and Subdivision Fund under <u>Section V.C</u> shall be reallocated and distributed as provided by that agreement.  Any State-Subdivision Agreement entered into or amended after the Preliminary Agreement Date shall be applied only if it requires: (a) that all amounts be used for Opioid Remediation, except as allowed by <u>Section V.B.2</u>, and (b) that at least seventy percent (70%) of amounts be used solely for future Opioid Remediation.[10]  For a State-Subdivision Agreement to be applied to the relevant portion of the Annual Payment, notice must be provided to CVS and the Settlement Fund Administrator at least ten (10) business days prior to the Settlement Fund Administrator's disbursements of such portion to a Settlement State and its Participating Subdivisions.

2.    <u>Distribution by Allocation Statute</u>.  If a Settling State has an Allocation Statute and/or a Statutory Trust that addresses allocation or distribution of amounts apportioned to such Settling State's State Fund, Remediation Accounts Fund, and/or Subdivision Fund and that, to the extent any or all such sub-funds are addressed, requires (1) all amounts to be used for Opioid Remediation, except as allowed by <u>Section V.B.2</u>, and (2) at least seventy percent (70%) of all amounts to be used solely for future Opioid Remediation,[11] then, to the extent allocation or distribution is addressed, the amounts apportioned to that Settling State's State Fund, Remediation Accounts Fund, and Subdivision Fund under <u>Section V.C</u> shall be allocated and distributed as addressed and provided by the applicable Allocation Statute or Statutory Trust.  For the avoidance of doubt, an Allocation Statute or Statutory Trust need not address all three (3) sub-funds that comprise the Settlement Fund, and if the applicable Allocation Statute or Statutory Trust does not address distribution of all or some of these three (3) sub-funds, the applicable Allocation Statute or Statutory Trust does not replace the default provisions described in <u>Section V.D.4</u> of any such unaddressed fund.  For example, if an Allocation Statute or Statutory Trust that meets the requirements of this <u>Section V.D.2</u> only addresses funds restricted to remediation and abatement, then the default provisions in this Agreement concerning allocation among the three (3) sub-funds comprising the Settlement Fund and the distribution of the State Fund and Subdivision Fund for that Settling State would still apply, while the distribution of the applicable Settling State's Remediation Accounts Fund would be governed by the qualifying Allocation Statute or Statutory Trust.

3.    <u>Voluntary Redistribution</u>.  A Settling State may choose to reallocate all or a portion of its State Fund to its Remediation Accounts Fund.  A Participating Subdivision included on <u>Exhibit G</u> may choose to reallocate all or a portion of its allocation from the Subdivision Fund to the State's Remediation Accounts Fund or to another Participating Subdivision.  The Settlement Fund Administrator is not required to honor a voluntary

---

[10] Future Opioid Remediation includes amounts paid to satisfy any future demand by another governmental entity to make a required reimbursement in connection with the past care and treatment of a person related to the Alleged Harms.

[11] Future Opioid Remediation includes amounts paid to satisfy any future demand by another governmental entity to make a required reimbursement in connection with the past care and treatment of a person related to the Alleged Harms.

redistribution for which notice is provided to it less than sixty (60) calendar days prior to the applicable Payment Date.

    4.    <u>Distribution in the Absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust</u>.  If <u>Section V.D.1</u> and <u>Section V.D.2</u> do not apply, amounts apportioned to that Settling State's State Fund, Remediation Accounts Fund, and Subdivision Fund under <u>Section V.C</u> shall be distributed as follows:

    a.    Amounts apportioned to that Settling State's State Fund shall be distributed to that State.

    b.    Amounts apportioned to that Settling State's Remediation Accounts Fund shall be distributed consistent with <u>Section V.E</u>.  Each Settling State shall submit to the Settlement Fund Administrator a designation of a lead state agency or other entity to serve as the single point of contact for that Settling State's funding requests from the Remediation Accounts Fund and other communications with the Settlement Fund Administrator.  The designation of an individual entity is for administrative purposes only and such designation shall not limit funding to such entity or even require that such entity receive funds from this Agreement.  The designated entity shall be the only entity authorized to request funds from the Settlement Fund Administrator to be disbursed from that Settling State's Remediation Accounts Fund.  If a Settling State has established a Statutory Trust, then that Settling State's single point of contact may direct the Settlement Fund Administrator to release the State's Remediation Accounts Fund to the Statutory Trust.

    c.    Amounts apportioned to that Settling State's Subdivision Fund shall be distributed to Participating Subdivisions in that State included on <u>Exhibit G</u> per the Subdivision Allocation Percentage listed in <u>Exhibit G</u>.  <u>Section V.F</u> shall govern amounts that would otherwise be distributed to Non-Participating Subdivisions listed in <u>Exhibit G</u>.  For the avoidance of doubt and notwithstanding any other provision in this Agreement, no Non-Participating Subdivision will receive any amount from the Settlement Fund, regardless of whether such Subdivision is included on <u>Exhibit G</u>.

    d.    Special Districts shall not be allocated funds from the Subdivision Fund, except through a voluntary redistribution allowed by <u>Section V.D.3</u> to Special Districts that are Participating Subdivisions.  A Settling State may allocate funds from its State Fund or Remediation Accounts Fund for Special Districts that are Participating Subdivisions.

    5.    <u>Restrictions on Distribution</u>.  No amounts may be distributed from the Subdivision Fund contrary to <u>Section VII</u>, *i.e.*, no amounts may be distributed directly to Non-Participating Subdivisions to the extent such a distribution would violate <u>Section VII.G</u> or <u>Section VII.H</u>.  Amounts allocated to the Subdivision Fund that cannot be distributed by virtue of the preceding sentence shall be distributed into the sub-account in the Remediation Accounts Fund for the Settling State in which the Non-Participating

Subdivision is located, unless those payments are redirected elsewhere by a State-Subdivision Agreement described in <u>Section V.D.1</u> or by an Allocation Statute or a Statutory Trust described in <u>Section V.D.2</u>.

E.    *Provisions Regarding the Remediation Accounts Fund.*

1.    <u>State-Subdivision Agreement, Allocation Statute, and Statutory Trust</u> <u>Fund Provisions</u>.  A State-Subdivision Agreement, Allocation Statute, or Statutory Trust in a Settling State may govern the operation and use of amounts in that State's Remediation Accounts Fund so long as it complies with the requirements of <u>Section V.D.1</u> or <u>Section V.D.2</u>, as applicable, and all direct payments to Participating Subdivisions in that State comply with <u>Section VII.G</u> through <u>Section VII.I</u>.

2.    <u>Absence of a State-Subdivision Agreement, Allocation Statute, or</u> <u>Statutory Trust</u>.  In the absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust that addresses distribution, the Remediation Accounts Fund will be used by a Settling State solely for future Opioid Remediation[12] and the following shall apply with respect to a Settling State:

a.    *Regional Remediation.*

(i)    At least fifty percent (50%) of distributions for remediation from a Settling State's Remediation Accounts Fund shall be annually allocated and tracked to the regional level.  A Settling State may allow the Advisory Committee established pursuant to <u>Section V.E.2.d</u> to define its regions and assign regional allocations percentages.  Otherwise, a Settling State shall (A) define its initial regions, which shall consist of one (1) or more General-Purpose Subdivision(s) and which shall be designated by the state agency with primary responsibility for substance abuse disorder services employing, to the maximum extent practical, existing regions established in that State for opioid abuse treatment or other public health purposes; (B) assign initial regional allocation percentages to the regions based on the Subdivision Allocation Percentages in <u>Exhibit G</u> and an assumption that all Subdivisions included on <u>Exhibit G</u> will become Participating Subdivisions.

(ii)    This minimum regional expenditure percentage is calculated using the Settling State's initial Remediation Accounts Fund allocation and does not include any additional amounts a Settling State has directed to its Remediation Accounts Fund from its State Fund, or any other amounts directed to the fund.  A Settling State may dedicate more than fifty percent (50%) of its Remediation Accounts Fund to the regional expenditure and may annually adjust the percentage of its Remediation Accounts Fund

---

[12] Future Opioid Remediation includes amounts paid to satisfy any future demand by another governmental entity to make a required reimbursement in connection with the past care and treatment of a person related to the Alleged Harms.

35

dedicated to regional expenditures as long as the percentage remains above the minimum amount.

(iii)    A Settling State (A) has the authority to adjust the definition of the regions, and (B) may annually revise the percentages allocated to each region to reflect the number of General-Purpose Subdivisions in each region that are Non-Participating Subdivisions.

b.    *Subdivision Block Grants.*  Certain Participating Subdivisions shall be eligible to receive regional allocation funds in the form of block grants for future Opioid Remediation.  A Participating Subdivision eligible for block grants is a county or parish (or in the case of Settling States that do not have counties or parishes that function as political subdivisions, a city) that (1) does not contain a Litigating Subdivision or a Later Litigating Subdivision for which it has the authority to end the litigation through a release, bar or other action, (2) either (i) has a population of 400,000 or more or (ii) in the case of California has a population of 750,000 or more, and (3) has funded or otherwise managed an established health care or treatment infrastructure (*e.g.*, health department or similar agency).  Each Participating Subdivision eligible to receive block grants shall be assigned its own region.

c.    *Small States.*  Notwithstanding the provisions of Section V.E.2.a, Settling States with populations under four (4) million that do not have existing regions described in Section V.E.2.a shall not be required to establish regions. However, such a Settling State that contains one (1) or more Participating Subdivisions eligible for block grants under Section V.E.2.c shall be divided regionally so that each block-grant eligible Participating Subdivision is a region and the remainder of the Settling State is a region.

d.    *Advisory Committee.*  A Settling State shall designate an Opioid Settlement Remediation Advisory Committee (the "*Advisory Committee*") to provide input and recommendations regarding remediation spending from that Settling State's Remediation Accounts Fund.  A Settling State may elect to use an existing advisory committee or similar entity (created outside of a State-Subdivision Agreement or Allocation Statute); *provided*, *however*, the Advisory Committee or similar entity shall meet the following requirements:

(i)    Written guidelines that establish the formation and composition of the Advisory Committee, terms of service for members, contingency for removal or resignation of members, a schedule of meetings, and any other administrative details;

(ii)    Composition that includes at least an equal number of local representatives as state representatives;

(iii)    A process for receiving input from Participating Subdivisions and other communities regarding how the opioid crisis is

36

affecting their communities, their abatement needs, and proposals for abatement strategies and responses; and

(iv)    A process by which Advisory Committee recommendations for expenditures for Opioid Remediation will be made to and considered by the appropriate state agencies.

3.    <u>Remediation Accounts Fund Reporting</u>.    The Settlement Fund Administrator shall track and assist in the report of remediation disbursements as agreed to between CVS and the Enforcement Committee.

F.    *Nature of Payment*.    CVS, the Settling States, and the Participating Subdivisions each acknowledge and agree that notwithstanding anything to the contrary in this Agreement, including, but not limited to, the scope of the Released Claims:

1.    They have entered into this Agreement to avoid the delay, expense, inconvenience, and uncertainty of further litigation;

2.    (a) The Settling States and Participating Subdivisions sought compensatory restitution and remediation (within the meaning of 26 U.S.C. § 162(f)(2)(A) and 26 C.F.R. § 1.162-21(e)(4)(i), (ii)) as damages for the Alleged Harms allegedly suffered by the Settling States and Participating Subdivisions; (b) the Total Remediation Amount is less than or equal to the amount, in the aggregate, of the Alleged Harms allegedly suffered by the Settling States and Participating Subdivisions; and (c) the portion of the Total Remediation Amount received by each Settling State or Participating Subdivision is less than or equal to the amount of the Alleged Harms allegedly suffered by such Settling State or Participating Subdivision;

3.    The payment of the Total Remediation Amount by CVS constitutes, and is paid for, compensatory restitution and remediation (within the meaning of 26 U.S.C. § 162(f)(2)(A) and 26 C.F.R. § 1.162-21(e)(4)(i), (ii)) for alleged damage or harm (as compensation for alleged damage or harm arising out of alleged bodily injury) allegedly caused by CVS in order to restore, in whole or in part, the Settling States, Participating Subdivisions, and persons to the same position or condition that they would be in had the Settling States, Participating Subdivisions, and persons not suffered the Alleged Harms, and constitutes compensatory restitution and remediation for alleged damage or harm allegedly caused by the potential violation of a law and/or is an amount paid to come into compliance with the law; and

4.    For the avoidance of doubt:  (a) the entire Total Remediation Amount is properly characterized as described in <u>Section V.F</u>, (b) no portion of the Total Remediation Amount represents reimbursement to any Settling State or Participating Subdivision or other person or entity for the fees or costs of any investigation or litigation, including without limitation attorneys' fees, (c) no portion of the Global Settlement Amount constitutes the disgorgement of any allegedly ill-gotten gains, and (d) no portion of the Global Settlement Amount is paid for, is in place of, or is properly characterized as the payment of any fine, penalty, punitive damages, or other punitive assessments.

37

## VI.    Enforcement

A.    *Enforceability.*  This Agreement is enforceable only by the Settling States and CVS; *provided*, *however*, that Released Entities may enforce Section XI and Participating Subdivisions listed on Exhibit G have the enforcement rights described in Section VI.D.  Except to the extent allowed by the Injunctive Relief Terms, Settling States and Participating Subdivisions shall not have enforcement rights with respect to either the terms of this Agreement that apply only to or in other States or any Consent Judgment entered into by another Settling State.  Participating Subdivisions shall not have enforcement rights against CVS with respect to this Agreement or any Consent Judgment except that Participating Subdivisions shall have enforcement rights as set forth herein as to payments that would be allocated to the Subdivision Fund or Remediation Accounts Fund pursuant to Section V; *provided*, *however*, that each Settling State shall allow Participating Subdivisions in such Settling State to notify it of any perceived violations of this Agreement or the applicable Consent Judgment.

B.    *Jurisdiction.*  CVS consents to the jurisdiction of the court in each Settling State in which the Consent Judgment is filed, limited to and for the sole and exclusive purpose of resolution of disputes identified in Section VI.F.2 for resolution in that court.

C.    *Specific Terms Dispute Resolution*.

1.    Any dispute that is addressed by the provisions set forth in the Injunctive Relief Terms shall be resolved as provided therein.

2.    In the event that CVS believes that the requirements established in Section V.B.1 are not being satisfied, CVS may request that CVS and the Enforcement Committee meet and confer regarding the use of funds to implement Section V.B.1.  The completion of such meet-and-confer process is a precondition to further action regarding any such dispute.  Further action concerning Section V.B.1 shall: (i) be limited to CVS obtaining a reduction of its Annual Payments by no more than five percent (5%) of the difference between the actual amount of Opioid Remediation and the 95.5% of CVS's maximum payment amounts pursuant to Section IV as set forth on Exhibit M-1 over the entirety of all Payment Years (but not in any single Payment Year);  (ii) only reduce Annual Payments to those Settling States and their Participating Subdivisions that are out of compliance with the requirements established in Section V.B.1; and (iii) not reduce Annual Payments restricted to future Opioid Remediation.

D.    *State-Subdivision Enforcement*.

1.    A Subdivision shall not have enforcement rights against a Settling State in which it is located with respect to this Agreement or any Consent Judgment except that a Participating Subdivision listed on Exhibit G shall have enforcement rights (a) as provided for in a State-Subdivision Agreement, Allocation Statute, or Statutory Trust with respect to intrastate allocation; or (b) in the absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust, to address allegations that (i) the Settling State's use of Remediation Accounts Fund monies were not used for uses similar to or in the nature of those uses contained in Exhibit E, or (ii) a Settling State failed to pay funds directly from

the Remediation Accounts Fund to a Participating Subdivision eligible to receive a block grant pursuant to <u>Section V.E.2.b</u>.

2.    A Settling State shall have enforcement rights against a Participating Subdivision located in its territory (a) as provided for in a State-Subdivision Agreement, Allocation Statute, or Statutory Trust; or (b) in the absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust, to address allegations that the Participating Subdivisions' uses of Remediation Accounts Fund monies were not used for purposes similar to or in the nature of those uses contained in <u>Exhibit E</u>.

3.    As between Settling States and Participating Subdivisions, the above rights are contractual in nature and nothing herein is intended to limit, restrict, change or alter any other existing rights under law.

E.    *Subdivision Payment Enforcement.*  A Participating Subdivision listed on <u>Exhibit G</u> shall have the same right as a Settling State pursuant to <u>Section VI.F.3.a(iv)</u> to seek resolution regarding the failure by CVS to make its allocable share of an Annual Payment in a Payment Year.

F.    *Other Terms Regarding Dispute Resolution.*

1.    Except as provided by <u>Section VI.C</u>, the parties to a dispute shall promptly meet and confer in good faith to resolve any dispute.  If the parties cannot resolve the dispute informally, and unless otherwise agreed in writing, they shall follow the remaining provisions of this <u>Section VI.F</u> to resolve the dispute.

2.    Except to the extent provided by <u>Section VI.C</u> or <u>Section VI.F.3</u>, all disputes shall be resolved in either the court that entered the relevant Consent Judgment or, if no such Consent Judgment was entered, a state or territorial court with jurisdiction located wherever the seat of the relevant state government is located.

a.    State court proceedings shall be governed by the rules and procedures of the relevant forum.

b.    For the avoidance of doubt, disputes to be resolved in state court include, but are not limited to, the following:

(i)    disputes concerning whether expenditures qualify as Opioid Remediation;

(ii)    disputes between a Settling State and its Participating Subdivisions as provided by <u>Section VI.D</u>, except to the extent the State-Subdivision Agreement provides for other dispute resolution mechanisms. For the avoidance of doubt, disputes between a Settling State and any Participating Subdivision shall not be considered National Disputes;

(iii)    whether this Agreement and relevant Consent Judgment are binding under state law;

(iv)    the extent of the Attorney General's or other participating entity's authority under state law, including the extent of the authority to release claims;

(v)    whether the definition of a Bar, a Case-Specific Resolution, Final Order, lead state agency as described in Section V.D.4.b, Later Litigating Subdivision, Litigating Subdivision, or Threshold Motion has been met; and

(vi)    all other disputes not specifically identified in Section VI.C or Section VI.F.3.

c.    Any Party may request that the National Arbitration Panel provide an interpretation of any provision of the Agreement that is relevant to the state court determination, and the National Arbitration Panel shall make reasonable best efforts to supply such interpretation within the earlier of thirty (30) calendar days or the time period required by the state court proceedings.  Any Party may submit that interpretation to the state court to the extent permitted by, and for such weight provided by, the state court's rules and procedures.  If requested by a Party, the National Arbitration Panel shall request that its interpretation be accepted in the form of an *amicus curiae* brief, and any attorneys' fees and costs for preparing any such filing shall be paid for by the requesting Party.

3.    National Disputes involving a Settling State, a Participating Subdivision that has enforcement rights pursuant to Section VI.A, and/or CVS (together, "*Participating Parties*") shall be resolved by the National Arbitration Panel.

a.    National Disputes are disputes that are not addressed by Section VI.C, and which are exceptions to Section VI.F.2's presumption of resolution in state courts because they involve issues of interpretation of terms contained in this Agreement applicable to all Settling States without reference to a particular State's law.  Disputes between a Settling State and any Participating Subdivision shall not be considered National Disputes.  National Disputes are limited to the following:

(i)    The amount of withholding attributable to Non-Settling States;

(ii)    issues involving the scope and definition of Product;

(iii)    interpretation and application of the terms "Alleged Harms," "Covered Conduct," "Released Entities," and "Released Claims";

(iv)    the failure by CVS to pay the Annual Payment, the Additional Remediation Amount in a Payment Year, or the amounts due pursuant to Exhibit S and Exhibit T, but for the avoidance of doubt, disputes between CVS and a Settling State over the amounts owed only to that

Settling State that do not affect any other Settling State shall not be considered National Disputes;

(v)    the interpretation and application of any most-favored-nation provision in Section XIII.E;

(vi)    questions regarding the performance and/or removal of the Settlement Fund Administrator;

(vii)    disputes involving liability of successor entities;

(viii)    disputes that require a determination of the sufficiency of participation in order to qualify for Incentive Payments A, B, C or D;

(ix)    disputes requiring the interpretation of Agreement terms that are national in scope or impact, which shall mean disputes requiring the interpretation of Agreement terms that (i) concretely affect four (4) or more Settling States; and (ii) do not turn on unique definitions and interpretations under state law; and

(x)    any dispute subject to resolution under Section VI.F.2 but for which all Participating Parties to the dispute agree to arbitration before the National Arbitration Panel under the provisions of this SectionVI.F.3.

b.    The National Arbitration Panel shall be comprised of three (3) arbitrators.  One (1) arbitrator shall be chosen by CVS, one (1) arbitrator shall be chosen by the Enforcement Committee with due input from Participating Subdivisions listed on Exhibit G, and the third arbitrator shall be agreed upon by the first two (2) arbitrators.  The membership of the National Arbitration Panel is intended to remain constant throughout the term of this Agreement, but in the event that replacements are required, the retiring arbitrator shall be replaced by the party that selected him/her.

c.    The National Arbitration Panel shall make reasonable best efforts to decide all matters within one hundred eighty (180) calendar days of filing, and in no event shall it take longer than one (1) year.

d.    The National Arbitration Panel shall conduct all proceedings in a reasonably streamlined process consistent with an opportunity for the Participating Parties to be heard.  Issues shall be resolved without the need for live witnesses where feasible, and with a presumption in favor of remote participation to minimize the burdens on the Participating Parties.

e.    To the extent allowed under state law, a Settling State, a Participating Subdivision that has enforcement rights pursuant to Section VI.A, and (at any Participating Party's request) the National Arbitration Panel may certify to an appropriate state court any question of state law.  The National Arbitration Panel

shall be bound by a final state court determination of such a certified question. The time period for the arbitration shall be tolled during the course of the certification process.

f.    The arbitrators will give due deference to any authoritative interpretation of state law, including any declaratory judgment or similar relief obtained by a Settling State, a Participating Subdivision that has enforcement rights pursuant to Section VI.A, or CVS on a state law issue.

g.    The decisions of the National Arbitration Panel shall be binding on Settling States, Participating Subdivisions, CVS, and the Settlement Fund Administrator. In any proceeding before the National Arbitration Panel involving a dispute between a Settling State and CVS whose resolution could prejudice the rights of a Participating Subdivision(s) in that Settling State, such Participating Subdivision(s) shall be allowed to file a statement of view in the proceeding.

h.    Nothing herein shall be construed so as to limit or otherwise restrict a Settling State from seeking injunctive or other equitable relief in state court to protect the health, safety, or welfare of its citizens.

i.    Each Participating Party shall bear its own costs in any arbitration or court proceeding arising under this Section VI. The costs for the arbitrators on the National Arbitration Panel shall be divided and paid equally by the disputing sides for each individual dispute, *e.g.*, a dispute between CVS and Settling States/Participating Subdivisions shall be split fifty percent (50%) by CVS and fifty percent (50%) by the Settling States/Participating Subdivisions that are parties to the dispute; a dispute between a Settling State and a Participating Subdivision shall be split fifty percent (50%) by the Settling State that is party to the dispute and fifty percent (50%) by any Participating Subdivisions that are parties to the dispute.

4.    Prior to initiating an action to enforce pursuant to this Section VI.F, the complaining Participating Party must:

a.    Provide written notice to the Enforcement Committee of its complaint, including the provision of the Consent Judgment and/or Agreement that the practice appears to violate, as well as the basis for its interpretation of the disputed provision. The Enforcement Committee shall establish a reasonable process and timeline for obtaining additional information from the involved parties; *provided*, *however*, that the date the Enforcement Committee establishes for obtaining additional information from the Participating Parties shall not be more than forty-five (45) calendar days following the notice. The Enforcement Committee may advise the Participating Parties of its views on the complaint and/or seek to resolve the complaint informally.

b.    Wait to commence any enforcement action until thirty (30) calendar days after the date that the Enforcement Committee establishes for obtaining additional information from the Participating Parties.

5.      If the Participating Parties to a dispute cannot agree on the proper forum for resolution of the dispute under the provisions of <u>Section VI.F.2</u> or <u>SectionVI.F.3</u>, a committee comprising the Enforcement Committee and sufficient representatives of CVS, such that the members of the Enforcement Committee have a majority of one (1) member, will determine, within twenty-eight (28) calendar days of receiving notification of the dispute relating to the proper forum, the forum where the dispute will be initiated.  The forum identified by such committee shall be the sole forum for resolving the issue of which forum will hear the substantive dispute, and the committee's identification of such forum in the first instance shall not be entitled to deference by the forum selected.

G.      *No Effect.*  Nothing in this Agreement shall be interpreted to limit the Settling States' Civil Investigative Demand ("*CID*") or investigative subpoena authority, to the extent such authority exists under applicable state law and the CID or investigative subpoena is issued pursuant to such authority, and CVS reserves all of its rights in connection with a CID or investigative subpoena issued pursuant to such authority.

## VII.   Participation by Subdivisions

A.      *Notice.*  Prior to the State Participation Date, the Parties shall agree on a vendor to serve as the Implementation Administrator and provide notice pursuant to this <u>Section VII.A</u>.  No later than fifteen (15) calendar days after the Preliminary Agreement Date, the Implementation Administrator shall send individual written notice (which may be delivered via e-mail or other electronic means) of the opportunity to participate in this Agreement and the requirements of participation to all Subdivisions in the Settling States that are (1) Litigating Subdivisions or (2) Non-Litigating Subdivisions listed on <u>Exhibit G</u>.  To the extent a Special District is entitled to an allocation for a direct payment through its inclusion in <u>Exhibit G</u> pursuant to a State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution, the Implementation Administrator, with the cooperation of the Settling States shall also send individual written notice (which may be delivered via e-mail or other electronic means) of the opportunity to participate in this Agreement and the requirements of participation to such Special Districts.  Unless otherwise agreed by the Parties, the version of <u>Exhibit G</u> used for notice shall be the one in place as of the State Participation Date.  Notice (which may be delivered via e-mail or other electronic means) shall also be provided simultaneously to counsel of record for Litigating Subdivisions and known counsel for Non-Litigating Subdivisions and Special Districts listed on <u>Exhibit G</u>.  The Settling States also may provide general notice reasonably calculated to alert Non-Litigating Subdivisions in the Settling States to this Agreement, the opportunity to participate in it, and the requirements for participation.  Such Notice may include publication and other standard forms of notification, as well as notice to national state and county organizations such as the National Association of Counties and the National League of Cities.  All notice provided under this subsection will include that the deadline for becoming a Participating Subdivision is the Initial Subdivision Participation Date. Nothing contained herein shall preclude a Settling State from providing further notice to or otherwise contacting any of its Subdivisions about becoming a Participating Subdivision, including beginning any of the activities described in this paragraph prior to the Preliminary Agreement Date.

43

B.    *Requirements for Becoming a Participating Subdivision—Non-Litigating Subdivisions*.  A Non-Litigating Subdivision in a Settling State may become a Participating Subdivision by returning an executed Subdivision Participation Agreement to the Implementation Administrator or Settlement Fund Administrator (which may be executed and returned by electronic means established by the Implementation Administrator or Settlement Fund Administrator) specifying (1) that the Subdivision agrees to the terms of this Agreement pertaining to Subdivisions, (2) that the Subdivision releases all Released Claims against all Released Entities, (3) that the Subdivision agrees to use monies it receives, if any, from the Settlement Fund pursuant to the applicable requirements of Section V; *provided*, *however*, that Non-Litigating Subdivisions may only use monies originating from the Settlement Fund for purposes that qualify as Opioid Remediation, and (4) that the Subdivision submits to the jurisdiction of the court where the applicable Consent Judgment is filed for purposes limited to that court's role under this Agreement.  The required Subdivision Participation Agreement is attached as Exhibit K.

C.    *Requirements for Becoming a Participating Subdivision—Litigating Subdivisions/Later Litigating Subdivisions*.    A Litigating Subdivision or Later Litigating Subdivision in a Settling State may become a Participating Subdivision by returning an executed Subdivision Participation Agreement to the Implementation Administrator or Settlement Fund Administrator (which may be executed and returned by electronic means established by the Implementation Administrator or Settlement Fund Administrator) and upon prompt dismissal with prejudice of its lawsuit following the Reference Date or the date on which the conditions for effectiveness in Section VIII.C have been met, whichever is later.  Following its execution of a Subdivision Participation Agreement, a Litigating Subdivision shall take reasonable steps to immediately cease all litigation activity against the Released Entities, where feasible, or to minimize such activity by means of agreed deadline extensions and agreed postponement of depositions, document productions, and motion practice, unless the Litigating Subdivision reasonably concludes that it would be prejudiced by doing so.  A Settling State may require each Litigating Subdivision in that State to specify on the Subdivision Participation Agreement whether its counsel has waived any contingency fee contract with that Participating Subdivision and whether, if eligible, it intends to seek fees pursuant to Exhibit R.   The Settlement Fund Administrator shall provide quarterly reports of this information to the parties organized by Settling State.  A Litigating Subdivision or Later Litigating Subdivision may not become a Participating Subdivision after the completion of opening statements in a trial of the lawsuit it brought that includes a Released Claim against a Released Entity.  For avoidance of doubt, where a subdivision official other than a General-Purpose Government has filed a lawsuit that includes a Released Claim against a Released Entity in a direct, *parens patriae*, or any other capacity, that Subdivision may become a Participating Subdivision only if, in addition to the other requirements of this Section VII.C, the lawsuit filed by the subdivision official has also been dismissed with prejudice.

D.    *Initial Participating Subdivisions.*    A Subdivision qualifies as an Initial Participating Subdivision if it meets the applicable requirements for becoming a Participating Subdivision set forth in Section VII.B or Section VII.C by the Initial Subdivision Participation Date.  All Subdivision Participation Agreements returned to the Implementation Administrator shall be held in escrow by the Implementation Administrator until the Reference Date.  Subdivision Participation Agreements returned to the Implementation Administrator shall not be withdrawn

unless notice of the withdrawal is provided to the Implementation Administrator within eighteen (18) days after the Initial Subdivision Participation Date.  If, for any reason, the Agreement does not become effective, all obligations created by such forms and releases in them shall be void *ab initio* and all Subdivision Participation Agreements shall be returned to Counsel for Litigating Subdivisions or to the Subdivisions not represented by counsel or destroyed to the extent that such destruction is not prohibited by then existing document preservation obligations.

      E.    *Later Participating Subdivisions.*  A Subdivision in a Settling State that is not an Initial Participating Subdivision may become a Later Participating Subdivision by meeting the applicable requirements for becoming a Participating Subdivision set forth in Section VII.B or Section VII.C after the Initial Subdivision Participation Date and by agreeing to be subject to the terms of a State-Subdivision Agreement (if any) or any other structure adopted or applicable pursuant to Section V.D or Section V.E.  The following provisions govern what a Later Participating Subdivision can receive (but do not apply to Initial Participating Subdivisions):

          1.    A Later Participating Subdivision shall not receive any share of any Annual Payment due before it became a Participating Subdivision.

          2.    A Subdivision that becomes a Later Participating Subdivision after November 30, 2023 shall receive seventy-five percent (75%) of the share of future base or incentive payments that it would have received had it become a Later Participating Subdivision prior to that date (unless the Later Participating Subdivision is subject to Section VII.E.3 or Section VII.E.4).

          3.    A Later Participating Subdivision that, after the Initial Subdivision Participation Date, maintains a lawsuit for a Released Claim(s) against a Released Entity and has judgment entered against it on every such Claim before it became a Participating Subdivision (other than a consensual dismissal with prejudice) is not eligible to become a Participation Subdivision.

          4.    A Subdivision that becomes a Later Participating Subdivision while a Bar or Case-Specific Resolution involving a different Subdivision exists in its State shall receive twenty-five percent (25%) of the share of future base or incentive payments that it would have received had it become a Later Participating Subdivision without such Bar or Case-Specific Resolution.

      F.    *No Increase in Payments*.  Amounts to be received by Later Participating Subdivisions shall not increase the payments due from CVS.

      G.    *Ineligible Subdivisions*.  Subdivisions in Non-Settling States and Prior Litigating Subdivisions are not eligible to be Participating Subdivisions.

      H.    *Non-Participating Subdivisions*.  Non-Participating Subdivisions shall not directly receive any portion of any Annual Payment, including from the State Fund and direct distributions from the Remediation Accounts Fund; however, a Settling State may choose to fund future Opioid Remediation that indirectly benefits Non-Participating Subdivisions.

I.    *Unpaid Allocations to Later Participating Subdivisions and Non-Participating Subdivisions*.  Any base payments and incentive payments allocated pursuant to <u>Section V.D</u> to a Later Participating Subdivision or Non-Participating Subdivision that cannot be paid pursuant to this <u>Section VII</u>, including the amounts that remain unpaid after the reductions required by <u>Section VII.E.2</u> through <u>Section VII.E.4</u>, will be allocated to the Remediation Accounts Fund for the Settling State in which the Non-Participating Subdivision is located, unless those payments are redirected elsewhere by a State-Subdivision Agreement or by a Statutory Trust.

## VIII.  Condition to Effectiveness of Agreement and Filing of Consent Judgment

A.    *Distribution of Subdivision Participation Agreements*.   No later than three (3) calendar days after the Initial Subdivision Participation Date, the Implementation Administrator shall report to the Settling States and CVS on which Subdivisions in the Settling States have and have not executed Subdivision Participation Agreements and shall provide notice under <u>Section XIII.Q</u> of any withdrawals of Subdivision Participation Agreements within one (1) business day of the withdrawal.  The Settling States and CVS each shall have online access to the Subdivision Participation Agreements for the purpose of auditing the Implementation Administrator's reports but may not maintain copies.  CVS shall pay up to and no more than $1.5 million of the Implementation Administrator's fees and costs, including advancing such fees and costs prior to the Effective Date.  If this Agreement becomes effective, then CVS may deduct from its Annual Payment for Payment Year 2 any amount in excess of $1.5 million it paid for the Implementation Administrator's fees and costs.

B.    *Determination to Proceed with Settlement—Settling States*.  Following the Initial Subdivision Participation Date, the Settling States on the Enforcement Committee shall determine whether to proceed with the Agreement.  No later than fifteen (15) calendar days prior to the Reference Date, the Settling States shall provide notice to CVS and the Enforcement Committee of their decision.  If the Settling States elect not to proceed, this Agreement will have no further effect, and all releases (including those contained in Subdivision Participation Agreements) and other commitments or obligations contained herein or in Subdivision Settlement Participation Forms will be void.

C.    *Determination to Proceed with Settlement—CVS*.  If the Settling States elect to proceed, CVS shall then determine whether to proceed with the Agreement.  This determination shall be in CVS's sole discretion and may be based on any criteria or factors it deems relevant.  CVS shall provide notice to the Settling States and the Enforcement Committee of its decision no later than the Reference Date.  If CVS elects to proceed with the Agreement, the Parties will proceed to file the Consent Judgments, and the obligations in the State Participation Forms and the Subdivision Participation Agreements will become effective as of the Reference Date.  If CVS elects not to proceed, this Agreement will have no further effect, and all releases (including those contained in Subdivision Participation Agreements) and other commitments or obligations contained herein or in Subdivision Participation Agreements will be void.

## IX.   Additional Remediation

A.    *Additional Remediation Amount*.  Subject to and without exceeding the maximum payment amounts set forth in the "Additional Remediation Amount" column of <u>Exhibit M-3</u> and

subject to the reduction specified in Section IX.B, CVS shall pay an Additional Remediation Amount to the Settling States listed in Exhibit N. Such funds shall be paid, on the schedule set forth in Exhibit M-3, on the Payment Date for each relevant Payment Year to such Settling States as allocated by the Settlement Fund Administrator pursuant to Exhibit N.

B.    *Reduction of Additional Remediation Amount.* The amounts owed by CVS pursuant to this Section IX shall be reduced by the allocations set forth on Exhibit N for Non-Settling States.

C.    For the avoidance of doubt, (1) a Settling State that retained outside counsel in connection with opioid investigations that receives an Additional Remediation Amount because the Settling State was not otherwise eligible to receive funds from the State Outside Counsel Fee Fund may choose to have the Additional Remediation Amount designated to pay the Settling State's outside counsel, and may instruct the Settlement Fund Administrator to pay those funds directly to the Settling State's outside counsel, and (2) Additional Remediation Amount funds, including funds designated by a Settling State to pay its outside counsel under this paragraph, shall not be subject to allocation as provided in Section V.C through Section V.E.

X.    **Plaintiffs' Attorneys' Fees and Costs**

The Agreement on Attorneys' Fees, Expenses and Costs is set forth in Exhibit R and incorporated herein by reference. CVS shall pay subdivision attorneys' fees and costs into the Subdivision Attorney's Fee and Subdivision Cost and Expense Fund as set forth in Exhibit R and Exhibit M-3. The Agreement on the State Outside Counsel Fee Fund and Agreement on the Joint State Cost Fund are set forth in Exhibit S and Exhibit T, respectively, and are incorporated herein by reference. Attorneys' fees, expenses and costs shall not exceed the maximum annual and total amounts set forth in the relevant columns of Exhibits M-1 and M-3 and shall be subject to reduction as set forth in Exhibit R, Exhibit S, and Exhibit T.

XI.    **Release**

A.    *Scope.* As of the Effective Date, the Released Entities are hereby released and forever discharged from all of the Releasors' Released Claims. Each Settling State (for itself and its Releasors) and Participating Subdivision (for itself and its Releasors) hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim; or to cause, assist in bringing or permit to be brought, filed, or claimed; or to otherwise seek to establish liability for any Released Claim against any Released Entity in any forum whatsoever. The releases provided for in this Agreement are broad, shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to any Released Claim, and extend to the full extent of the power of each Settling State and its Attorney General to release claims. This Agreement shall be a complete bar to any Released Claim.

B.    *Claim-Over and Non-Party Settlement.*

1.    It is the intent of the Parties that:

47

      a.      Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract), from other parties for their payment obligations under this Agreement;

      b.      the payments made under this Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out of, or related to Alleged Harms and/or Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity);

      c.      Claims by Releasors against non-Parties shall not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

      d.      the Agreement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties.

The provisions of this <u>Section XI.B</u> are to be implemented consistent with these principles. This Agreement and the releases and dismissals provided for herein are made in good faith.

      2.      No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner; *provided* that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it. For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

      3.      If any Releasor enters into a Non-Party Settlement on or after the Effective Date, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from CVS in <u>Section XI.B.2</u>, or a release from such Non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over. The obligation to obtain the prohibition and/or release required by this subsection is a material term of this Agreement.

      4.      If any Releasor obtains a judgment with respect to a Non-Party Covered Conduct Claim against a Non-Released Entity that does not contain the prohibition described in <u>Section XI.B.3</u>, or any Releasor files a Non-Party Covered Conduct Claim against a Non-Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in <u>Section XI.B.3</u>, and such Non-Released Entity asserts a Claim-Over against a Released Entity, the Released Entity shall be relieved of the prohibition in <u>Section XI.B.2</u> with respect to that Non-Released Entity and that Releasor and CVS shall take the following actions to ensure that

the Released Entities do not pay more with respect to Alleged Harms and/or Covered Conduct to Releasors or to Non-Released Entities than the amounts owed under this Agreement by CVS:

a.       CVS shall notify that Releasor of the Claim-Over within sixty (60) calendar days of the assertion of the Claim-Over or sixty (60) calendar days of the Effective Date of this Agreement, whichever is later;

b.       CVS and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that they are not required to pay more with respect to Alleged Harms and/or Covered Conduct than the amounts owed by CVS under this Agreement;

c.       That Releasor and CVS shall take steps sufficient and permissible under the law of the State of the Releasor to hold Released Entities harmless from the Claim-Over and ensure Released Entities are not required to pay more with respect to Alleged Harms and/or Covered Conduct than the amounts owed by CVS under this Agreement.  Such steps may include, where permissible:

(i)       Filing of motions to dismiss or such other appropriate motion by CVS or Released Entities, and supported by Releasors, in response to any claim filed in litigation or arbitration;

(ii)      Reduction of that Releasors' Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(iii)     Placement into escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

(iv)     Return of monies paid by CVS to that Releasor under this Agreement to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

(v)      Payment of monies to CVS by that Releasor to ensure CVS is held harmless from such Claim-Over, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(vi)     Credit to CVS under this Agreement to reduce the overall amounts to be paid under the Agreement such that it is held harmless from the Claim-Over; and

(vii)    Such other actions as that Releasor and CVS may devise to hold CVS harmless from the Claim-Over.

d.      The actions of that Releasor and CVS taken pursuant to clause (c) above must, in combination, ensure CVS is not required to pay more with respect to Alleged Harms and/or Covered Conduct than the amounts owed by CVS under this Agreement.

e.      In the event of any dispute over the sufficiency of the actions taken pursuant to clause (c) above, Releasor and CVS may seek review by the National Arbitration Panel, or, upon consent of the parties to the dispute, by the state court where the relevant Consent Judgment was filed.  The National Arbitration Panel shall have authority to order a remedy, including one or more of the actions specified in clause (c), sufficient to hold Released Entities fully harmless.  In the event that the Panel's actions do not result in Released Entities being held fully harmless, CVS shall have a claim for breach of this Agreement by Releasors, with the remedy being payment of sufficient funds to hold CVS harmless from the Claim-Over.  For the avoidance of doubt, the prior sentence does not limit or eliminate any other remedy that CVS may have.

5.      To the extent that the Claim-Over is based on a contractual indemnity, the obligations under Section XI.B.4 shall extend solely to a Non-Party Covered Conduct Claim against a pharmacy, distributor, clinic, hospital or other purchaser or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor.  CVS shall notify the Settling States, to the extent permitted by applicable law, in the event that any of these types of Non-Released Entity asserts a Claim-Over arising out of contractual indemnity against it.

C.      *Indemnification and Contribution Prohibited.*  No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory, from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner; *provided* that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it.  For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.  For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

D.      *General Release*.  In connection with the releases provided for in this Agreement, each Settling State (for itself and its Releasors) and Participating Subdivision (for itself and its Releasors) expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any State or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent**.  A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and

that if known by him or her, would have materially affected his or
her settlement with the debtor or released party.

A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Settling State (for itself and its Releasors) and Participating Subdivision (for itself and its Releasors) hereby expressly waives and fully, finally, and forever settles, releases and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date even if Releasors do not know or suspect such claims to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and even if knowledge of the existence of such claims would materially affect the Settling States' decision to enter into this Agreement or the Participating Subdivisions' decision to participate in this Agreement.

E.      *Assigned Interest Waiver*.  To the extent that any Settling State has any direct or indirect interest in any rights of a third-party that is a debtor under the Bankruptcy Code as a result of a claim arising out of Covered Conduct or Alleged Harms by way of assignment or otherwise, including as a result of being the beneficiary of a trust or other distribution entity, to assert claims against CVS (whether derivatively or otherwise), under any legal or equitable theory, including for indemnification, contribution, or subrogation, such Settling State waives the right to assert any such claim, or to receive a distribution or any benefit on account of such claim and such claim, distribution, or benefit shall be deemed assigned to CVS.

F.      *Res Judicata*.  Nothing in this Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in this Agreement, and/or any Consent Judgment or other judgment entered on this Agreement, gives rise to under applicable law.

G.      *Representation and Warranty*.  The signatories hereto on behalf of their respective Settling States expressly represent and warrant that they have (or will obtain no later than the Initial Subdivision Participation Date) the authority to settle and release, to the maximum extent of the State's power, all Released Claims of (1) their respective Settling States, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, and (3) any of their respective Settling State's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Alleged Harms and/or Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution or dispensing license.  For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor.  Also for the purposes of clause (3), a release from a State's Governor, to be materially similar to that in Exhibit X, is sufficient to demonstrate that the appropriate releases have been obtained.

H.      *Effectiveness*.  The releases set forth in this Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Settlement

Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Settlement Fund or any portion thereof.

       I.    *Cooperation.*  Settling States will meet and confer with CVS and simultaneously make reasonable efforts to resolve any action filed by a Subdivision involving any Covered Conduct, Alleged Harms, or a Product that remains pending against CVS after the Initial Subdivision Participation Date.  Releasors (i) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (ii) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims.

       J.    *Non-Released Claims.*  Notwithstanding the foregoing or anything in the definition of Released Claims, this Agreement does not waive, release or limit any criminal liability, Claims for liability under tax law, Claims under securities law by a State Releasor as investor, Claims against parties who are not Released Entities, Claims by private individuals, and any claims arising under this Agreement for enforcement of this Agreement.  Nothing in this Agreement precludes the Released Entities from asserting, in an action arising from or relating to Claims by private individuals, any defense or argument based on this Agreement that is available under applicable law.

## XII.    Later Litigating Subdivisions; Non-Settling States

       A.    *Released Claims against Released Entities.*  If a Later Litigating Subdivision in a Settling State maintains a lawsuit for a Released Claim against a Released Entity after the Initial Subdivision Participation Date, the Released Entity shall take ordinary and reasonable measures to defend the action, including filing a Threshold Motion with respect to the Released Claim.  The Released Entity shall further notify the Settling State and Settlement Fund Administrator immediately upon notice of a Later Litigating Subdivision bringing a lawsuit for a Released Claim and shall not oppose a Settling State's submission in support of the Threshold Motion.  CVS shall give the relevant Settling State a reasonable opportunity to extinguish the Released Claims without any payment or any other obligations being imposed upon any Released Entities (apart from the Global Settlement Amount payable by CVS under the Agreement or the Injunctive Relief Terms incurred by it).  The relevant Settling State and CVS shall confer and use reasonable efforts to promptly resolve the lawsuit so that it is dismissed with prejudice. Nothing in this subsection creates an obligation for a Settling State to make a monetary payment or incur any other obligation to an entity filing a lawsuit.

       B.    *Non-Settling States.*  Non-Settling States shall not be eligible for any payments or have any rights in connection with this Agreement.

       C.    *Settlement Class Resolution Opt Outs.*  If a Settling State is eligible for Incentive Payment A on the basis of a Settlement Class Resolution, and a Primary Subdivision that opted out of the Settlement Class Resolution maintains a lawsuit asserting a Released Claim against a Released Entity, the following shall apply. The Released Entity shall take ordinary and reasonable measures to defend the action, including filing a Threshold Motion with respect to the Released Claim.  The Settling State shall seek to obtain either dismissal of the lawsuit in cooperation with CVS, or a release of the Primary Subdivision's claims.  If the lawsuit asserting a Released Claim

either survives a Threshold Motion or has an unresolved Threshold Motion fewer than sixty (60) calendar days prior to the scheduled start of a trial involving a Released Claim, and is resolved with finality on terms requiring payment by the Released Entity, CVS shall receive a dollar-for-dollar offset for the amount paid against its obligation to make remaining Incentive Payment A payments that would be apportioned to that Settling State and to its Subdivisions.

       D.    *Revoked Bar, Settlement Class Resolution, or Case-Specific Resolution.* If CVS made any Annual Payments that included any incentive payments earned as a result of the existence of a Bar, Settlement Class Resolution, or Case-Specific Resolution in a Settling State, and there is subsequently a Revocation Event with respect to that Bar, Settlement Class Resolution, or Case-Specific Resolution after the determination of the amount of such Annual Payment, that Settling State shall seek to obtain a release of the claims impacted by the Revocation Event, including but not limited to defending the legality of the Bar, obtaining a dismissal of the claims made against the Released Entity, and obtaining releases from impacted Subdivisions. If the Settling State is unable to defend the legality of the bar and/or obtain releases form all impacted Subdivisions, then CVS shall receive a dollar-for-dollar offset against the portion of remaining Annual Payments that would be allocated to that Settling State and its Participating Subdivisions. This offset will be calculated as the dollar amount difference between (1) the total amount of incentive payments paid by CVS by virtue of the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the Revocation Event and (2) the total amount of incentive payments that would have been due from CVS during that time had the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the Revocation Event not been in effect. The amount of incentive payments that would have been due, referenced in clause (2) above, will be calculated one hundred eighty (180) calendar days after the Revocation Event; for purposes of calculating the amount of incentive payments that would have been due, any relevant Subdivision shall be included as a Participating Subdivision if: (1) its Released Claims are extinguished by any subsequent Bar, Settlement Class Resolution, or Case-Specific Resolution in effect as of the date of such calculation, or (2) it becomes a Participating Subdivision (in addition to all other Participating Subdivisions) prior to the date of such calculation.

       E.    *Certain Taxes.* Amounts paid by CVS under an Opioid Tax in a Settling State in a Payment Year shall give rise to a dollar-for-dollar offset against CVS's obligation to pay its share of the Annual Payment in that Payment Year that would be allocated to the taxing Settling State or its Participating Subdivisions. If such amounts paid exceed CVS's allocable share of the Annual Payment allocable to the taxing Settling State or its Participating Subdivisions in that Payment Year, the excess shall carry forward as an offset against its allocable share of remaining Annual Payments that would be allocated to the taxing Settling State or its Participating Subdivisions. CVS represents that as of December 2, 2022, there is no Opioid Tax currently in effect in any Eligible State that would give rise to this offset provision.

## XIII.  Miscellaneous

       A.    *Population of General-Purpose Governments.* The population figures for General-Purpose Governments shall be the published U.S. Census Bureau's population estimates for July

1, 2019, released May 2020.  These population figures shall remain unchanged during the term of this Agreement.[13]

B.    *Population of Special Districts*.  For any purpose in this Agreement in which the population of a Special District is used other than <u>Section IV.H.6.d</u> and <u>Section IV.H.9.d</u>:  (a) School Districts' populations will be measured by the number of students enrolled who are eligible under the Individuals with Disabilities Education Act ("*IDEA*") or Section 504 of the Rehabilitation Act of 1973; (b) Health Districts' and Hospital Districts' populations will be measured at twenty-five percent (25%) of discharges; and (c) all other Special Districts' (including fire districts' and library districts') populations will be measured at ten percent (10%) of the population served.  For the avoidance of doubt, this means that California healthcare districts will be measured at ten percent (10%) of their membership.  CVS and the Enforcement Committee shall meet and confer in order to agree on data sources for purposes of this <u>Section XIII.B</u> prior to the Preliminary Agreement Date.

C.    *Population Associated with Sheriffs*.  For any purpose in this Agreement in which the population associated with a lawsuit by a sheriff is used, the population will be measured at twenty percent (20%) of the capacity of the jail(s) operated by the sheriff.

D.    *No Admission*.  The Parties intend the settlement as described herein to be a final and complete resolution of all disputes between CVS and all Releasors.  CVS is entering into this Agreement solely for the purposes of settlement, to resolve all Actions and Released Claims and thereby avoid significant expense, inconvenience and uncertainty.  CVS denies the allegations in the Actions and denies any civil or criminal liability in the Actions.  Nothing contained herein may be taken as or deemed to be an admission or concession by CVS of: (i) any violation of any law, regulation, or ordinance; (ii) any fault, liability, or wrongdoing; (iii) the strength or weakness of any Claim or defense or allegation made in any Action, or in any other past, present or future proceeding relating to any Covered Conduct, Alleged Harms, or any Product; (iv) the legal viability of the claims and theories in any Action, including but not limited to the legal viability of the relief sought; or (v) any other matter of fact or law.  Nothing in this Agreement shall be construed or used to prohibit any Released Entity from engaging in the conduct of its business relating to any Product in accordance with the Injunctive Relief Terms and applicable laws and regulations.

E.    *Most-Favored-Nation Provision*.

1.    If, after the Effective Date, CVS enters into any settlement agreement with any Non-Settling State that resolves Claims similar in scope to the Claims released by a Settling State under this Agreement on overall payment terms that are more favorable to such Non-Settling State than the overall payment terms of the Agreement (after due consideration of relevant differences in population or other appropriate factors), then the Settling States may elect to seek review, pursuant to <u>Section XIII.E.3</u>, of the overall payment terms of this Agreement and the Non-Settling State agreement so that such

---

[13]  The estimates for counties and parishes were accessed at https://www.census.gov/data/datasets/time-series/demo/popest/2010s-countiestotal.html.  The estimates for cities and towns can currently be found at https://www.census.gov/data/datasets/time-series/demo/popest/2010s-total-cities-and-towns.html.

Settling State(s) may obtain, with respect to CVS, overall payment terms at least as favorable as those obtained by such Non-Settling State. "*Overall payment terms*" refers to consideration of all payment terms of the two agreements, taken together, including, but not limited to the amounts of payments, the timing of payments, and conditions or contingencies on payments.

2.    For any settlement with a Non-Settling State involving Released Claims that is entered into after the Effective Date, CVS shall provide the Enforcement Committee with a copy of the settlement agreement or relevant consent judgment within thirty (30) calendar days of the consummation of such settlement. The Enforcement Committee will promptly distribute such copy to all Settling States.

3.    In the event that one or more Settling State(s) believes that the overall payment terms of an agreement by CVS with a Non-Settling State are more favorable to the Non-Settling State, based on the totality of the considerations set forth in Section XIII.E.1, the Settling State(s) and CVS shall engage in the following process:

a.    The Settling State(s) shall provide notice, within sixty (60) calendar days of the date on which a settlement agreement or consent judgment is provided to the Enforcement Committee, to CVS of its (their) intent to seek revision of this Agreement to provide payment terms that are, on an overall basis, as favorable as those obtained by the Non-Settling State. To the extent allowed by law, such notice shall be confidential and not disclosed publicly and shall provide, in detail, the basis for the Settling State's (Settling States') belief that it (they) is (are) entitled to a revision of the Agreement.

b.    CVS shall, within thirty (30) calendar days, provide a response to the Settling State(s), explaining its position, in detail, as to whether the Settling State(s) is (are) entitled to more favorable overall payment terms than those provided for in this Agreement.

c.    In the event the Settling State(s) and CVS do not reach agreement as to the application of Section XIII.E.1, the Settling State(s) may petition the National Arbitration Panel to seek a ruling from the Panel as to the applicability of Section XIII.E.1, provided that the Settling State(s) may seek such review only if at least five (5) Settling States co-sign the petition. The Panel shall consider submissions and argument by the parties pursuant to the procedures set forth in Section VI.F.3.

d.    The Settling State(s) and CVS shall be bound by the determination of the National Arbitration Panel.

4.    This Section XIII.E does not apply to, and there is no ability of any Settling State to seek or obtain revision of this Agreement based on, any Non-Settling State agreement with CVS that is entered into with: (a) a Non-Settling State after a date ninety (90) calendar days prior to the scheduled start date of a trial between CVS and the Non-Settling State or any severed or bifurcated portion thereof, provided that, where, in order

to complete a settlement, a Non-Settling State and CVS jointly request an adjournment of the scheduled start date of a trial within ninety (90) calendar days of that date, this exception will apply as if the trial date had not been adjourned; (b) a Non-Settling State that previously litigated to judgment a case related to opioids against any manufacturer, distributor, or pharmacy; or (c) a Non-Settling State that has obtained any court order or judicial determination that grants judgment (in whole or in part) against CVS. For avoidance of doubt, the National Arbitration Panel shall have no power to review agreements described in this paragraph.

5.    This Section XIII.E does not apply to, and there is no ability of any Settling State to seek or obtain revision of this Agreement based on, (a) any agreement between CVS and Non-Participating Subdivisions, and (b) any global tribal settlement or any agreement between CVS and any federally-recognized tribe.

6.    This Section XIII.E will not apply to any agreement entered into more than eighteen (18) months after the Effective Date.

F.    *Tax Cooperation and Reporting*.

1.    Upon request by CVS, the Settling States and Participating Subdivisions agree to perform such further acts and to execute and deliver such further documents as may be reasonably necessary for CVS to establish the statements set forth in Section V.F to the satisfaction of their tax advisors, their independent financial auditors, the Internal Revenue Service, or any other governmental authority, including as contemplated by Treasury Regulations Section 1.162-21(b)(3)(ii) and any subsequently proposed or finalized relevant regulations or administrative guidance.

2.    Without limiting the generality of Section XIII.F.1, each Settling State and Participating Subdivision shall cooperate in good faith with CVS with respect to any tax claim, dispute, investigation, audit, examination, contest, litigation, or other proceeding relating to this Agreement.

3.    The Designated State, on behalf of all Settling States and Participating Subdivisions, shall designate one of its officers or employees to act as the "appropriate official" within the meaning of Treasury Regulations Section 1.6050X-1(f)(1)(ii)(B) (the "*Appropriate Official*").  The Designated State shall direct and ensure that the Appropriate Official timely (a) files (i) at the time this Agreement becomes binding on the Parties, an IRS Form 1098-F in the form attached as Exhibit U with respect to CVS and (ii) any legally required returns or amended returns with any applicable governmental authority, or any returns requested by CVS, and (b) provides to CVS a copy of (i) the IRS Form 1098-F filed with respect to CVS and (ii) any legally required written statement pursuant to any applicable law and any other document referred to in clause (a)(ii) above.  Any such form, return, or statement shall be prepared and filed in a manner fully consistent with Section V.F.

4.    Any return, amended return, or written statement filed or provided pursuant to Section XIII.F.3, and any similar document, shall be prepared and filed in a manner

consistent with reporting the Global Settlement Amount as the "Total amount to be paid" pursuant to this Agreement in Box 1 of IRS Form 1098-F and the Total Remediation Amount as "Restitution/remediation amount" in Box 3 of IRS Form 1098-F, as reflected in the attached Exhibit U. If the Designated State or Appropriate Official shall be required to file any return, amended return, or written statement contemplated by this Section XIII.F other than an IRS Form 1098-F in the form attached as Exhibit U, the Designated State shall direct and ensure that the Appropriate Official provides to CVS a draft of such return, amended return, or written statement no later than sixty (60) calendar days prior to the due date thereof, and shall accept any reasonable revisions from CVS on the return, amended return, or written statement.

5.    For the avoidance of doubt, neither CVS nor the Settling States and Participating Subdivisions make any warranty or representation to any Settling State, Participating Subdivision, or Releasor as to the tax consequences of the payment of the Total Remediation Amount (or any portion thereof).

G.    *No Third-Party Beneficiaries.*  Except as expressly provided in this Agreement, no portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity that is not a Settling State or Released Entity. No Settling State may assign or otherwise convey any right to enforce any provision of this Agreement.

H.    *Calculation.* Any figure or percentage referred to in this Agreement shall be carried to seven decimal places.

I.    *Construction.* None of the Parties and no Participating Subdivision shall be considered to be the drafter of this Agreement or of any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement. The headings of the provisions of this Agreement are not binding and are for reference only and do not limit, expand, or otherwise affect the contents or meaning of this Agreement.

J.    *Cooperation.* Each Party and each Participating Subdivision agrees to use reasonable efforts and to cooperate with the other Parties and Participating Subdivisions to cause this Agreement and Consent Judgments to become effective, to obtain all necessary approvals, consents and authorizations, if any, and to execute all documents and to take such other action as may be appropriate in connection herewith. Consistent with the foregoing, each Party and each Participating Subdivision agrees that it will not directly or indirectly assist or encourage any challenge to this Agreement or any Consent Judgment by any other person, and will support the integrity and enforcement of the terms of this Agreement and the Consent Judgments.

K.    *Entire Agreement.* This Agreement, including its exhibits and any other attachments, embodies the entire agreement and understanding between and among the Parties and Participating Subdivisions relating to the subject matter hereof and supersedes (1) all prior agreements and understandings relating to such subject matter, whether written or oral and (2) all purportedly contemporaneous oral agreements and understandings relating to such subject matter.

L.    *Execution*.  This Agreement may be executed in counterparts and by different signatories on separate counterparts, each of which shall be deemed an original, but all of which shall together be one and the same Agreement.  One or more counterparts of this Agreement may be delivered by facsimile or electronic transmission with the intent that it or they shall constitute an original counterpart hereof.  One or more counterparts of this Agreement may be signed by electronic signature.

M.    *Good Faith and Voluntary Entry*.  Each Party warrants and represents that it negotiated the terms of this Agreement in good faith.  Each of the Parties and Participating Subdivisions warrants and represents that it freely and voluntarily entered into this Agreement without any degree of duress or compulsion.  The Parties and Participating Subdivisions state that no promise of any kind or nature whatsoever (other than the written terms of this Agreement) was made to them to induce them to enter into this Agreement.

N.    *Legal Obligations*.  Nothing in this Agreement shall relieve CVS of the obligation to comply with all state and federal laws, regulations or rules, nor does any provision herein permit any acts or practices prohibited by such laws, regulations, or rules.  Except with respect to the Injunctive Relief Terms, in the event of a conflict between this Agreement and any requirement or requirements of federal, state, or local laws, such that CVS cannot comply with this Agreement without violating such a requirement or requirements, CVS shall document such conflicts and notify the Attorney(s) General of the relevant Settling State(s) that it intends to comply with the requirement or requirements to the extent necessary to eliminate the conflict.  With respect to the Injunctive Relief Terms, in the event of such a conflict, the procedures set forth in the Injunctive Relief Terms will be followed.

O.    *No Prevailing Party*.  The Parties and Participating Subdivisions each agree that they are not the prevailing party in this action, for purposes of any claim for fees, costs, or expenses as prevailing parties arising under common law or under the terms of any statute, because the Parties and Participating Subdivisions have reached a good faith settlement.  The Parties and Participating Subdivisions each further waive any right to challenge or contest the validity of this Agreement on any ground, including, without limitation, that any term is unconstitutional or is preempted by, or in conflict with, any current or future law.  Nothing in the previous sentence shall modify, or be construed to conflict with, Section XIII.N.

P.    *Non-Admissibility*.  Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement: (i) is or may be deemed to be or may be used as an admission or evidence relating to any matter of fact or law alleged in the Actions, the strength or weakness of any claim or defense or allegation made in those cases, or any wrongdoing, fault, or liability of any Released Entities; or (ii) is or may be deemed to be or may be used as an admission or evidence relating to any liability, fault or omission of Released Entities in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement shall be admissible in any proceeding for any purpose, except to enforce the terms of this Agreement, and except that Released Entities may file or use this Agreement in any action (1) involving a determination regarding insurance coverage; (2) involving a determination of the taxable income or tax liability of any Released Entities; (3) to support a defense or counterclaim

58

based on principles of res judicata, collateral estoppel, release, good-faith settlement, judgment bar or reduction or on any other theory of claim preclusion or issue preclusion or similar defense or counterclaim; (4) to support a claim for contribution and/or indemnification; or (5) to support any other argument or defense by a Released Entities that the Remediation Payment provides a measure of compensation for Alleged Harms or otherwise satisfy the relief sought.

Q.    *Notices.*  All notices or other communications under this Agreement shall be in writing (including, but not limited to, electronic communications) and shall be given to the recipients indicated below:

For the Attorney(s) General:

Josh Stein, Attorney General
North Carolina Department of Justice
Attn: Daniel Mosteller, Deputy General Counsel
PO Box 629
Raleigh, NC 27602
Dmosteller@ncdoj.gov

Dave Yost, Attorney General
Ohio Attorney's General Office
Attn: Jonathan Blanton, First Assistant Attorney General
30 East Broad Street
Columbus, OH 43215
Jonathan.Blanton@OhioAGO.gov

Letitia James, Attorney General
New York State Office of the Attorney General
Attn: Jennifer Levy, First Deputy Attorney General
28 Liberty Street
New York, NY 10005
Jennifer.Levy@ag.ny.gov

For the Plaintiffs' Executive Committee:

Paul T. Farrell, Jr.
Farrell & Fuller, LLP
270 Munoz Rivera Ave., Suite 201
San Juan, Puerto Rico 00918
paul@farrellfuller.com

Jayne Conroy
Simmons Hanly Conroy LLC
112 Madison Avenue, 7th Floor
New York, NY 10016-7416
JConroy@simmonsfirm.com

59

Joseph F. Rice
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
jrice@motleyrice.com

For CVS:

Elizabeth Ferguson
Senior Vice President and Deputy General Counsel
CVS Health Corporation
One CVS Drive
Woonsocket, RI 02895
betsy.ferguson@cvshealth.com

Notices to CVS's attorneys shall be delivered to:

Eric Delinsky
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036-5807
edelinsky@zuckerman.com

Perry Rowthorn
Jepsen Rowthorn LLP
PO Box 370496
West Hartford, CT 06137
perry@jeprow.com

Any Party or the Plaintiffs' Executive Committee may change or add the contact information of the persons designated to receive notice on its behalf by notice given (effective upon the giving of such notice) as provided in this <u>Section XIII.Q.</u>

R.      *No Waiver.*  The waiver of any rights conferred hereunder shall be effective only if made by written instrument executed by the waiving Party or Parties.  The waiver by any Party of any breach of this Agreement shall not be deemed to be or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, nor shall such waiver be deemed to be or construed as a waiver by any other Party.

S.      *Severability.*  In the event any one or more immaterial provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement.

T.      *Preservation of Privilege.*  Nothing contained in this Agreement or any Consent Judgment, and no act required to be performed pursuant to this Agreement or any Consent

60

WITH TECHNICAL CORRECTIONS 02.03.2023

Judgment, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, or common interest/joint defense privilege, and each Party and Participating Subdivision agrees that it shall not make or cause to be made in any forum any assertion to the contrary.

U.    *Successors.*

1.    This Agreement shall be binding upon, and inure to the benefit of, the Parties and their respective successors and assigns.

2.    CVS shall not sell the majority of its voting stock or substantially all its assets without obtaining the acquiror's agreement that it will constitute a successor with respect to CVS's obligations under this Agreement.

3.    CVS shall not in one (1) transaction, or a series of related transactions, sell, or transfer assets (other than sales or transfers of inventories, or sales or transfers to an entity owed directly or indirectly by CVS) having a fair market value equal to twenty-five percent (25%) or more of the consolidated assets of CVS where the sale or transfer transaction is announced after the Effective Date, is not for fair consideration, and would foreseeably and unreasonably jeopardize CVS's ability to make the payments under this Agreement that are due on or before the third Payment Date following the close of a sale or transfer transaction. The above restriction shall not apply if CVS obtains the acquiror's agreement that it will be either a guarantor of or successor to the percentage of CVS's remaining payment obligations under this Agreement equal to the percentage of CVS's consolidated assets being sold or transferred in such transaction. Percentages under this section shall be determined in accordance with the United States generally accepted accounting principles and as of the date of CVS's most recent publicly filed consolidated balance sheet prior to the date of entry into the sale or transfer agreement at issue. This Section XIII.U.3 shall be enforceable solely by the Enforcement Committee, and any objection under this Section XIII.U.3 not raised within twenty (20) calendar days from the date that CVS transmits notice of the transaction to the Enforcement Committee is waived. Any dispute under this Section XIII.U.3 shall be a National Dispute as described in Section VI.F.3 and must be raised exclusively with the National Arbitration Panel as described therein within twenty (20) calendar days of the announcement, and the sole remedy shall be an order enjoining the transaction.

V.    *Waiver.* CVS, for good and valuable consideration the receipt of which is acknowledged, hereby (a) waives, foregoes and relinquishes all rights to utilize and/or seek relief under any of the following laws of the State of Texas for the restructuring of its debts or liabilities related to Released Claims, Claims that would have been Released Claims if they had been brought by a Releasor against a Released Entity before the Effective Date, or this Agreement: Tex. Bus. Orgs. Code § 10.003 (Contents of Plan of Merger: More Than One Successor) or any other statute of Subchapter A of Chapter 10 of Tex. Bus. Orgs. Code to the extent such statute relates to multi-successor mergers (and/or any other similar laws or statutes in any other state or territory); Tex. Bus. Orgs. Code §§ 11.01–11.414 (Winding Up and Termination of Domestic Entity); or Tex. Bus. & Com. Code §§ 23.01–23.33 (Assignments for the Benefit of Creditors) (collectively, the "*Texas*

61

*Statutes*"), and (b) agrees, warrants and represents that it will not file, request or petition for relief under the Texas Statutes related to its debts or liabilities related to Released Claims, Claims that would have been Released Claims if they had been brought by a Releasor against a Released Entity before the Effective Date, or this Agreement, in each case until such time as all of CVS's payment obligations incurred hereunder are satisfied in full. The foregoing waiver and relinquishment includes, without limitation, until such time as all of CVS's payment obligations incurred hereunder are satisfied in full, CVS's rights to execute a divisional merger or equivalent transaction or restructuring related to its debts or liabilities related to Released Claims, Claims that would have been Released Claims if they had been brought by a Releasor against a Released Entity before the Effective Date, or this Agreement that in each case has the intent or foreseeable effect of (i) separating material assets from material liabilities and (ii) assigning or allocating all or a substantial portion of those liabilities to any subsidiary or affiliate that files for relief under chapter 11 of the Bankruptcy Code, or pursuant to which such subsidiary or affiliate that files for relief under chapter 11 of the Bankruptcy Code would be assuming or retaining all or a substantial portion of those liabilities.

W.    *Modification, Amendment, Alteration.*    In the event the Plaintiffs' Executive Committee, the Executive Committee of the State Attorneys General, or CVS concludes prior to January 18, 2023 that technical corrections are required to this Agreement, the Plaintiffs' Executive Committee, the Executive Committee of the State Attorneys General, and CVS shall meet and confer and make such amendments as they agree are appropriate. Except as otherwise provided in this Agreement, after the Reference Date, any modification, amendment, or alteration of this Agreement by the Parties shall be binding only if evidenced in writing signed by CVS, along with the signatures of at least two-thirds of the Settling States along with a representation from each such Settling State that either: (1) the Advisory Committee or similar entity established or recognized by that Settling State (either pursuant to Section V.E.2.d, by a State-Subdivision Agreement, or by statute) voted in favor of the modification, amendment or alteration of this Agreement including at least one member appointed by the Participating Subdivisions listed on Exhibit G; or (2) in States without any Advisory Committee, that 50.1% (by population) of the Participating Subdivisions listed on Exhibit G expressed approval of the modification, amendment, or alteration of this Agreement in a writing.

X.    *Termination.*

1.    Unless otherwise agreed to by CVS and the Settling State in question, this Agreement or the Consent Judgment as to that Settling State and all of its terms (except Section XIII.P and any other non-admissibility provisions, which shall continue in full force and effect) shall be canceled and terminated with respect to the Settling State, and the Agreement and all orders issued by the courts in the Settling State pursuant to the Agreement shall become null and void and of no effect, only if one or more of the following conditions applies:

a.    a Consent Judgment approving this Agreement without modification of any of the Agreement's terms has not been entered as to the Settling State by a court of competent jurisdiction on or before one hundred eighty (180) days after the Effective Date; or

b.    this Agreement has been disapproved by a court of competent jurisdiction to which it was presented for approval and/or entry (or, in the event of an appeal from or review of a decision of such a court to approve this Agreement and the Consent Judgment, by the court hearing such appeal or conducting such review), and the time to appeal from such disapproval has expired, or, in the event of an appeal from such disapproval, the appeal has been dismissed or the disapproval has been affirmed by the court of last resort to which such appeal has been taken and such dismissal or disapproval has become no longer subject to further appeal (including, without limitation, review by the United States Supreme Court).

2.    If this Agreement is terminated with respect to a Settling State for whatever reason pursuant to Section XIII.X.1, then:

a.    an applicable statute of limitation or any similar time requirement (excluding any statute of repose) shall be tolled from the date the Settling State signed this Agreement until the later of the time permitted by applicable law or for one year from the date of such termination, with the effect that CVS and the Settling State in question shall be in the same position with respect to the statute of limitation as they were at the time the Settling State filed its action; and

b.    CVS and the Settling State in question shall jointly move the relevant court of competent jurisdiction for an order reinstating the actions and claims dismissed pursuant to the terms of this Agreement governing dismissal, with the effect that CVS and the Settling State in question shall be in the same position with respect to those actions and claims as they were at the time the action or claim was stayed or dismissed.

3.    Unless CVS and the Enforcement Committee agree otherwise, this Agreement, with the exception of the Injunctive Relief Terms that have their own provisions on duration, shall terminate as to all Parties after the Payment Date for Payment Year 10, *provided* that CVS has performed its payment obligations under the Agreement as of that date.  Notwithstanding any other provision in this Section XIII.X.3 or in this Agreement, all releases under this Agreement will remain effective in perpetuity.

Y.    *Governing Law.*  Except (1) as otherwise provided in this Agreement or (2) as necessary, in the sole judgment of the National Arbitration Panel, to promote uniformity of interpretation for matters within the scope of the National Arbitration Panel's authority, this Agreement shall be governed by and interpreted in accordance with the respective laws of each Settling State, without regard to the conflict of law rules of such Settling State, that is seeking to enforce the Agreement against CVS or against which CVS is seeking enforcement. Notwithstanding any other provision in this subsection on governing law, any disputes relating to the Settlement Fund Escrow shall be governed by and interpreted in accordance with the law of the state where the escrow agent has its primary place of business.