# EXHIBIT 5

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                            FOURTH JUDICIAL DISTRICT

---

AVERA GETTYSBURG d/b/a
AVERA GETTYSBURG, et al.,                    Case File No.: 27-CV-23-17610
                                                  Case Type: Civil Other/Misc.
                    Plaintiffs,                    Judge: Karen A. Janisch

vs.                                            **Order on Walgreens and CVS
                                              Defendants' Joint Motion To
TEVA PHARMACEUTICAL                                   Dismiss**
INDUSTRIES LTD., et al.,

                    Defendants.

---

This matter came before Judge Karen A. Janisch of District Court on January 14, 2025,

for a hearing on the Walgreens and CVS Defendants Motion to Dismiss.

Shawn Raiter, Esq., appeared on behalf of the Plaintiffs.

Conor O'Croinin, Esq., and Ariella Muller, Esq., appeared on behalf Defendants
Walgreen Co., Walgreen astern Co., Inc. CVS Pharmacy, Inc, CVS Indiana, L.L.C.

Based upon all the files, records, and proceedings herein, the Court issues the following:

# Order

1. Defendants Walgreen Co., Walgreen Eastern Co., Inc. CVS Pharmacy, Inc, CVS Indiana,
   L.L.C. ("Defendants")  Motion to Dismiss for Lack of Personal Jurisdiction as to non-
   Minnesota hospitals and medical clinics is **Granted**.

   a. Claims against Defendant from Plaintiffs Avera Gettysburg, Avery Holy Family,
      Avera McKennan, Avera Queen of Peace, Avera St. Anthony's Hospital, Avera
      St. Luke's, Avera St. Mary's, Sacred Heart Health Services, St. Benedict Health
      Center, Sanford Bismarck, Sanford, Medical Center, Sanford Medical Center
      Fargo are **Dismissed**, without prejudice.

   b. Claims against Defendants from Plaintiff Sanford Health Network seeking relief
      for Sanford Aberdeen Medical Center, Sanford Canton Inwood Medical Center,
      Sanford Clear Lake Medical Center, Sanford Sheldon Medical Center, Sanford
      Vermillion Medical Center, and Sandford Webster Medical Center are **Dismissed,**
      without prejudice.

      c.   Claims against Defendants from Plaintiff Sanford Health Network North seeking relief for Sanford Hillsboro Medical Center and Sanford Mayville Medical Center are **Dismissed,** without prejudice.

      d.   As a result of the dismissal of these entities, Counts 3, 4 and 5 of the Complaint are Dismissed, without prejudice.

2.   Defendants Motion to Dismiss the claims of the remaining Plaintiffs' is **Granted.** As to Defendants:

      a.   Counts 1 and 2 are **Dismissed** with prejudice.

      b.   Counts 8, 9 and 10 are **Dismissed** without prejudice.

      c.   Count 7 as to a common law claim of nuisance is **Dismissed** without prejudice, and as to a statutory claim of nuisance under Minn. Stat. § 609.74 is **Dismissed,** with prejudice.

3.   The attached Memorandum of the Court is incorporated as part of this Order.

4.   Entry of judgment is stayed pending resolution of all remaining claims against all remaining parties.

By the Court:

Janisch, Karen
2025.05.22
14:30:45 -05'00'

_____
Karen A. Janisch
Judge of District Court

# Memorandum

Plaintiffs Avera Gettysburg, et. al. are a group of 57 private hospitals located in Minnesota, South Dakota, North Dakota, Nebraska, and Iowa. *(Complaint ¶¶ 1–32).* Through the Complaint, Plaintiffs assert claims including against various Defendants including Walgreen Co., Walgreen Eastern Co., Inc. CVS Pharmacy, Inc, CVS Indiana, L.L.C. ("Pharmacy Defendants"). The Pharmacy Defendants move to dismiss the non-Minnesota Plaintiffs asserting Minnesota state court lacks personal jurisdiction over the non-Minnesota entities. As to the personal jurisdiction motion, the Pharmacy Defendants seek dismissal of the non-Minnesota hospital defendants and claims, including the claims asserted to arise for hospitals located in Nebraska, Iowa, South Dakota and North Dakota that arise under Nebraska, South Dakota, North Dakota and Iowa common law or statutory law. Plaintiffs oppose the motion asserting personal jurisdiction exists in Minnesota to redress as to all Plaintiffs' claims.

The Pharmacy Defendants also move for dismissal of all Plaintiffs' claims against them for failure to state a claim upon which relief may be granted. Specifically, Defendants assert Plaintiffs' claims are (1) barred by the medical lien statute as the exclusive source of any remedy, (2) fail as a matter of law based on lack of proximate cause; (3) that Plaintiffs' lack standing under Minnesota law based on the indirect injury to Plaintiffs; (4) that the terms of the Consent Judgement and Releases in the State's settlement of opioid claims with these Defendants released Plaintiff's statutory claims; (5) that the Nuisance claims (common law and/or statutory) fail based on the other theories and for failure to assert a "special injury;" and (6) other challenges to the ability of Plaintiffs to establish a viable claim under the theories plead.

# General Overview of Facts Alleged[1]

## A.    The Parties

Defendant Walgreen Co. is an Illinois corporation with its principal place of business located in Deerfield, Illinois. (*Compl. ¶ 103*). Defendant Walgreen Eastern Co., Inc. ("WEC") is a New York corporation with its principal place of business in Deerfield, Illinois. (*Id.*). Walgreen Co. and WEC are jointly referred to as "Walgreens." (*Id.*). Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business in Rhode Island. (*Compl. ¶ 107*). Defendant CVS Indiana, L.L.C. is an Indiana limited liability company with its principal place of business located in Rhode Island. (*Id. at ¶ 108*). Defendants CVS Pharmacy, Inc. and CVS Indiana, L.L.C. are referred to jointly as "CVS." (*Id. at ¶ 109*).  Pharmacy Defendants are not Minnesota entities, or entities with their principal place of business in Minnesota.  The only Defendant with a principal place of business in Minnesota is Dakota Drug, Inc.  *(Id. at ¶ 101)*.

Plaintiffs include 57 private hospitals located in Minnesota, South Dakota, North Dakota, Nebraska, and Iowa.  *(Id. at ¶¶ 1–32)*.  Table 1 lists the individual Plaintiffs and the state in which it operates.

**Table 1:**

| Entity | Location |
| --- | --- |
| Avera Gettysburg | South Dakota |
| Avera Granite Falls | Minnesota |
| Avera Holy Family | Iowa |
| Avera Marshall | Minnesota |
| Avera McKennan | South Dakota |
| Avera Queen of Peace | South Dakota |
| Avera St. Anthony's Hospital | Nebraska |

---

[1] The Complaint is more than 200 pages and relating to more than 50 individual entities as parties.  This summary is not intended as a complete summary of the allegations in the Complaint.  It is provided to give context to the Court's decision.  Nothing in this summary is a finding of fact or in any way relieves a party the obligation to establish any fact in relation to any future motions or trial.

| | |
|---|---|
| Avera St. Luke's | South Dakota |
| Avera St. Mary's | South Dakota |
| Avera Tyler | Minnesota |
| Sacred Heart Health Services | South Dakota |
| St. Benedict Health Center | South Dakota |
| Carris Health, LLC | Minnesota |
| Carris Health – Redwood, LLC | Minnesota |
| Centra Care Health System Long Prairie | Minnesota |
| CentraCare Health System Melrose | Minnesota |
| CentraCare Health System – NR, LLC | Minnesota |
| CentraCare Health – Paynesville LLC | Minnesota |
| The Saint Cloud Hospital | Minnesota |
| Hutchinson Health | Minnesota |
| Lakeview Memorial Health Association, Inc | Minnesota |
| Park Nicollet Methodist Hospital | Minnesota |
| Regions Hospital | Minnesota |
| Hennepin Healthcare System, Inc. d/b/a HCMC | Minnesota |
| Sanford Bismarck | North Dakota |
| Sanford Health of Northern Minnesota | Minnesota |
| Sanford Medical Center | South Dakota |
| Sanford Medical Center Fargo | North Dakota |

Plaintiff Sanford Health Network has its principal place of business in South Dakota and operates 11 medical centers, five (5) in Minnesota and six (6) outside of Minnesota in South Dakota and Iowa. *(Complaint ¶ 29)*. Table 2 lists names and locations for the medical clinics in the Sanford Health Network:[2]

**Table 2:**

| Entity | Location |
|---|---|
| Sanford Aberdeen Medical Center | South Dakota |
| Sanford Canby Medical Center | Minnesota |
| Sanford Canton Inwood Medical Center | South Dakota |
| Sanford Clear Lake Medical Center | South Dakota |
| Sanford Jackson Medical Center | Minnesota |
| Sanford Sheldon Medical Center | Iowa |
| Sanford Tracy Medical Center | Minnesota |
| Sanford Vermillion Medical Center | South Dakota |

---

[2] For Sandford Health Network and Sanford Health Network North, the specific nature of the "network" as a distinct legal entity and the nature of each medical clinic in the network as to status as a separate or related legal entity is not clearly established in the record.

| Sanford Webster Medical Center | South Dakota |
| Sanford Westbrook Medical Center | Minnesota |
| Sanford Worthington Medical Center | Minnesota |

Plaintiff Sanford Health Network North also has its principal place of business in South Dakota and includes two (2) medical centers operating Minnesota and two (2) medical centers operating in North Dakota. *(Complaint ¶ 32).* Table 3 lists the medical centers and locations for those comprising the Sanford Health Network North:

Table 3:

| Entity | Location |
| --- | --- |
| Sanford Hillsboro Medical Center | North Dakota |
| Sanford Mayville Medical Center | North Dakota |
| Sanford Medical Center in Thief River Falls | Minnesota |
| Sanford Wheaton Medical Center | Minnesota |

## B.    Alleged Facts of Dispute

Plaintiffs make wide- and far-reaching allegations as to the defendants' collective faults and alleged wrongdoing in marketing, distribution, and providing opiate drugs to consumers in and around Minnesota.[3]  The crux of the allegations is that wrongful conduct and/or inactions of the Pharmacy Defendants, themselves, or in concert with other non-participating defendants,[4] regarding opiate drugs have raised the financial costs of these hospitals by increasing the frequency and cost of opiate-related conditions for the hospitals and patients who are unable to pay for the medical services provided.  Throughout the 230-page Complaint, Plaintiffs make a

---

[3]  Many allegations in the Complaint refer generally to "Defendants" without any distinction between the various named defendants.

[4]  The Walgreens, CVS and Dakota Drug, Inc. are the only remaining participating Defendants in this action. By prior orders of the Court and stipulations between Plaintiffs and various Defendants, Plaintiffs claims against all of the other named Defendants were severed from this litigation and assigned to five separate case files.  Some of those severed claims with Defendants have been fully resolved and judgments of dismissal have entered.

host of allegations as to both the Defendants as a class and as to each Defendant individually. The Complaint divides the Defendants into two broad classes: Marketing and Distributor Defendants. Broadly, the former are alleged to have taken illegal actions in marketing opiates to doctors, hospitals, and consumers. The latter are alleged to have taken illegal actions as to distributing the drugs. As this Motion is brough only by the Pharmacy Defendants, the Court focuses on the facts alleged in relation to their conduct.

### 1.    Marketing Defendants Generally

Although the Court primarily focuses on the Distributor Defendants, it will briefly summarize the allegations against the Marketing Defendants, some of which is realleged as to all Defendants.

In general, the Marketing Defendants are alleged to have created conditions for doctors to prescribe more opiate products than medically necessary and to have downplayed the addictiveness and effects of their drugs for greater profits. The Complaint alleges a number of falsehoods the Marketing Defendants perpetuated regarding opioid efficacy, addictiveness and use. *(Compl., ¶¶ 124–147)*. In addition to disclosing these statements directly, the Marketing Defendants are alleged to have created "Front Groups"[5] to disseminate patient education materials, treatment guidelines, and other marketing messages to medical professionals. *(Id. at ¶¶ 151–52)*. They are also alleged to have paid or influenced several doctors and medical groups to spread these messages. *(Id. at ¶¶ 151–74)*. There also some allegations of direct marketing to patients. *(Id. at ¶ 204)*. Plaintiffs allege that these marketing schemes were intentionally deceptive and created for the purpose of increasing their sales of opioids and opioid related products. *(Id. at ¶¶ 229– 32)*.

---

[5] These groups typically have official names such as the "American Pain Foundation." *(Compl., ¶ 152)*.

The *Complaint* goes on to identify specific allegations as to most of the Marketing Defendants as well as several unnamed Defendants. In addition to specific allegations against the Marketing Defendants, Plaintiffs make specific allegations as to CVS and their partnership with Purdue, Endo, and Actavis, three unnamed Marketing Defendants. *(Id. at ¶¶ 393–97).* The crux of these allegations is that CVS aided the Defendants in marketing specific drugs such as creating a brand loyalty program and sending letters to patients homes to promote Opana, a drug manufactured by Endo. *(Id. at ¶ 396).*

## 2.    Distributor Defendants Generally

Some of the Distributor Defendants as named in the Complaint held licenses to distribute prescription drugs and distributed them to doctors, pharmacies, hospitals (including Plaintiffs) and other health care settings in Minnesota and regionally. *(Compl. ¶ 85).* However, as to Walgreens and CVS, Plaintiffs allege they "distributed opioids to their own retail stores. All of these opioids were then purchased by consumers in Minnesota and the Region." *(Id.)* There is no allegation that the Pharmacy Defendants distributed to doctors, hospitals or medical clinics.

The thrust of the allegations against the Distributor Defendants is that the failed to take required or otherwise adequate measures to prevent opioids from diverting thereby creating or exacerbating the nationwide opioid crisis. Plaintiffs' allegations against Distributor Defendants fall into several categories. First, Plaintiffs allege that Distributor Defendants conspired with Marketing Defendants to sell more opiates than medically necessary. Second, Plaintiffs allege that Distributor Defendants conspired with each other and with Marketing Defendants to obtain coverage for prescription opioids, influence government policies and limit law enforcement as to opiates. Third, Plaintiffs allege that Distributor Defendants were aware of the fact that opiates were being diverted away from medically use to criminal uses. Plaintiffs also allege that

Distributor Defendants failed to take steps to prevent opiates from being diverted from genuine prescribed customers.

On the first point, Plaintiffs allege that Distributor Defendants received financial incentives from the Marketing Defendants to distribute higher volumes of opiates and to refrain from reporting or rejecting suspicious orders.  (*Compl., ¶ 418*).  As wholesalers, Distributor Defendants bought in bulk from Marketing Defendants and were thus incentivized to purchase larger quantities than necessary.  *(Id.)*.  Marketing Defendants also engaged in the practice of paying rebates and/or chargebacks to Distributor Defendants for opioids which was another way to incentivize greater sales.  (*Id. at ¶ 419*).  Marketing Defendants allegedly installed security vaults for Distributor Defendants in exchange for agreements to maintain minimum sales performance thresholds, which Distributor Defendants agreed to.  (*Id. at ¶ 420).*

Plaintiffs also allege that all the Distributor Defendants were part of the "Healthcare Distribution Alliance ('HDA')," an organization Plaintiffs allege was used to facilitate sales of opioids and […].  (*Id. at ¶ 424.*  Distributor and Marketing Defendants used the HDA to share detailed information regarding opioid sales, distribution, and other information that would help sell opioids.  *(Id. at ¶ 427).*  In addition to sharing knowledge, Distributor and Marketing Defendants used the HDA to control the flow of information and limit law enforcement's ability to "rein in illicit or inappropriate prescribing or distribution."  *(id. at ¶ 431).*

Plaintiffs allege the Distributor Defendants through their HDA network and their own observational data each had sufficient knowledge to know that a significant portion of the opiates they sold were being diverted and that they were selling far more opioids into certain communities than could have been reasonably expected for customers for legitimate medical use.  *(Id. at ¶ 436).*  Defendants allegedly possessed patient and prescriber level data sophisticated enough to inform them "the number of pills that [a pharmacy] sold, how many non-controlled

substances were sold compared to controlled substances, whether the pharmacy purchased opioids from other distributors, and the types of medical providers in the area." *(Id.).* Plaintiffs allege this information was sufficient for Defendants to have acted upon to prevent diversion. *(See id. at ¶ 437).*

Plaintiffs most robust allegations concern the Distributor Defendants' alleged failures to monitor suspicious orders and failure to act to prevent diversion. Distributor Defendants had duties under state and federal laws to monitor and report suspicious opioid orders. *(Id. at ¶ 448).* "Suspicious orders" include orders "of an unusual size, orders of unusual frequency or orders deviating substantially from a normal pattern." *(Id. at ¶ 458).* The DEA highlighted these duties in a series of letters to the Distributor Defendants. *(Id. at ¶¶ 4062–63).* Despite awareness, Distributor Defendants allegedly failed to properly train staff to report and block suspicious orders, failed to investigate or block customers who placed suspicious orders repeatedly, and continued delivering drugs to customers who made suspicious orders. *(Id. at ¶¶ 475–87).* When Distributor Defendants did identify a customer as suspicious, Plaintiffs allege the Distributor Defendants failed to report or improperly delayed reporting of the orders to federal and state authorities. *(Id. at ¶ 491).* Finally, Plaintiffs alleged Distributor Defendants had inadequate reporting systems and failed to retain knowledge of suspicious prescribers or customers. *(Id. at ¶ 490).*

### 3.    Allegations Against CVS

In addition to allegations about the Distributor Defendants generally, Plaintiffs make several specific averments as to CVS and their alleged failure to prevent the opioids they supplied from being diverted. Plaintiffs allege the DEA informed CVS of its reporting obligations in December 2010, but CVS did not report its first suspicious opioid order until February 2012, and had reported only 7 orders to the DEA across all of its distribution centers as

of November 21, 2013. *(Id. at ¶ 560).* Plaintiffs also allege that CVS conspired with other distributors such as Cardinal and McKesson to deflate the number of suspicious orders they reported. *(Id. at ¶ 563–64).* Plaintiffs allege CVS also worked with various manufacturing and marketing entities to promote and market Endo opioids including Opana ER to customers[6] and that it helped Actavis in participating with Cardinal in marketing and receiving rebates and invoices on products, as incentive to increase sales. *(Id. at ¶ 395-399).*

Plaintiffs also include multiple civil settlements in their Complaint and about other lawsuits and government enforcement actions CVS has incurred in the past. *(Id.* at ¶¶ *568–81).*

### 4.    Allegations Against Walgreens

Plaintiffs also make specific allegations as to Walgreens and their failure to prevent opioids they supplied from being diverted. Walgreens have been using formulas to identify suspicious orders since 1998. *(Id. at ¶ 582).* These formulas however are alleged to be based only on the size of an order and not frequency or pattern. *(Id. at ¶ 585).* Despite relying on only one criteria, Walgreens is alleged to have received thousands of pages of orders labeled as "suspicious" under their own formula, but failed to report them to the DEA, or otherwise act on them until it was too late. *(Id. at ¶¶ 587–88).* These ongoing issues resulted in an "immediate suspension order" ("ISO") issued by the DEA for Walgreen's distribution center in Jupiter, Florida. *(Id. at ¶ 589).*

Plaintiffs also allege that Walgreen's suspicious order management system was deficient. *(Id. at ¶ 599).* Among other things, Plaintiffs allege that instead of reporting or otherwise dealing with certain suspicious orders, Walgreens would simply fulfill that order up to the store's limit. *(Id. at ¶ 601).* Plaintiffs' Complaint contains specific allegations as to one of the

---

[6] It is unclear if any of the "areas where Opana ER had preferred formulary status" were in Minnesota.

employees who managed suspicious orders from 2009–12 who identifies several deficiencies with Walgreens' system, including reports of one particularly suspicious store which was apparently shipped 36,200 dosage units of opioids a week, despite the pharmacy serving a town of 3,000 people.[7]  *(Id. at ¶605).*  Walgreens continued to ship large amounts of opioids to this store even after being alerted to the orders, at least through January 2011.  *(Id.).*

Walgreens is also alleged to have failed to train their pharmacies at the retail level into recognizing and preventing diversion from suspicious orders.  (*Id. at ¶¶ 615–18).*  And, as with CVS, Plaintiffs include multiple settlements and enforcement actions against Walgreens.  *(Id. at ¶¶ 629–34).*

### 5.  Impact on General Public and Hospitals

Plaintiffs allege the opioid epidemic has become one of the US's defining health challenges of the last decade.  Between 2000 and 2017, Minnesota's opioid-related deaths increased 500% and now kill more Minnesotans every year than homicides.  *(Id. at ¶ 656-58).*  Beyond deaths, opioids also cause Minnesotans a host of other health and social problems.  *(Id. at ¶¶ 659–60).*  Plaintiffs allege the massive distribution of prescribed opioids by Defendants caused the opioid epidemic to expand to include illegal, nonprescribed opioids like heroin, heroin addition, abuse and death.  *(Id. ¶ 661).*

As hospitals, *plaintiffs* allege that they are legally and morally required to treat patients with opioid-related conditions.  *(Id. at ¶ 663).*  Among the laws plaintiffs cite for the requirement is the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. 1395dd, "which require hospital emergency departments that accept payments from Medicare to provide care to anyone seeking treatment for a medical condition, regardless of citizenship, legal status,

---

[7] The Complaint does not identify the location of this town.  Based on the nature and context of the allegations, the Court has no reason to believe it is located in Minnesota.

or ability to pay." *(Id. at ¶ 673).* In 2021, there were apparently 502,563 opioid related Emergency Department visits. *(Id. at ¶ 672).* Hospitals receive a lower rate of realization from treating patients with opioid related conditions than those without. *(Id. at ¶ 679).*

Treatments and care related to opioid conditions are complex and expensive including for opioid overdose, opioid addition, hepatitis C, HIV and other conditions from intravenous drug use, neonatal treatment for addicted babies and psychiatric and mental health treatments. *(Id. at § 678).* In short, hospitals treating patients for opioid related issues are expensive services and these treatments for patients with opioid related conditions results in "operational losses" in providing the medical services related to treating patients with conditions related to opioids, staff training in relation to opioid treatments and purchasing Naloxone. *(Id. at ¶ 683).* As compared to other medical services, the opioid related treatments and services have higher levels of uncompensated care.

## Claims Asserted Against Pharmacy Defendants

Plaintiffs' Complaint asserts against the Pharmacy Defendants statutory claims under Minnesota, Iowa, Nebraska and North Dakota consumer protection statutes, as well as, tort and equitable claims:

Count 1:      Violation of Minnesota's Prevention of Consumer Fraud Act,
              Minn. Stat. § 325F.68, *et seq.*

Count 2       Violation of Minnesota's Deceptive and Unfair Trade Practices
              Act, Minn. Stat. §§ 325D.43–325D.48.

Count 3       Violation of Nebraska's Consumer Protection Act, Neb. Rev. Stat.
              §§ 59-1601, *et seq.*

Count 4       Violation of North Dakota's Consumer Fraud Act, N.D.C.C.
              §§ 51-15-01, *et seq.*

Count 5       Violation of South Dakota's Deceptive Trade Practices and
              Consumer Protection Act, SDLC § 37-24-1, *et seq.*

Count 7[8]      Nuisance

Count 8        Fraud and Deceit

Count 9        Civil Conspiracy

Count 10       Unjust Enrichment

## Summary of Issues

A.  Whether the Court has personal jurisdiction over the claims for redress from hospitals and medical centers located in Iowa, Nebraska, North Dakota and South Dakota.

B.  Whether all claims should be dismissed because the Minnesota Medical Lien Act provides an exclusive remedy.

C.  Whether all claims should be dismissed for lack of proximate cause.

D.  Whether Plaintiffs' statutory claims should be dismissed as time barred, failure to plead with particularity, and failure to state a claim.

E.  Whether Plaintiffs' common law claims should be dismissed for lack of standing, failure to plead fraud with particularity or failure to state a claim.

F.  Whether Plaintiffs' Nuisance claims (common law or statutory) are precluded by the other motions or fail to state a valid claim.

G.  Whether Plaintiff's state a valid claim for unjust enrichment and any other claims .

## Analysis

## I.    Specific Personal Jurisdiction.

Under Minnesota's long arm statute, a court has personal jurisdiction over a nonresident corporation or individual who "transacts any business within the state." Minn. Stat. § 543.19, subd. 1(2).  Minnesota's long-arm statute "extend[s] the personal jurisdiction of Minnesota courts as far as the Due Process Clause of the federal constitution allows." *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 410 (Minn. 1992). Minnesota courts apply both state and federal law to determine issues of personal jurisdiction. *Id.* at 411. Under the United States

---

[8] Count 6 is asserted only against the Marketing Defendants.

Constitution, the Due Process Clause of the Fourteenth Amendment requires that nonresident defendants have "minimum contacts" with the forum state before courts of that state can exercise personal jurisdiction over them and that maintaining the lawsuit "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Minnesota courts have adopted a five-factor test "to determine whether the exercise of personal jurisdiction over a foreign defendant is consistent with due process." *Juelich v. Yamazaki Mazak Optonics Corp.*, 682 N.W.2d 565, 570 (Minn. 2004). The five factors are: "(1) the quantity of contacts with the forum state; (2) the nature and quality of those contacts; (3) the connection of the cause of action with these contacts; (4) the interest of the state providing a forum; and (5) the convenience of the parties." *Id.* The first three factors determine if the defendant has the minimum contacts required for personal jurisdiction and the final two determine whether exercising jurisdiction based on those contacts is reasonable based on "traditional notions of fair play and substantial justice." *Id.* at 570-571.

Because the Pharmacy Defendants are not Minnesota business entities and do not have their primary place of business located in Minnesota, this motion is one related to specific rather than general personal jurisdiction. For specific personal jurisdiction "the Due Process Clause requires that the case arise out of or be related to the contacts with the forum." *Valspar Corp.*, 495 N.W.2d at 411. Specific personal jurisdiction is present when "the defendant's contacts with the forum state are limited, yet connected with the plaintiff's claim such that the claim arises out of or relates to the defendant's contacts with the forum." *Domtar, Inc. v. Niagara Fire Ins. Co.*, 533 N.W.2d 25, 30 (Minn. 1995). The minimum contacts analysis to support specific personal jurisdiction centers on "the relationship among the defendant, the forum, and the litigation," and

the "defendant's suit-related conduct must create a substantial connection with the forum state."
*Walden v. Fiore,* 134 S.Ct. 1115, 1121 (2014).

The connection with the forum state must constitute a purposeful availment of the laws and protections of the forum such that the defendant could reasonably anticipate being brought into court in the forum state to resolve legal disputes. *Id.* In determining the minimum contacts necessary, the Court "look[s] to the defendant's contacts within the forum State itself" and not "'random, fortuitous, or attenuated' contacts" with persons who reside there. *Id.* at 1122-23.

When personal jurisdiction is challenged, a plaintiff must make a *prima facie* showing that personal jurisdiction is proper to survive a motion to dismiss. *Bandemer v. Ford Motor Company*, 931 N.W.2d 744, 749 (Minn. 2019). For the purposes of this motion, the Court accepts the factual allegations in the Complaint and supporting affidavits as true. *Id.* Finally, "in doubtful cases, doubts should be resolved in favor of retention of jurisdiction." *Hardrives, Inc. v. City of LaCrosse, Wisconsin*, 240 N.W.2d 814, 818 (Minn. 1976).

### A.    Nature, Quality, and Quantity of Contacts.

Parts one through three of the personal jurisdiction calculus relate to contacts with a forum state.  The Court will consider them together.[9]  "The first three factors determine whether minimum contacts exist and the last two factors determine whether jurisdiction is reasonable according to traditional notions of fair play and substantial justice." *Rilley v. MoneyMutual, LLC*, 884 N.W.2d 321, 328 (Minn. 2016).  The primary issue to consider under the first factor is the purposefulness of the contacts.  *See Paisley Park Enterprises, Inc. v. Boxill*, 361 F. Supp. 3d 869, 877 (D. Minn. 2019).  Contact that is "random, fortuitous, and attenuated" does not satisfy the first factor.  *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 594

---

[9] Many courts analyzing these factors consider these factors together. *See Rilley v. MoneyMutual,* 884 N.W.2d 321, 326 (Minn. 2016).

(8th Cir. 2011). As for the quantity of contacts, more contacts are helpful for establishing jurisdiction, but even a singular contact can be sufficient if it is sufficiently purposeful. *Pope v. Elabo GmbH*, 588 F. Supp. 2d 1008, 1020 (D. Minn. 2008); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985). As for the third factor, the inquiry is whether "the contacts are 'substantially connected' or 'related to' the litigation." *Rilley*, 884 N.W.2d at 336*; see also Bandemer v. Ford Motor Company*, 931 N.W.2d 774, 751–52 (Minn. 2019), *upheld* 592 U.S. 351 (2021). This standard does not require that the cause of action arise from the contacts to support personal jurisdiction, merely that the contacts are related to the cause of action. *Bandemer*, 931 N.W.2d at 751

Rather than alleging specific harms suffered by each hospital in each location, Plaintiffs allege generally that Defendants are nationwide corporations who have marketed their drugs across the entire Midwest region, including in Minnesota and who operated retail locations in Minnesota which included opioid prescriptions. Under Plaintiffs' theory, the Defendants have purposefully availed themselves to Minnesota by marketing and distributing drugs in the mid-west region, including in Minnesota so that any injury suffered by a hospital in any Midwest state could bring their action against the Pharmacy Defendants in Minnesota.

Plaintiffs Memorandum provides only scant analysis of the personal jurisdiction issue. *(Plaintiffs' Mem. pp. 37–39).* The theory of personal jurisdiction presented is not focused on specific actions and contacts in and with Minnesota, but rather a general "regional" approach, based in part on a theory that the opioids dispensed to a customer could be used or diverted by the customer within or outside of Minnesota. In essence, Plaintiffs argument asks this Court to find that nationwide actions that include actions operating retail pharmacies in Minnesota that dispense opioids to customers, create a regional specific jurisdiction for any hospital or medical clinic in a five-state region. (Arguably there would be no basis to limit it to a region, but the

analysis proposed would allow any facility in any state to claim personal jurisdiction over defendants in Minnesota). The analysis proposed, is far closer to a theory of general, rather than specific personal jurisdiction.

Plaintiffs rely heavily on *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.* for their argument. 592 U.S. 351 (2021). *Ford* involved product liability claims for injuries sustained in Montana and Minnesota. *Id.* at 357–58. Defendant Ford argued that plaintiffs had not alleged that the vehicles in question had been sold and distributed to those states but only that they had marketed their vehicles generally in those states. *Id.* at 361. But in finding personal jurisdiction against Ford in the states, the Supreme Court relied on the fact that Ford had marketed and sold the exact types of vehicles Plaintiffs had been injured by in those states and thus had "clear notice" that they could be subject to jurisdiction in the states if a vehicle malfunctioned. *Id.* at 368.

The problem with applying *Ford* to Plaintiffs' claims is that in *Ford* the specific injuries related to vehicle malfunction occurred in Montana and Minnesota**.** Here there are no factual averments as to the non-Minnesota hospitals that their injury occurred by conduct originating in Minnesota. Indeed, *Ford* addresses this exact scenario in its analysis of the earlier decision in *Bristol-Myers*:

> But that reading misses the point of our decision. We found jurisdiction improper in *Bristol-Myers* because the forum State, and the defendant's activities there, lacked any connection to the plaintiffs' claims. [See 582 U. S. 255, 264 (2017)]. ("What is needed— and what is missing here—is a connection between the forum and the specific claims at issue"). The plaintiffs, the Court explained, were not residents of California. They had not been prescribed Plavix in California. They had not ingested Plavix in California. And they had not sustained their injuries in California. *See ibid.* (emphasizing these points). In short, the plaintiffs were engaged in forum-shopping—suing in California because it was thought plaintiff-friendly, even though their cases had no tie to the State.

*Id.* at 369–70.

This case raises similar issues regarding lack of connection to the forum state, and—as to the non-Minnesota hospitals and clinics, apparent forum shopping. Just as in *Bristol-Myers*, Plaintiff have not alleged that the North Dakota, South Dakota, Iowa, or Nebraska hospitals have suffered any injuries in Minnesota or from conduct directed by Defendants to Minnesota, or a transaction related to the claim that actually occurred in Minnesota. Plaintiffs' theory of "regional" jurisdiction essentially creates general jurisdiction in Minnesota for any Defendant that does business in Minnesota in relation to persons or businesses in other states who assert a claim arising from the type of business conducted in Minnesota and other states. Indeed, Plaintiffs acknowledge the actions of the Pharmacy Defendants did not occur in relation to non-Minnesota facilities by asserting the law of these other states, instead of applying Minnesota statutory and common law claims to outside residents. *Ford* simply does not go that far. *Ford* does not create general "regional" jurisdiction in Minnesota just because Defendants have availed themselves to conducting business in Minnesota in relation to a product, and conduct retail pharmacy businesses nationwide. *See* 592 U.S. at 369–70.

In short, Plaintiffs have not identified any contacts of Defendants with the non-Minnesota hospitals and clinics that support personal jurisdiction in relation to their statutory and common law claims seeking redress in the Minnesota courts. The same analysis applies to Sanford "Network" Plaintiffs, which, as the network "entity" is not a resident or have a principal place of business in Minnesota, but have some clinics in the "network" in Minnesota. Plaintiffs did not address this issue and Defendants list the clinics as the entities having the claims without addressing the named Plaintiff being the "network." The Court finds specific personal jurisdiction for the Network Plaintiffs only in relation to the injuries and claims related to the Minnesota clinics. Claims related to opioid related harms and losses at medical clinics in other

states are not related to any meaningful conduct directed to Minnesota by the Pharmacy
Defendants.

**B.    Fairness Factors**

After evaluating whether minimum contacts exist, the Court considers whether exercising
jurisdiction comports with "traditional notions of fair play and substantial justice." *Rilley*, 884
N.W.2d at 338 (citations omitted).  The "reasonableness" determination includes consideration
of the interests of the forum state and the convenience of the parties.  *Id.*  These factors are
secondary to the minimum contacts analysis.  *Dent-Air, Inc. v. Beech Mountain Air Service, Inc.*,
332 N.W.2d 904, 907 (Minn. 1983).

Both of these factors also cut against finding personal jurisdiction in Minnesota for
injuries suffered by out-of-state hospitals at out of state hospitals.  Minnesota has zero legitimate
interest in adjudicating claims for hospitals and medical clinics located in Iowa, Nebraska, or the
Dakotas that claim losses related to providing treatment and care in those other states to patients
in the other states and arising under the laws of those foreign jurisdictions.  Because the
Pharmacy Defendants have retail locations in each of the other states, the non-Minnesota entities
have a viable forum in their states to bring their claims.  These entities were not injured in
Minnesota, or injured by a defendant who is a resident of Minnesota.  Minnesota also has no
interest in adjudicating claims under the business and consumer regulatory statutes and common
law of these other states that relate specifically to actions occurring within the entities in the
states where they engage in their businesses.

Minnesota is also not the most appropriate forum to adjudicate matters of Nebraska,
North Dakota or South Dakota consumer protection laws as Plaintiffs ask.  The courts of those
states, not Minnesota should be interpreting their statutory and common law to the greatest
extent possible.  Under the substantive law of these various states as developed by the courts in

those states, the outcomes may be very different than application of Minnesota's law. The fact that the courts of different states may come to different results as to Plaintiffs claims is not "unfair" in any manner and is simply a feature of our multi-judicial system. Indeed, it is the intended result in which our state/federal system of government and judiciaries operate. As to the non-Minnesota hospital and clinics, their parent companies, although conducting some business in Minnesota, are organized and headquartered in these other states, often for business regulatory and tax advantages. The courts and juries in those states applying their state's laws is the most appropriate method to address the alleged injuries.

To the extent Plaintiffs sought a broader, "regional" jurisdiction, they could have asserted these claims to support federal jurisdiction, where there are more ample support and staffing for the trial courts to address large-multi-state litigation. Instead, out of all of the defendants initially named in the litigation, Plaintiffs went out of their way to find a single, smaller, local distributor (Dakota) to ensure a defeat of complete diversity for purposes of federal jurisdiction. As was present in *Brystol-Myers,* the inclusion of the out of state hospitals is more about forum shopping for a perceived more "plaintiff-friendly" forum in Minnesota state court. The fairness factors significantly favor a finding that the Court lacks personal jurisdiction over the claims asserted by and in relation to the out of state entities.

The Court will dismiss all claims by the non-Minnesota hospitals. As to Sanford Medical Center and Sanford Medical Center North, they may remain as plaintiffs and litigate, in this matter the claims arising from and in relation to their hospital/clinics located in Minnesota. Because Counts III, IV and V arise solely in relation to the claims for which the Court finds there is no personal jurisdiction. Counts III, IV and V are dismissed.

## II.    Arguments for Dismissal of All Claims

The Pharmacy Defendants seek dismissal of all of the remaining Plaintiffs claims on various theories. The Court notes that both the Pharmacy Defendants and Plaintiffs briefing focused significantly on decisions in opioid related hospital cases from other jurisdictions. The focus on decisions from other state and federal courts was not particularly helpful to the Court. The viability of the remaining Plaintiffs' claims are based exclusively on application of Minnesota law. Some of the theories presented are raise issues uniquely specific to Minnesota pleading standards, precedential case law and statutes. In reviewing many of the out of state cases cited, the Court was frustrated because many turned on issues specific to the statutory and precedential decisions of those foreign jurisdictions. In its analysis, this Court has attempted to stay directly tethered to Minnesota law.

### A.    Minnesota Medical Lien Statute

The Pharmacy Defendants move for dismissal of all of Plaintiffs' claims based on Minnesota's Medical Lien Statute, Minn. Stat. §§ 514.68 – 514.72 ("MLA").

The MLA provides in relevant part:

> Any person, firm, or corporation operating a hospital in this state shall have a lien for the reasonable charges for hospital care of an injured person upon any and all causes of action accruing to the person to whom such care was furnished, or to the legal representatives of such person, on account of injuries giving rise to such causes of action and which necessitated such hospital care, subject, however, to any attorney's lien.

Minn. Stat. § 541.68. The Pharmacy Defendants argue the MLA provides the _exclusive_ means for Plaintiffs to recover costs for providing medical services to individuals who suffer injuries requiring medical care where the patient's care was caused by the wrongful acts of a third-party. Plaintiffs argue that dismissal is not appropriate because relief under the MLA does not bar it from asserting liability asserting claims for their alleged injuries and damages. The plain language of the MLA provides for a lien as against "any and all causes of action accruing to the person to whom such care was furnished[.]" _Id._ It is a means for any person or entity operation a

hospital to potentially receive payment on the lien if the patient recovers for injuries giving rise to the cause of action. *Id.* There is very little case law interpreting the operation or scope of the MLA.

The sole Minnesota case cited by the Pharmacy Defendants is *State Department of Human Services. v. Mohs,* 496 N.W.2d 817 (Minn. App. 1993). *Mohs* addressed a medical assistance lien under Minn. Stat. § 256B.042 (1990). *Id.* at 819. The Court of Appeals held a non-recipient of benefits had no obligation to inform the state agency about a lawsuit and settlement of a claim in which settlement payments were made to a recipient of state benefits. *Id.* at 820. Instead, the Court of Appeals noted that its interpretation of Minn. Stat. § 256B.042, was consistent with considerations that release of settlement proceeds by the at-fault third party is not actionable unless the lien was perfected. *Id.* at 180. The holding in *Mohs* does not relate to the exclusive remedy argument presented by the Pharmacy Defendants and is not helpful in relation to the present motion.

The Pharmacy Defendants' argument under the MLA is primarily predicated on the Arizona Supreme Court's decision in *CVS Pharmacy, Inc. v. Bostwick,* 494 P.3d 572 (Ariz. 2021). In *Bostwick*, the Arizona Supreme Court reviewed a trial court's denial of CVS's motion to dismiss opioid related claims for "negligence, wanton negligence, negligence per se, negligent distribution, nuisance, and unjust enrichment" brought by plaintiff hospitals. *Id.* at 576. As in this case, the Hospitals alleged that "defendants inflicted economic harm on the hospital both in the form of uncompensated care it was required to provide to opioid-addicted patients, and for additional expenses it incurred as a result of the opioid epidemic." *Id.* at 577. The Arizona court labeled the former as "indirect" or "derivative" damages and the later as "direct" damages. As to the indirect damages (those for uncompensated care) the Arizona court analyzed whether Arizona' Medical Lien Statute, and its case law interpreting the statute precluded the hospital's

claim against CVS. *Id.* at 577-78. *Bostwick's* reasoning was based on Arizona's existing case law that precludes assignment of personal injury claims and its determination the health care provider had no direct claim against the party who caused the injury to the patient for which the hospital provided care. *Id.* There was also Arizona precedent recognizing the medical lien statute was an *exclusive* avenue for relief because "those statutes 'created a right and also provide[] a complete and valid remedy for the right created." *Id.* (citations omitted).

Although Arizona's analysis in *Bostwick* may overlap with concepts under Minnesota law related to remoteness and standing which are addressed under Minnesota law in later sections of this Order, the Court does not find it persuasive in relation to a determination that the MLA bars claims based on exclusivity as a remedy. The Pharmacy Defendants cite no Minnesota case law supporting that (1) Minnesota's MLA mirrors the language (or critical language) of the Arizona statute; or (2) that the Minnesota appellate courts have interpreted the MLA as an "exclusive remedy" and that the statute acts as a bar to claims for which a medical lien may be asserted.

Under Minnesota law, statutes are presumed to be "consistent with the common law, and if a statute abrogates the common law, the abrogation must be by express wording or necessary implication." *Shaw Acquisition Co. v. Bank of Elk River,* 639, N.W.2d 873, 877 (Minn. 2002). Nothing in the language of the MLA supports it was intended to abrogate a hospital or medical provider's existing common law rights or claims (to the extent they exist). Arguably the MLA was necessary to provide a statutory vehicle for assertion of rights related to medical care for a patient whose injuries were caused by the wrongdoing of another because Minnesota's own common law did not provide for a direct claim. However, under this circumstance, the Court should instead be determining whether a direct claim exists under Minnesota law, rather than looking to interpret the MLA as intended as an exclusive remedy and a "bar" to otherwise valid claims. Thus, to the extent Plaintiffs establish they have a valid cause of action against the

Pharmacy Defendants, the MLA has not abrogated the common law or statutory claims and does not bar the Hospital's right to pursue the claim. Whether the Hospitals otherwise have standing and the right to assert claims against the Pharmacy Defendants, is a distinct issue, addressed in relation to the standing, *infra.* Dismissal of the Plaintiffs' claims based on the MMA being an exclusive statutory remedy is not appropriate.

### B.    Proximate Cause

The Pharmacy Defendants argue all Plaintiffs' claims must be dismissed because of a lack of proximate cause. The Pharmacy Defendants argue that Plaintiffs' claims relate to their distribution of opioids to their retail pharmacies and that the actions of others in misusing the prescription medication, diverting their medications to others, stealing opioid medications, or using illegal opioids such as heroine, break the causal chain as to the Pharmacy Defendants' alleged conduct and the Hospitals' injuries in providing medical care and treatment at their facilities for patients, including those who were unable to pay for the care.[10]

"[I]n order for a party's negligence to be the proximate cause of an injury "the act [must be] one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others, though he could not have anticipated the particular injury which did happen." [F]or a party's negligence to be the proximate cause of an injury," the injury must be a foreseeable result of the negligent act and the act must be a substantial factor in bringing about the injury. *Staub as Tr. of Weeks v. Myrtle Lake Resort*, LLC, 964 N.W.2d 613, 620 (Minn. 2021); *Lubbers v. Anderson*, 539 N.W.2d 398, 401–02 (Minn. 1995). There may be more than one substantial factor—in other words, more than one proximate cause—that contributes to an injury. *Staub*, 964 N.W.2d at 620. "Generally, proximate cause is a question of fact for the jury;

---

[10] The issue of indirect harms and "remoteness" is part of the standing analysis addressed, *infra.* This section focuses on broader general concepts of foreseeability in relation to the causal chain.

however, where reasonable minds can arrive at only one conclusion, proximate cause is a question of law." *Lubbers*, 539 N.W.2d at 402.

A criminal act of a third person is generally an intervening efficient cause sufficient to break the chain of proximate causation. *Hilligoss v. Cross* Companies, 228 N.W.2d 585, 586 (Minn. 1975) (citing *Anderson v. Theisen*, 43 N.W.2d 272 (Minn. 1950). However, to be a legally sufficient intervening cause, the criminal act itself must not be reasonably foreseeable. *Id.* (citing *Wallinga v. Johnson*, 131 N.W.2d 216 (Minn. 1964)); Restatement, Torts 2d, ss 302B, 448, 449. The question of foreseeability of an intervening criminal act is normally one for the trial court and should be submitted to a jury only where there might be a reasonable difference of opinion. *Strobel v. Chicago, R.I. & P.R. Co.*, 96 N.W.2d 195 (Minn. 1959).

Plaintiffs theory of harm requires the Court to consider foreseeability as to: (1) whether it was foreseeable that the opioids would be diverted; (2) whether it was foreseeable after diversion that a user would be injured by use and require medical care and treatment; or alternatively, (3) whether the amount of dispensing of opioids made it foreseeable legal users of the prescriptions would be addicted turning to illegal opioids and then requiring care and treatment at Plaintiffs' facilities.

Defendants cite *State Ex Rel. Stenehjem v. Purdue Pharma L.P.*, a district court case from North Dakota to argue that the claims here are too attenuated to satisfy proximate cause principles. 2019 WL 2245743, at *11 (N.D. Dist. May 10, 2019). *Stenehjem* was an analogous lawsuit brought by the State of North Dakota against Purdue Pharma for its misleading and deceptive opioid marketing campaign in North Dakota, in which the state district court found the proposed causal chain was "too attenuated" to be actionable under principles of proximate cause *Id. Stenehjem* is not precedential on this Court. It was dismissed on the pleadings under North Dakota, not Minnesota law and under North Dakota's stricter pleading standard. *Stenehjem* is

also factually different, involving only Marketing Defendants. The *Stenehjem* court found that "changing the message" as to opioids to include stronger warnings and labeling did not have a clear effect as to whether fewer would be sold and that there were numerous intervening causes to consider such as: "the [prescribing] doctor's independent medical judgment, the patient's decision whether and how to use the medication, the patient's response to the medication, and the State's own decision to reimburse the prescriptions." *Id. Stenehjem* is not persuasive, because Minnesota Court have dealt with the remoteness issue as one of standing.

Applying consideration of the allegations under the generous notice pleading standards applicable to a motion to dismiss, the allegations in the Complaint are sufficient as to evidence that could be produced that could establish foreseeability in relation to the causal chain and alleged intervening criminal conduct to withstand a motion to dismiss.

## III.    Dismissal of Common Law and Equitable Claims.

The Pharmacy Defendants move for dismissal of Counts 7 through 10 on the grounds that Plaintiffs' Complaint fails to establish standing because, as medical facilities, Plaintiffs economic harms are derivative claims of the injured patients. Alternatively, the Pharmacy Defendants argue the Complaint fails to sufficiently state a valid claim under Minnesota law for the Nuisance, Fraud, Civil Conspiracy and Unjust Enrichment.

### A.    Standing—Remote/Derivative Injury.

"Standing is the requirement that a party has a sufficient state in a justiciable controversy to seek relief from a court." *State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 493 (Minn. 1996). It presents a threshold issue for the Court. Standing is based on a party having a sufficient "injury in-fact" to support the claim, or alternatively, by a statutory grant of standing. *Id.* The Pharmacy Defendants' argument is predicated on the Minnesota Supreme Court's

dismissal of Blue Cross Blue Shield of Minnesota's non-statutory claims against the tobacco defendants in *Philip Morris* for lack of standing. *Id.*

In *Philip Morris,* the Minnesota Supreme Court addressed the trial court's denial of a motion to dismiss for lack of standing. *Id.* at 490. The tobacco defendants challenged whether Blue Cross Blue Shield—as a health insurer—could bring common law tort claims, statutory consumer protection claims and equitable claims for injuries it claims it sustained in relation to medical care for individuals with conditions caused by smoking. *Id.* Blue Cross asserted that as a non-profit entity under Minnesota law, it played a special role in regard to provision of efficient health services, having a broader role in relation to protection of public health. *Id.* at 492. Blue Cross alleged damages "resulting from the fact that it has paid and will pay substantially higher amounts to its contracted health care providers due to the increased cost of health care services for treatment of smoking-related illnesses in its nicotine-addicted consumer/patients." *Id.* at 492.

Philip Morris argued that Blue Cross's claims common law claims could not proceed because they were indirect claims of for damages for harms to individual patients for which Blue Cross lacked standing. *Id.* The trial court denied the motion to dismiss identifying five reasons supporting standing, many similar to those raised by Plaintiffs in this motion, including:

> 1) Blue Cross is the natural plaintiff for this suit and best able to pursue the claim because it has direct knowledge of the matter at issue and because any recovery will benefit Blue Cross subscribers directly; 2) whether or not Blue Cross actually recouped all its costs is a fact question to be answered after full discovery; 3) Blue Cross is not too remote a plaintiff to complain of harm allegedly caused by defendant tobacco companies; 4) as a health organization, Blue Cross has and will suffer a direct negative impact as a result of any conspiracy among the tobacco companies; 5) Blue Cross seeks relief independent from that available to smokers, such as pain and suffering. Finally, regarding the motion to dismiss the tort and antitrust claims, the trial court held that in the instance of the tort claim, it would not rule on the soundness of Blue Cross's tort theory that the tobacco companies had breached a duty independent of any it might owe its smoking customers.

*Id.* at 492-93.

Ruling for the tobacco defendants, the Minnesota Supreme Court held that the injuries caused by the tobacco companies' alleged wrongful conduct created were injuries to the smokers, who had the direct claim for damages arising from those injuries. *Id.* at 495. Blue Cross did not establish that the tobacco companies owed it a "duty under any traditional theory of tort law" and the assertion that the tobacco companies assumed "'special duty' by virtue of public representations made since the 1950s, when the connection between smoking and cancer were first established." *Id. at 493.* The Minnesota Supreme Court focused on the nature of the injuries allegedly suffered by Blue Cross. *Id.* The Minnesota Supreme Court determined that the "injury to Blue Cross appears to derive from injuries to consumers, the smokers" and the alleged wrongful conduct resulted in economic injury to "Blue Cross only because its consumer-patients remain more seriously addicted to nicotine for longer periods of time, thus requiring more medical care." *Id.* at 495. The Court held that the smoker/consumers were the most "directly" injured and that despite Blue Cross being a party who would "vigorously" pursue claims for injury, the injury to Blue Cross was remote and indirect, precluding standing for the tort claims. *Id.* The Minnesota Supreme Court did not dispute that Blue Cross suffered economic harms, but held the indirect nature of the injuries (arising through the medical injury suffered by the smokers) precluded standing. *Id.*

*Philip Morris* is a precedential decision in Minnesota. It appears to be the only Minnesota case directly addressing standing in relation to increased medical costs and expenses brought by a private entity in relation to medical caused by a public health crisis caused by private businesses as defendants.[11] *Philip Morris* characterized the remoteness issue as one of

---

[11] The Pharmacy Defendants also cite to *State of Sao Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*, a Delaware case which affirmed for similar reasons dismissals of claims brought by foreign governments seeking recovery of medical expenses tied to treating tobacco-related health problems. 919 A.2d 1116 (Del. 2007). Delaware fashioned the issue as proximate causation rather than standing issue. *Id.* at 1119.

standing due to the lack of a direct injury-in-fact, rather than an issue of proximate cause, but in doing so, used "remoteness" and indirect nature of the injury to the private insurer as grounds for the lack of standing. 551 N.W.2d at 495. Indeed, in subsequent cases against the tobacco companies, the Minnesota Supreme Court again characterized the issue as one of standing. *See Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 7 (Minn. 2001) ("[W]e held that the injury to Blue Cross was too remote from the alleged misconduct for it to assert a direct claim, and neither its unusual status as something more than a typical health insurer nor its claim that the tobacco companies assumed a "special duty" could overcome this barrier to standing.") Put differently, Blue Cross's claims could only be brought under subrogation, allowing them to stand in the shoes of the smokers. *See Philip Morris*, 551 N.W.2d at 495.

Plaintiffs are not health insurers but have obligations to provide medical care, treatment and services to individuals with opioid related medical conditions that require care and treatment, whether from legal or illegal use by the patient. Plaintiffs assert economic injury for costs and expenses for providing this care to the patients who for these services cannot pay the medical expenses at a higher rate than other types of medical care. Plaintiffs assert their legal obligation to providing emergency care regardless of ability to pay, results in a special status in relation to their economic injuries. It is unclear the extent to which Plaintiffs, like Blue Cross, may absorb these costs and spread them across its charges for services for those who are insured or otherwise able to pay for their care, but as in *Philip Morris,* this potential fact issue does not avoid lack of standing.

Here, the nature of Plaintiffs' economic injuries—the issue on which *Philip Morris* rests—are based on the costs related to the medical care for individual patients who have experienced an injury related to opioid use that requires the patient to require the medical care and treatment. Plaintiffs' harms are only incurred through the individual patient who is suffering

the physical injury from opioid use. The direct injury from the Pharmacy Defendants' alleged breach of duties is to the opioid user who becomes a patient at Plaintiffs' facilities, not the facilities. Under the MLA, Plaintiffs may have a lien against the claims of the patient (insured or uninsured) in relation to the Pharmacy Defendants or other at fault parties, or a claim for payment against the patient (or spouse or estate) for payment of the uncompensated care and treatment.

The injuries asserted here essentially the same as those found to be indirect and insufficient to confer standing in *Philip Morris*. Indeed, the reasons asserted as to establishing standing in this case are similar to those found by the district court in *Philip Morris* that were rejected by the Minnesota Supreme Court. *See* 551 N.W.2d at 492–93. Since *Philip Morris* issued, the Minnesota appellate courts have not limited or narrowed its application. Plaintiffs here assert common law tort claims for fraud and civil conspiracy. Plaintiffs' claims for fraud and civil conspiracy are predicated on alleged intentional or negligent breach of duties of care in relation to dispensing addictive opioid medications at its retail pharmacies. Its common law and statutory duties are owed to its customers at the retail pharmacy and to the general public under the statutory and regulatory framework for dispensing opioid drugs. The physical injuries suffered as a result of breaches of duties or care, statutes, or regulations that result in the need for medical care and treatment are suffered solely by the individual end-users. Under *Philip Morris,* Plaintiffs lack standing to assert each of these claims.

The standing analysis under *Philip Morris* in relation to Plaintiffs' Nuisance claim depends on whether the claim is a statutory nuisance claim, or a common law claim based on a breach of a statutory duty. Analysis as to statutory and common law Nuisance, and standing are addressed, *infra*.

### B.    Common Law Fraud.

Plaintiffs argue they have a direct claim for injuries for the Pharmacy Defendants "fraud and deceit."  Fraud is an intentional tort for which scienter is an essential element.  *See Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn. 1986).  "[A] representation is made with fraudulent intent when it is known to be false or, in the alternative, when it is asserted as of the representer's own knowledge when he or she does not in fact know whether it is true or false.  *Id.*  Fraud must be plead with particularity under Minn. R. Civ. P. 9.02.  "[T]he circumstances required to be [pleaded] with particularity under Rule [9.02] are the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [they] obtained thereby." *Angeles v. Medtronic, Inc.*, 863 N.W.2d 404, 422 (Minn. 2015).

In relation to Plaintiffs' common law fraud claim, the Court has reviewed the Complaint and Plaintiffs' identification of the allegations in the Complaint supporting their claim of fraud against the Pharmacy Defendants.  The failure to specifically plead what false statements or other allegedly fraudulent conduct each of the Pharmacy Defendants specifically did, as opposed to global reference to "Defendants" is insufficient to plead a claim for common law fraud as to each plaintiff in relation to each Pharmacy Defendant.  This is an alternative basis for a dismissal without prejudice in addition to the standing.

### C.    Common Law Civil Conspiracy.

There is no civil action for conspiracy.  *Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio*, 41 N.W.2d 818, 825 (Minn. 1950).  A civil conspiracy claim requires that the plaintiff establish an underlying tort and an agreement among the defendants to carry out that tort.  *Id.* at 824.  The underlying tort claims are the fraud and nuisance.  As reflected by the allegations in the Complaint the injuries suffered by the hospitals as to the asserted tort claims are suffered directly by the opioid users who come to the hospitals for care and treatment and the Plaintiffs' harms

occur when those injured opioid users are unable to pay for the costs and expenses related to their care and treatment. Under *Philip Morris,* Plaintiffs lack standing to pursue the tort theory under a civil conspiracy.

### D.    Unjust Enrichment

Plaintiffs' last common law claim stems from the doctrine of unjust enrichment. "Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." *Herlache v. Rucks*, 990 N.W. 2d 443, 450 (Minn. 2023). However, an unjust enrichment claim does not lie simply when one party "benefits from the efforts or obligations of others" but the plaintiff must show that the defendant was enriched "illegally or unlawfully, or in a manner that is morally wrong." *Id.* As an equitable doctrine, the Court has broad authority to fashion remedies for a claim of unjust enrichment. *Id.* at 451.

Although plaintiffs have made voluminous allegations as to the harm suffered by the hospitals, the Court cannot see from the Complaint how Defendants were directly enriched by Plaintiffs' conduct. Like Plaintiffs' other common law claims, their unjust enrichment claim is derivative—Plaintiffs are essentially alleging that they conferred a benefit on Defendants by treating patients for opioid related illnesses thereby allowing them to sell more opioid products than medically necessary. Even taking all of these allegations as true, they do not amount to a benefit conferred to Defendants. The hospitals conferred the benefit to the patients, not retail pharmacies.

This is consistent with the Minnesota Supreme Court's decision as to Blue Cross Blue Shield's equitable claim for unjust enrichment in *Philip Morris.* As to standing on the equitable claims, the Minnesota Supreme Court found Blue Cross Blue Shield had standing to pursue the equitable claims plead, but that "such standing is limited to pursuit of injunctive relief on these

claims." *Id.* at 498.  There was not standing to pursue recoupment of money under the theories, including unjust enrichment.  *Id.*  Here, Plaintiffs Complaint seeks, monetary payment as equitable relief as restitution and/or disgorgement.  Plaintiffs have not sought injunctive relief in relation to the equitable claim for unjust enrichment.

Plaintiffs cited cases are unpersuasive.  *State v. Purdue Pharma L.P.* dealt with *parens patriae* claims by Minnesota's Attorney General on behalf of the State and citizens of the State harmed by the opioid epidemic.  2019 WL 11729023 (Minn. 4th. Dist. 2019). The holding in *Philip Morris* as to standing is only as to the private entity, Blue Cross and Blue Shield, and not the State, through the Attorney General who is imbued with special status under Minnesota law to assert claims in the public interest.  This is also the case in *State v. Juul Labs*.  2023 WL 2586110 (Minn. 4th. Dist. 2023), which were claims brought by the unique authority vested in the Minnesota Attorney General to assert claims on behalf of the State and any of its citizens. Plaintiffs have not cited a case nor can the Court find one in which a sufferer of a derivative harm had standing under a claim for unjust enrichment to pursue monetary relief.  Based on the pleading of only monetary relief, under *Philip Morris,* dismissal without prejudice for lack of standing for this appropriate as to Count IX for Unjust Enrichment.

## IV.    Arguments for Dismissal of the Statutory Claims.

### A.    Statute of Limitations.

The Pharmacy Defendants argue is that the conduct alleged in the Complaint as giving rise to Plaintiffs' claims occurred more than six-year statute before this case was initiated and that these claims are barred by Minnesota's six-year limitations period for statutory claims as set forth in Minn Stat. § 541.05, subd. 1(2).  Affidavits of service on file reflect service on the Pharmacy Defendants between November 22, 2023 and December 7, 2023.  A six-year

limitations period would require Plaintiffs' claims against the Pharmacy Defendants to have accrued on or after November 22, 2017.

A statute of limitations defense is an affirmative defense and the party asserting it bears the burden of establishing its application. *Hansen v. U.S. Bank Nat'l Assoc.,* 934 N.W.2d 319, 326 (Minn. 2019). On a motion to dismiss, dismissal may be granted "only when it is clear from the stated allegations in the complaint that the statute of limitations has run.: *Id.* The Court cannot make any assumptions or inferences in favor of the moving party to establish that the claims are time barred. *Id* (citing *Joyce v. Armstrong Teasdale, LLP,* 635 F.3d 364, 367 (8th Cir. 2011)).

The statute of limitation begins to run when a cause of action accrues. *Hanson,* 934 N.W.2d at 327. Minnesota follows the "some damage" rule of accrual. *Id.* Accrual under this rule requires that "some damage" has occurred as a result of the alleged wrongful actions, here actions in violation of statutory duties, but does not require that the plaintiff know or have awareness of all the operative facts giving rise to the cause of action. *Id.* Plaintiffs' Complaint includes significant allegations related to the existence of the opioid epidemic and its impacts on the health of people using prescribed or unprescribed opioids and increasing medical costs to treat their conditions well before November of 2017. Plaintiffs assert their claims against these Pharmacy Defendants are not barred based on tolling for fraudulent concealment, and tolling in relation to the national class actions in which Plaintiffs could have opted into.

### 1.    Fraudulent Concealment.

"Fraudulent concealment tolls the statute of limitations until the party discovers, or has a reasonable opportunity to discover, the concealed defect." *Hydra-Mac, Inc. v. Onan Corp.* 450 N.W.2d 913, 918 (Minn. 1990). "However, it does so only if it is the very existence of the facts which establish the cause of action which are fraudulently concealed." *Id. (citing Wild v. Rarig,*

234 N.W.2d 775, 795 (Minn. 1975)). "Merely establishing that a defendant had intentionally concealed the alleged defects is insufficient; the claimant must establish that it was actually unaware that the defect existed before a finding of fraudulent concealment can be sustained." *Id.*

Although reversed on other grounds, *Curtis v. Altria Group, Inc.* held that the fraudulent concealment doctrine can be applied to claims asserted under the Minnesota's CFA. 792 N.W.2d 836, 860, *rev'd on other grounds*, 813 N.W.2d 891 (Minn. 2012). Finding that genuine issues of material fact existed as to whether fraudulent concealment occurred, the *Curtis* court reversed the decision of the district court to dismiss the case on that basis. *Id.* at 861.

Facts related to fraud to support a CFA claims must be pled with particularity. *Baker v. Best Buy Stores, LP*, 812 N.W.2d 177, 183 (Minn. App. 2012). Plaintiffs' allegations of fraudulent concealment are tied to pleadings of fraud in the Complaint. As noted, *supra,* the issue with considering fraudulent concealment as to Plaintiffs' CFA claims is that the averments in the Complaint asserting fraud are unclear because they do not identify the acts of the particular Defendants—CVS and Walgreens— and what conduct these Defendants engaged in to conceal from Plaintiffs the accrual of Plaintiffs' claims. Paragraphs 703 through 714 of the Complaint alleging fraudulent concealment focus primarily on misleading information presented to the medical community to increase the sale of opioids, which are directed primarily at the Manufacturing and Marketing Defendants. *(Compl. ¶¶ 703–14).* Where actions are tied to CVS and Walgreens there are general averments, or alternatively related to certain manufacturers, products and areas.

The Minnesota appellate courts have not specifically addressed whether a plaintiff must anticipate a statute of limitations defense and plead facts of "fraudulent concealment" for tolling of the limitations period with particularity. The Court is skeptical of imposing a heightened pleading standard in relation to assertion of facts to countermand a potential affirmative defense

a defendant may (or may not) raise.  As to facts supporting fraudulent concealment in relation to accrual of Plaintiffs CFA causes of action under the "some damage" rule, the Complaint cites specific evidence in the public and professional arena of the "opioid crisis" and the published statistics related to increased medical treatment and services to address patients with opioid related medical conditions.  According to the Complaint, Defendants allegedly fraudulent campaigns lasted for years.  Allegations against the Pharmacy Defendants are alleged to have occurred from 2006 to 2014, resulting in at least some lawsuits and judgments before 2014.  *(Compl.* ¶¶ 568–79, 629–34).

*Hydra-Mac* makes it clear that a plaintiff cannot merely allege that Defendants (or the Pharmacy Defendants particularly) fraudulently concealed facts, but also that Plaintiffs were "actually unaware that the defect existed[.]"  450 N.W.2d at 918.  On the face of the Complaint, the conduct at issue and Plaintiffs' alleged harm from increased costs from treating opioid related medical conditions stretched well before 2017 and litigation related to the conduct was initiated before 2014, when Plaintiffs would have been aware of the allegedly unlawful actions sufficient to investigate their own claims.  From the facts plead in the complaint fraudulent concealment did not preclude Plaintiffs' knowledge they suffered some harm as to accrual of their claims and does not toll the limitations period.

## 2.    American Pipe Tolling.

Plaintiffs assert that they are entitled to bring their claims based on equitable tolling of the limitations period pursuant to the doctrine set forth in *American Pipe and Construction Co. V. Utah,* 414 U.S. 538, 552, 94 S. Ct.756, 765 (1974).  Plaintiffs contend that under *American Pipe,* the statute of limitations on their individual claims against these Pharmacy Defendants was tolled for the period of time in which a national class action was awaiting certification.  Namely, Plaintiffs contend that a national class action of hospitals was started in New Mexico Federal

Court in 2019[12] and Plaintiffs are putative members of that class and thus eligible for *American Pipe* tolling from the date of that filing.

*American Pipe* involved consideration of <u>*federal*</u> law and limitations period for actions where a <u>*federal*</u> antitrust class action had been initiated, but the class action allegations were dismissed for insufficient numerosity. *Id.* 761. The Supreme Court noted that commencement of an action asserting class claims commences the action on behalf of all putative class members. *Id.* 765. The Supreme Court stated:

> We are convinced that the rule most consistent with <u>*federal*</u> class action procedure must be that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.

*Id.* at 766 (emphasis added). The Supreme Court held that under federal law where a defendant had notice of the potential class based claims against it, the applicable limitations period is tolled for the period of time under which class certification and determinations as to participation in the class are made. *Id.* at 766-67. Several years later, the U.S. Supreme Court extended American Pipe tolling to putative class members who later filed individual suits and separate actions. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983).

*American Pipe* has since created a split among state courts on whether the tolling applies to a state court action when the underlying action was filed in federal court. The majority of state courts around the country appear to follow *American Pipe* for *intra*-jurisdictional tolling for class actions filed in the same jurisdiction. *See, e.g.*, *First Baptist Church of Citronelle v. Citronelle-Mobile Gathering, Inc.*, 409 So. 2d 727, 730 (Ala. 1981); *Grimes v. Hous. Auth. of the City of New Haven*, 698 A.2d 302, 306 (Conn. 1997); *see also Castillo v. St. Croix Basic Servs., Inc.*, 72

---

[12] Astoundingly, neither party provided the exact case that Plaintiffs contend is responsible for the tolling. The Court understands from oral arguments and briefings that the action is a 2019 case filed in the Federal District of New Mexico that primarily comprises of New Mexico hospitals but subsumes a nationwide class of hospitals that Plaintiffs may opt into.

V.I. 528, 553 (V.I. Super. Ct. 2020) (collecting cases).  Cross-jurisdictional tolling, however, between courts in separate judicial systems is a more contested issue, with varying results in state courts.  *Compare, Portwood v. Ford Motor Co.*, 183 Ill. 2d 459, 467 (Ill. 1998) ("[W]e affirm the circuit and appellate courts' holding that the Illinois statute of limitations is not tolled during the pendency of a class action in federal court."), *and Ravitch v. Pricewaterhouse*, 793 A.2d 939, 945 (Pa. Super. Ct. 2002) ("[W]e hold that the filing of a class action in another state does not toll the statute of limitations as to a subsequent action filed in Pennsylvania's state court system."); *with, Bermudez Chavez v. Occidental Chem. Corp*., 158 N.E.3d 93, 101 (N.Y. 2020) ("Cross-jurisdictional tolling does not implicate [the concern of plaintiffs 'sleeping' on their rights] because injured individuals who rely on a representative class action have not slept on their rights and such tolling involves no exercise of judicial discretion—it turns entirely upon the existence of a class action"), *and, Staub v. Eastman Kodak Co*., 320 N.J. Super. 34, 56, 726 A.2d 955, 966 (App. Div. 1999) ("A tolling rule which permits individual claimants to refrain from filing suit pending a decision on certification of a class action that would encompass their claims is almost indispensable to accomplish those purposes").

As it stands today, the Minnesota appellate courts have not recognized either intra- or cross-jurisdictional tolling under *American Pipe*.  In *Carlson v. Indep. Sch. District 623*, the Minnesota Supreme Court considered whether certain Human Rights Act Claims, brought after the six month limitations period, could proceed based on tolling from a prior procedurally deficient action allegedly asserting class claims. 392 N.W.2d 216, 223 (Minn. 1986).  Citing *American Pipe,* the Minnesota Supreme Court held adequate notice for tolling the limitations period exists "when the defendant is notified not only of the substantive claims being asserted, but also of the number and generic identities of the potential plaintiffs."  *Id.; see also Bartlett v. Miller and Schroeder Municipals, Inc.,* 355 N.W.2d 435 (Minn. App. 1984) (recognizing

*American Pipe* tolling, but declining to apply tolling to a second state class action following a notification of putative class members of the federal court denial of class certification and of their need to bring individual actions).[13]

The Minnesota appellate court have cited *American Pipe,* but the parties did not identify and the Court did not find a precedential decision adopting application of *American Pipe* tolling in relation to an action brought in Minnesota state court.  Where cited, the Minnesota appellate courts have found the circumstances of the particular case did not fall within *American Pipe* tolling.  The citation to *American Pipe* tolling, however persuades this Court that the Minnesota appellate courts are at least open to applying it if the circumstances of the case at issue meet requirements for its application.  This is consistent with how a majority of state jurisdictions which have already adopted *American Pipe* for *intra*-jurisdictional tolling.  *See Castillo*, 72 V.I. at 553.  The reasons cited for the change usually given are the same as in *American Pipe*—to "(1) promote judicial economy and efficiency; (2) protect defendants from inconsistent obligations; (3) protect the interests of absentee parties; and (4) provide access to judicial relief for small claimants." *Grimes*, 698 A.2d at 306–07 (citing H. Newberg, *Class Actions* (3d Ed. 1992)).  This Court believes these reasons hold whether the original suit was filed in state or federal court.

Defendants argue that, even if *intra*-state tolling is widely accepted, cross-jurisdictional tolling is not widely accepted and should not be accepted in Minnesota. The reasons generally given for not applying *American Pipe* to cross-jurisdictional tolling is usually based on efficiency:

---

[13] An order issued by district court Judge Siegesmund analyzed jurisdictional tolling under *American Pipe* finding that it is premised in equitable tolling of the limitations period and that Minnesota law has generally not applied general equitable tolling in relation to application of statutes of limitation.  *See Ex. A to Pharmacy Defendant's Reply Memo*, 27-CV-23-7190.

> Tolling a state statute of limitations during the pendency of a federal class action, however, may actually increase the burden on that state's court system, because plaintiffs from across the country may elect to file a subsequent suit in that state solely to take advantage of the generous tolling rule. Unless all states simultaneously adopt the rule of cross-jurisdictional class action tolling, any state which independently does so will invite into its courts a disproportionate share of suits which the federal courts have refused to certify as class actions after the statute of limitations has run.

*Portwood*, 701 N.E.2d at 1104.

The same efficiency and judicial resources arguments are not as strong here where we have an absentee class of Minnesota based hospitals and medical clinics which elected to not file in a New Mexico federal class action comprised of primarily New Mexico hospitals. This is not a case where class action plaintiffs were denied certification and tried to relitigate their claims in another court. By filing in their home state in Minnesota, the Minnesota located hospitals and medical clinics are not forum shopping or taking advantage of a perceived laxer legal environment. Allowing cross-jurisdictional tolling for the claims of the remaining Plaintiffs is also not likely to increase similar types of litigation in this forum in the future.

In *Bartlett*, the Minnesota Court of Appeals recognized that "the interests of judicial economy and the other policies served by class action litigation" underscored *American Pipe* tolling but that those interests were not satisfied where a class was denied certification in a federal state action and then tried to refile over six years after denial of the certification based on the original date. 355 N.W.2d at 439–40. The Court's reading of *Bartlett* is that Minnesota would consider cross-jurisdictional tolling based on equitable considerations if the right factors were met. The Court finds this to be such a scenario. As to the remaining Minnesota hospitals and medical clinics, the claims are being brought in their home state while being absentee putative class members of a nationwide action that they chose not to join and has not been denied

certification or otherwise dismissed.[14]  "Tolling principles are a creature of equity."  *Bartlett*,

355 N.W.2d at 439.  This Court finds that equitable considerations favor allowing *American Pipe*

tolling for the claims of the remaining Plaintiffs.  Dismissal of the statutory claims based on the

statute of limitations is not appropriate.

B.    **Plaintiffs Private Claims for Violation of Minnesota's Consumer Protection Statutes.**

Plaintiffs bring claims under both Minnesota Prevention of Consumer Fraud Act

("CFA"), Minn. Stat. § 325F.68, *et. seq.*; and Minnesota's Deceptive and Unfair Trade Practices

Act ("MDUTPA"), Minn. Stat. § 325D.43 *et. seq.*  Under *Ly v. Nystrom*, private claims for

violation of these statutes are brought through the "private attorney general" provisions of Minn.

Stat. § 8.31, subd. 3a and must allege a "public benefit" if the plaintiff seeks monetary relief for

private injuries.  615 N.W.2d 302, 313 (Minn. 2000).

The Pharmacy Defendants ask the Court to take judicial notice of the Consent Judgments

and related Settlement Agreements and Releases in regard to the State's participation and

settlement on behalf of the State and its citizens in relation to the multi-state opioid litigation.

The Consent Judgments were filed into Ramsey Court Case File No. 62-CV-24-2062.  The

Pharmacy Defendants contend that State's settlement of claims with Walgreens and CVS in

relation to the  State's opioid litigation released all of the Minnesota-based Plaintiffs statutory

claims that require Plaintiffs to proceed under the private attorney general provisions of § 8.31,

subd. 3a.

---

[14] Significantly, the "efficiencies" do not exist in relation to a "regional" action brought in relation to hospitals and clinics located in five states and raising claims under the statutory and common law of multiple states.  For such a multi-state action, the efficiency would be to have the multi-state claims proceed in the federal class action, or in their own specific states of residence.

### 1.    Judicial Notice under Rule 201.

Under Minn. R. Evid. 201, the Court may take judicial notice of adjudicative facts in civil matters.  "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Minn. R. Evid. 201(b).  The Pharmacy Defendants request that the Court take judicial notice of the Consent Judgments entered between the Pharmacy Defendants and the State of Minnesota, through its Attorney General, Keith Ellison.  *(Muller Dec. Exh 1, 2; Index ## 149).*  Plaintiffs do not object to the Court's taking judicial notice of the Consent Decrees filed in Ramsey Court Case File No. 62-CV-24-2062.  Plaintiffs separately submitted the Settlement Agreements entered between CVS and Walgreens with the State, but the Court notes, these documents were included in the large filing submitted by the Pharmacy Defendants.  *(Compare id. and Raiter Dec. Exhs. A, B; Index ## 156-58).*[15]

Because the parties do not dispute the propriety of the Court taking judicial notice of these records under Rule 201, judicial notice is granted as to the Consent Judgment, Settlement Agreements, and Releases.

### 2.    Contract Interpretation Standard.

A settlement agreement is a contract.  *See Voicestream Minneapolis, Inc. v. RPC Properties, Inc.,* 742 N.W.2d 267, 271 (Minn. 2008).  "The primary goal of contract interpretation is to determine and enforce the intent of the parties." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.,* 666 N.W.2d 320, 323 (Minn. 2003) (citation omitted).

---

[15] These filings totaled more than 3,000 pages.  It is would have helped the Court to have more clearly described the content of these large filings and included "tags" within the pdf for locating relevant content. The presentation without internal tags, and duplicating content in subsequent filings made the Court's review unnecessarily cumbersome.

"Interpretation of unambiguous contracts is a question of law for the court, as is the determination that a contract is ambiguous." *Staffing Specifix, Inx. v. TempWork Management Services, Inc*., 913 N.W.2d 687, 692 (Minn. 2018) (citing *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003)). "Where the parties express their intent in unambiguous words, those words are to be given their plain and ordinary meaning." *Motorsports,* 666 N.W.2d at 323. "To determine whether a contract is ambiguous, courts should not read words and phrases in isolation, but should consider their meaning the context of the contract as a whole." *Minnesota Judicial Brance v. Teamsters Local 320,* 971 N.W.2d 82, 88 (Minn. Ct. App. 2022) (citing *Art Goebel, Inc. V. N. Suburban Agencies, Inc.,* 567 N.W.2d 511, 515 (Minn. 1997)). "A contract must be interpreted in a way that gives all of its provisions meaning." *Id.* (citing *Current Tech. Concepts v. Irie Enters., Inc.,* 530 N.W.2d 539, 543 (Minn. 1995)).

"The terms of a contract are ambiguous if they are susceptible to more than one reasonable interpretation." *Id.* "A contract's terms are not ambiguous simply because the parties' interpretation differ." *Id*. "If the district court determines that a contract is ambiguous, it may admit parole, or extrinsic, evidence of the parties' intent … When intrinsic evidence has been admitted, the interpretation of ambiguous terms becomes a question of fact for the jury." *Id.*

### 3.    The Language of the Settlement Documents, Releases and Consent Judgment.

The Consent Decrees entered between the State of Minnesota and the Pharmacy Defendants incorporates the Release in Section XI of the Settlement Agreement and the Releases signed by the Attorney General and Governor.  The Consent Judgments contain the following language:

> 10.  Release. The Parties acknowledge that the release provisions in Section XI of the Agreement and the Release, which are incorporated by reference herein, are an integral part of this Consent Judgment. Pursuant to the Agreement, the Release, the claims bar contained in Minnesota Statutes section 3.757, and the Minnesota Participating Subdivisions' execution of Participation Forms releasing their claims,

and ***without limitation and to the maximum extent of the power of the State's Attorney General***, CVS and the other Released Entities are, as of the Effective Date, hereby released from any and all Released Claims of . . .  (c) ***any person or entity acting in*** a parens patriae, sovereign, quasi-sovereign, ***private attorney general***, qui tam, taxpayer, ***or other capacity seeking relief on behalf of or generally applicable to the general public*** with respect to the State or any Subdivision in the State***, whether or not any of them participate in the Agreement***.  . . .

*(Muller Dec. p. 8-9)(emphasis added).*

The Consent Judgments also describe the as "Non-Released Claims" as:

12. <u>Non-Released Claims</u>.  This Consent Judgment and the Agreement do not waive, release, or limit any criminal liability, Claims for any liability under tax law, Claims under securities law by a State Releasor as investor, Claims against parties who are not Released Entities, ***Claims by private individuals***, and any Claims arising under the Agreement for enforcement of the Agreement. Nothing in the Agreement precludes the Released Entities from asserting, in an action arising from or relating to Claims by private individuals, any defense or argument based on this Consent Judgment and the Agreement that is available under applicable law.

*(Id. at p. 10)(emphasis added).*

The Settlement Agreement defines "Claims" and Released Claims:

M. "*Claim*" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, parens patriae claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, abatement, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

*(Id. at p. 33).*

JJJ. "*Released Claims*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern Covered Conduct

and/or Alleged Harms occurring prior to the Initial Subdivision Participation Date. Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against the Released Entities by any Settling State or any of its Litigating Subdivisions or Litigating Special Districts in any federal, state or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct and/or Alleged Harms, *or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by a State*, any of its Subdivisions or Special Districts, or any Releasors (whether or not such State, Subdivision, Special District, or Releasor has brought such action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct and/or Alleged Harms. *The Parties intend that "Released Claims" be interpreted broadly. This Agreement does not release Claims by private individuals. It is the intent of the Parties that the use and/or effect of this Agreement in connection with Claims by private individuals be treated in accordance with applicable law.* Released Claims is also used herein to describe Claims brought by a Later Litigating Subdivision or other non-party Subdivision that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

*(Id at p. 40).*

   Section XI of the Settlement Agreements provide:

[T]he releases provided for in this Agreement are broad, shall be interpreted so as to give the Released Entities *the broadest possible bar against any liability relating in any way to any Released Claim, and extend to the full extent of the power of each Settling State and its Attorney General to release claims*.

*(Id. at p. 77).*

   The Settlement Agreement contains the same language and provision of "Non-Released Claims as set forth in the Consent Judgment. *(Id. at p. 82).*

   The Release signed by Attorney General Ellison in relation to the Settlement Agreements contains the same language as the Consent Judgment as to release of claims by provides:

(c) any person or entity acting in a parens patriae, sovereign, quasi-sovereign, *private attorney general*, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to a Settling State or Subdivision in a Settling State, whether or not any of them participate in the Agreement.

*(Id. at p. 966).*

In interpreting the scope of the release of claims granted to the Pharmacy Defendants through the settlement and release documents, the Court reads all of the documents and provisions together and in light of each other in an attempt to give meaning to all of the language and provisions.  The Court applies the definitions from the documents, and the plain meaning of non-defined words.  The terms of the Settlement Agreements and Releases of the Attorney General and Governor made under the Settlement Agreement are not in conflict with the Consent Judgments because the language and terms of the documents can be read consistently with one another.

The unambiguous language of the Releases intended the release of claims to be as broad the authority of the State to release claims and to include claims the State made, or could have made, including the claims the Attorney General had authority to bring in relation to the State and the citizens of the Minnesota.  The Release of claims expressly including a release of claims being pursued by *private persons or entities* "acting in a . . . *private attorney general*, . . . or other capacity seeking relief on behalf of or generally applicable to the general public with respect to a Settling State."

The Court agrees with the Pharmacy Defendants that the operative language and the agreements as a whole reflect a release of all claims being pursued by a private person or entity in a private attorney general capacity.  The language "or other capacity seeking relief on behalf of or generally applicable to the general public with respect to a Settling State" is catch-all language to include other non-specifically listed avenues for private individuals or entities to assert claims that the State or Attorney General for a State could otherwise assert within their authority on behalf of the State and its citizens. This language in the Consent Judgment and Release unambiguously includes within the Released claims against the Pharmacy Defendants, any actions or claims by "persons or entities" brought under the private attorney general

47

provisions of Minn. Stat. § 8.31, subd. 3a.  Moreover, even if the "seeking relief on behalf of or generally applicable to the general public" was interpreted as limiting language, clear Minnesota law requiring that any private person or entity seeking monetary relief under Minn. Stat. § 8.31, subd. 3a establish that the claims provides a benefit to the general public, also supports that these claims were released.

This is consistent with the broad authority and rights of the Minnesota Attorney General to bring claims on behalf of the State and its citizens.  The broad powers and authority under § 8.31 grant the Attorney general broad authority to pursue violations of laws to protect consumers on behalf of the public and on behalf of private interests within the State.  The Attorney General's powers are superior to the rights of a private litigant to bring the same claim under § 8.31, subd. 3a.  *Curtis v. Altria Group, Inc.,* 813 N.W.2d 891, 900 (Minn. 2012).  The Attorney General under § 8.31 also has the broad authority to settle claims with responsible parties, including the claims of private litigants.  *Id.* at 901.  Specific inclusion of private attorney general claims as within the "Released Claims" is consistent with the language expressing the breadth of the release to include a release to the broadest extent of the State's authority to effect a release of claims.

The definition of Released Claims, Consent Judgments and Attorney General Releases unambiguously exercised the power of the State, through its Attorney General, to release claims that the State did pursue or that could have pursued under § 8.31 against the Pharmacy Defendants.  The Released Claims identified in subpart (c) is the more specific and narrower description of claims, than the general reference of "Claims by private individuals" identified as Non-released Claims.  This language is read as consistent with the release language to preserve "Claims" (which does not expressly include private attorney general claims) brought by private

individuals,[16] outside of those that must be pursued as a private attorney general (or otherwise by assertion of claims that also belongs to and could have been brought and pursued by the State) are the Non-released Claims. The language "Claims by private individuals" cannot be read, consistent with the other language, to preserve _all_ claims brought by a private person or entity. That would render the entirety of (c) of the Release meaningless. The State and Attorney General were aware of the private hospital consumer protection claims and class litigation when it entered the Settlement Agreement, Releases and Consent Decree. If it intended to preserve these type of private attorney general claims (or other private claims by similar entities under Minnesota law), more specific language as "Claims by private individuals" to include these claims would be necessary. Because the Attorney General undisputedly had the power and authority to waive all private claims under § 8.31 that existed and that could have been pursued by the State, these claims fall within the claims the State released as to Walgreens in CVS.

Accordingly, Plaintiffs' Minnesota claims pursuant to Minn. Stat. § 8.31, subd. 3a are barred by the State of Minnesota's Releases in the Consent Judgment and Attorney General Release and must be dismissed.

## C.    Nuisance.

The Complaint asserts that "all Defendants" (including the Pharmacy Defendants), created an actionable a nuisance from "the over-saturation of opioids in the patient population of Plaintiffs and in the geographic area served by Plaintiffs." _(Compl. ¶ 820)._ The alleged injury to Plaintiffs is an economic injury related to the costs associated with providing medical care and treatment for opioid related conditions.

---

[16] "Individuals" is not defined. Use of a term that is generally in common usage more associated only with natural persons, rather than the broader language in describing released claims of "any person or entity" that would clearly include for-profit or non-profit business entities such as Plaintiffs.

Nuisance is a complicated subject under Minnesota law and there appear to both be potential common law and statutory bases for nuisance. For starters, Plaintiffs do not appear to allege a private nuisance claim at all, nor can they as private nuisance claims in Minnesota are limited to real property. Minn. Stat. § 561.01; *Anderson v. Min. Dep't. Nat. Re*s., 693 N.W.2d 181, 192 (Minn. 2005). As for a public nuisance, Plaintiffs' Responsive Memorandum cites criminal statute, Minn. Stat. § 609.74(1) as the primary definition of what constitutes a public nuisance, and several cases predating this statute which would reflect a common law claim. *See Hill v. Stokely-Van Camp*, *Inc.*, 109 N.W.2d 749, 751 (Minn. 1961); *State v. Sportsmen's Country Club*, 7 N.W.2d 495, 497 (Minn. 1943); *State v. Red Owl Stores, Inc*., 92 N.W.2d 103, 109 (Minn. 1958).

### 1.    Common Law Public Nuisance

Minnesota's precedents on a common law claim for damages for a public nuisance are exceptionally cryptic as to the elements of such a claim. For example, in both *Sportsmen's Country* and *Red Owl Stores*, a "public nuisance" is predicated on violation of another specific statute. *See Sportsmen's Country*, 7 N.W.2d at 155 (finding liability under Minn. Stat. § 340.05 (1941), a liquor statute; and § 340.14 (1941), a gambling statute); *Red Owl Stores*, 92 N.W.2d at 109 fn. 8 (finding liability under Minn. Stat. § 616.01 (1958), a public decency statute). Plaintiffs have not identified any statute other than § 609.74 that would establish the predicate for establishment of a "public nuisance per se" claim such as those identified in the cases cited. The Court declines to find a common law claim for private damages for a public nuisance outside of identification of a violation of a specific statute creating the duty of care owed to the public.

There is an additional line of cases Plaintiffs argue under which seem to allow private suits for a public nuisance when there is a "special injury" suffered by a private individual

different than what is suffered by the public at large.  *See Hill v. Stokely-Van Camp, Inc.*, 109

N.W.2d 749 (Minn. 1961); N. *Star Legal Found. v. Honeywell Project*, 355 N.W.2d 186, 189

(Minn. Ct. App. 1984); *Doe 596 v. Holy Innocents' Sch. Inc*., 2024 WL 3565640, at *3 (Minn.

Ct. App. July 29, 2024), review denied (Nov. 27, 2024).  *Hill* dealt with a canning factory in the

vicinity of plaintiff's property which caused noise and pollution to the plaintiff.  109 N.W.2d at

753.  The Minnesota Supreme Court found that, for a private individual to recover for a public

nuisance, they must allege "some special or peculiar damage not common to the general public"

to recover on the injury.  *Id.*  If properly alleged, the existence of a special injury is a question of

fact.  *Id.*

      Exceedingly few cases relying on *Hill* have found a special injury to exist.  *See Clean

Water & Air Legacy, LLC v. Tofte Wastewater Treatment Ass'n*, 649 F. Supp. 3d 764, 773 (D.

Minn. 2023) (declining to find special injury for class of people who have visited a particular

park as all people could be members of that class);  *N. Star Legal Found. v. Honeywell Project*,

355 N.W.2d 186, 189 (Minn. Ct. App. 1984) (declining to find special injury for trespass claim);

*Doe 596 v. Holy Innocents' School Incorporated*, 2024 WL 3565640 (Minn. Ct. App. Jul. 29,

2024) (unpublished) (affirming district court finding that a sexual assault victim had not suffered

a special injury as she could not show how operation of the school had caused any of the harm

she suffered).  Indeed, the only case in Minnesota such a claim stems is a 1905 case where the

Court held that construction of a bridge caused special injury to a steamboat company by

obstructing its physical ability to operate.  *See Viebahn v. Bd. Of Comm'rs of Crow Wing Cnty.*,

104 N.W. 1089, 1090 (Minn. 1905).

      Plaintiffs argue that they suffered a "special harm" based on their unique moral and legal

obligations requiring that they expend resources, to provide medical care and treatment to all

patients who have opioid related medical conditions, regardless of the user's ability to pay.  Such

51

responsibilities however are not unique to Plaintiffs, but to all hospitals in the State.  The general incurring of expenses in relation to responding to and addressing opioid use, addiction and treatment in the population, for medical treatment is also the specific injury suffered by opioid users who require medical care.  They must pay for their care through insurance or otherwise, and even if not paid, have a legal liability for the cost of their services. The purpose of a public nuisance claim is to differentiate a single or single set of actors from a public who might all be affected by the same nuisance.  *See Hill*, 109 N.W.2d at 753 ("Take, for example, an establishment erected near a public street, which produces such noxious and offensive smells as to annoy the whole community . . . unless [the plaintiffs] have property or business in the vicinity which is injuriously affected, the injury to them would be one common to the public generally[.]").   Plaintiffs have not shown that their injuries are sufficiently specific and unique to them to qualify as a "special injury" under the doctrine.

Even if the Court could find support for a common law public nuisance claim, the Court believes the claim would be barred as a derivative claim under *Philip Morris*.  551 N.W.2d at 493.  As stated *supra*, the Court believes that the *Philip Morris* decision extends to standing to assert common law claims where the injury is more directly suffered by the consumer/user rather than the business entity providing coverage or payment in relation to the medical care and treatment.  *See Id.* at 495.

The Court concludes that Plaintiffs' lack standing to pursue their common law claims for private monetary relief in relation to a public nuisance.  Alternatively, the allegations in the Complaint establish no special injury, because the injury is shared with the individual opioid users who require the medical care and treatment.

### 2.    Statutory Public Nuisance

Plaintiffs cite criminal statute, Minn. Stat. § 609.74 as establishing a statutory claim for a public nuisance, which provides:

> Whoever by an act or failure to perform a legal duty intentionally does any of the following is guilty of maintaining a public nuisance, which is a misdemeanor:
>
>   (1) maintains or permits a condition which unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of any considerable number of members of the public; or
>
>   (2) interferes with, obstructs, or renders dangerous for passage, any public highway or right-of-way, or waters used by the public; or
>
>   (3) is guilty of any other act or omission declared by law to be a public nuisance and for which no sentence is specifically provided.

Plaintiffs allege the Pharmacy Defendants maintained a "condition" in relation to its dispensing of opioid drugs that endangered the health of a considerable number of members of the public.  Unlike § 561.01 which creates a civil action for damages, the broader language in the criminal "public" nuisance statute does not give rise to or create a private cause of action for damages.  *See Becker v. Mayo Found.*, 737 N.W.2d 200, 207 (Minn. 2007) (a statute allows a civil cause of action only if it expressly creates one or clearly implies the intent to do so).  No Minnesota appellate court has found that § 609.74 create a civil cause of action for damages for private persons or entities.  In *State v. Juul Labs,* 2021 WL 2692131 (June 21, 2021), the case relied on by Plaintiffs, a state district court directly addressed a motion asserting that the State had no authority to enforce a public nuisance alleged under § 609.74.  The district court held that the State, through the broad power and authority of the Attorney General acting under Minn. Stat. § 8.31 had the power to enforce § 609.74 against the Juul defendants for a public nuisance. The *Juul* decision was never appealed.  Under its rationale, a private person or entity could arguably pursue claims for a public nuisance under the private attorney general provisions of § 8.31, subd. 3a.  However, as the Court has already decided, *supra*, the State has released these

claims as to Walgreens and CVS.  Therefore, Plaintiffs here are barred by the release from asserting a statutory public nuisance private claim.

K.A.J.