# Exhibit C

|  |  |
|---|---|
| **CITY OF PHILADELPHIA** | : |
| City of Philadelphia Law Department | : |
| 1515 Arch Street, 17th Floor | : |
| Philadelphia, PA 19102 | : |
| Plaintiff, | : |
| | : |
| | : |
| vs. | : |
| | : |
| **ALLERGAN LIMITED F/K/A** | : |
| **ALLERGAN PLC F/K/A ACTAVIS PLC** | : |
| **F/K/A ACTAVIS, INC.** | : |
| Clonshaugh Business and Technology Park | : |
| Dublin, Ireland, D17 E400, | : |
| | : |
| | : |
| **ALLERGAN SALES, LLC** | : |
| 2525 Dupont Dr | : |
| Irvine, CA, 92612-1599, | : |
| | : |
| | : |
| **ALLERGAN USA, INC.** | : |
| 5 Giralda Farms | : |
| Madison, NJ 07940, | : |
| | : |
| | : |
| **WATSON LABORATORIES, INC.** | : |
| 132 Business Center Drive | : |
| Corona, CA 92880, | : |
| | : |
| | : |
| **WARNER CHILCOTT COMPANY,** | : |
| **LLC** | : |
| 100 Enterprise Drive | : |
| Rockaway, NJ 07866, | : |
| | : |
| | : |
| **ACTAVIS PHARMA, INC., F/K/A** | : |
| **WATSON PHARMA, INC.** | : |
| 400 Interpace Pkwy | : |
| Parsippany, NJ, 07054-1120, | : |
| | : |
| | : |
| **ACTAVIS SOUTH ATLANTIC LLC** | : |
| 1300 Sawgrass Corp Parkway | : |
| Sunrise, FL 33323, | : |
| | : |
| | : |
| **ACTAVIS ELIZABETH LLC** | : |
| 200 Elmora Ave | : |
| Elizabeth, NJ 07202, | : |
| | : |
| | : |
| | : |

JUNE TERM, 2021

NO. _____

COMMERCE PROGRAM

JURY TRIAL DEMANDED

THIS IS NOT AN ARBITRATION CASE

COMPLAINT

*Filed and Attested by the
Office of Judicial Records
23 JUN 2021 03:56 pm
S. RICE*

122329891-1

Case ID: 210601660

**ACTAVIS MID ATLANTIC LLC**                :
400 Interpace Pkwy                          :
Parsippany, NJ, 07054-1120,                 :
                                            :
**ACTAVIS TOTOWA LLC**                      :
400 Interpace Pkwy                          :
Parsippany, NJ, 07054-1120,                 :
                                            :
**ACTAVIS LLC**                             :
400 Interpace Pkwy                          :
Parsippany, NJ, 07054-1120,                 :
                                            :
**ACTAVIS KADIAN LLC**                      :
60 Columbia Road, Bldg. B                   :
Morristown, NJ 07960,                       :
                                            :
**ACTAVIS LABORATORIES UT, INC**            :
577 S. Chipeta Way                          :
Salt Lake City, UT 84108,                   :
                                            :
**ACTAVIS LABORATORIES FL, INC.**           :
4955 Orange Drive                           :
Davie, FL 33314-3902,                       :
                                            :
and                                         :
                                            :
**TEVA PHARMACEUTICAL**                     :
**INDUSTRIES, LTD.**                        :
5 Basel Street                              :
Petach Tikva, Israel 4951033,               :
                                            :
                        Defendants.         :
                                            :

Case ID: 210601660

## NOTICE TO DEFEND – CIVIL

| | |
|---|---|
| **NOTICE** You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. **PHILADELPHIA COUNTY BAR ASSOCIATION** LAWYER REFERRAL AND INFORMATION SERVICE, 1101 MARKET STREET, 11th FLOOR PHILADELPHIA, PENNSYLVANIA 19107 TELEPHONE: (215) 238-1701 | **AVISO** Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siquientes, usted tiene veinte (20) dias de plazo al partir de la fecha de lan demanda y la notificacion. Hace falta asentar una comparesencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiendandes u otros derechos importantes para uted. LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIOI, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. **ASOCIACION DE LICENCIADOR DE PHILADELPHIA** VICIO DE REFERENCIA DE INFORMACION LEGAL 1101 MARKET STREET, 11th FLOOR PHILADELPHIA, PENNSYLVANIA 19107 TELEFONO: (215) 238-1701 |

Case ID: 210601660

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## <u>CIVIL TRIAL DIVISION</u>

Diana Cortes, City Solicitor
(PA Bar No. 204274)
Eleanor N. Ewing, Chief Deputy Solicitor
(PA Bar No. 28226)
Benjamin H. Field, Deputy City Solicitor
(PA Bar No. 204569)
**CITY OF PHILADELPHIA LAW DEPT.**
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
Tel: (215) 683-5000
diana.cortes@phila.gov
eleanor.ewing@phila.gov
benjamin.field@phila.gov

Russell W. Budd *(admitted pro hac vice)*
Christine C. Mansour *(admitted pro hac vice)*
**BARON & BUDD, P.C.**
3102 Oak Lawn Ave, Suite 1100
Dallas, TX 75219
Tel.: (214) 521-3605
rbudd@baronbudd.com
cmansour@baronbudd.com

Burton LeBlanc *(admitted pro hac vice)*
**BARON & BUDD, P.C.**
2600 Citiplace Drive
Baton Rouge, LA 70808
Tel.: (225) 927-5441
bleblanc@baronbudd.com

Jennifer F. Connolly *(admitted pro hac vice)*
**BARON & BUDD, P.C.**
600 New Hampshire Ave. NW, 10th Floor
Washington, DC 20037
Tel: (202) 333-4562
jconnolly@baronbudd.com

Mark P. Pifko *(admitted pro hac vice)*
**BARON & BUDD, P.C.**
15910 Ventura Blvd #1600
Encino, CA 91436
Tel: (818) 839-2333
mpifko@baronbudd.com

Jerry R. DeSiderato (PA Bar No. 201097)
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Tel: (215) 575-7000
JDeSiderato@dilworthlaw.com

Professor David Kairys (PA Bar No. 14535)
P.O. Box 4073
8225 Germantown Avenue
Philadelphia, PA 19118

Stephen A. Sheller (PA Bar No. 3270)
Lauren Sheller (PA Bar No. 314399)
**SHELLER, P.C.**
1528 Walnut Street, 4th Floor
Philadelphia, PA 19102
Tel: (215) 790-7300
sasheller@sheller.com
lsheller@sheller.com

Andrew Sacks (PA Bar No. 41390)
John Weston (PA Bar No. 26314)
**SACKS WESTON, LLC**
1845 Walnut Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 925-8200
asacks@sackslaw.com
jweston@sackslaw.com

Gregory B. Heller (PA Bar No. 61130)
**MCLAUGHLIN & LAURICELLA, P.C.**
One Commerce Square
2005 Market Street, Suite 2300
Philadelphia, PA 19103
Tel: (267) 238-1211
gheller@best-lawyers.com

*Counsel for Plaintiff City of Philadelphia*

## <u>COMPLAINT</u>

| | | |
|---|---|---|
| **CITY OF PHILADELPHIA** | : | JUNE TERM, 2021 |
| City of Philadelphia Law Department | : | |
| 1515 Arch Street, 17th Floor | : | NO. _____ |
| Philadelphia, PA 19102 | : | |
| Plaintiff, | : | JURY TRIAL DEMANDED |
| | : | |
| vs. | : | THIS IS NOT AN ARBITRATION CASE |
| | : | |
| **ALLERGAN LIMITED F/K/A** | : | COMMERCE PROGRAM |
| **ALLERGAN PLC F/K/A ACTAVIS PLC** | : | |
| **F/K/A ACTAVIS, INC.** | : | COMPLAINT |
| Clonshaugh Business and Technology Park | : | |
| Dublin, D17 E400, Ireland, | : | |
| | : | |
| **ALLERGAN SALES, LLC** | : | |
| 2525 Dupont Dr | : | |
| Irvine, CA, 92612-1599, | : | |
| | : | |
| **ALLERGAN USA, INC.** | : | |
| 5 Giralda Farms | : | |
| Madison, NJ 07940, | : | |
| | : | |
| **WATSON LABORATORIES, INC.** | : | |
| 132 Business Center Drive | : | |
| Corona, CA 92880, | : | |
| | : | |
| **WARNER CHILCOTT COMPANY,** | : | |
| **LLC** | : | |
| 100 Enterprise Drive | : | |
| Rockaway, NJ 07866, | : | |
| | : | |
| **ACTAVIS PHARMA, INC., F/K/A** | : | |
| **WATSON PHARMA, INC.** | : | |
| 400 Interpace Pkwy | : | |
| Parsippany, NJ, 07054-1120, | : | |
| | : | |
| **ACTAVIS SOUTH ATLANTIC LLC** | : | |
| 1300 Sawgrass Corp Parkway | : | |
| Sunrise, FL 33323, | : | |
| | : | |
| **ACTAVIS ELIZABETH LLC** | : | |
| 200 Elmora Ave | : | |
| Elizabeth, NJ 07202, | : | |
| | : | |

Case ID: 210601660

**ACTAVIS MID ATLANTIC LLC**                  :
400 Interpace Pkwy                             :
Parsippany, NJ, 07054-1120,                    :
                                               :
**ACTAVIS TOTOWA LLC**                         :
400 Interpace Pkwy                             :
Parsippany, NJ, 07054-1120,                    :
                                               :
**ACTAVIS LLC**                                :
400 Interpace Pkwy                             :
Parsippany, NJ, 07054-1120,                    :
                                               :
**ACTAVIS KADIAN LLC**                         :
60 Columbia Road, Bldg. B                      :
Morristown, NJ 07960,                          :
                                               :
**ACTAVIS LABORATORIES UT, INC**               :
577 S. Chipeta Way                             :
Salt Lake City, UT 84108,                      :
                                               :
**ACTAVIS LABORATORIES FL, INC.**              :
4955 Orange Drive                              :
Davie, FL 33314-3902,                          :
                                               :
and                                            :
                                               :
**TEVA PHARMACEUTICAL**                        :
**INDUSTRIES, LTD.**                           :
5 Basel Street                                 :
Petach Tikva, Israel 4951033,                  :
                                               :
                    Defendants.                :
                                               :
_____               :

## COMPLAINT

Case ID: 210601660

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................1

II.   JURISDICTION & VENUE ..................................................................8

III.  PARTIES ...............................................................................................9

    A.    Plaintiff ........................................................................................9

    B.    Defendants ..................................................................................11

        1.    Allergan/Actavis entities..................................................11

        2.    Teva Pharmaceutical Industries, Ltd................................17

        3.    Agency and Authority.......................................................19

IV.   FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS..............20

    A.    Opioids and their Effects ...........................................................20

    B.    The Manufacturer Defendants, Along with other Manufacturers of Opioids, Increased the Demand for Opioids Through a Multi-Pronged Scheme to Change Prescriber Habits and Public Perception to Increase Demand for Opioids.........................................................................................23

        1.    The Manufacturer Defendants Promoted Multiple Falsehoods About Opioids.............................................................................27

            a.    Falsehood #1: The false or misleading claims that the risk of addiction from chronic opioid therapy is low. ..................................29

            b.    Falsehood #2: The false and misleading claims that to the extent there is a risk of addiction, it can be easily identified and managed. ...................................33

            c.    Falsehood #3: The false or misleading claims that signs of addictive behavior are "pseudoaddiction," requiring more opioids.....................................33

            d.    Falsehood #4: The false or misleading claims that opioid withdrawal can be avoided by tapering. ...........................................35

            e.    Falsehood #5: The false or misleading claims that opioid doses can be increased without limit or greater risks. .....................36

            f.    Falsehood #6: The false or misleading claims that long-term opioid use improves functioning.....................................37

i

Case ID: 210601660

g.    Falsehood #7: The false or misleading claims that alternative forms of pain relief pose greater risks than opioids..........................41

h.    Falsehood #8: The false or misleading claims that new formulations of certain opioids successfully deter abuse. ...............43

2.   The Manufacturer Defendants Disseminated Their Misleading Messages About Opioids Through Multiple Channels....................................44

a.    The Manufacturer Defendants Directed Front Groups to Deceptively Promote Opioid Use. ...................................45

i.    American Pain Foundation ......................................47

ii.    American Academy of Pain Medicine and the American Pain Society ...........................................49

iii.    The Federation of State Medical Boards ................................52

iv.    The Alliance for Patient Access.................................53

v.    The U.S. Pain Foundation.........................................56

vi.    American Geriatrics Society .....................................57

b.    The Manufacturer Defendants Paid Key Opinion Leaders to Deceptively Promote Opioid Use. ..................................58

i.    Dr. Russell Portenoy .....................................60

ii.    Dr. Lynn Webster......................................................63

iii.    Dr. Perry Fine...........................................................64

iv.    Dr. Scott Fishman .....................................................65

c.    The Manufacturer Defendants Disseminated Their Misrepresentations Through Continuing Medical Education Programs. ....................................................66

d.    The Manufacturer Defendants Used "Branded" Advertising to Promote Their Products to Doctors and Consumers....................69

e.    The Manufacturer Defendants Used "Unbranded" Advertising to Promote Opioid Use for Chronic Pain.....................70

f.    The Manufacturer Defendants Funded, Edited and Distributed Publications that Supported Their Misrepresentations. ......................................................71

122329891-1

Case ID: 210601660

g.   The Manufacturer Defendants Used Detailing to Directly Disseminate Their Misrepresentations to Prescribers.......................72

h.   Manufacturer Defendants Used Speakers' Bureaus and Programs to Spread Their Deceptive Messages. ...............................73

3.   The Manufacturer Defendants Targeted Vulnerable Populations. .................74

4.   The Manufacturer Defendants' Scheme Succeeded, Creating a Public Health Epidemic.........................................................................75

a.   Manufacturer Defendants Dramatically Expanded Opioid Prescribing and Use. .........................................................75

b.   Manufacturer Defendants' Deception in Expanding Their Market Created and Fueled the Opioid Epidemic. ..........................78

C.   Defendants Throughout the Supply Chain Deliberately Disregarded Their Duties to Maintain Effective Controls to Prevent Diversion and to Identify, Report, and Take Steps to Halt Suspicious Orders.....................................................80

1.   All Defendants Have a Duty to Provide Effective Controls and Procedures to Guard Against Theft and Diversion, and to Report Suspicious Orders and Not to Ship Those Orders Unless Due Diligence Disproves Their Suspicions.............................................81

2.   Defendants Were Aware of and Have Acknowledged Their Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders. .........................................................88

3.   Defendants Worked Together to Inflate the Quotas of Opioids They Could Distribute..............................................................92

4.   Defendants Kept Careful Track of Prescribing Data and Knew About Diversion and Suspicious Orders and Prescribers. .......................100

5.   Defendants Failed to Report Suspicious Orders or Otherwise Act to Prevent Diversion...............................................................106

6.   Defendants Delayed a Response to the Opioid Crisis by Pretending to Cooperate with Law Enforcement. ......................................113

D.   Philadelphia's Opioid Epidemic .............................................................115

E.   Public Health Impacts of the Opioid Epidemic in Philadelphia. ............................116

1.   The Mayor's Task Force to Combat the Opioid Epidemic.............................116

Case ID: 210601660

2.  Opioid Use and Adverse Health Consequences in Philadelphia Repeat the National Pattern Linked to Prescription Opioids for Medical Uses.........121

   a.    Opioid Addiction and Opioid Use Disorders.................................121

   b.    Opioid Overdoses. ........................................................125

   c.    Other Adverse Health Effects from Opioids...................................126

   d.    Use of Prescription Opioids for Medical Purposes.........................127

F.  Public Safety Impacts of Opioids in Philadelphia. ..................................130

G.  The Opioid Epidemic Has Greatly Increased the City's Costs..............................133

   1.  City-Funded Public Medical Costs. ..............................................133

   2.  The City's Increased Costs of Emergency Services Provided by Police, Fire and EMS and Attributable to the Opioid Epidemic...............................138

   3.  The City's Increased Public Safety and Criminal Justice Costs Attributable to the Opioid Epidemic............................................139

   4.  The City's Increased Homelessness and Foster Care Costs Attributable to the Opioid Epidemic. .................................................141

   5.  The City's Increased Public Awareness Costs Attributable to the Opioid Epidemic. ...................................................142

   6.  The Task Force Recommendations to Combat the Opioid Epidemic Will Lead to Further Increased Costs to the City. ........................................143

H.  The City Incurs Increased Prescription Drug, Health Care, and Disability Costs for its Employees Attributable to the Opioid Epidemic...............................145

I.  Defendants' Conduct Created an Abatable Public Nuisance.................................148

J.  Statutes of Limitations are Tolled and Defendants Are Estopped From Asserting Statutes of Limitations as Defenses.......................................150

   1.  Enforcement of a Public Right.....................................................150

   2.  Equitable Estoppel .................................................................150

   3.  Fraudulent Concealment .............................................................151

K.  Facts Pertaining to Civil Penalties and Punitive Damages .....................................153

V.  LEGAL CAUSES OF ACTION....................................................................155

COUNT I – PUBLIC NUISANCE ....................................................................155

COUNT II – VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. §§ 201-1 to 201-9.3 ...............................................................................................165

COUNT III – VIOLATION OF PHILADELPHIA FALSE CLAIMS ACT – PHILA. CODE §§ 19-3601 to 19-3606 ...........................................................171

COUNT IV – FRAUD ....................................................................................175

COUNT V – UNJUST ENRICHMENT ............................................................180

VERIFICATION................................................... A-**ERROR! BOOKMARK NOT DEFINED.**

Case ID: 210601660

## COMPLAINT

Plaintiff City of Philadelphia ("Philadelphia" or the "City"), upon personal knowledge as to its own acts, and upon information and belief as to all other matters based on the investigation of its counsel, alleges as follows:

## I.    INTRODUCTION

1.    The City brings this civil action to eliminate the hazard to public health and safety caused by the opioid epidemic, to abate the nuisance in the City, and to recoup City monies that have been spent as a result of Defendants' false, deceptive and unfair marketing and/or unlawful diversion of prescription opioids (hereinafter "opioids").[1] Such economic damages were foreseeable to Defendants and were sustained because of Defendants' intentional and/or unlawful actions and omissions.

2.    The City asserts two categories of claims against pharmaceutical manufacturers of prescription opioid drugs: (1) claims that these manufacturers engaged in a massive false marketing campaign to drastically expand the market for such drugs and their own market share and (2) claims that the manufacturers reaped enormous financial rewards by refusing to monitor and restrict the improper distribution of those drugs.

3.    Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[2]

4.    The Centers for Disease Control ("CDC") estimated that prescription opioid misuse costs the United States $78.5 billion per year, taking into account healthcare expenses,

---

[1] As used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic and semi-synthetic opiates.

[2] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

1

Case ID: 210601660

lost productivity, addiction treatment, and criminal justice involvement.[3]  In 2015, over 33,000 Americans died as a result of opioid overdose, while an estimated 2 million people in the United States suffered from substance abuse disorders relating to prescription opioids.[4] In the twelve months that ended in September 2017, opioid overdoses claimed 45,000 lives. In the twelve-month period that ended in May 2020, over 81,000 people died from drug overdoses in the United States, the highest number of ever recorded in a 12-month period.[5]  The CDC predicts that Pennsylvania will have endured a 15 percent rise in drug overdoses during that time.[6] From 1999 through 2016, overdoses killed more than 350,000 Americans.[7]

5.    This case arises from the worst man-made epidemic in modern medical history— the misuse, abuse, diversion, and over-prescription of opioids. The opioid crisis is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[8]

6.    Opioids are regulated as Schedule II controlled substances under Pennsylvania law. *See* 35 P.S. § 780-104 (2). Controlled substances are categorized in five schedules, ranked

---

[3] *See* Curtis S. Florence, et al., *The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States*, 2013, 54 Medical Care 901 (2016).

[4] *See* Rose A. Rudd et al., *Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010-2015*, 65 Morbidity & Mortality Wkly. Rep. 1445 (2016); Substance Abuse and Mental Health Servs. Admin., U.S. Dep't of Health and Human Servs., *National Survey on Drug Use and Health, 2015 Detailed Tables* (2016).

[5] *Overdose Deaths Accelerating During COVID-19*, CDC Press Release, https://www.cdc.gov/media/releases/2020/p1218-overdose-deaths-covid-19.html (Dec. 17, 2020).

[6] *Figure 1b, Percent Change in Predicted 12 Month-ending Count of Drug Overdose Deaths, by Jurisdiction: June 2019 to June 2020, Data Table for Figure 1b,* CDC, National Center for Health Statistics, Vital Statistics Rapid Release, https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

[7] *Understanding the Epidemic*, CDC, https://www.cdc.gov/drugoverdose/epidemic/index.html (last updated Aug. 30, 2017).

[8] *See* Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016).

2

in order of their potential for abuse, with Schedule I being the most dangerous. *See id.* The Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally are categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, and may lead to severe psychological or physical dependence. Schedule III drugs are deemed to have a lower potential for abuse, but their abuse still may lead to moderate or low physical dependence or high psychological dependence.

7.     **Hydrocodone** is the most frequently prescribed opioid in the United States and is associated with more drug abuse and diversion than any other licit or illicit opioid. Its street names include Hydro, Norco, and Vikes. It is an orally active agent most frequently prescribed for the treatment of moderate to moderately severe pain. There are numerous brand and generic hydrocodone products marketed in the United States. The most frequently prescribed combination is hydrocodone and acetaminophen (for example, Vicodin®, Lorcet®, and Lortab®). Other examples of combination products include those containing aspirin (Lortab ASA®), ibuprofen (Vicoprofen®) and antihistamines (Hycomine®). Most often these drugs are abused by oral rather than intravenous administration.[9]

8.     **Oxycodone** is a semi-synthetic narcotic analgesic and historically has been a popular drug of abuse among the narcotic abusing population. Its street names include Hillbilly Heroin, Kicker, OC, Ox, Oxy, Perc, and Roxy. Oxycodone is marketed alone as OxyContin® in 10, 20, 40 and 80 mg controlled-release tablets and other immediate-release capsules like 5 mg

---

[9] *See* Drug Enf't Admin., *Drug Fact Sheet: Hydrocodone* (n.d.), https://www.dea.gov/ druginfo/drug_data_sheets/Hydrocodone.pdf.

Case ID: 210601660

OxyIR®.   It is also marketed in combination products with aspirin such as Percodan® or acetaminophen such as Roxicet®. Oxycodone is abused orally or intravenously.   The tablets are crushed and sniffed or dissolved in water and injected.   Others heat a tablet that has been placed on a piece of foil then inhale the vapors.[10]

9.      By now, most Americans have been affected, either directly or indirectly, by the opioid disaster.   But few realize that this crisis arose from the opioid manufacturers' deliberately deceptive marketing strategy to expand opioid use, together with their equally deliberate efforts to disregard their legal obligations on opioid distribution.   Opioid manufacturers acted without regard for the lives that would be trammeled in pursuit of profit.

10.     From 1999 through 2016, overdoses killed more than 350,000 Americans.[11]   Over 200,000 of them (more than were killed in the Vietnam War), died from opioids prescribed by doctors to treat pain.[12]   These opioids include brand-name prescription medications such as OxyContin, Opana ER, Vicodin, Subsys, and Duragesic, as well as generics like oxycodone, hydrocodone, and fentanyl.

11.     Most of the overdoses from non-prescription opioids are also directly related to prescription pills.   Many opioid users, having become addicted to but no longer able to obtain prescription opioids, have turned to heroin.   According to the National Institute on Drug Abuse, 80% of people who initiated heroin use started with prescription opioids—which, at the

---

[10]  *See* Drug Enf't Admin., *Drug Fact Sheet: Oxycodone* (n.d.), https://www.dea.gov/druginfo/drug_data_sheets/Oxycodone.pdf.

[11]  *Understanding the Epidemic*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/epidemic/index.html (last updated Aug. 30, 2017).

[12]  *Prescription Opioid Overdose Data*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/data/overdose.html (last updated Aug. 1, 2017).

122329891-1

Case ID: 210601660

molecular level and in their effect, closely resemble heroin.[13]  In fact, people who are addicted to prescription opioids are 40 times more likely than people not addicted to prescription opioids to become addicted to heroin, and the CDC identified addiction to prescription opioids as the strongest risk factor for heroin addiction.[14]

12.    As a result, in part, of the proliferation of opioid pharmaceuticals between the late 1990s and 2015, the life expectancy for Americans decreased for the first time in recorded history.  Drug overdoses are now the leading cause of death for Americans under 50.[15]

13.    Meanwhile, the Defendants made blockbuster profits.  In 2012 alone, opioids generated $8 billion in revenue for drug companies.  By 2015, sales of opioids grew to approximately $9.6 billion per year.[16]

14.    The City brings this suit against manufacturers of these highly addictive drugs.[17] The manufacturers aggressively pushed highly addictive, dangerous opioids, falsely representing to doctors that patients would only rarely succumb to drug addiction.  These pharmaceutical

---

[13] Prescription Opioid DrugFacts, National Institute on Drug Abuse, https://www.drugabuse.gov/publications/drugfacts/prescription-opioids#ref (last updated May 2020).

[14] *Today's Heroin Epidemic*, "Overdose Prevention" tab, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/opioids/heroin.html (last updated Aug. 29, 2017); *see also Today's Heroin Epidemic*, Ctrs. for Disease Control and Prevention https://www.cdc.gov/ vitalsigns/heroin/index.html (last updated July 7, 2015).

[15] Sheila Kaplan, *C.D.C. Reports a Record Jump in Drug Overdose Deaths Last Year*, New York Times (Nov. 3, 2017), https://www.nytimes.com/2017/11/03/health/deaths-drug-overdose-cdc.html; *see also Drug Overdose,* Drug Policy Alliance, https://drugpolicy.org/issues/drug-overdose.

[16] Matthew Perrone & Ben Wieder, *Pro-Painkiller Echo Chamber Shaped Policy Amid Drug Epidemic*, The Center for Public Integrity (updated Dec. 15, 2016), https://publicintegrity.org/politics/state-politics/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic/.

[17] On January 17, 2018, the City filed its first complaint against certain other manufacturers of opioids.  *See* Case No. 002718.

5

Case ID: 210601660

companies aggressively advertised to and persuaded doctors to prescribe highly addictive, dangerous opioids, which turned patients into drug addicts for their own corporate profit. Such actions were intentional and/or unlawful.

15.    The City also brings this suit against these manufactures for their role as distributors of these highly addictive drugs, because they breached their legal duties under *inter alia* the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. § 780-1 *et seq.* and the Pennsylvania Wholesale Prescription Drug Distributors License Act, 63 P. S. § 391.1 *et seq.* to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates. On the supply side, the crisis was fueled and sustained by those involved in the supply chain of opioids, including manufacturers, distributors, and pharmacies who failed to maintain effective controls over the distribution of prescription opioids, and who instead have actively sought to evade such controls. Defendants have contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses, while failing to report, and to take steps to halt suspicious orders when they were identified, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market.

16.    Defendants' conduct has exacted, and foreseeably so, a financial burden on the City of Philadelphia. Categories of past and continuing damages sustained by the City include, but are not limited to: (1) money wrongfully paid for opioids through government-funded insurance; (2) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (3) costs for providing treatment, counseling, and rehabilitation services; (4) costs for providing treatment of infants born with opioid-related medical conditions;

(5) costs for providing welfare for children whose parents suffer from opioid-related disability or incapacitation; (6) costs associated with law enforcement and public safety relating to the opioid epidemic and (7) loss of tax revenue due to the decreased efficiency and size of the working population in the City.

17.    The City brings this action to obtain mandatory injunctive relief and compensatory and punitive damages. The injunctive relief seeks to require Defendants to inform the medical community and the public of the true risks of daily, long-term prescription opioid use, to report and take steps to halt suspicious orders when they are identified, and to pay for the costs of detoxification and treatment, including after-care, of every resident in the City currently suffering from opioid addiction attributable to prescription opioids.

18.    Additionally, the City seeks its actual damages to recover the costs of procurement of and/or reimbursement for prescription opioids for long-term daily use and the costs of treatment of opioid addiction and other adverse medical conditions associated with long-term daily use incurred by City health plans or paid directly by the City.  The City also seeks recovery of its costs of increased municipal services directly associated with opioid addiction, fatal and non-fatal overdoses, and other adverse health and public safety conditions, including increased emergency response costs and increased costs of City law enforcement authorities and of its criminal justice system and social and health agencies, which are attributable to long-term use of prescription opioids to treat chronic pain.

19.    The City brings claims against the defendants for public nuisance, violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S. §§ 201-1 to 201-9.3), violation of the Philadelphia False Claims Act (Phila. Code §§ 19-3601 to 19-3606), fraud and unjust enrichment.

7

122329891-1

Case ID: 210601660

20.     The City brings this action exclusively under the laws of the Commonwealth of Pennsylvania. No federal claims are being asserted, and to the extent that any claim or factual assertion set forth herein may be construed to have stated any claim for relief arising under federal law, such claim is expressly and undeniably disavowed and disclaimed by the City.

21.     Nor does the City bring this action on behalf of a class or any group of persons that can be construed as a class.  The claims asserted herein are brought solely by the City and are wholly independent of any claims that individual users of opioids may have against Defendants.

## II.     JURISDICTION & VENUE

22.     This Court has jurisdiction over this action pursuant to 42 Pa. C. S. § 931(a). The amount in controversy exceeds $50,000, exclusive of interest and costs, which is the jurisdictional amount below which a compulsory arbitration referral pursuant to 42 Pa. C. S. § 7361(b) would be required.

23.     Venue is proper in Philadelphia County pursuant to 42 Pa. C. S. § 931(c), Pa. R. Civ. P. 1006(b) and (c)(l), and Pa. R. Civ. P. 2179(a).

24.     This action is not removable to federal court.  The instant Complaint does not confer diversity jurisdiction upon the federal courts pursuant to 28 U.S.C. § 1332, The City is not considered a party for purposes of diversity of citizenship jurisdiction and there is not complete diversity.  This action is not subject to the jurisdiction of the Class Action Fairness Act of 2005. Further, the claims alleged in the Complaint do not permit federal question jurisdiction to be exercised, because the case does not arise directly or indirectly under the Constitution, laws, or treaties of the United States.  Likewise, federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 is not invoked by the Complaint, as it sets forth herein exclusively viable state law claims against Defendants.  Nowhere herein does Plaintiff plead, expressly or implicitly, any

8

Case ID: 210601660

cause of action or request any remedy that arises under federal law. The issues presented in the allegations of this Complaint do not implicate any substantial federal issues and do not turn on the necessary interpretation of federal law. No federal issue is important to the federal system as a whole under the criteria set by the Supreme Court in *Gunn v. Minton*, 568 U.S. 251 (2013) (*e.g.*, federal tax collection seizures, federal government bonds). Specifically, the causes of action asserted, and the remedies sought herein, are founded upon the positive statutory, common, and decisional laws of Pennsylvania. Further, the assertion of federal jurisdiction over the claims made herein would improperly disturb the congressionally approved balance of federal and state responsibilities. Accordingly, any exercise of federal jurisdiction is without basis in law or fact.

25. In this complaint, Plaintiff cites federal statutes and regulations. Plaintiff does so to state the duty owed under Pennsylvania law, *not* to allege an independent federal cause of action and *not* to allege any substantial federal question. To be clear, Plaintiff cites federal statutes and federal regulations for the sole purpose of stating the duty owed under Pennsylvania law. Thus, the removal of this complaint based on an imagined federal cause of action or substantial question is without merit.

### III.    PARTIES

#### A.  Plaintiff

26. The City of Philadelphia is a municipal corporation. It is the largest city in the Commonwealth of Pennsylvania and sixth-largest city in the United States. Philadelphia is home to approximately 1.6 million residents.

27. The City of Philadelphia includes Philadelphia County, which is merged with the City. They are collectively referred to here as the "City of Philadelphia," "City," or "Philadelphia."

9

Case ID: 210601660

28.    The City provides a wide range of social services on behalf of Philadelphia residents, including health-related services.  In addition, the City administers and provides funding for, among others, the Philadelphia Police Department, Philadelphia Fire Department, the District Attorney's Office, the Philadelphia Department of Health, the Philadelphia Department of Behavioral Health and Intellectual DisAbility Services, the Philadelphia Department of Human Services, and other public health and safety departments and agencies.

29.    Philadelphia is one of the largest employers in Pennsylvania, employing thousands of individuals throughout its numerous departments and agencies.

30.    The City self-funds its own medical benefits plan on behalf of its covered full-time employees, through which it pays medical costs, including the cost of treatment of, *inter alia*, opioid addiction and related diseases, and prescription drug costs (including for prescription opioids and medications to treat the effects of prescription opioids).  The City's medical benefits plan provides benefits for approximately 4,000 non-union employees, as well as 2,300 union employees who have chosen not to participate in union medical plans.

31.    The City also self-funds its own workers' compensation and disability plan, through which it pays disability costs and related benefits for covered employees.

32.    The City's health, prescription, and workers' compensation and disability plans are administered by third-party service providers that are in the business of administering employee health plan accounts and workers compensation and disability benefits.

33.    References to the City refer to the City as a municipality, including residents within its borders, the community as a whole, and City government by itself consisting of its departments and agencies.

Case ID: 210601660

### B. Defendants

34.    At all relevant times Defendants, and each of them, have engaged in the business of, or were successors in interest to, entities engaged in the business of researching, licensing, designing, formulating, developing, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, advertising, and/or selling the prescription opioid drugs to individuals and entities in the Commonwealth of Pennsylvania, including the City and County of Philadelphia.

35.    Defendants, (collectively, "the Manufacturer Defendants"), are defined below. At all relevant times, the Manufacturer Defendants have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs.

#### 1. Allergan/Actavis entities

36.    Defendant Allergan Limited f/k/a Allergan plc f/k/a Actavis plc f/k/a Actavis, Inc. is a non-public Irish corporation with its principal place of business in Dublin, Ireland. Its administrative headquarters and all executive officers are located in Madison, New Jersey. It is a wholly owned subsidiary of the U.S. Company AbbVie, Inc. ("AbbVie").

37.    In October 2012, the Actavis Group was acquired by Watson Pharmaceuticals, Inc., and the combined company changed its name to Actavis, Inc. as of January 2013, and then to Actavis plc in October 2013. In October 2013, Actavis plc (n/k/a Allergan Limited) acquired Warner Chilcott plc pursuant to a transaction agreement dated May 19, 2013. Actavis plc (n/k/a Allergan Limited) was established to facilitate the business combination between Actavis, Inc.

11

Case ID: 210601660

(n/k/a Allergan Finance, LLC)[18] and Warner Chilcott plc. Following the consummation of the October 1, 2013 acquisition, Actavis, Inc. (n/k/a Allergan Finance, LLC Inc.) and Warner Chilcott plc became wholly owned subsidiaries of Actavis plc (n/k/a Allergan Limited). Pursuant to the transaction, each of Actavis, Inc.'s common shares was converted into one Actavis plc share. Further, Actavis plc (n/k/a Allergan Limited) was the "successor issuer" to Actavis, Inc. and Warner Chilcott. Actavis plc acquired Allergan, Inc. in March 2015, and the combined company thereafter changed its name to Allergan plc. AbbVie is a Delaware Corporation. On May 8, 2020, AbbVie paid $63 billion to buy all of the publicly traded stock of Allergan plc and changed Allergan plc's name to Allergan Limited.

38.    The transaction that created Allergan Limited (then known as Actavis plc) converted each share of Actavis, Inc.'s Class A common shares into one Actavis plc Ordinary Share. Actavis, Inc. and Actavis plc had the same corporate headquarters both before and after the merger; Actavis plc had the same website as Actavis, Inc.; and Actavis plc maintained all of Actavis, Inc.'s officers in the same positions. Actavis plc's SEC filings explained that "references throughout to 'we,' 'our,' 'us,' the 'Company' or 'Actavis' refer interchangeably to Watson Pharmaceuticals, Inc., Actavis, Inc., and Actavis plc depending on the date."

39.    Allergan Limited f/k/a Allergan plc f/k/a Actavis plc f/k/a Actavis, Inc. holds itself out as engaging in the same business of distributing, manufacturing, and selling opioids that Actavis, Inc. did before the stock transaction occurred where all shares of Actavis, Inc. were

---

[18] The City has previously sued a subsidiary of Allergan plc n/k/a Allergan Limited: Allergan Finance, LLC in a separate complaint filed on January 17, 2018, in the Court of Common Pleas of Philadelphia County, Case No. 002718. Allergan Finance, LLC, is an indirect wholly owned subsidiary of Allergan plc n/k/a Allergan Limited, and was formerly known as Actavis, Inc., which in turn was formerly known as Watson Pharmaceuticals, Inc.

Case ID: 210601660

cancelled and converted into the right to receive shares in Actavis plc (n/k/a Allergan Limited) on a one-to-one basis. Thus, Allergan Limited is the successor Actavis, Inc.

40.    In 2008, Actavis, Inc. acquired the opioid Kadian through its subsidiary, Actavis Elizabeth LLC, which had been the contract manufacturer of Kadian since 2005. Since 2008, Kadian's label has identified the following entities as the manufacturer or distributor of Kadian: Actavis Elizabeth LLC; Actavis Kadian LLC; Actavis Pharma, Inc.; and Allergan USA, Inc. Currently, Allergan USA, Inc. is contracted with UPS SCS, Inc. to distribute Kadian on its behalf.

41.    Defendant Allergan Sales, LLC is incorporated in Delaware and headquartered in Irvine, California. Allergan Sales, LLC is registered to do business in Pennsylvania. Allergan Sales, LLC is the current New Drug Application ("NDA") holder for Kadian, and in 2016, Allergan Sales, LLC held the Abbreviated New Drug Application ("ANDA's") for Norco.[19] Allergan Sales, LLC is a wholly owned subsidiary of Allergan Limited f/k/a Allergan plc.

42.    Defendant Allergan USA, Inc. is incorporated in Delaware and headquartered in Madison, New Jersey. Allergan USA, Inc. is registered to do business in Pennsylvania. Allergan USA, Inc. is currently responsible for Norco and Kadian Sales. Allergan USA, Inc. is a wholly owned subsidiary of Allergan Limited f/k/a Allergan plc.

43.    Defendants Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California. Watson Laboratories, Inc. is registered to do business in Pennsylvania. Watson Laboratories, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva. Prior to the sale, Watson

---

[19]  The Norco ANDAs are currently held by non-defendant Allergan Pharmaceuticals International Limited, which is incorporated in Ireland.

Laboratories, Inc. was a direct subsidiary of Actavis, Inc.  Between 2000 and 2015, Watson Laboratories, Inc. held the ANDAs for Norco and was the manufacturer of the drug.  Watson Laboratories, Inc. was also the ANDA holder of various generic opioids.

44.     Defendant Warner Chilcott Company, LLC is a limited liability company incorporated in Puerto Rico.  Since 2015, Warner Chilcott Company, LLC has been the manufacturer of Norco.  Warner Chilcott Company, LLC was a subsidiary of Warner Chilcott plc until Warner Chilcott plc became a wholly owned subsidiary of Allergan plc n/k/a Allergan Limited in 2013.  Warner Chilcott Company, LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

45.     Defendant Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) is a Delaware corporation with its principal place of business in New Jersey.  Actavis Pharma, Inc. is registered to do business in Pennsylvania.  Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) was previously responsible for sales of Kadian and Norco.  Actavis Pharma, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

46.     Defendant Actavis South Atlantic LLC is a Delaware limited liability company with its principal place of business in Sunrise, Florida.  Actavis South Atlantic LLC was listed as the ANDA holder for oxymorphone and fentanyl transdermal.  Actavis South Atlantic LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

47.     Defendant Actavis Elizabeth LLC is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey.  From December 19, 2005, until it purchased the medication in December 2008, Actavis Elizabeth LLC served as the contract

Case ID: 210601660

manufacturer of Kadian for Alpharma. Actavis Elizabeth LLC held the NDA for Kadian from 2008 to 2013. Actavis Elizabeth LLC was also the holder of ANDAs for the following Schedule II opioid products: oxycodone/acetaminophen; homatropine methylbromide/hydrocodone bitartrate; morphine sulfate capsule; morphine sulfate tablet; oxycodone/hydrochloride tablet; oxycodone/ibuprofen; and oxymorphone tablet. Actavis Elizabeth LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

48.     Defendant Actavis Mid Atlantic LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis Mid Atlantic LLC has held the ANDA for homatropine methylbromide/hydrocodone bitartrate. Actavis Mid Atlantic LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

49.     Defendant Actavis Totowa LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis Totowa LLC has held the ANDAs for the following Schedule II opioid products: oxycodone/acetaminophen; homatropine methylbromide; oxycodone/hydrochloride.

50.     Defendant Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Defendants Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, and Actavis Totowa LLC were all direct subsidiaries of Actavis LLC, which was an indirect subsidiary of defendant Watson Laboratories, Inc. Watson Laboratories, Inc., in turn, was a direct subsidiary of Actavis, Inc. Actavis LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

15

Case ID: 210601660

51.     Defendant Actavis Kadian LLC is a Delaware limited liability company with its principal place of business in Morristown, New Jersey.  Actavis Kadian LLC has been identified on Kadian's label as a manufacturer or distributor of Kadian.  Actavis Kadian LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

52.     Defendant Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc.-Salt Lake City) is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah.  Actavis Laboratories UT, Inc. was the Kadian NDA holder from 2013 to 2016 and was listed as the NDA holder for morphine sulfate capsule.  Actavis Laboratories UT, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.  Prior to the sale, Actavis Laboratories UT, Inc. was a direct subsidiary of Actavis, Inc.

53.     Defendant Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc.-Florida) is a Florida limited liability company with its principal place of business in Davie, Florida. Actavis Laboratories FL, Inc. was a Norco ANDA holder in 2015 and was the ANDA holder of the following Schedule II opioid products: hydrocodone/acetaminophen; hydrocodone/ibuprofen; oxycodone/aspirin; and hydromorphone tablet.  Actavis Laboratories FL, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva. Prior to the sale, Actavis Laboratories FL, Inc. was a direct subsidiary of Andrx Corporation, which was a direct subsidiary of Actavis, Inc.  Andrx Corporation was transferred to Teva as part of the 2016 sale.

54.     Each of these defendants and entities is or was previously owned by defendant Allergan Limited f/k/a Allergan plc, which uses or used them to market and sell its drugs in the

16

Case ID: 210601660

United States. Collectively, these defendants and entities, and their DEA registrant subsidiaries and affiliates that manufacture, promote, distribute and sell prescription opioids, are referred to as "Allergan/Actavis."

55.    Upon information and belief, profits from the sale of opioid products by Allergan/Actavis ultimately inured or inure to the benefit of Defendant Allergan Limited f/k/a Allergan plc.

56.    At all times material hereto, these defendants manufactured, promoted, marketed, and sold both brand name and generic[20] versions of opioids nationally and in Philadelphia, including but not limited to the following:

**Table 1. Allergan/Actavis Opioids**

| Drug Name | Chemical Name | Schedule |
|-----------|---------------|----------|
| Kadian | Morphine sulfate extended release | Schedule II |
| Norco | Hydrocodone bitartrate and acetaminophen | Schedule II |
| Generic Duragesic | Fentanyl | Schedule II |
| Generic Kadian | Morphine sulfate extended release | Schedule II |
| Generic Opana | Oxymorphone hydrochloride | Schedule II |

**2.    Teva Pharmaceutical Industries, Ltd.**

57.    Defendant Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli corporation headquartered in Petah Tikva, Israel. As described above, Teva Ltd. acquired Allergan plc's global generics business in August 2016. Teva Ltd. also owns Teva Pharmaceuticals USA, Inc. ("Teva USA") and Cephalon, Inc. ("Cephalon").[21] Teva USA is a

---

[20] In August 2016, Allegan plc's global generics business was acquired by Teva Pharmaceutical Industries Ltd. Allergan plc, Annual Report (Form 10-K), 3 (Feb. 16, 2018), *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459018002345/agn-10k_20171231.htm.

[21] The City has previously sued Teva USA and Cephalon in a separate complaint filed on January 17, 2018, in the Court of Common Pleas of Philadelphia County, Case No. 002718.

Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva USA was in the business of selling generic opioids, including a generic form of OxyContin from 2005 to 2009. Cephalon is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. In 2011, Teva Ltd. acquired Cephalon, Inc.

58.    Teva Ltd. and Teva USA are alter egos. Teva Ltd. and Teva USA share the same employees, corporate officers and committee members on their Executive Committee and subsidiaries' subcommittees. For example, a Teva USA employee coordinated and directed advocacy, lobbying, and policy development across the entire Teva group of companies. Teva Ltd. and Teva USA engage in the same business enterprise because Teva Ltd. controls the operations of its subsidiaries, including their day-to-day activities through an integrated management team. Teva Ltd. depicts itself as "One global brand, One story, One Teva" and its indirect subsidiaries report directly to Teva Ltd. The head of Teva Ltd.'s Global Research and Development division controls Teva's product formulation, design, and commercial execution. Teva Ltd. has substantial control over its subsidiaries' marketing, administration, manufacturing, research and development, purchasing of supplies, and finances. Teva Ltd. and Teva USA use the same assets and file consolidated financial results with the SEC. Teva Ltd. controls the daily activities of Teva USA, with the Teva Ltd. CEO being ultimately responsible for allocating all of Teva's resources and having to approve whether or not Teva USA launches an opioid product in the United States.

59.    Teva Ltd. is also the successor to Cephalon and the Actavis generic entities. Teva Ltd. merged or consolidated with Cephalon in 2011 and with the Actavis generic entities it acquired from Allergan plc in 2016, for which it explicitly agreed to indemnify Allergan plc for all liability it may incur in the opioid litigation. Teva Ltd. characterized its acquisitions of these

Case ID: 210601660

subsidiaries as "mergers" and then continued the businesses of these entities. Teva Ltd. continued to sell the brand name opioids, Fentora and Actiq, after its merged with Cephalon, and continued to sell the generic opioids after its acquisition of the Actavis generic entities.

60.    At all times material hereto, Cephalon and Teva USA, together with their DEA and Pennsylvania registrant and licensee subsidiaries and affiliates (collectively, "Teva/Cephalon"), worked together to manufacture, promote, distribute and sell brand name and generic versions of opioids nationally, and in the City, including the following:

| Product Name | Chemical Name |
|---|---|
| Actiq | Fentanyl citrate |
| Fentora | Fentanyl buccal |

61.    From 2000 forward, Teva/Cephalon has made thousands of payments to physicians nationwide, many of whom were not oncologists and did not treat cancer pain, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services. In fact, these payments were made to deceptively promote and maximize the use of opioids.

62.    Collectively, Allergan/Actavis and Teva/Cephalon are referred to herein as the "Manufacturer Defendants."

63.    Defendants include the above referenced entities as well as their predecessors, successors, affiliates, subsidiaries, partnerships and divisions to the extent that they are engaged in the manufacture, promotion, distribution, sale, and/or dispensing of opioids.

### 3.  Agency and Authority.

64.    All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management

19

Case ID: 210601660

of Defendants' affairs within the course and scope of their duties and employment, and/or with

Defendants' actual, apparent, and/or ostensible authority.

## IV.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS[22]

### A.  Opioids and their Effects

65.    Opioids are a class of drugs that bind with opioid receptors in the brain and

includes natural, synthetic, and semi-synthetic opioids.  Natural opioids are derived from the

opium poppy.  Generally used to temporarily relieve pain, opioids block pain signals but do not

treat the source of the pain.  Opioids produce multiple effects on the human body, the most

significant of which are analgesia, euphoria, and respiratory depression.

66.    The medicinal properties of opioids have been recognized for millennia—as has

their potential for abuse and addiction.  The opium poppy contains various opium alkaloids, three

of which are used in the pharmaceutical industry today: morphine, codeine, and thebaine.  Early

use of opium in Western medicine was with a tincture of opium and alcohol called laudanum,

which contains all of the opium alkaloids and is still available by prescription today.  Chemists

first isolated the morphine and codeine alkaloids in the early 1800s.

67.    In 1827, the pharmaceutical company Merck began large-scale production and

commercial marketing of morphine.  During the American Civil War, field medics commonly

used morphine, laudanum, and opium pills to temporarily relieve the pain of the wounded, and

many veterans were left with morphine addictions.  By 1900, an estimated 300,000 people were

addicted to opioids in the United States, and many doctors prescribed opioids solely to prevent

---

[22] The allegations in this Complaint are made upon facts, as well as upon information and belief.
The City reserves the right to seek leave to amend or correct this Complaint based upon analysis
of data or other discovery of the ARCOS, IMS Health, and other data and upon further
investigation and discovery.

Case ID: 210601660

their patients from suffering withdrawal symptoms. The nation's first Opium Commissioner, Hamilton Wright, remarked in 1911, "The habit has this nation in its grip to an astonishing extent. Our prisons and our hospitals are full of victims of it, it has robbed ten thousand businessmen of moral sense and made them beasts who prey upon their fellows . . . it has become one of the most fertile causes of unhappiness and sin in the United States."[23]

68.    Pharmaceutical companies tried to develop substitutes for opium and morphine that would provide the same analgesic effects without the addictive properties. In 1898, Bayer Pharmaceutical Company began marketing diacetylmorphine (obtained from acetylation of morphine) under the trade name "Heroin." Bayer advertised heroin as a non-addictive cough and cold remedy suitable for children, but as its addictive nature became clear, heroin distribution in the U.S. was limited to prescription only in 1914 and then banned altogether a decade later.

69.    Although heroin and opium became classified as illicit drugs, there is little difference between them and prescription opioids. Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

70.    Throughout the twentieth century, pharmaceutical companies continued to develop prescription opioids like Percodan, Percocet, and Vicodin, but these opioids were generally produced in combination with other drugs, with relatively low opioid content.

71.    Medical professionals describe the strength of various opioids in terms of morphine milligram equivalents ("MME"). According to the CDC, doses at or above 50

---

[23] Nick Miroff, *From Teddy Roosevelt to Trump: How Drug Companies Triggered an Opioid Crisis a Century Ago*, The Wash. Post (Oct. 17, 2017), https://www.washingtonpost.com/news/retropolis/wp/2017/09/29/the-greatest-drug-fiends-in-the-world-an-american-opioid-crisis-in-1908/?utm_term=.7832633fd7ca.

MME/day double the risk of overdose compared to 20 MME/day, and one study found that patients who died of opioid overdose were prescribed an average of 98 MME/day.

72.    Different opioids provide varying levels of MMEs.  For example, just 33 mg of oxycodone provides 50 MME.  Thus, at OxyContin's twice-daily dosing, the 50 MME/day threshold is nearly reached by a prescription of 15 mg twice daily.

73.    Fentanyl is a synthetic opioid that is 100 times stronger than morphine and 50 times stronger than heroin.  First developed in 1959, fentanyl is showing up more and more often in the market for opioids created by Manufacturer Defendants' promotion, with particularly lethal consequences.

74.    The effects of opioids vary by duration.  Long-acting opioids, such as Allergan/Actavis's Kadian, are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, 12 hours.  Short-acting opioids, such as Teva/Cephalon's Actiq and Fentora, are designed to be taken in addition to long-acting opioids to address "episodic pain" (also referred to as "breakthrough pain") and provide fast-acting, supplemental opioid therapy lasting approximately 4 to 6 hours.  Still other short-term opioids are designed to be taken in addition to long-acting opioids to specifically address breakthrough cancer pain, excruciating pain suffered by some patients with end-stage cancer.  The Manufacturer Defendants promoted the idea that pain should be treated by taking long-acting opioids continuously and supplementing them by also taking short-acting, rapid-onset opioids for episodic or "breakthrough" pain.

75.    Patients develop tolerance to the analgesic effect of opioids relatively quickly.  As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction.  The same is true of the euphoric effects of opioids—the

"high."  However, opioids depress respiration, and at very high doses can and often do arrest respiration altogether.  At higher doses, the effects of withdrawal are more severe.  Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

76.    Discontinuing opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms.  These withdrawal symptoms include: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

**B. The Manufacturer Defendants, Along with other Manufacturers of Opioids, Increased the Demand for Opioids Through a Multi-Pronged Scheme to Change Prescriber Habits and Public Perception to Increase Demand for Opioids.**

77.    Given the history of opioid abuse in the United States and the medical profession's resulting wariness, the commercial success of the Manufacturer Defendants' prescription opioids, and those of other manufacturers of opioids,[24] would not have been possible without a fundamental shift in prescribers' perception of the risks and benefits of long-term opioid use.

78.    Through a massive marketing campaign premised on false and incomplete information, the Manufacturer Defendants and the other manufacturers of opioids engineered a shift in how and when opioids are prescribed by the medical community and used by patients. They misrepresented the safety and efficacy of their products, asserting that the risk of addiction

---

[24] The City has sued Allergan Finance, LLC, Cephalon, Inc., Teva Pharmaceuticals USA, Inc., Endo Health Solutions, Inc., Endo Pharmaceuticals, Inc., Janssen Pharmaceuticals, Inc., Johnson & Johnson, Purdue Pharma, L.P., Purdue Pharma Inc., and the Purdue Frederick Company, Inc. (these last three entities are referred to as "Purdue" herein) in a separate complaint filed on January 17, 2018, in the Court of Common Pleas of Philadelphia County, Case No. 002718. This case has been transferred to the Delaware County Coordinated Proceedings.

Case ID: 210601660

was low when opioids were used to treat chronic pain, overstating the benefits and trivializing the risk of long-term use of opioids.

79.    Specifically, Allergan/Actavis pursued a broader chronic pain market.  Its predecessor, Watson Pharmaceuticals, Inc., obtained approval for Norco (hydrocodone and acetaminophen) and launched the product in 1997.  Allergan/Actavis also developed Kadian (morphine sulfate) and was the contract manufacturer for Kadian starting in 2005. Allergan/Actavis then acquired Kadian in December 2008.[25]  Kadian sales grew 50 percent from 2007 to 2011 to approximately $275 million for the year ending September 30, 2011 and Allergan/Actavis then introduced a generic version of the drug.[26]  As described with more particularity below, Allergan/Actavis deceptively promoted Kadian to its highest prescribers in order to increase sales and stated that Kadian was less likely to be abused when it had no evidence of this.

80.    In order to accomplish this fundamental shift in perception that was key to successfully marketing their opioids, the Manufacturer Defendants and other manufacturers of opioids designed and implemented a sophisticated and deceptive marketing strategy.

81.    This marketing strategy included both "branded" and "unbranded" promotional activities, which will be described in more detail below.  Branded marketing refers to marketing of a specific drug manufactured by a specific company.  Unbranded marketing refers not to the

---

[25] *Actavis Acquires Kadian; Extends Specialty Drug Portfolio in U.S.*, Business Wire (Dec. 30, 2008)  https://www.businesswire.com/news/home/20081230005227/en/Actavis-Acquires-Kadian -Extends-Specialty-Drug-Portfolio.

[26] *Actavis Launches Generic KADIAN® Capsules in the U.S.*, PR Newswire, (Nov. 11, 2011), https://www.prnewswire.com/news-releases/actavis-launches-generic-kadian-capsules-in-the-us- 133689873.html.

Case ID: 210601660

marketing of a specific drug or brand, but rather a class of drugs or a particular disease, condition, or treatment.

82.     As will be discussed below, Manufacturer Defendants disseminated much of their false, misleading, unbalanced, and unsupported statements through unbranded marketing materials – materials that promoted prescription opioid use but did not name a specific opioid while doing so.  Through these unbranded materials and statements, Manufacturer Defendants presented information and guidelines concerning prescription opioids generally that were false and misleading.

83.     Further, by acting through third parties, Manufacturer Defendants were able to give the false appearance that their messages reflected the views of independent unbiased sources.  Manufacturer Defendants falsely cited to these sources as "independent" corroboration of their own statements.

84.     Manufacturer Defendants' engineered third-party documents and marketing not only had greater credibility, but also broader diffusion among practitioners in the medical profession.  Doctors generally did not resist receiving materials from purportedly independent entities on display in their offices, as they might with drug company pieces.

85.     Manufacturer Defendants disseminated many of their false, misleading, unbalanced and unsupported promotional messages through the third-party vehicles because the messages appeared to be independent.  Through unbranded materials, Defendants presented information and guidance concerning opioids that were false, misleading, unsubstantiated, unbalanced, and incomplete.

86.     Even where unbranded messages were disseminated through third-party vehicles, Manufacturer Defendants adopted those messages as their own when they cited to, edited,

122329891-1

Case ID: 210601660

approved, and distributed such materials in their direct marketing activities knowing they were false, misleading, unsubstantiated, unbalanced, and incomplete.

87.    Manufacturer Defendants' sales representatives regularly distributed deceptive third-party marketing materials to Manufacturer Defendants' target audience, including physicians, patients, pharmacy benefit managers, formularies, insurers, third-party payors, health plan administrators and other participants in the prescribing or third-party approval chain.

88.    Manufacturer Defendants took an active role in guiding, reviewing, and approving many of the misleading statements issued by third parties, ensuring that Manufacturer Defendants were consistently in control of their content.  By funding, directing, editing, and distributing these materials, Manufacturer Defendants exercised control over their deceptive messages and acted in concert with these third parties to promote the use of prescription opioids for the treatment of chronic pain.

89.    The unbranded marketing materials that Manufacturer Defendants assisted in creating and disseminating failed to properly disclose the risks of opioid addiction, abuse, misuse, and overdose, or wrongfully denied or minimized those risks as alleged more fully herein.  Those materials also misrepresented or concealed information concerning the efficacy of prescription opioids as a treatment for chronic pain.

90.    The Manufacturer Defendants and other manufacturers of opioids promoted, and profited from, their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their marketing was false and misleading.  The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes.  The FDA and other regulators warned Manufacturer Defendants of these risks.  The Manufacturer Defendants

122329891-1

Case ID: 210601660

had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths—all of which made clear the harms from long-term opioid use and that patients were and are suffering from addiction, overdoses, and death in alarming numbers.  More recently, the FDA and CDC issued pronouncements based on existing medical evidence that conclusively expose the known falsity of these Defendants' misrepresentations.

91.     The deceptive marketing to increase opioid prescriptions centered around several categories of misrepresentations, which are discussed in detail below.   The Manufacturer Defendants and other manufacturers of opioids disseminated these misrepresentations through various branded and unbranded channels, including through advertising, sales representatives, purportedly independent organizations these defendants funded and controlled, "Front Groups," so-called industry "Key Opinion Leaders," and Continuing Medical Education ("CME") programs discussed subsequently below.

**1. The Manufacturer Defendants Promoted Multiple Falsehoods About Opioids.**

92.     The Manufacturer Defendants' misrepresentations fall into the following categories:

a. False or misleading claims that the risk of addiction from chronic opioid therapy is low;

b. False or misleading claims that to the extent there is a risk of addiction, it can be easily identified and managed;

c. False or misleading claims that signs of addictive behavior are actually signs of "pseudoaddiction," requiring more opioids;

d. False or misleading claims that opioid withdrawal can be avoided by tapering;

27

Case ID: 210601660

e.   False or misleading claims that opioid doses can be increased without limit or greater risks;

f.   False or misleading claims that long-term opioid use improves functioning;

g.   False or misleading claims that alternative forms of pain relief pose greater risks than opioids;

h.   False or misleading claims that new formulations of certain opioids successfully deter abuse.

93.   Each of these propositions was false.  The Manufacturer Defendants knew this, but they nonetheless set out to convince physicians, patients, and the public at large of the truth of each of these propositions in order to expand the market for their opioids.

94.   The categories of misrepresentations are offered to organize the numerous statements the Manufacturer Defendants made and to explain their role in the overall marketing effort, not as a checklist for assessing each Manufacturer Defendant's liability or that of other opioids manufacturers.  While each Manufacturer Defendant deceptively promoted their opioids specifically, and, together with other opioid manufacturers, opioids generally, not every Manufacturer Defendant propagated (or needed to propagate) each misrepresentation.  Each Manufacturer Defendant's conduct, and each misrepresentation, was part of and contributed to an overall narrative that aimed to—and did—mislead doctors, patients, and payors about the risk and benefits of opioids.  While this Complaint endeavors to document examples of each Manufacturer Defendant's misrepresentations and the manner in which they were disseminated, they are just that—examples.  The Complaint is not, especially prior to discovery, an exhaustive catalog of the nature and manner of each deceptive statement by each Manufacturer Defendant.

122329891-1

a. **Falsehood #1: The false or misleading claims that the risk of addiction from chronic opioid therapy is low.**

95.     Central to the Manufacturer Defendants' promotional scheme was the misrepresentation that opioids are rarely addictive when taken for chronic pain. Through their marketing efforts, the Manufacturer Defendants advanced the idea that the risk of addiction is low when opioids are taken as prescribed by "legitimate" pain patients. That, in turn, directly led to the expected and intended result that doctors prescribed more opioids to more patients— thereby enriching the Manufacturer Defendants and substantially contributing to the opioid epidemic.

96.     Each of the Manufacturer Defendants claimed that the potential for addiction from its opioids was relatively small or non-existent, even though there was no scientific evidence to support those claims. None of them have acknowledged, retracted, or corrected their false statements.

97.     In fact, studies have shown that a substantial percentage of long-term users of opioids experience addiction. Addiction can result from the use of any opioid, "even at recommended dose,"[27] and the risk substantially increases with more than three months of use.[28]

---

[27] *FDA Announces Safety Labeling Changes and Postmarket Study Requirements For Extended-Release and Long-Acting Opioid Analgesics*, MagMutual (Aug. 18, 2016), https://www.magmutual.com/learning/article/fda-announces-safety-labeling-changes-and-postmarket-study-requirements-opioids; *see also* Press Release, U.S. Food & Drug Admin., *Announces Enhanced Warnings For Immediate-Release Opioid Pain Medications Related to Risks of Misuse, Abuse, Addiction, Overdose and Death*, FDA (Mar. 22, 2016), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm491739.htm.

[28] Deborah Dowell, M.D. et al., *CDC Guideline for Prescribing Opioids for Chronic Pain – United States 2016,* 65(1) Morbidity & Mortality Wkly. Rep. 1, 21 (Mar. 18, 2016) (hereinafter "CDC Guideline"). The CDC Guideline extensively discussed the evidence (or lack thereof) supporting opioid use to treat long-term chronic pain.

As the CDC Guideline states, "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" (a diagnostic term for addiction).[29]

98.    For example, through its "Learn More About Customized Pain Control with Kadian," material, Allergan/Actavis claimed that it is possible to become addicted to morphine-based drugs like Kadian, but that it is "less likely" to happen in those who "have never had an addiction problem."  The piece goes on to advise that a need for a "dose adjustment" is the result of tolerance, and "not addiction."

99.    Training for Allergan/Actavis sales representatives deceptively minimizes the risk of addiction by: (i) attributing addiction to "predisposing factors" like family history of addiction or psychiatric disorders; (ii) repeatedly emphasizing the difference between substance dependence and substance abuse; and (iii) using the term pseudoaddiction, which, as described elsewhere, dismisses evidence of addiction as the undertreatment of pain and, dangerously, counsels doctors to respond to its signs with more opioids.  Allergan/Actavis also trained its sales force that long-acting opioids were less likely to produce addiction than short-acting opioids, although there is no evidence that either form of opioid is less addictive or that any opioids can be taken long-term without the risk of addiction.

100.    Allergan/Actavis conducted a market study on takeaways from prescribers' interactions with Kadian sales representatives.  The study revealed that doctors reported a strong recollection of the sales representatives' discussion of Kadian's supposed low-abuse potential.  Allergan/Actavis' sales representatives' misstatements on the low-abuse potential were considered an important factor to doctors, and were likely repeated and reinforced to their patients.  Additionally, doctors reviewed visual aids that Kadian sales representatives used

---

[29] *Id.* at 2.

122329891-1

Case ID: 210601660

during the visits, and Allergan/Actavis noted that doctors who reviewed those visual aids associated Kadian with less abuse and no highs, in comparison to other opioids. Numerous marketing surveys of doctors in 2010 and 2012, for example, confirmed Allergan/Actavis' messaging about Kadian's purported low addiction potential, and that it had less abuse potential than other similar opioids.

101.     A guide for prescribers, published under Allergan/Actavis' copyright, deceptively represents that Kadian is more difficult to abuse and less addictive than other opioids. The guide includes the following statements: 1) "unique pharmaceutical formulation of KADIAN may offer some protection from extraction of morphine sulfate for intravenous use by illicit users," and 2) "KADIAN may be less likely to be abused by health care providers and illicit users" because of "Slow onset of action," "Lower peak plasma morphine levels than equivalent doses of other formulations of morphine," "Long duration of action," and "Minimal fluctuations in peak to trough plasma levels of morphine at steady state." These statements convey both that (1) Kadian does not cause euphoria and therefore is less addictive and that (2) Kadian is less prone to tampering and abuse, even though Kadian was not approved by the FDA as abuse deterrent, and, upon information and belief, Allergan/Actavis had no studies to suggest it was.

102.     In March 2010, the FDA found that Allergan/Actavis had been distributing promotional materials that "minimize[] the risks associated with Kadian and misleadingly suggest[] that Kadian is safer than has been demonstrated."[30]

103.     Similarly, Cephalon (now Teva) sponsored and facilitated the development of a guidebook, *Opioid Medications and REMS: A Patient's Guide*, which included claims that

---

[30] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth, LLC (Feb. 18, 2010), https://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf.

Case ID: 210601660

"patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids."  Cephalon also sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft.

104.   A  2003  Cephalon-sponsored  CME  presentation  titled  *Pharmacologic Management of Breakthrough or Incident Pain*, posted on Medscape in February 2003, teaches:

> [C]hronic pain is often undertreated, particularly in the noncancer patient population. . . . The continued stigmatization of opioids and their prescription, coupled with often unfounded and self-imposed physician fear of dealing with the highly regulated distribution system for opioid analgesics, remains a barrier to effective pain management and must be addressed. Clinicians intimately involved with the treatment of patients with chronic pain recognize that the majority of suffering patients lack interest in substance abuse. In fact, patient fears of developing substance abuse behaviors such as addiction often lead to undertreatment of pain. The concern about patients with chronic pain becoming addicted to opioids during long-term opioid therapy may stem from confusion between physical dependence (tolerance) and psychological dependence (addiction) that manifests as drug abuse.[31]

105.   Manufacturer Defendants' suggestions that the opioid epidemic is the result of bad patients who manipulate doctors to obtain opioids illicitly helped further their marketing scheme, but those suggestions are at odds with the facts.  While there are certainly patients who unlawfully obtain opioids, they are a small minority.  For example, patients who "doctor-shop"—i.e., visit multiple prescribers to obtain opioid prescriptions—are responsible for roughly 2% of opioid prescriptions.[32]  The epidemic of opioid addiction and abuse is overwhelmingly a problem of false marketing (and unconstrained distribution) of the drugs, not problem patients.

---

[31] Michael J. Brennan, et al., *Pharmacologic Management of Breakthrough or Incident Pain*, Medscape, http://www.medscape.org/viewarticle/449803 (behind paywall).

[32] National Institute on Drug Abuse, *Although Relatively Few, "Doctor Shoppers" Skew Opioid Prescribing*, May 27, 2014, https://archives.drugabuse.gov/news-events/nida-notes/2014/05/although-relatively-few-doctor-shoppers-skew-opioid-prescribing

b. **Falsehood #2: The false and misleading claims that to the extent there is a risk of addiction, it can be easily identified and managed.**

106.    While continuing to maintain that most patients can safely take opioids long-term for chronic pain without becoming addicted, the Manufacturer Defendants assert that to the extent that *some* patients are at risk of opioid addiction, doctors can effectively identify and manage that risk by using screening tools or questionnaires. In materials they produced, sponsored, or controlled, the Manufacturer Defendants instructed patients and prescribers that screening tools can identify patients predisposed to addiction, thus making doctors feel more comfortable prescribing opioids to their patients and patients more comfortable starting opioid therapy for chronic pain.  These tools, they say, identify those with higher addiction risks (stemming from personal or family histories of substance use, mental illness, trauma, or abuse) so that doctors can then more closely monitor those patients.

107.    There are three fundamental flaws in the Manufacturer Defendants' representations that doctors can consistently identify and manage the risk of addiction.  First, there is no reliable scientific evidence that doctors can depend on the screening tools currently available to materially limit the risk of addiction.  Second, there is no reliable scientific evidence that high-risk patients identified through screening can take opioids long-term without triggering addiction, even with enhanced monitoring.  Third, there is no reliable scientific evidence that patients who are not identified through such screening can take opioids long-term without significant danger of addiction.

c. **Falsehood #3: The false or misleading claims that signs of addictive behavior are "pseudoaddiction," requiring more opioids.**

108.    The Manufacturer Defendants instructed patients and prescribers that signs of addiction are actually indications of untreated pain, such that the appropriate response is to prescribe even more opioids.  A doctor who later became a Senior Medical Director for Purdue,

33

Case ID: 210601660

published a study in 1989 coining the term "pseudoaddiction," which he characterized as "the iatrogenic syndrome of abnormal behavior developing as a direct consequence of inadequate pain management."[33]  In other words, people on prescription opioids who exhibited classic signs of addiction— for example, asking for more and higher doses of opioids, self-escalating their doses, or claiming to have lost prescriptions in order to get more opioids—were not addicted, but rather simply suffering from undertreatment of their pain.

109.    In the materials and outreach they produced, sponsored, or controlled, Manufacturer Defendants made these misrepresentations and omissions, and have never acknowledged, retracted, or corrected them.

110.    For example, opioid manufacturers, including Cephalon (now Teva), sponsored the Federation of State Medical Boards' ("FSMB") unbranded *Responsible Opioid Prescribing* (2007), written by Dr. Scott Fishman and discussed in more detail below, which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, which are signs of genuine addiction, are all really signs of "pseudoaddiction."  In addition, Allergan/Actavis trained its sales force to instruct physicians that aberrant behaviors like self-escalation of doses constituted "pseudoaddiction."

111.    The CDC Guideline does not and, upon information and belief, never did recommend attempting to provide more opioids to patients exhibiting symptoms of addiction. Dr. Lynn R. Webster (discussed below) later admitted that pseudoaddiction "is already

---

[33] David E. Weissman & J. David Haddox, *Opioid Pseudoaddiction – An Iatrogenic Syndrome*, 36(3) Pain 363-66 (Mar. 1989), https://www.ncbi.nlm.nih.gov/pubmed/2710565. ("Iatrogenic" describes a condition induced by medical treatment.).

Case ID: 210601660

something we are debunking as a concept" and became "too much of an excuse to give patients more medication. It led us down a path that caused harm."[34]

### d. Falsehood #4: The false or misleading claims that opioid withdrawal can be avoided by tapering.

112.    In an effort to underplay the risk and impact of addiction, the Manufacturer Defendants falsely claimed that, while patients become physically dependent on opioids, physical dependence is not the same as addiction and can be easily addressed, if and when pain relief is no longer desired, by gradually tapering patients' dose to avoid withdrawal. Manufacturer Defendants failed to disclose the extremely difficult and painful effects that patients can experience upon ceasing opioid treatment – adverse effects that also make it less likely that patients will be able to stop using the drugs.  Manufacturer Defendants also failed to disclose how difficult it is for patients to stop using opioids after they have used them for prolonged periods.

113.    For example, Allergan/Actavis trained its sales force to convey that discontinuing opioid therapy can be handled "simply" and that it can be done at home.  Allergan/Actavis' sales representative training also claimed that opioid withdrawal would take only a week, even in addicted patients.

114.    Most patients who have been taking opioids regularly will, upon stopping treatment, experience withdrawal, characterized by intense physical and psychological effects, including anxiety, nausea, headaches, and delirium, among others.[35]  This painful and arduous

---

[34] John Fauber, "Chronic Pain Fuels Boom in Opioids," *Medpage Today*, (Feb. 19, 2012). https://www.medpagetoday.com/neurology/painmanagement/31254.

[35] Mayo Clinic, *Tapering off opioids: When and how*, https://www.mayoclinic.org/diseases-conditions/prescription-drug-abuse/in-depth/tapering-off-opioids-when-and-how/art-20386036.

Case ID: 210601660

struggle to terminate use can leave many patients unwilling or unable to give up opioids and heightens the risk of addiction.

115.     To this day, the Manufacturer Defendants have not corrected or retracted their misrepresentations regarding tapering as a solution to opioid withdrawal.

**e.  Falsehood #5: The false or misleading claims that opioid doses can be increased without limit or greater risks.**

116.     In materials they produced, sponsored or controlled, Manufacturer Defendants instructed prescribers that they could safely increase a patient's dose to achieve pain relief.  Each of the Manufacturer Defendants' claims was deceptive in that it omitted warnings of increased adverse effects that occur at higher doses, effects confirmed by scientific evidence.

117.     For example, Allergan/Actavis trained its sales force that "individualization" of opioid therapy depended on increasing doses until patient reports adequate analgesia and to set dose levels based on patient need and not on "predetermined maximal dose."  Allergan/Actavis further counseled its sales representatives that the reasons some physicians had for not increasing doses indefinitely were simply a matter of physician "comfort level," which could be overcome or used as a tool to induce them to switch to Allergan/Actavis' opioid, Kadian

118.     These misrepresentations were integral to the Manufacturer Defendants' promotion of prescription opioids.  As discussed above, patients develop a tolerance to opioids' analgesic effects, so that achieving long-term pain relief requires constantly increasing the dose.

119.     Manufacturer Defendants were aware of the greater dangers high dose opioids posed.  In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events" and that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."  For example, a study of patient data from the Veterans Health

122329891-1

Case ID: 210601660

Administration published in 2011 found that higher maximum prescribed daily opioid doses were associated with a higher risk of opioid overdose deaths.[36]

**f.    Falsehood #6: The false or misleading claims that long-term opioid use improves functioning.**

120.    Despite the lack of evidence of improved function and the existence of evidence to the contrary, the Manufacturer Defendants consistently promoted opioids as capable of improving patients' function and quality of life because they viewed these claims as a critical part of their marketing strategies.  In recalibrating the risk-benefit analysis for opioids, increasing the perceived benefits of treatment was necessary to overcome its risks.  These statements were also likely to, and did, make a difference in consumers' and others' purchasing, prescribing, and reimbursing decisions, since they were designed to convince these members of Defendants' target audience that opioids were safe and effective, and to choose opioids over alternative treatment therapies for chronic pain.

121.    Allergan/Actavis trained its sales force to instruct prescribers that most chronic benign pain patients have markedly improved function when maintained on chronic opioid therapy.

122.    Allergan/Actavis also trained its sales force that increasing and restoring function is an expected outcome of long-term Kadian therapy, including physical, social, vocational, and recreational function.

123.    Allergan/Actavis distributed a product brochure and detailing document that claimed that use of Kadian to treat chronic pain would relieve "stress on your body and your

---

[36] Amy S. B. Bohnert, Ph.D. et al., *Association Between Opioid Prescribing Patterns and Opioid Overdose-Related Deaths*, 305(13) J. of Am. Med. Assoc. 1315, 1315-1321 (Apr. 6, 2011), https://jamanetwork.com/journals/jama/fullarticle/896182.

Case ID: 210601660

mental health," allow patients to avoid "miss[ing] work," and cause patients to better enjoy their lives.[37]  Government regulators warned Allergan/Actavis that such claims were misleading, writing: "We are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug has in alleviating pain, taken together with any drug-related side effects patients may experience . . . , results in an overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[38]  The regulators concluded that the representations were "false or misleading because they omit and minimize the serious risks associated with the drug, . . . and present unsubstantiated superiority and effectiveness claims. . . .  These violations are a concern from a public health perspective because they suggest that the product is safer and more effective than has been demonstrated."[39]

124.    On information and belief, Allergan/Actavis sales representatives told prescribers that prescribing Allergan/Actavis' opioids would improve their patients' ability to function and improve their quality of life.

125.    Similarly, *Responsible Opioid Prescribing* (2007), sponsored and distributed by Cephalon, taught that relief of pain by opioids, by itself, improved patients' function.

126.    The APF's *Treatment Options: A Guide for People Living with Pain* (2007), sponsored in part by Cephalon (now Teva), counseled patients that opioids "give [pain patients]

---

[37]  Warning Letter from Thomas Abrams, Dir., FDA Div. of Marketing, Advertising and Communications, to Doug Boothe, CEO, Actavis U.S. (Feb. 18. 2010), *available at* https://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf.

[38]  *Id.*

[39]  *Id.*

38

Case ID: 210601660

a quality of life we deserve." The guide was available online until APF shut its doors in May 2012.

127. The Manufacturer Defendants' claims that long-term use of opioids improves patient function and quality of life are unsupported by clinical evidence. There are no controlled studies of the use of opioids beyond 16 weeks, and there is no evidence that opioids improve patients' pain and function long term. The FDA, for years, has made clear through warning letters to manufacturers the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life.[40] Based upon a review of the existing scientific evidence, the CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use."[41]

128. Consistent with the CDC's findings, substantial evidence exists demonstrating that opioid drugs are ineffective for the treatment of chronic pain and worsen patients' health. For example, a 2006 study-of-studies found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments. The few longer-term studies of opioid use had "consistently poor results," and "several studies have showed that

---

[40] The FDA has warned other drugmakers that claims of improved function and quality of life were misleading. *See* Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), (rejecting claims that Actavis' opioid, Kadian, had an "overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."); Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008), (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."). The FDA's warning letters were available to Defendants on the FDA website.

[41] CDC Guideline at 20.

Case ID: 210601660

opioids for chronic pain may actually worsen pain and functioning . . ."[42] along with general health, mental health, and social function.  Over time, even high doses of potent opioids often fail to control pain, and patients exposed to such doses are unable to function normally.

129.    Increased duration of opioid use is also strongly associated with increased prevalence of mental health disorders (depression, anxiety, post-traumatic stress disorder, and substance abuse), increased psychological distress, and greater health care utilization.  The CDC Guideline concluded that "[w]hile benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant."[43]  According to the CDC, "for the vast majority of patients, the known, serious, and too-often-fatal risks far outweigh the unproven and transient benefits [of opioids for chronic pain]."[44]

130.    As one pain specialist observed, "opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning.  Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."[45]  In fact, research such as a 2008 study in the journal *Spine* has shown that pain sufferers prescribed opioids long-term suffered addiction that made them more likely to be disabled and unable to work.[46]  Another study demonstrated that

---

[42] Thomas R. Frieden and Debra Houry, *Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline*, New Eng. J. Med., at 1503 (Apr. 21, 2016).

[43] CDC Guideline at 2, 18.

[44] Frieden & Houry, *supra,* at 1503.

[45] Andrea Rubinstein, M.D. *Are We Making Pain Patients Worse?*, Sonoma Med. (Fall 2009), http://www.nbcms.org/about-us/sonoma-county-medical-association/magazine/sonoma-medicine-are-we-making-pain-patients-worse.aspx?pageid=144&tabid=747.

[46] Jeffrey Dersh, et al., *Prescription Opioid Dependence Is Associated With Poorer Outcomes In Disabling Spinal Disorders*, 33(20) Spine 2219-27 (Sept. 15, 2008).

40

Case ID: 210601660

injured workers who received a prescription opioid for more than seven days during the first six weeks after the injury were 2.2 times more likely to remain on work disability a year later than workers with similar injuries who received no opioids at all.[47]  Moreover, the first randomized clinical trial designed to make head-to-head comparisons between opioids and other kinds of pain medications was recently published on March 6, 2018, in the Journal of the American Medical Association.  The study reported that "[t]here was no significant difference in pain-related function between the 2 groups" – those whose pain was treated with opioids and those whose pain was treated with non-opioids, including acetaminophen and non-steroidal anti-inflammatory drugs ("NSAIDs") like ibuprofen.  Accordingly, the study concluded: "Treatment with opioids was not superior to treatment with nonopioid medications for improving pain-related function over 12 months."

### g.  Falsehood #7: The false or misleading claims that alternative forms of pain relief pose greater risks than opioids.

131.    In materials they produced, sponsored or controlled, the Manufacturer Defendants omitted known risks of chronic opioid therapy and emphasized or exaggerated risks of competing products so that prescribers and patients would favor opioids over other therapies such as over-the-counter acetaminophen or over-the-counter or prescription NSAIDs.

132.    For example, in addition to failing to disclose in promotional materials the risks of addiction, overdose, and death, the Manufacturer Defendants routinely ignored the risks of hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy in which

---

[47] Franklin, GM, Stover, BD, Turner, JA, Fulton-Kehoe, D, Wickizer, TM, *Early Opioid Prescription and Subsequent Disability Among Workers With Back Injuries: The Disability Risk Identification Study Cohort*, Spine 2008 Jan 15;33(2):199-204,at 201-202.

the patient becomes more sensitive to certain painful stimuli over time,"[48] hormonal dysfunction,[49] decline in immune function, mental clouding, confusion, and dizziness, increased falls and fractures in the elderly,[50] neonatal abstinence syndrome (when an infant exposed to opioids prenatally suffers withdrawal after birth), and potentially fatal interactions with alcohol or with benzodiazepines, which are used to treat anxiety and may be co-prescribed with opioids, particularly to veterans suffering from pain.[51]

133.    For example, Allergan/Actavis trained its sales force that the ability to escalate doses during long-term opioid therapy, without hitting a dose ceiling, made opioid use safer than other forms of therapy that had defined maximum doses, such as acetaminophen or NSAIDs. Allergan/Actavis also trained physician-speakers that "maintenance therapy with opioids can be safer than long-term use of other analgesics," including NSAIDs, for older persons.   On information and belief, Allergan/Actavis sales representatives told prescribers that NSAIDs were less beneficial or more risky than opioids.

134.    The APF's *Treatment Options: A Guide for People Living with Pain*, sponsored in part by Teva/Cephalon, warned that risks of NSAIDs increase if "taken for more than a period of

---

[48] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. *Physicians for Responsible Opioid Prescribing,* Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).

[49] H.W. Daniell, *Hypogonadism in Men Consuming Sustained-Action Oral Opioids*, 3(5) J. Pain 377-84 (2001).

[50] *See* Bernhard M. Kuschel, *The Risk of Fall Injury in Relation to Commonly Prescribed Medications Among Older People – a Swedish Case-Control Study*, Eur. J. Pub. H. 527, 527-32 (July 31, 2014).

[51] Karen H. Seal, *Association of Mental Health Disorders With Prescription Opioids and High-Risk Opioids in US Veterans of Iraq and Afghanistan*, 307(9) J. Am. Med. Ass'n 940-47 (2012).

Case ID: 210601660

months," with no corresponding warning about opioids. The publication falsely attributed 10,000 to 20,000 deaths annually to NSAID overdoses, when the figure is closer to 3,200.[52]

135.    As a result of the Manufacturer Defendants' deceptive promotion of opioids over safer and more effective drugs, opioid prescriptions increased even as the percentage of patients visiting a doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID and acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID prescribing.[53]

### h. Falsehood #8: The false or misleading claims that new formulations of certain opioids successfully deter abuse.

136.    Rather than take widespread opioid abuse as reason to cease its untruthful marketing efforts, Defendant Allergan/Actavis seized it as a competitive opportunity, promoting its branded opioids as formulated to be less addictive or less subject to abuse than other opioids.

137.    The CDC Guideline confirms that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes." Tom Frieden, the former Director of

---

[52] Robert E. Tarone, et al., *Nonselective Nonaspirin Nonsteroidal Anti-Inflammatory Drugs and Gastrointestinal Bleeding: Relative and Absolute Risk Estimates from Recent Epidemiologic Studies*, 11 Am. J. of Therapeutics 17-25 (2004).

[53] M. Daubresse, et al*., Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010*, 51(10) Med. Care, 870-878 (2013). For back pain alone, the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined from 39.9% to 24.5% of these visits; and referrals to physical therapy remained steady. *See also* J. Mafi, et al*., Worsening Trends in the Management and Treatment of Back Pain*, 173(17) J. of the Am Med. Ass'n Internal Med. 1573, 1573 (2013).

Case ID: 210601660

the CDC, reported that his staff could not find "any evidence showing the updated opioids [ADF opioids] actually reduce rates of addiction, overdoses, or death."

138.    A guide for prescribers under Allergan/Actavis's copyright deceptively represents that Kadian is more difficult to abuse and less addictive than other opioids.  The guide declares that "unique pharmaceutical formulation of KADIAN may offer some protection from extraction of morphine sulfate for intravenous use by illicit users," and "KADIAN may be less likely to be abused by health care providers and illicit users" because of its "[s]low onset of action."  Kadian, however, was not approved by the FDA as abuse deterrent, and, upon information and belief, Allergan/Actavis had no studies to suggest it was.

139.    While Manufacturer Defendants promote patented technology as the solution to opioid abuse and addiction, none of their "technology" addresses the most common form of abuse—oral ingestion—and their statements regarding abuse-deterrent formulations give the misleading impression that these reformulated opioids can be prescribed safely.

140.    In sum, each of the categories of misrepresentations discussed above regarding the use of opioids to treat chronic pain was unfair, deceptive and unconscionable, as these were false and misleading statements and material misrepresentations that were not supported by or were contrary to the scientific evidence.

### 2. The Manufacturer Defendants Disseminated Their Misleading Messages About Opioids Through Multiple Channels.

141.    The Manufacturer Defendants' false marketing campaign not only targeted the medical community who had to treat chronic pain, but also patients who experience chronic pain.

142.    The Manufacturer Defendants utilized various channels—most of which were unbranded—to carry out their marketing scheme of targeting the medical community and patients with deceptive information about opioids: (1) "Front Groups" with the appearance of

44

Case ID: 210601660

independence from the Manufacturer Defendants; (2) Key Opinion Leaders or "KOLs", that is, doctors who were paid by the Manufacturer Defendants to promote their pro-opioid message; (3) CME programs controlled and/or funded by the Manufacturer Defendants; (4) branded advertising; (5) unbranded advertising; (6) publications; (7) direct, targeted communications with prescribers by sales representatives or "detailers"; and (8) speakers bureaus and programs.

### a. The Manufacturer Defendants Directed Front Groups to Deceptively Promote Opioid Use.

143.    Patient advocacy groups and professional associations became vehicles to reach prescribers, patients, and policymakers.    Manufacturer Defendants exerted influence and effective control over the messaging by these groups by providing major funding directly to them, as well as through KOLs who served on their boards.    These "Front Groups" put out unbranded patient education materials, treatment guidelines and CMEs that supported the use of opioids for chronic pain, overstated their benefits, and understated their risks. [54]    Manufacturer Defendants funded these Front Groups in order to ensure supportive messages from these seemingly neutral and credible third parties, and their funding did, in fact, ensure such supportive messages—often at the expense of their own constituencies.

144.    "Patient advocacy organizations and professional societies like the Front Groups 'play a significant role in shaping health policy debates, setting national guidelines for patient treatment, raising disease awareness, and educating the public.'"[55]    "Even small organizations— with 'their large numbers and credibility with policymakers and the public'—have 'extensive influence in specific disease areas.'    Larger organizations with extensive funding and outreach

---

[54] U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Members' Office, (Feb. 12, 2018), https://www.hsdl.org/?view&did=808171 at 3 ("*Fueling an Epidemic*"), at 3.

[55] *Id.* at p. 2.

Case ID: 210601660

capabilities 'likely have a substantial effect on policies relevant to their industry sponsors.'"[56] Indeed, the U.S. Senate's report, *Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups*,[57] which arose out of a 2017 Senate investigation, "provides the first comprehensive snapshot of the financial connections between opioid manufacturers and advocacy groups and professional societies operating in the area of opioids policy,"[58] and found that the Manufacturer Defendants and other opioids manufacturers gave millions of dollars in contributions to various Front Groups.[59]

145.    The Manufacturer Defendants also "made substantial payments to individual group executives, staff members, board members, and advisory board members" affiliated with the Front Groups subject to the Senate Committee's study.[60]

146.    As the Senate *Fueling an Epidemic* Report found, the Front Groups "amplified or issued messages that reinforce industry efforts to promote opioid prescription and use, including guidelines and policies minimizing the risk of addiction and promoting opioids for chronic pain."[61]  They also "lobbied to change laws directed at curbing opioid use, strongly criticized landmark CDC guidelines on opioid prescribing, and challenged legal efforts to hold physicians and industry executives responsible for over prescription and misbranding."[62]

---

[56] *Id.*

[57] *Id.* at 3.

[58] *Id.* at 1.

[59] *Id.* at 3.

[60] *Id.* at 10.

[61] *Id.* at 12-15.

[62] *Id.* at 12.

Case ID: 210601660

147.    The Manufacturer Defendants took an active role in guiding, reviewing, and approving many of the false and misleading statements issued by the Front Groups, ensuring that Manufacturer Defendants were consistently in control of their content.  By funding, directing, editing, approving, and distributing these materials, Manufacturer Defendants exercised control over and adopted their false and deceptive messages and acted in concert with the Front Groups and through the Front groups, with each other to deceptively promote the use of opioids for the treatment of chronic pain.

### i. American Pain Foundation

148.    The most prominent of the Front Groups was the American Pain Foundation ("APF").  While APF held itself out as an independent patient advocacy organization, in reality it received 90% of its funding in 2010 from the drug and medical-device industry, including from Teva/Cephalon.  APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012.  In practice, APF operated in close collaboration with opioid manufacturers, submitting grant proposals seeking to fund activities and publications suggested by opioid manufacturers and assisting in marketing projects for opioid manufacturers.

149.    For example, APF also developed the National Initiative on Pain Control ("NIPC"), which ran a facially unaffiliated website, *www.painknowledge.com*.  NIPC promoted itself as an education initiative led by its expert leadership team, including purported experts in the pain management field.  NIPC published unaccredited prescriber education programs (accredited programs are reviewed by a third party and must meet certain requirements of independence from pharmaceutical companies), including a series of "dinner dialogues."  But it was opioid manufacturer Endo that substantially controlled NIPC, by funding NIPC projects, developing, specifying, and reviewing its content, and distributing NIPC materials.  Yet, Endo's

122329891-1

Case ID: 210601660

involvement in NIPC was nowhere disclosed on the website pages describing NIPC or *www.painknowledge.org.*

150.    Although APF presented itself as a patient advocacy organization, it functioned largely as an advocate for the interests of the Manufacturer Defendants, not patients.

151.    In practice, APF operated in close collaboration with Manufacturer Defendants, submitting grant proposals seeking to fund activities and publications suggested by Manufacturer Defendants and assisting in marketing projects for Manufacturer Defendants.

152.    APF's Board of Directors was largely comprised of doctors who were on the payrolls of Manufacturer Defendants and other manufacturers of opioids, either as consultants or speakers at medical events.    The close relationship between APF and the Manufacturer Defendants demonstrates APF's clear lack of independence in its finances, management, and mission, and its willingness to allow Manufacturer Defendants and other opioid manufacturers to control its activities and messages.    This close relationship also supports a reasonable inference that each Manufacturer Defendant that worked with it was able to exercise editorial control over its publications—even when Manufacturer Defendants' messages contradicted APF's internal conclusions.    For example, a roundtable convened by APF acknowledged the lack of evidence to support chronic opioid therapy.    APF's formal summary of the meeting notes concluded that: "[An] important barrier[] to appropriate opioid management [is] the lack of confirmatory data about the long-term safety and efficacy of opioids in non-cancer chronic pain, amid cumulative clinical evidence."

153.    In May 2012, the U.S. Senate Finance Committee began looking into APF to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers.    Within days of being targeted by the Senate investigation, APF's board voted

to dissolve the organization "due to irreparable economic circumstances." APF then "cease[d] to exist, effective immediately." Without support from Manufacturer Defendants, to whom APF could no longer be helpful, APF was no longer financially viable.

### ii.  American Academy of Pain Medicine and the American Pain Society

154.    The American Academy of Pain Medicine ("AAPM") and the American Pain Society ("APS") are professional medical societies, each of which received substantial funding from Defendants from 2009 to 2013. In 1997, AAPM issued a "consensus" statement that endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.[63]  The consensus statement, which also formed the foundation of the 1998 Model Guidelines for Use of Controlled Substances for the Treatment of Pain issued by the Federation of State Medical Boards (see below), was published on the AAPM's website.

155.    AAPM's corporate council includes pharmaceutical companies and its past presidents include doctors with connections to the opioid manufacturers. AAPM was "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[64]  AAPM's past presidents include Dr. Scott Fishman (2005), Dr. Perry G. Fine (2011), and Dr. Lynn R. Webster (2013), all of whose connections to the opioid manufacturers are well-documented as set forth elsewhere in this Complaint.

---

[63] Consensus Statement by the Am. Acad. of Pain Med. & the Am. Pain Soc'y, *The Use of Opioids for the Treatment of Chronic Pain*, APS & AAPM (1997), http://www.stgeorgeutah.com/wp-content/uploads/2016/05/OPIOIDES.DOLORCRONICO.pdf (Aug. 18, 2017).

[64] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), available at http://www.medscape.org/viewarticle/500829.

122329891-1

Case ID: 210601660

156.    Fishman, who also served as a KOL for Manufacturer Defendants, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[65]

157.    AAPM received over $2.2 million in funding since 2009 from opioid manufacturers.  AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate.  The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations.

158.    AAPM describes the annual event as an "exclusive venue" for offering CMEs to doctors.  Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Teva/Cephalon was a member of the council and presented deceptive programs to doctors who attended this annual event.  The conferences sponsored by AAPM heavily emphasized CME sessions on opioids – 37 out of roughly 40 at one conference alone.

159.    AAPM's staff understood that they and their industry funders were engaged in a common task.  Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

160.    With the assistance, prompting, involvement, and funding of Manufacturer Defendants and other manufacturers of opioids, AAPM and APS issued their own treatment guidelines in 2009 ("2009 Guidelines"), and continued to recommend the use of opioids to treat

---

[65] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), available at http://www.medscape.org/viewarticle/500829.

122329891-1

Case ID: 210601660

chronic pain. Fourteen of the 21 panel members who drafted the 2009 Guidelines, including KOL Dr. Fine, received support from opioid manufacturers, including Teva/Cephalon.

161.    One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Teva/Cephalon, made to the sponsoring organizations and committee members.

162.    The 2009 Guidelines have been a particularly effective channel of deception. They have influenced not only treating physicians, but also the scientific literature on opioids; they were reprinted in the *Journal of Pain*, have been cited hundreds of times in academic literature, were disseminated during the relevant time period, and were and are available online. Treatment guidelines are especially influential with primary care physicians and family doctors to whom Manufacturer Defendants promoted opioids, whose lack of specialized training in pain management and opioids makes them more reliant on, and less able to evaluate, these types of guidelines. For that reason, the CDC has recognized that treatment guidelines can "change prescribing practices."[66]

163.    The 2009 Guidelines are relied upon by doctors, especially general practitioners and family doctors who have no specific training in treating chronic pain, and upon information and belief the 2009 Guidelines were created just for that purpose.

164.    The Manufacturer Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions, their involvement in the

---

[66] CDC Guideline at 2.

51

Case ID: 210601660

development of the 2009 Guidelines, or their financial backing of the authors of the 2009 Guidelines.

### iii.   The Federation of State Medical Boards

165.    The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States.  The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians.

166.    The FSMB finances opioid and pain-specific programs through grants from Manufacturer Defendants.

167.    Since 1998, the FSMB has been developing treatment guidelines for the use of opioids for the treatment of pain.  The 1998 version, Model Guidelines for the Use of Controlled Substances for the Treatment of Pain ("1998 Guidelines") was produced "in collaboration with pharmaceutical companies."  The 1998 Guidelines that the pharmaceutical companies helped author taught not that opioids could be appropriate in only limited cases after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option.

168.    A 2004 iteration of the 1998 Guidelines and the 2007 book, *Responsible Opioid Prescribing*, also made the same claims as the 1998 Guidelines.  These guidelines were posted online and were available to and intended to reach physicians nationwide, including in the City of Philadelphia.

169.    *Responsible Opioid Prescribing* was backed largely by drug manufacturers.  The publication also received support from the American Pain Foundation and the American Academy of Pain Medicine.  The publication was written by Dr. Fishman, and Dr. Fine served on the Board of Advisors.  In all, 163,131 copies of *Responsible Opioid Prescribing* were

52

Case ID: 210601660

distributed to state medical boards (and through the boards, to practicing doctors).  The FSMB website describes the book as "the leading continuing medical education (CME) activity for prescribers of opioid medications."  This publication asserted that opioid therapy to relieve pain and improve function is a legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins; that pain is under-treated, and that patients should not be denied opioid medications except in light of clear evidence that such medications are harmful to the patient.[67]

170.    The Manufacturer Defendants relied on the 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were documented.  FSMB turned doctors' fear of discipline on its head: doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with chronic pain.

### iv.  The Alliance for Patient Access

171.    Founded in 2006, the Alliance for Patient Access ("APA") is a self-described patient advocacy and health professional organization that styles itself as "a national network of physicians dedicated to ensuring patient access to approved therapies and appropriate clinical care."[68]  It is run by Woodberry Associates LLC, a lobbying firm that was also established in

---

[67] Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide* at 8-9 (Waterford Life Sciences 2007).

[68] *About AfPA*, The Alliance for Patient Access, http://allianceforpatientaccess.org/about-afpa (last visited Apr. 25, 2018). References herein to APA include two affiliated groups: the Global Alliance for Patient Access and the Institute for Patient Access.

53

Case ID: 210601660

2006.[69]  As of June 2017, the APA listed 30 "Associate Members and Financial Supporters." The list includes Teva/Cephalon.

172.    APA's board members have also directly received substantial funding from pharmaceutical companies.[70]   For instance, board vice president Dr. Srinivas Nalamachu, received more than $800,000 from 2013 through 2015 from pharmaceutical companies—nearly all of it from manufacturers of opioids or drugs that treat opioids' side effects, including from Teva/Cephalon.   In addition, board member Dr. Robert A. Yapundich from North Carolina received $215,000 from 2013 through 2015 from pharmaceutical companies, including Teva/Cephalon; Dr. Jack D. Schim from California, received more than $240,000 between 2013 and 2015 from pharmaceutical companies, including Teva/Cephalon; Dr. Howard Hoffberg from Maryland, received $153,000 between 2013 and 2015 from pharmaceutical companies including Teva/Cephalon; and Dr. Robin K. Dore from California, received $700,000 between 2013 and 2015 from pharmaceutical companies.

173.    Among its activities, APA issued a "white paper" titled "Prescription Pain Medication: Preserving Patient Access While Curbing Abuse."[71]   Among other things, the white paper criticizes prescription monitoring programs, purporting to express concern that they are burdensome, not user friendly, and of questionable efficacy:

---

[69] Mary Chris Jaklevic, *Alliance for Patient Access Uses Journalists and Politicians to Push Big Pharma's Agenda*, Health News Review (Oct. 2, 2017), https://www.healthnewsreview.org/2017/10/non-profit-alliance-patient-access-uses-journalists-politicians-push-big-pharmas-agenda/ (hereinafter "Jaklevic*, Non-Profit Alliance for Patient Access*").

[70] All information concerning pharmaceutical company payments to doctors in this paragraph is from ProPublica's Dollars for Docs database, https://projects.propublica.org/docdollars/.

[71] *Prescription Pain Medication: Preserving Patient Access While Curbing Abuse, Institute for Patient Access* (Dec. 2013), http://1yh21u3cjptv3xjder1dco9mx5s.wpengine.netdna-cdn.com/wp-content/uploads/2013/12/PT_White-Paper_Finala.pdf.

54

Case ID: 210601660

Prescription monitoring programs that are difficult to use and cumbersome can place substantial burdens on physicians and their staff, ultimately leading many to stop prescribing pain medications altogether.  This forces patients to seek pain relief medications elsewhere, which may be much less convenient and familiar and may even be dangerous or illegal.

\*        \*        \*

In some states, physicians who fail to consult prescription monitoring databases before prescribing pain medications for their patients are subject to fines; those who repeatedly fail to consult the databases face loss of their professional licensure. Such penalties seem excessive and may inadvertently target older physicians in rural areas who may not be facile with computers and may not have the requisite office staff.  Moreover, threatening and fining physicians in an attempt to induce compliance with prescription monitoring programs represents a system based on punishment as opposed to incentives. . . .

We cannot merely assume that these programs will reduce prescription pain medication use and abuse.[72]

174.    The white paper also purports to express concern about policies that have been

enacted in response to the prevalence of pill mills:

Although well intentioned, many of the policies designed to address this problem have made it difficult for legitimate pain management centers to operate.  For instance, in some states, [pain management centers] must be owned by physicians or professional corporations, must have a Board certified medical director, may need to pay for annual inspections, and are subject to increased record keeping and reporting requirements. . . . [I]t is not even certain that the regulations are helping prevent abuses.[73]

175.    In addition, in an echo of earlier industry efforts to push back against what they

termed "opiophobia," the white paper laments the stigma associated with prescribing and taking

pain medication:

Both pain patients and physicians can face negative perceptions and outright stigma.  When patients with chronic pain can't get their prescriptions for pain medication filled at a pharmacy, they may feel like they are doing something wrong – or even criminal. . . . Physicians can face similar stigma from peers.

---

[72] *Id*. at 4-5.

[73] *Id.* at 5-6.

Case ID: 210601660

Physicians in non-pain specialty areas often look down on those who specialize in pain management – a situation fueled by the numerous regulations and fines that surround prescription pain medications.[74]

176.    In conclusion, the white paper states that "[p]rescription pain medications, and specifically the opioids, can provide substantial relief for people who are recovering from surgery, afflicted by chronic painful diseases, or experiencing pain associated with other conditions that does not adequately respond to over-the-counter drugs."[75]

177.    The APA also issues "Patient Access Champion" financial awards to members of Congress, including 50 such awards in 2015.    The awards were funded by a $7.8 million donation from unnamed donors.    While the awards are ostensibly given for protecting patients' access to Medicare and are thus touted by their recipients as demonstrating a commitment to protecting the rights of senior citizens and the middle class, they appear to be given to provide cover to and reward members of Congress who have supported the APA's agenda.[76]

### v.  The U.S. Pain Foundation

178.    The U.S. Pain Foundation ("USPF") was another Front Group with systematic connections and interpersonal relationships with the Manufacturer Defendants.    The USPF was one of the largest recipients of contributions from the Manufacturer Defendants, collecting more than $3 million in payments between 2012 and 2017 from opioid manufacturers.[77]    The USPF was also a critical component of the Manufacturer Defendants' lobbying efforts to reduce the limits on over-prescription.    The USPF advertises its ties to the Manufacturer Defendants, listing

---

[74] *Id.* at 6.

[75] *Id.* at 7.

[76] Jaklevic, *Non-profit Alliance for Patient Access*, *supra*.

[77] *Fueling an Epidemic*, *supra*.

122329891-1

Case ID: 210601660

opioid manufacturers like Teva as "Platinum," "Gold," and "Basic" corporate members.[78] Industry Front Groups like the American Academy of Pain Management, the American Academy of Pain Medicine, the American Pain Society, and PhRMA are also members of varying levels in the USPF.

### vi. American Geriatrics Society

179.   The American Geriatrics Society ("AGS") was another Front Group with systematic connections and interpersonal relationships with the Manufacturer Defendants.  The AGS was a large recipient of contributions from opioid manufacturers.  AGS contracted with opioid manufacturers to disseminate guidelines regarding the use of opioids for chronic pain in 2002 (*The Management of Persistent Pain in Older Persons*, hereinafter "2002 AGS Guidelines") and 2009 (*Pharmacological Management of Persistent Pain in Older Persons*,[79] hereinafter "2009 AGS Guidelines").   According to news reports, AGS has received at least $344,000 in funding from opioid manufacturers since 2009.[80]  AGS's complicity in the common purpose with the Manufacturer Defendants is evidenced by the fact that AGS internal discussions in August 2009 reveal that it did not want to receive upfront funding from drug companies, which would suggest drug company influence, but would instead, accept commercial support to disseminate pro-opioid publications.

---

[78] *Id*. at 12; Transparency, U.S. Pain Foundation, https://uspainfoundation.org/transparency/ (last visited on March 9, 2018).

[79] *Pharmacological Management of Persistent Pain in Older Persons*, 57 J. Am. Geriatrics Soc'y 1331, 1339, 1342 (2009), available at https://www.nhqualitycampaign.org/files/AmericanGeriatricSociety-PainGuidelines2009.pdf (last visited Apr. 25, 2018).

[80] John Fauber & Ellen Gabler, "Narcotic Painkiller Use Booming Among Elderly," *Milwaukee J. Sentinel*, May 30, 2012, https://medpagetoday.com/geriatrics/painmanagement/32967.

Case ID: 210601660

180.    The 2009 AGS Guidelines recommended that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy."  The panel made "strong recommendations" in this regard despite "low quality of evidence" and concluded that the risk of addiction is manageable for patients, even with a prior history of drug abuse.[81]  These Guidelines further stated that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."  These recommendations and statements are not supported by any study or other reliable scientific evidence.  Nevertheless, they have been cited as many as 1,833 times in Google Scholar (which allows users to search scholarly publications that would be have been relied on by researchers and prescribers) since their 2009 publication and as recently as this year.

181.    Representatives of the Manufacturer Defendants, often during informal meetings at conferences, suggested activities, lobbying efforts and publications for AGS to pursue.  AGS then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

182.    Members of the AGS Board of Directors were doctors on the Manufacturer Defendants' payrolls, either as consultants or speakers at medical events.  As described below, many of the KOLs also served in leadership positions within the AGS.

### b.  The Manufacturer Defendants Paid Key Opinion Leaders to Deceptively Promote Opioid Use.

183.    To falsely promote their opioids, the Manufacturer Defendants and other opioid manufacturers paid and cultivated a select circle of doctors whom they chose and sponsored by for their supportive messages.  Pro-opioid doctors have been at the hub of the Manufacturer

---

[81] 2009 AGS Guidelines at 1342.

58

Case ID: 210601660

Defendants' well-funded, pervasive marketing scheme since its inception and were used to create the grave misperception that science and respected medical professionals favored the broader use of opioids. These doctors include Dr. Russell Portenoy, Dr. Lynn Webster, Dr. Perry Fine, and Dr. Scott Fishman, as set forth below.

184. Although these KOLs were funded by the Manufacturer Defendants and other opioid manufacturers, the KOLs were used extensively to present the appearance that unbiased and reliable medical research supporting the broad use of opioid therapy for chronic pain had been conducted and was being reported on by independent medical professionals. These pro-opioid KOLs wrote, consulted on, edited, and lent their names to books and articles, and gave speeches and CMEs supportive of opioid therapy for chronic pain. They served on committees that developed treatment guidelines that strongly encouraged the use of opioids to treat chronic pain and they were placed on boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs.

185. Through use of their KOLs and strategic placement of these KOLs throughout every critical distribution channel of information within the medical community, the Manufacturer Defendants and other opioid manufacturers were able to exert control of each of these modalities through which doctors receive their information.

186. In return for their pro-opioid advocacy, the Manufacturer Defendants' KOLs received money, prestige, recognition, research funding, and avenues to publish.

187. The Manufacturer Defendants and other opioid manufacturers carefully vetted their KOLs to ensure that they were likely to remain on-message and supportive of the Manufacturer Defendants' agenda. They kept close tabs on the content of the materials published by these KOLs. And, of course, the Manufacturer Defendants and other opioid

Case ID: 210601660

manufacturers kept these KOLs well-funded to enable them to push the deceptive message out to the medical community.

188.    Once the Manufacturer Defendants and other opioid manufacturers identified and funded KOLs and those KOLs began to publish "scientific" papers supporting the Manufacturer Defendants' false position that opioids were safe and effective for treatment of chronic pain, the Manufacturer Defendants and other opioid manufacturers poured significant funds and resources into a marketing machine that widely cited and promoted their KOLs and studies or articles by their KOLs to drive prescription of opioids for chronic pain.  The Manufacturer Defendants cited to, distributed, and marketed these studies and articles by their KOLs as if they were independent medical literature so that it would be well-received by the medical community.  These studies and articles were available to and were intended to reach doctors in Philadelphia.  By contrast, the Manufacturer Defendants and other opioid manufacturers did not support, acknowledge, or disseminate the truly independent publications of doctors critical of the use of chronic opioid therapy.[82]

189.    In their promotion of the use of opioids to treat chronic pain, the KOLs knew that their statements were false and misleading, or they recklessly disregarded the truth in doing so, but they continued to publish their misstatements to benefit themselves, the Manufacturer Defendants and other opioid manufacturers.

### i.    Dr. Russell Portenoy

190.    In 1986, Dr. Russell Portenoy, who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York while at the same

---

[82] *See, e.g.*, Volkow & McLellan*, supra; see also* Matthew Miller, *et al.*, *Prescription Opioid Duration of Action and the Risk of Unintentional Overdose Among Patients Receiving Opioid Therapy*, JAMA Intern Med 2015; 175(4): 608-615.

Case ID: 210601660

time serving as a top spokesperson for drug companies, published an article reporting that "[f]ew substantial gains in employment or social function could be attributed to the institution of opioid therapy."[83]

191.    Writing in 1994, Dr. Portenoy described the prevailing attitudes regarding the dangers of long-term use of opioids:

> *The traditional approach to chronic non-malignant pain does not accept the long-term administration of opioid drugs.*  This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction. According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter.  It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life.  *Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects. There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.*[84]

(emphasis added). According to Dr. Portenoy, the foregoing problems could constitute "compelling reasons to reject long-term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain."[85]

192.    Dr. Portenoy was also a critical component of the Manufacturer Defendants' control over their Front Groups. Specifically, Dr. Portenoy sat as a Director on the board of the APF.  He was also the President of the APS.

---

[83] R. Portenoy & K. Foley, *Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 cases*, 25(2) Pain 171 (1986).

[84] Russell K. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt., 247-287 (H.L. Fields and J.C. Liebeskind eds., 1994) (emphasis added).

[85] *Id.*

Case ID: 210601660

193.    In recent years, some of the Manufacturer Defendants' KOLs have conceded that many of their past claims in support of opioid use lacked evidence or support in the scientific literature.[86]  Dr. Portenoy has now admitted that he minimized the risks of opioids, and that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true."[87]  He mused, "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation?  Well, against the standards of 2012, I guess I did . . . ."[88]

194.    In a 2011 interview released by Physicians for Responsible Opioid Prescribing, Portenoy stated that his earlier work purposefully relied on evidence that was not "real" and left real evidence behind:

> [W]hat I was trying to do was to create a narrative so that the primary care audience would look at this information in [total] and feel more comfortable about opioids in a way they hadn't before. *In essence this was education to destigmatize [opioids], and because the primary goal was to destigmatize, we often left evidence behind.*[89]

---

[86] *See*, *e.g.*, John Fauber, *Painkiller Boom Fueled by Networking*, Journal Sentinel (Feb. 18, 2012), http://archive.jsonline.com/watchdog/watchdogreports/painkiller-boom-fueled-by-networking-dp3p2rn-139609053.html/ (reporting that a key Endo KOL acknowledged that opioid marketing went too far).

[87] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, The Wall Street Journal    https://www.wsj.com/articles/SB10001424127887324478304578173342657044604. (Last updated Dec. 17, 2012 11:36 AM).

[88] *Id.*

[89] Harrison Jacobs, *This 1-Paragraph Letter May Have Launched the Opioid Epidemic*, AOL (May 26, 2016), https://www.aol.com/article/2016/05/26/letter-may-have-launched-opioid-epidemic/ 21384408/; Andrew Kolodny, *Opioids for Chronic Pain: Addiction is NOT Rare*, YouTube    (Oct.    30,    2011), https://www.youtube.com/watch?v=DgyuBWN9D4w&feature=youtu.be.

195.    Several years earlier, when interviewed by journalist Barry Meier for his 2003 book, *Pain Killer*, Dr. Portenoy was more direct: "It was pseudoscience.  I guess I'm going to always have to live with that one."[90]

### ii.    Dr. Lynn Webster

196.    Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of the Lifetree Clinical Research & Pain Clinic in Salt Lake City, Utah.  Dr. Webster was President of AAPM in 2013 and remains a current board member.  He is a Senior Editor of *Pain Medicine*.  Dr. Webster was the author of numerous CMEs sponsored by other opioid manufacturers.

197.    Dr. Webster created and promoted the *Opioid Risk Tool*, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids.  The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines.  Versions of Dr. Webster's *Opioid Risk Tool* ("ORT") appear on, or are linked to, websites run by opioid manufacturers.

198.    Dr. Webster was himself tied to numerous overdose deaths.  He and the Lifetree Clinic were investigated by the DEA for overprescribing opioids after twenty patients died from overdoses.  In keeping with the Manufacturer Defendants' promotional messages, Dr. Webster apparently believed the solution to patients' tolerance or addictive behaviors was more opioids, and he prescribed staggering quantities of pills.

---

[90] Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* (Rodale 2003) at 277.

### iii.    Dr. Perry Fine

199.    Dr. Perry Fine's ties to the Manufacturer Defendants have been well-documented. He has authored articles and testified in court cases and before state and federal committees, and he, too, has argued against legislation restricting high-dose opioid prescription for non-cancer patients.   He co-chaired the APS-AAPM Opioid Guideline Panel, served as treasurer of the AAPM from 2007 to 2010 and as president of that group from 2011 to 2013, and was also on the board of directors of APF.[91]

200.    Multiple videos feature Fine delivering educational talks about prescription opioids.   He even testified at trial that the 1,500 pills a month prescribed to celebrity Anna Nicole Smith for pain did not make her an addict before her death.

201.    Dr. Fine and Dr. Portenoy co-wrote *A Clinical Guide to Opioid Analgesia*, in which they downplayed the risks of opioid treatment, such as respiratory depression and addiction:

> At clinically appropriate doses, . . . respiratory rate typically does not decline. Tolerance to the respiratory effects usually develops quickly, and doses can be steadily increased without risk.

> Overall, the literature provides evidence that the outcomes of drug abuse and addiction are rare among patients who receive opioids for a short period (i.e., for acute pain) and among those with no history of abuse who receive long-term therapy for medical indications.[92]

---

[91] Scott M. Fishman, MD, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306 (13) JAMA 1445 (Sept. 20, 2011), https://jamanetwork.com/journals/jama/ article-abstract/1104464?redirect=true. (hereinafter, "Fishman").

[92] Perry G. Fine, MD & Russell K. Portenoy, MD, *A Clinical Guide to Opioid Analgesia* 20 and 34, McGraw-Hill Companies (2004), at 20, 34. http://www.thblack.com/links/RSD/OpioidHandbook.pdf.

64

Case ID: 210601660

### iv.    Dr. Scott Fishman

202.    Dr. Scott Fishman is a physician whose ties to the opioid drug industry are legion. He has served as an APF board member and as president of the AAPM, and has participated yearly in numerous CME activities for which he received "market rate honoraria." As discussed below, he has authored publications, including the seminal guides on opioid prescribing, which were funded by the Manufacturer Defendants and other opioid manufacturers. He has also worked to oppose legislation requiring doctors and others to consult pain specialists before prescribing high doses of opioids to non-cancer patients. He has himself acknowledged his failure to disclose all potential conflicts of interest in a letter in the *Journal of the American Medical Association* titled "Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion."[93]

203.    Dr. Fishman authored a physician's guide on the use of opioids to treat chronic pain titled *Responsible Opioid Prescribing* in 2007 which promoted the notion that long-term opioid treatment was a viable and safe option for treating chronic pain.

204.    In 2012, Dr. Fishman updated the guide and continued emphasizing the "catastrophic" "under-treatment" of pain and the "crisis" such under-treatment created:

> Given the magnitude of the problems related to opioid analgesics, it can be tempting to resort to draconian solutions: clinicians may simply stop prescribing opioids, or legislation intended to improve pharmacovigilance may inadvertently curtail patient access to care. As we work to reduce diversion and misuse of

---

[93] Scott M. Fishman, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306(13) JAMA 1445 (2011); Tracy Weber & Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry*, ProPublica (Dec. 23, 2011, 2:14 PM), https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drug-industry.

65

prescription opioids, it's critical to remember that the problem of unrelieved pain remains as urgent as ever.[94]

205.    The updated guide still assures that "[o]pioid therapy to relieve pain and improve function is legitimate medical practice for acute and chronic pain of both cancer and noncancer origins."[95]

206.    In another guide by Dr. Fishman, he continues to downplay the risk of addiction: "I believe clinicians must be very careful with the label 'addict.' I draw a distinction between a 'chemical coper' and an addict."[96]  The guide also continues to present symptoms of addiction as symptoms of "pseudoaddiction."  These physician's guides were available to and were intended to reach doctors in Philadelphia.

### c.    The Manufacturer Defendants Disseminated Their Misrepresentations Through Continuing Medical Education Programs.

207.    Now that the Manufacturer Defendants had both a group of physician promoters and had built a false body of "literature," Manufacturer Defendants and other opioid manufacturers needed to make sure their false marketing message was widely distributed.

208.    One way the Manufacturer Defendants aggressively distributed their false message was through thousands of Continuing Medical Education courses ("CMEs").

209.    A CME is a professional education program provided to doctors.  Doctors are required to attend a certain number and, often, type of CME programs each year as a condition of their licensure.  These programs are delivered in person, often in connection with professional

---

[94] Scott M. Fishman, *Responsible Opioid Prescribing: A Guide for Michigan Clinicians*, 10-11 (Waterford Life Sciences 2d ed.  2012).

[95] *Id.*

[96] Scott M. Fishman, *Listening to Pain: A Clinician's Guide to Improving Pain Management Through Better Communication* 45 (Oxford University Press 2012).

Case ID: 210601660

organizations' conferences, and online, or through written publications.  Doctors rely on CMEs not only to satisfy licensing requirements, but also to get information on new developments in medicine or to deepen their knowledge in specific areas of practice.  Because CMEs typically are taught by KOLs who are highly respected in their fields, and are thought to reflect these physicians' medical expertise, they can be especially influential with doctors.

210.    The countless doctors and other health care professionals who participate in accredited CMEs constitute an enormously important audience for the Manufacturer Defendants' opioid reeducation effort.  As one target, Manufacturer Defendants aimed to reach general practitioners, whose broad area of practice and lack of expertise and specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to the Manufacturer Defendants' deceptions.

211.    The Manufacturer Defendants sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating the deceptive and biased messages described in this Complaint.  These CMEs, while often generically titled to relate to the treatment of chronic pain, focus on opioids to the exclusion of alternative treatments, inflate the benefits of opioids, and frequently omit or downplay their risks and adverse effects. These CMEs were available to and were intended to reach doctors in Philadelphia.

212.    Cephalon (now Teva) sponsored numerous CME programs, which were made widely available through organizations like Medscape, LLC ("Medscape") and which disseminated false and misleading information to physicians across the country.

213.    Teva paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of Pain Medicine News in 2009.  The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer- or

Case ID: 210601660

noncancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain. The CME is still available online.

214.    *Responsible Opioid Prescribing* was sponsored by Teva. The FSMB website described it as the "leading continuing medical education (CME) activity for prescribers of opioid medications."

215.    In all, more than 163,000 copies of *Responsible Opioid Prescribing* were distributed nationally.

216.    The American Medical Association ("AMA") recognized the impropriety that pharmaceutical company-funded CMEs creates; stating that support from drug companies with a financial interest in the content being promoted "creates conditions in which external interests could influence the availability and/or content" of the programs and urges that "[w]hen possible, CME[s] should be provided without such support or the participation of individuals who have financial interests in the education subject matter."[97]

217.    Physicians, including those who practice or practiced in Philadelphia, attended or reviewed CMEs sponsored by the Manufacturer Defendants during the relevant time period and were misled by them.

218.    By sponsoring CME programs put on by Front Groups like APF, AAPM, and others, the Manufacturer Defendants could expect instructors to deliver messages favorable to them, as these organizations were dependent on the Manufacturer Defendants for other projects. The sponsoring organizations honored this principle by hiring pro-opioid KOLs to give talks that supported chronic opioid therapy. Manufacturer Defendant-driven content in these CMEs had a

---

[97] Opinion 9.0115, *Financial Relationships with Industry in CME*, Am. Med. Ass'n (Nov. 2011), at 1.

Case ID: 210601660

direct and immediate effect on Philadelphia prescribers' views on opioids.  Producers of CMEs and the Manufacturer Defendants both measure the effects of CMEs on prescribers' views on opioids and their absorption of specific messages, confirming the strategic marketing purpose in supporting them.

### d. The Manufacturer Defendants Used "Branded" Advertising to Promote Their Products to Doctors and Consumers.

219.    The Manufacturer Defendants engaged in widespread advertising campaigns touting the benefits of their branded drugs. The Manufacturer Defendants published print advertisements in a broad array of medical journals, ranging from those aimed at specialists, such as the *Journal of Pain* and *Clinical Journal of Pain*, to journals with wider medical audiences, such as the *Journal of the American Medical Association*.  The Manufacturer Defendants collectively spent more than $14 million on the medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

220.    The Manufacturer Defendants also targeted consumers in their advertising.  They knew that physicians are more likely to prescribe a drug if a patient specifically requests it.[98] They also knew that this willingness to acquiesce to such patient requests holds true even for opioids and for conditions for which they are not approved.[99]  The Manufacturer Defendants thus increasingly took their opioid sales campaigns directly to consumers, including through patient-focused "education and support" materials in the form of pamphlets, videos, or other publications that patients could view in their physician's office.

---

[98] In one study, for example, nearly 20% of sciatica patients requesting oxycodone received a prescription for it, compared with 1% of those making no specific request. J.B. McKinlay et al., *Effects of Patient Medication Requests on Physician Prescribing Behavior*, *Results of a Factorial Experiment* 52(2) Med. Care 294-99 (April 2014).

[99] *Id.*

Case ID: 210601660

e. **The Manufacturer Defendants Used "Unbranded" Advertising to Promote Opioid Use for Chronic Pain.**

221. As discussed above, the Manufacturer Defendants also aggressively promoted opioids in Philadelphia through "unbranded advertising" to generally tout the benefits of opioids without specifically naming a particular brand-name opioid drug.  Instead, unbranded advertising is usually framed as "disease awareness"—encouraging consumers to "talk to your doctor" about a certain health condition without promoting a specific product and, therefore, without providing balanced disclosures about the product's limits and risks.  But by funding, directing, reviewing, editing, and distributing this unbranded advertising, the Manufacturer Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain.  Much as Manufacturer Defendants controlled the distribution of their "core messages" via their own "detailers" (an industry term for sales representatives) and speaker programs, the Manufacturer Defendants similarly controlled the distribution of these messages in scientific publications, treatment guidelines, CME programs, and medical conferences and seminars.  To this end, the Manufacturer Defendants used third-party public relations firms to help control those messages when they originated from third-parties.

222. The Manufacturer Defendants marketed opioids in Philadelphia through third-party, unbranded advertising to avoid regulatory scrutiny because that advertising is not submitted to, and typically is not reviewed by, the FDA.  The Manufacturer Defendants also used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source.  Like the tobacco companies, the Manufacturer Defendants used third-parties that they funded, directed, and controlled to carry out and conceal

70

Case ID: 210601660

their scheme to deceive doctors and patients about the risks and benefits of long term opioid use for chronic pain.

223.    Many of the Manufacturer Defendants utilized unbranded websites to promote opioid use without promoting a specific branded drug.

      **f.    The Manufacturer Defendants Funded, Edited and Distributed Publications that Supported Their Misrepresentations.**

224.    The Manufacturer Defendants created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was likely to shape the perceptions of prescribers, patients, and payors. This literature served marketing goals rather than treatment goals, and was intended to persuade doctors and consumers that the benefits of long-term opioid use outweighed the risks.

225.    To accomplish their goal, the Manufacturer Defendants and other opioid manufacturers—sometimes through third-party consultants and/or Front Groups—commissioned, edited, and arranged for the placement of favorable articles in academic journals, including journals distributed in Philadelphia.

226.    The Manufacturer Defendants' plans for these materials did not originate in the departments with the organizations that were responsible for research, development, or any other area that would have specialized knowledge about the drugs and their effects on patients; rather, they originated in the Manufacturer Defendants' marketing departments.

227.    The Manufacturer Defendants made sure that favorable articles were disseminated and cited widely in the medical literature, even when the Manufacturer Defendants knew that the articles distorted the significance or meaning of the underlying study.  The Manufacturer Defendants also frequently relied on unpublished data or posters, neither of which are subject to

Case ID: 210601660

peer review, but were presented as valid scientific evidence. Posters are preliminary, unpublished, non-peer reviewed reports that are intended to be turned into peer-reviewed academic papers, but sometimes do not.

228.    The Manufacturer Defendants published or commissioned deceptive review articles, letters to the editor, commentaries, case-study reports, and newsletters aimed at discrediting or suppressing negative information that contradicted their claims or raised concerns about chronic opioid therapy.  These publications were available to and were intended to reach doctors in Philadelphia.

> g.    **The Manufacturer Defendants Used Detailing to Directly Disseminate Their Misrepresentations to Prescribers.**

229.    The Manufacturer Defendants' sales representatives executed carefully crafted marketing tactics, developed at the highest rungs of their corporate ladders, to reach targeted doctors in Philadelphia with centrally orchestrated messages.  The Manufacturer Defendants' sales representatives also distributed third-party marketing material to their target audience that was deceptive.

230.    Each Manufacturer Defendant and other opioid manufacturers promoted opioids through detailers and, upon information and belief, small group speaker programs to reach out to individual prescribers.  By establishing close relationships with doctors, the Manufacturer Defendants were able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to promote their opioids and to allay individual prescribers' concerns about prescribing opioids for chronic pain.

231.    In accordance with common industry practice, the Manufacturer Defendants purchase and closely analyze prescription sales data from IMS Health (now IQVIA), a healthcare data collection, management and analytics corporation started by Arthur Sackler.  This data

allows them to track precisely the rates of initial and renewal prescribing by individual doctors, which allows them to target and tailor their appeals. Sales representatives visited hundreds of thousands of doctors, including doctors in the City, and disseminated the misinformation and materials described above.

232.    Manufacturer Defendants and other opioid manufacturers devoted and continue to devote massive resources to direct sales contacts with doctors. In 2014 alone, Manufacturer Defendants spent $166 million on detailing branded opioids to doctors. This amount is twice as much as Manufacturer Defendants spent on detailing in 2000. The amount includes $13 million by Teva.

233.    Cephalon's quarterly spending steadily climbed from below $1 million in 2000 to more than $3 million in 2014 (and more than $13 million for the year), with a peak, coinciding with the launch of Fentora, of more than $27 million in 2007.

### h.  Manufacturer Defendants Used Speakers' Bureaus and Programs to Spread Their Deceptive Messages.

234.    In addition to making sales calls, Manufacturer Defendants' detailers also identified doctors to serve, in exchange for significant sums of money, on their speakers' bureaus and to attend programs with speakers and meals paid for by the Manufacturer Defendants and other opioid manufacturers. These speaker programs and associated speaker trainings serve three purposes: they provide an incentive to doctors to prescribe, or increase their prescriptions of, a particular drug; they qualify and/or vet doctors to be selected for a forum in which the Manufacturer Defendants can further market directly to the speaker himself or herself; and they provide an opportunity for Manufacturer Defendants and other opioid manufacturers to market to the speaker's peers. The Manufacturer Defendants grade their speakers, and make the offer of

Case ID: 210601660

future opportunities contingent upon, speaking performance, post-program sales, and product usage.

### 3. The Manufacturer Defendants Targeted Vulnerable Populations.

235.    The Manufacturer Defendants and other opioid manufacturers specifically targeted their marketing at two vulnerable populations—the elderly and veterans.

236.    Elderly patients taking opioids have been found to be exposed to elevated fracture risks, a greater risk for hospitalizations, and increased vulnerability to adverse drug effects and interactions, such as respiratory depression, which occur more frequently in elderly patients.

237.    The Manufacturer Defendants promoted the notion—without adequate scientific foundation—that the elderly are particularly unlikely to become addicted to opioids.   The AAPM's and APS 2009 Guidelines, for example, described the risk of addiction as "*exceedingly low* in older patients with no current or past history of substance abuse." (emphasis added).  As another example, a CME put on by NIPC, *Persistent Pain in the Older Adult*, taught that prescribing opioids to older patients carried "possibly less potential for abuse than in younger patients."  Contrary to these assertions, however, a 2010 study examining overdoses among long-term opioid users found that patients 65 or older were among those with the largest number of serious overdoses.[100]

238.    According to a study published in the 2013 *Journal of American Medicine*, veterans returning from Iraq and Afghanistan who were prescribed opioids have a higher incidence of adverse clinical outcomes, such as overdoses and self-inflicted and accidental injuries.  A 2008 survey showed that prescription drug misuse among military personnel doubled

---

[100] Kate M. Dunn, PhD et al., *Opioid Prescriptions for Chronic Pain and Overdose*, Ann Intern Med. 2010 Jan. 19; 152(2):85-92, https://www.ncbi.nlm.nih.gov/pubmed/20083827.

Case ID: 210601660

from 2002 to 2005, and then nearly tripled again over the next three years.[101]  Veterans are twice as likely as non-veterans to die from an opioid overdose.[102]

239.    Yet the Manufacturer Defendants deliberately targeted veterans with deceptive marketing.  For example, a 2009 publication sponsored by opioid manufacturers, and distributed by APF, was written as a personal narrative of one veteran but was in fact another vehicle for opioid promotion.  Called *Exit Wounds*, the publication describes opioids as "underused" and the "gold standard of pain medications" while failing to disclose significant risks of opioid use, including the risks of fatal interactions with benzodiazepines.  According to a VA Office of Inspector General Report, 92.6% of veterans who were prescribed opioid drugs were also prescribed benzodiazepines, despite the increased danger of respiratory depression from the two drugs together.

240.    Opioid prescriptions have dramatically increased for veterans and the elderly. Since 2007, prescriptions for the elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59.  And in 2009, military doctors wrote 3.8 million prescriptions for narcotic pain pills—four times as many as they did in 2001.

### 4.    The Manufacturer Defendants' Scheme Succeeded, Creating a Public Health Epidemic.

#### a.    Manufacturer Defendants Dramatically Expanded Opioid Prescribing and Use.

241.    The Manufacturer Defendants necessarily expected a return on the enormous investment they made in their deceptive marketing scheme, and worked to measure and expand

---

[101] National Institute on Drug Abuse, *Substance Abuse in the Military*, Revised March 2013, https://www.drugabuse.gov/publications/drugfacts/substance-abuse-in-military.

[102] Barbara Goldberg, "Opioid abuse crisis takes heavy toll on U.S. veterans," *Reuters*, Nov. 10, 2017, https://www.reuters.com/article/us-usa-veterans-opioids-opioid-abuse-crisis-takes-heavy-toll-on-u-s-veterans-idUSKBN1DA1B2.

122329891-1

Case ID: 210601660

their success.  Their own documents show that they knew they were influencing prescribers and increasing prescriptions.  Studies also show that in doing so, they fueled an epidemic of addiction and abuse.

242.    Upon information and belief, each of the Manufacturer Defendants tracked the impact of their marketing efforts to measure their impact in changing doctors' perceptions and prescribing of their drugs.  They purchased prescribing and survey data that allowed them to closely monitor these trends, and they did actively monitor them.  For instance, they monitored doctors' prescribing before and after detailing visits, at various levels of detailing intensity, and before and after speaker programs.  Manufacturer Defendants continued and, in many cases, expanded and refined their aggressive and deceptive marketing for one reason:  it worked.  As described in this Complaint, both in specific instances and more generally, Manufacturer Defendants' marketing changed prescribers' willingness to prescribe opioids, led them to prescribe more of their opioids, and persuaded them to continue prescribing opioids or to switch to supposedly "safer" abuse-deterrent ("ADF") opioids.

243.    This success would have come as no surprise.  Drug company marketing materially impacts doctors' prescribing behavior.[103]  The effects of sales calls on prescribers' behavior is well documented in the literature, including a 2017 study that found that physicians

---

[103] *See, e.g.*, P. Manchanda & P. Chintagunta, *Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis*, 15 (2-3) Mktg. Letters 129 (2004) (detailing has a positive impact on prescriptions written); I. Larkin, *Restrictions on Pharmaceutical Detailing Reduced Off-Label Prescribing of Antidepressants and Antipsychotics in Children*, 33(6) Health Affairs 1014 (2014) (finding academic medical centers that restricted direct promotion by pharmaceutical sales representatives resulted in a 34% decline in on-label use of promoted drugs); *see also* A. Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99(2) Am J. Pub. Health 221 (2009) (correlating an increase of OxyContin prescriptions from 670,000 annually in 1997 to 6.2 million in 2002 to a doubling of Purdue's sales force and trebling of annual sales calls).

ordered fewer promoted brand-name medications and prescribed more cost-effective generic versions if they worked in hospitals that instituted rules about when and how pharmaceutical sales representatives were allowed to detail prescribers.[104]  The changes in prescribing behavior appeared strongest at hospitals that implemented the strictest detailing policies and included enforcement measures.   Another study examined four practices, including visits by sales representatives, medical journal advertisements, direct-to-consumer advertising, and pricing, and found that sales representatives have the strongest effect on drug utilization.  An additional study found that doctor meetings with sales representatives are related to changes in both prescribing practices and requests by physicians to add the drugs to hospitals' formularies.

244.    Manufacturer Defendants spent millions of dollars to market their drugs to prescribers and patients nationwide, including in the City, and meticulously tracked their return on that investment.  In one recent survey published by the AMA, even though nine in ten general practitioners reported prescription drug abuse to be a moderate to large problem in their communities, 88% of the respondents said they were confident in their prescribing skills, and nearly half were comfortable using opioids for chronic non-cancer pain.[105]  These results are directly due to the Manufacturer Defendants' deceptive and fraudulent marketing campaign and repeated misrepresentations.

245.    Thus, both independent studies and Manufacturer Defendants' own tracking confirm that Manufacturer Defendants' deceptive marketing scheme dramatically increased their sales, including sales within Philadelphia.

---

[104] Larkin et al, *Association Between Academic Medical Center Pharmaceutical Detailing Policies and Physician Prescribing*, 317(17) J. of Am. Med. Assoc. 1785-1795 (May 2, 2017), https://jamanetwork.com/journals/jama/fullarticle/2623607. 305(13).

[105] Research Letter, Prescription Drug Abuse:  A National Survey of Primary Care Physicians, JAMA Intern. Med. (Dec. 8, 2014), E1-E3.

Case ID: 210601660

b. **Manufacturer Defendants' Deception in Expanding Their Market Created and Fueled the Opioid Epidemic.**

246.    Independent research demonstrates a close link between opioid prescriptions and opioid abuse.  For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[106]   It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.[107]

247.    There is a parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes.   The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[108]

248.    In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[109]   Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses.[110]   For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic

---

[106] Theodore J. Cicero et al., *Relationship Between Therapeutic Use and Abuse of Opioid Analgesics in Rural, Suburban, and Urban Locations in the United States*, 16.8 Pharmacopidemiology and Drug Safety, 827-40 (2007).

[107] Anna Lembke, M.D., *Why Doctors Prescribe Opioids to Known Opioid Abusers*, New Eng. J. Med. 2012; 367:1580-1581 (Oct. 25, 2012),
https://www.nejm.org/doi/full/10.1056/NEJMp1208498.

[108] Robert M. Califf, M.D., et al., *A Proactive Response to Prescription Opioid Abuse,* New Eng. J. Med., http://www.nejm.org/doi/full/10.1056/NEJMsr1601307.

[109] Rose A. Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, January 1, 2016, https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm.

[110] Olfson, et al., *Service Use Preceding Opioid-Related Fatality*, Am J. Psychiatry 2018 Jun 1; 175(6):538-544.

Case ID: 210601660

pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[111]

249.    The Manufacturer Defendants' scheme was and continues to be resoundingly successful.  Chronic opioid therapy—the prescribing of opioids long-term to treat chronic pain—has become a commonplace, and often first-line, treatment.  The Manufacturer Defendants' deceptive marketing caused prescribing not only of their opioids, but of opioids as a class, to skyrocket.  According to the CDC, opioid prescriptions, as measured by number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015.  The prescribing rate in the City rose during this time, from 67.6 prescriptions per 100 residents in 2006 to 84.0 in 2011.[112]  Philadelphia's number of opioid overdose deaths rose dramatically in lockstep with Defendants' increasing sale and distribution of opioid drugs, more than tripling since 2003.[113]  In 2015, more than 650,000 opioid prescriptions were dispensed in the U.S. every day on average.  While previously a small minority of opioid sales, today between 80% and 90% of opioids dispensed (measured by weight) are for chronic pain.  Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids.  Opioids are the most common treatment for chronic pain, and 20% of office visits now include the prescription of an opioid.

---

[111] Rudd et al., *supra*.

[112] CDC, U.S. County Prescribing Rates, 2006 and 2011 maps, https://www.cdc.gov/drugoverdose/maps/rxcounty2006.html and https://www.cdc.gov/drugoverdose/maps/rxcounty2011.html.

[113] *Opioid Misuse and Overdose Report*, Phila. Dept. of Public Health (Sept. 7, 2017), at 25, *available at* https://hip.phila.gov/Portals/_default/HIP/DataReports/Opioid/2017/Q2/Opioid MisuseOverdoseReport_Quarter2_2017_finalupdate_09122017_V2.pdf.

Case ID: 210601660

**C. Defendants Throughout the Supply Chain Deliberately Disregarded Their Duties to Maintain Effective Controls to Prevent Diversion and to Identify, Report, and Take Steps to Halt Suspicious Orders.**

250.    Through their systematic and deceptive marketing schemes, the Manufacturer Defendants created a vastly and dangerously larger market for opioids both in Pennsylvania and nationwide.  The Manufacturer Defendants then compounded this harm by facilitating the supply of far more opioids than could have been justified to serve that market.  The failure of the Defendants to maintain effective controls and to investigate, report, and take steps to halt orders that they knew or should have known were suspicious breached both their State statutory and common law duties.

251.    For over a decade, as the Manufacturer Defendants increased the demand for opioids they also aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold.  However, Defendants are not permitted to engage in a limitless expansion of their sales through the unlawful sales of regulated painkillers.  Rather, as described below, Defendants are subject to various duties to report the quantity of Schedule II controlled substances they have sold in order to monitor such substances and prevent oversupply and diversion into the illicit market.

252.    Manufacturer Defendants have several responsibilities under Pennsylvania law with respect to control of the supply chain of opioids.  First, they must set up a system to prevent diversion, including excessive volume and other suspicious orders.   That would include reviewing their own data, relying on their observations of prescribers and pharmacies, and following up on reports or concerns of potential diversion.   All suspicious orders must be reported to relevant enforcement authorities.  Further, they must also stop shipment of any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious

80

Case ID: 210601660

if, after conducting due diligence, they can determine that the order is not likely to be diverted into illegal channels.

> **1. All Defendants Have a Duty to Provide Effective Controls and Procedures to Guard Against Theft and Diversion, and to Report Suspicious Orders and Not to Ship Those Orders Unless Due Diligence Disproves Their Suspicions.**

253. Multiple sources, including Pennsylvania statutes and regulations, impose duties on the Manufacturer Defendants to provide effective controls and procedures to guard against theft and diversion of opioid drugs. Multiple sources also impose duties on Defendants to report suspicious orders and to not ship such orders unless due diligence disproves those suspicions.

254. Under the common law, Defendants had a duty to exercise reasonable care in delivering dangerous narcotic substances. By flooding the City with more opioids than could be used for legitimate medical purposes, by failing to provide effective controls and procedures against theft and diversion, and by filling and failing to report orders that they knew or should have known were likely being diverted for illicit uses, Defendants breached that duty and both created and failed to prevent a foreseeable risk of harm.

255. In addition, each of the Defendants assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully.

256. The Manufacturer Defendants also had multiple duties under Pennsylvania statutes and regulations. Opioids are Schedule II controlled substances. *See* 35 P.S. § 780-104. Opioids are categorized as "Schedule II" drugs because they have a "high potential for abuse" and "abuse may lead to severe psychic or physical dependence." 35 P.S. § 780-104; 28 Pa. Code § 25.72(c).

257. Under Pennsylvania law, each of the Defendants was required to be licensed by the Pennsylvania Department of Health. 63 P.S. § 391.4; 35 P.S. § 780-106; 28 Pa. Code § 25.113. To receive and maintain this license, each of the Defendants assumed a duty to comply

81

Case ID: 210601660

with "all applicable federal and state laws and regulations" and all applicable DEA, State and local regulations. 63 P.S. § 391.6(k).  *See also* 63 P.S. §§ 391.3 (including manufacturers in definition of wholesale distributors).

258.    The Pennsylvania Department of Health may revoke, suspend, limit or refuse to issue a license to a licensee for "engaging in conduct which is harmful to the public health, safety or welfare." 63 P.S. § 391.9(b)(7).  The Pennsylvania Department of Health may also revoke, suspend, limit or refuse to issue a license to a licensee who has violated the Wholesale Prescription Drug Distributors License Act, 63 P.S. § 391.9(b)(2), or who is making misleading, deceptive, untrue or fraudulent representations in obtaining or seeking to obtain a license or registration. 63 P.S. § 391.9(b)(4).

259.    Each Defendant has an affirmative duty under Pennsylvania law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs. Pennsylvania law requires that wholesale distributors (which includes manufacturers) and others "maintaining stocks or having controlled substances in production areas or on hand for distribution shall provide effective controls and procedures to guard against theft and diversion of the substances."  28 Pa. Code § 25.61.  *See also* 63 P.S. § 391.6(c)(5) (facilities where prescription drugs are stored and handled must be equipped with security systems "that will provide suitable protection from theft and diversion."); 63 P.S. § 391.6(g) (licensee shall "establish and maintain inventories and records of all transactions regarding the receipt and distribution or other disposition of prescription drugs.").

260.    Pennsylvania law also requires wholesale distributors to ensure that prescription drugs are distributed only for lawful purposes.  Licensees must follow written policies and procedures "for the receipt, security, storage, inventory and distribution of prescription drugs,

including policies and procedures for identifying, recording and reporting losses or thefts."  63 P.S. § 391.6(h).

261.    The Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act prohibits "the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board."  35 P.S. § 780.113(a)(30).  Violation of this provision as to a Schedule II narcotic is a felony.  35 P.S. § 780.113(f)(1).

262.    The Act also prohibits the "dissemination or publication of any false or materially misleading advertisement."  35 P.S. § 780-113(a)(3).  Pennsylvania further prohibits "the furnishing of false or fraudulent material information in, or omission of any material information from any application, report, or other document required to be kept or filed under this act, or any record required to be kept by this act."  35 P.S. § 780.113(a)(28).  Violations of these provisions are misdemeanors.  35 P.S. § 780.113(b) & (e).

263.    Pennsylvania has declared that "Pennsylvania consumers of prescription drugs will be better assured of safe and effective prescription drug products if the Commonwealth joins with other jurisdictions to require the licensure of all persons who operate facilities from which they engage in the wholesale distribution of prescription drugs."  63 P.S. § 391.2(a)(2).  Further, the legislature has declared that "It is the further intent of the General Assembly to promote the safety and effectiveness of prescription drug products by requiring all persons who operate facilities within this Commonwealth from which they engage in the wholesale distribution of prescription drugs to secure a license and meet minimum quality assurance and operational standards as required by this act."  63 Pa. Stat. Ann. § 391.2(b).

264.    Manufacturer Defendants have violated their duties under the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act and the Wholesale Prescription Drug Distributors License Act.

265.    Defendants violated their duties as licensed wholesale distributors by selling huge quantities of opioids that were diverted from their lawful, medical purpose, thus causing an opioid and heroin addiction and overdose epidemic in the City.

266.    Defendants violated Pennsylvania law when they violated 63 P.S. § 391.6(k): "The licensee shall operate in compliance with applicable Federal, State and local laws and regulations. . . .  The licensee that deals in controlled substances shall register with the Drug Enforcement Administration (DEA) and shall comply with all applicable DEA, State and local regulations." Defendants thereby had a duty to disclose suspicious orders:

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 C.F.R. § 1301.74(b).[114]  Pennsylvania law dictates the source of the duties owed.  Therefore, even where a federal regulation informs some part of the case, that does not convert any state legal cause of action into any federal question, substantial or otherwise, because it is Pennsylvania law, and not any federal authority, that informs the existence of a duty.

267.    "Suspicious orders" include orders of an unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. These criteria are

---

[114] Once again, Plaintiff cites federal regulations in this complaint to state the duty owed under Pennsylvania law, *not* to allege an independent federal cause of action or substantial federal question.

disjunctive and are not all-inclusive.  For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious.  Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious.  The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the wholesale distributor's responsibility to report the order as suspicious.  The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the wholesale distributor's customer base and the patterns throughout the relevant segment of the wholesale distributor industry.

268.    The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion.  The Manufacturer Defendants engaged in the practice of paying "chargebacks" to opioid distributors.  A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate.  After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product.  Thus, the Manufacturer Defendants knew – just as opioid distributors knew – the volume, frequency, and pattern of opioid orders being placed and filled.  The Manufacturer Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

269.    As indicated above, Pennsylvania law requires Defendants to prevent diversion. Pennsylvania law also requires that its licensees operate in compliance with federal laws that are equally clear: just like opioid distributors, opioid manufacturers are required to "design and

operate a system to disclose . . . suspicious orders of controlled substances" and to maintain "effective controls against diversion."  21 C.F.R. § 1301.74; 21 USCA § 823(a)(1).[115]

270.    Furthermore, both the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. § 780-1 *et seq.*, and Pennsylvania Wholesale Prescription Drug Distributors License Act, 63 P. S. § 391.1 *et seq.*, independent and exclusive of any federal law or regulation, required Manufacturer Defendants to maintain controls, procedures and security suitable to protect against theft and diversion of prescription opioid drugs.

271.    In sum, all Defendants have many responsibilities under Pennsylvania law related to controlling the supply chain of opioids.  They must set up a system to prevent diversion, including identifying excessive volume and other suspicious orders by reviewing their own data, relying on their observations of prescribers and pharmacies, and following up on reports or concerns of potential diversion.  All suspicious orders must be reported to relevant enforcement authorities.  They must also stop shipment of any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, they can determine that the order is not likely to be diverted into illegal channels.

272.    State statutes and regulations reflect a standard of conduct and care below which reasonably prudent manufacturers and distributors would not fall.  Together, these laws and industry guidelines make clear that Manufacturer Defendants possess and are expected to possess specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the diversion of prescription narcotics when the supply chain is not properly controlled.

---

[115] Again, Plaintiff cites federal statutes and federal regulations in this complaint to state the duty owed under Pennsylvania law, *not* to allege an independent federal cause of action or substantial federal question.

Case ID: 210601660

273.    Further, these laws and industry guidelines make clear that the Manufacturer Defendants have a duty and responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply of prescription opioids and minimize the risk of their diversion into an illicit market.

274.    Manufacturer Defendants also have specialized and detailed knowledge of the potential suspicious prescribing and dispensing of opioids through their regular visits to doctors' offices and pharmacies, and from their purchase of data from commercial sources, such as IMS Health (now IQVIA).  Their extensive boots-on-the-ground sales forces allow Manufacturer Defendants to observe the signs of suspicious prescribing and dispensing discussed elsewhere in the Complaint—lines of seemingly healthy patients, out-of-state license plates, and cash transactions, to name only a few.  In addition, Manufacturer Defendants regularly mined data, including, upon information and belief, chargeback data, that allowed them to monitor the volume and type of prescribing of doctors, including sudden increases in prescribing and unusually high dose prescribing that would have alerted them, independent of their sales representatives, to suspicious prescribing.  These information points gave Manufacturer Defendants all the insight into prescribing and dispensing conduct they would have needed to prevent diversion and fulfill their obligations under Pennsylvania and related laws.

275.    Defendants have a duty to, and are expected to, be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.

276.    Each of the Defendants sold prescription opioids, including hydrocodone and/or oxycodone, to retailers in the City.

277.    Thus, each Defendant owes a duty under Pennsylvania law to monitor and detect suspicious orders of prescription opioids.

278.    Each Defendant owes a duty under Pennsylvania law to investigate and refuse suspicious orders of prescription opioids.

279.    Each Defendant owes a duty under Pennsylvania law to report suspicious orders of prescription opioids, including suspicious orders originating outside Pennsylvania that would likely result in distribution of Defendants' opioids into the Commonwealth and the City.

280.    Each Defendant owes a duty under Pennsylvania law to prevent the diversion of prescription opioids into illicit markets in the Commonwealth and the City.

281.    The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

282.    The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity and mortality in the City and the damages caused thereby.

283.    Defendants breached these duties by failing to: (a) control the supply chain; (b) maintain effective controls, procedures and security to prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities they knew or should have known could not be justified and were indicative of serious overuse of opioids.

**2.    Defendants Were Aware of and Have Acknowledged Their Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders.**

284.    The reason for the reporting rules is to create a "closed" system intended to control the supply and reduce the diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.  Both because entities that distribute opioids handle large volumes of controlled substances, and because they are uniquely positioned based on their knowledge of their customers and orders, distributors are supposed to act as the first line

88

Case ID: 210601660

of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market. Because of this role, distributors' obligation to maintain effective controls to prevent diversion of controlled substances is critical.  Should an entity that distributes opioids deviate from these checks and balances, the closed system of distribution, designed to prevent diversion, collapses as it did here.

285.    Defendants were well aware they had an important role to play in this system, and also knew or should have known that their failure to comply with their obligations would have serious consequences.

286.    Trade organizations to which Defendants belong have acknowledged that wholesale distributors have been responsible for reporting suspicious orders for more than 40 years.  The Healthcare Distribution Management Association ("HDMA," now known as the Healthcare Distribution Alliance ("HDA")), a trade association of pharmaceutical distributors, has long taken the position that distributors have responsibilities to "prevent diversion of controlled prescription drugs" not only because they have statutory and regulatory obligations do so, but "as responsible members of society."  Guidelines established by the HDA also explain that distributors, "[a]t the center of a sophisticated supply chain . . . are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."  The guidelines set forth recommended steps in the "due diligence" process, and note in particular:  If an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units

89

Case ID: 210601660

of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest.[116]

287.    The DEA also repeatedly reminded Defendants of their obligations to report and decline to fill suspicious orders.  Responding to the proliferation of pharmacies operating on the internet that arranged illicit sales of enormous volumes of opioids to drug dealers and customers, the DEA began a major push to remind distributors of their obligations to prevent these kinds of abuses and educate them on how to meet these obligations.  Since 2007, the DEA has hosted at least five conferences that provided registrants with updated information about diversion trends and regulatory changes.  The DEA has also briefed wholesalers regarding legal, regulatory, and due diligence responsibilities since 2006.  During these briefings, the DEA pointed out the red flags wholesale distributors should look for to identify potential diversion.

288.    The DEA advised in a September 27, 2006 letter to every commercial entity registered to distribute controlled substances that they are "one of the key components of the distribution chain.  If the closed system is to function properly . . . distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.  This responsibility is critical, as . . . the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people." [117]  This letter also expressly reminded them that registrants, in addition to

---

[116] Healthcare Distribution Management Association (HDMA) Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances, filed in *Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B).

[117] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006) [hereinafter Rannazzisi Letter] ("This letter is being sent to every commercial entity in the United States registered with the Drug Enforcement Agency (DEA) to distribute controlled substances.  The

90

Case ID: 210601660

reporting suspicious orders, have a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[118]  The same letter warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[119]

289.    The DEA sent another letter to Defendants on December 27, 2007, reminding them that, as registered manufacturers and distributors of controlled substances, they share, and must each abide by, statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[120]  This letter reiterated the obligation to detect, report, and not fill suspicious orders and provided detailed guidance on what constitutes a suspicious order and how to report (*e.g.*, by specifically identifying an order as suspicious, not merely transmitting data to the DEA).  Finally, the letter references the Revocation of Registration issued in *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to report suspicious orders and "some criteria to use when determining whether an order is suspicious."[121]

---

purpose of this letter is to reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces."), *filed in Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00085-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51.

[118] *Id*. at 2.

[119] *Id.*

[120] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), *filed in Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00085-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8.

[121] *Id.*

Case ID: 210601660

### 3. Defendants Worked Together to Inflate the Quotas of Opioids They Could Distribute.

290.    Finding it impossible to legally achieve their ever-increasing sales ambitions, Defendants engaged in the common purpose of increasing the supply of opioids and fraudulently and deceptively increasing the quotas that governed the manufacture and distribution of their prescription opioids.

291.    Wholesale opioid distributors such as McKesson, Cardinal Health and AmerisourceBergen had close financial relationships with both Manufacturer Defendants and customers, for whom they provide a broad range of value-added services that render them uniquely positioned to obtain information and control against diversion.  These services often otherwise would not be provided by manufacturers to their dispensing customers and would be difficult and costly for the dispenser to reproduce.  For example, "[w]holesalers have sophisticated ordering systems that allow customers to electronically order and confirm their purchases, as well as to confirm the availability and prices of wholesalers' stock."  *Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 41 (D.D.C. 1998).  Through their generic source programs, wholesalers are also able "to combine the purchase volumes of customers and negotiate the cost of goods with manufacturers."  Wholesalers typically also offer marketing programs, patient services, and other software to assist their dispensing customers.

292.    The Manufacturer Defendants provided financial incentives to opioid distributors to distribute higher volumes, and thus to refrain from reporting or declining to fill suspicious orders, or using any effective controls to prevent diversion.  Wholesale drug distributors acquire pharmaceuticals, including opioids, from manufacturers at an established wholesale acquisition cost.  Discounts and rebates from this cost may be offered by manufacturers based on market share and volume.  As a result, higher volumes may decrease the cost per pill to distributors.

92

Case ID: 210601660

Decreased cost per pill in turn, allows wholesale distributors to offer more competitive prices, or alternatively, pocket the difference as additional profit. Either way, the increased sales volumes result in increased profits.

293.    The Manufacturer Defendants engaged in the practice of paying rebates and/or chargebacks to opioid distributors for sales of prescription opioids as a way to help them boost sales and better target their marketing efforts. The *Washington Post* has described the practice as industry-wide, and the HDA includes a "Contracts and Chargebacks Working Group," suggesting a standard practice. The transaction information contains data relating to the direct customer sales of controlled substances to "downstream" registrants, meaning pharmacies or other dispensaries, such as hospitals. The Manufacturer Defendants buy data from pharmacies as well. This exchange of information, upon information and belief, would have opened channels providing for the exchange of information revealing suspicious orders as well.

294.    The contractual relationships among the Defendants also include vault security programs. Defendants are required to maintain certain security protocols and storage facilities for the manufacture and distribution of their opioids. The manufacturers negotiated agreements whereby the Manufacturer Defendants installed security vaults for opioid distributors in exchange for agreements to maintain minimum sales performance thresholds. These agreements were used by the Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

295.    In addition, Defendants worked together to achieve their common purpose through trade or other organizations, such as the Pain Care Forum ("PCF") and the HDA.

296.    The PCF has been described as a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding, including the Front Groups

described in this Complaint.  The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

297.    The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drug makers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[122]  Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[123]

298.    The Defendants who stood to profit from expanded prescription opioid use are members of and/or participants in the PCF.  In 2012, membership and participating organizations included Allergan/Actavis and Cephalon/Teva.  The Manufacturer Defendants and other opioid manufacturers worked together through the PCF.  Opioid distributors actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA  and participated directly in the PCF as well.

299.    Additionally, the HDA led to the formation of interpersonal relationships and an organization among the Defendants.  Although the entire HDA membership directory is private, the HDA website confirms that in addition to opioid distributors, opioid manufacturers including Allergan/Actavis and Cephalon/Teva were members of the HDA.  Additionally, the HDA and opioid distributors eagerly sought the active membership and participation of the Manufacturer

---

[122] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity, https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echochamber-shaped-policy-amid-drug-epidemic. (Last Updated Dec. 15, 2016, 9:09 AM) (emphasis added).

[123] *Id*.

Case ID: 210601660

Defendants by advocating for the many benefits of members, including "strengthen[ing] . . . alliances."[124]

300.    Beyond strengthening alliances, the benefits of HDA membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[125]    Clearly, the HDA and the Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships and "alliances" between the Manufacturer Defendants and opioid distributors.

301.    The application for manufacturer membership in the HDA further indicates the level of connection among the Defendants and the level of insight that they had into each other's businesses.[126]    For example, the manufacturer membership application must be signed by a "senior company executive," and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company.

302.    The HDA application also requests that the manufacturer identify its current distribution information, including the facility name and contact information.  Manufacturer members were also asked to identify their "most recent year end net sales" through wholesale distributors.

---

[124]*Manufacturer      Membership*,      Healthcare      Distribution      Alliance, https://healthcaredistribution.org/ about/membership/manufacturer (last accessed Apr. 25, 2018).

[125] *Id.*

[126]*Manufacturer Membership Application*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-application.ashx?la=en.

Case ID: 210601660

303.    The closed meetings of the HDA's councils, committees, task forces and working groups provided the Manufacturer Defendants and opioid distributors with the opportunity to work closely together, confidentially, to develop and further the common purpose and interests of the enterprise.

304.    The HDA also offers a multitude of conferences, including annual business and leadership conferences.   The HDA and opioid distributors advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[127]    The conferences also gave the Manufacturer Defendants and opioid distributors "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[128]    The HDA and its conferences were and continue to be significant opportunities for the Manufacturer Defendants and opioid distributors to interact at a high-level of leadership.   It is clear that the Manufacturer Defendants have embraced this opportunity by attending and sponsoring these events.[129]

305.    After becoming members of HDA, Defendants were eligible to participate on councils, committees, task forces and working groups, including:

    1.    Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."

---

[127] *Business and Leadership Conference–Information for Manufacturers*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/blc-for-manufacturers.

[128] *Id*.

[129] *2015 Distribution Management Conference and Expo*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/events/2015-distribution-management-conference.

2.    Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions.  The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce."  Participation in this committee includes distributor and manufacturer members.

3.    Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain.  Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement."  Participation in this committee includes distributor and manufacturer members.

4.    Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel.  Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement."  Participation in this committee includes manufacturer members.

5.    Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies.  It also creates and exchanges industry knowledge of interest to contract and chargeback professionals."  Participation in this group includes manufacturer and distributor members.

306.    Opioid distributors and the Manufacturer Defendants also participated, through the HDA, in webinars and other meetings designed to exchange detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices.[130]  For example, on April 27, 2011, the HDA offered a webinar to "accurately and effectively exchange business transactions between distributors and manufacturers …."  The

---

[130] *Webinar Leveraging EDI: Order-to-Cash Transactions CD Box Set*, Healthcare Distribution Alliance, (Apr. 27, 2011), https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

Case ID: 210601660

Manufacturer Defendants used this information to gather high-level data regarding overall distribution and direct opioid distributors on how to most effectively sell prescription opioids.

307.    Taken together, the interaction and length of the relationships between and among the Manufacturer Defendants and opioid distributors reflects a deep level of interaction and cooperation between two groups in a tightly-knit industry.  The Manufacturer Defendants and opioid distributors were not two separate groups operating in isolation or two groups forced to work together in a closed system at arm's length.  They operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids in the City, the Commonwealth of Pennsylvania and nationwide.

308.    The HDA and the PCF are but two examples of these overlapping relationships and concerted joint efforts to accomplish common goals, and demonstrates that the leaders of the Manufacturer Defendants and opioid distributors were in communication and cooperating with each other during the relevant time period.

309.    Publications and guidelines issued by the HDA confirm that the Defendants utilized their membership in the HDA to form agreements.  Specifically, in the fall of 2008, the HDA published the *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances* (the "Industry Compliance Guidelines") regarding diversion.  As the HDA (then the HDMA) explained in an amicus brief, the Industry Compliance Guidelines were the result of "[a] committee of HDMA members contribut[ing] to the development of this publication" beginning in late 2007.[131]

---

[131] *See Amicus Curiae* Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., *Cardinal Health, Inc. v. United States Dept. of Justice*, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL 1637016, at *5.

Case ID: 210601660

310.    This statement by the HDA and the Industry Compliance Guidelines themselves support the allegation that Defendants utilized the HDA to form agreements about their approach to their duties under controlled substances laws.  As John M. Gray, President/CEO of the HDA stated in April 2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications."  Here, it is apparent that the Defendants, working together with other opioid manufacturers and opioid distributors, found the same balance – an overwhelming pattern and practice of failing to identify, report or halt suspicious orders and failure to prevent diversion, all the while obscuring naked profit motives with opaque concerns about drug "access."

311.    The Defendants' scheme involved a decision-making structure driven by the Manufacturer Defendants and other opioid manufacturers and corroborated by opioid distributors.  The Manufacturer Defendants and other opioid manufacturers worked together to control the state and federal government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion, and to identify, report or halt suspicious orders.

312.    The Manufacturer Defendants and other opioid manufacturers worked together to control the flow of information and influence state and federal governments to pass legislation that supported the use of opioids and limited the authority of law enforcement to rein in illicit or inappropriate prescribing and distribution.   The Manufacturer Defendants, other opioid manufacturers and opioid distributors did this through their participation in the PCF and HDA.

313.    The Manufacturer Defendants, other opioid manufacturers and opioid distributors also worked together to ensure that the Aggregate Production Quotas, Individual Quotas, and Procurement Quotas allowed by the DEA remained artificially high and ensured that suspicious

99

Case ID: 210601660

orders were not reported to the DEA. By not reporting suspicious orders or diversion of prescription opioids as required by Pennsylvania law, the Defendants ensured that the DEA had no basis for refusing to increase, or to decrease, the production quotas for prescription opioids due to diversion of suspicious orders.

314.    The Defendants also had reciprocal obligations to report suspicious orders of other parties if they became aware of them. Defendants were thus collectively responsible, along with and opioid manufacturers and opioid distributors, for each other's compliance with their reporting obligations.

315.    Defendants thus knew that their own conduct could be reported by other distributors or manufacturers and that their failure to report suspicious orders they filled could be brought to the DEA's attention. As a result, Manufacturer Defendants, other opioid manufacturers and opioid distributors had an incentive to communicate with each other about the reporting of suspicious orders to ensure the continued appearance of consistency in their dealings with DEA.

316.    The desired appearance of consistency was achieved. As described below, none of the Defendants reported suspicious orders as required by law, and the flow of opioids continued unimpeded.

### 4. Defendants Kept Careful Track of Prescribing Data and Knew About Diversion and Suspicious Orders and Prescribers.

317.    Publicly available information confirms that the Manufacturer Defendants funneled far more opioids into communities across the United States than could have been expected to serve legitimate medical use and ignored other red flags of suspicious orders. This information, along with the information known only to the Manufacturer Defendants, other

122329891-1

Case ID: 210601660

opioid manufacturers and opioid distributors, would have alerted them to likely signs of diversion and potentially suspicious orders of opioids.

318.    This information includes the following facts:

1.    Distributors and manufacturers have access to detailed transaction-level data on the sale and distribution of opioids, which can be broken down by zip code, prescriber, and pharmacy and includes the volume of opioids, dose, and the distribution of other controlled and non-controlled substances;

2.    Manufacturers make use of that data to target their marketing and, for that purpose, regularly monitor the activity of doctors and pharmacies;

3.    Manufacturers and distributors regularly visit pharmacies and doctors to promote and provide their products and services, which allows them to observe red flags of diversion, as described elsewhere in this Complaint;

4.    Manufacturer Defendants purchased chargeback data (in return for discounts to opioid distributors) that allowed them to monitor the combined flow of opioids into a pharmacy or geographic area.

319.    The conclusion that Defendants were on notice of the problems of abuse and diversion follows inescapably from the fact that they flooded communities with opioids in quantities that they knew or should have known exceeded any legitimate market for opioids – even the artificially wider market for chronic pain.

320.    At all relevant times, the Defendants were in possession of national, regional, state, and local prescriber-and patient-level data that allowed them to track prescribing patterns over time. They obtained this information from data companies, including but not limited to: IMS Health, QuintilesIMS, IQVIA, Pharmaceutical Data Services, Source Healthcare Analytics, NDS Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science, and all of their predecessors or successors in interest (the "Data Vendors").

321.    Opioid distributors developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007 was intended to help the them identify suspicious orders or customers who were likely to divert prescription opioids.[132] The "know your customer" questionnaires informed the Defendants of the number of pills that the pharmacies sold, how many non-controlled substances were sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

322.    Defendants purchased nationwide, regional, state, and local prescriber- and patient-level data from the Data Vendors that allowed them to track prescribing trends, identify suspicious orders, identify patients who were doctor shopping, identify pill mills, etc.  The Data Vendors' information purchased by the Defendants allowed them to view, analyze, compute, and track their competitors' sales, and to compare and analyze market share information.[133]

323.    IMS Health, for example, provided Defendants with reports detailing prescriber behavior and the number of prescriptions written between competing products.[134]

---

[132] *Suggested Questions a Distributor Should Ask Prior to Shipping Controlled Substances*, Drug Enforcement Admin. Diversion Control Div., https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf; Richard Widup, Jr., Kathleen H. Dooley, Esq. *Pharmaceutical Production Diversion: Beyond the PDMA,* Purdue Pharma and McGuireWoods LLC (Oct. 2010), https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf.

[133]    A Verispan representative testified that the Supply Chain Defendants use the prescribing information to "drive market share."  *Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 661712, *9-10 (Feb. 22, 2011).

[134] Paul Kallukaran & Jerry Kagan, *Data Mining at IMS HEALTH: How We Turned a Mountain of Data into a Few Information-Rich Molehills*, (accessed on February 15, 2018),

Case ID: 210601660

324.    Similarly, Wolters Kluwer, an entity that eventually owned data mining companies that were created by McKesson (Source) and Cardinal Health (ArcLight), provided the Defendants with charts analyzing the weekly prescribing patterns of multiple physicians, organized by territory, regarding competing drugs, and analyzed the market share of those drugs.[135]

325.    This information allowed the Defendants to track and identify instances of overprescribing.  In fact, one of the Data Vendors' experts testified that the Data Vendors' information could be used to track, identify, report and halt suspicious orders of controlled substances.[136]

326.    Defendants were, therefore, collectively aware of the suspicious orders that flowed daily from their manufacturing and distribution facilities because Defendants have made it part of their collective business to know where those orders went and to whom.

327.    Defendants refused to maintain effective controls to prevent diversion, and refused to identify, investigate and report suspicious orders to the DEA or the Pennsylvania Department of Health when they became aware of the same, despite their actual knowledge of drug diversion rings.  For instance, as described in detail below, Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final decisions against registrants

---

http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.198.349&rep=rep1&type=pdf,   Figure 2 at p.3.

[135] Joint Appendix in *Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 705207, *467-471 (Feb. 22, 2011).

[136] In *Sorrell*, expert Eugene "Mick" Kolassa testified, on behalf of the Data Vendor, that "a firm that sells narcotic analgesics was able to use prescriber-identifiable information to identify physicians that seemed to be prescribing an inordinately high number of prescriptions for their product."  *Id.*; *see also* Joint Appendix in *Sorrell v. IMS Health*, No. 10-779, 2011 WL 687134, at *204 (Feb. 22, 2011).

103

Case ID: 210601660

in 178 registrant actions between 2008 and 2012[137] and 117 recommended decisions in registrant actions from The Office of Administrative Law Judges.  These numbers include seventy-six (76) actions involving orders to show cause and forty-one (41) actions involving immediate suspension orders, all for failure to report suspicious orders.[138]

328.    Sales representatives were also aware that the prescription opioids they were promoting were being diverted, often with lethal consequences. As a sales representative wrote on a public forum:

> Actions have consequences – so some patient gets Rx'd the 80mg OxyContin when they probably could have done okay on the 20mg (but their doctor got "sold" on the 80mg) and their teen son/daughter/child's teen friend finds the pill bottle and takes out a few 80's... next they're at a pill party with other teens and some kid picks out a green pill from the bowl... they go to sleep and don't wake up (because they don't understand respiratory depression) Stupid decision for a teen to make...yes... but do they really deserve to die?

329.    As to Allergan/Actavis, a Kadian prescriber guide discusses abuse potential of Kadian. It is full of disclaimers that Allergan/Actavis has not done any studies on the topic and that the guide is "only intended to assist you in forming your own conclusion."  However, the guide includes the following statements: 1) "unique pharmaceutical formulation of KADIAN may offer some protection from extraction of morphine sulfate for intravenous use by illicit users," and 2) "KADIAN may be less likely to be abused by health care providers and illicit users" because of "Slow onset of action," "Lower peak plasma morphine levels than equivalent doses of other formulations of morphine," "Long duration of action," and "Minimal fluctuations

---

[137] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

[138] *Id.*

in peak to trough plasma levels of morphine at steady state." The guide is copyrighted by Actavis in 2007, before Actavis officially purchased Kadian from Alpharma.

330.    Defendants' obligations to maintain effective controls against diversion and to report suspicious prescribing ran head on into their marketing strategy. Defendants did identify doctors who were their most prolific prescribers, not to report them, but to market to them. It would make little sense to focus on marketing to doctors who may be engaged in improper prescribing only to report them to law enforcement, nor to report those doctors who drove Defendants' sales.

331.    Defendants purchased data from IMS Health (now IQVIA) or other proprietary sources to identify doctors to target for marketing and to monitor their own and competitors' sales. Marketing visits were focused on increasing, sustaining, or converting the prescriptions of the biggest prescribers, particularly through aggressive, high frequency detailing visits.

332.    For example, at a national sales meeting presentation in 2011, Allergan/Actavis pressed its sales representatives to focus on its high prescribers: "To meet and exceed our quota, we must continue to get Kadian scripts from our loyalists. MCOs will continue to manage the pain products more closely. We MUST have new patient starts or we will fall back into 'the big leak'. We need to fill the bucket faster than it leaks." "The selling message should reflect the opportunity and prescribing preferences of each account. High Kadian Writers / Protect and Grow / Grow = New Patient Starts and Conversions." In an example of how new patients plus a high volume physician can impact performance: "102% of quota was achieved by just one high volume physician initiating Kadian on 2-3 new patients per week."[139]

---

[139] ACTAVIS0969604.

Case ID: 210601660

333.    This focus on marketing to the highest prescribers had two impacts.  First, it demonstrates that manufacturers were keenly aware of the doctors who were writing large quantities of opioids.  But instead of investigating or reporting those doctors, Defendants were singularly focused on maintaining, capturing, or increasing their sales.

334.    Whenever examples of opioid diversion and abuse have drawn media attention, the Manufacturer Defendants have consistently blamed "bad actors."  But given the closeness with which Defendants monitored prescribing patterns through IMS Health data, it is highly improbable that they did not know what was going on.  As pill mills were lucrative for the manufacturers and individual sales representatives alike, Manufacturer Defendants and their employees turned a collective blind eye, allowing certain clinics to dispense staggering quantities of potent opioids and feigning surprise when the most egregious examples eventually made the nightly news.

**5.    Defendants Failed to Report Suspicious Orders or Otherwise Act to Prevent Diversion.**

335.    As discussed above, Defendants failed to report suspicious orders, prevent diversion, or otherwise control the supply of opioids flowing into the City and across America. Despite the notice described above, and in disregard of their duties, Defendants continued to pump massive quantities of opioids despite their obligations to control the supply, prevent diversion, report and take steps to halt suspicious orders.

336.    Before the year-end 2012 merger, Allergan/Actavis produced twelve different generic opioids including some of the most abused and diverted opioids, such as generic OxyContin (Oxycodone I hydrochloride tablet), generic Opana ER (Oxymorphone tablet) and generic Duragesic (a fentanyl transdermal patch).  Pre-merger, Allergan/Actavis maintained the

Case ID: 210601660

same rudimentary, threshold-based SOM system in place from November 2000 through October 2012.[140]

337.    Under that system, the Customer Service group printed a report several times a day showing any controlled substance order that was 25% over the customer's rolling average of orders placed over the prior six months.  Then Customer Service reviews (eyeballs) the suspicious order report throughout the day (when a new report is created), any order that looks unusual is investigated, and any unusual items are cleared before the order is released.  In February 2009, Senior Manager of Allergan/Actavis's Customer Service Department, Nancy Baran, told her boss that the existing Allergan/Actavis process was inadequate to "prevent shipping excess product" because it was not cumulative and because there were too many orders over the 25% threshold.[141]  Baran remembered only one order between 2008 and 2017 that was ever deemed to be suspicious and reported to the DEA as such, but testified she did not know any details about it.  All other pending orders were cleared and released.

338.    The 2000-2012 Allergan/Actavis system only flagged orders unusual in size; it did not flag orders unusual in frequency or pattern in real time.  The system did not utilize any downstream customer information available to Allergan/Actavis, did not differentiate among NDC codes for drugs with a higher risk of diversion, and did not automatically stop orders from shipping.  Although Allergan/Actavis mailed reports to the DEA of orders that were identified in the system from 2009-2012, the lack of any analysis of such data made the reports meaningless.

---

[140] Allergan_MDL_02081243; Allergan_MDL_02128514.

[141] Allergan_MDL_02128035.

Case ID: 210601660

The system was not an effective control and Allergan/Actavis employees recognized as much. Yet the system remained in place until 2012.[142]

339.    In September 2012, Allergan/Actavis was implementing a more modern statistics-based SOM system designed by the Buzzeo/Cegedim group to detect "orders of interest" in "Direct Customer sales."[143] On October 1, 2012, it began working alongside Allergan/Actavis's prior system.[144] Until October 1, 2012, Allergan/Actavis used the SOM system as implemented in November 2000.[145]

340.    At the same time, Allergan/Actavis was preparing to implement the Buzzeo/Cegedim SOM system, its personnel were called to meet with the DEA. On September 12, 2012, five Allergan/Actavis employees met with the seven DEA personnel at its Arlington, Virginia office for about three hours to discuss opioid diversion. At the meeting, Barbara J. Boockholdt, Chief, Regulatory Section, told the Allergan/Actavis employees that its products were being distributed in Florida in quantities and under circumstances highly suggestive of diversion.[146] Leonard Levin, Staff Coordinator of the DEA Regulatory Section told Baran that:

---

[142] A separate program from January 2011 designed by Allergan/Actavis's marketing group, tracked only "oxycodone IR suspicious orders." Allergan_MDL_00490306. The marketing program compared monthly order rates and noted "any individual customer locations that have ordered 50% or greater than their established six month order average." *Id.* It was not designed to track any DEA regulations, and after three months of trials, it was apparently abandoned. Acquired_Actavis_00665233 (March 24, 2011 email discussing SOP).

[143] Allergan_MDL_01684748.

[144] Allergan_MDL_03380778 (Thursday October 4, 2012 email noting that "we went live on Monday with our enhanced Suspicious Order Monitoring" system).

[145] A separate system, titled "Indirect Customer Sales" also was issued in late 2012. Allergan_MDL_01979834. This SOP, which was to focus on customers of Allergan/Actavis's direct customers using chargeback and other data, was never implemented. Allergan/Actavis assigned no resources, or personnel, to carry out the indirect SOP.

[146] US-DEA-00000001.

Case ID: 210601660

    a.   "Actavis should send someone from their compliance team to visit pharmacies who were receiving their products in south Florida, in order for them to witness the long lines at pain clinics, out of state license plates, questionable clients, security guard(s) in the parking lots, and signs stating cash payment only."

    b.   Allergan/Actavis employees should "get to know their customers, visit distribution sites, visit customers of those distributors, check on customers' suspicious order monitoring systems, review due diligence files, and obtain printouts of pharmacies or practitioners who are receiving Actavis products."

    c.   "[I]f their customers refused to provide them with sales information Actavis should consider cutting them off.

    d.   "Actavis [should take a] serious look at their quota request, review their suspicious order monitoring system, visit their customers to review their suspicious order monitoring systems as well as their due diligence files, ask to see their customers' top customers for Actavis products, and contact their local DEA Office with any questions or issues."[147]

341.    The DEA presentation included slides compiled from ARCOS reports Allergan/Actavis had previously submitted to DEA showing the massive amount of Allergan/ Actavis opioids being shipped to Florida compared to other states.  One slide, for example showed that 2011 sales of Allergan/Actavis's 30 mg Oxycodone (generic OxyContin) were six times higher in Florida than in the next highest state.

342.    The meeting was ostensibly for the DEA to talk to Allergan/Actavis about its anti-diversion efforts, but Allergan/Actavis's Ethics & Compliance Officer, Michael R. Clarke, claims that the tone and the tenor of the meeting made it less productive than it could have been because, instead of treating the Allergan/Actavis individuals as professionals, the DEA looked at and talked to the Allergan/Actavis representatives as street dealers.  In late October 2012, Allergan/Actavis had a follow-up meeting with two field representatives from the DEA's Newark, New Jersey office where, according to Clarke, DEA requested a reduction of

---

[147] *Id.*

Case ID: 210601660

approximately 30%-40% in Actavis' manufacturing quota for oxycodone. According to Clarke, Allergan/Actavis' then CEO, Doug Boothe, rejected the DEA's request.

343.    Boothe has testified that he believed Allergan/Actavis' responsibility was limited to making certain that orders were received from licensed pharmacies and were within numerical thresholds, and that Allergan/Actavis had no responsibility (or accountability) for preventing diversion.

344.    Thus, although some Defendants may have made changes to their order monitoring programs and due diligence policies at various times, those policies consistently and continuously failed to adhere to the CSA and its implementing regulations, and the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act and the Wholesale Prescription Drug Distributors License Act and their implementing regulations. Specifically, those violations include Defendants' failure to identify and report suspicious orders, failure to halt the shipment of suspicious orders, and failure to conduct due diligence to investigate orders that were identified, or should have been identified, as suspicious prior to shipment.

345.    It is the various governmental agencies who have alleged or found—and the Defendants themselves who have admitted—that the Defendants, acting in disregard of their duties, pumped massive quantities of opioids into communities around the country despite their obligations to control the supply, prevent diversions, and report and take steps to halt suspicious orders.

346.    The sheer volume of prescription opioids distributed to pharmacies in the City is excessive for the medical need of the community and facially suspicious. Some red flags are so

110

Case ID: 210601660

obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.[148]

347.    The City is of the information and belief that the Defendants failed to report "suspicious orders" originating from Philadelphia to the DEA and/or the Pennsylvania Department of Health, as they were required to do under Pennsylvania law.

348.    The Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in the City.

349.    The Defendants illegally promoted the sale of dangerous and harmful drugs, in violation of the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. § 780-1 *et seq.*, and the Wholesale Prescription Drug Distributors License Act, 63 P. S. § 391.1 *et seq.* by supplying suspicious orders for opiates to retail pharmacies, hospitals, and other health care facilities throughout the City that the Defendants knew were suspicious, including orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

350.    The laws at issue here, including *inter alia* 63 P.S. § 391.6(k), 63 P.S. § 391.9, 63 P.S. § 391.2, are public safety laws.

351.    The Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

352.    The Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the DEA of

---

[148] *Masters Pharmaceuticals, Inc.*, 80 Fed. Reg. 55,418-01, 55,482 (Sept. 15, 2015) (citing *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,316, 62,322 (2012)).

suspicious orders when discovered, in violation of mandatory duties. *See* 63 P.S. § 391.6(k). Pennsylvania law dictates the source of the duties owed. Therefore, even where a federal regulation informs some part of the case, that does not convert any state legal cause of action into any federal question, substantial or otherwise, because it is Pennsylvania law, and not any federal authority, that informs the existence of the duties owed.

353.    Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.[149]

354.    The Defendants breached their duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates originating from the City.

355.    The Defendants' failures to monitor, report, and halt suspicious orders of opioids were intentional and unlawful. They refuse to abide by the duties imposed by law which are required to maintain a Pennsylvania license to distribute prescription opiates.

356.    The Defendants have misrepresented their compliance with Pennsylvania law, both to the public and to Pennsylvania state regulators.

357.    The Defendants enabled the supply of prescription opioids to suspicious physicians and pharmacies, enabled the illegal diversion of opioids, aided criminal activity, and disseminated massive quantities of prescription opioids into the black market.

358.    The Defendants' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioids into the City and into areas surrounding Philadelphia from which opioids were illicitly diverted into the City.

---

[149] *See Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 206 (D.D.C. 2012).

**6. Defendants Delayed a Response to the Opioid Crisis by Pretending to Cooperate with Law Enforcement.**

359.    To protect their registered distributor status with *inter alia* the Pennsylvania Department of Health, Defendants undertook efforts to deceptively and fraudulently assure the public that they were complying with their obligations under licensing regulations.  Through such statements, Defendants attempted to assure the public they were working to curb the opioid epidemic.

360.    When a manufacturer or distributor does not report or stop suspicious orders, prescriptions for controlled substances may be written and dispensed to individuals who abuse them or who sell them to others to abuse.  This, in turn, fuels and expands the illegal market and results in opioid-related overdoses.  Without reporting and without maintaining effective controls against diversion by those involved in the supply chain, law enforcement may be delayed in taking action – or may not know to take action at all.  Indeed, this notice to law enforcement is the very essence of what the suspicious order reporting requirements are all about.

361.    After being caught for failing to comply with particular obligations at particular facilities, Defendants made broad promises to change their ways and insisted that they sought to be good corporate citizens.

362.    Defendants publicly portrayed themselves as committed to working with law enforcement, opioid manufacturers, and others to prevent diversion of these dangerous drugs.

363.    In furtherance of their effort to affirmatively conceal their conduct and avoid detection, the Defendants, through their trade associations, the HDMA (now HDA) along with

113

Case ID: 210601660

the National Association of Chain Drugstores ("NACDS"), filed an *amicus* brief in *Masters Pharmaceuticals*, which made the following statements:[150]

> 1. "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."
>
> 2. "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that is available to them in the ordering process."

364.    Through the above statements made on their behalf by their trade associations, and other similar statements assuring their continued compliance with their legal obligations, the Defendants not only acknowledged that they understood their obligations under the law, but they further affirmed, falsely, that their conduct was in compliance with those obligations.

365.    Manufacturer Defendants also misrepresented their compliance with their legal duties and their cooperation with law enforcement.  Public statements by the Defendants and their associates created the false and misleading impression to regulators, prescribers, and the public that the Defendants rigorously carried out their legal duties, including their duty to report suspicious orders and exercise due diligence to prevent diversion of these dangerous drugs, and further created the false impression that these Defendants also worked voluntarily to prevent diversion as a matter of corporate responsibility to the communities their business practices would necessarily impact.

366.    By misleading the public and the City about the effectiveness of their controlled substance monitoring programs, the Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the City now asserts.  The City did not know of the existence

---

[150] Brief for HDMA and NACDS, *Masters Pharms., Inc. v. U.S. Drug Enf't Admin.,* Case No 15-1335, 2016 WL 1321983, (D.C. Cir. April 4, 2016) at *3-4, *25 (emphasis in original).

122329891-1

Case ID: 210601660

or scope of Defendants' industry-wide deception and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

**D. Philadelphia's Opioid Epidemic**

367.    The City – like the nation – is also now in the grips of an opioid-fueled public health and safety emergency of unprecedented dimensions that has endangered and continues to endanger the health, safety and peace of Philadelphia and its residents.

368.    The City's public health and safety emergency includes historically high incidences of opioid addiction and opioid use disorder and of opioid-related deaths and non-fatal opioid overdoses.  It also includes other adverse health effects of opioid addiction and opioid use disorder including historically high incidences of babies born with opioid withdrawal conditions, and an unprecedented increase in new hepatitis C virus ("HCV") infections caused by opioid injections.  The epidemic has also been accompanied by an unprecedented level of opioid-related emergency room visits and hospitalizations; extensive provision of emergency response services by the Fire Department and other City agencies in reviving and transporting overdose victims; and the expenditure of enormous resources by, among others, the Police Department, District Attorney's Office, Health Department, Department of Behavioral Health and Intellectual disAbility Services, Department of Human Services, and other City departments and agencies providing health and related services to address increased crime and violence and family and social dysfunction linked to opioid use and addiction.  The Medical Examiner's office is struggling to keep up with the rising tide of opioid deaths.  In 2017, the homicide rate in Philadelphia reached its highest level since 2012, due in part to the opioid epidemic and

115

Case ID: 210601660

competition from rival drug dealers who sell opioids.  The number of homicides has continued to rise.[151]

369.    The opioid epidemic and its deleterious impact on public health and safety in the City has created an overall substantial, repeated, and steadily increasing drain on the City's financial, personnel, medical, and other resources and capacities.

### E.  Public Health Impacts of the Opioid Epidemic in Philadelphia.

#### 1.  The Mayor's Task Force to Combat the Opioid Epidemic.

370.    In 2016, the City established a task force of stakeholders working in public health called the *Mayor's Task Force to Combat the Opioid Epidemic in Philadelphia* ("Task Force") to investigate the opioid epidemic in Philadelphia and make recommendations to address the ensuing public health and safety crisis.  On May 19, 2017, the Task Force issued its final report and recommendations ("Final Report").[152]  The Task Force also issued several Opioid Misuse and Overdose Reports since then.[153]  The Final Report and Opioid Misuse and Overdose Reports issued to date are collectively referred to herein as the "Reports."

---

[151] Philadelphia Police Department, Crime Maps & Stats, https://www.phillypolice.com/crime-maps-stats/.

[152]  The Mayor's Task Force to Combat the Opioid Epidemic in Philadelphia: Final Report and Recommendations, City of Philadelphia (May 19, 2017) (hereinafter "Mayor's Task Force Report, May 19, 2017"), available at http://dbhids.org/wp-content/uploads/2017/05/OTF_Report.pdf.

[153]  The reports are: (i) *Opioid Misuse and Overdose Report*, Phila. Dept. of Public Health (Sept. 7, 2017) (hereinafter "*Opioids Misuse Report*, Sept. 7, 2017"), *available at* https://hip.phila.gov/Portals/_default/HIP/DataReports/Opioid/2017/Q2/OpioidMisuseOverdose Report_Quarter2_2017_finalupdate_09122017_V2.pdf; (ii) *Opioid Misuse and Overdose Report*, Phila. Dept. of Public Health (Oct. 13, 2017), *available at* https://hip.phila.gov/Portals/_default/ HIP/DataReports/Opioid/2017/Q2/OpioidMisuseOverdoseReport_Quarter2_2017_update_10132 017.pdf; (iii) *Opioid Misuse and Overdose Report*, Phila. Dept. of Public Health (Dec. 13, 2017), *available at* https://hip.phila.gov/Portals/_default/HIP/DataReports/Opioid/2017/Q3/Dec/Opioid MisuseOverdoseReport_Quarter3_2017_12132017.pdf; (iv) *Opioid Misuse and Overdose Report*, Phila. Dept. of Public Health (Nov. 29, 2018), *available at* https://www.phila.gov/

116

Case ID: 210601660

371.    The findings of the Final Report are sobering, disturbing and alarming.  The Final

Report concluded:

> The crisis caused by opioids encompasses opioid use, opioid use disorder, and
> related morbidity and mortality.  Each of these is a problem of its own and each
> leads to many other individual and social problems.  Opioid use and addiction are
> not new issues, but they have reached epidemic proportions in the city and
> demand a new and coordinated response.[154]

372.    The Final Report noted that Philadelphia is facing an "opioid epidemic" and

"public health crisis" caused by the enormous rise in the use of prescription opioids for medical

purposes.[155]

373.    The City Health Department conducted a survey of Philadelphia residents in 2017

and found that "32% of Philadelphia adults surveyed – nearly 1 in 3 – used a prescription opioid

in the past year."[156]  According to the Final Report, the City Health Department estimates that

between 100,000 and 200,000 Philadelphia residents received more than one prescription for

opioids each year.   Approximately 50,000 of those individuals are estimated to misuse

prescription opioids.[157]

374.    Regarding opioid addiction and opioid use disorder, the Final Report stated:

> The physical and psychological impact of opioid use disorder on the residents and
> communities of Philadelphia is difficult to measure but cannot be overstated.
> *Approximately 14,000 people were treated for opioid use disorder in
> Philadelphia's publicly funded system in the 12-month period from October 2015*

---

media/20181129123743/Substance-Abuse-Data-Report-11.29.18.pdf; and (v) *Opioid Misuse and
Overdose Report*, Phila. Dept. of Public Health (Aug. 6, 2020) *available at*
https://www.phila.gov/media/20200806162023/Substance-Abuse-Data-Report-08.06.20.pdf.

[154] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 6.

[155] *Id*. at pg. 2 and introductory page titled "Message from Mayor Kenney."

[156] *Prescription Opioid and Benzodiazepine Use in Philadelphia, 2017*, Phila. Dept. of Public
Health (Aug. 2017).

[157] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 6.

122329891-1

Case ID: 210601660

*through September 2016.* The patients actively seeking and participating in care still represent only a fraction of those with opioid use disorder, including those who use heroin and those in need of treatment.[158]

375.    In 2018, there were 651 hospitalizations attributable to opioid poisoning in Philadelphia.[159]    That is over twice the number of hospitalizations attributable to opioid poisoning in 2002.[160]

376.    According to the Reports, as of 2016 the number of opioid overdose deaths in Philadelphia had more than tripled since 2003.[161]  This is consistent with the national rate, where the number of drug overdose deaths involving opioids has quadrupled since 1999.[162]

377.    In Philadelphia there were 1,150 overdose deaths in 2019, of which 963 (84 percent) were opioid-related.[163]

378.    According to a joint analysis of Pennsylvania overdose deaths by the Drug Enforcement Agency ("DEA") and the University of Pittsburgh, the "presence of an opioid,

---

[158] *Id.* at pg. 8 (emphasis added).

[159]  Philadelphia County Department of Public Health Opioid Surveillance Dashboard, Hospitalizations Attributable to Non-Fatal Opioid Poisoning (Oct. 28, 2019), https://public. tableau.com/profile/pdph#!/vizhome/HospitalizationsAttributabletoNon-FatalOpioidPoisoning/ HospitalizationsAttributabletoNon-FatalOpioidPoisoning.

[160] *Opioids Misuse Report*, Sept. 7, 2017, *supra,* at pg. 18.

[161] *Id*. at pg. 25.

[162]    CDC, *Opioid Overdose: Understanding the Epidemic* (2017), *available at* http://www.cdc.gov/ drugoverdose/epidemic/index.html.

[163]  Philadelphia County Department of Public Health Opioid Surveillance Dashboard, Unintentional Drug Related Deaths by Year (Oct. 28, 2019), https://public. tableau.com/profile/pdph#!/vizhome/UnintentionalDrugRelatedDeaths/UnintentionalDrugRelate dDeathsbyYear; *see also Opioid Misuse and Overdose Report*, Aug. 6, 2020, *supra*, at pg. 2.

118

Case ID: 210601660

illicit or prescribed by a doctor, was detected in 85 percent of drug related overdose deaths in Pennsylvania in 2016."[164]

379.     According to the Final Report and other sources, as of 2015 Philadelphia suffered a higher incidence of drug overdose deaths on a per-capita basis relative to all other counties in Pennsylvania and most large cities throughout the United States.  Philadelphia was ranked first among all Pennsylvania counties in terms of the number of drug overdose deaths per 100,000 residents in 2015.[165]  Philadelphia's rate of 47 drug overdose deaths per 100,000 residents was four times higher than New York City's (11 deaths per 100,000 residents) and three times higher than Chicago's (15 deaths per 100,000 residents) in 2015.[166]  By 2017 Philadelphia's rate of drug-related overdose deaths had climbed to 77 per 100,000, an amount that was again higher than any other county in Pennsylvania.[167]  This amount was over three times higher than New York City's (21.1 per 100,000 in 2017)[168] and nearly three times Chicago's (28.4 per 100,000 in 2017.[169] The vast majority of these overdose deaths were opioid-related.

---

[164] *Analysis of Overdose Deaths in Pennsylvania, 2016,* Drug Enforcement Agency Philadelphia Division and the University of Pittsburg (July 2017), at pg. 5 (hereinafter "*Analysis of Overdose Deaths in Pennsylvania*, July 2017"), available at https://www.duq.edu/assets/Documents/ forensics/Forensic%20Fridays/OCT%2027/Handouts/DEA-PHL-DIR-034-17%20Analysis%20 of%20Overdose%20Deaths%20in%20Pennsylvania%202016A[4080].pdf.

[165] *Id.* at pg. 9.

[166] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 8.

[167] Joint Intelligence Report, The Opioid Threat in Pennsylvania (September 2018) (hereinafter "Joint Intelligence Report"), at 34.

[168] New York City Department of Public Health, Epi Data Brief, Unintentional Drug Poisoning (Overdose) Deaths in New York City in 2018 (Oct. 28, 2019), https://www1.nyc.gov/ assets/doh/downloads/pdf/epi/databrief116.pdf.

[169] Chicago Department of Public Health, Chicago Health Atlas, Drug Induced Deaths for 2017 (Oct. 28, 2019), https://www.chicagohealthatlas.org/indicators/drug-induced-deaths.

122329891-1

Case ID: 210601660

380.    In Pennsylvania, the per-capita rate of overdose deaths "far exceed[ed] the national average" in 2016,[170] and continued to do so in 2017.[171]

381.    The drug naloxone (usually sold under the brand name Narcan) is a potentially life-saving medication that reverses the effect of opioids and is used to treat opioid overdoses that would otherwise be fatal.  In 2016, Philadelphia Fire Department personnel administered naloxone over 4,000 times, in every zip code in the City, and the Philadelphia Police Department administered naloxone 200 times.[172]  In 2017, Philadelphia Emergency Medical Services (EMS) administered naloxone to more than 5,000 individuals and in 2018 and 2019 EMS treated more than 3,000 people with naloxone.[173]  EMS transported 80 to 90 percent of persons receiving naloxone to hospitals.[174]  In addition, approximately 5,500 doses of naloxone were distributed from a needle exchange program to individuals who use drugs and are at risk of a fatal overdose.[175]  Thus, for the last years for which data is available, City emergency response services treated an estimated 15,000 opioid overdoses, a volume that was several multiples higher than the number of fatal overdoses.  Employees in the City's libraries have had to administer naloxone to overdose victims at their facilities.

382.    The Final Report also addressed the impact of opioid use disorder on not only addicted users, but on their families.  The Final Report's conclusion was particularly distressing, stating: "Philadelphia families are burdened with grief and loss to overdose, stigma associated

---

[170] *Analysis of Overdose Deaths in Pennsylvania,* July 2017, *supra,* at pg. 8.

[171] Joint Intelligence Report at 35 (for 2017, rate of drug-related overdose deaths was 43 per 100,000 in 2017 in Pennsylvania, and 22 per 100,000 for the nation as a whole).

[172] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 9.

[173] *Opioid Misuse and Overdose Report*, Aug. 6, 2020, *supra,* at pg. 2.

[174] *Id.*

[175] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 9.

Case ID: 210601660

with opioid addiction, and the multigenerational dynamic of the disease of addiction. The consequences of alcohol and drug misuse that impact families include compromised physical health and mental health, increased health care costs, loss of productivity at school and/or work, reduced quality of life, increased crime and violence, as well as child abuse and neglect."[176]

383.    All of these circumstances – opioid deaths, opioid-related emergency department visits and hospital admissions, and drug overdoses requiring naloxone, as well as the family and social dysfunction as discussed above – are recognized, direct, and quantifiable measures of the adverse public health impact on Philadelphia due to the opioid epidemic.

## 2. Opioid Use and Adverse Health Consequences in Philadelphia Repeat the National Pattern Linked to Prescription Opioids for Medical Uses.

384.    The opioid epidemic and public health crisis in Philadelphia closely tracks the national pattern of dramatic expansion in prescription opioid sales and resulting opioid addiction and use disorders and overdoses beginning at least as early as 2001, as addressed above.

### a.    Opioid Addiction and Opioid Use Disorders.

385.    The City Health Department tracks the prevalence and incidence of opioid addiction and opioid use disorder in a number of ways, including referring to data collected from state authorities and data the City Health Department collects regarding hospitalization for opioid use disorder.

386.    Philadelphia data on hospitalizations attributable to opioid poisoning for the period 2002-2018 is as follows (Figure 2):[177]

---

[176] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 10.

[177] *Opioids Misuse and Overdose Report*, Aug 6, 2020 *supra,* at pg. 28.



Number of Hospitalizations Attributable to Opioid Poisoning by Year, 2002-2018

122329891-1

Case ID: 210601660

387.    Similar Philadelphia data on hospitalizations for opioid abuse or dependence per 10,000 residents, for the period 2003-2015, is as follows (Figure 3):[178]



---

[178] Hospitalization data was gathered by the City from the Pennsylvania Health Care Cost Containment Council.

Case ID: 210601660

388.    Hospitalization data relating to the City as referred to above are similar to the national data utilized by the CDC, and the City and national trends track each other as indicated through a comparison of the following graphs:

Philadelphia (Figure 3):[179]          Nationwide (Figure 4):[180]




389.    Accordingly, national trends on opioid addiction parallel trends at the local level in Philadelphia.

---

[179] Hospitalization data was gathered by the City from the Pennsylvania Health Care Cost Containment Council.

[180] This nationwide graph was extracted from Figure 1 below.

124

Case ID: 210601660

b. **Opioid Overdoses.**

390.    Opioid overdose levels in Philadelphia are also similar to the national overdose

levels and the City and national trends track each other as indicated in the following graphs:

Philadelphia (Figure 5):[181]                    Nationwide (Figure 6):[182]



---

[181] Overdose data was gathered by the City from the Philadelphia Medical Examiner's Office.  A similarly-shaped graph of opioid overdose data based on raw numbers (*i.e.*, not adjusted to a "per 100,000 Philadelphia Residents" figure) is located in the *Opioids Misuse Report*, Sept. 7, 2017, *supra,* at pg. 25.

[182] This nationwide graph was extracted from Figure 1 below.

125

Case ID: 210601660

### c. __Other Adverse Health Effects from Opioids.__

391.    Opioid use during pregnancy can lead to neonatal abstinence syndrome (NAS) and may interfere with a child's brain development and may result in subsequent consequences for mental functioning and behavior.  In Philadelphia, the rate of NAS increased more than four-fold from 3 per 1,000 live births in 2002, to 13.75 per 1,000 live births in 2018.[183]  The following graph illustrates the drastic increase in NAS in Philadelphia (Figure 7):[184]



392.    Opioid use can also lead to infectious diseases such as hepatitis C virus (HCV) as a result of using needles to inject opioids.[185]  If left untreated, HCV can result in liver cirrhosis,

---

[183] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 10.

[184] *Opioids Misuse and Overdose Report*, Aug. 6, 2020, *supra,* at pg. 53.

[185] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 22; *see also* Sean Murphy *et al.*, *Association Between Hepatitis C Virus and Opioid Use While in Buprenorphine Treatment: Preliminary Findings* (2015) ("The prevalence of hepatitis-C-virus (HCV) infections is high

126

Case ID: 210601660

cancer, and end-stage liver disease.  Incidences of HCV have increased in Philadelphia due to the opioid epidemic.  The Philadelphia Department of Public Health has noted that "concurrent with the increases in opioid overdose has been other adverse outcomes including increasing rates of . . . hepatitis C virus (HCV) transmission."[186]  It also noted that the "number of newly-identified cases of HepC infection among 18-35 year olds nearly . . . doubled from 660 in 2010 to 1161 in 2016."[187]

393.    Similarly, opioid abuse can lead to other health problems such as right-sided heart valve infections as a result of using needles to inject opioids.  The incidence of right-sided heart valve infections has increased rapidly over the past decade as a consequence of the opioid epidemic.[188]

#### d.  Use of Prescription Opioids for Medical Purposes.

394.    Use of prescription opioids for medical purposes in the City can also be correlated with the national pattern referred to above.  The CDC's analysis of opioid prescriptions reflected in the graph in Figure 1, *infra*, is based on data on prescriptions for opioid pain relievers collected by the U.S. Drug Enforcement Agency.  Similar data are available for Philadelphia County and can be directly compared with the CDC's data on prescription use and its adverse health effects.

---

among opioid-dependent individuals."), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4638227/.

[186] https://www.phila.gov/programs/combating-the-opioid-epidemic/reports-and-data/.

[187] *Hepatitis C Virus Infection in Philadelphia*, Phila. Dept. of Public Health (Nov. 2017), *available at* https://www.phila.gov/media/20181106124822/chart-v2e11.pdf.

[188] *Hospitalizations for Heart Infection Related to Drug Injection Rising Across the US*, Science Daily (Sept. 1, 2016), *available at* https://www.sciencedaily.com/releases/2016/09/160901092818.htm.

122329891-1

Case ID: 210601660

395.    The following graph reflects the use of prescription opioids in Philadelphia as measured by the number of prescriptions written for opioid pain relievers from 2003-2016 and compares to the national data:

Philadelphia (Figure 8):[189]                    Nationwide (Figure 9):[190]





---

[189] Prescription opioid sales data were gathered from DEA ARCOS Retail Drug Summary Reports.  A similar graph of prescription opioid sales data based on raw numbers (*i.e.*, not adjusted to a "per 100,000 Philadelphia Residents" figure) is located in the *Opioids Misuse Report*, Sept. 7, 2017, *supra,* at pg. 5.

[190] This nationwide graph was extracted from Figure 1 below.

128

Case ID: 210601660

396.    Just as reflected in the nationwide CDC analysis, reliable measures of prescription opioid use, opioid addiction/use disorders, and overdoses are available in Philadelphia, and the trend mirrors the national trend:[191]

Prescription Opioid Sales, Hospitalizations, and Overdose Deaths in Philadelphia (Figure 10):



---

[191] Prescription opioid sales data were gathered from DEA ARCOS Retail Drug Summary Reports.  Hospitalization data were gathered from the Pennsylvania Health Care Cost Containment Council.  Overdose data were gathered from the Philadelphia Medical Examiner's Office.

397.     The parallels in patterns of morbidity and mortality for prescription opioid use in

Philadelphia and nationally are striking, as noted in the following graphs:

<u>Philadelphia</u> (Figure 10):[192]                     <u>Nationally</u> (Figure 1):[193]

          

## F. Public Safety Impacts of Opioids in Philadelphia.

398.     As the Task Force and others have pointed out, the opioid crisis also imperils, and

adversely affects, public safety in the City in a number of ways.

399.     According to the Final Report, the disease of opioid addiction has prompted

criminal acts by addicted individuals seeking to obtain opioids through illegal and sometimes

---

[192]     Prescription opioid sales data were gathered from DEA ARCOS Retail Drug Summary Reports.   Hospitalization data were gathered from the Pennsylvania Health Care Cost Containment Council.   Overdose data were gathered from the Philadelphia Medical Examiner's Office.

[193]     Andrew Kolodny, M.D., *Responding to the Prescription Opioid and Heroin Crisis: An Epidemic of Addiction*, at 23 (2016), *available at* http://www.pdmpassist.org/pdf/ TTAC_Opioid_Policy_Research_Collaborative_20170726.pdf; *accord CDC Vital Signs*, Nov. 2011 (similar graph), *supra* note 28; *Vital Signs: Overdoses of Prescription Opioid Pain Relievers – United States, 1999-2008*, CDC (Nov. 4, 2011) (similar graph), *available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6043a4.htm.

130

Case ID: 210601660

violent means.  This type of public safety issue both strains City resources and places all City residents at an increased risk of harm.

400.    Opioid-related crimes include, among other things, theft of money or property to finance opioid addiction; theft of prescription opioids from friends, relatives or others; and crimes committed while under the influence of opioids.

401.    Nationally, roughly 80% of individuals who are incarcerated are in jail for a crime committed while under the influence of alcohol or drugs, in order to obtain drugs (including opioids), or for a crime associated with the trade in illegal or diverted drugs.[194]  Philadelphia's criminal justice system profile is no different – and indeed Philadelphia is one of the cities in the country most adversely impacted by the opioid epidemic.

402.    In both 2016 and 2017, there were approximately 4,000 arrests each year in Philadelphia related to heroin.[195]  Four out of five individuals who begin using heroin start the transition to heroin from prescription opioid pain medications.[196]

403.    Opioid abuse has also adversely impacted neighborhood public safety and well-being throughout the City.  The railroad encampment of drug users in North Philadelphia that was known as "El Campamento" is a striking example of the many ways in which the opioid problem harmed public safety in the City.  Until it was shut down in the summer of 2017, in no small part as a result of law enforcement efforts by the City, a sprawling encampment of drug users who injected themselves with opioids and heroin in broad daylight sprung up on the

---

[194] *Alcohol, Drugs and Crime*, Nat'l Council on Alcoholism and Drug Dependence (2017), *available at* https://www.ncadd.org/about-addiction/alcohol-drugs-and-crime.

[195] *Opioids Misuse Report*, Sept. 7, 2017, *supra,* at pg. 22; *Opioids Misuse and Overdose Report*, Nov. 29, 2018, *supra*, at pg. 39.

[196] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 7.

Case ID: 210601660

railroad tracks running under Gurney Street in the Kensington area of Philadelphia. Hundreds of drug users came from around the United States to what eventually became the largest open-air drug market on the East Coast, and some of them began living near the train tracks. Piles of trash and hundreds of thousands of used needles littered the encampment. In response to this enormous public health and safety crisis, the City entered into an agreement in June 2017 with Conrail, the railroad company which owns the tracks, to clean up the area. The effort, which included tearing down makeshift shacks and disposing of hazardous waste materials such as needles, began at the end of July 2017. Ultimately, the City paid tens of thousands of dollars for security, waste removal and fencing at the Kensington encampment, plus substantial additional costs to police the area, among other things.

404.    Further, opioid use is a significant cause of homelessness in Philadelphia, and a major reason why many in the homeless population remain without shelter. Opioids frequently are abused on the City's streets, including in public parks and in municipal buildings. A large number of individuals afflicted with opioid addiction who have lost stable housing have crowded into encampments on City property, with the byproducts of their abuse – piles of trash, needles, and other waste – littering City streets. The City's homeless population has increased as a result of the opioid epidemic, and the City has taken steps to expand City-funded programs and services available to the homeless population.

405.    The Task Force also noted that "improper disposal of drug use equipment," such as used needles, poses a threat to neighborhood safety.[197] Accidental needle sticks are a safety hazard to City residents caused by the opioid epidemic.

---

[197] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 23.

Case ID: 210601660

406.    According to the Final Report and other commentators, automobile accidents caused by impaired opioid users pose a safety risk.  "[R]esearchers report a sevenfold increase in the number of drivers killed in car crashes while under the influence of prescription [opioid] painkillers. . . .  Prescription [opioid] drugs can cause drowsiness, impaired thinking and slowed reaction times, which can interfere with driving skills."[198]

407.    Children face safety risks when parents who abuse opioids are unable to care properly for their children.

408.    Much opioid-related criminal activity – including prostitution and theft committed to support opioid addiction – takes place on City streets and in other public areas.  This is just an example of how Philadelphia's real property interests have been adversely affected by the opioid epidemic.

## G. The Opioid Epidemic Has Greatly Increased the City's Costs.

409.    The City's efforts to address and abate these opioid related harms have come at considerable cost.  Financial burdens to the City have expanded along with the increased sale, use, and misuse of prescription opioids in Philadelphia.

### 1. City-Funded Public Medical Costs.

410.    Over 17,500 people were treated for opioid-use disorder in the City's publicly-funded health system in 2019, up from 16,844 in 2018, and 15,561 in 2017.[199]  The City incurred significant increased costs for these services during this period, as well as similar such costs for other periods.

---

[198] Steven Reinberg, *Significant Spike in Opioid-Related Car Crash Deaths*, CBS News (July 31, 2017), *available at* https://www.cbsnews.com/news/opioid-drugs-car-crash-fatalities-deaths/.

[199] *Opioids Misuse and Overdose Report*, Aug. 6, 2020, *supra,* at pg. 59.

Case ID: 210601660

411.    The number of persons treated actually understates the extent of opioid addiction and treatment need, because patients participating in addiction treatment represent only a fraction of those with an opioid use disorder.  National data establish that roughly one out of every ten people with a substance use disorder actually obtain treatment for the specific disorder.[200] Extrapolating on this basis, if there were 17,500 Philadelphia residents who received specialty treatment for an opioid use disorder, there were roughly 175,000 residents who likely needed treatment and did not seek it.[201]

412.    In Philadelphia, the nonprofit organization Community Behavioral Health ("CBH") is contracted and funded by the City of Philadelphia to manage the behavioral health services for Philadelphia Medicaid beneficiaries.  Similarly, Philadelphia's Department of Behavioral Health and Intellectual disAbility Services ("DBHIDS") manages care for uninsured Philadelphia residents.[202]

413.    CBH maintains a network of treatment providers for various behavioral and medical needs, including opioid abuse.  There are 13 opioid treatment providers within the CBH network ("CBH facilities"), as well as residential treatment facilities, halfway houses, hospitals, and other treatment facilities.[203]  As noted, over 17,500 individuals who received care through the City's publicly-funded drug treatment network in 2019 received treatment for opioid-use

---

[200] Rachel Lipari et al., *America's Need for and Receipt of Substance Use Treatment in 2015*, Substance Abuse and Mental Health Services Administration (Sept. 29, 2016), *available at* https://www.samhsa.gov/data/sites/default/files/report_2716/ShortReport-2716.html.

[201] Even that number is an undercount, because it includes only Philadelphia residents who receive treatment through the City's publicly-funded health system, and does not include others such as those residents who receive from the City private insurance or other forms of coverage and payment.

[202] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 13.

[203] *Id*. at pg. 13.

Case ID: 210601660

disorders.[204]   The City incurred significant costs for these City-funded and City-managed services.

414.   In these CBH facilities, medication-assisted treatment with methadone is an important component of treatment for opioid-use disorder.  *There are 13 methadone clinics in Philadelphia that receive City funding.  In 2016, those clinics served nearly 6,000 Philadelphia residents who received methadone for their opioid use disorder.*[205]  The City incurred significant costs to fund these methadone clinics.  Methadone is administered daily in pill form, which costs approximately $150 per month per person.[206]

415.   The availability of other forms of medication-assisted opioid treatment in the CBH facilities, including Suboxone (buprenorphine plus naloxone), was increased in City-funded programs in 2015 and 2016 in response to the opioid epidemic.[207]   Suboxone is often administered by a daily film placed under the tongue, which costs approximately $450 per month per person.[208]

416.   Another form of medication-assisted treatment, Vivitrol (injectable extended-release naltrexone), has shown early promise and is provided in City-funded programs.[209]

---

[204] *Opioids Misuse and Overdose Report*, Aug. 6, 2020, *supra,* at pg. 59; *see also Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 13.

[205] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 14.

[206] Cara Tabachnick, *Breaking Good: Vivitrol, a New Drug Given as a Monthly Shot, is Helping Addicts Stay Clean*, The Washington Post (March 13, 2015) (hereinafter "Washington Post, March 13, 2015"), *available at* https://www.washingtonpost.com/lifestyle/magazine/his-last-shot-will-a-monthly-jab-of-a-new-drug-keep-this-addict-out-of-jail/2015/03/05/7f054354-7a4c-11e4-84d4-7c896b90abdc_story.html?utm_term=.9058b0492059.

[207] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 14.

[208] Washington Post, March 13, 2015, *supra*.

[209] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 14, 27.

135

Case ID: 210601660

Vivitrol is administered by a monthly injection, which costs approximately $1,000 per month per person.[210]

417.    Medication-assisted treatment includes not only the medications themselves, but also psychosocial treatments.  City-funded programs provide these services.

418.    The City, via  DBHIDS, funded eight opioid-related substance use disorder early intervention programs in 2017.  These programs target at-risk individuals in Philadelphia and provide individual, group and family therapy and service referrals.[211]

419.    In direct response to the opioid epidemic, DBHIDS has taken several actions – many at considerable cost to the City – including the following:

   a.  Expanding the use of recovery houses and extending hours of some residential programs to accept individuals after 5 p.m. and during weekends;

   b.  Starting work on a web-based treatment capacity portal where all residential providers are required to enter their availability for new patients daily;

   c.  Authorizing higher levels of care in instances where patients face risks requiring immediate residential treatment;

   d.  Mandating all opioid treatment programs to offer all forms of medication-assisted treatment, including methadone, buprenorphine, and naltrexone in 2017.  As a result of this mandate, naltrexone is now available in 14 outpatient treatment sites and 4 residential sites throughout Philadelphia;

   e.  Requiring all halfway houses to accept individuals on all forms of medication-

---

[210] Washington Post, March 13, 2015, *supra*.

[211] *The Opioid Epidemic in Philadelphia: Implementation of the Mayor's Task Force Recommendations*, at pg. 7 (Sept. 13, 2017) (hereinafter "*Implementation of Task Force Recommendations*, Sept. 13, 2017"), *available at* http://dbhids.org/wp-content/uploads/2017/04/OTF_StatusReport-1.pdf.

Case ID: 210601660

assisted treatment and psychiatric medications, to increase patients' access to treatment;

f.  Initiating the development of a 24/7 walk-in center where individuals can receive immediate stabilization in an outpatient setting and get access to further treatment;[212] and

g.  The City has also taken other steps to expand treatment capacity and access to treatment across the entire continuum of care, from inpatient detoxification to residential treatment to supported recovery housing.

420.  The City has also incurred costs for opioid-related medical or surgical services provided to certain indigent or other qualifying residents.  Such services may include treatment for infants born with NAS.  Costs for treating NAS have been estimated at $60,000 per infant for hospital care alone, compared to less than $8,000 for a healthy birth.[213]

421.  Opioid-related services also include treatment for hepatitis C virus (HCV). Recently approved treatments for HCV cost approximately $84,000 per patient.[214]

422.  In 2018, approximately 84% of individuals with hospital stays in Philadelphia attributable to opioids received some form of public insurance paid by the City.[215]

423.  Opioid-related deaths generally require an autopsy and toxicology screen, performed by the Philadelphia Medical Examiner's office.[216]  The number of autopsies at the

---

[212] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 12.

[213] *What's Best for Babies Born to Drug-Addicted Mothers?*, USA Today (April 26, 2014), *available at* https://www.usatoday.com/story/news/health/2014/04/25/best-babies-born-drug-addicted-mothers/8170555/.

[214] *Jack Hoadley et al.*, *The Cost of a Cure: Revisiting Medicare Part D and Hepatitis C Drugs* (Nov. 3, 2016), *available at* http://healthaffairs.org/blog/2016/11/03/the-cost-of-a-cure-revisiting-medicare-part-d-and-hepatitis-c-drugs/.

[215] *Opioids Misuse and Overdose Report*, Aug. 6, 2020, *supra,* at pg. 30.

Case ID: 210601660

Medical Examiner's office has risen about 20 percent in three years, from 2,489 in 2013 to 3,018 in 2016. The increase, largely due to opioid deaths, required a doubling in the budget for supplies and materials (body bags, safety equipment, gowns, etc.) and the hiring of a new assistant medical examiner.[217] There were also increased costs for toxicology tests. These costs are funded by the City.

> **2. The City's Increased Costs of Emergency Services Provided by Police, Fire and EMS and Attributable to the Opioid Epidemic.**

424.    The City provides a wide range of services to protect public health and safety, including police, fire, and EMS services.

425.    These City services have been severely burdened by the opioid epidemic at substantial increased costs to the City. For example, the City has faced increased expenditures for naloxone and related costs such as training EMS personnel to administer naloxone; increased volumes of 911 emergency calls and trips (so many, in fact, that the City often needs to send fire trucks because there are not enough ambulances available); increases in the number of personnel required; increases in the budget of the departments; increases in the amount of work applying for grants and other alternative sources of funding to offset increased opioid-related costs; increased turnover and recruitment costs; and increased occupational hazards arising from opioid use and abuse such as exposure to carfentanil (where only a few drops can be deadly) and accidental needle sticks, among others.

---

[216]  http://www.phila.gov/health/medicalexaminer/Pathology.html; http://www.phila.gov/health/medicalexaminer/Toxicology.html.

[217]  Sam Wood, *Victims of Opioid Overdoses Stack Up for Coroners, Costing Taxpayers Dearly*, Philadelphia Inquirer (Oct. 19, 2017), *available at* http://www.philly.com/philly/health/addiction/bodies-opioid-ods-coroners-oxycontin-marino-trump-cdc-cadavers-philadelphia-pathologists-autopsies-norristown-toxicology-20171018.html.

426.   The City also spends hundreds of thousands of dollars per year to purchase naloxone to address opioid overdoses.  The City administered nearly 10,000 doses of naloxone in 2015 via its fire department, police department, and as part of a needle exchange program.

### 3.   The City's Increased Public Safety and Criminal Justice Costs Attributable to the Opioid Epidemic.

427.   Opioid addiction has had major impacts on the City's policing and criminal justice system.[218]  The opioid epidemic has caused an increase in crime, arrests and incarceration for opioid-related offenses.

428.   As noted above, opioid-related crimes include theft of money or property to help finance opioid addiction; theft of prescription opioids from friends, relatives or others; unlawful possession or trafficking of opioids; and crimes committed while under the influence of opioids.

429.   Public safety and criminal justice costs directly attributable to the opioid epidemic include increased costs for police resources, district attorney resources, public defender resources, judicial system resources, prison resources, and increased costs in the form of property losses due to crimes.  Nationally, these costs have been calculated to be over $7.6 billion per year for prescription opioid abuse and dependence.[219]  Based on the disproportionate severity with which the opioid epidemic has impacted Philadelphia relative to the rest of the country, the City has suffered a disproportionate share of these financial burdens as a percentage of its population. Based on a measure of percentage of the national population alone, a rough estimate of these additional costs to the City would be approximately $30 to $40 million per year.

---

[218] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 11.

[219] Florence, *et al., The Economic Burden of Opioid Overdose, Abuse, and Dependence in the United States, 2013*, Medical Care, Vol. 54, No. 10, at pg. 904 (October 2016).

Case ID: 210601660

430.    Further, the City established a "Drug Treatment Court" in 1997, which often directs criminal defendants to substance abuse disorder treatment instead of incarceration.[220] Approximately 37% of the individuals who participate in Drug Treatment Court have reported that they are opioid users.  That percentage continues to increase and is currently estimated to be as much as 50%.  Drug Treatment Court proceedings frequently result in individuals being enrolled in treatment services such as recovery housing, vocational training, employment placement programs, medication-assisted treatment, and trauma counseling.  Over the past five years, 890 participants were accepted to Drug Treatment Court.[221]  The City incurs significant costs for these programs as a direct result of the opioid epidemic.

431.    The Philadelphia Department of Prisons ("PDP") has incurred increased costs for inmates incarcerated for opioid-related crimes.  For example, many such inmates required additional hospitalization and medical care directly relating to their opioid addiction disorder.

432.    The PDP also provides  Suboxone (buprenorphine plus naloxone) and methadone to inmates at a considerable cost to the City.[222]

433.    The PDP also incurs costs for medical assessments, detoxification programs, and enrollment in its cognitive behavioral therapy program related to opioid addiction.  At considerable cost to the City, the PDP provides withdrawal management services to about 8,000 prisoners annually, approximately two-thirds to three-quarters of which are for opioids.[223]

434.    Opioid addiction frequently affects released inmates.  Based on the City's ongoing assessment of fallout from the opioid epidemic, there is a high correlation between

---

[220] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 11-12.

[221] *Id*. at pg. 12.

[222] *Id*. at pg. 11.

[223]  *Id*. at pg. 11.

122329891-1

Case ID: 210601660

prisoners released from Philadelphia prisons and subsequent overdose deaths involving opioids. In light of this risk, in 2017 the PDP began to distribute naloxone to released inmates who are at high risk of opioid abuse and overdose.[224]

###### 4. The City's Increased Homelessness and Foster Care Costs Attributable to the Opioid Epidemic.

435.    The City, via its Department of Behavioral Health, increased the capacity of the City's "Housing First/Pathways to Housing" program in 2017 by adding 60 slots targeting individuals with opioid-use disorder.[225]  The City incurs costs of $28,500 per year for each slot, including housing, medical treatment, psychiatric care, and social services,[226] at a total annual cost of approximately $1.7 million per year ($28,500 x 60) for this program which arises directly from the opioid epidemic.

436.    The City has incurred increased costs for homelessness stemming from opioid addiction.  The City secures both temporary and longer-term housing for the City's homeless, including for homeless individuals addicted to opioids.  The City also provides certain health care and other services for the homeless.  The City's Office of Homeless Services operated with a $45 million budget in 2016,[227] some of which was used to serve opioid-addicted homeless.

437.    The City also incurs costs to fund its foster care system.  In Philadelphia, the City pays a $21.25 per diem rate ($7,756 per year) to foster parents to cover expenses such as food,

---

[224] *Implementation of Task Force Recommendations*, Sept. 13, 2017, *supra,* at pg. 9.

[225] *Id*. at pg. 7.

[226] Don Sapatkin, *In Philly, Finding a Place for the Homeless on Opioids*, Philadelphia Inquirer (Sept. 29, 2017), *available at* http://www.philly.com/philly/health/addiction/housing-first-treatment-second-philadelphia-pathways-for-homeless-opioid-users-20170929.html.

[227] *The Mayor's Operating Budget in Brief for Fiscal Year 2018*, at pg. 71 (March 2017), *available at* http://www.phila.gov/finance/pdfs/FY18-22%20Budget%20in%20Brief_ALL.pdf.

Case ID: 210601660

clothing, school supplies, transportation, and other incidentals for the child.[228]  The City's foster

care costs have increased significantly as a direct result of the opioid epidemic.

5.  **The City's Increased Public Awareness Costs Attributable to the Opioid Epidemic.**

438.    The City granted a $1.9 million budget allocation to the Philadelphia Department

of Public Health ("DPH") for fiscal 2018 (7/1/17 – 6/30/18) for the ongoing funding of a

program targeting the opioid crisis.[229]  The funds are being used to increase public awareness

about the dangers of prescription opioids; attempt to reduce or narrow opioid prescribing through

a campaign aimed at the highest-prescribing health care providers; improve the distribution and

use of naloxone; and develop a real-time database to track openings in addiction treatment

facilities.[230]

439.    At    considerable    cost,    the    City,    via    DPH,    launched    a    website

(www.donttaketherisk.org) in May 2017 aimed at raising awareness of the dangers of opioids.[231]

440.    At considerable cost, the City, via DPH and DBHIDS, mailed opioid prescribing

guidelines to 16,000 health care providers in Southeastern Pennsylvania in 2017 to educate

health care professionals about responsible opioid prescribing.[232]

441.    At considerable cost, the City, via DPH, launched a detailing program in 2017 in

which 1,400 health care providers across Philadelphia received one-on-one guidance on how to

---

[228] City of Philadelphia Five Year Financial and Strategic Plan for Fiscal Years 2018-2022, at pg. 160 (March 2, 2017), *available at* https://www.phila.gov/media/20170301200611/FY18-22-Five-Year-Plan.pdf.

[229] *The Mayor's Operating Budget in Brief for Fiscal Year 2018*, at pg. ii (March 2017), *available at* http://www.phila.gov/finance/pdfs/FY18-22%20Budget%20in%20Brief_ALL.pdf.

[230] *Id*. at pg. ii.

[231] *Implementation of Task Force Recommendations*, Sept. 13, 2017, *supra,* at pg. 6.

[232] *Id*.

Case ID: 210601660

prescribe opioids judiciously.  Leadership from DPH and DBHIDS visited all major health systems serving adult patients in Philadelphia and is working with them to reduce overprescribing of prescription opioids. [233]  The City's campaign was "Think NSAIDs," which emphasized the use of non-opioid pain treatments.  DPH representatives also distributed guidelines on prescribing and tapering opioids.[234]  The campaign began in November 2017, ran for 8 weeks, and cost approximately $290,000 to administer.

### 6. The Task Force Recommendations to Combat the Opioid Epidemic Will Lead to Further Increased Costs to the City.

442.    The Task Force made various recommendations to address Philadelphia's opioid epidemic and to change the behaviors of doctors and patients regarding opioid prescribing and use, including the following:

a.  Conducting a consumer-directed media campaign about opioid risks;

b.  Conducting a public education campaign about naloxone, including the availability of naloxone through various avenues;

c.  Destigmatizing opioid use disorder and its treatment via public education programs;

d.  Improving health care professional education about the dangers and abuse of opioids;

e.  Establishing insurance practices that support safer opioid prescribing and related treatment;

---

[233] *The Opioid Epidemic in Philadelphia: Implementation of the Mayor's Task Force Recommendations*, at pg. 11 (Dec. 13, 2017) (hereinafter "*Implementation of Task Force Recommendations*, Dec. 13, 2017"), *available at* http://dbhids.org/wp-content/uploads/ 2017/12/OTF_StatusReport_December2017.pdf.

[234] *See* Think NSAIDS Action Kit, *available at* https://www.phila.gov/documents/think-nsaids-action-kit/.

Case ID: 210601660

f.   Increasing the provision of medication-assisted opioid abuse treatment;

g.   Expanding addiction treatment access and capacity at City-funded sites;

h.   Embedding withdrawal management into all levels of patient care;

i.   Implementing "warm handoffs" to treatment centers after overdose;

j.   Providing safe housing, recovery, and vocational support systems;

k.   Incentivizing medical providers to enhance the quality of substance-use disorder screening and treatment;

l.   Expanding naloxone availability;

m.  Further exploring comprehensive user engagement sites;

n.   Establishing a coordinated rapid response to periodic surges in the number of overdoses;

o.   Addressing homelessness among opioid users;

p.   Expanding the Philadelphia court system's capacity for diversion of opioid abusers to treatment programs;

q.   Expanding law enforcement's capacity in key areas relevant to opioid abuse; and

r.   Providing substance use disorder assessment and treatment in the Philadelphia Department of Prisons.[235]

443.   The Task Force recommendations represent a substantial effort to address the impact of the opioid epidemic in Philadelphia.  The City has made substantial steps toward implementing some of these recommendations, and adapting them to address current conditions and concerns.  But implementing even a subset of the recommendations comes at a considerable cost to the City, and funding constraints place limits on both the speed and the scope of these

---

[235] *Mayor's Task Force Report*, May 19, 2017, *supra,* at pg. 15-25.

Case ID: 210601660

efforts.  Certain additional steps are set forth in the injunctive relief requested herein, which can and must supplement the City's efforts, both existing and planned, to abate the many harms involved.

**H.  The City Incurs Increased Prescription Drug, Health Care, and Disability Costs for its Employees Attributable to the Opioid Epidemic.**

444.    In addition to the many social services costs set forth above, the City has spent significant amounts of money each year for purchases of prescription opioids (and related medical services) for its employees.

445.    The City self-funds its own pharmacy benefits plan, through which it pays prescription drug costs for covered employees.  Through this plan, the City pays for opioids prescribed by physicians to covered employees, their family members, and others.

446.    The City pays significant sums for the costs of visits to doctors' offices when covered employees and their family members visit doctors to obtain opioid prescriptions.  Many such individuals visit their doctors on a recurring basis due to the long-term nature of opioid treatments.

447.    The City pays significant costs for opioid addiction treatment for covered employees and their family members.   These costs include, *e.g.*, addiction counseling, rehabilitation costs (inpatient and outpatient), overdose costs (ambulance and emergency room visits), and costs to treat infants born with NAS.

448.    The City also pays for medical care needed to treat opioid side effects such as opioid-induced constipation, and other health effects such as hepatitis C virus (HCV) and heart valve infections.

449.    National data establish that medical costs incurred by insurers increase by an average of approximately $15,000 per annum for individuals who suffer from opioid abuse or

Case ID: 210601660

addiction.[236]   The City incurs no less than this amount for medical costs per year for each affected employee or family member abusing or addicted to opioids that it insures.

450.   Similarly, the City self-funds its own workers' compensation and disability plan, through which it pays disability costs and related benefits for covered employees.  Coverage includes payments for wages while absent from work, and medical costs including doctor's visits and prescription opioid purchases, among other things.

451.   Many City employees have been prescribed opioids in connection with injuries sustained at work.  Those employees often remain out of work for extended periods of time due to prolonged opioid dependence.  The National Council on Compensation Insurance has noted there is much evidence that long-term opioid use leads to a longer duration of worker's compensation claims, long-term disability, and higher costs.  In light of the addictive nature of opioids, the City has incurred costs for workers' compensation claims for longer periods than it otherwise would absent Defendants' conduct in creating the opioid epidemic.

452.   The City has experienced lost productivity as a result of employees' work absences due to opioid abuse and addiction, and lost productivity in workers who do show up for work but are impaired by opioid use or withdrawal.

453.   There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[237]

---

[236]  Noam Kirson *et al.*, *The Economic Burden of Opioid Abuse: Updated Findings*, Journal of Managed Care & Specialty Pharmacy, at 437 (April 2017) ("Opioid abusers generate an average of $14,810 in excess costs to payers in the 6 months before and after the initial abuse episode."), *available at* http://www.jmcp.org/doi/pdf/10.18553/jmcp.2017.16265.

[237] *See* Richard C. Dart, et al., *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241 (2015).

146

Case ID: 210601660

454.    Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[238]

455.    The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[239]

456.    The increased use of prescription painkillers for nonmedical reasons (meaning without a prescription for the high they cause), along with growing sales, has contributed to a large number of overdoses and deaths.

457.    As discussed above, the City has experienced a substantial increase in the rates of opiate-related substance abuse, hospitalization and death that mirrors Defendants' increased distribution of opioids.

458.    Given the well-established relationship between the use of prescription opioids and the use of heroin, the City is informed and believes, and based thereon alleges, that the increase in opioid usage in Philadelphia is dramatically increasing the rate of addiction to opioids and other drugs among Philadelphia residents.

459.    Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in the City.

460.    Heroin and Fentanyl abuse, addiction, morbidity, and mortality are hazards to public health and safety in the City as is drug abuse addiction, morbidity, and mortality, as many opioid addicts also use other drugs.

461.    The City seeks economic damages from the Defendants as reimbursement for the costs associated with past efforts to eliminate the hazards to public health and safety.

---

[238] *See* Volkow & McLellan*, supra*.

[239] *See* Califf et al., *supra*.

Case ID: 210601660

462.    The City seeks economic damages from the Defendants to pay for the cost to permanently eliminate the hazards to public health and safety and abate the temporary public nuisance.

463.    To eliminate the hazard to public health and safety, and abate the public nuisance, a "multifaceted, collaborative public health and law enforcement approach is urgently needed."[240]

464.    A comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients experiencing pain.[241]

465.    These community-based problems require community-based solutions that have been limited by "budgetary constraints at the state and Federal levels."[242]

466.    Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opiates, Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon the City.

**I.    Defendants' Conduct Created an Abatable Public Nuisance.**

467.    As alleged throughout this Complaint, Defendants' conduct created a public health crisis and a public nuisance.

---

[240]  *See* Rudd et al., *Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010-2015, supra* at 1445.

[241]  *See* Johns Hopkins Bloomberg School of Public Health, *The Prescription Opioid Epidemic: An Evidence-Based Approach* (G. Caleb Alexander et al. eds., 2015), http://www.jhsph.edu/ research/centers-and-institutes/center-for-drug-safety-and-effectiveness/research/prescription-opioids/JHSPH_OPIOID_EPIDEMIC_REPORT.pdf.

[242]  *See* Office of Nat'l Drug Control Policy, Exec. Office of the President, *Epidemic: Responding to America's Prescription Drug Abuse Crisis* (2011), https://www.ncjrs.gov/pdffiles1/ondcp/ rx_abuse_plan.pdf.

148

Case ID: 210601660

468.    The public nuisance—*i.e.*, the opioid epidemic—created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated by, *inter alia*, (a) educating prescribers (especially primary care physicians and the most prolific prescribers of opioids) and patients regarding the true risks and benefits of opioids, including the risk of addiction, in order to prevent the next cycle of addiction; (b) providing effective, long-term addiction treatment to patients who are already addicted to opioids; (c) making naloxone and other overdose reversal drugs widely available so that overdoses are less frequently fatal; and (d) ensuring that state regulators have the information they need to investigate compliance.

469.    Defendants have the ability to act to abate the public nuisance, and the law recognizes that they are uniquely well-positioned to do so.  It is the manufacturer of a drug that has primary responsibility to assure the safety, efficacy, and appropriateness of a drug's marketing and promotion.  And, all companies in the supply chain of a controlled substance are primarily responsible for ensuring that such drugs are only distributed and dispensed to appropriate patients and not diverted.  These responsibilities exist independent of any FDA or DEA regulation, to ensure that their products and practices meet state consumer protection laws and regulations, as well as the obligations under the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act.  As registered manufacturers and distributors of controlled substances, Defendants are placed in a position of special trust and responsibility and are uniquely positioned, based on their knowledge of prescribers and orders, to act as a first line of defense.

122329891-1

Case ID: 210601660

### J. Statutes of Limitations are Tolled and Defendants Are Estopped From Asserting Statutes of Limitations as Defenses.

#### 1. Enforcement of a Public Right

470.     No statute of limitation can be pleaded against the Plaintiff, which seeks to enforce strictly public rights.

#### 2. Equitable Estoppel

471.     To the extent any statute of limitations defense would apply, Defendants are equitably estopped from relying upon such a defense because they undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the public, including in the City, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the Commonwealth and to continue generating profits.  Notwithstanding the allegations set forth above, the Defendants affirmatively assured the public, including the City, that they were working to curb the opioid epidemic.

472.     The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support.  These Defendants invented "pseudoaddiction" and promoted it to an unsuspecting medical community using literature and materials created at the direction of, and paid for by, the Defendants. Manufacturer Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction.  Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks.  Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales.  The medical community, consumers, and the City were duped by the

122329891-1

Case ID: 210601660

Manufacturer Defendants' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing in the City.

473.     Defendants intended that their actions and omissions would be relied upon, including by Plaintiff, the public and persons living in the City.  The City did not know, and did not have the means to know, the truth due to Defendants' actions and omissions.

474.     The City reasonably relied on Defendants' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

### 3.  Fraudulent Concealment

475.     The City's claims are further subject to equitable tolling, stemming from Defendants' knowingly and fraudulently concealing the facts alleged herein.  Defendants knew of the wrongful acts set forth above, had material information pertinent to their discovery, and concealed them from the City.  The City did not know, or could not have known through the exercise of reasonable diligence, of its cause of action, as a result of Defendants' conduct.

476.     The Defendants were deliberate in taking steps to conceal their behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

477.     As set forth herein, the Manufacturer Defendants deliberately worked through Front Groups purporting to be patient advocacy and professional organizations, through public relations companies hired to work with the Front Groups and through paid KOLs to secretly control messaging, influence prescribing practices and drive sales.    The Manufacturer Defendants concealed their role in shaping, editing, and approving the content of prescribing guidelines, informational brochures, KOL presentations and other false and misleading materials addressing pain management and opioids that were widely disseminated to regulators, prescribers and the public at large.  They concealed the addictive nature and dangers associated

151

Case ID: 210601660

with opioid use and denied blame for the epidemic attributing it instead solely to abuse and inappropriate prescribing. They manipulated scientific literature and promotional materials to make it appear that misleading statements about the risks, safety and superiority of opioids were actually accurate, truthful, and supported by substantial scientific evidence. Through their public statements, omissions, marketing, and advertising, the Manufacturer Defendants' deceptions deprived the City of actual or implied knowledge of facts sufficient to put the City on notice of potential claims.

478.    Defendants also concealed from the City the existence of the City's claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that their legal duties to report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic. They publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens. These repeated misrepresentations misled regulators, prescribers and the public, including the City, and deprived the City of actual or implied knowledge of facts sufficient to put the City on notice of potential claims.

479.    The City did not discover the nature, scope and magnitude of Defendants' misconduct, and its full impact on jurisdiction, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

480.    The Manufacturer Defendants' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing in the City deceived the medical community, consumers, and the City.

122329891-1

Case ID: 210601660

481.     Defendants intended that their actions and omissions would be relied upon, including by the City.  The City did not know, and did not have the means to know, the truth, due to Defendants' actions and omissions.

482.     The City reasonably relied on Defendants' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

483.     The purposes of the statutes of limitations period are satisfied because Defendants cannot claim prejudice due to a late filing where the City filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

484.     In light of their statements to the media, in legal filings, and settlements, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

485.     Defendants continually and secretly engaged in their scheme to avoid compliance with their reporting obligations.  Only Defendants and their agents knew or could have known about Defendants' unlawful failure to report suspicious sales because Defendants made deliberate efforts to conceal their conduct.  As a result of the above, the City was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on its part.

**K.  Facts Pertaining to Civil Penalties and Punitive Damages**

486.     As set forth above, Defendants acted deliberately to increase sales of, and profits from, opioid drugs.  The Manufacturer Defendants knew there was no support for their claims that addiction was rare, that addiction risk could be effectively managed, that signs of addiction were merely "pseudoaddiction", that withdrawal is easily managed, that higher doses pose no significant additional risks, that long-term use of opioids improves function, or that time-release or abuse-deterrent formulations would prevent addiction or abuse.  Nonetheless, they knowingly promoted these falsehoods in order to increase the market for their addictive drugs.

153

Case ID: 210601660

487.    Moreover, Defendants knew that large and suspicious quantities of opioids were being poured into communities throughout the United States and in Philadelphia, yet, despite this knowledge, took no steps to report suspicious orders, control the supply of opioids, or otherwise prevent diversion.  Defendants acted in concert with each other and with opioid distributors to maintain high levels of quotas for their products and to ensure that suspicious orders would not be reported to regulators.

488.    Defendants' conduct was so willful and deliberate that it continued in the face of numerous enforcement actions, fines, and other warnings from state and local governments and regulatory agencies.  Defendants paid their fines, made promises to do better, and continued on with their marketing and supply schemes.  Through their ongoing course of conduct, Defendants knowingly, deliberately and repeatedly threatened, harmed, and created a risk of harm to public health and safety, and caused large-scale economic loss to communities and government liabilities across the country.

489.    By engaging in the above-described intentional and/or unlawful acts or practices, Defendants acted with actual malice, wantonly, and oppressively.  Defendants engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm.

490.    Defendants were repeatedly admonished and even fined by regulatory authorities, but continued to disregard their obligations to control the supply chain of dangerous opioids and to institute controls to prevent diversion because the profits outweighed the penalties.

491.    As all of the governmental actions against the Defendants show, Defendants knew that their actions were unlawful, and yet deliberately refused to change their practices because compliance with their legal obligations would have decreased their sales and their profits.

Case ID: 210601660

492.    Meanwhile, the opioid epidemic rages unabated in the City.

493.    The epidemic still rages because the fines and suspensions imposed by the DEA do not change the conduct of the industry.  They pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue.  They hold multiple DEA registration numbers and when one facility is suspended, they simply ship from another facility.

494.    The Defendants have knowingly abandoned their duties imposed under Pennsylvania law and federal law that is incorporated therein, and abused the privilege of distributing controlled substances in this community.

## V.    LEGAL CAUSES OF ACTION

### COUNT I
### PUBLIC NUISANCE

495.    The City re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

496.    Defendants have contributed to and/or assisted in creating and maintaining a condition that is harmful to the health of thousands of Philadelphia residents and which interferes with the enjoyment of life in violation of Pennsylvania law.

497.    Prescription opioid abuse, addiction, morbidity, and mortality are a public nuisance in the City, which remains unabated.  The unlawful conduct by the Defendants as described herein has created these hazards to public health and safety.

498.    Defendants' conduct has led to a sharp increase in the incidence and prevalence of opioid addiction and related diseases.  The result has been an epidemic of opioid addiction, overdoses and deaths that has significantly interfered with public health, safety and peace.  The increased incidence and prevalence of these conditions have harmed individual prescription opioid users, damaged the community as a whole, and caused a serious deterioration in public

order, public safety, economic productivity, and the quality of life in the City and in the community as a whole.  The opioid epidemic has also required City government to increase significantly the provision of services at dramatically increased costs, thereby shifting the imposition of the social costs of the opioid epidemic to the City, its residents and the community as a whole from those responsible.

499.    Each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of, and/or substantial factor leading to, Plaintiff's injury.  *See* Restatement Second, Torts § 821B. *See Machipongo Land & Coal Co. v. Com.*, 799 A.2d 751, 773 (Pa. 2002); *Muehlieb v. City of Philadelphia*, 574 A.2d 1208 (Pa. Commw. Ct. 1990).

500.    The health and safety of the citizens of the City, including those who use, have used or will use opioids, as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern to the City's citizens and residents.  Defendants' misconduct as set forth above has created or contributed to a substantial and unreasonable interference with rights common to the general public, including the right to be free of an unreasonable interference with public health, safety and peace.

501.    The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit.

502.    Defendants knew, or should have known, that their promotion and irresponsible distribution of opioids (in violation of their monitoring and reporting obligations) would create a public nuisance.

122329891-1

Case ID: 210601660

503.    Defendants are liable for a public nuisance because they acted without lawful authority in knowingly creating and maintaining opioid use at such volumes and degree as to create an epidemic, which clearly affects a number of citizens, is injurious to public health, safety, morals and welfare, and interferes with the exercise and enjoyment of public rights.

504.    Each Defendant is liable for public nuisance because each Defendant's conduct at issue has caused or contributed to an unreasonable interference with a right common to the general public.  The Defendants' conduct described herein significantly interferes with public health, safety, peace, comfort, and convenience. Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used for non-medical purposes.  Without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

505.    In addition and independently, Defendants' conduct invades a legally protected interest.  Defendants' conduct constitutes an unreasonable interference because *inter alia* each Defendant has violated Pennsylvania law.  Defendants have permitted dangerous drugs under their control to be diverted for illicit purposes such as to injure the City and its residents.  By failing to maintain a closed system that guards against diversion of dangerously addictive drugs for illicit purposes, Defendants injuriously affected public rights, including the right to public health, public safety, public peace, and public comfort of the people of the City.

506.    Defendants have unlawfully and/or intentionally distributed opioids or caused opioids to be distributed without maintaining effective controls against diversion.  Such conduct was illegal.  Defendants' failures to maintain effective controls against diversion include

157

Case ID: 210601660

Defendants' failure to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders.

507.    A violation of any rule or law controlling the distribution of a drug of abuse in the City and the Commonwealth is a public nuisance.  Defendants' distribution of opioids while failing to maintain effective controls against diversion was proscribed by Pennsylvania statutes and regulations.

508.    The Manufacturer Defendants have violated Pennsylvania law by conducting a deceptive campaign to misrepresent the safety and efficacy of opioid drugs and to ensure their widespread use for chronic pain knowing that they were specifically misrepresenting the high risk of severely harmful addiction.  This misconduct has created, caused and/or substantially contributed to the public nuisance.

509.    Defendants' unreasonable interference with a right common to the public is of a persistent and continuing nature.

510.    The Defendants have intentionally and/or unlawfully created an absolute nuisance.

511.    Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference with public rights that their conduct has caused in the City. Defendants are in the business of manufacturing and distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because *inter alia* these drugs are defined under Pennsylvania law as substances posing a high potential for abuse and severe addiction.  35 P.S. § 780-104.  Defendants' actions created and expanded the abuse of opioids, drugs specifically codified as constituting severely harmful substances.

Case ID: 210601660

512.    Defendants' conduct in marketing, distributing, and selling prescription opioids which the Defendants know, or reasonably should know, will likely be diverted for non-legitimate, non-medical use, creates a strong likelihood that these illegal distributions of opioids will cause death and injuries to Philadelphia and otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

513.    The injury, damage and costs to the City from Defendants' misconduct were both significant and either known or wholly foreseeable to Defendants.  While reaping billions of dollars in revenues and profits through their misconduct, the Defendants improperly shifted the burden, harm and costs of their public nuisance to the City and the community as a whole, and its residents, which the City has had to address to its detriment, as alleged herein.  It is, or should be, reasonably foreseeable to defendants that their conduct will cause deaths and injuries to residents in Philadelphia, and will otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

514.    The following additional circumstances also further support the City's public nuisance claim:

    a.    Defendants had sufficient control over, and responsibility for, the public nuisance they created, as alleged more fully herein.  Defendants were in control of the "instrumentality" of the nuisance, namely prescription opioids. For the Manufacturer Defendants, this included the process of marketing and promotion and creation and maintenance of the demand for prescription opioids at all relevant times, which included control of the misleading

159

Case ID: 210601660

representations they conveyed through branded and unbranded marketing and product promotion. Manufacturer Defendants could have ameliorated, at least in part, the public nuisance by ceasing their improper marketing of opioids and their dissemination of misleading messages about the safety and efficacy of opioids, and by disseminating corrective statements that informed physicians, consumers, third-party payors and health plan administrators and others about the true risks of prescription opioids. Manufacturer Defendants also controlled the supply of prescription opioids and the process of distributing these drugs, and were under an obligation to prevent diversion and report suspicious orders. Defendants could have ameliorated, at least in part, the public nuisance by monitoring suspicious orders, reporting suspicious orders, and/or stopping shipment of suspicious orders.

b. Defendants are not immune from public nuisance claims because they produced and marketed otherwise and/or allegedly legal products. Lawful conduct of businesses, like lawful conduct of individuals, has long been held to constitute a public nuisance if it unreasonably interferes with public health, safety, or peace. In any event, Defendants' conduct was unlawful.

c. Defendants have interfered with common public rights, which were understood for centuries to be and have become common rights to public health, safety, order, peace, comfort, or convenience, rather than specific, individual rights.

515.    Defendants' misconduct has not been insubstantial or fleeting as it has involved sophisticated and highly deceptive conduct involving expenditures of tens of millions of dollars

122329891-1

Case ID: 210601660

per year by the Manufacturer Defendants to market and promote prescription opioids and which they engaged in for decades. The misconduct is ongoing and has produced permanent or long-lasting harm including the worst drug epidemic in the history of the country and in the City, along with all of the deleterious consequences thereof as more fully alleged herein. Defendants' misconduct has caused deaths, serious injuries, and a significant disruption of public health, safety and peace in the City, as further alleged herein.

516. The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid and heroin use resulting from the Defendants' abdication of their gate-keeping duties and their deceptive marketing activities, have caused harm to the entire community that includes, but is not limited to:

    a. The high rates of use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

    b. Nor have children escaped the opioid epidemic unscathed. Infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

    c. Even those City residents who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties and fraudulent and deceptive promotions. Many residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or

other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

d.   The opioid epidemic has increased health care costs.

e.   Employers have lost the value of productive and healthy employees.

f.   Defendants' conduct created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

g.   Defendants' dereliction of duties, deception and/or fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them. More pills sold by Defendants led to more addiction, with many addicts turning from prescription pills to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

h.   The diversion of opioids into the secondary criminal market and the increased number of individuals who abuse or are addicted to opioids increased the demands on health care services and law enforcement in the City.

i.   The significant and unreasonable interference with the public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement, and financial resources of the City.

j.   Defendants' interference with the comfortable enjoyment of life in Philadelphia is unreasonable because there is no social utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

122329891-1

Case ID: 210601660

517.    The opioid epidemic and resulting public health and safety crisis touch and harm many neighborhoods, workplaces and communities in the City.  The harm is not confined to any City zip code or census tract, or to people of any race, ethnicity, religion, gender, sexual preference, or other demographic, but affects the public health, safety, order and well-being of the City as a whole.

518.    The deterioration of public health and safety caused by the opioid epidemic tears at the social and economic fabric of the City; its impact is not limited to opioid users adversely affected by the side-effects of prescription opioids, but have been socialized and ultimately borne by the community and the City as a whole.

519.    The public nuisance for which Defendants are responsible has caused, and continues to cause, substantial, extraordinary and repeated injury to the City and its residents that will continue unless enjoined and remedied by the Court.

520.    The City has been injured and continues to be injured in that, among other things, it has been forced to pay for a variety of social, public health, emergency, medical, and other services, the need for which arose from the opioid epidemic as alleged above.  The City has also been directly injured in that it has paid for long-term opioid prescriptions, related medical treatment, and disability benefits for City employees using City funds related to prescription opioids marketed by Defendants as alleged more fully herein.

521.    The City sues in its public capacity for all appropriate injunctive and mandatory relief to abate the ongoing public nuisance, restore the City's public health, safety and peace, and recover all appropriate damages, expenses, costs and fees.

522.    The City also sues in its proprietary capacity to recover the additional costs it has incurred in addressing the nuisance and other appropriate damages, expenses, costs and fees.

163

Case ID: 210601660

523.    The City has suffered and continues to suffer special harm that is different in kind and degree from that suffered by individual residents of the City.  The harm to City residents includes opioid addiction, overdoses and death, among other things, while the harm to the City itself, upon which this action is based, includes social services costs, treatment costs, emergency costs, equipment costs, and medical and prescription costs, among other things.

524.    Defendants also are liable for punitive damages to reflect the aggravating circumstances of their intentional, willful, wanton, malicious and oppressive conduct as set forth herein. Defendants acted or failed to act knowingly, willfully and deceptively, with gross negligence, maliciously, and/or wantonly with conscious disregard of the public's health, safety, and welfare.

WHEREFORE, Plaintiff, the City demands judgment against Defendants, jointly and severally, for the following:

a.  injunctive relief as noted above;

b.  abatement of the public nuisance, to the fullest extent allowed by law, including an abatement fund;

c.  damages expenses, costs and fees to the fullest extent allowed by law, in excess of $50,000, exclusive of interest and costs;

d.  punitive damages;

e.  litigation costs (including expert fees) and attorneys' fees;

f.  prejudgment interest; and

g.  such other and further relief as the Court deems just and proper.

## COUNT II
## VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. §§ 201-1 to 201-9.3

525.    The City re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

526.    This Count does not sound in fraud.

527.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits companies from employing "[u]nfair methods of competition" and "unfair or deceptive acts or practices," which are defined to include, *inter alia*, the following conduct:

   a.   "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." 73 P.S. § 201-2(4)(ii);

   b.   "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . . ." 73 P.S. § 201-2 (4)(v); or

   c.   "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2 (4)(xxi).

528.    Defendants are persons under the UTPCPL.

529.    Defendants violated the UTPCPL in that their conduct as alleged herein caused a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of the drugs at issue.

530.    Defendants violated the UTPCPL in that by their conduct as alleged herein they represented that the drugs at issue had sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have.

165

Case ID: 210601660

531.    Defendants violated the UTPCPL in that by their conduct as alleged herein Defendants engaged in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

532.    Under Pennsylvania law, an act or practice is unfair or deceptive if it had the capacity to deceive, or was likely to deceive, a substantial portion of the public, and was likely to make a difference in the purchasing decision.

533.    Defendants' conduct as alleged herein constitutes unfair or deceptive acts or practices in violation of the above provisions of the UTPCPL in that:

a.    At all relevant times, Manufacturer Defendants directly or indirectly made and disseminated, or caused to be made and disseminated, materially false and misleading statements directed at the Defendants' target audiences, which included the PBM responsible for selecting the drugs covered by the City's health coverage plans and included on the City's pharmacy formularies;

b.    These false and misleading statements by Manufacturer Defendants were specifically intended to promote the sale and use of opioids to treat chronic pain to members of their target audiences;

c.    At all relevant times, Manufacturer Defendants directly or indirectly made statements that omitted material facts to promote the sale and use of opioids to treat chronic pain;

d.    Manufacturer Defendants directly or indirectly repeatedly failed to disclose or minimized material facts about the risks of opioids, including the life-threatening risks of abuse, misuse, and addiction, and their risks compared to

166

Case ID: 210601660

alternative treatments.  These omissions were directed at and affected all of the members of the target audiences described above;

e.  Such material omissions by Manufacturer Defendants were deceptive and misleading in their own right, and further rendered even otherwise truthful statements about opioids misleading, creating a false impression of the risks, benefits, and superiority of opioids for treatment of chronic pain;

f.  At all relevant times, Manufacturer Defendants, directly or indirectly, made and disseminated the foregoing misleading and deceptive statements and omissions through an array of marketing channels including, but not limited to: in-person and other forms of detailing; speaker events, including meals, conferences, and teleconferences; CMEs; journal articles and studies; advertisements; and brochures and other patient education materials;

g.  These materially false and misleading statements and omissions by Manufacturer Defendants were widely disseminated to the purchasing public, including the target audiences alleged above;

h.  Manufacturer Defendants knew or should have known that their marketing and promotional efforts created a misleading impression of the risks, benefits and purported superiority of opioids;

i.  Manufacturer Defendants knowingly failed to disclose the material facts that *inter alia* they were not in compliance with laws and regulations requiring that they maintain a closed distribution system, protect against addiction and severe harm, and specifically monitor, investigate, report, and refuse suspicious orders.  Defendants knowingly misrepresented to regulators and the

public that their distribution services and methods for preventing diversion were safe and effective when they were not. But for these knowing and material factual misrepresentations and omissions, Manufacturer Defendants would not have been able to receive and renew licenses to sell opioids.

j. Manufacturer Defendants intentionally misrepresented their compliance with their affirmative legal obligations to provide effective controls to guard against diversion and to identify and report suspicious orders of prescription opioids, and prevent the shipping and sale of suspicious orders of prescription opioids to retailers and health care providers;

k. Manufacturer Defendants knew or should have known that their deceptive and misleading statements regarding the effectiveness of their monitoring systems in identifying, blocking, and reporting suspicious orders and preventing diversion of prescription opioids created the misleading impression that the Defendants were providing to law enforcement the names of prescribers they knew or should have known to be facilitating the over-prescription and diversion of opioid drugs, while simultaneously distributing opioid drugs to those same prescribers;

l. Manufacturer Defendants' conduct, including their deceptive representations and concealments of material fact, created a significant likelihood of confusion and/or misunderstanding as to the safety, efficacy, and risks of opioids, including the risks associated with the use of opioids for chronic pain;

m. Manufacturer Defendants' conduct had a tendency to deceive a substantial segment of the target audiences in the Philadelphia area, and their

Case ID: 210601660

misrepresentations and concealments of material facts were likely to be misinterpreted in a misleading way; and

n. Manufacturer Defendants' acts and practices – taken individually and collectively – were likely to make a difference in the prescribing decisions of doctors; usage and purchasing decisions of patients; the formulary decisions of PBMs; and the payment decisions of end-payors like the City, because their misrepresentations and other wrongful acts were specifically designed to mislead and convince these individuals and groups that opioids were safe and superior to alternative treatments for chronic pain and that Defendants were complying with their legal duties to prevent diversion and working with law enforcement to prevent diversion.

534.    As a direct result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in violations of the UTPCPL as alleged herein.

535.    As direct result of their foregoing acts and practices in violation of the UTPCPL, Defendants have caused the City and its affected residents and other persons in interest to incur, and continue to incur, enormous costs and expenses related to the purchase of opioids and the consequences of dealing with the opioid epidemic.

536.    The City was injured in that Manufacturer Defendants' branded and unbranded marketing of opioids for chronic pain led to doctors prescribing, patients using, the City's PBMs approving, and the City paying or reimbursing for unnecessary long-term opioid treatment with Defendants' opioids.

122329891-1

Case ID: 210601660

537.    The City operates as a consumer when it purchases goods or services, which it does when it pays for the procurement of and/or reimbursement for prescription opioids.

538.    The City, via its PBMs acting as the City's agents, was subjected to Manufacturer Defendants' improper marketing as alleged above, including Manufacturer Defendants' materially false representations and omissions about the purported safety and efficacy of opioids. The City, via its PBMs, justifiably relied upon these misrepresentations and omissions in determining that Manufacturer Defendants' opioids should be listed on the City's approved drug formulary, resulting in the City paying or reimbursing for prescriptions of Defendants' opioids.

539.    The City was injured in that the Manufacturer Defendants' deceptive and misleading statements regarding the effectiveness of their diversion monitoring systems in identifying, blocking, and reporting suspicious orders and preventing diversion of prescription opioids led to the City believing that Defendants' distribution services and methods for preventing diversion were safe and effective when they were not.

540.    But for Manufacturer Defendants' deceptive conduct in violation of the UTPCPL, the City would not have expended millions of dollars in connection with the purchase or reimbursement of prescription opioids or the treatment for opioid addiction, opioid use disorder, or any other opioid-related adverse health effect involving the opioid epidemic.  As a direct and proximate result of Defendants' deceptive conduct, the City has been injured.

541.    Philadelphia has suffered economic injuries that are direct, ascertainable, and quantifiable.  The City's damages constitute both an "ascertainable loss of money or property" and "actual damages" for purposes of 73 P.S. § 201-9.2(a).

542.    The Court "may, in its discretion, award up to three times the actual damages sustained."  73 P.S. § 201-9.2(a).

543.    The City is entitled to treble damages in light of the severe, willful, and long-running nature of Defendants' conduct, the opioid epidemic it caused, and the resulting harm to public health and safety.

544.    The City is also entitled to an award of its litigation costs and attorneys' fees pursuant to 73 P.S. § 201-9.2(a).

WHEREFORE, the City demands judgment against Defendants, jointly and severally, for the following:

      a.   injunctive relief to enjoin Defendants' continued violations of the UTPCPL as requested in detail above;

      b.   damages to the fullest extent available by law in excess of $50,000, exclusive of interest and costs;

      c.   treble damages;

      d.   litigation costs (including expert fees) and attorneys' fees;

      e.   prejudgment interest; and

      f.   such other and further relief as the Court deems just and proper.

## COUNT III
## VIOLATION OF PHILADELPHIA FALSE CLAIMS ACT
## PHILA. CODE §§ 19-3601 to 19-3606

545.    The City re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

546.    The City incorporates by reference all paragraphs set forth above as if fully set forth herein at length.

547.    This Count does not sound in fraud.

548.    The Philadelphia False Claims Act ("PFCA") is violated when any person:

(1) Knowingly presents or causes to be presented to an officer or employee of the City a false claim for payment or approval by the City; (2) Knowingly makes, uses or causes to be made or used a false record or statement to get a false claim paid or approved by the City; [or] (3) Conspires to defraud the City by getting a false claim allowed or paid by the City.

Phila. Code § 19-3602.

549.    The PFCA defines a "false claim" as a "claim, or information relating to a claim, which is false or fraudulent." Phila. Code § 19-3601(3).

550.    The PFCA defines "knowingly" as follows: "Acting with actual knowledge of the information, in deliberate ignorance of the truth or falsity of the information, or in reckless disregard of the truth or falsity of the information. *No proof of specific intent to defraud is required*." Phila. Code § 19-3601(5) (emphasis added).

551.    Manufacturer Defendants' practices, as alleged above, violated § 19-3602(1) – (3) of the Philadelphia Code in that:

   a.   Opioid prescriptions written for patients covered by the City's health plans are filled by pharmacies, which submit claims for payment to the City's PBMs;

   b.   The City, via its PBMs acting as the City's agent, was subjected to Manufacturer Defendants' deceptive promotion and marketing as alleged herein, including misrepresentations and omissions about the purported safety and efficacy of opioids and specifically as to the risks of use for long term chronic pain;

   c.   The City, via its PBMs, relied, directly or indirectly, upon those misrepresentations and omissions and was thereby induced to list Manufacturer Defendants' opioid products on the City's approved drug formulary and to thereafter pay false claims for their prescriptions;

172

Case ID: 210601660

d. Manufacturer Defendants, through their misleading marketing of opioids for chronic pain, knowingly caused to be presented to the City false claims for payment or approval by the City;

e. Manufacturer Defendants knew or should have known that their marketing and promotional efforts created a misleading impression about the risks, benefits, and/or superiority of opioids for chronic pain;

f. Manufacturer Defendants knew or should have known that, as a natural consequence of their misconduct, governmental entities such as the City would pay false claims for opioid prescriptions to treat chronic pain; and

g. Manufacturer Defendants' misrepresentations were material because they had a natural tendency to influence or be capable of influencing whether doctors prescribed opioids, patients used opioids, PBMs approved opioids for payment by listing them on their formularies, and third-party payors like the City paid for opioids.

552. By reason of Manufacturer Defendants' unlawful acts, the City has been damaged. The City has spent significant funds per year to pay false claims for improper prescriptions of Manufacturer Defendants' opioids, as well as related office visits.

553. The PFCA provides that any company that violates the Act "shall be liable to the City for three (3) times the amount of damages which the City sustains." Phila. Code § 19-3602. Treble damages are mandatory, not discretionary. Manufacturer Defendants are liable to the City for treble damages under the Act.

173

Case ID: 210601660

554.    The PFCA also provides that any company that violates the Act "shall have committed a Class III offense and be subject to the fines set forth in Section 1-109(3) of this Code." Phila. Code § 19-3602.

555.    Section 1-109(3) of the Act states: "For violations that are designated in this Code as Class III offenses, the maximum fine shall be as follows: . . . for any violation committed on January 1, 2009 or thereafter, two thousand (2,000) dollars for each violation."  Lower fines are available for violations occurring before 2009.

556.    The Manufacturer Defendants are liable to the City for fines under the Act.

557.    The PFCA also provides that any company that violates the Act "shall be liable for attorneys' fees and costs for any civil action brought to recover such damages."  Phila. Code § 19-3602.  An award of attorneys' fees and costs is mandatory, not discretionary.

558.    Manufacturer Defendants are liable to the City under the Act for its attorneys' fees and litigation costs.

WHEREFORE, the City demands judgment against Manufacturer Defendants, jointly and severally, under the PFCA for the following:

    a.  damages to the fullest extent available by law in excess of $50,000, exclusive of interest and costs;

    b.  treble damages;

    c.  appropriate fines;

    d.  litigation costs (including expert fees) and attorneys' fees;

    e.  prejudgment interest; and

    f.  such other and further relief as the Court deems just and proper.

122329891-1

Case ID: 210601660

## COUNT IV
## FRAUD

559.    The City re-alleges all prior paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

560.    Defendants violated their general duty not to actively deceive and have made knowingly false statements.  Further, Defendants have knowingly omitted and/or concealed material information, thereby making its representations knowingly false. In so doing, Defendants acted intentionally and/or unlawfully.

561.    Defendants violated their duty not to actively deceive by intentionally and unlawfully making knowingly false statements, and by intentionally and unlawfully omitting and/or concealing information.

562.    Specifically, the Defendants' knowing deceptions during the relevant period, which were intended to induce reliance, include but are not limited to:

    a.  Manufacturer Defendants' misrepresentations overstating the benefits of, and evidence for, the use of opioids for chronic pain;

    b.  Manufacturer Defendants' misrepresentations that the risks of long-term opioid use, especially the risk of addiction, were overblown;

    c.  Manufacturer Defendants' misrepresentations that opioid doses can be safely and effectively increased until pain relief is achieved; Manufacturer Defendants' misrepresentations that signs of addiction were "pseudoaddiction" and thus reflected undertreated pain, which should be responded to with more opioids; Manufacturer Defendants' misrepresentations that screening tools effectively prevent addiction;

175

Case ID: 210601660

d.  Manufacturer Defendants' misrepresentations concerning the comparative risks of NSAIDs and opioids;

e.  Manufacturer Defendants' misrepresentations that opioids differ from NSAIDs in that opioids have no ceiling dose;

f.  Manufacturer Defendants' misrepresentations that evidence supports the long-term use of opioids for chronic pain;

g.  Manufacturer Defendants' misrepresentations that chronic opioid therapy would improve patients' function and quality of life;

h.  Manufacturer Defendants' false portrayal of their efforts and/or commitment to rein in the diversion and abuse of opioids;

i.  Manufacturer Defendants' misrepresentations that withdrawal is easily managed;

j.  Manufacturer Defendants' misrepresentations that they meet or exceed legal requirements for controlling against diversion of controlled substances they have been entrusted to handle;

k.  Manufacturer Defendants' use of front groups to misrepresent that the deceptive statements from the sources described in this Complaint came from objective, independent sources;

l.  Manufacturer Defendants' creation of a body of deceptive, misleading and unsupported medical and popular literature, advertisements, training materials, and speaker presentations about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of

176

Case ID: 210601660

independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

m.  Teva/Cephalon's misrepresentations that Actiq and Fentora were appropriate for treatment of non-cancer pain and its failure to disclose that Actiq and Fentora were not approved for such use; and,

n.  Such other misrepresentations and deceptions outlined above.

563.  By engaging in the acts and practices alleged herein, Defendants in the relevant time period with the intent that others rely on their omissions or suppression of information, omitted material facts that Defendants had a duty to disclose by virtue of these Defendants' other representations, including but not limited to:

a.  By Manufacturer Defendants: that opioids are highly addictive and may result in overdose or death;

b.  By Manufacturer Defendants: that no credible scientific evidence supports the use of screening tools as a strategy for reducing abuse or diversion;

c.  By Manufacturer Defendants: that high dose opioids subject the user to greater risks of addiction, other injury, and/or death;

d.  By Manufacturer Defendants: that opioids present the risks of hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, dizziness, increased falls and fractures in the elderly, neonatal abstinence syndrome, and potentially fatal interactions with alcohol or benzodiazepines; these omissions were made while Defendants exaggerated the risks of competing products such as NSAIDs;

177

Case ID: 210601660

    e.   By Manufacturer Defendants: that claims regarding the benefits of chronic opioid therapy lacked scientific support or were contrary to the scientific evidence;

    f.   Manufacturer Defendants' failure to report suspicious prescribers and/or orders;

    g.   Manufacturer Defendants' failure to disclose their financial ties to and role in connection with KOLs, front groups, and deceptive literature and materials, as more fully described above; and

    h.   Such other omissions and concealments as described above.

564.    In each of the circumstances described in, *inter alia,* the foregoing paragraph, Defendants knew that their failure to disclose rendered their prior representations untrue or misleading. Thus, Defendants had a duty not to deceive the City.

565.    In addition and independently, Defendants had a duty not to deceive the City because Defendants had in their possession unique material knowledge that was unknown, and not knowable, to the City, the City's agents, physicians, and the public.

566.    These Defendants made these false representations and concealed facts with knowledge of the falsity of their representations. These Defendants' false representations and concealed facts were material to the conduct and actions at issue.

567.    These false representations and concealments were reasonably calculated to deceive the City, the public, and the physicians who prescribed opioids for persons in Philadelphia, were  made with the intent to deceive, and did in fact deceive these persons, the City and the public.

178

Case ID: 210601660

568.    Defendants intended and had reason to expect under the operative circumstances that the City, the public, the physicians who prescribed opioids for persons in Philadelphia, and persons on whom the City and its agents relied would be deceived by Defendants' statements, concealments, and conduct as alleged herein, and that the City would act or fail to act in reasonable reliance thereon.

569.    Defendants intended that the City, physicians, the public, and persons on whom City and its agents relied would rely on these Defendants' misrepresentations and omissions; Defendants intended and knew that this reasonable and rightful reliance would be induced by these Defendants' misrepresentations and omissions; and, Defendants intended and knew that such reliance would cause the City to suffer loss.

570.    The City, its agents, the public, physicians who prescribed opioids, and persons on whom the City its agents relied, did in fact rightfully, reasonably, and justifiably rely on Defendants' representations and/or concealments, both directly and indirectly.  The Defendants knew or should have known that the City was directly and proximately injured as a result of this reliance.  The City's injuries were directly and proximately caused by this reliance.

571.    The injuries alleged by the City herein were sustained as a direct and proximate cause of the Defendants' fraudulent conduct.

572.    As a result of these representations and/or omissions, the City proceeded under the misapprehension that the opioid crisis was simply a result of conduct by persons other than Defendants.  As a consequence, these Defendants prevented the City from a more timely and effective response to the opioid crisis.

573.    By reason of its reliance on Defendants' misrepresentations and omissions of material fact, the City suffered damages.

179

Case ID: 210601660

574.    Defendants' misconduct alleged in this case is ongoing and persistent.

575.    Defendants' conduct was accompanied by wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

576.    Defendants' actions demonstrated both malice and also aggravated and egregious fraud.  Defendants engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm.

WHEREFORE, the City demands judgment against Defendants, jointly and severally, for the following:

    a.   damages to the fullest extent available by law in excess of $50,000, exclusive of interest and costs;

    b.   punitive damages;

    c.   litigation costs (including expert fees) and attorneys' fees;

    d.   prejudgment interest; and

    e.   such other and further relief as the Court deems just and proper.

## COUNT V
## UNJUST ENRICHMENT

577.    The City re-alleges all prior paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

578.    To prevail on a claim for unjust enrichment, one must show that: 1) benefits conferred on defendant by plaintiff; 2) appreciation of such benefits by defendant; and 3) retention of such benefits by the defendant under circumstances which are inequitable. *Discovery Bank v. Stucka*, 2011 Pa. Super. 241, 33 A.3d 82 (2011).

122329891-1

Case ID: 210601660

579.    Defendants have unjustly retained a benefit to the City's detriment, and the Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

580.    As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from the increase in the distribution and purchase of opioids within the City, including from opioids foreseeably and deliberately diverted within and into the City.

581.    Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

582.    The City has expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Defendants' conduct.

583.    These expenditures include the provision of healthcare services and treatment services to people who use opioids.

584.    These expenditures have helped sustain Defendants' businesses.

585.    The City has conferred a benefit upon Defendants by paying for Defendants' externalities: the cost of the harms caused by Defendants' improper distribution practices.

586.    Defendants were aware of these obvious benefits, and their retention of the benefit is unjust.

587.    The City has paid for the cost of Defendants' externalities and Defendants have benefited from those payments because they allowed them to continue providing customers with a high volume of opioid products.  The cost of Defendants' wrongful conduct in selling and distributing opioids includes, *inter alia,* increased healthcare services and addiction treatment for opioid users.  These costs are part of Defendants' business, yet Defendants are not paying for

Case ID: 210601660

them.  The City does, and these costs are not part of the normal and expected costs of a local government's existence.  By using the City to fund Defendants' negative externalities (i.e., the cost of the harms caused by their wrongful practices), Defendants knowingly saved on expenses, thereby allowing them to sell and distribute more opioids, and make more money, than if they had internalized the actual cost of their activities.  Defendants have thereby received a benefit unjustly financed by the City.

588.    Because of their deceptive marketing of prescription opioids, Manufacturer Defendants obtained enrichment they would not otherwise have obtained.  Because of their conscious failure to exercise due diligence in preventing diversion, Manufacturer Defendants obtained enrichment they would not otherwise have obtained.  The enrichment was without justification.

589.    Defendants have unjustly retained benefits to the detriment of the City, and Defendants' retention of such benefits violates the fundamental principles of justice, equity, and good conscience.

590.    Defendants' misconduct alleged in this case is ongoing and persistent.

591.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a city would reasonably expect to occur, and is not part of the normal and expected costs of a city government's existence.  The City alleges wrongful acts which are neither discrete nor of the sort a city government can reasonably expect.

592.    The City has incurred expenditures for special programs over and above its ordinary public services.

593.    In addition, the City has made payments for opioid prescriptions, and Defendants benefitted from those payments.  Because of their deceptive promotion of opioids and failure to

182

Case ID: 210601660

prevent diversion, Defendants obtained enrichment they would not otherwise have obtained. Retention of such benefits by the Defendants is inequitable because the City should not have had to pay for these opioid prescriptions.  The enrichment was without justification and the City lacks a remedy provided by law.

594.    By reason of Defendants' unlawful acts, the City has been damaged and continues to be damaged, in a substantial amount to be determined at trial.

WHEREFORE, the City demands judgment against Defendants, jointly and severally, for the following:

a.    seeks an order compelling Defendants to disgorge all unjust enrichment to the City;

b.    such other and further relief as the Court deems just and proper.

Dated: June 23, 2021                                        RESPECTFULLY SUBMITTED,


By:_____
                                                      Jerry R. DeSiderato (PA Bar No. 201097)

Diana Cortes, City Solicitor                       **DILWORTH PAXSON LLP**
(PA Bar No. 204274)                                 1500 Market Street, Suite 3500E
Eleanor N. Ewing, Chief Deputy Solicitor           Philadelphia, PA 19102
(PA Bar No. 28226)                                  Tel: (215) 575-7000
Benjamin H. Field, Deputy City Solicitor           JDeSiderato@dilworthlaw.com
(PA Bar No. 204569)
**CITY OF PHILADELPHIA LAW DEPT.**
1515 Arch Street, 17th Floor                       Professor David Kairys (PA Bar No. 14535)
Philadelphia, PA 19102                             P.O. Box 4073
Tel: (215) 683-5000                                8225 Germantown Avenue
diana.cortes@phila.gov                             Philadelphia, PA  19118
eleanor.ewing@phila.gov
benjamin.field@phila.gov                           Stephen A. Sheller (PA Bar No. 3270)
                                                   Lauren Sheller (PA Bar No. 314399)
Russell W. Budd (admitted *pro hac vice*)          **SHELLER, P.C.**
Christine C. Mansour (admitted *pro hac vice*)     1528 Walnut Street, 4th Floor
**BARON & BUDD, P.C.**                              Philadelphia, PA 19102
3102 Oak Lawn Ave, Suite 1100                      Tel: (215) 790-7300
Dallas, TX 75219                                   sasheller@sheller.com

122329891-1

Case ID: 210601660

Tel.: (214) 521-3605
rbudd@baronbudd.com
cmansour@baronbudd.com

Burton LeBlanc *(admitted pro hac vice)*
**BARON & BUDD, P.C.**
2600 Citiplace Drive
Baton Rouge, LA 70808
Tel.: (225) 927-5441
bleblanc@baronbudd.com

Jennifer F. Connolly *(admitted pro hac vice)*
**BARON & BUDD, P.C.**
600 New Hampshire Ave. NW, 10th Floor
Washington, DC 20037
Tel: (202) 333-4562
jconnolly@baronbudd.com

Mark P. Pifko *(admitted pro hac vice)*
**BARON & BUDD, P.C.**
15910 Ventura Blvd #1600
Encino, CA 91436
Tel: (818) 839-2333
mpifko@baronbudd.com

lsheller@sheller.com

Andrew Sacks (PA Bar No. 41390)
John Weston (PA Bar No. 26314)
**SACKS WESTON, LLC**
1845 Walnut Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 925-8200
asacks@sackslaw.com
jweston@sackslaw.com

Gregory B. Heller (PA Bar No. 61130)
**MCLAUGHLIN & LAURICELLA, P.C.**
One Commerce Square
2005 Market Street, Suite 2300
Philadelphia, PA 19103
Tel: (267) 238-1211
gheller@best-lawyers.com

*Counsel for Plaintiff, City of Philadelphia*

184

Case ID: 210601660

## VERIFICATION

I, Danielle E. Walsh, hereby state that I am a Deputy City Solicitor for the City of Philadelphia, and that I have authority to make this verification on behalf of the City. The averments in the Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements made herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Date: June 21, 2021



Danielle Walsh

Filed and Attested by the
Office of Judicial Records
23 JUN 2021 03:56 pm
S. RICE

122331148_1

# COMMERCE PROGRAM ADDENDUM
## TO CIVIL COVER SHEET

This case is subject to the Commerce Program because it is not an arbitration matter and it falls within one or more of the following types (check all applicable):

_____ 1. Actions relating to the internal affairs or governance, dissolution or liquidation, rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of business corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises, including but not limited to any actions involving interpretation of the rights or obligations under the organic law (e.g., Pa. Business Corporation Law), articles of incorporation, by-laws or agreements governing such enterprises;

**X** 2. Disputes between or among two or more business enterprises relating to transactions, business relationships or contracts between or among the business enterprises. Examples of such transactions, relationships and contracts include:

    _____ a. Uniform Commercial Code transactions;

    _____ b. Purchases or sales of business or the assets of businesses;

    **X** c. Sales of goods or services by or to business enterprises;

    _____ d. Non-consumer bank or brokerage accounts, including loan, deposit cash management and investment accounts;

    _____ e. Surety bonds;

    _____ f. Purchases or sales or leases of, or security interests in, commercial, real or personal property; and

    _____ g. Franchisor/franchisee relationships.

_____ 3. Actions relating to trade secret or non-compete agreements;

_____ 4. "Business torts," such as claims of unfair competition, or interference with contractual relations or prospective contractual relations;

_____ 5. Actions relating to intellectual property disputes;

_____ 6. Actions relating to securities, or relating to or arising under the Pennsylvania Securities Act;

_____ 7. Derivative actions and class actions based on claims otherwise falling within these ten types, such as shareholder class actions, but not including consumer class actions, personal injury class actions, and products liability class actions;

_____ 8. Actions relating to corporate trust affairs;

_____ 9. Declaratory judgment actions brought by insurers, and coverage dispute and bad faith claims brought by insureds, where the dispute arises from a business or commercial insurance policy, such as a Comprehensive General Liability policy;

_____ 10. Third-party indemnification claims against insurance companies where the subject insurance policy is a business or commercial policy and where the underlying dispute would otherwise be subject to the Commerce Program, not including claims where the underlying dispute is principally a personal injury claim.