**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CITY OF PHILADELPHIA, | : | |
| | : | |
| Plaintiff, | : | No. 2:25-cv-06185-GJP |
| | : | |
| vs. | : | |
| | : | |
| CVS HEALTH CORPORATION, et al. | : | |
| | : | |
| Defendants. | : | |
| | : | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 1

LEGAL STANDARD .............................................................................................. 4

ARGUMENT ............................................................................................................ 5

   I.   THE CITY'S CLAIMS ARE NOT TIME-BARRED........................................ 5

      A.  The City's RICO Claim is Timely........................................................ 5

      B.  The City's State Law Claims Are Timely. ............................................ 7

          1.  Nullum Tempus Applies to the City's Public Nuisance, Conspiracy, and Concerted Action Claims. ........................................................ 7

          2.  Several Tolling Doctrines Apply to the City's Claims............................ 8

   II.  THE CITY STATES A CIVIL RICO CLAIM. ................................................. 9

      A.  The City Alleges Injury to Business or Property. .................................... 10

      B.  Plaintiffs Adequately Allege Proximate Cause. ...................................... 11

      C.  The City is Entitled to Equitable Relief..................................................... 12

  III.  THE CITY HAS PROPERLY ALLEGED PUBLIC NUISANCE. ................... 13

      A.  The City's Claim Is Based on Interference with Public Rights. ................ 13

      B.  The City Alleges That Defendants Control the Oversupply of Opioids. ... 16

      C.  The City Is Not Required to Allege Special Injury..................................... 18

  IV.  THE CITY HAS PROPERLY ALLEGED A NEGLIGENCE CLAIM............. 18

      A.  Defendants Owed the City a Duty of Care. .............................................. 18

      B.  Defendants' Mail-Order Pharmacies Have Statutory Dispensing Duties. . 22

      C.  The City Has Sufficiently Alleged Proximate Causation. .......................... 22

      D.  The Municipal Cost Recovery Rule Does Not Bar the City's Claims........ 25

V.    THE CITY PROPERLY ALLEGES A PRIVATE UTPCPL CLAIM. ............................. 26

    A.  The City Is a "Person" Under the UTPCPL. ................................................. 26

    B.  The City is a Consumer of Goods and Services. ........................................ 27

    C.  The City Has Properly Stated A UTPCPL Claim Against CVS. ............................. 28

        1.  The City Alleges CVS Engaged in Unfair or Deceptive Acts. ............................ 28

        2.  The City Alleges Justifiable Reliance Resulting in Losses. .................................. 30

VI.   THE CITY'S CPO CLAIM SHOULD BE SUSTAINED. ............................................... 31

    A.  The UTCPCL and the CPO Do Not Conflict. ............................................... 33

    B.  The UTPCPL Does Not Demonstrate a Clear Intent to Preempt the Field. ................ 34

VII.  THE CITY STATES CLAIMS FOR CONSPIRACY AND CONCERTED ACTION. ................................................................................................... 35

VIII. THE CITY'S CLAIMS ARE NOT PREEMPTED BY ERISA OR MEDICARE. .......... 36

    A.  ERISA Preemption Does Not Apply. ........................................................ 36

    B.  Medicare Part D Preemption Does Not Apply. ............................................. 38

CONCLUSION ................................................................................................... 39

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adams v. Zimmer US, Inc.*,
    943 F.3d 159 (3d Cir. 2019)......................................................................9

*Alaska v. Express Scripts, Inc.*,
    Case No. 3:23-cv-00233-JMK, 2024 WL 2321210 (D. Alaska May 22, 2024)..........37, 38, 39

*Alaska v. Express Scripts, Inc.*,
    774 F. Supp. 3d 1150 (D. Alaska 2025) ........................................ 6, 10-11

*Alderwoods (Pennsylvania), Inc. v. Duquesne Light Co.*,
    106 A.3d 27 (Pa. 2014)...........................................................................20

*Applebaum v. Fabian*,
    No. 22-1049, 2022 WL 17090172 (3d Cir. Nov. 21, 2022) ....................................5

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................4

*Atlantic Richfield Co. v. County of Montgomery*,
    294 A.3d 1274 (Pa. Cmwlth. 2023) ..................................................14, 15, 16

*Bouriez v. Carnegie Mellon Univ.*,
    585 F.3d 765 (3d Cir. 2009)....................................................................23

*California v. Express Scripts, Inc.*,
    No. 23STCV20886 (Sup. Ct. Ca. Dec. 17, 2024)............................................37, 39

*Canyon County v. Sygenta Seeds, Inc.*,
    519 F.3d 969 (9th Cir. 2008) ..................................................................10

*Carmona v. New Jersey Dep't of Educ.*,
    No. 22-2874, 2023 WL 5814677 (3d Cir. Sept. 8, 2023) ......................................12

*Chambers Dev. Co. v. Browning-Ferris Indus.*,
    590 F. Supp. 1528 (W.D. Pa. 1984)...........................................................12

*Chevron Corp. v. Donzinger*,
    833 F.3d 74 (2d Cir. 2016).....................................................................12

*Cincinnati Ins. Co. v. PPL Corp.*,
    979 F. Supp. 2d 602 (E.D. Pa. 2013) .........................................................22

*Cincinnati v. Beretta U.S.A. Corp.*,
  768 N.E.2d 1136 (Ohio 2002) ...........................................................................26

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*,
  620 F. Supp. 3d 936 (N.D. Cal. 2022) ...............................................................25

*City of Boston v. Express Scripts, Inc.*,
  765 F. Supp. 3d 31 (D. Mass. 2025) ................................................................ 6-7

*City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*,
  719 F.2d 322 (9th Cir. 1983) .............................................................................25

*City of Philadelphia v. Beretta U.S.A. Corp.*,
  277 F.3d 415 (3d Cir. 2002), *aff'g* 126 F. Supp. 2d 882 (E.D. Pa. 2000)...................... *passim*

*City of Philadelphia v. Holmes Elec. Protective Co. of Philadelphia*,
  6 A.2d 884 (Pa. 1939)..........................................................................................7

*City of Pittsburgh v. Equitable Gas Co.*,
  512 A.2d 83 (Pa. Cmwlth. 1986) .......................................................................25

*Com. v. Barnes & Tucker Co.*,
  319 A.2d 871 (Pa. 1974) .....................................................................................14

*Com. ex rel. Pappert v. TAP Pharmaceutical Prods., Inc.*,
  885 A.2d 1127 (Pa. Cmwlth. 2005) ..............................................................27, 28

*Com. ex rel. Preate v. Danny's New Adam & Eve Bookstore*,
  625 A.2d 119 (Pa. Cmwlth. 1993) .....................................................................14

*Commonwealth by Creamer v. Monumental Props.*,
  329 A.2d 812 (Pa. 1974) .....................................................................................27

*Commonwealth ex rel. Shapiro v. Golden Gate Nat'l Senior Care LLC*,
  194 A.3d 1010 (Pa. 2018) ...............................................................27, 29, 30, 31

*Crawford v. Commonwealth*,
  326 A.3d 850 (Pa. 2024) ............................................................................ 32, 34-35

*Crouse v. Cyclops Indus.*,
  745 A.2d 606 (Pa. 2000) .......................................................................................9

*Diess v. Pennsylvania Dep't of Transp.*,
  935 A.2d 895 (Pa. Cmwlth. 2007) .....................................................................17

*Feld v. Merriam*,
  485 A.2d 742 (Pa. 1984) ...............................................................................19, 20

*Fitzpatrick v. Universal Tech. Inst., Inc.*,
  No. CIV.A. 08-1137, 2010 WL 3239173 (E.D. Pa. Aug. 11, 2010) ......................................19

*Gabriel v. Giant Eagle, Inc*.,
  124 F. Supp. 3d 550 (W.D. Pa. 2015).................................................................................22

*Gagliardi v. Kratzenberg*,
  404 F. Supp. 2d 858 (W.D. Pa. 2005)...................................................................................5

*Gregg v. Ameriprise Financial, Inc.*,
  245 A.3d 637 (Pa. 2021)....................................................................................29, 30, 31

*Groff v. Borough of Sellersville*,
  314 A.2d 328 (Pa. Cmwlth. 1974) ...........................................................................14

*Hausknecht v. John Hancock Life Ins. Co. of New York*,
  334 F. Supp. 3d 665 (E.D. Pa. 2018) .......................................................................11

*Hoffman Min. Co., Inc. v. Zoning Hearing Bd.*,
  32 A.3d 587 (Pa. 2011)............................................................................32, 33, 34

*Holmes v. Sec. Inv. Prot. Corp.*,
  503 U.S. 258 (1992)...........................................................................................11

*Holt's Cigar Co., Inc. v. City of Philadelphia*,
  10 A.3d 902 (Pa. 2011)....................................................................................33, 34

*Hunt v. United States Tobacco Co.*,
  538 F.3d 217 (3d Cir. 2008).....................................................................................28

*In re Actiq Sales & Marketing Pracs. Litig.*,
  790 F. Supp. 2d 313 (E.D. Pa. 2011) .......................................................................28

*In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*,
  804 F.3d 633 (3d Cir. 2015).........................................................................10, 11, 12

*In re Mushroom Transp. Co., Inc.*,
  382 F.3d 325 (3d Cir. 2004).....................................................................................7

*In re Nat'l Prescription Opiate Litig.*,
  2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ...............................................11, 21

*In re Nat'l Prescription Opiate Litig.*,
  406 F. Supp. 3d 672 (N.D. Ohio 2019)...................................................................16

*In re Nat'l Prescription Opiate Litig.*,
  477 F. Supp. 3d 613 (N.D. Ohio 2020)...................................................................22

*In re Nat'l Prescription Opiate Litig.*,
   622 F. Supp. 3d 584 (N.D. Ohio 2022), *rev'd and remanded on other grounds,*
   No. 22-3750, 2025 WL 354758 (6th Cir. Jan. 31, 2025)......................................................25

*In re Nat'l Prescription Opiate Litig.*,
   No. 1:17-MD-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019) .....................................26

*In re Nat'l Prescription Opiate Litig.*,
   No. 19-op-45853, 2024 WL 4912429 (N.D. Ohio Aug. 22, 2024) ................................6, 7, 10

*In re: Opioid Litig.*,
   Civ. No. 21-C-9000 (W. Va. MLP July 1, 2022).....................................................................16

*James v. Arms Tech., Inc.*,
   820 A.2d 27 (N.J. App. Div. 2003).................................................................................. 25-26

*Jones v. Montefiore Hosp.*,
   431 A.2d 920 (Pa. 1981)................................................................................................. 22-23

*Jordan v. City of Philadelphia*,
   66 F. Supp. 2d 638 (E.D. Pa. 1999) .......................................................................................23

*Kalan v. Farmers & Merchants Trust Co. of Chambersburg*,
   No. 15-1435, 2015 WL 13874056 (E.D. Pa. Nov. 23, 2015) ...................................................8

*Kleinknecht v. Gettysburg Coll.*,
   989 F.2d 1360 (3d Cir. 1993)...........................................................................................18, 19

*Maio v. Aetna, Inc.*,
   221 F.3d 472 (3d Cir. 2000)...................................................................................................10

*Mars Emergency Medical Srvs., Inc. v. Township of Adams*,
   740 A.2d 193 (Pa. 1999).........................................................................................................34

*Meyer v. Community College of Beaver County*,
   93 A.3d 806 (Pa. 2014)......................................................................................................26, 27

*MFW Wine Co. v. Pennsylvania Liquor Control Board*,
   318 A.3d 100 (Pa. 2024)..........................................................................................................27

*Muehlieb v. City of Philadelphia*,
   574 A.2d 1208 (Pa. Cmwlth. 1990) ..................................................................................14, 18

*Nat'l Org. for Women, Inc. v. Scheidler*,
   267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003).........................12

*New Mexico v. Purdue Pharma, L.P., et al*,
   No.: D-101-CV-2017-02541 (Santa Fe County, NM) ............................................................25

*Newcal Industries, Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ...................................................................................11

*Norman v. Elkin*,
    860 F.3d 111 (3d Cir. 2017)........................................................................................8

*Nutter v. Dougherty*,
    938 A.2d 401 (Pa. 2007) ...................................................................... 32-33, 34, 35

*O'Reilly v. Inst. for Cancer Rsch.*,
    No. CV 24-5315-KSM, 2025 WL 1534969 (E.D. Pa. May 29, 2025) ......................4

*Ohio Cnty. Comm'n v. Express Scripts, Inc.*,
    No. 5:24-CV-142, 2024 WL 5701504 (N.D. W.Va. Dec. 23, 2024).................................6, 21

*Pennsylvania Soc'y for Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.*,
    237 A.2d 342 (Pa. 1968) ...........................................................................................18

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Sec. Transactions, Inc.*,
    730 F.3d 263 (3d Cir. 2013).........................................................................................5

*Pharm. Care Mgmt. Ass'n v. Mulready*,
    78 F.4th 1183 (10th Cir. 2023) .................................................................................38

*Pharm. Care Mgmt. Ass'n v. Wehbi*,
    18 F.4th 956 (8th Cir. 2021) ..............................................................36, 37, 38, 39

*Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*,
    359 F.3d 226 (3d Cir. 2004)..........................................................................................5

*Reformed Church of Ascension v. Theodore Hooven & Sons, Inc.*,
    764 A.2d 1106 (Pa. Super. 2000)...............................................................................24

*Reid v. Brodsky*,
    156 A.2d 334 (Pa. 1959) ...........................................................................................14

*Rost v. Ford Motor Co.*,
    151 A.3d 1032 (Pa. 2016) ..........................................................................................17

*Rutledge v. Pharm. Care Mgmt. Ass'n*,
    592 U.S. 80 (2020)............................................................................................36, 37

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014)..........................................................................................5

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)......................................................................................................9

*State of Rhode Island v. Purdue Pharma, L.P.*,
No. PC-2018-4555, 2019 WL 3991963 (R.I. Super. Ct. Aug. 16, 2019) ..............................16

*Straw v. Fair*,
187 A.3d 966 (Pa. 2018) ......................................................................................................20

*Toy v. Metropolitan Life Ins. Co.*,
928 A.2d 186 (Pa. 2007) ......................................................................................................31

*Twp. of Indiana v. Acquisitions & Mergers, Inc.*,
770 A.2d 364 (Pa. Cmwlth. 2001) ........................................................................................7

*Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc.*,
574 A.2d 641 (Pa. Super. 1990) ..........................................................................................28

*Van Buskirk v. Carey Canadian Mines, Ltd.*,
760 F.2d 481 (3d Cir. 1985) .............................................................................................5, 7

*Walters v. UPMC Presbyterian Shadyside*,
187 A.3d 214 (Pa. 2018) ........................................................................................19, 20, 21

*Warren v. City of Philadelphia*,
115 A.2d 218 (Pa. 1955) ......................................................................................................34

*Wellock v. Taylor Hospital, Inc.*,
No. 10-2883, 2010 WL 11711521 (E.D. Pa. July 29, 2010) ..................................................8

*Werner v. Plater-Zyberk*,
799 A.2d 776 (Pa. Super. 2002) ..........................................................................................24

*Western Pennsylvania Restaurant Association v. City of Pittsburgh*,
77 A.2d 616 (Pa. 1951) ................................................................................................. 33-34

*Wisniewski v. Fisher*,
857 F.3d 152 (3d Cir. 2017) ...........................................................................................4, 5, 7

**Federal Statutes**

18 U.S.C. § 1964(a) .................................................................................................................12

18 U.S.C. § 1964(c) ...................................................................................................................9

29 U.S.C. § 1144(a) .................................................................................................................36

42 U.S.C. § 1395w-26(b)(3) .....................................................................................................38

42 U.S.C. § 1395w-112(g) ........................................................................................................38

**State Statutes**

49 Pa. Code § 27.18 .................................................................................................22

53 Pa. C.S. §§ 2901 *et seq.* ....................................................................................34

53 Pa. C.S. § 2962(e) ..............................................................................................34

53 P.S. §§ 13101-13157 ..........................................................................................32

53 P.S. § 13131 ...............................................................................................32, 35

53 P.S. § 13133 .......................................................................................................32

73 P.S. § 201-2(2) ...................................................................................................26

73 P.S. § 201-2(4) .............................................................................................32, 33

73 P.S. § 201-2(4)(ii) .........................................................................................28, 29

73 P.S. § 201-2(4)(v) .........................................................................................28, 29

73 P.S. § 201-2(4)(xxi) ..............................................................................28, 29, 30

73 P.S. § 201-3 ........................................................................................................33

73 P.S. § 201-9.2(a) ..........................................................................................26, 27

Phila. Code §§ 9-6301 to 9-6307 ...........................................................................31

Phila. Code § 9-6301(d) ....................................................................................32, 33

Phila. Code § 9-6302 ..............................................................................................33

Phila. Code § 9-6307 .........................................................................................31-32

**Rules**

Fed. R. Civ. P. 12(b)(6) ..........................................................................................4, 5

**Regulations**

83 F.R. 16440-1,
    2018 WL 1783794 (April 16, 2018) ..................................................................39

**Other Authorities**

Restatement (Second) of Torts § 821C ...............................................................8, 18

## INTRODUCTION

The City of Philadelphia seeks to hold Defendants, three pharmacy benefit managers ("PBMs") and related entities, liable for their long-hidden role in creating and exacerbating the opioid crisis that has ravaged the City. Defendants administer prescription drug benefit plans for health insurers, employers, and government agencies. Those health plans rely on Defendants not only to use their expertise and skill to design a prescription drug program that protects the health and safety of their beneficiaries, but also to use their contractual relationships with opioid manufacturers and pharmacies to provide cost-effective access to prescription drugs for their beneficiaries. Instead of serving their health plan clients, however, Defendants served themselves. Defendants conspired with opioid manufacturers to promote opioid use and facilitate unrestricted access to these dangerous drugs, for which the manufacturers richly rewarded them. Defendants did so knowing that opioids pose serious risks of addiction and abuse and that they were fueling the opioid epidemic the drug manufacturers had sparked. Their conduct exacerbated the oversupply of prescription opioids in Philadelphia, causing a public health and safety crisis.

To hold Defendants accountable for their actions, the City brings claims for civil RICO, public nuisance, negligence, violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL) and Philadelphia's Consumer Protection Ordinance (CPO), civil conspiracy, concerted action, and breach of contract. Defendants urge this Court to dismiss the City's claims on the theory that the City seeks to blame them for the acts of third parties, including individuals who used or abused opioids and criminals. But the City's claims target Defendants' own conduct and this Court should deny their motion to dismiss.

## STATEMENT OF FACTS

The City filed its action on October 30, 2025, against three corporate families of Defendants: CVS Caremark ("CVS"), Express Scripts, and Optum. ECF 1 ("Compl.") at 1.

Within each family, the City's allegations focus on two types of actors: PBMs and mail-order pharmacies. The Complaint alleges that the PBMs colluded with opioid manufacturers, such as Purdue Pharma, Allergan, Johnson & Johnson/Janssen, Endo, Insys, Mallinckrodt, Purdue, and Teva/Cephalon, to expand the opioid market. *See, e.g.*, Compl. ¶¶ 6, 324, 342-45, 365, 559-60. In exchange for rebates and fees from opioid manufacturers, the PBMs agreed to favorably place opioids on their national formularies (lists of covered drugs available to patients) and limit utilization management ("UM") measures, such as quantity limits and prior authorization, that would have restricted opioid prescribing. *See, e.g., id.* ¶¶ 6, 162-63, 169, 309, 319-53.

Defendants also conspired with opioid manufacturers to fraudulently market opioids, including by disseminating the manufacturers' "false messages about chronic pain and addiction to high prescribers and patients" and providing "research, data, and consulting services to the opioid manufacturers to assist in expanding the opioid market." *Id.* ¶ 365; *see also id.* ¶¶ 6, 366-413. In addition, Defendants possessed extensive prescription data that demonstrated that opioids were being abused and diverted, but instead of using this information to help their client health plans identify and restrict such abuse, Defendants sold it to the manufacturers to assist their marketing. *Id.* ¶¶ 6, 215-31, 235-36, 238-41, 261-84. "Because of all of data they possessed, the PBM Defendants were well aware that the volume of opioids being prescribed in the United States, including in Philadelphia, far exceeded an amount that could possibly be justified as medically necessary or appropriate." *Id.* ¶ 229. The City further alleges that Defendants' mail-order pharmacies dispensed voluminous quantities of prescription opioids in Philadelphia without complying with their statutory and professional duties under federal and state law to ensure that the prescriptions were for a legitimate medical purpose. *See, e.g., id.* ¶¶ 433, 454, 470-72.

All of this conduct resulted in an oversupply of opioids in Philadelphia that has substantially interfered with the public rights of health, safety, and enjoyment of public spaces. *See, e.g., id.* ¶¶ 492-512, 515-18, 520, 530, 709, 722. The City seeks abatement relief for that public nuisance. *Id.* ¶¶ 12, 726. In addition, Defendants' collusion with opioid manufacturers to promote opioid prescribing and sales, without regard for public safety, resulted in financial losses and property damage to the City, in violation of the federal RICO statute. *See, e.g., id.* ¶¶ 788-90, 806, 812, 816-21. That same coordinated conduct also renders Defendants liable for civil conspiracy and concerted action. *See, e.g., id*. ¶¶ 823-24, 826-27, 833, 839, 842-53.

The City also seeks damages against CVS under the UTPCPL and for breach of contract. *Id*. ¶¶ 729-49. As the City's PBM, CVS engaged in unfair and deceptive conduct, including by misrepresenting to the City that its formularies were designed to protect patient health and safety and reduce costs when instead they maximized unrestricted opioid use to increase CVS's own profits, and by partnering with manufacturers to fraudulently market opioids. *See, e.g., id*. ¶¶ 361-94, 552-58, 615, 624, 627, 858-59. And CVS's mail-order pharmacy held itself out as a law-abiding pharmacy even though it failed to ensure that it only dispensed opioids prescribed for a legitimate medical purpose. *See, e.g., id*. ¶¶ 476-79, 481-82. As a result, the City purchased more opioid prescriptions than it otherwise would have. *See, e.g., id*. ¶¶ 478, 481, 484. Some of this same conduct, as well as CVS' withholding of rebates owed to the City, violated CVS's duties under its contracts with the City. *See, e.g., id*. ¶¶ 552-58, 858-59.

The City further alleges that Defendants violated Philadelphia's CPO by engaging in the same type of unfair and deceptive behavior as CVS. *See, e.g., id*. ¶¶ 750-66. This includes misrepresentations about opioids' safety, colluding with manufacturers to increase opioid prescribing and dispensing, and misrepresenting that their services were designed to protect patient

safety and prevent diversion, all of which harmed individuals in Philadelphia. *Id.* ¶¶ 361-94, 552-58, 616, 627, 759, 858-59. And because it was foreseeable that Defendants' conduct would result in an oversupply of opioids and harm Philadelphia, Defendants owed the City a duty to carry out their services with reasonable care to avoid such harm. *See, e.g., id.* ¶ 768. Defendants were negligent in failing to do so. *See, e.g., id.* ¶¶ 770-71, 774-75.

Moreover, Defendants steadfastly concealed their misconduct, safeguarding their confidential agreements with opioid manufacturers that created a conflict of interest for them. *Id.* ¶¶ 181, 681. Defendants thereby prevented the City from discovering their significant contribution to Philadelphia's opioid crisis. *Id.* ¶¶ 2, 672, 677-85. Only after highly confidential documents were produced in other opioid litigation in late 2021 and thereafter was the City able to investigate and discover Defendants' conflict of interest, their contribution to the City's injuries, and the pattern of conduct that gave rise to those injuries. *Id.* ¶¶ 1-2, 673, 676. Defendants fraudulently concealed this conduct, which still continues, harming Philadelphia. *Id.* ¶¶ 8, 487, 514, 677-90.

## LEGAL STANDARD

To prevail on their Rule 12(b)(6) motion to dismiss, Defendants must show that the complaint fails to allege sufficient facts to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017). A plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary" elements of the claim. *O'Reilly v. Inst. for Cancer Rsch.*, No. CV 24-5315-KSM, 2025 WL 1534969, at *4 (E.D. Pa. May 29, 2025).

## ARGUMENT

### I.   THE CITY'S CLAIMS ARE NOT TIME-BARRED.

A Rule 12(b)(6) motion may raise a statute of limitations defense only when the untimeliness of the claim is "apparent on the face of the complaint." *Wisniewski*, 857 F.3d at 157; *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (same).  Because "the applicability of the statute of limitations usually involves questions of fact for the jury, defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred." *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 498 (3d Cir. 1985). Defendants fail to meet that burden.

### A.  The City's RICO Claim is Timely.

Defendants contend (ECF 85-1 at 5-6) that the City's RICO claim is time-barred, but apply the wrong standard for accrual of such a claim.  A RICO claim accrues when the plaintiff knows, or should know, of *both* its injury *and the source of its injury*. *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F.3d 226, 233 (3d Cir. 2004) (noting that "these *two requirements* 'w[ere] required to trigger the running of [RICOs'] four-year limitations period'") (emphasis added); *accord Applebaum v. Fabian*, No. 22-1049, 2022 WL 17090172, at *1 (3d Cir. Nov. 21, 2022).[1]

The City alleges that it did not discover that Defendants caused its injury until after "documents revealing those facts were produced" in other opioid litigation "in late 2021 and thereafter."  Compl. ¶ 673; *id.* ¶¶ 1-2, 673 (statute "did not begin to run until 2022, at the earliest"). These documents, not previously public or known to the City, revealed Defendants' secret collusion with opioid manufacturers for over twenty years to increase opioid prescribing and sales.

---

[1] Defendants' cited cases do not hold otherwise. Defendants omit that *Gagliardi v. Kratzenberg*, 404 F. Supp. 2d 858 (W.D. Pa. 2005), recognized *Prudential Insurance*'s rule that a plaintiff must discover the source of its injury. *Id.* at 865-66. And their quotation from *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Sec. Transactions, Inc*., 730 F.3d 263 (3d Cir. 2013), articulates the standard in the *Second* Circuit. *Id.* at 274.

*Id.* ¶¶ 1-2, 181, 324, 720.   Further investigation of those facts uncovered that Defendants' partnership with the opioid manufacturers created a conflict of interest for Defendants, which resulted in Defendants not performing their PBM services to protect the health and safety of patients, as represented to their health plan clients and the public, but instead to promote opioid use and prescribing, which generated revenue for Defendants.  *Id.*; *see also id.* ¶¶ 181, 681.  Taking these allegations as true, the City has alleged that its RICO claim did not accrue until 2022, when it discovered that Defendants were a source of its injuries, after investigating and piecing together the evidence produced in late 2021.  Even if the City knew of its injury earlier, as Defendants suggest (at 5-6), there are no allegations that the City knew, prior to 2022, of Defendants' role in that injury.  Because the City's Complaint was filed in October 2025, this Court cannot conclude as a matter of law that the Complaint was untimely.

Other courts have rejected similar arguments that RICO claims against PBMs are time-barred because of facts disclosed in prior opioid litigation against different defendants.  For example, in *Alaska v. Express Scripts, Inc.*, 774 F. Supp. 3d 1150 (D. Alaska 2025), the court held that: 1) the State's prior opioid litigation in 2017 and 2018, and another case by a different plaintiff against the same defendant, did not establish that the State knew the facts constituting its RICO claim against the PBM, and 2) whether these prior suits were sufficient to put the State on notice is a question of fact. *Id.* at 1165-66; *see also In re Nat'l Prescription Opiate Litig.*, No. 19-op-45853, 2024 WL 4912429, at *4-7 (N.D. Ohio Aug. 22, 2024); *Ohio Cnty. Comm'n v. Express Scripts, Inc.,* No. 5:24-CV-142, 2024 WL 5701504, at *2-4 (N.D. W.Va. Dec. 23, 2024). Moreover, Defendants' reliance (at 5-6) on *City of Boston v. Express Scripts, Inc.*, 765 F. Supp. 3d 31 (D. Mass. 2025) (appeal pending), is misplaced because, in that case, accrual of Boston's RICO claim turned only on when it discovered its injury, not its source.  *Id.* at 38, 41-42 (applying First Circuit's

injury discovery rule). But even if the City's RICO claim were untimely, the City could still pursue its requested equitable relief, *see* Compl. ¶¶ 821(a)-(g), (i), (l). *See, e.g., In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 337 (3d Cir. 2004) ("statutes of limitations do not directly apply to equitable claims"); *In re Nat'l Prescription Opiate Litig.*, 2024 WL 4912429, at *4-5.

**B.  The City's State Law Claims Are Timely.**

The City's state law claims are also timely.  The allegations in the Complaint, including application of various tolling provisions, do not demonstrate that any of the City's claims are time-barred.  *See, e.g., Wisniewski*, 857 F.3d at 157.  At a minimum, those allegations raise factual questions precluding this Court from conclusively resolving on a motion to dismiss that any of the City's claims are barred by the statute of limitations. *Van Buskirk*, 760 F.2d at 498.

**1.  Nullum Tempus Applies to the City's Public Nuisance, Conspiracy, and Concerted Action Claims.**

Under the doctrine of nullum tempus, no statute of limitations runs against the City's public nuisance claim, or against its conspiracy and concerted action claims based on the nuisance.  "It is well settled that municipalities, counties or other political subdivisions, though not vested with Commonwealth status, may still invoke nullum tempus provided they do so in an effort to enforce strictly public rights and obligations imposed by law." *Twp. of Indiana v. Acquisitions & Mergers, Inc.*, 770 A.2d 364, 371 (Pa. Cmwlth. 2001); *accord City of Philadelphia v. Holmes Elec. Protective Co. of Philadelphia*, 6 A.2d 884, 887 (Pa. 1939). Because the City's public nuisance claim seeks to enforce well-established public rights, such as public health, safety, and public spaces, *see infra* Section III.A, nullum tempus applies.

Defendants contend (at 9) that nullum tempus applies only if the City is "acting in an exclusively governmental way" that could not be pursued by "any private litigant."  But the City's public nuisance claim is exactly that.  The City, as a governmental entity, brings its public nuisance

claim solely to enforce strictly public rights.  A private litigant cannot bring such a claim absent a showing that he suffered special injury. *See infra* Section III.C.  Nor is the City acting like a private litigant because it seeks "damages for alleged harms," as Defendants contend (at 9-10). The City does not seek compensatory damages, but equitable abatement relief. Compl. ¶ 821; *id.* at; *id.* at p. 275-76, Prayer for Relief, ¶ (a).  Indeed, public entities are precluded from seeking damages in a public nuisance action.  *See, e.g.*, Restatement (Second) of Torts § 821C.

### 2.  Several Tolling Doctrines Apply to the City's Claims.

The Complaint invokes the discovery rule, fraudulent concealment, and equitable estoppel. Defendants, improperly relying on extrinsic evidence,[2] argue (at 10-11) that none of these doctrines applies because the City knew of its injury by 2018 or 2019.  But the City alleges that, despite other opioid suits filed against PBMs in 2018 or 2019, the City was not on inquiry notice as to Defendants' role in its injury until after critical documents on which those lawsuits were based were produced in the MDL "in late 2021 and thereafter." Compl. ¶¶ 1-2, 673-74.  At a minimum, determining when the City had inquiry notice as to its claims against Defendants is "a fact intensive inquiry," *Norman v. Elkin*, 860 F.3d 111, 127 (3d Cir. 2017), which precludes dismissal.

The City further alleges that Defendants fraudulently concealed their unlawful conduct, preventing the City from discovering its injury.  Compl. ¶¶ 677-85. For example, Defendants went to great lengths to keep their manufacturer agreements confidential to obscure their powerful

---

[2] Defendants' reliance (at 7-8) on exhibits outside of the Complaint to demonstrate the supposed untimeliness of the City's claims is improper on a motion to dismiss.  *See, e.g., Wellock v. Taylor Hospital, Inc.*, No. 10-2883, 2010 WL 11711521, at *1 n.1 (E.D. Pa. July 29, 2010) (refusing to address statute of limitations issue on motion to dismiss where defendants relied on exhibits outside of complaint); *Kalan v. Farmers & Merchants Trust Co. of Chambersburg*, 2015 WL 13874056 at *1 n.1 (E.D. Pa. Nov. 23, 2015).  Moreover, resolving Defendants' limitations argument at this stage would deprive the parties of an opportunity to discover and present facts as to the applicability of any tolling provisions.  *Kalan*, 2015 WL 13874056 at *1 n.1.

financial motivation to avoid any restrictions on opioid prescribing and use. *Id.* ¶¶ 681, 683. Defendants also professed both to their clients and the public that their services complied with the law and that they were working to curb opioid abuse. *Id.* ¶¶ 677, 681. Defendants intended this fraudulent conduct to prevent their clients and the public from discovering their wrongful acts and self-dealing. *Id.* ¶¶ 677-85. These allegations are likewise sufficient to create a factual question as to when the City discovered, or should have discovered, its injury, thereby precluding dismissal on statute of limitations grounds. *See, e.g., Adams v. Zimmer US, Inc.*, 943 F.3d 159, 164 (3d Cir. 2019) (if claim is potentially timely, including because of tolling, factfinder should resolve); *Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000) ("[O]nly where the facts are so clear that reasonable minds *cannot differ* may the … limitations period be determined as a matter of law.") (emphasis in original).

The City also invokes the continuing violations doctrine, alleging that Defendants' "wrongful conduct alleged herein is of a persistent and continuing nature." Compl. ¶ 686. The City further alleges that "Defendants' tortious conduct has not ceased," *id*. ¶ 688, and their "wrongful conduct which caused the opioid epidemic . . . remains unabated," *id*. ¶ 690. Contrary to Defendants' assertion (at 11-12), therefore, the City has alleged "continuing acts," not just "continuing *harm*." Accordingly, even if the Court were to conclude that some of the City's claims may be untimely, the City has sufficiently pled circumstances that create a factual question as to whether those claims are tolled, thereby precluding dismissal.

## II.    THE CITY STATES A CIVIL RICO CLAIM.

The RICO Act permits "[a]ny person injured in his business or property by reason of" a RICO violation to bring a civil action. 18 U.S.C. § 1964(c). "RICO is to be read broadly" and "liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985). To establish standing, a RICO plaintiff must show that: (1) the plaintiff

suffered an injury to business or property; and (2) the plaintiff's injury was proximately caused by a RICO violation. *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000). The City has alleged both.

### A. The City Alleges Injury to Business or Property.

Philadelphia alleges that Defendants' wrongdoing in creating the opioid epidemic injured the City in its business and property because the City has: (1) borne costs to provide additional, extraordinary public services; (2) been forced to purchase naloxone; (3) suffered diminished property values, as well as lost business investments and business tax revenue; (4) lost income tax revenue due to a reduced working population in Philadelphia; and (5) purchased prescription opioids that it would not otherwise have purchased. *See, e.g.*, Compl. ¶¶ 816-17.

The Third Circuit has broadly held that the "business or property" injury "can be satisfied by allegations and proof of actual monetary loss, i.e., an out-of-pocket loss." *Maio*, F.3d at 483; *see also In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633, 638 (3d Cir. 2015). Most, if not all, of the City's alleged injuries qualify as such losses. Compl. ¶¶ 816-17. Despite this precedent, Defendants contend (at 14) that *Canyon County v. Sygenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008), excludes governmental expenditures for public services as cognizable RICO injuries. The Supreme Court, however, has not adopted that limitation, and the federal opioid MDL rejected it, holding that municipalities that pled similar injuries against many of these same defendants satisfied RICO's injury requirement. *In re Nat'l Prescription Opiate Litig.,* No. 19-op-45853, 2024 WL 4912429, at *12-15 (N.D. Ohio Aug. 22, 2024).

In any event, even *Canyon County* (and the other cases Defendants cite (at 14)) recognizes that governmental entities *can* recover costs associated with doing business in the marketplace, which would, at a minimum, include the City's costs for purchasing opioids and naloxone. 519 F.3d at 978 (business or property includes "states' interests as ordinary marketplace actors"); *Alaska*, 774 F. Supp. 3d at 1170-72 (under *Canyon County* purchases of naloxone and opioids and

lost property values are cognizable RICO injuries). Thus, even under the Ninth Circuit's more restrictive reading of RICO's injury requirement, the City has alleged cognizable RICO injuries.

### B. Plaintiffs Adequately Allege Proximate Cause.

Proximate cause under RICO requires "some direct relation" between the plaintiff's injury and the defendant's RICO violation. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). The three relevant factors are: 1) the directness of the injury; 2) the risk of multiple recoveries; and 3) whether there are more immediate victims. *Hausknecht v. John Hancock Life Ins. Co. of New York*, 334 F. Supp. 3d 665, 680 (E.D. Pa. 2018) (quoting *Avandia*, 804 F.3d at 642-44). Because proximate cause is a factual question, it is rarely appropriate to resolve on a motion to dismiss. *See, e.g., Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1055 (9th Cir. 2008).

The City's allegations demonstrate a direct relation between its injuries and Defendants' RICO violation. The City alleges that Defendants' coordinated efforts with opioid manufacturers: 1) caused an oversupply of opioids; 2) the oversupply of opioids was foreseeably diverted into an illegal market; and 3) the City bore the costs, including extraordinary costs to carry out its governmental functions, lost tax revenue, and diminished property values. *See, e.g.*, Compl. ¶¶ 6, 789-90, 806, 810, 812-13, 816-21, 849. None of those injuries derive from personal injuries to third parties, such as opioid users, as Defendants contend (at 13). Indeed, the federal opioid MDL rejected that argument in denying a motion to dismiss municipalities' RICO claims based on a similar chain of causation. *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898 at *5-6 (N.D. Ohio Dec. 19, 2018) ("Plaintiffs' asserted economic injuries are borne by them and not passed-on by an intermediate party standing less removed from Defendants' actions.").

*Avandia*, cited by Defendants (at 13), further supports the conclusion that the City's injuries are direct and do not derive from third parties. In that case, third party payors (TPPs) filed a RICO action against a drug manufacturer, based on its sales representatives' misrepresentations that its

11

medication was safe, which caused the TPPs to include the drug on their formularies and cover it at favorable rates. *Avandia*, 804 F.3d at 634-36. The Third Circuit held that the TPPs sufficiently alleged proximate causation because "[t]he conduct that allegedly caused plaintiffs' [economic] injuries is the same conduct forming the basis of the RICO scheme alleged in the complaint," and the TPPs' alleged injury is "independent of any physical injury suffered by Avandia users." *Id*. at 644. Similarly here, the City's injuries are independent of and separate from any injuries suffered by individual opioid users. The City, therefore, has sufficiently alleged proximate causation.

**C.  The City is Entitled to Equitable Relief.**

Defendants rely on Fourth and Ninth Circuit rulings (at 12) to argue that the City may not seek equitable relief under RICO. But the Third Circuit has not adopted the same rule. In fact, subsequent to those rulings, the Third Circuit expressly stated that "[n]either the Supreme Court nor this Court has decided" "whether RICO establishes a private right of equitable relief." *Carmona v. New Jersey Dep't of Educ.*, No. 22-2874, 2023 WL 5814677, at *6 n.12 (3d Cir. Sept. 8, 2023). Thus, there is no rule in this circuit barring the City's request for equitable relief.

In any event, the Second and Seventh Circuits persuasively explained that § 1964(a) "expansively authoriz[es] federal courts to exercise their traditional equity powers," including for private plaintiffs to seek equitable relief, because that subsection sets out a non-exclusive list of remedies, including injunctive relief, and does not "limit the court's subsection (a) authority by reference to the identity or nature of the plaintiff." *Chevron Corp. v. Donzinger*, 833 F.3d 74, 137-140 (2d Cir. 2016); *see also Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 697-700 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003). At least one court in this circuit, after a full statutory analysis, reached the same conclusion. *See, e.g.*, *Chambers Dev. Co. v. Browning-Ferris Indus.*, 590 F. Supp. 1528, 1540-41 (W.D. Pa. 1984). This Court should follow suit.

## III.     THE CITY HAS PROPERLY ALLEGED PUBLIC NUISANCE.

Defendants argue that the City's public nuisance claim is deficient because the City fails to allege: (1) interference with public, as opposed to individual, rights; (2) that Defendants controlled the source of the nuisance; and (3) special injury.  Each argument lacks merit.

### A.  The City's Claim Is Based on Interference with Public Rights.

The City alleges injury to at least three separate public rights: public safety, public health, and the right to enjoy public spaces.  The Complaint alleges that Defendants' actions enabled opioid use and abuse, which adversely impacted Philadelphians' public health, including by increasing the risk of addiction, abuse, and overdoses from these drugs, and from heroin and fentanyl. *See, e.g.*, Compl. ¶¶ 492-99, 507, 530, 709, 722. Defendants' conduct also contributed to historically high rates of babies born addicted to opioids and an unprecedented increase in new hepatitis C infections caused by opioid injections. *Id*. ¶¶ 500-03.  Other public health and safety effects from Defendants' actions include more drivers under the influence of opioids, putting all City residents in greater danger of automobile accidents, and improper disposal of used needles and other toxic waste, open air drug markets, and an increased risk of needle sticks. *Id.* ¶¶ 490, 508-12, 515-16.  Defendants' conduct also increased crime in Philadelphia, including violent crime and homicides, theft, and crimes committed under the influence of opioids, putting all Philadelphians at risk. *Id.* ¶¶ 490, 505, 508-11, 520, 531.

The Complaint also alleges that Defendants have interfered with the public right to enjoy public spaces. By fueling the oversupply of opioids in Philadelphia, Defendants exposed all City residents, including children, to opioid abuse (including witnessing overdoses and emergency responses) in public places, such as libraries, parks, and city streets. *See, e.g., id*. ¶¶ 490, 509, 521, 530. City residents have suffered opioid-related disturbances, including crime, and other disruptive and objectionable behavior on public property. *Id*. ¶¶ 490, 509, 511, 520, 530. The opioid epidemic

has increased the homeless population in Philadelphia, further interfering with the traditional use and enjoyment of public spaces, such as streets and parks. *Id*. ¶¶ 490, 512, 530.

Pennsylvania's public nuisance law has long protected these public rights of health, safety, and enjoyment of public spaces. *See, e.g., Com. v. Barnes & Tucker Co.*, 319 A.2d 871, 882 (Pa. 1974) (pollution that "menaces the public health becomes a nuisance"); *Reid v. Brodsky*, 156 A.2d 334, 338-39 (Pa. 1959) (taproom was nuisance where "public conduct of the [intoxicated] patrons . . . offend[ed] the sensibilities of the residents" and "seriously interfere[d] with the residential character" of the neighborhood); *Com. ex rel. Preate v. Danny's New Adam & Eve Bookstore*, 625 A.2d 119, 122 (Pa. Cmwlth. 1993) (sexual conduct on premises, which risked spread of HIV, posed a "significant threat to the public health"); *Muehlieb v. City of Philadelphia*, 574 A.2d 1208, 1211 (Pa. Cmwlth. 1990) (keeping twenty dogs in private residence, resulting in foul odors and noise, interfered with public rights to "health, safety, and welfare"); *Groff v. Borough of Sellersville*, 314 A.2d 328, 331 (Pa. Cmwlth. 1974) (dilapidated structure that was fire hazard and risk to children was public nuisance).

Defendants argue (at 15) that *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415 (3d Cir. 2002), *aff'g* 126 F. Supp. 2d 882 (E.D. Pa. 2000), and *Atlantic Richfield Co. v. County of Montgomery*, 294 A.3d 1274 (Pa. Cmwlth. 2023), preclude the City's public nuisance claim. They contend that those cases establish that "[t]he distribution of products to individuals cannot support a public nuisance claim because only *individual* rights are affected." Neither case supports such a broad proposition.

In *Beretta*, Philadelphia alleged that gun manufacturers' lawful distribution of guns created a public nuisance because it resulted in widespread gun violence that harmed its citizens and increased municipal costs. 126 F. Supp. 2d at 888, 906. The district court concluded that the City

14

did not plead a public nuisance, in part because the City's allegations implicated only an individual "right to be free from guns and violence," rather than a public right. *Id.* at 909. Notably, however, the Third Circuit did not affirm on that basis. Instead, *Beretta* concluded that: (1) Pennsylvania does not recognize a public nuisance based on a manufacturer's *lawful* sale of a lawful product, and (2) "defendants lack the requisite control over the interference with a public right." *Beretta*, 277 F.3d at 421-22. That holding does not preclude the City's claim here.  First, *Beretta* concerned the lawful distribution of a product, which posed a risk of individual harm. Except with respect to Defendants' mail order pharmacies, Defendants do not distribute products, but instead provide PBM services that establish broad rules of coverage and benefits that generally apply to all members of the client health plans, and which, if defective, would pose a risk of *communal* harm (as occurred here). Second, insofar as the City's claims concern distribution and dispensing of opioids, the City alleges that Defendants did so *unlawfully*, *see, e.g.*, Compl. ¶¶ 470-86, and that Defendants control the distribution and dispensing of opioids (discussed below).

Nor does *Atlantic Richfield* bar the City's nuisance claim. That case, unlike the City's claim here, involved only individual rights. In *Atlantic Richfield*, Montgomery County alleged that lead paint in individual homes was a public nuisance because "lead poisoning creates a cumulative, deleterious effect on whole communities."  294 A.3d at 1277. The court, however, concluded that, because lead paint inside individual residences affected only certain individuals and presented no risk to the general public, only individual rights were implicated, even if "a large number of persons have been affected." *Id.* at 1285.

Here, the City does not base its claim on interferences with individual rights, but public rights, including public safety, public health, and the right to enjoy public spaces.  Those are collective rights that affect *all* residents, including those who have never used or abused opioids.

In other words, the City's public nuisance claim is not premised on an accumulation of injuries to certain individuals (as in *Atlantic Richfield*, or as the *Beretta* district court found), but rather on the public's right to be protected from *communal* risks to health, safety, and public spaces.  The City alleges that increased crime, risk of accidental needle sticks, toxic waste, hepatitis C infections, opioid impaired drivers, and other widespread communal impacts endanger the health and safety of all Philadelphians, including those who have never used opioids.[3]  Indeed, the vast majority of courts that have addressed similar allegations have rejected the argument that the opioid epidemic is only an aggregation of individual injuries.  *See, e.g., In re Nat'l Prescription Opiate Litig.*, 406 F. Supp. 3d 672, 674 (N.D. Ohio 2019); *State of Rhode Island v. Purdue Pharma, L.P.*, No. PC-2018-4555, 2019 WL 3991963, at *9 (R.I. Super. Ct. Aug. 16, 2019); *In re: Opioid Litig.*, Civ. No. 21-C-9000 (W. Va. MLP July 1, 2022) (Distributor), at 2 (reporting that 22 state courts have concluded that the opioid epidemic interferes with public rights), *available at* https://www.courtswv.gov/sites/default/pubfilesmnt/2023-07/7-1-22OrderDenyingFactualIssue2.pdf.

### B.  The City Alleges That Defendants Control the Oversupply of Opioids.

The City describes how Defendants exercised significant control over the flow of opioids into Philadelphia, resulting in an oversupply that has significantly and unreasonably interfered with public rights. The Complaint alleges that Defendants favored opioids on their formularies to increase utilization, participated in fraudulent marketing to increase opioid sales, and failed to take steps to prevent diversion despite their knowledge of a growing opioid epidemic. *See, e.g.*, Compl. ¶¶ 169-79, 215-29, 261-63. And they did so in violation of their legal duties to prevent diversion.

---

[3] As Defendants note (at 16-17 n.2), this same issue is pending before the Pennsylvania Superior Court in *CVS Pharmacy Inc. v. City of Philadelphia*, No. 3093 EDA 2024.  If this Court is concerned about the scope of Pennsylvania public nuisance law, it could hold Defendants' motion in abeyance pending resolution of that appeal.

*See, e.g., id.* ¶¶ 711-12. The City alleges that the public harms—the oversupply of opioids and the corresponding societal consequences—were foreseeable to Defendants. *See, e.g., id.* ¶¶ 707, 718-19. The City, therefore, has adequately alleged causation. In any event, because causation is generally a factual question, it is not grounds for dismissing the City's claim. *See, e.g., Rost v. Ford Motor Co.*, 151 A.3d 1032, 1049 (Pa. 2016) (causation should be left to fact-finder's consideration unless no reasonable mind could find defendant's conduct was a substantial cause of the harm).

Defendants argue (at 17-18) that the City's harms are caused by "misuse by third parties," like in *Beretta*. But in *Beretta*, there was no allegation that the gun manufacturers acted unlawfully; instead, the allegation was that manufacturers did not impose restrictions on the federally licensed dealers they sold to. 277 F.3d at 422. The gun manufacturers themselves were not accused of any injurious acts. 126 F. Supp. 2d at 910-11. As a result, *Beretta* declined to hold the manufacturers legally responsible for third parties' misuse of their products. In contrast, here, the City alleges that, to the extent Defendants distributed and dispensed opioids such that *Beretta* is arguably applicable, they did so unlawfully, which directly and foreseeably caused the oversupply problem and resulting public harms. Unlike *Beretta*, therefore, the City seeks to hold Defendants accountable for their own misconduct, which directly contributed to the public nuisance.

Defendants' assertion (at 19) that causation is lacking absent allegations that they exercised *physical* control of opioids or were the sole cause of the nuisance is unsupported. *Diess v. Pennsylvania Dep't of Transp.*, 935 A.2d 895 (Pa. Cmwlth. 2007), in fact, supports the City's claim, because it makes clear that physical possession *or* control of the source of the nuisance is sufficient, and that a defendant's conduct need only be "a substantial factor" in causing the alleged harm. *Id.* at 904-05, 907. Here, Defendants controlled the source of the nuisance through formulary

placement, marketing, and other opioid-related misconduct, while their mail-order pharmacies had physical possession of opioids. *See, e.g.*, Compl. ¶¶ 3, 169-79, 215-29, 261-63, 294-95, 441, 481.

### C.  The City Is Not Required to Allege Special Injury.

There are two types of public nuisance action: "an individual action for a public nuisance," which requires "harm of a kind different from that suffered by other members of the public," and an action by a public official or public agency, "represent[ing] the state or a political subdivision," which does not. *See* Restatement (Second) of Torts § 821C; *id.*, comment j; *Pennsylvania Soc'y for Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.*, 237 A.2d 342, 348 (Pa. 1968). The City's action is the latter type, brought in its governmental capacity to abate a public nuisance. *See* Compl. ¶ 726; *id.* ¶¶ 13, 23. It is well established that the City has such authority. *See, e.g., Muehlieb*, 574 A.2d at 1211-12 (City can enjoin a public nuisance); *Beretta*, 126 F. Supp. 2d at 894. The City, therefore, is not required to allege a special injury. *See* Restatement (Second) of Torts § 821C. And the fact that the City seeks recovery of certain costs does not convert its public entity action for abatement into a private action. *See Beretta*, 277 F.3d at 420 n.4 ("public entities may recover" abatement costs).

## IV.    THE CITY HAS PROPERLY ALLEGED A NEGLIGENCE CLAIM.

Defendants contend that the negligence claim must be dismissed because the City fails to allege that they owed any duty to the City or causation. Defendants further argue that the claim is barred by the municipal cost recovery rule. Defendants are wrong on all counts.

### A.  Defendants Owed the City a Duty of Care.

Foreseeability is an "integral part" of determining whether a duty exists under Pennsylvania law. *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1369 (3d Cir. 1993). Foreseeability in this context—distinct from foreseeability for proximate cause—"means the likelihood of the occurrence of a general type of risk rather than the likelihood of the occurrence

of the precise chain of events leading to the injury." *Id*. A court will "hold as a matter of law that the defendant did not have a duty to plaintiff to guard against" a type of risk "[o]nly when even the general likelihood" of that type of risk is unforeseeable. *Id*.

Here, the City alleges facts to show that the type of risk that injured the City, an oversupply of opioids that led to an opioid epidemic, extraordinary municipal costs, and other injuries, was completely foreseeable to Defendants. The City alleges that Defendants collected and tracked real-time opioid prescription data that showed the extreme volume of prescription opioids dispensed into Philadelphia and the growing opioid epidemic. *See, e.g.*, Compl. ¶¶ 215-31, 235-41, 261-84. Moreover, Defendants knew the dangers of opioid use, abuse, and addiction and how the opioid manufacturers' fraudulent marketing stoked the opioid epidemic. *See, e.g., id*. ¶¶ 365-94. Defendants nevertheless contributed to the opioid oversupply in a number of ways. *See, e.g., id*. ¶¶ 6, 162-63, 169, 309, 319-53, 369. In short, it was completely foreseeable to Defendants that if they threw gas on the fire, the flames would get higher. Those facts counsel in favor of concluding that Defendants owed the City a duty.

Alternatively, a defendant can impose upon itself a duty of reasonable care through a voluntary undertaking. *See, e.g., Fitzpatrick v. Universal Tech. Inst., Inc.*, No. CIV.A. 08-1137, 2010 WL 3239173, at *3 (E.D. Pa. Aug. 11, 2010); *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 224 (Pa. 2018); *Feld v. Merriam*, 485 A.2d 742, 746-47 (Pa. 1984). Here the City alleges that Defendants voluntarily undertook a duty to the City to use reasonable care and to not create a foreseeable risk of harm. They did so by voluntarily (1) offering services that involved a significant public interest, namely, the sale, delivery, dispensing, reimbursement, and promotion of highly addictive opioid drugs—including, as to Optum, offering those drugs through its cash

card business; and (2) creating formulary and utilization management ("UM") offerings ostensibly to promote public health and safety. *See, e.g.*, Compl. ¶¶ 768, 771.

That Defendants voluntarily undertook a duty to exercise these tasks with reasonable care and skill is underscored by Defendants' repeated representations to the public, their clients, and Congress that they were working to ensure that opioids were prescribed and dispensed only for safe and legitimate reasons. *See, e.g., id.* ¶¶ 287, 355-60, 696, 739-40, 771. Defendants intended that the public, their clients, and the City would rely on them to serve as skilled experts to prevent misuse, abuse, and diversion of prescription opioids. *See, e.g., id.* ¶¶ 171, 573, 678, 682. The City relied upon these representations to its detriment when it reasonably expected that Defendants would conduct such activity with reasonable care and protect public health and safety. *See, e.g., id.* ¶ 679.

Instead of addressing the City's voluntary undertaking theory of liability, Defendants suggest that the City seeks to impose "novel tort duties" on Defendants. Br. at 21 (citing *Walters*, 187 A.3d at 222). But a duty voluntarily undertaken is distinct from a novel duty, *see, e.g., Feld, supra*, and Defendants' balancing test (at 21-22), which applies to novel duties, is therefore inapplicable. *See Alderwoods (Pennsylvania), Inc. v. Duquesne Light Co.*, 106 A.3d 27, 40 (Pa. 2014) (balancing test is "more relevant to the creation of new duties"); *see also Straw v. Fair*, 187 A.3d 966, 984 n.12 (Pa. 2018).

In any event, Defendants' balancing test also supports the conclusion that Defendants owe the City a duty. Although the City does not have a relationship with Express Scripts and Optum (first factor), the other four factors weigh heavily in favor of imposing a duty upon Defendants. Under the second factor, there is no social utility in permitting Defendants to *oversupply* opioids. *See* Compl. ¶¶ 492-512, 515-21. And requiring Defendants to use reasonable care to prevent such

an oversupply does not impair their ability to make prescription medications affordable for legitimate patients, as Defendants argue (at 21-22).

The third factor—the "nature of the risk imposed and foreseeability of the harm incurred" —also weighs in favor of a duty, as "[i]t would be difficult to overstate the risk to public health that this case presents." *Walters*, 187 A.3d at 236; *see also* Compl. ¶¶ 492-504. The harm here was entirely foreseeable: Defendants were uniquely aware of the opioid epidemic as it unfolded in Philadelphia because of their vast, real-time opioid prescription data. *See, e.g.*, Compl ¶¶ 229, 235, 240, 261, 295. "When there is a flood of highly addictive drugs into a community it is foreseeable—to the point of being a foregone conclusion—that there will be a secondary, 'black' market created for those drugs." *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *19.

The fourth factor, the "consequences of imposing a duty," would require Defendants to use reasonable care to protect the City and the public in the sale, delivery, dispensing, promotion, and control of highly addictive, dangerous opioids, all of which would benefit society. None of these consequences would require "PBM Defendants to override the decisions of doctors by restricting prescription benefits," as Defendants contend (at 22). The final factor—the public interest—also weighs in favor of finding a duty, as Defendants implicitly concede (at 22) by not addressing it. Because opioids are highly addictive, negligent conduct creates a high likelihood of injury with catastrophic harm. For this reason, "the majority of other jurisdictions addressing the issue in opioid litigation" have found that opioid defendants have a duty to act reasonably in conducting their opioid businesses. *Ohio County Comm'n v. Express Scripts, Inc.*, No. 5:24-cv-142, 2024 WL 5701504, at *15 (N.D. W.Va. Dec. 23, 2024) (citing cases); *see also In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *19.

### B.  Defendants' Mail-Order Pharmacies Have Statutory Dispensing Duties.

Defendants also have express statutory duties as dispensers of controlled substances, Compl. ¶¶ 470-72, which require them to exercise reasonable care in performing those duties. Defendants' mail-order pharmacies violated those duties by, *inter alia*, knowingly dispensing opioid prescriptions that they knew, or should have known, would be diverted or misused.  *See, e.g., id*. ¶¶ 433, 454 (Defendants knowingly violated 49 Pa. Code § 27.18).  That is the opposite of reasonable care and states a claim for negligence.

Defendants nevertheless contend that the City fails to plead negligence because pharmacies have no duty to protect against third-party criminal conduct.  Br. at 24-25 (citing *Gabriel v. Giant Eagle, Inc*., 124 F. Supp. 3d 550, 563 (W.D. Pa. 2015)).  But the City's negligence claim is not premised on the mail-order pharmacies' failure to protect their customers from third-party criminals, as was at issue in *Gabriel*, 124 F. Supp. 3d at 564, but rather on their failure to exercise due care in dispensing opioids to their customers.  *Gabriel* recognized that pharmacists owe a broad duty to perform "gatekeeper responsibilities," which "are designed and intended to combat the illegal distribution of controlled substances." *Id*. ("[a] pharmacist may not knowingly fill or refill a prescription for a controlled substance … if the pharmacist knows or has reason to know it … will be []diverted, abused or misused") (quoting 49 Pa. Code § 27.18(c)).  Opioid courts have repeatedly found that municipal plaintiffs can sue pharmacies for their failure to obey their duties under the federal CSA and similar state laws. *See, e.g., In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. 3d 613, 629 (N.D. Ohio 2020).

### C.  The City Has Sufficiently Alleged Proximate Causation.

Under Pennsylvania law, proximate cause depends upon whether the conduct "was a substantial factor in bringing about the [plaintiff's] harm." *Cincinnati Ins. Co. v. PPL Corp.*, 979 F. Supp. 2d 602, 612 (E.D. Pa. 2013) (citing *Jones v. Montefiore Hosp*., 431 A.2d 920, 923 (Pa.

1981)).  "[T]his substantial factor need not be ... the only factor." *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 773 (3d Cir. 2009) (citing *Jones*, 431 A.2d at 923). "[O]rdinarily [this is] a question of fact for the jury." *Jordan v. City of Philadelphia*, 66 F. Supp. 2d 638, 644 (E.D. Pa. 1999).

The Complaint sets forth how Defendants' conduct was a substantial factor in causing the City's harm.  For example, the City alleges that Defendants declined to use formulary and UM tools to restrict opioid prescriptions.  *See, e.g.*, Compl. ¶¶ 6, 169-72, 202-07, 325, 331-36, 342-46. Defendants also gave opioids favored formulary placement, which increased their utilization and expanded the opioid market in Philadelphia.  *Id.* ¶ 344.  In addition, Defendants collaborated with opioid manufacturers to deceptively market opioids.  *See, e.g., id.* ¶¶ 6, 365, 369-94. And Defendants deliberately failed to implement effective drug utilization review, despite promises to do so, or to use their extensive data to try to curb the flood of opioids into Philadelphia; instead, they used their mail-order pharmacies to dispense more opioids than they knew were necessary for legitimate medical uses.  *See, e.g., id.* ¶¶ 6, 294-307, 476-78, 484-86.  All of that conduct substantially contributed to the opioid oversupply in Philadelphia that caused the City's extraordinary governmental costs and other injuries.

Defendants nevertheless assert (at 23) that the City's harms are "too remote" under *Beretta*. Applying a six-factor test from the antitrust context, *Beretta* affirmed dismissal of Philadelphia's negligence claim against gun manufacturers, concluding that the City's increased costs from gun violence and crimes were "too remote" from manufacturers' lawful sales.  277 F.3d at 423-26.  But the connection here between the City's harms and Defendants' conduct is much closer.

First, there is a direct "causal connection between the defendant's wrongdoing and plaintiff's harm," unlike the "long and tortuous" path between a manufacturer's sale of a gun to a licensed dealer, that ends up in the hands of a third party, who then commits a crime or causes

violence, which injures the City. *Id*. at 423-24. As explained *supra*, Defendants themselves pushed increasing amounts of opioids into the City, directly causing the City's harm. Moreover, unlike the manufacturers' conduct in *Beretta* that was entirely lawful, *id.* at 424, the City has alleged that Defendants' conduct that contributed to Philadelphia's opioid oversupply violated federal and state controlled substance laws. *See, e.g.*, Compl. ¶¶ 470-86.

The third factor, "the nature of plaintiff's alleged injury, and whether it relates to the purposes of tort law," *Beretta*, 277 F.3d at 423, also supports proximate causation here. Tort law is intended to "put an injured person in a position as near as possible to his position prior to the tort." *Reformed Church of Ascension v. Theodore Hooven & Sons, Inc.*, 764 A.2d 1106, 1109 (Pa. Super. 2000) (citations omitted); *see also Werner v. Plater-Zyberk*, 799 A.2d 776, 784 (Pa. Super. 2002) (primary purpose of tort law is for wrongdoer to compensate an injured party). Here, the City seeks compensation from Defendants, who unlawfully and directly caused its injuries. The City's negligence claim, therefore, stands in stark contrast to the one in *Beretta*, where the gun manufacturers were not alleged to have engaged in any wrongdoing that injured anyone.

Fourth, the City's damages are not "highly speculative"; it identifies specific costs and losses directly attributable to Defendants' conduct. Compl. ¶ 817. Contrary to Defendants' unsupported assertion (at 24), the City need not estimate its damages to plead proximate cause.

The fifth factor—the directness of the alleged injury—likewise demonstrates that Defendants' conduct was a substantial factor in causing the City's harm. As explained above, *see supra* Section II.B, the City's injuries are not derivative of individual injuries, but directly result from Defendants' efforts to promote opioid prescribing and use. *Compare with Beretta*, 277 F.3d at 424-25. By ignoring this factor, Defendants implicitly concede the City has satisfied it.

Finally, multiple opioid trials around the country have demonstrated that a trial of the City's claim is judicially manageable, thereby satisfying the sixth factor. *See, e.g., In re Nat'l Prescription Opiate Litig.*, 622 F. Supp. 3d 584, 591-92 (N.D. Ohio 2022) (apportioning damages), *rev'd and remanded on other grounds,* No. 22-3750, 2025 WL 354758 (6th Cir. Jan. 31, 2025); *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936, 938 (N.D. Cal. 2022); **Ex. 1**, *New Mexico v. Purdue Pharma*, *L.P., et al*, No.: D-101-CV-2017-02541 (Santa Fe County, NM Dec. 28, 2022) (post trial order). At a minimum, the City has raised factual questions as to proximate cause such that Defendants' motion to dismiss should be denied.

### D.  The Municipal Cost Recovery Rule Does Not Bar the City's Claims.

Defendants contend that the City has not suffered cognizable damages because, under Pennsylvania law, costs for "public services for protection from a safety hazard" cannot be "assessed against a tortfeasor whose negligence creates the need for the service." Br. at 24 (quoting *Beretta*, 126 F. Supp. 2d at 894). But this principle, known as the municipal cost recovery rule, does not apply here.  First, Pennsylvania has not clearly adopted the municipal cost recovery rule. *City of Pittsburgh v. Equitable Gas Co.*, 512 A.2d 83, 84 (Pa. Cmwlth. 1986), appears to be the *only* Pennsylvania court to have applied the doctrine, denying Pittsburgh recovery of its costs for standard emergency services after a natural gas line explosion.

Second, the rule has generally been applied to preclude public entities from recovering the costs of routine and generally anticipated public services, including discrete emergency responses, for which they are generally funded.  *See, e.g., City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 324 (9th Cir. 1983) (doctrine applies to recovery of costs associated with emergency response to train derailment); *Equitable Gas*, 512 A.2d at 84.  The rule does not preclude damages from a repeated course of tortious conduct, as is alleged here, where a public entity cannot reasonably be expected to bear the costs. *See, e.g., James v. Arms Tech., Inc.*, 820

A.2d 27, 48-49 (N.J. App. Div. 2003); *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1149-50 (Ohio 2002) (distinguishing "single, discrete incident requiring a single emergency response" from "ongoing and persistent" misconduct that "may justify the recoupment of such governmental costs"). For that reason, courts adjudicating public entity opioid cases have uniformly rejected application of the municipal cost recovery rule. *See, e.g., In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 3737023, at *8 (N.D. Ohio June 13, 2019) ("[t]he current trend among state court judges ruling in opioid-related cases around the country is that the municipal cost recovery rule does not apply").

## V.    THE CITY PROPERLY ALLEGES A PRIVATE UTPCPL CLAIM.

Defendants urge dismissal of the City's UTPCPL claim on three grounds: (1) the City is not a "person" authorized to bring a UTPCPL claim; (2) the City is not a consumer of goods or services for personal, family, or household purposes; and (3) the City fails to allege sufficient facts to state a claim. Each argument lacks merit.

### A.    The City Is a "Person" Under the UTPCPL.

The UTPCPL provides a private cause of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of . . . a method, act or practice declared unlawful by section 3 of this act." 73 P.S. § 201-9.2(a). The UTPCPL defines "person" broadly to include "any . . . legal entity." 73 P.S. § 201-2(2). Because the City is a "legal entity," it is a "person" under the UTPCPL.

Defendants nevertheless contend (at 25-26) that the City is not a "person" because *Meyer v. Community College of Beaver County*, 93 A.3d 806, 814 (Pa. 2014), held that a community college was not a "person" that could be sued under the UTPCPL. *Meyer*, however, addresses only the "narrow issue" of who is a "person" *against* whom a UTPCPL action can be brought, and

does not address who is a "person" who may *bring* a private UTPCPL action. *Commonwealth ex rel. Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1033 (Pa. 2018) (*Meyer* addressed "whether the College—a political subdivision agency—fell within the UTPCPL's definition of 'person' so as to be *liable for violations of* the UTPCPL") (emphasis added); *id.* ("the outcome in [*Meyer*] was driven in large part by the College's *status as a defendant* in the lawsuit") (emphasis added); *see also MFW Wine Co. v. Pennsylvania Liquor Control Board*, 318 A.3d 100, 124 (Pa. 2024) (same). *Meyer*, therefore, does not preclude the City from *bringing* a UTPCPL suit.

Defendants argue (at 26) that *Golden Gate* addresses the distinct term of "person in interest." True enough, but that provides no reason to disregard the Pennsylvania Supreme Court's understanding (expressed in *Golden Gate* and *MFW Wine*) that *Meyer* was limited to defining a "person" *against* whom a UTPCPL suit may be brought. Moreover, if there is any doubt, the UTPCPL should be "construed liberally to effect its" purpose. *Commonwealth by Creamer v. Monumental Props.*, 329 A.2d 812, 817 (Pa. 1974).

### B. The City is a Consumer of Goods and Services.

The City purchases opioids and PBM services from CVS, Compl. ¶¶ 548-50, which provides prescription drugs and processes claims for the personal benefit of the City's health plan beneficiaries.[4] Thus, the City purchases "goods or services primarily for personal, family or household purposes." 73 P.S. § 201-9.2(a). That conclusion is compelled by *Com. ex rel. Pappert v. TAP Pharmaceutical Prods., Inc.*, 885 A.2d 1127, 1142 (Pa. Cmwlth. 2005). In that case, the Commonwealth Court held that Pennsylvania could bring a private UTPCPL action based on its agencies' purchase of drugs for their current and retired employees because "the Commonwealth's

---

[4] The City is pursuing its UTPCPL claim against only CVS.

ultimate purpose of buying the Defendants' drugs is for the personal benefit of the end user." *Id.; see also In re Actiq Sales & Marketing Pracs. Litig.*, 790 F. Supp. 2d 313, 327 (E.D. Pa. 2011) (because third party payors purchased prescription drugs for their members' personal use, they had standing to bring UTPCPL claim); *Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641, 648 (Pa. Super. 1990) (roof purchased by condominium association for a residence, was purchased for personal, family, or household use).

Defendants mistakenly contend (at 26) that the City is not suing in a representative capacity and therefore cannot rely on how its beneficiaries use the goods and services. But the City's relationship to its health plan beneficiaries is the same as the relationship between the Commonwealth and its employees in *TAP Pharmaceuticals*, between the third-party payors and their members in *Actiq*, and between the condominium association and unit owners in *Valley Forge*. In each circumstance, the end user's purpose was determinative. *TAP Pharmaceuticals*, 885 A.2d at 1142; *Actiq*, 790 F. Supp. 2d at 327; *Valley Forge*, 574 A.2d at 648.

### C. The City Has Properly Stated A UTPCPL Claim Against CVS.

To state a cognizable UTPCPL claim, the City must allege that CVS engaged in prohibited conduct, and that the City justifiably relied upon that conduct, resulting in harm. *See, e.g., Hunt v. United States Tobacco Co.*, 538 F.3d 217, 221 (3d Cir. 2008).

#### 1. The City Alleges CVS Engaged in Unfair or Deceptive Acts.

The City alleges (*see* Compl. ¶ 731) that Defendants, including CVS, engaged in three types of prohibited unfair or deceptive acts. 73 P.S. § 201-2(4)(ii) ("Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services."); *id.* § 201-2(4)(v) ("Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have"); *id.* § 201-2(4)(xxi)

("Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding").

The City alleges that all Defendants violated subsections (ii) and (v) by conspiring with opioid manufacturers to make false statements about opioids, *see, e.g.*, Compl. ¶¶ 361-94, 616, 27, and by making false representations about their PBM services, *see, e.g., id*. ¶¶ 345, 355-60, 558, 567-68, 573, 613, 631. Defendants mistakenly contend (at 27) that subsections (ii) and (v) apply only to false advertising. But the Pennsylvania Supreme Court has held that the statutory text of subsection (v) is not so limited. *Golden Gate*, 194 A.3d at 1026-28. *Golden Gate*'s reasoning directly applies to subsection (ii) as well, which similarly contains no textual limit.

The City likewise alleges that all Defendants, including CVS, violated the catchall provision, 73 P.S. § 201-2(4)(xxi). Under this provision, an act or practice is unfair or deceptive if it has "the capacity to deceive." *Gregg v. Ameriprise Financial, Inc.*, 245 A.3d 637, 648-49 (Pa. 2021). Actual fraud, or intent to deceive, is not required. *Id.*; *see also id.* at 652. The City alleges that, among other things, Defendants' conduct had the capacity to deceive the City that their PBM services were designed to promote patient safety and health and reduce the City's costs, when in fact Defendants, including CVS, designed their formularies to encourage opioid use and increase their own profits. *See, e.g.*, Compl. ¶¶ 361-94, 552-58, 859. Moreover, in providing mail-order pharmacy services, all Defendants held themselves out as law-abiding pharmacies even though they did not comply with their legal responsibility to ensure that only legitimate prescriptions were dispensed. *Id*. ¶¶ 473-78, 484-86. That conduct likewise had the capacity to deceive the City. *Id*. ¶¶ 737-40, 744-45.

Defendants nevertheless argue that the City fails to allege conduct prohibited by the catchall provision. First, Defendants contend (at 28) that the City must plead the elements of fraud.

29

But the Pennsylvania Supreme Court has expressly rejected that argument. *Gregg*, 245 A.3d at 646-47 (1996 UTPCPL amendment expanded liability beyond common law fraud).

Second, Defendants argue (at 28-29) that their alleged misrepresentations are too broad to be actionable. Whether a statement could be misleading to a reasonable consumer, however, is almost always a factual question, and therefore an inappropriate ground for dismissal. *Golden Gate*, 194 A.3d at 1024. But even if some of Defendants' alleged misrepresentations are not actionable, the City's UTPCPL claim is also grounded on deceptive *conduct*. *See* 73 P.S. § 201-2(4)(xxi) (including "fraudulent or deceptive conduct"). For example, Defendants' mail-order pharmacies, including those of CVS, held themselves out as legitimate pharmacies, but did not adhere to their legal duty to ensure that only legitimate prescriptions were dispensed. Compl. ¶¶ 473-78, 484-86. In addition, Defendants concealed from their health plan clients the extent of their deeply profitable relationships with opioid manufacturers and the conflict of interest those relationships created. *See, e.g.*, *id.* ¶¶ 2, 181, 681, 683. In short, the City has adequately alleged that CVS engaged in unfair or deceptive conduct in violation of the UTPCPL.

### 2. The City Alleges Justifiable Reliance Resulting in Losses.

The City has also pled that it (1) justifiably relied on CVS's wrongful conduct or representations; and (2) suffered harm as a result. *Gregg*, 245 A.3d at 646. The Complaint alleges that CVS conspired with opioid manufacturers to increase opioid prescribing, dispensing, and sales by, among other things, misrepresenting the risks of prescription opioids, and then concealed that behavior from its clients. Compl. ¶¶ 2, 6, 181, 324, 342-45, 365, 559-60, 681-83. CVS also misrepresented that it designed its formularies based on patient safety, efficacy, and costs, when in fact its formularies were designed to maximize its profits. *Id.* ¶¶ 361-94, 552-58, 859. Moreover, CVS held itself out as providing valid mail-order pharmacy services even though it failed to ensure only legitimate prescriptions were dispensed. *Id.* ¶¶ 473-78, 484-86. As a result of these unfair

and deceptive practices, the City purchased more opioids than it otherwise would have. *Id*. ¶¶ 478, 481, 484. In addition, the excessive volume of opioids that CVS pumped into the City resulted in additional costs borne by the City. *Id*. ¶¶ 745, 817. At a minimum, these allegations raise factual questions as to whether the City justifiably relied on CVS's unfair or deceptive practices such that dismissal should be denied. *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007).

Defendants assert (at 29-30) that these allegations are insufficient because: (1) the City does not allege that it relied on Defendants' statements in SEC filings or to government authorities; (2) there are no plausible allegations that the City altered its behavior in reliance on Defendants' conduct; and (3) the City does not allege that it was deceived. Defendants' arguments lack merit.

First, CVS's statements in SEC filings and to government authorities are not the only misrepresentations or challenged conduct. The City alleges that CVS also engaged in deceptive conduct, which is sufficient to support the City's UTPCPL claim. Second, Defendants' suggestion that justifiable reliance requires allegations that CVS's misrepresentations were material, in that they altered the City's conduct, is inconsistent with the law. *Gregg*, 245 A.3d at 645-46. Third, the City is not required to allege that it was actually deceived. *See Golden Gate*, 194 A.3d at 1023 ("neither the intention to deceive nor actual deception must be proved") (cleaned up).

## VI.    THE CITY'S CPO CLAIM SHOULD BE SUSTAINED.

Defendants contend (at 31-36) that the City's claim under the Consumer Protection Ordinance (CPO), Phila. Code §§ 9-6301 to 9-6307, must be dismissed for two reasons: (1) the CPO claim fails for the same reasons as the UTPCPL claim; and (2) the UTPCPL impliedly preempts the CPO. Neither argument has merit.

As explained above, *see supra* Section V, the City has adequately pled a UTPCPL claim against CVS. Because the City has adequately alleged that CVS violated the UTPCPL, that same conduct, to the extent it was within six years of the CPO's enactment, also states a claim for

violation of the CPO. Phila. Code § 9-6307. The City alleges that Express Scripts and Optum engaged in the same type of conduct as CVS that violated the UTPCPL. *See supra* Section V.C.1. That conduct likewise violates the CPO. *Compare* 73 P.S. § 201-2(4), *with* Phila. Code § 9-6301(d). And the City may pursue a CPO claim against Express Scripts and Optum even though it is not suing them under the UTPCPL.

Defendants' preemption argument (at 32-35) fares no better. Municipalities have "the power of self-government through the enactment of home rule charters." *Crawford v. Commonwealth*, 326 A.3d 850, 858-59 (Pa. 2024). The First Class City Home Rule Act of 1949, Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §§ 13101-13157, provides cities of the first class (*i.e.*, Philadelphia, the only first class city in Pennsylvania) "'complete powers of legislation and administration in relation to its municipal functions ... to the full extent that the General Assembly'" could legislate with respect to a first class city. *Crawford*, 326 A.3d at 859 (quoting 53 P.S. § 13131). However, the City may not "exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are" applicable to the whole Commonwealth. 53 P.S. § 13133.

In determining whether the General Assembly restricted a municipality's powers, courts consider preemption principles. *Crawford*, 326 A.3d at 861. In so doing, courts "presume that a home rule municipality's exercise of legislative power is valid, and we construe such power liberally, resolving any ambiguities relative thereto in the home rule municipality's favor." *Id.*; *see also Nutter v. Dougherty*, 938 A.2d 401, 411 (Pa. 2007). Preemption is disfavored. *Hoffman Min. Co., Inc. v. Zoning Hearing Bd.*, 32 A.3d 587, 594 (Pa. 2011) (requiring clear evidence of General Assembly's intent to preempt); *Nutter*, 938 A.2d at 414 ("a home rule municipality's exercise of

its local authority is not lightly intruded upon"). Here, Defendants' contention that the UTPCPL impliedly preempts the CPO under both conflict and field preemption is wrong

**A. The UTCPCL and the CPO Do Not Conflict.**

"Conflict preemption is applicable when the conflict between a local ordinance and a state statute is irreconcilable, *i.e.*, when simultaneous compliance with both the local ordinance and the state statute is impossible," or when a local ordinance "stands as an obstacle to" the state statute. *Hoffman*, 32 A.3d at 594 (internal quotation marks omitted). Defendants identify no irreconcilable conflict between the CPO and the UTPCPL. The CPO and UTPCPL prohibit the same conduct. *Compare* Phila. Code §§ 9-6301(d), 9-6302 *with* 73 P.S. §§ 201-2(4), 201-3. Thus, if a potential seller complies with the CPO, he will also comply with the UTPCPL, and vice versa. *See, e.g.*, *Hoffman*, 32 A.3d at 603-07 (no conflict preemption where it was possible to comply with both local setback and state setback, even though setbacks were different).

> It has long been the established general rule, in determining whether a conflict exists between a general and local law, that where the legislature has assumed to regulate a given course of conduct by prohibitory enactments, a municipal corporation with subordinate power to act in the matter may make such additional regulations in aid and in furtherance of the purpose of the general law as may seem appropriate to the necessities of the particular locality and which are not themselves unreasonable.

*Holt's Cigar Co., Inc. v. City of Philadelphia*, 10 A.3d 902, 907 (Pa. 2011) (internal quotation marks omitted).

Defendants' laundry list of purported "conflicts" (at 35-36) is not to the contrary; although the CPO and the UTPCPL have differences, such as the available remedies or the required proof, none of those distinctions is relevant to whether it is possible to simultaneously comply with both. Because it is possible, there is no conflict preemption. Indeed, the relationship between the CPO and the UTPCPL is analogous to the municipal ordinance and state statute in *Western Pennsylvania Restaurant Association v. City of Pittsburgh*, 77 A.2d 616 (Pa. 1951), which both concerned

regulation of public eating places and "cover[ed] substantially the same ground and ha[d] the same objectives." *Id.* at 618. The Pennsylvania Supreme Court concluded that, even though there were a number of "minor discrepancies" between those laws, there was no conflict. *Id*. at 620; *see also Warren v. City of Philadelphia*, 115 A.2d 218, 221 (Pa. 1955) (even if a state statute and a municipal ordinance legislate the same subjects, they are upheld if not in conflict).

Nor does the CPO stand as an obstacle to enforcement of the UTPCPL. Instead, The CPO provides a complementary, additional means to further the purpose of the UTPCPL within Philadelphia. The Pennsylvania Supreme Court has consistently recognized that such parallel local laws are not preempted. *See Holt's Cigar*, 10 A.3d at 907*; Mars Emergency Medical Srvs., Inc. v. Township of Adams*, 740 A.2d 193, 195 (Pa. 1999); *Western Pennsylvania*, 77 A.2d 616-20.

### B. The UTPCPL Does Not Demonstrate a Clear Intent to Preempt the Field.

Field preemption applies where the state statute is "implicitly intended . . . to be exclusive with respect to" the subject matter "within a municipality." *Hoffman*, 32 A.3d at 605. But "the mere fact that the General Assembly has enacted legislation in a field does not lead to the presumption that the state has precluded all local enactments in that field." *Id.* at 593. The General Assembly "must clearly evidence its intent to preempt" local laws. *Id.*; *accord Nutter*, 938 A.2d at 406. To date, the Pennsylvania Supreme Court has determined such "clear intent to totally preempt local regulation in only three areas: alcoholic beverages, anthracite strip mining, and banking." *Hoffman*, 32 A.3d at 593.

Defendants fail to identify any evidence that the General Assembly intended the UTPCPL to totally preempt Philadelphia from adopting local consumer protection laws. Instead, Defendants argue (at 33-34) that the Home Rule Law, 53 Pa. C.S. § 2901 *et seq.*, expressly bars municipalities from legislating on the same subject as any state statute, 53 Pa. C.S. § 2962(e), such that the UTPCPL preempts the CPO. But the Home Rule Law does not apply to Philadelphia as a first

class city and county. *Crawford*, 326 A.3d at 860. And the First Class City Home Rule Act does not contain the same limitation. *See* 53 P.S. § 13131.

Alternatively, Defendants assert (at 34-35) that, because the General Assembly conferred exclusive authority on the Attorney General and district attorneys to bring UTPCPL public enforcement actions, but not on the City, it intended to preclude the City from bringing public enforcement actions. Defendants' argument is wrong for two reasons. First, field preemption looks to whether the legislature expressed clear intent to occupy the entire field, thereby precluding *any* municipal legislation on that subject matter. *See, e.g., Nutter*, 938 A.2d at 406 ("legislature must manifest its intent entirely to preempt [the] field"). Here, the mere fact that the General Assembly did not authorize the City to bring UTPCPL public enforcement actions, which is only one part of the UTPCPL, does not establish clear intent that the General Assembly sought to preclude Philadelphia from enacting *any* consumer protection legislation.

Second, Defendants seek to establish a clear statement of legislative intent from the General Assembly's silence. *Nutter* rejected that approach. In *Nutter*, the appellant argued that, because the General Assembly declined to impose limits on campaign contributions in the Election Code, it also intended to preclude municipalities from doing so. But the Pennsylvania Supreme Court explained that "the General Assembly's silence as to campaign contribution limits" did not demonstrate intent to preempt, noting that it was equally plausible that the General Assembly's silence demonstrated "its desire to leave the field open to locally tailored restrictions . . . of a particular municipality." 938 A.2d at 413-14. The same is true here.

## VII.    THE CITY STATES CLAIMS FOR CONSPIRACY AND CONCERTED ACTION.

Defendants move to dismiss the City's conspiracy and concerted action claims (at 37) on the ground that the City has failed to adequately plead an underlying tort. As discussed herein, the

City has properly pled that Defendants committed a number of underlying torts, any one of which is adequate to support its civil conspiracy and concerted action claims.

## VIII.    THE CITY'S CLAIMS ARE NOT PREEMPTED BY ERISA OR MEDICARE.

Defendants contend (at 37-40) that, to the extent the City's state law claims concern Defendants' administration of ERISA or Medicare Part D plans, those claims are partially preempted.  Defendants fail to bear their burden of proving preemption.  *See, e.g., Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 967, 972 (8th Cir. 2021).

### A.  ERISA Preemption Does Not Apply.

ERISA preempts "any and all" state laws that "relate to [an] employee benefit plan."  29 U.S.C. § 1144(a).  A state law "relates to" an ERISA plan if it has a "connection with" or "reference to" such a plan.  *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020) (citation omitted).  "[N]ot every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan."  *Id.* at 87.  ERISA is "primarily concerned with pre-empting laws that require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits, or by binding plan administrators to specific rules for determining beneficiary status."  *Id.* at 86-87 (internal citation omitted).  Similarly, a law will be preempted if its "acute, albeit indirect, economic effects" force an ERISA plan to adopt certain substantive coverage.  *Id.* at 87 (citation omitted).  "As a shorthand for these considerations," courts "ask[] whether a state law governs a central matter of plan administration or interferes with nationally uniform plan administration."  *Id.* (internal quotation marks omitted).  If so, the state law is preempted.  *Id.* A state law is also preempted if it "refers to" ERISA, which turns on whether "it acts immediately and *exclusively* upon ERISA plans or where the existence of ERISA plans is essential to the law's operation."  *Id.* at 88 (internal quotation marks omitted) (emphasis added).

Here, the City's action does not seek to require Defendants to structure ERISA plans in a certain way, to determine substantive coverage, or to "interfere with nationally uniform plan administration." *Id.* at 87. Indeed, the only *possible* "connection to" an ERISA plan that Defendants identify (at 38) is that the City challenges Defendants' formularies and UM practices, which might be used by ERISA plans. But the City does not seek to regulate, standardize, or approve Defendants' formularies or UM tools; instead it seeks to prevent Defendants from colluding with manufacturers, creating a public nuisance, violating controlled substances laws, violating state and local consumer protection laws, and related misconduct. *See, e.g.*, Compl. ¶¶ 6, 704, 737, 759, 774. Those matters have no connection to ERISA plans. Nor does the City's action exclusively concern ERISA plans. The City's claims are not directed at ERISA providers, but at PBMs, regardless of the type of health plan they administer.

The City's action is akin to the state law in *Rutledge*, which regulated the price at which PBMs reimburse pharmacies for covered drugs, and which the Supreme Court concluded did not have a connection with, or refer to, ERISA. 592 U.S. at 83. Similarly, *Wehbi* held that ERISA did not preempt state laws that imposed extensive requirements on how PBMs dealt with pharmacies and health plans because those laws did not specify required benefits or bind plan administrators to specific rules, nor did they apply exclusively to ERISA plans. 18 F.4th at 968-70.

Moreover, two trial courts in similar opioid actions have rejected ERISA preemption. *See Alaska v. Express Scripts, Inc.*, Case No. 3:23-cv-00233-JMK, 2024 WL 2321210 (D. Alaska May 22, 2024); *California v. Express Scripts, Inc.*, No. 23STCV20886 at 13 (Sup. Ct. Ca. Dec. 17, 2024) (attached as **Ex. 2**) (following *Alaska* as "persuasive"). Although Defendants do not distinguish *Rutledge* or *Wehbi*, they attempt to distinguish *Alaska* by arguing that the State "did not allege that the PBM Defendants 'failed to ... timely implement opioid limits'" on improper

prescribing or dispensing. Br. at 39 (quoting Alaska Compl. ¶ 262). But *Alaska* turned on the fact that the State did not seek a "*particular* scheme of substantive coverage," not that the State did not seek *any* limits on coverage. 2024 WL 2321210, at *10 (emphasis added). In addition, the court explained that Alaska's claims were not limited to formularies "adopted by an ERISA plan." *Id*.

In any event, even if ERISA preemption were to apply, it would preempt the City's claims only insofar as they specifically concern ERISA plans (*i.e.*, plans sponsored by private employers). *See also Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1201 (10th Cir. 2023) (state law preempted only "*as applied to ERISA plans*") (emphasis in original).

## B.  Medicare Part D Preemption Does Not Apply.

Defendants' Medicare Part D arguments (at 39-40) are also unavailing. Medicare Part D provides that "[t]he standards established under this part shall supersede any State law or regulation." *See* 42 U.S.C. § 1395w-26(b)(3); 42 U.S.C. § 1395w-112(g) (incorporating preemption standard into Medicare Part D). This express preemption provision displaces state laws that "regulate the same subject matter" as Part D standards. *See Wehbi*, 18 F.4th at 971.

However, "Congress did not intend for Part D to preempt state laws of general applicability, such as 'environmental laws, laws governing private contracting relationships, tort law, civil rights laws, and similar areas of the law.'" *Mulready*, 78 F.4th at 1206 n.22. That should be the end of the matter here, because the City's claims are based on laws of general applicability. Indeed, as *California* explained in rejecting Medicare Part D preemption: "The goal of [the county's] claims is merely to stop manufacturers and PBMs from colluding when it comes to giving preferred status. At the pleading stage, at least, the Court believes the goal can be achieved without affecting CMS standards and requirements." *See* **Ex. 2** at 13.

Defendants cite (at 39-40) various CMS regulations regarding formularies, drug coverage, and utilization management that they contend preempt the City's claims. But the City's claims do

not seek to substantively regulate or set standards for how Defendants design their formularies, including coverage and UM tools—a task assigned to CMS. The City seeks only to preclude Defendants from operating their businesses negligently, creating a public nuisance, violating state consumer protection laws, and the like. Those subjects are not regulated by Part D. The City's action, therefore, does not seek to "encroach on territory covered by federal standards." *Wehbi*, 18 F.4th at 976. For that reason, the City's action is distinguishable from *Alaska*, where the court found that the State sought "to impose liability for the structure of formularies[,] which CMS requires to be developed in a specific manner." *Alaska*, 2024 WL 2321210, at *11.

In any event, most, if not all, of the CMS regulations that Defendants cite did not become effective until June 15, 2018. *See* 83 F.R. 16440-1, 2018 WL 1783794 (April 16, 2018) (final rule). Those provisions cannot operate retroactively to preempt the City's claims that are based on pre-2018 conduct. But even if CMS regulations now cover some of the same subjects challenged by the City, most of the City's claims, such as collusion with manufacturers, fraudulent marketing, or creating a public nuisance, do not overlap with Medicare Part D and cannot be preempted. Any doubt as to whether any of the City's claims or requested relief implicate subject matters regulated by Part D is "a factual question that should be fleshed out through discovery." *California* (**Ex. 2**) at 13.

## CONCLUSION

For the forgoing reasons, this Court should deny Defendants' joint motion to dismiss the City's complaint for failure to state a claim. The City requests oral argument on this motion.

DATED: February 24, 2026

Respectfully Submitted,

THE CITY OF PHILADELPHIA LAW DEPT.

By: /s/*Catherine Hancock Dorsey*

| | |
|---|---|
| Renee Garcia, City Solicitor | Catherine Hancock Dorsey (pro hac vice) |
| (PA Bar No. 315622) | **BARON & BUDD, P.C.** |
| Anne Taylor, Litigation Chair | 2600 Virginia Ave. N.W. Suite 900 |
| (PA Bar No. 206057) | Washington, DC 20037 |
| Lydia Furst, Chief Deputy City Solicitor | Tel.: (202) 333-4562 |
| (PA Bar No. 307450) | cdorsey@baronbudd.com |
| Michael Pfautz, Deputy City Solicitor | |
| (PA Bar No. 325323) | Russell W. Budd (pro hac vice) |
| **CITY OF PHILADELPHIA LAW DEPT.** | Christine C. Mansour (pro hac vice) |
| 1515 Arch Street, 17th Floor | **BARON & BUDD, P.C.** |
| Philadelphia, PA 19102 | 3102 Oak Lawn Ave., Suite 100 |
| Tel: (215) 683-5000 | Dallas, TX 75219 |
| renee.garcia@phila.gov | Tel.: (214) 521-3605 |
| anne.taylor@phila.gov | rbudd@baronbudd.com |
| lydia.furst@phila.gov | cmansour@baronbudd.com |
| michael.pfautz@phila.gov | |

Jerry R. DeSiderato (PA Bar No. 201097)
Timothy J. Ford (PA Bar No. 325290)
Silvio Trentalange (PA Bar No. 320606)
Stanford B. Ponson (PA Bar No. 322548)
**DILWORTH PAXSON LLP**
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Tel.: (215) 575-7000
jdesiderato@dilworthlaw.com
tford@dilworthlaw.com
strentalange@dilworthlaw.com
sponson@dilworthlaw.com

Gregory B. Heller (PA Bar No. 61130)
**FELDMAN SHEPHERD WOHLGELERNTER TANNER WEINSTOCK DODIG LLP**
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
Tel: (215) 567-8300
gheller@feldmanshepherd.com

J. Burton Leblanc, IV (pro hac vice)
**BARON & BUDD, P.C.**
2600 CitiPlace Drive, Suite 400
Baton Rouge, LA 70808
Tel.: (225) 927-5441
bleblanc@baronbudd.com

Daniel Alberstone (pro hac vice)
Mark Pifko (pro hac vice)
Peter Klausner (pro hac vice)
Evan Zucker (pro hac vice)
Elizabeth Smiley (pro hac vice)
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Los Angeles, California 91436
Tel.: (818) 839-2333
dalberstone@baronbudd.com
mpifko@baronbudd.com
pklausner@baronbudd.com
ezucker@baronbudd.com
esmiley@baronbudd.com

Andrew B. Sacks (Pa Bar No. 41390)
John Weston (PA Bar No. 26314)
**SACKS LAW, LLC**
1 Liberty Place, 55th Floor
1650 Market Street
Philadelphia, PA 19103
Tel.: (215) 925-8200
asacks@sackslaw.com
jweston@sackslaw.com

Stephen A. Sheller (PA Bar No. 3270)
**SHELLER PC**
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Tel.: (215) 790-7300
sasheller@sheller.com

David Kairys (PA Bar No. 14535)
P.O. Box 4073
8225 Germantown Avenue
Philadelphia, PA 19118
dkairys@verizon.net

Anthony J. Majestro (pro hac vice)
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite 807
Charleston, WV 25301
Tel.: (304) 346-2889
amajestro@powellmajestro.com

Peter J. Mougey (pro hac vice)
Jeffrey R. Gaddy (pro hac vice)
**LEVIN, PAPANTONIO, PROCTOR,
BUCHANAN, O'BRIEN, BARR &
MOUGEY P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
(850) 435-7068
pmougey@levinlaw.com
jgaddy@levinlaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2026, the foregoing was served upon counsel of record via the Court's electronic case filing system.

_/s/Catherine Hancock Dorsey_
Catherine Hancock Dorsey