# EXHIBIT 2



The People of the State of California v. Express Scripts, Inc. (23STCV20886)

~~Tentative~~ Ruing Re: Demurrer

| | |
|---|---|
| **Date:** | **12/17/24** |
| **Time:** | **10:30 am** |
| **Moving Party:** | **OptumRX, Inc., et al. (collectively "Defendants")** |
| **Opposing Party:** | **The People of the State of California (the "People" or "Plaintiff")** |
| **Department:** | **11** |
| **Judge:** | **David S. Cunningham III** |

## ~~TENTATIVE~~ RULING

Defendants' demurrer is overruled, except the safe-harbor portion is sustained with leave to amend.

## BACKGROUND

> Defendants are Pharmacy Benefit Managers ("PBMs"). They "administer prescription-drug benefits for health-plan sponsors, including employers, government entities, and unions." [Citation.] "When a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with a PBM to determine that person's coverage and copayment information." [Citation.] "[T]he PBM [then] reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment." [Citation.] "The prescription-drug plan, in turn, reimburses the PBM." [Citation.]
>
> Plaintiff sued Defendants for their alleged contributions to the opioid crisis. Plaintiff claims Defendants created a public nuisance.

(7/18/24 Ruling Re: Motion to Stay Pending Appeal, p. 1.)

Here, Defendants demur to Plaintiff's second amended complaint ("SAC"). Plaintiff alleges two causes of action, one for statutory public nuisance, and one for common-law public nuisance. The demurrer challenges both counts.

## LAW

When considering demurrers, courts read the allegations liberally and in context, and "treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." (Serrano v. Priest (1971) 5 Cal.3d 584, 591.) "A demurrer tests the pleadings alone and not the evidence or other extrinsic matters. Therefore, it lies only where the defects appear on the face of the pleading or are judicially noticed." (Hahn v. Mirda (2007) 147 Cal.App.4th 740, 747.) It is error "to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment." (Aubry v. Tri-City Hospital Dist. (1992) 2 Cal.4th 962, 967.)

1

## DISCUSSION

### *Allegations*

The SAC alleges the following:

**CLAIM FOR RELIEF**
*Public Nuisance*
**Violations of California Civil Code Sections 3479 and 3480**

272. The People reallege and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein unless inconsistent with the allegations in this Count, and further alleges:

273. Civil Code Section 3479 provides that "[a]nything that is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance."

274. Civil Code Section 3480 defines a "public nuisance" as "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

275. Pursuant to Section 731 of the Civil Code, this action is brought by the People to abate the public nuisance created by the Defendants in the County of Los Angeles.

276. A public nuisance cause of action is established where a defendant knowingly created or assisted in the creation of a substantial and unreasonable interference with a public right.

277. Civil Code Section 3490 states that "[n]o lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right."

278. Each Defendant has created or assisted in the creation of a condition that is injurious to the health of and interferes with the comfortable enjoyment of life and property of entire communities or neighborhoods or of any considerable number of persons in the County of Los Angeles in violation of Civil Code Sections 3479 and 3480.

279. The significant interference with public rights is described in detail throughout this Complaint and includes but is not limited to:

2

12/18/2024

      a. The creation and fostering of an illegal, secondary market for prescription opioids;

      b. Easy access to prescription opioids by children and teenagers;

      c. A staggering increase in opioid abuse, addiction, overdose, injuries, and deaths;

      d. Infants being born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

      e. Employers have lost the value of productive and healthy employees; and

      f. Increased costs and expenses relating to healthcare services, law enforcement, the criminal justice system, social services, and education systems.

280. The public nuisance is substantial and unreasonable. Defendants' actions caused and continue to cause the public health epidemic described above in the County of Los Angeles, and that harm outweighs any offsetting benefit.

281. Defendants have created and maintained a public nuisance through their ongoing conduct of facilitating and encouraging the use of dangerously addictive opioids by colluding with manufacturers to place opioid drugs on formularies with preferred status, declining to impose limits on their approval for use in exchange for payments and fees from manufacturers, assisting in promoting but failing to disclose the real risks and appropriate limits on the use of opioids, failing to use the wealth of data available to them to identify and address signs of over-prescribing, illegitimate and dangerous use of opioids, misuse, abuse, and diversion, and failing to maintain effective controls against diversion in the operation of their mail order pharmacies. Their conduct caused utilization of opioids to skyrocket, and Defendants failed to take measures to restrict their utilization even as evidence of the epidemic mounted, including in the County, flooding the County with opioids and facilitating and encouraging the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to the County and its residents.

282. Defendants knew, or should have known, that their conduct would create or assist in the creation of the public nuisance – i.e., the opioid epidemic.

283. Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used and, therefore, widely misused and diverted. Defendants' actions were, at the very least, a substantial factor in the dissemination of misleading information about the risks and benefits of opioids for the treatment of chronic pain. Because of Defendants' actions in using their unique position to increase the availability of opioids in the marketplace and inflate opioid

sales, because of their collusion with manufacturers in the deceptive marketing of opioids, and because of Defendants' special position within the closed system of opioid distribution, without Defendants' actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

284. The public nuisance – i.e., the opioid epidemic – created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

285. Pursuant to Code of Civil Procedure § 731, the People request an order providing for abatement of the public nuisance that Defendants created or assisted in the creation of, and enjoining Defendants from future violations of Civil Code §§ 3479 and 3480.

## SECOND CLAIM FOR RELIEF
### *Common Law Public Nuisance*

286. The People reallege and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein unless inconsistent with the allegations in this Count, and further allege:

287. A public nuisance is a substantial and unreasonable interference with a right common to the public.

288. Defendants, individually and acting through their employees and agents, have intentionally, recklessly, or negligently engaged in conduct or omissions which endanger, injure, and interfere with the health, safety, or comfort of the public in the County of Los Angeles by their provision of PBM and mail order pharmacy services in and to the residents of the County.

289. Defendants' acts and omissions offend, substantially and unreasonably interfere with, public rights common to all, such as the public health, public safety, public peace, and the public comfort. Defendants had control over their conduct in Los Angeles County and that conduct has had an adverse effect on the public right. The public nuisance caused by Defendants has caused significant harm to the residents of the County.

290. Defendants' conduct is unreasonable.

291. Defendants' conduct is not insubstantial or fleeting. It has caused deaths, serious injuries, and a severe disruption of public peace, health, order and safety; it is ongoing, and it is producing permanent and long-lasting damage.

292. Defendants have created and maintained a public nuisance through their ongoing conduct of facilitating and encouraging the use of dangerously addictive

opioids by colluding with manufacturers to place opioid drugs on formularies with preferred status, declining to impose limits on their approval for use in exchange for payments and fees from manufacturers, assisting in promoting but failing to disclose the real risks and appropriate limits on the use of opioids, failing to use the wealth of data available to them to identify and address signs of over-prescribing, illegitimate and dangerous use of opioids, misuse, abuse, and diversion, and failing to maintain effective controls against diversion in the operation of their mail order pharmacies. Their conduct caused utilization of opioids to skyrocket, and Defendants failed to take measures to restrict their utilization even as evidence of the epidemic mounted, including in the County, flooding the County with opioids and facilitating and encouraging the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to the County and its residents.

293. Defendants knew, or should have known, that their conduct would create or assist in the creation of the public nuisance – i.e., the opioid epidemic.

294. Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used and, therefore, widely misused and diverted. Because of Defendants' actions in using their unique position to increase the availability of opioids in the marketplace and inflate opioid sales, because of their collusion with manufacturers in the deceptive marketing of opioids, and because of Defendants' special position within the closed system, without Defendants' actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

295. Defendants' conduct directly and proximately caused the significant harm described herein, and that harm outweighs any offsetting benefit.

296. The County suffered special injuries distinguishable from those suffered by the general public. The County has incurred and continues to incur substantial harms requiring investigation, monitoring, treating, policing, and remediating the opioid epidemic.

297. Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence.

298. The public nuisance – i.e., the opioid epidemic – created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

5

299. The People request an order providing for abatement of the public nuisance that Defendants created or assisted in the creation of, and enjoining Defendants from continuing the injurious conduct described herein.

(SAC, ¶¶ 272-299, bold and italics in original.)

*Analysis*

Defendants assert that five federal laws preempt Plaintiff's causes of action:

* the Employee Retirement Income Security Act ("ERISA");

* the Medicare Act;

* the Affordable Care Act ("ACA");

* the Federal Employee Health Benefits Act ("FEHBA"); and

* the Defense Department's TRICARE program ("TRICARE").

Defendants also assert that the California safe-harbor statute applies.

## ERISA

"The provisions of ERISA 'supersede any and all State laws insofar as they . . . relate to any employee benefit plan[.]'" (Alaska v. Express Scripts, Inc. (D. Alaska May 22, 2024, No. 3:23-cv-00233-JMK) 2024 WL 2321210, at *9 [quoting 29 U.S.C. section 1144(a)].) "This includes 'all state common law causes of action[.]'" (Ibid. [quoting Olson v. General Dynamics Corp. (9th Cir. 1991) 960 F.2d 1418].) "While the language of ERISA's express preemption clause is broad, 'the need for workable standards has led the U.S. Supreme Court to reject "uncritical literalism" in applying the clause.'" (Ibid. [quoting Gobeille v. Liberty Mutual Insurance Co. (2016) 577 U.S. 312].) To that end, "the [High] Court has instructed that ERISA preempts 'two categories of state laws.'" (Ibid. [same].) "'First, ERISA pre-empts a state law if it has a "reference to" ERISA plans[,]' that is, 'where a State's law acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation.'" (Ibid. [same].) "Second, ERISA pre-empts a state law that has an impermissible 'connection with' ERISA plans, meaning a state law that governs [ ] a central matter of plan administration or interferes with nationally uniform plan administration." (Ibid. [same].)

*Reference*

Defendants contend "Plaintiff's claims are [] preempted because they impermissibly make 'reference to' ERISA plans":

> . . . ERISA preempts state-law claims if "the existence of a[n ERISA-covered] plan is a critical factor in establishing liability" and there would be "no cause of action

6

if there [wa]s no plan." [Citation.] That description applies to the claims here. Although Plaintiff's allegations focus on PBM conduct, the Complaint recognizes that insurers and other PBM clients—not the PBMs—made the final decisions that allegedly contributed to a nuisance. For example, the allegedly defective formularies were "offered" to ERISA plans by the PBMs, but impacted plan beneficiaries only when they were "accept[ed]" or "adopted" by the plans. [Citation.] Moreover, if the ERISA plans did not exist, there would be no public nuisance liability as to those plans. By its own admission, Plaintiff has "no cause of action if there [wa]s no plan" that adopted Defendants' formularies. [Citation.] Plaintiff's claims relating to the administration of any ERISA plans are therefore preempted.

(Demurrer, p. 9; see also Reply, p. 8 ["Plaintiff's public nuisance claims 'reference' ERISA plans because Plaintiff must prove that the nuisance 'affects at the same time an entire community or neighborhood, or any considerable number of persons.' [Citation.] The nuisance cannot affect 'an entire neighborhood or community' without affecting individuals covered by ERISA plans."].)

Plaintiff claims Defendants fail to pass the "reference to" test:

> . . . The People seek to hold the PBMs liable for creating and maintaining a public nuisance in the form of the opioid epidemic "whether or not the plans they service fall within ERISA's coverage" and thus does not refer to ERISA plans. [Citation.] The People's claims focus on the PBMs' activities outside the confines of any particular plan; it challenges Defendants' misconduct related to the standard, national formulary offerings they made available to insurers and plan sponsors, some of which are not covered by ERISA. "Although a portion of the plan sponsors that adopt Express Scripts[, Inc.'s ("Express Scripts")] formularies are covered by ERISA," the federal district court in Alaska explained, "the State's causes of action would persist with or without ERISA-covered plans as they would proceed with respect to Express Scripts' formularies adopted by [non-ERISA] plans," including "plans offered by government or religious entities, Medicare and Medicaid plans, and individual plans offered by insurers, such as ACA exchange plans." [Citation.]

(Opposition, p. 7.)

Plaintiff is correct; the district court did consider the same issue. The State of Alaska filed a public-nuisance case "against Express Scripts for its alleged role in fueling the opioid epidemic in Alaska." (Alaska, supra, 2024 WL 2321210, at *1.) "The State allege[d] that Express Scripts substantially contributed to the opioid epidemic . . . in its capacity as a PBM, a research provider, and a mail order pharmacy." (Ibid.) In part, the State "assert[ed] that Express Scripts colluded with opioid manufacturers to increase prescription opioid sales in Alaska by favorably placing certain opioids on its formularies and failing to put in place safeguards that would have reduced the illegitimate use and dissemination of these drugs." (Ibid.) Notably, the district court found the "reference to" test unsatisfied:

... Under the first "reference to" prong, state law is preempted where "the existence of ERISA plans is essential to the law's operation" or if "the existence of [an ERISA-covered] plan is a critical factor in establishing liability" and there would be "no cause of action if there [was] no plan." Here, the existence of ERISA-covered plans is not essential to the State's claims. The State's Complaint addresses Express Scripts' conduct with respect to formularies that it offers to insurers and plan sponsors. Although a portion of the plan sponsors that adopt Express Scripts' formularies are covered by ERISA, the State's causes of action would persist with or without ERISA-covered plans as they would proceed with respect to Express Scripts' formularies adopted by plans offered by government or religious entities, Medicare and Medicaid plans, and individual plans offered by insurers, such as ACA exchange plans.

(Id. at *9, footnotes omitted.)

As support, the district court analogized <u>Rutledge v. Pharmaceutical Care Management Association</u> (2020) 592 U.S. 80 and <u>New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Co.</u> (1995) 514 U.S. 645:

In <u>Rutledge v. Pharmaceutical Care Management Association</u>, the U.S. Supreme Court came to a similar conclusion, deciding that an Arkansas law regulating the price at which PBMs reimburse pharmacies for the cost of prescription drugs covered by health plans "does not act immediately and exclusively upon ERISA plans because it applies to PBMs whether or not they manage an ERISA plan." The Court noted that the law regulates PBMs "whether or not the plans they service fall within ERISA's coverage" and specifically gave the counter-example that "PBMs contract with a variety of healthcare plans and programs that are not covered by ERISA, including Medicaid, Medicare, military, and market place plans." Similarly, in <u>New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.</u>, the Court held that a New York law requiring hospitals to collect surcharges from patients covered by a commercial insurer, but not those covered by Blue Cross/Blue Shield did not impermissibly make "reference to" ERISA plans. The Court reasoned that "[t]he surcharges are imposed upon patients and HMO's, regardless of whether the commercial coverage or membership, respectively, is ultimately secured by an ERISA plan, private purchase, or otherwise, with the consequence that the surcharge statutes cannot be said to make 'reference to' ERISA plans in any manner." Here, as in both <u>Rutledge</u> and <u>Travelers</u>, the State's claims with respect to Express Scripts' formularies cannot be said to make "reference to" ERISA plans as they address formularies regardless as to whether they are adopted by an ERISA plan or a non-ERISA plan.

(Id. at 10, footnotes omitted.)

12/18/2024

<u>Alaska</u> is not binding, but it is persuasive as to this issue. The Court agrees with the district court's analysis, including the <u>Rutledge</u> and <u>Travelers</u> discussions, and finds that Defendants' argument should be rejected.

*Connection*

Defendants assert:

> Plaintiff's claims target the PBM Defendants' work for ERISA plans. . . .
>
> \* \* \*
>
> Plaintiff's claims squarely seek to dictate ERISA plans' choices regarding coverage of prescription opioids. Plaintiff's principal theory is that the PBM Defendants allegedly designed formulary offerings and UM tools in ways that increased opioid use and then declined to make alterations to abate the alleged nuisance. [Citation.] As such, Plaintiff's claims concern plans' benefits structure as to the placement of prescription opioids on formularies that health plans adopt and control, the alleged lack of prior authorization requirements, the alleged failure to impose quantity limits, the alleged failure to investigate and deny claims based on concerns of fraud or abuse, and the alleged exclusion of certain opioid addiction treatments. [Citation.] Plaintiff seeks injunctive relief to enjoin Defendants from engaging in these actions or inactions [citation], which would require ERISA plans to "adopt a certain scheme of substantive coverage." [Citation.] These allegations "strik[e] at the heart of . . . benefit design" and are therefore preempted under the ERISA preemption clause. [Citation.]

(Demurrer, pp. 7, 8.)

Plaintiff contends "Defendants' argument mis-frames the People's case":

> The People are not requiring the coverage of non-opioid drugs or treatments in place of opioid drugs (even in the PBMs' formulary offerings). <u>Shaw v. Delta Air Lines</u> (1983) 463 U.S. 85, 90, on which <u>Rutledge</u> relies, involved New York's "Disability Benefits Law" [citation], which "requires employers to pay certain benefits to employees unable to work because of nonoccupational injuries or illness." That state statute, the Supreme Court said, "requires employers to pay employee specific benefits," and thus "relate[s] to" benefit plans. [Citation.]
>
> By contrast here, the People's state law claims seek to enjoin Defendants "from performing any further acts in violation of" state law. [Citation.] Those acts and practices include "colluding with manufacturers to place opioid drugs on formularies with preferred status [and] declining to impose limits on their approval for use in exchange for payments and fees from manufacturers." [Citation.] Defendants engaged in this misconduct "even though they knew that dangerous numbers of opioids were being utilized in the County and the nation and were

9

causing an unprecedented crisis of addiction, overdose, and death." [Citation.] The People are not requiring PBMs (or anyone) to cover non-opioid drugs or treatment; the People are requiring PBMs to stop their acts and practices which resulted in a public nuisance.

(Opposition, pp. 5, 6, underlined case names added, footnote omitted.)

In reply, Defendants state that "Plaintiff's Complaint, accepted as true, seeks to impose liability for and pursue injunctive relief against ERISA plans based on formulary and UM decisions, which would require changes to substantive health care coverage." (Reply, p. 8.)

The Court returns to Alaska. The district court applied the "connection with" test and held that ERISA did not preempt the State's claims:

> Under the second "connection with" prong, a state law has an impermissible connection with ERISA plans if "acute, albeit indirect, economic effects" of the state law "force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers." Put differently, a state law has an impermissible connection with ERISA if it would "require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits, or by binding plan administrators to specific rules for determining beneficiary status." However, ERISA does not preempt state law "if a law merely affects costs" or "alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage."
>
> The State's claims do not have an impermissible "connection with" ERISA plans as they do not dictate any particular scheme of substantive coverage. True, the State's claims target Express Scripts' plan administration. For example, the State alleges that Express Scripts structured their formularies in a manner that increased opioid usage, such as by placing opioids as preferred drugs and changing prior authorization requirements and other requirements that would limit access to opioids. But the State's success on its claims would not dictate any particular scheme of coverage. Although the State seeks injunctive relief barring Express Scripts from engaging in further deceptive acts or practices and from engaging the conduct that caused the alleged public nuisance, an injunction would not require Express Scripts to cover alternative, non-medication treatments, cover less addictive treatments, or otherwise structure benefit plans in any particular way. Indeed, Express Scripts could structure its formularies in the same exact manner as it did prior to this suit. That is because the State's CPA and public nuisance claims are not merely based on the structure of the formularies, but on the manner in which Express Scripts arrived that their structure: allegedly by ignoring evidence that suggested the need for utilization management due to its financial agreements with manufacturers and desire for profits.

(Alaska, supra, 2024 WL 2321210, at *10, footnotes omitted.)

10

Again, <u>Alaska</u> is persuasive. On this issue, the Court agrees with the district court's reasoning. The decision supports Plaintiff's position.[1]

**Medicare Act**

Defendants contend "[t]he Medicare Act . . . preempts Plaintiff's claims with respect to plans covered by Medicare Part D – the part of Medicare that provides prescription drug coverage." (Demurrer, p. 9.) Specifically, Defendants claim:

> . . . The Part D preemption clause [] provides that the "standards established under [Part D] shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Part D prescription drug] plans which are offered by [Part D sponsors]." [Citations.] Courts applying the Medicare Part D preemption clause have observed that it is "unmistakably broad." [Citations.]

> Plaintiff's attempt to impose public nuisance liability based on how prescription drugs, including opioids, are selected and priced on formularies, including for Medicare Part D plans, [citations], necessarily is preempted because the Medicare Act already includes detailed "standards" governing Part D formularies. [Citation.] These standards include the requirements that (i) each Part D formulary include at least two drugs "within each therapeutic category and class," including both long-acting and short-acting prescription opioids [citation]; and (ii) CMS review and approve every Part D plan's formulary (including any tiered formulary structure or utilization management program) [citation]. In other words, CMS dictates the types of drugs that must be included on a Part D formulary (including opioids), and only CMS may review and approve all Part D plan formularies, including UM.

> By seeking to second guess the formularies and UM adopted in accordance with CMS standards and approved by CMS itself, Plaintiff's claims steer directly into the Medicare Part D preemption clause. [Citations.] Imposition of public nuisance liability on the PBM Defendants based on the design of CMS-approved formularies, or potential equitable relief intended to alter those formularies or UM requirements, would impermissibly undermine CMS's determinations and the Congressional intent behind the law. [Citations.] Plaintiff cannot use California law

---

[1] Plaintiff makes another convincing argument in footnote 5:

> Even if the People were requiring PBMs to cover non-opioid drugs or treatment on their formularies, which they are not, that is not the same as requiring *plans* to cover non-opioid drugs or treatment. The People allege that PBMs design formularies and choose which drugs appear on those formularies and what limits to impose on drug utilization. Those formularies are then offered to health insurers and payors. While many health insurers and payors adopt PBM's standard formulary offerings into their plans (ERISA and non-ERISA), giving PBMs significant influence over which drugs are disseminated, [citation], it is their decision whether to adopt the PBMs' proposed formulary. [Citations.]

(Opposition, pp. 5-6 n.5, emphasis in original.)

11

and causes of action to supplant CMS's decisions about how prescriptions opioids
are covered and administered on Part D plans. [Citation.] Plaintiff's claims as to
Part D plans are preempted.

(Id. at pp. 10-11, footnote omitted.)

Plaintiff disagrees. The People insist that their causes of action "do not require PBMs (or anyone)
to cover or not cover opioid or non-opioid drugs." (Opposition, p. 8.) "Nor do they establish
standards for the review and approval of Part D plan formularies." (Ibid.) What they require,
instead, is for "PBMs to stop their acts and practices which resulted in a public nuisance, including
colluding with manufacturers to place opioids on formularies with preferred status and declining
to impose limits on their approval for use in exchange for kickbacks. [Citations.]" (Ibid.) Plaintiff
contends Medicare Part D does not cover collusion allegations. (See ibid. [citing Pharmaceutical
Care Management Association v. Wehbi (8th Cir. 2021) 18 F.4th 956].)

Defendants argue that Plaintiff is misrepresenting the SAC. (See Reply, pp. 3-5, 8.) They contend
the Alaska court held that Medicare Part D preempted similar allegations. (See id. at pp. 8-9 [citing
Alaska, supra, 2024 WL 2321210].)

The Court agrees with Plaintiff that the gravamen of the SAC is collusion. The People claim
Defendants "collud[ed] with opioid manufacturers to give opioids preferred status on
[Defendants'] formularies without restrictions in exchange for payments and fees[.]" (Opposition,
p. 2.) This theory is alleged in multiple paragraphs. (See, e.g., SAC, ¶¶ 27, 99-113, 115, 174, 181-
185, 194, 242-246, 281, and 292.)[2]

In Alaska, the district court evaluated a nearly identical collusion theory and dismissed it. The
plaintiff theorized that Express Scripts "colluded with opioid manufactures to increase prescription
opioid sales in Alaska by favorably placing certain opioids on its formularies and failing to put in
place safeguards that would have reduced the illegitimate use and dissemination of th[o]se drugs."
(Alaska, supra, 2024 WL 2321210, at *1.) The district court found the theory preempted:

> Express Scripts contends that the State's claims act "with respect to" CMS standards
> because they seek to impose liability based on how Express Scripts selected and
> priced drugs on Medicare Part D formularies, which CMS regulates by providing
> detailed "standards." Among other things, CMS regulations require that "[a] Part
> D sponsor that uses a formulary under its qualified prescription drug coverage"
> must meet requirements, including requirement that "a Part D sponsor's formulary
> must be developed and reviewed by a pharmacy and therapeutic committee that ...
> [b]ases clinical decisions on the strength of scientific evidence and standards of
> practice," "[c]onsiders whether the inclusion of a particular Part D drug in a
> formulary or formulary tier has any therapeutic advantages in terms of safety and

---

[2] The SAC alleges additional theories. (See, e.g., id. at ¶ 281 [alleging that Defendants "assist[ed] in promoting but
fail[ed] to disclose the real risks and appropriate limits on the use of opioids, fail[ed] to use the wealth of data available
to them to identify and address signs of over-prescribing, illegitimate and dangerous use of opioids, misuse, abuse,
and diversion, and fail[ed] to maintain effective controls against diversion in the operation of their mail order
pharmacies"]; see also id. at ¶ 292 [same].)

12

efficacy," and "[r]eviews policies that guide exceptions and other utilization management processes, including drug utilization review, quantity limits, generic substitution, and therapeutic interchange." The State's claims act "with respect to" this standard as they seek to impose liability for the structure of formularies which CMS requires be developed and reviewed in a specific manner. Accordingly, Medicare Part D preempts the State's claims insofar as they seek to impose liability for Express Scripts' administration of Part D plans.

(Id. at *11, footnotes omitted.)

The Court disagrees with <u>Alaska</u>. The Court is not convinced that Plaintiff's nuisance causes of action infringe on Medicare Part D. The People do not seek to force Defendants to remove opioids from the formularies. The goal of their claims is merely to stop manufacturers and PBMs from colluding when it comes to giving preferred status. At the pleading stage, at least, the Court believes the goal can be achieved without affecting CMS standards and requirements. If nothing else, the potential impact of Plaintiff's requested relief raises a factual question that should be fleshed out through discovery.

The demurrer is overruled.[3]

As a matter of guidance, <u>Wehbi</u> does not appear to help Plaintiff. There, "a national trade association representing PBMs" sued North Dakota officials to enjoin enforcement of two North Dakota statutes that regulated PBMs and pharmacies. (<u>Wehbi</u>, supra, 18 F.4th at 966.) The Eighth Circuit Court of Appeals found some of the provisions preempted and some not. Plaintiff highlights the fact that the provisions had "no bearing on whether a drug [could] be listed on a formulary, and [they] contain[ed] no language banning formularies or compelling Part D plans to cover any drugs." (Id. at 974; see also Opposition, p. 8.) But the provisions regulated different conduct than is at issue here. (See <u>Wehbi</u>, supra, 18 F.4th at 964-966.) The decision does not speak to whether Medicare Part D preempts collusion-rooted nuisance claims.

## ACA

According to Defendants, under ACA regulations, "every individual or small group plan administered by . . . Defendants in California is required to have at least as many opioids in each category and class as California's benchmark plan." (Demurrer, p. 12.) Defendants state that "California's benchmark plans have consistently included multiple prescription opioids in two opioid-specific USP classes that cover long-acting and short-acting opioids." (Ibid.)[4] For example, Defendants claim "California's benchmark plan covered three long-acting opioids and eight short-acting opioids from 2014 to 2016 [citation], and three long-acting opioids and seven short-acting opioids from 2017 to 2024 [citation]." (Ibid.) Defendants contend "[t]his implicitly preempts Plaintiff's claim that inclusion of opioids on . . . Defendants' formularies establishes liability for public nuisance." (Ibid.; see also Reply, p. 5 [arguing that, "by challenging

---

[3] Plaintiff claims the collusion is hidden from regulators. Plaintiff should amend to allege a specific nondisclosure/deception allegation. This is discussed further in the safe-harbor section.

[4] "USP" means United States Pharmacopeia.

Defendants' alleged collusion with manufacturers to place prescription opioids on formularies, Plaintiff is necessarily challenging the placement of prescription opioids on formularies"].)

Plaintiff makes two arguments. One, the regulations do not apply to Defendants. (See Opposition, p. 9 n.8 [claiming Defendants fail to demonstrate that they qualify as "health insurance issuers"].) Two, the SAC does not allege that "Defendants are liable because their formularies include opioids[.]" (Id. at p. 9.) The People contend the requested injunctive relief "would not require Defendants to remove opioids from their formularies or affect the number or type of opioids that could be included." (Ibid. [stating that Plaintiff "seek[s] to enjoin Defendants from engaging in the conduct that caused the public nuisance, including 'colluding with manufacturers to place opioid drugs on formularies with preferred status [and] declining to impose limits on their approval for use in exchange for payments and fees from manufacturers' while knowing that 'dangerous numbers of opioids were being utilized in the County and the nation and were causing an unprecedented crisis of addiction, overdose, and death' and while representing that their formulary offerings were based on safety and efficacy"].)

The first argument is persuasive. The regulations require "[a] health insurance issuer that offers health insurance coverage" to "ensure that such coverage includes the essential health benefit package." (42 U.S.C.A. § 300gg-6, 54 CFR 147.150(a).) "A 'health insurance issuer' is 'an insurance company, insurance service, or insurance organization . . . which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance.'" (Opposition, p. 9 n.8 [quoting 42 USCA § 300gg-91(b)(2), § 144.103].) Defendants appear to admit that they do not constitute health insurance issuers. (See Reply, p. 9 n.4 [stating that "[m]any of the PBM Defendants' *plan sponsor clients are subject to the ACA's regulations*, and the PBM Defendants administer those clients' formularies"], emphasis added; see also Grasso Enterprises, LLC v. Express Scripts, Inc. (E.D. Mo. Mar. 4, 2015, No. 4:14cv1932), 2015 WL 10781579, at *4 [pharmacies conceding that Express Scripts, Inc., a PBM, is not a health insurance issuer].)

The demurrer is overruled.

**FEHBA and TRICARE**

Plaintiff says the SAC "does not include claims related to Defendants' conduct in carrying out FEHBA contracts or TRICARE contracts." (Opposition, p. 10.) In fact, Plaintiff asserts that "there is no claim to preempt" because "[t]he People have specifically and unambiguously disclaimed any such claims." (Id. at pp. 10, 13; see also id. at pp. 11-12 [citing People of the State of Calif. v. Eli Lilly and Co. (C.D. Cal. June 28, 2023, No. 2:23-cv-01929-SPG-SK) 2023 WL 4269750 ("Eli Lilly"), People of the State of Calif. v. Express Scripts, Inc. (C.D. Cal. Feb. 28, 2024, No. 2:23-cv-08570-SPG-PD) 2024 WL 841197 ("Express Scripts"), and Westchester County v. Mylan Pharmaceuticals, Inc. (S.D.N.Y. June 18, 2024, No. 23-CV-6096(CS)) 2024 WL 3043121 ("Mylan Pharmaceuticals")].)

Defendants contend the "disclaimer is ineffective in light of the sweeping nature of Plaintiff's . . . claims." (Demurrer, p. 15.) They claim the Ninth Circuit recently rejected a similar disclaimer. (See Reply, p. 9 [citing People of the State of California v. CaremarkPCS Health LLC (9th Cir. Aug. 13, 2024, Nos. 23-55597, 23-55599) 2024 WL 3770326 ("CaremarkPCS")].)

14

Eli Lilly, Express Scripts, and Mylan Pharmaceuticals involved motions for remand. The district courts granted the motions because the plaintiffs had disclaimed all claims and recoveries related to the defendants' conduct concerning federal healthcare plans. (See Eli Lilly, supra, 2023 WL 4269750, at *2-*7; see also Express Scripts, supra, 2024 WL 841197, at *4-*5; Mylan Pharmaceuticals, supra, 2024 WL 3043121, at *6-*9.)

The words of the Eli Lilly, Express Scripts, and Mylan Pharmaceuticals disclaimers were important to the courts' analyses. The following chart collects the words:

| Cases | Disclaimers |
|---|---|
| Eli Lilly | As discussed more fully in the body of the Complaint, this lawsuit relates to the unlawful, unfair, and fraudulent inflation of insulin's price and the relationship of that inflation to the PBM Defendants' market power. It does not challenge the creation of custom formularies for a federal officer, such as for any Federal Employees Health Benefits Act or TRICARE governed health benefits plan. Furthermore, it does not seek to recover moneys paid by the federal government pursuant to such plans, nor does it seek the recovery of federally mandated co-pays that were paid by such plans' patients. As such, the Complaint does not seek relief from any PBM Defendants that is governed by or available pursuant to any claim(s) involving a federal officer associated with any Federal Employees Health Benefits Act or TRICARE-governed health benefits plan. |
| Express Scripts | This lawsuit relates to the Defendants' conduct in the non-federal market which resulted in the increased use, abuse, and diversion of opioids. The allegations in this Complaint do not include and specifically exclude Defendants' provision of PBM or mail order pharmacy services pursuant to contracts with the Department of Defense, the Office of Personnel Management, the U.S. Department of Veteran Affairs, the Veterans Health Administration, or any other federal agency. . . . |
| Mylan Pharmaceuticals | [T]his lawsuit relates to Defendants' unlawful conduct that has created, perpetuated, contributed to, and maintained, a serious public health crisis of opioid abuse, addiction, morbidity, and mortality throughout New York state. The Defendants must be held accountable to abate the nuisances they have caused in communities across the state. This lawsuit does not seek damages related to the federal government or for conduct undertaken pursuant to contracts with the federal government, nor does it challenge the creation of custom formularies for, or on behalf of, a federal government agency or federal officer, such as for any Federal Employees Health Benefit Act ("FEHBA"), TRICARE-governed health benefits plan or any other federal plan. Furthermore, it does not seek to recover moneys paid by the federal government pursuant to such plans. As such, the Complaint does not seek relief from any PBM Defendant that is available pursuant to any claim(s) involving a federal government agency, federal officer or federal government contracting officer associated with any FEHBA or TRICARE-governed health benefits plan or federal health insurance program; nor pharmacy care services provided to the federal government; nor remedies |

15

that would interfere with or otherwise affect any federal plan, including but not limited to any remedies that would interfere with or affect the formularies, utilization management policies and programs, or administration of any Federal Plan; the uniform administration of the TRICARE program or the provision of healthcare services to U.S. military servicemembers, veterans, and their beneficiaries; or services provided under a contract that requires the exclusive use of any federal government formulary, including the Department of Defense's Uniform Formulary, that specifies the drugs authorized, sets requirements for prior authorization and utilization reviews, and/or assures medical necessity, clinical appropriateness and/or cost-effectiveness, and/or establishes a prescription restriction program for TRICARE federal health insurance program members and/or beneficiaries.

This lawsuit does not contain claims against the Defendants that are federal in character related to prescriptions adjudicated or processed under any federal program or federal contract, including OptumRx's contract with the Veterans Health Administration or pharmacy care services provided to the federal government, Express Script's contracts with the U.S. Department of Defense, the TRICARE health care program, and other health plans participating in the FEHBP overseen or administered by the federal government; nor does it include requests for relief governed by, or available pursuant to claims associated with any FEHBP or TRICARE-governed health benefits plan; nor claims against Defendants involving beneficiaries under federal healthcare programs or federal plans; nor federal prescription claims adjudicated or processed for plans controlled or sponsored by federal government agencies or entities or those processed according to a federal formulary design or Medicare Part D plans; nor conduct as a fiscal intermediary on behalf of the federal government; nor conduct governed or managed by a federal officer or federal government contracting offer [*sic*], or basic governmental tasks fulfilled or carried out by a Defendant on behalf of the federal government; nor determinations as to the appropriateness of restrictions on a TRICARE member's prescriptions, which are to be determined by a federal officer; nor conduct considered to be undertaken by any defendant as a statutorily authorized *alter ego* of the federal government; nor any contract that provides and/or requires federal government subjection, guidance and/or control over a Defendant's performance and/or the prescription drugs included in formularies. Plaintiff further disclaims any claims herein regarding: (1) conduct related to prescription claims for federal plans that may or may not have caused an oversupply of prescription opioids or caused or contributed to the harms for which Plaintiff seeks recovery, (2) Express Scripts' pharmacy benefits management or mail order pharmacy work for the Department of Defense under any TRICARE Contract and pertaining to health plans under FEHBA, including the operation of mail order pharmacies in accordance with contractual guidelines set by the federal government; and (3) OptumRx's work for the Veterans Health Administration and/or the federal government.

Plaintiff disavows any cause of action or claim for recovery related to opioids distributed to military personnel, veterans, federal customers or health plan beneficiaries under the authority or direction of a federal officer,

<table>
<tr><td></td><td>

federal agency, or pursuant to any federal contract; or any statutory mandate to provide health care to beneficiaries of federal plans, military personnel or veterans and/or their beneficiaries through the TRICARE federal health insurance program; contracts pertaining to pharmacy benefit management and mail order pharmacy services for federal employees, including pertaining to the TRICARE Home Delivery/Mail Order Pharmacy, or programs such as Meds by Mail; or federal contracts where a federal officer or agency directed or exercised guidance and control over Defendants' conduct as described generally in this lawsuit; the operation or management of a TRICARE mail order pharmacy; or federal contracts pertaining to dispensing by mail order pharmacies to beneficiaries of federal plans, military personnel or veterans and/or their beneficiaries; or prescription claims under a contract between Defendants and the federal government.

Plaintiff expressly disclaims and disavows any and all federal claims or questions related to opioids at issue in this lawsuit and disavows any cause of action or claim for recovery related to opioids at issue that could give rise to federal subject matter jurisdiction under either 28 U.S.C. § 1331 (federal question) or 28 U.S.C. § 1442(a)(1) (federal officer). Plaintiff is not seeking relief for any and all claims for damages against any Defendant whose conduct whether by omission or commission, was engaged in at the behest of the United States or any agency or person acting under him or under color of such office to the extent that such a claim would implicate federal court jurisdiction under 28 U.S.C. § 1442(a)(1), predicated on preemption by the TRICARE statute and the FEHBA, or the government contactor's defense articulated in Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). All such claims that legitimately implicate such defenses, in the unlikely event that they exist and are factually supported, are not asserted and are hereby expressly and preemptively disclaimed. Plaintiff hereby puts any Defendant who may nonetheless assert such defenses as a basis for federal jurisdiction over this case on notice that Plaintiff seeks no recovery for injuries as a result of conduct that meets the three-prong Boyle test and constitutes actions of a federal officer sufficient to trigger jurisdiction under 28 U.S.C. § 1442(a)(1). Plaintiff specifically advises all Defendants of their position that such an express, clear and unequivocal disclaiming of exposures and of claims implicating the Boyle defense, as well as any other claims that legitimately implicate 28 U.S.C. § 1442(a)(1), render any potential future removal of this case to federal court on one of these clearly-disclaimed bases objectively unreasonable under Martin v. Franklin Capital Corp., 546 U.S. 132, 126 S.Ct. 704, 163 L.Ed.2d 547 (2005).

</td></tr>
</table>

In CaremarkPCS, the Ninth Circuit reversed Eli Lilly. The panel found that the disclaimer did not support remand since it "fail[ed] to *explicitly* release claims or possible recovery from rebate practices as they relate to FEHBA and TRICARE." (CaremarkPCS, supra, 2024 WL 3770326, at *1, emphasis in original.)

Given these authorities, and the wording of the disclaimers at issue there, the Court agrees with Plaintiff. The remand standard is different than the demurrer standard. Moreover, Plaintiff's

17

disclaimer is broader and more explicit than the Eli Lilly disclaimer was and is closer to the Mylan Pharmaceuticals disclaimers.  Paragraph 34 alleges:

> 34. This lawsuit relates to the Defendants' conduct in the non-federal market which resulted in the increased use, abuse, and diversion of opioids.  The allegations in this Complaint do not include and specifically exclude Defendants' provision of PBM or mail order pharmacy services pursuant to contracts with the Department of Defense, the Office of Personnel Management, the U.S. Department of Veteran Affairs, the Veterans Health Administration, or any other federal agency.  The Complaint does not challenge the creation of custom formularies or administration or management of such formularies for or by a federal officer or federal agency, such as for any Federal Employees Health Benefits Act, Veterans Health Administration, or TRICARE governed health benefits plan, or any other federal health benefit plan.  The Complaint does not challenge Defendants' provision of mail order pharmacy services pursuant to contracts with the Department of Defense, the Office of Personnel Management, U.S. Department of Veteran Affairs, the Veterans Health Administration, or any other federal agency, and does not challenge the Defendants' administration or operation of the TRICARE Home Delivery/Mail Order Pharmacy.  The Plaintiff does not seek to recover moneys paid by the federal government pursuant to such plans, nor does it seek recovery of federally mandated co-pays that were paid by such plans' patients.  The Plaintiff does not challenge opioid prescriptions adjudicated or processed by Defendants under federal contracts.  The Plaintiff does not seek declaratory relief, injunctive relief, abatement relief, or any other relief for the conduct of Defendants related to the provision of any services pursuant to contracts with the Department of Defense, the Office of Personnel Management, the U.S. Department of Veteran Affairs, the Veterans Health Administration, or any other federal agency.

(SAC, ¶ 34.)  This allegation coupled with Plaintiff's clear statement in the opposition brief (see Opposition, pp. 10-14) demonstrates that Plaintiff is disclaiming all potential relief connected to the FEHBA and TRICARE contracts.  The allegation and statement should be taken as true, and the demurrer should be overruled.

The demurrer is overruled, yet the Court is willing to grant Plaintiff leave to amend the disclaimer to ensure that it complies with CaremarkPCS.[5]

**Safe Harbor**

Civil Code "section 3482 confers a statutory immunity that is a complete defense to a nuisance claim."  (City of Norwalk v. City of Cerritos (2024) 99 Cal.App.5th 977, 986 ("Norwalk").)  "Section 3482 provides that '[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance.'"  (Ibid.)  "Although its plain language refers to *statutory* authority, the immunity conferred by section 3482 also applies to acts authorized by

---

[5] If Plaintiff tries to renege in the future, the Court would be inclined to enforce the disclaimer.  Judicial estoppel would be a potential basis for enforcement.

regulations and 'other express government approvals' (such as permits)." (Ibid., emphasis in original.)

"To ensure that section 3482-based immunity goes no further than the Legislature contemplated, courts construe that immunity narrow[ly]." (Ibid., internal quotation marks omitted.) "Consequently, immunity from public nuisance liability under section 3482 applies only if the acts complained of [as a nuisance] are authorized either (1) by the express terms of the statute under which the justification is made, or (2) by the plainest and most necessary implication from the powers expressly conferred." (Id. at 987, internal quotation marks omitted.)

Defendants contend section 3482 bars the nuisance causes of action because the Insurance Code and Knox-Keene Act "require formularies to include 'medically necessary' drugs." (Demurrer, p. 17.) Defendants assert that "prescription opioids are 'medically necessary[.]'" (Ibid.; see also Reply, pp. 9-10.)

The Court disagrees. The cited statutes and regulations – Insurance Code section 10123.201, Health and Safety Code section 1342.71(c), Welfare and Institutions Code section 14059.5, Code of Regulations title 10, section 2594.4(a)(3), Code of Regulations title 28, section 1300.67.005(c)(4), Health and Safety Code section 124961(d), Health and Safety Code section 1367.215(a), and Code of Regulations title 10, section 2218.82(e) (see id. at pp. 17-18) – generally mandate that "medically necessary" opioids be placed on formularies, and covered by health plans, but they do not authorize the collusion scheme alleged in the SAC, explicitly or implicitly. I agree with Plaintiff on this point. (See Opposition, pp. 14-18.) Indeed, this Court made an analogous finding in June 2024 in People of the State of California v. Eli Lilly and Co. (23STCV00719), another PBM case that alleged the same rebates conspiracy. (See id. at Ex. B, pp. 5-7 [overruling the PBMs' safe-harbor demurrer].)

Next, Defendants argue that section 3482 immunizes them because "California reviews and approves formularies . . . through a strict regulatory approval process." (Demurrer, p. 18; see also id. at pp. 19-20; Reply, p. 10.)

Reviewing and approving formularies is different than giving Defendants permission to collude with manufacturers. (See Opposition, p. 18.) Safe-harbor-wise, it is a material distinction, particularly since Plaintiff claims "Defendants deceived the public and regulators" about "the construction of their formularies." (Ibid. [citing paragraphs 98 and 106].)

Nevertheless, the demurrer is sustained with leave to amend. Paragraphs 98 and 106 do not discuss the regulators. (See SAC, ¶¶ 98, 106.) The extent of the deception – what information was or was not disclosed to the regulators – is a factual question, but, first, Plaintiff needs to amend to actually plead that the deception occurred. The Court believes the amendment would suffice to overcome Defendants' safe-harbor defense.

DEC 1 7 2024

DAVID S. CUNNINGHAM III

19